UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALAH N. OSSEIRAN,<br>  Bechara Al Khoury Tower<br>  Bechara Al Khoury Blvd.<br>  P.O. Box 155-521<br>  Beirut, Lebanon<br><br>            *Plaintiff,*<br><br>      v.<br><br>INTERNATIONAL FINANCE CORPORATION,<br>  2121 Pennsylvania Avenue, N.W.<br>  Washington D.C. 20433<br><br>            *Defendant.* | Civil Action No. 06-_____ |

**COMPLAINT FOR PRELIMINARY AND
PERMANENT INJUNCTIVE RELIEF AND DAMAGES**

By this complaint, plaintiff Salah N. Osseiran seeks to prevent the irreparable harm that defendant International Finance Corporation (IFC) would inflict, and the unconscionable benefit that it would enjoy, if it were allowed to proceed with an impending sale of its Middle East Capital Group (MECG) stock in violation of its contractual obligations to, and as a consequence of its deceitful conduct toward, plaintiff.

1.    Plaintiff Osseiran is an international entrepreneur with business interests in the United States and throughout the world. For several years, he has been a minority shareholder of MECG, a closely held merchant banking and finance institution incorporated in Guernsey, Channel Islands and having its principal place of business in Beirut, Lebanon.

2.  Defendant IFC is a member of the World Bank Organization having its principal place of business in the District of Columbia. IFC is also a minority shareholder of MECG and has for several years been attempting to sell its MECG stock.

3.  In the summer of 2005, Osseiran, believing that he could enhance the value of his and other shareholders' investment in MECG if he were able to control its activities, formed a plan to purchase additional shares of MECG with a view toward becoming its majority shareholder. Toward this end, Osseiran approached IFC and another MECG shareholder, Barclays Capital, and proposed his purchase of their MECG shares. In November 2005, after months of negotiations, Osseiran and IFC, acting on its own behalf and on behalf of Barclays Capital, entered into an agreement wherein they agreed upon all material terms by which IFC and Barclays Capital would sell their MECG shares to Osseiran and to incorporate those terms into a standard stock purchase agreement, to be provided by IFC.

4.  In reliance upon that November agreement, Osseiran set aside the funds to pay the agreed-upon initial installment of the purchase price and obtain bank guarantees for the remainder of the purchase price.

5.  In December 2005, Osseiran, IFC and Barclays reached agreement upon the language of the formal stock purchase agreement provided by IFC, and Osseiran and Barclays proceeded to execute the formal agreement and consummate Osseiran's purchase of Barclays' shares in January 2006. IFC, however, repeatedly postponed executing the purchase agreement, all the while

assuring Osseiran that it fully intended to complete the transaction as envisioned in the November agreement and the draft stock purchase agreement.

6. In reliance upon the November agreement and IFC's continuing assurances that it would soon execute the formal stock purchase agreement, Osseiran proceeded to purchase a sufficient number of shares of MECG stock from other shareholders, including Barclays, so that his total holdings, after completion of the IFC transaction, would total at least 51 percent of the outstanding shares of MECG stock.

7. IFC's contrary intention did not become known to Osseiran until February 16, 2006 when IFC, at a meeting of MECG shareholders, actively solicited higher offers for its MECG stock and proposed a joint sale of stock by MECG shareholders other than Osseiran to a third party so as to assure that the third party, rather than Osseiran, would be the majority shareholder.  On February 20, 2006, Osseiran learned that IFC had entered into an agreement with other MECG shareholders contemplating the joint sale of their MECG shares to a third party pursuant to a stock purchase agreement to be entered into no later than March 31, 2006.

8. In retrospect, it is clear that IFC not only reneged on its promise to sell its MECG stock to Osseiran, it also deceived Osseiran and abused his trust and confidence by stringing him along and inducing him to purchase other MECG shares, all the while conspiring with other MECG shareholders to solicit a higher price for their shares from a third party.  The end result is that Osseiran, instead of achieving his objective of gaining control of MECG and a concomitant

opportunity to turn it into a profitable company, has increased his minority position in a money-losing company over which he has no control.

9. The harm that will accrue to Osseiran in this transformation from controlling to minority shareholder cannot be determined or compensated by money damages. Without an immediate injunction preventing IFC from selling its MECG stock, Osseiran will suffer irreparable harm.

### PARTIES

10. Plaintiff is a citizen of and resides and has his principal place of business in Lebanon.

11. Defendant is an international organization established by Articles of Agreement among its member countries and having its principal place of business in the District of Columbia.

### Jurisdiction and Venue

12. This Court has jurisdiction over all claims by virtue of 22 U.S.C. § 282f, which provides, "any such action at law or in equity to which the [International Finance] Corporation shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of any such action."

13. Venue is proper in the District of Columbia, which is defendant's principal place of business.

### Facts

14. Including Osseiran, MECG has approximately 25 shareholders, which include both individuals, such as Osseiran, and institutions and investment

companies, such as IFC. Because of the limited number of shareholders, there is not a ready market for the purchase or sale of MECG shares.

15. In the summer of 2005, Osseiran owned approximately 1.5 percent of MECG's outstanding shares. At that time, he began his efforts to become the majority shareholder of MECG by purchasing additional shares from other existing shareholders.

16. IFC owns approximately 30,000 shares of MECG stock, representing approximately 10.8 percent of MECG's outstanding shares. On information and belief, IFC had unsuccessfully attempted to sell its MECG stock for several years until Osseiran approached it in September 2005 with a proposal to purchase its shares.

17. Also in September 2005, Osseiran made a similar proposal to Barclays Capital (Barclays), a subsidiary of Barclays Bank, which owned 50,000 shares or approximately 18 percent of MECG's outstanding shares.

18. Barclays authorized IFC to negotiate on its behalf to sell the MECG stock to Osseiran. The IFC employee who served as the primary negotiator for both IFC and Barclays assured Osseiran that he had full authority to negotiate and consummate the sale of MECG stock on behalf of both IFC and Barclays.

19. In the fall of 2005 Osseiran and IFC proceeded with negotiations, during which Osseiran made IFC aware of his objective to become the majority shareholder of MECG.

20. IFC agreed with Osseiran that the parties would keep all information concerning the proposed sale of IFC's and Barclays' MECG stock to Osseiran strictly confidential until the sales were consummated.

21. On or about November 19, 2005, Osseiran and IFC reached agreement upon the terms of Osseiran's purchase of IFC's and Barclays' shares of MECG stock. This agreement (the November agreement) was memorialized in an exchange of e-mails between Osseiran and IFC on November 18 and 19, 2005, in which they confirmed all material terms of the transaction including the purchase price for each seller's shares and the schedule of payments, and agreed that the sale would be consummated upon execution of a formal "standard" stock purchase agreement, to be prepared by IFC, and Osseiran's providing bank guarantees satisfactory to IFC for the post-closing installments of the purchase price. On November 23, 2005, IFC's representative advised that he had discussed the proposed terms with Barclays and confirmed Barclays' and IFC's agreement to the terms.

22. In reliance upon the November agreement, Osseiran set aside the funds necessary to pay the initial installments of the purchase price and obtain bank guarantees for the future payments. Osseiran was thereby prevented from using these funds to participate in other investment opportunities.

23. On November 26, 2005, IFC forwarded its draft stock purchase agreement to Osseiran by e-mail stating that the draft was "[f]urther to our discussion and confirmation by yourself [Osseiran], Barclays and IFC on the main terms of the sale of IFC's and Barclays' shares to you." The draft stock purchase agreement made no significant change to the terms set forth in the November agreement.

24. By e-mail dated December 1, 2005, Osseiran informed IFC that the draft stock purchase agreement was "generally Ok" and provided comments

concerning typographical errors, rejected a provision that would have required Osseiran to pay IFC's transaction costs and urged IFC to accept a form of bank guarantee less complicated than that included with the draft.

25. Shortly thereafter, Osseiran authorized IFC to communicate directly with Osseiran's bank in Switzerland to develop a form of guarantee acceptable to both IFC and the bank. Acting on this authorization, IFC and the bank developed a form of guarantee acceptable to all parties.

26. On December 20, 2005, Barclays, noting IFC's failure to follow through with the transactions contemplated by the November agreement, informed Osseiran that it was prepared to close the transaction on the basis of that agreement and the IFC November 26, 2005 draft stock sale agreement, modified as suggested in Osseiran's December 1, 2005 e-mail. Osseiran agreed to Barclays' suggestion and purchased Barclays' shares 0n January 9, 2006.

27. On December 22, 2005, Osseiran sent another e-mail to IFC, reconfirming the terms of the November agreement and requesting that IFC immediately proceed to execute the stock purchase agreement as contemplated by the November agreement.

28. In that December 22, 2005 email, Osseiran discussed in detail his desire to consummate the share sale transaction quickly. Osseiran also informed IFC that he was aware that IFC employees, in clear violation of the parties' agreement to keep all discussions confidential, had told third parties that IFC and Barclays had sold their MECG stock to Osseiran.

29.   On information and belief, IFC has records, including e-mails and other documents, confirming that IFC believed and understood that it had sold its MECG stock to Osseiran.

30.   By a letter dated January 20, 2006, Osseiran's attorney informed IFC that unless IFC confirmed its intent to proceed with the stock sale by January 24, 2006, Osseiran would institute legal proceedings to enforce his right to purchase IFC's shares of MECG stock.

31.   From on or about December 19, 2005 through February 8, 2006, IFC's representatives put forward various excuses for postponing the closing of the sale of its MECG shares to Osseiran, all the while continuing to assure Osseiran that IFC intended to abide by its obligation to sell its MECG shares to Osseiran as contemplated by the November agreement.  Specifically, IFC representatives did the following:

   a.   On or about December 19, 2005, Jan Van Bilsen and Mike Elloway of IFC told Osseiran that IFC wanted to postpone the closing on IFC's sale of its MECG shares to Osseiran to avoid problems with the chairman of MECG, Khalid Ali Turki, who was threatening to sue IFC if it proceeded with the sale independent from other shareholders.  At the same time, Van Bilsen and Elloway assured Osseiran that IFC was eager to sell its MECG shares to Osseiran, that it was not soliciting other buyers, and that once IFC confirmed that it did not need approval from other shareholders to sell its stock, IFC would proceed with the sale to Osseiran.

   b.   On or about January 24, 2006, IFC's Elloway told Osseiran that the stock sale agreement still needed internal IFC approvals before it could be

8

finalized and that such approval would be forthcoming soon; he also asked Osseiran to postpone his threatened legal action until the required approvals could be obtained.

    c.  On or about January 25, 2006, Van Bilsen and Carmen Genovese of IFC told Osseiran that the only impediment to closing the stock sale was IFC's desire to hear directly from other MECG shareholders, at a shareholders' meeting scheduled for February 8, 2006, that all shareholders, including IFC, were free to sell their MECG shares. Van Bilsen and Genovese assured Osseiran that IFC was not soliciting other offers for its MECG stock, and Genovese asked Osseiran to withhold any legal action until after the February 8, 2006 meeting.

    d.  All of the MECG shareholders who were present at the February 8, 2006 shareholders' meeting informed IFC, represented there by Genovese, that all shareholders were free to sell their MECG shares as they saw fit. Nonetheless, after that meeting, Genovese informed Osseiran that, while IFC remained committed to the stock sale to Osseiran, IFC needed to further postpone consummation of that stock sale until after the completion of the shareholders' meeting, which was to resume on February 16, 2006. As a further enticement to Osseiran, Genovese suggested that IFC would be interested in making a similar sale to him of IFC's interest in two Yemeni companies. Once again, Genovese and Van Bilsen encouraged Osseiran to withhold legal action until after the February 16th meeting.

32.  Relying upon the foregoing acts and representations of IFC, including the November agreement and IFC's assurances that it would soon execute the formal

stock purchase agreement, Osseiran proceeded to purchase stock from other MECG shareholders, including Barclays, so that his MECG holdings, after completion of the IFC transaction, would total 51 percent of all outstanding shares of MECG stock.

33. IFC's deception came to an end at the February 16, 2006 MECG shareholders' meeting, during which Genovese proposed that all MECG shareholders other than Osseiran enter into an agreement to sell their shares to the First National Bank in Lebanon (FNB), which had, on February 10, 2006, offered to buy no less than 51 percent of MECG's stock at US$60 per share.

34. On February 20, 2006, Osseiran learned that IFC had in fact, on or about February 19, 2006, agreed with other MECG shareholders that they would jointly sell their MECG shares to FNB or another third party under an agreement to be executed with the third party on or before March 31, 2006.

## COUNT I
### (Breach of the November Agreement)

35. Plaintiff repeats the preceding paragraphs as if fully set forth here.

36. The November agreement, as documented by the e-mails referenced above, is a legally binding contract between Osseiran and IFC.

37. Osseiran has at all material times been, and remains, ready, willing and able to fulfill his obligations under the November agreement.

38. IFC materially breached its obligations under the November agreement by failing to proceed in good faith to execute the formal stock purchase agreement and by agreeing to make its MECG shares available for sale to a party other than Osseiran.

39. If IFC is permitted to sell its MECG stock to any other party, Osseiran will be unable to realize his contractual right to purchase those shares and achieve his stated objective, known all along to IFC, of obtaining a controlling interest in MECG.  The resulting harm to Osseiran will be irreparable in that it cannot be determined or compensated in terms of money damages.

## COUNT II
### (Promissory Estoppel: Stock Sale)

40. Plaintiff repeats the preceding paragraphs as if fully set forth here.

41. IFC, knowing that Osseiran was attempting to purchase at least 51 percent of MECG's stock and that he was counting on the purchase of IFC's MECG stock to achieve that objective, made affirmative representations, as set forth above, that it would sell its MECG shares to Osseiran and that it intended to consummate that sale with Osseiran.

42. Osseiran, to his detriment, reasonably and justifiably relied on IFC's agreement to sell its MECG shares to Osseiran by (a) setting aside funds to pay the agreed-upon initial installment of the purchase price of IFC's MECG stock and obtain bank guarantees for the remainder of the purchase price and otherwise passing up other opportunities to invest those funds; and (b) expending million of dollars to acquire MECG shares from Barclays and other shareholders only to end up with a large minority interest in a money-losing company over which he had no control.

43. If IFC is permitted to sell its MECG stock to any other party, Osseiran will be unable to realize his right, as promised by IFC, to purchase those shares and achieve his stated objective, known all along to IFC, of obtaining a

11

controlling interest in MECG. The resulting harm to Osseiran will be irreparable in that it cannot be determined or compensated in terms of money damages.

## COUNT III
### (Breach of Confidentiality Agreement)

44. Plaintiff repeats the preceding paragraphs as if fully set forth here.

45. IFC, knowing that Osseiran was attempting to purchase at least 51 percent of MECG's stock including that held by IFC and Barclays, agreed with Osseiran that the parties would maintain the confidentiality of all discussions and agreements between IFC, acting for itself and Barclays, and Osseiran.

46. IFC breached the parties' confidentiality agreement by informing other MECG shareholders that Osseiran was purchasing the MECG shares of IFC and Barclays.

47. As a direct and proximate result of IFC's breach, Osseiran was forced to pay a higher price for the stock that he purchased from other MECG shareholders, suffering damages in an amount in excess of US$75,000.00.

## COUNT IV
### (Fraud)

48. Plaintiff repeats the preceding paragraphs as if fully set forth here.

49. As explained in detail above, from on or about December 19, 2005 through February 8, 2006, IFC, through its employees, agents and representatives acting within the scope of their authority, knowingly made a false representation of material fact with the intent to deceive Osseiran. Specifically, IFC represented to Osseiran that IFC was not soliciting other offers for its MECG stock and that IFC would soon be consummating the sale of its MECG stock to Osseiran.

50. Osseiran, to his detriment, reasonably and justifiably relied on IFC's representations by (a) setting aside the funds to pay the agreed-upon initial installment of the purchase price of IFC's MECG stock and obtain bank guarantees for the remainder of the purchase price; and (b) expending millions of dollars to acquire MECG shares from Barclays and other shareholders only to end up with a large minority interest in a money-losing company over which he had no control.

51. As a direct and proximate result of Osseiran's reliance on IFC's knowingly false representations, Osseiran suffered damages in excess of US$75,000.00.

## COUNT V
### (Negligent Misrepresentation)

52. Plaintiff repeats the preceding paragraphs as if fully set forth here.

53. As explained in detail above, from on or about December 19, 2005 through February 8, 2006, IFC, through its employees, agents and representatives acting within the scope of their authority, negligently represented to Osseiran that IFC was not soliciting other offers for its MECG stock and that IFC would soon be consummating the sale of its MECG stock to Osseiran.

54. IFC's representations were false, and IFC, with the exercise of reasonable diligence, would and should have known that they were false.

55. Osseiran, to his detriment, reasonably and justifiably relied on IFC's misrepresentations by (a) setting aside the funds to pay the agreed-upon initial installment of the purchase price of IFC's MECG stock and obtain bank guarantees for the remainder of the purchase price; and (b) expending millions of

dollars to acquire MECG shares from Barclays and other shareholders only to end up with a large minority interest in a money-losing company over which he had no control.

56.  As a direct and proximate result of Osseiran's reliance on IFC's false representations, Osseiran suffered damages in excess of US$75,000.00.

IN LIGHT OF THE FOREGOING, plaintiff requests this Court to

(a) enter an Order declaring that the November agreement made between the parties is a valid and legally enforceable contract by which defendant IFC became obligated to proceed in good faith to prepare and execute the formal share sale agreement under which IFC would transfer its shares of Middle East Capital Group stock to plaintiff;

(b) enter an Order preliminarily and permanently enjoining defendant IFC, and its successors and assigns, from entering into any agreement to sell, transfer, or in any way convert, any of its MECG shares to any person or entity other than plaintiff;

(c) enter an Order for specific performance of the November agreement requiring defendant IFC, and successors and assigns, to proceed in good faith to execute the formal share sale agreement by which defendant would sell and transfer its MECG shares to plaintiff;

(d) award compensatory and punitive damages to plaintiff, in an amount to be determined at trial;

(e) award plaintiff its costs and reasonable attorneys' fees in this action; and

  **(f)**  **award such other and further relief as may be just and proper.**

           <u>/s/ ALEX BLANTON</u>
           **Alex Blanton (DC Bar No. 169623)**
           **Joseph O. Click (DC Bar No. 417294)**
           **Blank Rome LLP**
           **600 New Hampshire Ave. NW**
           **Washington, D.C. 20037**
           **(202) 772-5909**
           **blanton@blankrome.com**

           *Counsel for plaintiff Salah N. Osseiran*

**Of Counsel:**
**Sharon J. Zealey**
**William A. Huse**
**Blank Rome LLP**
**1700 PNC Center**
**201 East Fifth Street**
**Cincinnati, Ohio 45202**
**(513) 362-8716**
**Zealey@blankrome.com**