UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

_____
                                   )
SALAH N. OSSEIRAN,                 )
                                   )
    Plaintiff,                     )
                                   )
    v.                             )   Civil Action No. _____
                                   )
INTERNATIONAL FINANCE CORPORATION, )
                                   )
    Defendant.                     )
_____)

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR A TEMPORARY RESTRAINING ORDER
AND MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff Salah N. Osseiran is a minority shareholder of the Middle East Capital Group (MECG), a money-losing, closely held banking and finance institution based in Beirut, Lebanon. His plans to enhance the value of his and other shareholders' investments in MECG by gaining control of its activities have been thwarted by the failure of defendant International Finance Corporation (IFC), another MECG minority shareholder, to comply with its contractual obligation to sell its shares to plaintiff. Relying on IFC's commitment to sell him its 10-plus percent of MECG's shares, plaintiff proceeded to accumulate 41 percent of the company's outstanding shares by purchasing stock from other shareholders. Now, IFC, through a course of deceit and double-dealing, has not only reneged on its commitment to sell its MECG shares to plaintiff, it has also supported a proposal in which all MECG shareholders other than plaintiff would sell their shares to a third party. The end result is that plaintiff, instead of achieving his objective of gaining control of MECG and a concomitant opportunity to

turn it into a profitable company, has increased his minority position in a money-losing company over which he has no control.

By his motion for preliminary injunction, Osseiran seeks immediate injunctive relief to avoid the irreparable harm that he will suffer if, during the pendency of this action, IFC is allowed to transfer its shares of MECG stock to another party. In addition, Osseiran seeks a Temporary Restraining Order to prevent IFC from transferring its shares before the Court can hear and decide the Motion for a Preliminary Injunction.

## FACTS

Plaintiff Osseiran is an international entrepreneur with business interests in the United States and throughout the world. He is a shareholder of MECG, a merchant banking and finance institution, which is incorporated in Guernsey, Channel Islands and has its corporate headquarters in Beirut, Lebanon. See attached Declaration of Salah N. Osseiran at ¶ 2.

MECG is a closely held corporation with only 25 shareholders; it has been losing money since its inception in 1996. *Id.* In the summer of 2005, Osseiran, who then owned only 1.5 percent of MECG's outstanding shares, believing that he could enhance the value of his and other shareholders' investment in MECG if he were able to control its activities, formed a plan to become MECG's majority shareholder by purchasing additional shares from other shareholders. Toward this end, Osseiran approached IFC, which owned approximately 10.8 percent of MECG's shares, and Barclays Capital, which owned approximately 18 percent, and offered to purchase their shares. Osseiran Declaration at ¶¶ 3 and 15.

IFC represented to Osseiran that it had full authority to negotiate on behalf of both IFC and Barclays and agreed that it would keep all information concerning the proposed

2

sale of IFC's and Barclays' MECG stock to Osseiran strictly confidential until the sales were consummated. At that point, Osseiran informed IFC that he intended to purchase sufficient shares to become the majority shareholder of MECG. Osseiran Declaration at ¶ 4.

On or about November 19, 2005, Osseiran and IFC reached agreement upon the terms of Osseiran's purchase of IFC's and Barclays' shares of MECG stock. This agreement (the November agreement) was memorialized in an exchange of e-mails between Osseiran and IFC on November 18 and 19, 2005, in which they confirmed all material terms of the transaction including the purchase price for each seller's shares and the schedule of payments. Osseiran Declaration ¶ 5 and Exhibit A. In a subsequent e-mail on November 23, 2005, IFC, after checking with Barclays, confirmed the agreement and informed Osseiran that it would soon send him the "standard document" by which it wished to document their agreements. *Id.* ¶ 6 and Exhibit B.

In reliance upon the November agreement, Osseiran set aside the funds necessary to pay the initial installments of the purchase price and obtain bank guarantees for the future payments. Osseiran was thereby prevented from using these funds to participate in other investment opportunities. Osseiran Declaration at ¶ 7.

On November 26, 2005, IFC forwarded its standard stock purchase agreement to Osseiran by e-mail stating that the draft was "[f]urther to our discussion and confirmation by yourself [Osseiran], Barclays and IFC on the main terms of the sale of IFC's and Barclays' shares to you." The stock purchase agreement made no significant change to the terms set forth in the November agreement. Osseiran Declaration at ¶ 8 and Exhibit C.

By e-mail dated December 1, 2005, Osseiran informed IFC that the draft stock purchase agreement was "generally Ok" and provided comments concerning typographical errors, rejected a provision that would have required Osseiran to pay IFC's transaction costs and urged IFC to accept a form of bank guarantee less complicated than that included with the draft. Osseiran Declaration at ¶ 9 and Exhibit D.

Shortly thereafter, Osseiran authorized IFC to communicate directly with Osseiran's bank in Switzerland to develop a form of guarantee acceptable to both IFC and the bank. Acting on this authorization, IFC and the bank developed a form of guarantee acceptable to all parties. Osseiran Declaration at ¶ 9.

On December 22, 2005, Osseiran sent another e-mail to IFC, reconfirming the terms of the November agreement and requesting that IFC immediately proceed to execute the stock purchase agreement as contemplated by the November agreement. In that e-mail, Osseiran discussed in detail his desire to consummate the stock sale transaction quickly. Osseiran also informed IFC that he was aware that IFC employees, in clear violation of the parties' agreement to keep all discussions confidential, had told third parties that IFC and Barclays had sold their MECG stock to Osseiran.[1] Osseiran Declaration at ¶ 12 and Exhibit E.

In the meantime, on December 20, 2005, Barclays, noting that despite the parties' agreement on the terms of the transaction, IFC had failed to follow through with it, informed Osseiran that it was prepared to close the transaction on the basis of the November agreement and the IFC November 26, 2005 draft stock sale agreement,

---

[1] Osseiran understands and believes that IFC has other records, including e-mails and other documents, confirming that IFC believed and understood that it had sold its MECG stock to Osseiran. Osseiran Declaration at ¶ 13.

4

modified as suggested in Osseiran's December 1, 2005 e-mail. Osseiran agreed to Barclays' suggestion and purchased Barclays' shares On January 9, 2006 for US$2.8 million. Osseiran Declaration at ¶ 11.

By letter dated January 20, 2006, Osseiran's attorney informed IFC that unless IFC confirmed its intent to proceed with the stock sale by January 24, 2006, Osseiran would institute legal proceedings to enforce his right to purchase IFC's shares of MECG stock. Osseiran Declaration at ¶ 14.

From on or about December 19, 2005 through February 8, 2006, IFC's representatives, knowing that Osseiran was attempting to purchase at least 51 percent of MECG's stock and that he was counting on the purchase of IFC's MECG stock to achieve that objective, put forward various excuses for postponing the closing of the sale of its MECG shares to Osseiran, all the while continuing to assure him that IFC intended to abide by its agreement to sell its MECG shares to him as contemplated by the November agreement. Specifically, IFC representatives did the following:

a. On or about December 19, 2005, Jan Van Bilsen and Mike Elloway of IFC told Osseiran that IFC wanted to postpone the closing on IFC's sale of its MECG shares to Osseiran to avoid problems with the chairman of MECG, Khalid Ali Turki, who was threatening to sue IFC if it proceeded with the sale independent from other shareholders. At the same time, Van Bilsen and Elloway assured Osseiran that IFC was eager to sell its MECG shares to Osseiran, that it was not soliciting other buyers, and that once IFC confirmed that it did not need approval from other shareholders to sell its stock, IFC would proceed with the sale to Osseiran.

b. On or about January 24, 2006, IFC's Elloway told Osseiran that the stock sale agreement still needed internal IFC approvals before it could be finalized and that

such approval would be forthcoming soon; he also asked Osseiran to postpone his threatened legal action until the required approvals could be obtained.

c.  On or about January 25, 2006, Van Bilsen and Carmen Genovese of IFC told Osseiran that the only impediment to closing the stock sale was IFC's desire to hear directly from other MECG shareholders, at a shareholders' meeting scheduled for February 8, 2006, that all shareholders, including IFC, were free to sell their MECG shares. Van Bilsen and Genovese assured Osseiran that IFC was not soliciting other offers for its MECG stocks, and Genovese asked Osseiran to withhold any legal action until after the February 8th meeting.

d.  All of the MECG shareholders who were present at the February 8, 2006 shareholders' meeting informed IFC, represented there by Genovese, that all shareholders were free to sell their MECG shares as they saw fit. Nonetheless, after that meeting, Genovese informed Osseiran that, while IFC remained committed to the stock sale to Osseiran, IFC needed to further postpone consummation of that stock sale until after the completion of the shareholders' meeting, which was to resume on February 16, 2006. As a further enticement to Osseiran, Genovese suggested that IFC would be interested in making a similar sale to him of IFC's interest in two Yemeni companies. Once again, Genovese and Van Bilsen encouraged Osseiran to withhold legal action until after the February 16th meeting. Osseiran Declaration at ¶ 15.

Relying upon the foregoing acts and representations of IFC, including the November agreement and IFC's assurances that it would soon execute the formal stock purchase agreement, Osseiran proceeded to purchase 57,000 additional shares of MECG stock from five other MECG shareholders for a total purchase price of nearly US$3 million.

These purchases, combined with the 1.5 percent interest that he already owned and the 50,000 shares purchased from Barclays for US$2.8 million, brought Osseiran's holdings to 41 percent of MECG's stock. Thus his MECG holdings, after completion of the IFC transaction, would total 51 percent of all outstanding shares of MECG stock. Osseiran Declaration ¶ 16.

IFC's deception came to an end at the February 16, 2006 MECG shareholders' meeting, during which Genovese proposed that all MECG shareholders other than Osseiran enter into an agreement to sell their shares to the First National Bank in Lebanon (FNB), which had, on February 10, 2006, offered to buy no less than 51 percent of MECG's stock at US$60 per share. Osseiran declaration at ¶ 17. Finally, on February 20, 2006, Osseiran learned that IFC had in fact, on or about February 19, 2006, agreed with other MECG shareholders that they would jointly sell their MECG shares to FNB or another third party under an agreement to be executed with the third party on or before March 31, 2006. *Id.* at ¶ 18 and Exhibit F.

Because MECG is a closely held corporation and has continuously lost money since its inception, the additional shares Osseiran has purchased at a cost in excess of US$5 million are worth very little because he is still a minority shareholder with no ability to influence MECG's management and business plans. He will be unable to become the majority shareholder of MECG unless IFC fulfills its obligation to sell its shares to him. Osseiran Declaration ¶¶ 19-20.

**ARGUMENT**

The law governing preliminary injunctions in the District of Columbia is well established:

> In considering whether to grant preliminary injunctive relief, the court must consider whether: (1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest.... The test is a flexible one. If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.... [I]njunctive relief may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.

*CSX Transp. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005) (internal citations and quotation marks omitted). The Court "considers the same factors in ruling on a motion for a temporary restraining order...." *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001). As shown below, all of the prescribed factors support the issuance of a preliminary injunction here.

## I. Osseiran Is Likely to Prevail on the Merits.

On balance, the available evidence demonstrates that IFC and Osseiran, in November 2005, formed a contract for the sale of IFC's MECG shares to Osseiran subject only to formal documentation and execution of their agreement. At the very least, IFC's repeated promises to Osseiran, from December 19, 2005 through February 8, 2006, that it would sell its MECG shares to Osseiran in accordance with the previously agreed upon terms, along with Osseiran's reasonable and expected reliance on those promises, form a sound basis for enforcing those promises.

### A. IFC Breached the Parties' Contract.

Under the law of the District of Columbia, as well as that of most jurisdictions, an enforceable contract requires both (a) agreement to all material terms and (b) intention by the parties to be bound. *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995). As next shown, there is no doubt that IFC and Osseiran, through e-

8

mail exchanges on November 18, 19 and 23, 2005, reached agreement on all the material terms under which IFC would sell its MECG shares to Osseiran.

The parties' contemporaneous e-mails (Osseiran Declaration, Exhibits A and B) contain all of the material terms that IFC included its subsequent stock purchase agreement (*id.*, Exhibit C). First, Osseiran offered to purchase IFC's shares on specified terms. *Id.*, Exhibit A (e-mail sent at 3.54 a.m. on Nov. 18, 2005). Second, IFC responded with a counteroffer, suggesting conditions and an additional term. *Id.*, Exhibit A (e-mail sent at 3:37 p.m. on Nov. 18, 2005). Third, Osseiran, accepted IFC's conditions and rejected its proposed additional term. *Id.*, Exhibit A (e-mail sent at 5:14 a.m. on Nov. 19, 2005). Finally, IFC, after checking with Barclays, confirmed that IFC and Barclays agreed to the deal as set out in Osseiran's previous e-mail. *Id.*, Exhibit B (e-mail sent at 7:01 p.m. on Nov. 23, 2005). The only open question is whether the parties agreed to be bound by their agreement before it was reduced to a formal stock purchase agreement.

The November 18-23, 2005 e-mail exchange contains two provision that could be construed to denote that IFC and Osseiran did not intend to be bound at that time by the terms agreed to in those e-mails. First, the e-mails state,

> [IFC's] acceptance [of Osseiran's offer] is subject to documentation – which means separate sales agreements with IFC and Barclays, and acceptable bank guarantees from either HSBC and/or UBS Switzerland for the 40% after 6 months and the 20% payable 6 months thereafter, as well as for the 180 thousand and 300 thousand.

Osseiran Declaration Exhibit A. Second, the e-mails provide,

> The sales agreements come into force and effect after signing of the sales agreements and receipt of above mentioned bank guarantees acceptable to [IFC], as well as the first 40% paid.

*Id.*² As next explained, these provisions should not preclude the Court from concluding that the parties intended to be bound by their agreement. At the very least, the parties agreed in their November 2005 e-mail exchanges, to proceed in good faith to document and execute a formal stock sale agreement.

Viewed as a whole, the foregoing e-mail exchange between IFC and Osseiran is a typical preliminary agreement, often set out in the form of a "letter of intent," by which parties to a transaction document the terms of their contract pending due diligence research, formal documentation and closing. While such preliminary agreements may not bind the parties to their ultimate contractual objective, they do bind them to negotiate any open issues in good faith and to proceed to document and execute the formal contract once those open issues have been resolved. *Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 407 (4th Cir. 2002) (citing *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987).

Such a preliminary agreement "does not guarantee that the final contract will be concluded if both parties comport with their obligation, because good faith differences in the negotiation of open issues may prevent the parties from reaching a final contract." *Burbach Broad. Co.*, 278 F.3d at 407 n.2. It does, however, bar a party "from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *Id.*, 278 F.3d at 407.³

---

² There are small, inconsequential differences between the wording in IFC's November 18, 2005 e-mail in which IFC placed these conditions on its acceptance of Osseiran's offer and that of Osseiran's November 19, 2005 e-mail accepting IFC's conditions. The quotation above is from the latter, which became the document reflecting the parties' agreement when it was "confirmed" by IFC on November 23, 2005. Osseiran Declaration Exhibit B.

³ *Cf.* the D.C. Court of Appeals' statement in *Jack Baker, supra*: "'Parties [may] make an enforceable contract binding them to prepare and execute a subsequent

10

Here, IFC was not bound to transfer its MECG shares to Osseiran until their agreement had been formally documented and signed and Osseiran had made the first payment. It was, however, obligated to proceed in good faith to formally document and close the sale to which it had agreed. Based on the same preliminary agreement, Barclays and Osseiran proceeded to document and close their transaction, using the exact terms that were set forth in both the e-mails from November 18-23, 2005 and the stock sales agreement proposed by IFC on November 26, 2005. IFC, on the other hand, simply renounced the deal and abandoned its own proposed documentation. This was a breach of its obligations under the parties agreement.

## B.  IFC Is Bound by Promissory Estoppel.

Even if IFC were not bound by the parties' November 2005 agreement, it would be bound by promissory estoppel. Under District of Columbia law, the elements of a promissory estoppel claim are (1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to his detriment.

---

documentary agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called 'contract' to make a contract is not a contract at all.'" 664 A.2d at 1239 (quoting *D.C. Area Community Council v. Jackson*, 385 A.2d 185, 187 (D.C. 1978). In *Burbach Broad. Co.* and the cases on which the Fourth Circuit there relied, the type of agreement referenced in this quotation is denoted a Type I preliminary agreement, in which the "parties have reached a complete agreement (including the agreement to be bound) on all issues perceived to require negotiation." 278 F.3d at 407. Courts in the District of Columbia have apparently not determined whether the District recognizes so-called Type II preliminary agreements in which the "parties commit to negotiate open issues." *Cf. id.* In *Burbach Broadasting*, the Fourth Circuit, faced with a similar lacuna in West Virginia law, concluded that West Virginia probably would "follow[] the modern trend in contract law, and many state courts that have recognized the pragmatism and commercial necessity of recognizing such agreements." *Id.* If necessary, this Court should do the same with respect to District of Columbia law.

11

*Building Servs. Co. v. National R.R. Passenger Corp.*, 305 F. Supp. 2d 85, 95 (D.D.C. 2004). "[A] promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." RESTATEMENT OF CONTRACTS § 90 (cited with approval in *Granfield v. Catholic Univ. of Am.*, 530 F.2d 1035, 1039 (D.C. Cir. 1976)).

Here, plaintiff has shown that (1) IFC, during the period of December 19, 2005 through February 8, 2006, repeatedly promised Osseiran that it would sell its MECG stock to him in accordance with the terms to which the parties had agreed in November 2005; (2) IFC knew that Osseiran was attempting to obtain a majority of MECG's outstanding shares and that Osseiran, in reliance on IFC's promise to sell its shares to him, would proceed to purchase sufficient shares from other MECG shareholders to accumulate a majority; and (3) Osseiran in fact relied on IFC's promise to his detriment in purchasing additional shares at a cost in excess of US$5 million.

Prior to IFC's promise to sell its shares to him, Osseiran owned only 1.5 percent of MECG's stock. In reliance on the promise made to him by IFC, Osseiran purchased shares from other shareholders, at a cost well in excess of US$5 million, to the point that he now owns approximately 41 percent of MECG's shares. Thus IFC's failure to adhere to its promise to sell its shares to Osseiran not only deprived him of those shares, it caused him to expend millions of dollars only to end up with a much larger minority position in a money-losing company over which he has no control. As shown below, this inability to obtain majority control of MECG constitutes irreparable injury. Thus "injustice can be avoided only by enforcement of [IFC's] promise," *cf.* Restatement, *supra*, § 90, and Osseiran has made out a case of promissory estoppel.

## II. Osseiran Will Suffer Irreparable Injury if IFC Is Not Enjoined From Selling Its Shares of MECG Stock.

IFC can sell its shares of MECG at any time. In fact, IFC has already taken the initial steps to sell its MECG shares to another party. If IFC sells its MECG shares to anyone else, Osseiran's interest in the stock will be negated. Osseiran's sole purpose for purchasing IFC's shares was to obtain majority control of MECG. Without IFC's shares, Osseiran will be unable to gain majority control. Solely on the basis of his agreement with IFC, Osseiran spent millions of dollars in increasing his ownership interest in MECG from 1.5 percent to 41 percent.

The Second Circuit has expressly determined that the inability to obtain a controlling interest in a corporation constitutes irreparable injury.

> [T]he denial of a controlling ownership interest in a corporation may constitute irreparable harm. *See, e.g., United Acquisition Corp. v. Banque Paribas*, 631 F. Supp. 797, 805 (S.D.N.Y. 1985) (in action to enjoin defendants from selling all of stock to third parties, then-district judge John M. Walker, Jr. held that plaintiff's inability to gain a controlling interest in the sought-after company constituted irreparable harm, although injunctive relief was ultimately denied after finding no likelihood of success on the merits). Conduct that unnecessarily frustrates efforts to obtain or preserve the right to participate in the management of a company may also constitute irreparable harm. *See, e.g., International Banknote Co. v. Muller*, 713 F. Supp. 612, 623 (S.D.N.Y. 1989) (in action seeking to enjoin enforcement of corporate bylaw limiting time period in which slates of proposed directors must be filed, the court held that frustrating shareholders in an attempt to obtain representation on board of directors constituted irreparable harm).

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114-115 (2d Cir. 2003). *See also Pacific Elec. Wire & Cable Co. v. Set Top Int'l Inc.*, 2004 U.S. Dist. LEXIS 3400 at *7 (S.D.N.Y. 2004) ("preventing a ready, willing, and able buyer from purchasing a majority interest in a corporation ... constitutes irreparable harm"); *Beztak Co. v. Bank One Columbus, N.A.*, 811 F. Supp. 274, 284 (E.D. Mich. 1992) (A controlling interest in a corporation is an important and unique interest); *Castle v. Cohen*, 676 F. Supp. 620,

630 (E.D. Pa. 1987) (purchase of a control block of stock in a private corporation is subject to specific performance), *aff'd in part &remanded in part, 840 F.2d 173 (3d Cir. 1988)*; *Data Consultants, Inc. v. Traywick*, 593 F. Supp. 447, 453 (D. Md. 1983) (granting specific performance of a contract for the sale of the stock of a closely held corporation). *Cf. Independence Fed'l Sav. Bank v. Bender*, 326 F. Supp. 2d 36, 49 (D.D.C. 2004) (the frustration of shareholder voting power is an irreparable injury).

The irreparable injury is especially evident here, where Osseiran, in reliance on IFC's promise that it would sell its MECG shares to him, purchased 107,000 additional shares at a cost in excess of US$5 million. Now, instead of being a small minority shareholder (and a small investor) in a money losing company, he is the largest minority shareholder (and the largest single investor) in that company. Yet he still lacks the control that would give him the ability to influence the company's management or business plan. In short, plaintiff's loss simply cannot be determined or compensated in terms of money damages, and his proof of irreparable harm is thus particularly strong.

### III. The Requested Preliminary Injunction Will Not Harm IFC.

In deciding whether to award preliminary injunctive relief, the Court must assess whether issuing an injunction would substantially injure other interested parties. *Almurbati v. Bush*, 366 F. Supp. 2d 72, 81 (D.D.C. 2005). Moreover, the preliminary injunction is best used to preserve the status quo. *Graphic Sciences, Inc. v. International Mogul Mines, Ltd.*, 397 F. Supp. 112, 128 (D.D.C. 1974). Against this background, it is evident that, while the potential injuries to plaintiff if the Court does not issue a preliminary injunction would be substantial, the potential injuries to IFC would be minimal at best.

The temporary restraining order and preliminary injunction sought by plaintiff would not prevent IFC from selling its MECG stock. Indeed, the requested relief would simply preserve the *status quo*, including IFC's ability ultimately to sell its stock to the party to whom it legally committed itself to sell it, be that plaintiff or some third party. To the extent that the requested injunction is ultimately determined to have wrongfully denied IFC an opportunity to sell its stock at a higher price, plaintiff is prepared to post security for that potential loss. Surely, IFC cannot claim to be harmed by any delay in selling its MECG stock. It has been attempting, unsuccessfully to sell its stock for years, and, for the last two and a half months has been improperly postponing its commitment to sell it to plaintiff.

## IV.  The Requested Preliminary Injunction Will Further the Public Interest.

The final consideration in granting a preliminary injunction or temporary restraining order is whether the public interest will be advanced or disserved by grant or denial of the motion. *See, e.g., NOW, Washington, D.C. Chapter v. Social Sec. Admin. of Dept. of Health & Human Servs.*, 736 F.2d 727, 742 (D.C. Cir. 1984). This Court has recognized a public interest in respecting "the sanctity of contracts." *Barnstead Broad. Corp. v. Offshore Broad. Corp.*, 865 F. Supp. 2, 8 (D.D.C. 1994) (in this breach of contract case, the court granted the preliminary injunction after finding that there was no countervailing public interest) *aff'd sub nom. Barnstead Broad. Corp. v. BAF Enters.*, 81 F.3d 1147 (D.C. Cir. 1996); *see also Pritchard v. Dent Wizard Int'l Corp.*, 275 F. Supp. 2d 903, 920 (S.D. Ohio 2003) ("The public has an interest in the enforceability of contracts").

**The issuance of preliminary injunctive relief in this matter will result in the furtherance of the public interest by preserving the Court's ability to enforce the parties' agreement. Conversely, permitting IFC, during the pendency of this action, to sell its MECG shares to another party in disregard of its agreement with, or at least its enforceable promise to, plaintiff would not serve the public interest as it would encourage unscrupulous sellers to disregard their commitments whenever a "better" opportunity presents itself. Indeed, the only interests that would be served should the court deny plaintiff's request would be IFC's improper interest in increasing its profit at the expense of its promise to plaintiff.**

## CONCLUSION

**For the foregoing reasons, the Court should grant plaintiff's Motion for a Temporary Restraining Order ordering IFC to refrain from transferring or encumbering its MECG shares to any party other than plaintiff pending a decision on IFC's Motion for a Preliminary Injunction and should grant the latter motion, ordering IFC to refrain from transferring or encumbering its MECG shares to any party other than plaintiff, pending the outcome of this action.**

**Respectfully submitted,**

/s/ ALEX BLANTON
Alex Blanton (D.C. Bar No. 169623)
Joseph O. Click (DC Bar No. 417294)
BLANK ROME, LLP
 600 New Hampshire Ave., NW
 Washington, D.C. 20037
 202-772-5909
 Fax: 202-572-8357
 Email: Blanton@BlankRome.com

*Counsel for plaintiff Salah N. Osseiran*

16

**Of Counsel:**
**Sharon J. Zealey**
**William M. Huse**
  Blank Rome LLP
  1700 PNC Center
  201 East Fifth Street
  Cincinnati, Ohio 45202
  (513) 362-8716
  zealey@blankrome.com