# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| SALAH N. OSSEIRAN, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| *v.* | )     Civil Action No. 1-06-CV-0336 RWR |
| | ) |
| INTERNATIONAL FINANCE | ) |
| CORPORATION, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

## DEFENDANT INTERNATIONAL FINANCE CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

**WHITE & CASE** LLP

Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
Frank Panopoulos (D.C. Bar No. 459365)
701 Thirteenth Street, N.W.
Washington, D.C. 20005-3807
(202) 626-3600

*Attorneys for International Finance Corporation*

March 10, 2006

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................. 1

BACKGROUND .............................................................................................. 2

I.    IFC IS A PUBLIC INSTITUTION THAT HAS BEEN SPECIFICALLY
DESIGNATED AS AN "INTERNATIONAL ORGANIZATION" UNDER U.S.
LAW ...................................................................................................... 2

II.    PLAINTIFF ATTEMPTED BUT FAILED TO PURCHASE CERTAIN SHARES
OF MECG OWNED BY IFC ..................................................................... 4

    A.    Plaintiff Proposed to Purchase IFC's Shares, But Never Concluded an
Agreement ................................................................................... 4

    B.    IFC Elected To Consider Other Potential Offers For Its Shares .............. 6

    C.    Plaintiff Claimed He Did Not Need IFC's Shares And Then Began
Making Threats ............................................................................. 8

    D.    IFC Was Presented With Another Offer That It Has Accepted
Conditionally ............................................................................... 9

ARGUMENT ................................................................................................... 11

I.    IFC IS IMMUNE FROM THE IMPOSITION OF ANY PRELIMINARY
ORDER THAT WOULD RESTRAIN ITS ASSETS ......................................... 11

    A.    The Property and Assets of IFC Enjoy Absolute Immunity From
Attachment Before Final Judgment ................................................. 11

    B.    Enjoining IFC from Transferring its Shares Acts as an Unlawful Pre-
Judgment Attachment of IFC's Property .......................................... 13

II.    PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION ................. 16

    A.    A Preliminary Injunction Is a Drastic and Disfavored Remedy .............. 16

    B.    Plaintiff Fails To Establish A Substantial Likelihood Of Success On The
Merits ........................................................................................ 17

        1.    A Choice Of Law Analysis Points To The Law Of Guernsey As
Most Likely To Apply ............................................................ 18

        2.    Plaintiff Is Unlikely To Succeed On The Merits Under Guernsey
Law .................................................................................... 20

i

**TABLE OF CONTENTS**

Page

3.   Plaintiff Is Unlikely To Succeed On The Merits Under Lebanese
     Law ...................................................................................................21

4.   Plaintiff Is Unlikely To Succeed On The Merits Under The Law Of
     The District Of Columbia ..................................................................22

     (a)   Plaintiff And IFC Did Not Enter Into An Enforceable
           Agreement Under District Of Columbia Law...............................22

           i.    The Parties Did Not Intend To Be Bound..........................22

           ii.   The Parties Did Not Reach Agreement On All
                 Material Terms..................................................................24

           iii.  Additional Factors Weighed By District of
                 Columbia Courts Reaffirm That  The Parties Did
                 Not Enter Into An Enforceable Agreement .......................26

     (b)   Even If This Court Finds That The Parties Reached A
           Preliminary Agreement, District of Columbia Law Does
           Not Recognize A Duty To Negotiate Open Terms.......................27

     (c)   Plaintiff Is Not Likely To Succeed On His Promissory
           Estoppel Claim..........................................................................28

           i.    IFC Did Not *Promise* To Conclude A Final
                 Agreement........................................................................28

           ii.   Plaintiff Did Not *Reasonably Rely* On IFC's
                 Representations .................................................................29

           iii.  Plaintiff Did Not *Detrimentally Rely* On IFC's
                 Representations .................................................................30

           iv.   Compelling IFC To Sell Its Shares To Plaintiff
                 Would Create, Rather Than Avoid, Injustice.....................31

C.   Plaintiff Cannot Demonstrate Irreparable Harm.....................................32

D.   The Balance Of Harms Analysis Favors IFC .........................................36

E.   The Public Interest Would Not Be Furthered By An Injunction ............37

CONCLUSION...................................................................................................39

## TABLE OF AUTHORITIES

**FEDERAL CASES**            **PAGE(S)**

*American Bankers Ass'n v. Nat'l Credit Union Admin.*,
38 F. Supp. 2d 114 (D.D.C. 1999) ......................................................................17

*\*Atkinson v. Inter-Am. Dev. Bank*, 156 F.3d 1335 (D.C. Cir. 1998) ................................12, 15, 37

*Bancoult v. McNamara,* 227 F. Supp. 2d 144 (D.D.C. 2002)...................................................17

*Benten v. Kessler,* 505 U.S. 1084 (1992) .................................................................................17

*Bestor v. Cent. Intelligence Agency*, Civ. No. 04-2049,
2005 U.S. Dist. LEXIS 3574 (D.D.C. March 2, 2005) .......................................16

*Beztak Co. v. Bank One Columbus, N.A.*, 811 F. Supp. 274
(E.D. Mich. 1992) ...............................................................................................34

*Breen v. Mineta*, Civ.A. 05-654, 2005 WL 3276163 (D.D.C. Sept. 30, 2005) ...........................32

*\*Bldg. Servs. Co. v. Nat'l R.R. Passenger Corp.*, 305 F. Supp. 85
(D.D.C. 2004) ...............................................................................................28, 29

*Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401
(4th Cir. 2002).....................................................................................................27

*Castle v. Cohen*, 676 F. Supp. 620 (E.D. Pa. 1987)...................................................................35

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738
(D.C. Cir. 1995) ..................................................................................................35

*Data Consultants, Inc. v. Traywick*, 593 F. Supp. 447 (D. Md. 1983) ...................................34-35

*\*De Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984)............................................12, 16

*Doll v. Grand Union Co.*, 925 F.2d 1363 (11th Cir. 1991) ...........................................................30

*Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969) ................................................................35

*Edgar v. MITE Corp.*, 457 U.S. 624 (1982) ..............................................................................20

*Flota Maritima Browning De Cuba Sociadad Anonima v.
Motor Vessel Ciudad De La Habana*, 335 F.2d 619 (4th Cir. 1964).................13

*\*FMC Corp. v. R.P. Scherer Corp.*, 545 F. Supp. 318 (D. Del. 1982).........................................35

*\*Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438
(D.C. Cir. 1990) ..................................................................................................36

*GEICO v. Fetisoff*, 958 F.2d 1137 (D.C. Cir. 1992)...................................................18

*\*Gelco Corp. v. Coniston Partners*, 811 F.2d 414 (8th Cir. 1987) ...............................35

*Globe Nuclear Serv. and Supply, Ltd. v. AO Techsnabexport*, No. DKC-03-3339
    (D. Md. argued Sept. 24, 2004) ............................................................................15

*Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445 (6th Cir. 1988) ....................36

*\*Granfield v. Catholic Univ. of Am.*, 530 F.2d 1035 (D.C. Cir. 1976)...................28, 31

*Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.*, 129 F.3d 143
    (D.C. Cir. 1997) ...................................................................................................18

*Independence Fed. Savings Bank v. Bender*, 326 F. Supp. 2d 36
    (D.D.C. 2004) .......................................................................................................34

*Int'l Banknote Co., Inc. v. Muller*, 713 F. Supp. 612 (S.D.N.Y. 1989) .........................34

*Labovitz v. The Wash. Times Corp.*, 900 F. Supp. 500
    (D.D.C. 1994) .......................................................................................................20

*Lincoln Hockey LLC v. Semin*, Civ. No. 05-02094,
    2005 U.S. Dist LEXIS 34047 (D.D.C. Dec. 5, 2005).........................................17

*Lutcher S.A. Celulose e Papel v. Inter-Am. Dev. Bank*, 382 F.2d 454 (D.C. Cir. 1967) ..............12

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)................................................................17

*Mendaro v. World Bank*, 717 F.2d 610 (D.C. Cir. 1983) .......................................12, 37

*\*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1999)................................17

*Mylan Pharms. v. Shalala*, 81 F. Supp. 2d 30 (D.D.C. 2000) .......................................32

*Nat'l Head Start Ass'n v. Dep't of Health and Human Servs.*,
    297 F. Supp. 2d 242 (D.D.C. 2004) ...................................................................17

*\*Novecon, Ltd. v. Bulgarian-American Enter. Fund*, 967 F. Supp. 1382
    (D.D.C. 1997), *aff'd* 190 F.3d 556 (D.C. Cir. 1999) ................................ *passim*

*\*Pacific Electric Wire & Cable Co., Ltd. v. Set Top Int'l Inc.*,
    2004 U.S. Dist. LEXIS 3400 (S.D.N.Y. Jan. 20, 2004)....................................32

*\*Pesch v. First City Bank of Dallas*, 637 F. Supp. 1539 (N.D. Tex. 1986)...................36

*Sampson v. Murray*, 415 U.S. 61 (1974) .......................................................................32

*\*Stephens v. Nat'l Distillers and Chem. Corp.*, 69 F.3d 1226 (2d Cir. 1996)...........13, 14, 15

*S & S Mach. Co. v. Masinexportimport*, 706 F.2d 411 (2d Cir. 1983) ............................13, 14, 15

*Technical Publ'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136
    (7th Cir. 1984) ...............................................................................................................17

*United Acquisition Corp. v Banque Paribas*, 631 F. Supp. 797
    (S.D.N.Y. 1985) ............................................................................................................33

*U.S. S.E.C. v. Lines Overseas Mgt., Ltd.*, 2005 WL 3579139 (D.D.C. Dec. 30, 2005) ...............35

*In re. U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77
    (D.D.C. 2003) ..............................................................................................................28

*Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co. Ltd.*,
    339 F.3d 101 (2d Cir. 2003) .......................................................................................34

## STATE CASES

*Bender v. Design Store Corp.*, 404 A.2d 194 (D.C. 1979) ..............................................29

*Coulibay v. Malaquias*, 728 A.2d 595 (D.C. 1999) ........................................................18

*D.C. Area Comm. Council, Inc. v. Jackson*, 385 A.2d 185 (D.C. 1978) ...................... 24-25, 28

*Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543 (D.C. 1981) ..........................................25

**Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236 (D.C. 1995) ......................... *passim*

## FEDERAL STATUTES

22 U.S.C. § 282-282i ..................................................................................................3, 13

22 U.S.C. § 282g ............................................................................................................13

22 U.S.C. § 288, International Organizations Immunities Act of 1945 ("IOIA") ............................3

22 U.S.C. § 288a(b) (2005) ...........................................................................................11

28 U.S.C. § 1610-1611, Foreign Sovereign Immunities Act ......................................13, 15

Executive Order 10680, 21 Fed. Reg. 194 (Oct. 5, 1956) ...........................................3, 11

H.R. Rep. No. 94-1487, 94th Cong. 2d Sess. (1976),
    *reprinted in* 1976 U.S.C.C.A.N. 6604 .......................................................................12, 16

## <u>OTHER MATERIALS</u>

Articles of Agreement of the International Finance Corporation, May 25, 1955, *amended* Apr. 28, 1993, Art. VI, Section 3, 7 U.S.T. 2197 ...............................................................12

Restatement (Second) of Conflict of Laws §§ 188, 301-310 (1971).................................18, 19, 20

Restatement (First) of Contracts § 90 (1932) .............................................................................28

Restatement (Second) of Contracts § 90, Comment b (1979) .......................................................31

# INTRODUCTION

International Finance Corporation ("IFC") respectfully files this Opposition to Plaintiff's Motion for a Preliminary Injunction ("Motion").[1]  Plaintiff's Motion seeks to enjoin IFC from transferring its shares of stock in Middle East Capital Group ("MECG") to a third party. According to Plaintiff, such a transfer allegedly would prevent him from gaining majority control of MECG.

Plaintiff's Motion should be denied for two reasons.  First, preliminarily enjoining IFC from transferring its MECG shares constitutes an unlawful prejudgment attachment of its property.  Because IFC's property is absolutely immune from pre-judgment attachment and IFC has not waived such immunity, its shares in MECG cannot be enjoined from transfer as a matter of law.  The Court can and should deny Plaintiff's motion for this reason alone.

Second, Plaintiff has not met his burden of establishing the four elements that would entitle him to preliminary injunctive relief.  Plaintiff's claims are based on e-mails and an unexecuted draft agreement, and are not likely to succeed on the merits.  Moreover, Plaintiff is not irreparably harmed by the transfer because he can be compensated for the value of his shares and, therefore, has an adequate remedy at law.  Further, the balance of harms and public interest clearly favors IFC, which is a public institution composed of 178 member countries that provides financing for projects in developing countries around the world.[2]

---

[1] IFC plans to respond to the Complaint with a motion to dismiss on grounds that it anticipates will include *forum non conveniens* and international organizational immunity.  IFC reserves all rights and privileges to the immunity to which it is entitled under U.S. law and its Articles of Agreement.

[2]  IFC submits the following declarations in support of its Opposition:  Declaration of Jan van Bilsen dated March 7, 2006 ("J. van Bilsen") (IFC Exhibit A); Declaration of Carmen Genovese dated March 7, 2006 ("Genovese") (IFC Exhibit B); Declaration of Mark Alloway dated March 9, 2006 ("Alloway") (IFC Exhibit C); First Affidavit of Mark Gideon Andrew Dunster dated March 9, 2006 ("Dunster") (IFC Exhibit D); Declaration of Sami Sader dated March 8, 2006 ("Sader") (IFC Exhibit E).

IFC respectfully requests that Plaintiff's motion be resolved on or before March 24, 2006. Pursuant to the documents included with Plaintiff's papers, IFC has agreed and is scheduled to convey the shares at issue on or before March 31, 2006. Declaration of Salah N. Osseiran dated February 26, 2006, ("Osseiran") Exhibit F thereto. Preparations for that transaction have been undertaken and IFC would like to be able to perform as it agreed. Given that Plaintiff's motion can be denied as a matter of law without consideration of the factual matters the parties have raised, IFC believes that an expedited decision on the motion is possible.

## BACKGROUND

I.    **IFC IS A PUBLIC INSTITUTION THAT HAS BEEN SPECIFICALLY DESIGNATED AS AN "INTERNATIONAL ORGANIZATION" UNDER U.S. LAW**

IFC is an international organization and is the private sector arm of the World Bank Group. J. van Bilsen ¶ 2, Exh. 2 ¶ 2 (http://www.ifc.org/about, Basic Facts About IFC ("Basic Facts")). Founded in 1956, IFC is a global investor and advisor, and is committed to promoting sustainable projects in its developing member countries that are economically beneficial, financially and commercially sound, and environmentally and socially sustainable. J. van Bilsen ¶ 2; Basic Facts ¶¶ 1-2. IFC invests in enterprises majority-owned by the private sector throughout most developing countries in the world. J. van Bilsen ¶ 2. It provides loans and equity investments, as well as advice and technical assistance. Basic Facts ¶ 3. In fiscal 2005, IFC invested in 236 projects in 67 countries covering all developing regions, including Sub-Saharan Africa, East Asia and the Pacific, South Asia, Europe & Central Asia, Latin America & the Caribbean, and the Middle East & North Africa. J. van Bilsen ¶ 2. In 2005, IFC's committed portfolio for its own account was US$19.3 billion and it held US$5.3 billion for participants in loan syndications. Basic Facts ¶ 2.

IFC has 178 member countries. J. van Bilsen ¶ 2; Basic Facts ¶ 7. To join IFC, a country must be a member of the World Bank, have signed IFC's Articles of Agreement, and have deposited with the World Bank Group's Corporate Secretariat an Instrument of Acceptance of IFC's Articles of Agreement. J. van Bilsen ¶ 2. IFC operates in accordance with its Articles of Agreement. J. van Bilsen ¶ 2 and Exhibit 1 thereto (attaching copy of the Articles of Agreement).

The United States was a founding member of IFC and Congress authorized the President to accept membership for the United States in IFC. *See* 22 U.S.C. § 282. Further, pursuant to the International Organizations Immunities Act of 1945 ("IOIA"), 22 U.S.C. § 288, the President, by Executive Order, "designate[d] [IFC] as a public international organization entitled to enjoy the privileges, exemptions, and immunities conferred by said International Organizations Immunities Act." Executive Order 10680, 21 Fed. Reg. 194 (Oct. 5, 1956).

As a public institution, IFC does not enter into binding agreements to buy or sell investments on a casual or informal basis through conversations or emails. J. van Bilsen ¶ 3; Alloway ¶ 7. Rather, for each investment, IFC requires formal documentation to be approved and executed before it will bind itself. J. van Bilsen ¶ 3; Alloway ¶ 7. Moreover, managers of IFC's investments do not have the authority to conclude transactions with third parties to buy or sell investments without formal approvals and executed documentation. J. van Bilsen ¶ 3; Alloway ¶ 7. As such, in negotiating with third parties, IFC always conditions its approval of any investment on the execution and completion of formal documentation. J. van Bilsen ¶ 3; Alloway ¶ 7.

3

## II.  PLAINTIFF ATTEMPTED BUT FAILED TO PURCHASE CERTAIN SHARES OF MECG OWNED BY IFC

### A.  Plaintiff Proposed to Purchase IFC's Shares, But Never Concluded an Agreement

As set forth in Plaintiff's papers, the case concerns the shares of MECG that are owned by IFC.    Complaint for Preliminary and Permanent Injunctive Relief and Damages ("Complaint") at 1; Osseiran ¶ 3; J. van Bilsen ¶ 4.  MECG is a merchant banking and investment company registered and headquartered in Guernsey, a Channel Island off the Southeast coast of England.  Complaint ¶ 1l; Osseiran ¶ 2.  IFC currently holds 30,000 shares at MECG, or about 10% of the total outstanding shares.  Osseiran ¶ 3 and Exhibit C at 3 (Draft Share Sale Agreement identifying amount of IFC shares).

In the declaration he submitted with his Motion, Plaintiff offers a conclusory and highly misleading account of the interactions he had with IFC concerning IFC's shares.  Through this Opposition and its accompanying declarations, IFC corrects those misstatements and explains the facts accurately and in detail, as summarized below.

In September 2005, Plaintiff, who owned one or two percent of the shares of MECG at the time, approached Jan van Bilsen of IFC about purchasing IFC's shares in MECG.  J. van Bilsen ¶ 5.  On October 3, 2005, Plaintiff sent Jan van Bilsen an email in which he offered to purchase all of IFC's shares in MECG and asked IFC to accept his offer prior to October 11, 2005.  Id. ¶ 7.  IFC did not accept Plaintiff's offer, and could not have accepted it in that time frame, but Mr. van Bilsen began negotiating with him.  Id.

Negotiations continued into November.  In his negotiations with Plaintiff, Mr. van Bilsen always made it clear that IFC's acceptance of any agreement was conditioned on the final approval, completion and execution of all necessary documentation.  Id. ¶¶ 8-9.  This is obvious even from the documentation that Plaintiff has submitted.  For example, in Mr. van Bilsen's

email to Plaintiff sent by Blackberry dated November 18, 2005 that Plaintiff attaches as Exhibit A to his declaration, the first point Mr. van Bilsen makes is that IFC's "acceptance is subject to documentation." Osseiran Exh. A at 1. Mr. van Bilsen asks Plaintiff to confirm that he understands and accepts this condition. *Id.* In Plaintiff's response the next day, November 19, 2005 (included with Exhibit A to his declaration), he recognizes IFC's condition and states "I accept that your acceptance is subject to documentation," which includes "sales agreements" and "acceptable bank guarantees." Osseiran Exhibit A at 3. In a Blackberry message Mr. van Bilsen sent on November 23, 2005, attached with Exhibit B to Plaintiff's declaration, Mr. van Bilsen informed Plaintiff that he would be sending him drafts of the documentation shortly. Osseiran Exh. B at 1.

Notwithstanding Plaintiff's assertions to the contrary, Mr. van Bilsen never intended to enter into a binding agreement on behalf of IFC with his email communications from his Blackberry. J. van Bilsen ¶¶ 8-9. Nor could he. Mr. van Bilsen did not have the authority to finalize any agreement with Plaintiff without agreement and approval on the final documentation, both with Plaintiff and internally at IFC. J. van Bilsen ¶ 9. As noted, IFC is a public international institution and requires formal documentation to be approved and executed for all transactions involving the purchase or sale of investments. *Id.* ¶¶ 3, 9. That is why Mr. van Bilsen stated clearly to Plaintiff that the transaction was subject to documentation before there would be an agreement. *Id.* ¶ 9. As is evident from Plaintiff's response, Plaintiff understood the requirement of documentation prior to agreement. Osseiran Exh. A at 3. Moreover, he appeared to IFC to be a sophisticated investor who knew what he was doing. J. van Bilsen ¶ 9.

On November 26, 2005, Mr. van Bilsen sent Plaintiff the draft share sale agreement and draft bank guarantees. Osseiran Exh. C. Consistent with IFC's policies and practices about agreements pertaining to its investments not being binding until executed, the draft share sale agreement emphasized on its face in bold, underlined lettering:

> **This draft document is not a contract or an offer to enter into a contract. Only the document as executed by IFC and Mr. Osseiran will contain the terms that bind them. Until this document is executed by IFC and Mr. Osseiran, neither IFC nor Mr. Osseiran intends to be bound.**

Osseiran Exh. C at 2. Mr. Osseiran never objected to this condition. J. van Bilsen ¶ 10. Mr. van Bilsen's November 23 email noted that IFC reserved its right to make changes to the draft agreement and that it had to complete a Know Your Client background check as well. *Id.*; Osseiran Exh. C at 1.

The draft documents were not satisfactory to Plaintiff, and he responded that several changes needed to be made to the draft share sale agreement. J. van Bilsen ¶ 11; Osseiran Exh. D. He also said that the banks would not accept the draft bank guarantees, and that they "would need to refer to their legal departments, which could take a long time." J. van Bilsen ¶ 11; Osseiran Exh. D.

Mr. van Bilsen continued to work on the draft documentation with Plaintiff and his banks. On December 12, 2005, Mr. van Bilsen received an email with a draft bank guarantee from Plaintiff's bank, UBS AG. J. van Bilsen Exh. 4. According to the email, the draft was tendered "strictly without any liabilities for [UBS AG] so far" and was for "discussion purposes." J. van Bilsen ¶ 12, Exh. 4 at 1–2. Those discussions were never completed. *Id.*

## B.  IFC Elected To Consider Other Potential Offers For Its Shares

IFC had met with Plaintiff and the other shareholders at a board of directors meeting in September 2005 about the possibility of selling their shares, either individually or as a group.

J. van Bilsen ¶ 5. At that meeting, the board decided to form a committee to attract potential buyers for their shares. *Id.* As of the middle of December, that committee had not yet identified any potential buyers.

While IFC and Plaintiff were still negotiating in December, however, other MECG shareholders informed IFC that Plaintiff had told them that IFC had already sold its shares to him, which was untrue. *Id.* ¶ 13. After IFC informed the other shareholders that IFC had not sold its shares, the other shareholders indicated that they believed there would be additional offers for the shares forthcoming in the near future. *Id.* IFC, therefore, decided to wait to see if there would be any other offers before agreeing to sell its shares to Plaintiff. *Id.* Accordingly, in a telephone conference with Plaintiff on December 19, 2005, Mr. van Bilsen and others from IFC informed Plaintiff that IFC had decided not to sell him IFC's shares at that time. *Id.* ¶ 14; Alloway ¶ 4.

Specifically, Mr. van Bilsen told Plaintiff that IFC was genuine in its plans and efforts to complete an agreement with him, but that given the concerns of the other shareholders and that there may be other purchasers for the shares, IFC had decided to wait for up to four months to see if there would be any other offers forthcoming. J. van Bilsen ¶ 14. Plaintiff disagreed with IFC's decision to wait and tried to convince Mr. van Bilsen that waiting was not in IFC's best interests. *Id.* He also said that he was considering withdrawing his offer to IFC, but that he hoped that there might still be a way to conclude an agreement to sell him the shares. *Id.*

Contrary to Plaintiff's assertions in paragraph 15(a) of his declaration, at no time during the conference call on December 19 did Mr. van Bilsen say that IFC wanted to postpone its sale to Plaintiff to avoid problems with the Chairman of MECG or that the Chairman had threatened to sue IFC. *Id.* ¶ 15. Nor did Mr. van Bilsen provide Plaintiff with any assurances that IFC

would complete a transaction with him, would not solicit or consider other buyers, or would proceed with the sale once it confirmed that it did not need approval from other shareholders to sell its stock. *Id.* IFC never made any such assurances.

### C.     Plaintiff Claimed He Did Not Need IFC's Shares And Then Began Making Threats

Plaintiff next telephoned Mr. van Bilsen on December 30, 2005 to inform him that, as of that date, he had already acquired a majority of the shares of MECG, that he did not intend to buy everyone's shares, and that he did not really need any more shares to have control of the company. *Id.* ¶¶ 16, 24. Thus, Plaintiff represented to IFC that he did not need IFC's shares to provide him with a majority. This was the first time Plaintiff mentioned to IFC that his ultimate goal was to acquire a majority of MECG's shares. *Id.* ¶ 24. Plaintiff also mentioned an email dated December 22, 2005 that Mr. van Bilsen had not yet received. *Id.* ¶ 16. That email, attached as Exhibit E to Plaintiff's declaration, was then faxed to Mr. van Bilsen. In that email, which Plaintiff copies to his lawyers, Plaintiff for the first time claims that he actually had a binding agreement with IFC and he "invites" Mr. van Bilsen to execute the draft share sale agreement. *Id.* ¶ 17.

Thereafter, Plaintiff continued to urge Mr. van Bilsen to have IFC sell its shares to him, and threatened litigation if IFC did not sell the shares. *Id.* ¶¶ 18-19. Mr. van Bilsen and IFC's Mark Alloway spoke with Plaintiff on January 24, 2006. Contrary to Plaintiff's assertions in paragraph 15(b) of his declaration, neither Mr. van Bilsen nor Mr. Alloway told Plaintiff at that time that IFC was merely awaiting internal approvals or that IFC was going to approve a sale to him. *Id.* ¶ 20; Alloway ¶ 5. Instead, they repeated what they had told him on December 19 and asked him to wait for an upcoming shareholders' meeting where they would learn if there were any other offers for the shares. J. van Bilsen ¶ 20; Alloway ¶ 5.

The following day, Messrs. van Bilsen, Alloway and IFC's Carmen Genovese spoke again with Plaintiff. On that call, Plaintiff repeated his demand that IFC sell him its shares. Genovese ¶ 4. Mr. Alloway told him that IFC was not prepared to sell him the shares, but wanted to wait for an upcoming shareholders' meeting to hear from the committee that had been established to find a buyer for the shareholders and to learn if there were any other offers to be considered. *Id.*; Alloway ¶ 6; J. van Bilsen Decl. ¶ 21. Plaintiff asked for a letter confirming that IFC would agree to sell him the shares, but Mr. Alloway said that IFC would not sign any documents that would bind IFC at that time. Genovese Decl. ¶ 4. Plaintiff again threatened to sue IFC—this time for "triple damages." Genovese ¶ 5. Mr. Alloway advised Plaintiff that there would be nothing to gain by suing IFC and asked him to be patient.[3] *Id.*

### D.     IFC Was Presented With Another Offer That It Has Accepted Conditionally

The MECG shareholders meeting took place in Beirut, Lebanon on February 8, 2006. It was led by MECG Chairman Mr. Khalid Al Turki. *Id.* ¶ 6. Mr. Al Turki informed the shareholders that there were a number of offers and serious expressions of interest to purchase the shares of MECG (i.e., both IFC's holdings and the shares of others), including offers from the former CEO of MECG and a group of investors, expressions of interests from several banks and Plaintiff's offer. *Id.* It was agreed at the meeting that the banks would be asked to provide firm offers in writing by the following Monday. *Id.* Plaintiff responded to the news by saying he would increase his offer from $44 to $50 per share, which he said he would confirm in writing, but he never did. *Id.* It was also announced at this meeting that Plaintiff had recently acquired 92,000 shares and now controlled 34.6% of the company. *Id.*

---

[3] Notably, Plaintiff did not own a majority of the company as he had represented to IFC on December 30, 2005. Genovese ¶ 6 (noting that by February 8, 2006 Plaintiff had acquired 34.6% of the Company). Nor would the addition of IFC's 10% holdings provide him with that majority.

Mr. Genovese attended the February 8 meeting on behalf of IFC. *Id.* He was asked whether IFC had made any agreements to sell its shares yet and he responded that IFC had not concluded any sale agreement with anyone and did not consider itself bound under any obligation to sell its shares to anyone in particular. *Id.* Plaintiff did not object or contradict Mr. Genovese's statement that he and IFC did not have an agreement. *Id.*

A follow-up meeting of the shareholders took place in Beirut, Lebanon about a week later, on February 16, 2006. The purpose of this meeting was to consider the five offers that had been submitted and circulated on February 13. *Id.* ¶ 9; Letter to Shareholders dated February 13, 2006, attached as Exhibit 1 to Genovese Declaration; J. van Bilsen ¶ 22. With the exception of Plaintiff, the shareholders agreed that they should work together to maximize their returns. Genovese ¶ 9. It was agreed that the offer from First National Bank of Lebanon ("FNB") appeared to be the most attractive and discussions should begin with that Bank. *Id.* Messrs. van Bilsen and Genovese stated that they would recommend to IFC's management that IFC sign the agreement to proceed if a majority (i.e., 51%) of the shareholders agreed and if the sale could be concluded in a timely fashion. *Id.* The shareholders, except for Plaintiff, agreed that they would pursue the FNB offer on the condition that the sale could be concluded by the end of March 2006 and a draft agreement with such conditions was drawn up at IFC's request. *Id.* Messrs. van Bilsen and Genovese stated they would take the draft agreement to IFC's management for approval. *Id.*

Contrary to Plaintiff's assertions in paragraph 17 of his declaration, IFC did not exclude Plaintiff from participating with the other shareholders and did not propose that all MECG shareholders other than Plaintiff enter into an agreement to sell their shares to FNB at $60 per share. *Id.* ¶ 10. Plaintiff was given the full opportunity to join the other shareholders in selling

10

their shares at $60 per share, but said he would not sell. *Id.* He was also asked about the status of his verbal offer of $50 per share from the meeting of February 8. *Id.* Plaintiff announced that he would not be increasing his offer to $50 per share from his initial offer made prior to the February 8, 2006 meeting. *Id.*

Messrs. Bilsen and Genovese took the FNB proposal to IFC's management and obtained approval. *Id.* ¶ 11. Mr. van Bilsen executed the document on February 19, 2006, and it is attached to Plaintiff's declaration as Exhibit F. In that document, IFC agrees that it will sell its shares to FNB on or before March 31, 2006 at $60 per share, provided certain conditions are met.

## ARGUMENT

### I.    IFC IS IMMUNE FROM THE IMPOSITION OF ANY PRELIMINARY ORDER THAT WOULD RESTRAIN ITS ASSETS

The property and assets of IFC have absolute immunity from pre-judgment attachment under the IOIA and IFC's Articles of Agreement. A preliminary injunction that restrains the sale or transfer of IFC's shares before a final judgment would unlawfully violate this immunity, and is therefore not permitted as a matter of law.

### A.    The Property and Assets of IFC Enjoy Absolute Immunity From Attachment Before Final Judgment

The IOIA provides that "[i]nternational organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract." 22 U.S.C. § 288a(b) (2005). As discussed in the Background part of this memorandum, IFC qualifies as an "international organization" under the IOIA, because it was designated by Executive Order 10680 as a public international organization entitled to enjoy the privileges, exemptions, and immunities conferred by the Act.

11

In *Atkinson v. Inter-Am. Dev. Bank,* 156 F.3d 1335 (D.C. Cir. 1998), the Court of Appeals unequivocally held that an international organization's immunity under the IOIA is absolute and is co-extensive with the absolute immunity accorded to foreign sovereigns in 1945. *Id.* at 1341. In 1945, the United States accorded a foreign sovereign's property absolute immunity from attachment and execution. *De Letelier v. Republic of Chile*, 748 F.2d 790, 799 (2d Cir. 1984); H.R. Rep. No. 94-1487, 94th Cong. 2d Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6626 ("the traditional view in the United States concerning execution has been that the property of foreign states is absolutely immune from execution").

As an international organization, the absolute immunity of IFC is subject to only two limitations: (1) express waiver by the international organization contained in the Articles of Agreement or contract and (2) a modification by Executive Order of the President. *Mendaro v. World Bank,* 717 F.2d 610, 613 (D.C. Cir. 1983).[4]

Neither of these limitations applies in this case. Regarding prejudgment restraint of its assets, IFC's Articles of Agreement state unequivocally that "[t]he property and assets of the Corporation shall, wheresoever located and by whomsoever held, be *immune* from *all forms* of seizure, attachment or execution *before the delivery of final judgment* against the Corporation." Articles of Agreement of the International Finance Corporation, May 25, 1955, *amended* Apr. 28, 1993, Art. VI, Section 3, 7 U.S.T. 2197 (emphasis added) (attached as J. van Bilsen Exh. 1). This provision of IFC's Articles of Agreement is specifically given "full force and effect" by statute: "The provisions of . . . article VI, sections 2 to 9, both inclusive, of the Articles of

---

[4] The status of the immunities of IFC and the other World Bank entities is virtually indistinguishable. All were granted immunity by similar Executive Order. *See Lutcher S.A. Celulose e Papel v. Inter-American Development Bank,*, 382 F.2d 454, 457-58 (D.C. Cir. 1967). Moreover, even the relevant portions of their Articles of Agreement are the same. *Compare Mendaro*, 717 F.2d at 614 (quoting World Bank's Articles of Agreement, Article VII, Section 3) with J. van Bilsen Exh. 1 at 9, IFC's Articles of Agreement Article VI, Section 3).

Agreement of the Corporation shall have full force and effect in the United States . . . ."  22 U.S.C. § 282g.[5]

Nor do any of the communications allegedly constituting the purported agreement between IFC and Plaintiff contain any language addressing, much less waiving, IFC's absolute immunity from prejudgment attachment.  Finally, there is no Executive Order modifying the otherwise absolute immunity of IFC's property and assets.  *See* 22 U.S.C. §§ 282-282i.

**B.    Enjoining IFC from Transferring its Shares Acts as an Unlawful Pre-Judgment Attachment of IFC's Property**

The immunity of IFC from any form of prejudgment attachment has never been challenged in a United States court.  In analogous cases involving foreign sovereigns, courts have held uniformly that where property is protected from prejudgment attachment,[6] courts may not "sanction any other means to effect the same result," such as a preliminary injunction or other form of relief having the effect of a prejudgment attachment.  *S & S Mach.,* 706 F.2d at 418; *Stephens v. Nat'l Distillers and Chem. Corp.,* 69 F.3d 1226, 1229 (2d Cir. 1996).

In *S & S Machinery,* plaintiff purchased goods from a state-owned Romanian company, issuing letters-of-credit as payment to a state-owned Romanian bank that acted as the company's collection agent.  Alleging the goods defective, plaintiff sued the bank and company and attached their New York assets.  Plaintiff also obtained an injunction preventing the Romanian bank from

---

[5] Moreover, any argument that IFC has waived its immunity from suit in Article IV, Section 3 is immaterial to the issue of the immunity of its property.  "[W]aivers of immunity from suit or from execution of judgment have no bearing upon the question of immunity from prejudgment attachment."  *S & S Mach. Co. v. Masinexportimport,* 706 F.2d 411, 417 (2d Cir. 1983); *see also Flota Maritima Browning De Cuba Sociadad Anonima v. Motor Vessel Ciudad De La Habana,* 335 F.2d 619, 626 (4th Cir. 1964) (noting that there is a distinction between jurisdictional immunity and immunity from execution of the property of a sovereign, and waiver of the former is not necessarily a waiver of the latter).  Here, as noted, Article VI, Section 3 of IFC's Articles of Agreement explicitly preserves the right to immunity from prejudgment attachment separate and apart from IFC's general immunity from suit.

[6] 28 U.S.C. § 1610(d) of the Foreign Sovereign Immunities Act ("FSIA") provides that the property of a foreign state shall be immune from attachment prior to the entry of judgment unless (1) the foreign state has explicitly waived its immunity from attachment prior to judgment, and (2) the purpose of the attachment is to secure satisfaction of a judgment.

negotiating the letters-of-credit.  After removal to federal court, the district court vacated the attachments and dissolved the injunction.

In affirming the district court, the Second Circuit held with respect to the injunction that "such a measure could only have resulted in the disingenuous flouting of the FSIA ban on prejudgment attachment of assets belonging to a 'foreign state'.  Once the district court held . . . that the [defendants] were protected from prejudgment attachment by the FSIA, the court properly refused to sanction any other means to effect the same result."  *S & S Machinery*, 706 F.2d at 418.  The court emphasized: "The FSIA would become meaningless if courts could eviscerate its protections merely by denominating their restraints as injunctions against the negotiation or use of property rather than as attachments of that property.  We hold that courts in this context may not grant, by injunction, relief which they may not provide by attachment."  *Id.*

Continuing to warn against the disingenuous flouting of the ban on prejudgment attachment of assets, the Second Circuit in *Stephens* held that *S & S Machinery's* "principle behind the prohibition against attachments ***should apply broadly***."  *Stephens*, 69 F.3d at 1230 (emphasis added).  In that case, plaintiff sued sovereign retrocessionaires and demanded they post security as required for out-of-state insurance litigants under New York insurance law.  The retrocessionaires claimed  immunity from the New York security requirement.  The Second Circuit agreed and held: "The pre-judgment security requirement before us would force foreign sovereign retrocessionaires to place some of their assets in the hands of the United States courts for an indefinite period.  During that time, the retrocessionaires would have no access to those assets.  All this is precisely the same result that would obtain if the foreign sovereign's assets were formally attached.  There is, therefore, no significant distinction between New York's security requirement and an attachment of the property."  *Id.* at 1229.  The court emphasized that

14

"the FSIA forbids any 'attachment[,] arrest or execution' of a foreign sovereign's property subject only to the exceptions set forth in §§ 1610-1611. And we are not at liberty to create other exceptions, not in the statute." *Id.* at 1230.

A more recent ruling by the United States District Court for the District of Maryland followed the Second Circuit's decisions in *S & S Machinery* and *Stephens*. In *Globe Nuclear Serv. and Supply, Ltd. v. AO Techsnabexport*, No. DKC-03-3339 (Sept. 24, 2004) (attached as Exhibit F to this Memorandum), the district court denied plaintiff's request for a preliminary injunction that sought to restrain a sovereign-owned uranium exporting company from using certain uranium in its business and, instead, restrain the uranium in favor of the plaintiff pending the outcome of an arbitration. *See Globe Nuclear Serv. and Supply, Ltd. v. AO Techsnabexport*, No. DKC-03-3339 (Sept. 24, 2004), 129-130. The district court concluded that the injunctive relief "would clearly require the court to assert its jurisdiction in a most dramatic way over [defendant's] property" protected from prejudgment attachment and thus "flout the immunity" against prejudgment attachment. *Id.* at 127, 130.

IFC recognizes that the foregoing cases are construing specifically the FSIA and not the IOIA or IFC's Articles of Agreement. This is of little import, however, because the immunity granted to IFC is derived from the immunity sovereigns enjoyed in 1945. *Atkinson*, 156 F.3d at 1341. That form of immunity against attachment or execution was absolute—not the restrictive (i.e., lesser) immunity that currently applies to foreign states under the FSIA. *Id.* Regarding attachment and execution under the old law that still applies to IFC, the Second Circuit observed:

> Congress passed the FSIA on the background of the views of
> sovereignty expressed in the 1945 charter of the United Nations
> and the 1972 enactment of the European Convention, which left
> the availability of execution totally up to the debtor state, and its
> own understanding as the legislative history demonstrates, that

prior to 1976 property of foreign states was absolutely immune
from execution.

*De Letelier*, 748 F.2d at 799 (citing 1976 U.S.C.C.A.N. 6604, 6606). Thus, the proposition that

immunity from prejudgment attachment also means immunity from preliminary injunctions that

are, in effect, the same thing should be even stronger in the case of an international organization

such as IFC than it is in the case of foreign state-owned entities under the FSIA.

In any event, the preliminary injunction sought by Plaintiff clearly acts as a prejudgment

attachment of IFC's shares for an indefinite period and prevents IFC from negotiating or using

the property as it wishes. If the Court were to grant such a remedy, it would be asserting

jurisdiction over IFC property that is absolutely immune from attachment and eviscerating the

immunity from attachment that IFC enjoys pursuant to statute and Executive Order. Such a

flouting of IFC's immunity from attachment would be unlawful and, therefore, Plaintiff's Motion

must be denied as a matter of law.

## II. PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION

### A. A Preliminary Injunction Is a Drastic and Disfavored Remedy

"[A] preliminary injunction [seeks] a 'drastic and extraordinary form of relief that should

not be granted absent a clear and convincing showing by the moving party.'" *Bestor v. Cent.*

*Intelligence Agency*, Civ. No. 04-2049, 2005 U.S. Dist. Lexis 3574, at *4 (D.D.C. March 2,

2005). The four essential elements that constitute that "clear and convincing showing" are well

established. Plaintiffs must demonstrate:

> (1) a substantial likelihood of success on the merits, (2) that it
> would suffer irreparable injury if the injunction is not granted, (3)
> that an injunction would not substantially injure other interested
> parties, and (4) that the public interest would be furthered by the
> injunction.

*Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C. Cir. 1998); *accord, Nat'l Head Start Ass'n v. Dep't of Health and Human Serv.*, 297 F. Supp. 2d 242, 246 (D.D.C. 2004).  Each factor is an essential element for which "the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997); *Technical Publ'g Co. v. Lebhar-Friedman, Inc.,* 729 F.2d 1136, 1139 (7th Cir. 1984) (a "[p]laintiff bears the burden of establishing that *each* of these factors supports granting the injunction") (emphasis added).

As discussed below, Plaintiff cannot meet his burden on *any* element.

**B.     Plaintiff Fails To Establish A Substantial Likelihood Of Success On The Merits**

In setting forth the essential requirements for injunctive relief, this Circuit lists as the first element as "a substantial likelihood of success on the merits." *Mova Pharm.*, 140 F.3d at 1066. And for good reason.  Without a clear demonstration that the movant has a legal right to the relief it seeks "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review."  *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F.Supp.2d 114, 140 (D.D.C. 1999).  *Accord, e.g., Bancoult v. McNamara,* 227 F. Supp. 2d 144, 150-51 (D.D.C. 2002).  Indeed, when this first and crucial element is not satisfied, injunctive relief is routinely denied without consideration of the other essential elements.  *See Benten v. Kessler,* 505 U.S. 1084, 1085 (1992) (denying injunction on sole basis that plaintiff failed to demonstrate a substantial likelihood of success on the merits); *Nat'l Head Start Assoc.,* 297 F. Supp. 2d at 247 (same); *Lincoln Hockey LLC v. Semin,* No. 05-02094, 2005 U.S. Dist LEXIS 34047, at *6 (D.D.C. Dec. 5, 2005).

Although Plaintiff has alleged five counts in his complaint, he recognizes that only the first two—for breach of contract and promissory estoppel—present any claim for specific performance.  Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order

and Motion for a Preliminary Injunction ("Pl. Mem.") at 8-12. Thus, Plaintiff must show that he

is likely to succeed on one or both of those claims to be entitled to preliminary relief. Plaintiff is

not likely to succeed on either of those claims under any applicable law for the reasons set forth

below.

          1.      **A Choice Of Law Analysis Points To The Law Of Guernsey As Most Likely To Apply**

      As evident from Plaintiff's own papers, other than the location of IFC's main office, this

case has little connection with the District of Columbia. Rather, according to Plaintiff, this case

concerns control of the shares of MECG, a corporation headquartered in Guernsey. Complaint

¶ 1; Pl. Mem at 2. Moreover, none of the operative events underlying the Complaint took place

in the District of Columbia. Osseiran ¶¶ 5-18 and Exhibits A-F thereto; Complaint ¶¶ 16-34.

      Under District of Columbia conflicts rules, the Court is not required to engage in a

conflicts of law analysis unless there is a true conflict. *GEICO v. Fetisoff*, 958 F.2d 1137, 1141

(D.C. Cir. 1992). If a true conflict exists, then the court "applies the law of the state which has

the 'more substantial interest in the resolution of the issue.'" *Coulibay v. Malaquias*, 728 A.2d

595, 606 (D.C. 1999). In this case, as discussed below, IFC is likely to prevail in this matter

regardless of what law is applied. Thus, a conflict of law analysis may be unnecessary. If

necessary, however, that analysis suggests that Guernsey law should be applied, and that the law

of the District of Columbia is least likely to apply to the claims Plaintiff has asserted.

      To determine which law should apply, District of Columbia courts follow the

Restatement (Second) of Conflict of Laws § 188. *Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.*,

129 F.3d 143, 148 (D.C. Cir. 1997). According to that section, in contract cases courts look to

five factors to determine the applicable law: "(a) the place of contracting, (b) the place of

negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of

the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflicts § 188.

The jurisdictions whose laws are potentially applicable to this case are Guernsey, Lebanon, and Washington D.C. Employing the Restatement analysis, the first two factors are not implicated because there was no one place of alleged contracting or negotiation. Plaintiff resides in Lebanon and presumably sent his emails from there, while Mr. van Bilsen works in Dubai (J. van Bilsen ¶ 1; November 26, 2005 email from Mr. van Bilsen to Plaintiff, attached as Osseiran Exh. C). The conference calls with Plaintiff involved persons in Lebanon (Plaintiff) (Osseiran ¶1 ); Dubai (Mr. van Bilsen) (J. van Bilsen ¶ 1); and on other occasions Istanbul, Turkey (Mr. Genovese) (Genovese ¶ 1) and the District of Columbia (Mr. Alloway) (Alloway ¶ 1). The MECG shareholders meetings in February 2006 occurred in Lebanon. Genovese ¶¶ 6, 9.

The place of performance was Guernsey, as that is where the corporation resides and, therefore, where its shares are registered. The fifth factor is non-determinative, as it implicates the laws of Guernsey, Lebanon, Dubai, and the District of Columbia. Considering all of these factors, Guernsey has the more substantial interest in applying its law to the contract dispute. While Lebanon is a close second, the District of Columbia cannot be considered to have a more substantial interest than these other two jurisdictions because its only relation to this case is that the IFC is located here—a fact that is not material to the contract dispute between the parties.

Moreover, if this matter does concern control of MECG, as Plaintiff alleges, Osseiran ¶¶ 19-20, Complaint ¶ 8, the choice of Guernsey is mandated by the internal affairs doctrine. Under that doctrine, "only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current

officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.*, 457 U.S. 624, 645-46 (1982). Thus, "[w]hen a particular claim addresses matters of corporate governance or other internal affairs of the organization, most states apply the law of the state where the corporation is incorporated . . . ." *Labovitz v. Washington Times Corp.*, 900 F. Supp. 500, 503 (D.D.C. 1995) (citing Restatement (Second) of Conflicts of Law §§ 301-310 (1971)). Given that this dispute concerns matters peculiar to and among MECG's shareholders, as well as the internal affairs of MECG (Osseiran ¶¶ 15(d), 17; J. van Bilsen ¶ 5; Genovese ¶¶ 6-10), the internal affairs doctrine clearly points to Guernsey law as the most applicable.

### 2.    Plaintiff Is Unlikely To Succeed On The Merits Under Guernsey Law

IFC has submitted an opinion of Guernsey law assessing Plaintiff's claims based upon a review of Plaintiff's Complaint and Motion papers. Dunster ¶¶ 6-7. Mr. Dunster is an advocate of the Royal Court of Guernsey and is well-qualified to opine on the law of that jurisdiction. In forming his opinion, Mr. Dunster assumes that the facts set forth in Plaintiff's papers are true and does not account for the factual statements submitted by IFC. Dunster ¶ 10. Reviewing these facts, Mr. Dunster comes to two fundamental conclusions.

First, Guernsey law does not recognize Plaintiff's remedy for specific performance that forms the basis for the instant Motion. *Id.* ¶¶ 26-30. Instead, Guernsey law will seek, where required, to provide for an alternative remedy such as damages. *Id.* ¶ 29. Absent an available remedy for specific performance post-judgment, Plaintiff clearly cannot be entitled to that remedy prejudgment. His request for a preliminary injunction must fail for that reason alone.

Second, as a matter of law, Plaintiff's allegations fail to state a claim under Guernsey law for breach of contract or promissory estoppel. Importantly, the alleged contract lacks certainty, *id.* ¶ 35, which reveals that the parties had not reached a binding agreement. *Id.* ¶ 41 ("In fact,

Osseiran goes on to mention queries and amendments to the Draft SSA, as well as raising the issue of the reluctance of the material banks to enter into the Bank Guarantee Provision as set out in the Draft SSA. There is no clearer prima facie evidence that the terms of the agreement between Osseiran and IFC had not been finalized."). Moreover, if the agreement were merely an "agreement to agree," as Plaintiff appears to admit on page 10 of Plaintiff's Memorandum, it could not bind IFC under Guernsey legal principles as a matter of law. *Id.* ¶ 42. *See also*, *id.* ¶ 43 ("To conclude the analysis of Court I, I believe Osseiran's claim for breach of contract would fail under Guernsey law.") Similarly, Guernsey courts do not recognize the remedy of promissory estoppel and, even if they did, the claim would fail because the allegations fail to evidence any sort of binding agreement that could have been relied upon. *Id.* ¶ 46.[7] *See also*, *id.* ¶ 47 ("On this basis, I believe that the promissory estoppel claim would fail under Guernsey law.")

### 3. Plaintiff Is Unlikely To Succeed On The Merits Under Lebanese Law

IFC also has submitted an opinion of Lebanese law assessing Plaintiff's claims based upon a review of Plaintiff's Complaint and Motion papers. Sader ¶¶ 3, 6. Lebanon follows a civil law system. Under Article 220 of the Lebanese Commercial Code, a written sale agreement will not be perfected, have any binding effect on the parties, or be enforceable until it is finalized and executed. *Id.* ¶ 8. Plaintiff's allegations and submissions admit that the written sale agreement was not finalized as to its terms and, therefore, Plaintiff's claim for breach of contract would fail under Lebanese law. *Id.* ¶ 9. Plaintiff's claim for promissory estoppel is not recognized under Lebanese law, and therefore would also fail outright. *Id.* ¶ 10.

---

[7] Though not pertinent here, Mr. Dunster also notes that all of Plaintiff's other claims would also fail on their face. Regarding all five claims, he concludes: "As a result of the matters more fully detailed above, I believe if the matters set forth in the Plaintiff's papers were to be taken as true, his claims would fail under Guernsey law." Dunster ¶ 70.

**4.      Plaintiff Is Unlikely To Succeed On The Merits Under The Law Of The District Of Columbia**

(a)      Plaintiff And IFC Did Not Enter Into An Enforceable Agreement Under District Of Columbia Law

Assuming, arguendo, that District of Columbia law applies to resolve Plaintiff's contract claims, there was no enforceable agreement under District of Columbia law.

For an enforceable contract to exist under District of Columbia law, there must be both (1) agreement on all material terms; and (2) an intention of the parties to be bound. *See, e.g., Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995); *see also Novecon, Ltd. v. Bulgarian-American Enter. Fund*, 190 F.3d 556, 564 (D.C. Cir. 1999) ("*Novecon II*"). Plaintiff bears the burden of proving the existence of an agreement; this burden is "particularly onerous" when—as here—the parties contemplated the execution of a final written contract. *Jack Baker*, 664 A.2d at 1238. Under both factors articulated by the District of Columbia courts, Plaintiff has failed to meet his burden.

i.      The Parties Did Not Intend To Be Bound

In order to form a binding agreement, "both parties must have the ***distinct intention to be bound***; without such intent, there can be no assent and therefore no contract." *Jack Baker*, 664 A.2d at 1239 (emphasis added). Here, the evidence clearly establishes that neither party intended to be bound before the execution of a formal, written contract.

During the email exchange that Plaintiff claims formed an enforceable agreement, IFC and Plaintiff both expressly stated that any agreement between them was contingent upon the conclusion of separate banking transactions and final documentation. In his November 18, 2005 email, Mr. van Bilsen asked Plaintiff to confirm, "you accept that ***our acceptance is subject to documentation***—meaning separate sales agreements with [IFC] and [B]arclays, and acceptable bank guarantees . . . ." J. van Bilsen ¶ 8; Osseiran Exh. A at 1 (emphasis added). Mr. van Bilsen

also asked Plaintiff to agree that "[t]he sales agreements come into force and affect [sic] ***after*** signing of the sales agreements and receipt of the above mentioned bank guarantees acceptable to us, as well as the first 40% payable." Osseiran Exh. A at 1 (emphasis added).

In his November 19, 2005 email responding to Mr. van Bilsen, Plaintiff accepted these conditions unequivocally:

> 1) ***I accept that your acceptance is subject to documentation***—
> which means separate sales agreements with IFC and Barclays, and
> acceptable bank guarantees . . . .
>
> . . .
>
> 3) The sales agreements come into force and effect ***after*** signing
> of the sales agreements and receipt of above mentioned bank
> guarantees acceptable to you, as well as the first 40% paid.

J. van Bilsen ¶ 8; Osseiran Exh. A at 3. (emphasis added).

One week later, Mr. van Bilsen emailed Plaintiff a draft of the share sale agreement "for your review." Osseiran Exh. C at 1. The email provided that "IFC and/or Barclays reserve the right to make amendments ourselves to this draft, and/or to Barclays' draft share sale agreement," and noted that the draft agreement "left open for now" certain requirements concerning share transfer documentation. *Id.*

The draft agreement stated on its face that the parties did not intend to be bound until the execution of a final contract. The top of the cover page read, "IFC Legal Department/CONFIDENTIAL DRAFT/[Subject to Change]." Osseiran Exh. C at 2. On the same page, the draft provided in bold, underlined text:

> **This draft document is not a contract or an offer to enter into a
> contract. Only the document as executed by IFC and Mr.
> Osseiran will contain the terms that bind them. Until the
> document is executed by IFC and Mr. Osseiran, neither IFC
> nor Mr. Osseiran intends to be bound.**

*Id.*

Although Plaintiff reviewed and commented on the draft agreement, he never objected to this condition. J. van Bilsen ¶¶ 10-11; Osseiran Exh. D. During a series of telephone calls in the weeks after the email exchange, meanwhile, IFC repeatedly represented to Plaintiff that it did not intend to enter into a binding agreement at that time. J. van Bilsen ¶¶ 15, 18, 20 (describing conference calls on December 19, 2005 and January 24, 2006, in which IFC representatives informed Plaintiff that IFC had decided not to sell him shares at that time); Genovese ¶¶ 3-5 (describing a telephone conversation on January 25, 2006, in which IFC representatives informed Plaintiff that IFC was not prepared to sell him the shares and would not sign any binding documents at that time).

Under District of Columbia law, "considerable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed." *Novecon, Ltd. v. Bulgarian-American Enter. Fund*, 967 F.Supp. 1382, 1387 (D.D.C. 1997), *aff'd*, 190 F.3d 556 (D.C. Cir. 1999) ("*Novecon I*"). Courts are "reluctant to discount such a clear signal" that a party does not intend to be bound by preliminary writings or negotiations. *Id.* Here, *both* parties expressly agreed in writing that there would be no binding agreement between them until they executed a final written contract. In the weeks that followed, IFC maintained that it would not be bound at an earlier time. Plaintiff's claim that the parties formed an enforceable agreement is, therefore, contrary to law and at odds with both parties' expressed intentions.

        ii.      The Parties Did Not Reach Agreement On All Material Terms

Plaintiff cannot prevail on the merits of his breach of contract claim unless he shows that the written contract contemplated by the parties is "understood to be a mere memorial of the agreement already reached." *Jack Baker*, 664 A.2d at 1238-1239 (citing *D.C. Area Comm.*

*Council, Inc. v. Jackson*, 385 A.2d 185, 187 (D.C. 1978)).   Plaintiff implies that the draft contract documented a preexisting agreement because Mr. van Bilsen referred to it as a "standard document[]" in a November 23, 2005 email.   *See, e.g.*, Complaint ¶ 21; Osseiran ¶ 6.   The "standard" nature of the draft agreement, however, does not negate the express condition on its face that the parties were to be bound only by a final, executed contract.

Under District of Columbia law, moreover, a contract has not been formed if the final document "is to contain *any material term that is not already agreed on*."   *Jack Baker*, 664 A.2d at 1239 (emphasis added); *see also Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 547 (D.C. 1981) ("To be final, contract negotiations must include all of the terms which the parties intended to resolve . . . .").   The documents Plaintiff attaches to his declaration clearly establish that the parties had yet to reach final agreement on a number of material terms.

As noted, when Mr. van Bilsen sent the draft agreement to Plaintiff by email dated November 26, 2005, he specifically stated that (i) "IFC and/or Barclays *reserve the right to make amendments* ourselves to this draft, and/or to Barclays' draft share sale agreement," (ii) "we have *left open for now*" the requirements for necessary share transfer documentation, and (iii) Plaintiff "[p]lease let us know if you are in agreement with these terms."   Osseiran Exh. C at 1 (emphasis added).   These statements hardly evidence that the draft represented the "mere memorial" of a preexisting agreement.

Plaintiff's response to the draft agreement only underscores the fact that negotiations were ongoing, and a number of material terms remained unresolved.   In his December 1, 2005 email responding to the draft agreements, Plaintiff requested IFC to make certain amendments, to explain the presence of brackets around some provisions, to remove a provision on legal fees, and objected to the wording of contingent liability and contingent bank guarantee provisions,

which "[b]oth banks [were] reluctant to accept . . . ." Osseiran Exh. D; J. van Bilsen ¶ 11. Indeed, the parties never reached an agreement even on the form of the bank guarantees. J. van Bilsen ¶ 12, Exh. 4 (discussing December 12, 2005 email attaching draft bank guarantee from UBS AG, which stated draft was for "discussion purposes" and was "strictly without any liabilities").

Because the parties had previously agreed that any final agreement was "subject to documentation," including "acceptable bank guarantees," the parties could not proceed without mutually acceptable guarantee language. All of these requests indicate that the agreement was anything but final. Thus, absent agreement on such material terms, the parties could not and did not form a binding contract under District of Columbia law. *See Jack Baker*, 664 A.2d at 1239.

iii.    Additional Factors Weighed By District of Columbia Courts Reaffirm That The Parties Did Not Enter Into An Enforceable Agreement

In addition to the two-part test articulated above, District of Columbia courts consider five other factors "useful" and "appropriate" to determine whether an enforceable agreement exists when parties have not yet executed a formal document: (1) if the contract is one usually put in writing; (2) if the transaction involves many or few details; (3) if the amount involved is large or small; (4) if a full expression of the covenants and promises requires a formal writing; and (5) if negotiations indicate that a written draft was contemplated as the final conclusion of negotiations. *See, e.g., Jack Baker*, 664 A.2d at 1240; *Novecon I,* 967 F.Supp. at 1387. A consideration of these five factors further demonstrates that IFC and Plaintiff did not enter into an enforceable agreement.

As a public institution, IFC always conditions the approval of its investment agreements on the completion and execution of formal documents. J. van Bilsen ¶ 3; Alloway ¶ 7. IFC does not enter into contracts through telephone conversations or email exchanges, and investment

managers do not have the authority to bind IFC except though formal approvals and executed documentation. J. van Bilsen ¶ 3; Allowing ¶ 7. As such, the share sale agreement that IFC was negotiating with Plaintiff was of a type that is always, and not just usually, put in writing.

Furthermore, the parties' contemplated share sale was detailed, involved a large amount of money, and required a writing for the full expression of all covenants and promises. As the cover page of the draft agreement sent to Plaintiff and his December 1, 2005 response to that draft agreement indicate, both parties specifically agreed that they would not be bound until they had executed a formal written contract. This being the most important of these five additional factors, the parties' expressed intention that preliminary negotiations not constitute an enforceable agreement firmly establishes that there is no such agreement here. *See Novecon I*, 967 F.Supp. at 1387.

        (b)    <u>Even If This Court Finds That The Parties Reached A Preliminary Agreement, District of Columbia Law Does Not Recognize A Duty To Negotiate Open Terms</u>

Plaintiff readily admits that, even if the parties entered into an enforceable preliminary agreement, this "may not bind [them] to their ultimate contractual objective . . . ." Pl. Mem. at 10. Plaintiff further argues, nonetheless, that the alleged preliminary agreement does "bind [the parties] to negotiate any open issues in good faith and to proceed to document and execute the formal contract once those open issues have been resolved." *Id.* (citing *Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 407 (4th Cir. 2002)). Plaintiff is clearly grasping at straws.

Plaintiff acknowledges the District of Columbia has not adopted any such general duty to negotiate in good faith after the conclusion of a preliminary agreement. Motion at 10-11, n.3. Under District of Columbia law, "[p]arties may make an enforceable contract binding them to prepare and execute a subsequent documentary agreement"—but ***only if*** that final document is "understood to be a mere memorial of the agreement already reached." *Jack Baker*, 664 A.2d at

1239 (citing *D.C. Area Comm. Council*, 385 A.2d at 187).  As discussed, the parties intended to be bound only by a final written agreement and had not agreed upon open terms.  Hence, any alleged preliminary agreement to further agree was not binding under District of Columbia law and IFC was under no obligation to continue negotiations or to proceed to formal documentation.

(c)    <u>Plaintiff Is Not Likely To Succeed On His Promissory Estoppel Claim</u>

Plaintiff claims in the alternative that, if the parties' November 2005 emails do not constitute an enforceable agreement, IFC is bound under the theory of promissory estoppel.  Pl. Mem. at 11.  District of Columbia law provides that the three principal elements of promissory estoppel are (1) a promise; (2) the promise reasonably induced reliance on it; and (3) the promisee relied on the promise to his detriment.  *Building Servs. Co. v. Nat'l R.R. Passenger Corp.*, 305 F.Supp.2d 85, 95 (D.D.C. 2004) (citing *In re U.S. Office Prods. Co. Sec. Litig.*, 251 F.Supp.2d 77, 97 (D.D.C. 2003)).  In addition, D.C. courts consider whether "injustice can be avoided only by enforcement of the promise."  *Granfield v. Catholic Univ. of Am.*, 530 F.2d 1035, 1039 (D.C. Cir. 1976) (citing Restatement (First) of Contracts § 90 (1932)).

i.    IFC Did Not *Promise* To Conclude A Final Agreement

For purposes of promissory estoppel, the promise "must still be a promise with definite terms on which the promisor would expect the promisee to rely."  *In re U.S. Office Prods.*, 251 F.Supp.2d at 97.  In order to justify reasonable reliance, a promise "must be more than merely a promise to 'bargain in good faith.'"  *Novecon II*, 190 F.3d at 565 (citation omitted).

Contrary to Plaintiff's claims, IFC never made "repeated[] promise[s]" from December 19, 2005 through February 8, 2006, to sell him its MECG stock.  Pl. Mem. at 12.  Rather, as discussed, IFC assured Plaintiff only that, while it genuinely would continue to deal with him, IFC would wait for other forthcoming offers.  J. van Bilsen ¶ 14 (informing Plaintiff on a

28

December 19 conference call that IFC was genuine in its plans and efforts to complete an agreement with him but, given other shareholder concerns and the fact that there may be other purchasers for the shares, IFC would wait for up to four months to see if there were any other offers forthcoming); *id.* ¶ 20 (stating the same thing to Plaintiff during the January 24 conference call); Genovese ¶ 4 (stating the same thing to Plaintiff during the January 25 conference call); *id.* ¶¶ 6-7 (IFC announcing at February 8, 2006 shareholder meeting that it had not concluded a sale agreement and did not consider itself bound to sell its shares to anyone in particular, and that it would have to consider all of the offers presented before making a decision as to the sale of its shares).

Under these circumstances, District of Columbia law does not recognize an enforceable promise. *See, e.g., Bender v. Design Store Corp.*, 404 A.2d 194, 196-97 (D.C. 1979) (holding that no promise existed where there was no agreement in writing, one party had clearly expressed an intention to be bound only by a final written agreement, and the same party had merely made assurances to bargain in good faith).

ii.    Plaintiff Did Not *Reasonably Rely* On IFC's Representations

Even if IFC's statements could in some way be construed as a promise to enter into an enforceable agreement, Plaintiff must show that he relied **reasonably** on such a promise. *Building Servs. Co.*, 305 F.Supp.2d at 95. The steps that Plaintiff took—including his purchase of other shares in MECG—were made, however, in reliance on an alleged "promise" that was expressly contingent upon the conclusion and execution of a final written contract. *See, e.g.,* Osseiran Exh. A at 3 ("I accept that your acceptance is subject to documentation . . . ."). Under these circumstances, any reliance by Plaintiff before the execution of formal documentation was unreasonable. *See Novecon I*, 967 F.Supp. at 1388 (denying recovery under theory of

29

promissory estoppel because promisee unreasonably relied on a promise conditioned on ratification by the promisor's board of directors) (citing *Doll v. Grand Union Co.*, 925 F.2d 1363, 1372 (11th Cir. 1991) (holding that there was no reasonable reliance where the defendant had given "repeated caveats that it did not intend to be bound" until a final agreement was signed)).

Moreover, by December 19, 2005, IFC had told Plaintiff explicitly that it would *not* be selling him its shares at that time. J. van Bilsen ¶¶ 14-15. Thus, none of the actions Plaintiff took after December 19, 2005, including his subsequent purchase of MECG shares from others, could be considered to be in reasonable reliance on any alleged promise by IFC—by any stretch of the imagination.

### iii.    Plaintiff Did Not *Detrimentally Rely* On IFC's Representations

Plaintiff alleges that the setting aside of funds for the IFC share purchase, as well as the purchase of MECG stock from other shareholders, constitute detrimental reliance. Complaint ¶ 42; Osseiran ¶¶ 7, 16. In the absence of a definite promise or any reasonable reliance, this Court need not consider whether Plaintiff's reliance was actually detrimental. *See Bender*, 404 A.2d at 196–97 (denying a claim for promissory estoppel and holding that, where there was no promise, it was not necessary to determine if there had been reasonable or detrimental reliance). In any event, Plaintiff's actions do not constitute a detriment to him.

Plaintiff now owns a significant number of MECG shares that, contrary to his assertions, are certainly worth more than "very little." Osseiran ¶ 19. Plaintiff purchased 50,000 of the shares from Barclays Bank for $2.8 million, and 57,000 shares from five other MECG shareholders for nearly $3 million—on average, a purchase price of approximately $56 and $53 per share, respectively. *Id.* ¶ 16. Plaintiff was given a full opportunity at the February 16, 2006

shareholders' meeting to join other shareholders in selling their stock at $60 per share. Genovese ¶ 10. Rather than a worthless investment, then, Plaintiff's purchase of the 107,000 additional MECG shares actually put him in a good position to turn a profit—an opportunity which he flatly refused. *See id.* ¶ 10. IFC cannot be held responsible for Plaintiff's intransigence and unwillingness to deal reasonably with others.

iv.  Compelling IFC To Sell Its Shares To Plaintiff Would Create, Rather Than Avoid, Injustice

District of Columbia courts have recognized that satisfaction of the avoiding injustice requirement "may depend on the reasonableness of the promisee's reliance [and] . . . on the formality with which the promise is made." *Granfield*, 530 F.2d at 1041 n.15 (citing Restatement (Second) of Contracts § 90 cmt. b (1981)). As discussed above, IFC did not promise to enter into a binding agreement before execution of a written contract. Plaintiff's reliance on any alleged IFC "promise" prior to the conclusion of a final agreement was entirely unreasonable.

As a result, enforcing IFC's so-called "promise" to sell its MECG shares to Plaintiff would not satisfy the requirement of avoiding injustice. *Id.* Rather, it would bind IFC to a contract that it never made, and violate the express intention of both parties to form an enforceable agreement only through the conclusion and execution of formal documentation. Indeed, such a ruling would completely undermine IFC's policy of being bound only by formal, executed agreements that governs IFC's transactions and, given the extent of IFC's committed portfolio for its own account (US$19.3 billion in 2005) and loan participations (US$5.3 billion in 2005), would significantly chill IFC's discussions with potential purchasers of its assets and other contractual counter-parties. It would also make it difficult for IFC to fulfill the operational principles set forth in its Articles of Agreement, which include revolving its funds by selling to

31

private investors whenever possible.   J. van Bilsen Exh. 1 at 3 (IFC Articles of Agreement, Article III, Section 3).

### C.    Plaintiff Cannot Demonstrate Irreparable Harm

Plaintiff also cannot meet the "threshold requirement" of "a showing of some irreparable harm flowing from the injury claimed." *Breen v. Mineta*, No. Civ. A. 05-654 RWR, 2005 WL 3276163, at *2 (D.D.C. Sept. 30, 2005); *see also Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies . . . ."). Plaintiff's failure to prove irreparable harm is fatal to his request for an injunction, independent of the purported merit of his claims. *See, e.g., Mylan Pharms., Inc. v. Shalala*, 81 F.Supp.2d 30, 42 (D.D.C. 2000); *see also Sampson*, 415 U.S. at 88.

Plaintiff contends that his inability to gain a controlling share of MECG constitutes irreparable harm *per se*.   As set forth in the cases he cites, however, the inability to gain a controlling share of a corporation does *not* automatically—or even ordinarily—constitute irreparable harm.   In *Pac. Elec. Wire & Cable Co., Ltd. v. Set Top Int'l Inc.*, No. 03 Civ. 9623, 2004 U.S. Dist. LEXIS 3400 (S.D.N.Y. Jan. 20, 2004), the court held there was no irreparable harm caused by a transaction involving at least a 22.4% share transfer, and explained that controlling share transactions only involve irreparable harm in a *few particular situations*: "[c]ases where courts have found irreparable harm in corporate or commercial settings fall into roughly three categories, *none of which categorically equate the loss of a majority interest in a corporation with irreparable harm*." *Id.* at *6-7 (emphasis added).   These three categories include:  (1) "preventing a ready, willing, and able buyer from purchasing a majority interest in a corporation," (2) management denying "shareholders a voice by preventing shareholders from voting their shares or from having representation on the board of directors" and infringing on

"minority rights," and (3) preventing the movant "from losing its livelihood or its position in a business that the movant helped to start." *Id.* at *7-8.

None of these situations is applicable here. First, according to Plaintiff's emails, his attempt to buy IFC's shares of MECG was not begun as an attempt to gain majority control of MECG. *See* J. van Bilsen Exh. 3 (Oct. 3, 2005 email); Osseiran Exh. A at 2,3 (Nov. 18 and 19, 2005 emails); Exh. D at 1 (Dec. 1, 2005 email). Indeed, at the time Plaintiff approached IFC to buy its stock, in September 2005, he owned only 1.5% of MECG's stock. Complaint ¶ 15; J. van Bilsen ¶ 5; Osseiran ¶ 3. Afterwards, Plaintiff was inconsistent in his representations to IFC on whether the sale of IFC's shares to him would give him control of MECG or not. J. van Bilsen ¶ 24 (explaining that Plaintiff did not tell IFC "that his ultimate goal was to acquire a majority of MECG's shares until our conversation on December 30, 2005. In that same conversation he also told me that he had already acquired a majority of the shares of MECG and, thus, he was not depending on IFC's shares to provide him with a majority"). By February 8, 2006, by which time IFC had repeatedly refused to conclude a sale with Plaintiff, Plaintiff had still acquired only 34.6% of the shares. Genovese ¶ 6. Thus, even by that late date, IFC's shares were still insufficient to confer control of the company to Plaintiff.[8]

Second, IFC is but one shareholder of MECG and has never controlled it.[9] Thus, by refusing to convey its shares to Plaintiff, IFC is not preventing Plaintiff from exercising his minority rights and voting his shares or having a place on the board by MECG's management. Indeed, Plaintiff's minority rights are not at stake in any possible transaction involving IFC. Plaintiff's reliance on the cases he cites on pages 13-14 of his memorandum is therefore

---

[8] Plaintiff's reliance on *United Acquisition Corp. v Banque Paribas*, 631 F. Supp. 797, 799 (S.D.N.Y. 1985), to support its argument on irreparable harm is clearly inappropriate because that case involved the attempted purchase of "all of the shares" of a company, rather than a mere 10.8%. Pl. Mem. at 13.

[9] IFC is not allowed to manage enterprises in which it invests. J. van Bilsen Exh. 1 at 3 (IFC Articles of Agreement, Art. III, Sec. 3).

misplaced, because those cases found irreparable harm in the denial of shareholders' rights to vote, rights of management, and minority veto rights, rather than in the denial of the mere ability to gain control. *See, e.g.*, *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co. Ltd.*, 339 F.3d 101, 114 (2d Cir. 2003) (holding that "the denial of bargained-for minority rights, standing alone, *may constitute* irreparable harm for purposes of obtaining preliminary injunctive relief where such rights are central to preserving an agreed-upon balance of power (*e.g.*, preserving the management role of the minority directors) in corporate management") (emphasis added); *Independence Fed. Savings Bank v. Bender*, 326 F.Supp.2d 36, 49 (D.D.C. 2004) (finding no irreparable harm because the movant was "not attempting to purchase 100% of the Bank's stock . . . . He only want[ed] to increase his minority position enough to fatally undermine a two-thirds shareholder vote in favor of the [] merger"); *Int'l Banknote Co., Inc. v. Muller*, 713 F.Supp. 612, 623 (S.D.N.Y. 1989) (explaining that "corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in their attempt to obtain representation on the board of directors"); *Beztak Co. v. Bank One Columbus, N.A.*, 811 F.Supp. 274, 284 (E.D. Mich. 1992) (holding that "the issue of whether or not a plaintiff may suffer irreparable harm [in cases involving the loss of stock voting rights or corporate control] is highly fact specific" and finding irreparable harm because plaintiffs would be "deprived of their right to vote the shares" if the transaction were not enjoined).  None of these "shareholder rights" issues are implicated here.

Third, Plaintiff does not have a history of working with or caring about MECG.  Rather, he is in the business of "investing in distressed companies," himself describing that as "all he did" and indicating that he was interested in looking for other "distressed companies" while in negotiations for IFC's shares of MECG.  Genovese ¶ 8.  Therefore, Plaintiff's reliance on *Data*

*Consultants, Inc. v. Traywick*, 593 F.Supp. 447, 454 (D. Md. 1983) (finding irreparable harm where the company involved was a "small, closely held company, and [the movant] had provided the financial resources from the outset and had continued to be personally responsible for corporate indebtedness") and *Castle v. Cohen*, 676 F.Supp. 620, 629-30 (E.D. Pa. 1987) (finding irreparable harm because the stock was unique in that it was a majority block of stock in a closely-held corporation and the transaction at issue represented "an opportunity for the employees to own their own business") is also misplaced, and inapplicable here.

This Court fundamentally must inquire whether Plaintiff's alleged injury could be compensable by money damages—a point virtually ignored by Plaintiff in his discussion of irreparable harm. If the injury to Plaintiff can be valued monetarily, then there is no irreparable harm. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (holding that where plaintiffs have an adequate remedy at law, a preliminary injunction is not appropriate); *Dorfmann v. Boozer*, 414 F.2d 1168, 1174 (D.C. Cir. 1969); *U.S. S.E.C. v. Lines Overseas Mgmt., Ltd.*, No. 04-302, 2005 WL 3579139, at *2 (D.D.C. Dec. 30, 2005) ("'Irreparable harm' is an imminent injury that is both great and certain, and that legal remedies cannot repair.").

In cases similar to Plaintiff's involving requests for preliminary injunctions, courts have found irreparable harm lacking because the shares in question could be valued monetarily. *See Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987) (affirming a finding of the lack of irreparable harm because the inability to engage in post-tender offer liquidation could be remedied in an action for money damages); *FMC Corp. v. R.P. Scherer Corp.*, 545 F.Supp. 318, 322 (D. Del. 1982) (finding that "the price FMC offers for their shares would net the intervenors approximately $2,500,000 more than they would have realized had they sold their shares on the

open market during the period immediately preceding the announcement of FMC's offer. That harm, a loss of money, can be remedied by a post-transaction suit for damages in an appropriate forum"); *Pesch v. First City Bank of Dallas*, 637 F.Supp. 1539, 1546 (N.D. Tex. 1986) (finding no irreparable harm where "the price of the shares could be easily ascertained and damages could be awarded" and rejecting movant's arguments, including that the movant would lose the power to vote 210,000 shares in a leveraged buy-out).

Here, the amount of damages to Plaintiff, if any, could be valued easily by using the value of the shares set forth in the agreement IFC has to sell the shares to FNB. *See* Osseiran Exh. F. That agreement sets a price for 51% of the shares (a majority interest) at $60 per share (or $66 per share depending upon whether a Real Estate Fund is included). *Id.* Because money damages are sufficient, Plaintiff's "subjective" desire to obtain IFC's shares does not constitute irreparable injury. *Pesch*, 637 F.Supp. at 1547 (rejecting movant's argument that the shares were items of personal property with unique value to the entrepreneur movant who invested in corporations for the purpose of acquiring control). He has not shown irreparable harm and his motion must be denied.

### D.    The Balance Of Harms Analysis Favors IFC

IFC would be substantially injured if the Court were to issue a preliminary injunction restricting its assets. First, the denial of its property's absolute immunity from attachment would render that immunity meaningless and, just like the denial of a sovereign's immunity, subject IFC to extensive, costly proceedings and the "attendant burdens of litigation" from which it is immune. *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990); *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 451 (6th Cir. 1988) (noting that immunity under the FSIA includes immunity from "extensive discovery and other extended proceedings . . . [that] may frustrate the significance and benefit of entitlement to immunity from

suit"). Indeed, the Court of Appeals in *Atkinson* made the same observation with respect to broadly construing waivers of immunity and subjecting an international organization to garnishment proceedings from which it had not specifically waived immunity: "we are skeptical . . . that the costs imposed on a garnishee are minimal." *Atkinson*, 156 F.3d at 1339.

Second, as noted, enjoining IFC from transferring its shares would temporarily bind IFC to a contract with Plaintiff that it never made and completely undermine IFC's policy of being bound only by formal, executed agreements that governs IFC's transactions. In light of the extent of IFC's committed equity portfolio and loan portfolio and the hundreds of projects it finances each year, the injunction would significantly chill IFC's discussions with potential purchasers of its assets and other contractual counter parties.

By contrast, Plaintiff would suffer little real harm because his alleged injuries are compensable with damages. Moreover, since Plaintiff actively deals in distressed companies as a business, Genovese ¶ 8, money is ultimately all he seeks.

### E.    The Public Interest Would Not Be Furthered By An Injunction

The United States has a great interest in the efficient functioning of international organizations of which it is a member state, especially World Bank institutions such as IFC. To date, IFC has provided nearly $50 billion of its own funds in project financing assistance to developing countries. Basic Facts ¶ 2. As the Court of Appeals discussed in *Mendaro*, "[t]he strong foundation in international law for the privileges and immunities accorded to international organizations denotes a fundamental importance of these immunities to the growing efforts to achieve coordinated international action through multinational organizations with specific missions." *Mendaro*, 717 F.2d at 615. According to the Court, part of this public interest is in maintaining the independence of the organization from its member states. *Id.* at 615-16 (discussing that an international organization's immunities are "rooted in the need to protect

international organizations from unilateral control by a member nation over the activities of the international organization within its territory . . . . [T]he very structure of an international organization . . . requires that the organization remain independent from the international policies of its individual members").

The preliminary injunction sought by Plaintiff would stand this policy on its head by interfering with IFC's policies concerning when it can be bound by an agreement and, thereby, disrupting its otherwise efficient transactions and bringing uncertainty to those transactions. Moreover, as noted, the injunction would be in violation of IFC's Articles of Agreement to which all member countries, including the United States, have agreed, as well as U.S. statutes governing international organizational immunity. *See, supra,* Argument § I.

There are no public policies that would favor the granting of Plaintiff's motion.

## CONCLUSION

For all the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction should be

denied.

Dated: Washington, D.C.                          Respectfully submitted,
       March 10, 2006


                                           **WHITE & CASE** LLP


                                    / S / Francis A. Vasquez, Jr.
                                    Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
                                    Frank Panopoulos (D.C. Bar No. 459365)
                                    701 Thirteenth Street, N.W.
                                    Washington, D.C. 20005-3807
                                    (202) 626-3600

                                    *Attorneys for International Finance*
                                    *Corporation*