# EXHIBIT B

## DECLARATION OF CARMEN GENOVESE

I, Carmen Genovese, state as follows:

1. I am the Principal Special Operations Officer for International Finance Corporation ("IFC") and work in IFC's office in Istanbul, Turkey. I have been employed by IFC since 2001 and have held my current title since 2004. Unless otherwise stated, I have personal knowledge of the facts stated herein, and if sworn as a witness, would testify to those facts.

2. I have read the Declaration of Salah N. Osseiran, the Complaint and the factual portions of the Memorandum of law that Mr. Osseiran submitted in his case against IFC. I believe he has made a number of misstatements and mischaracterizations about the events he has described pertaining to his attempted purchase of IFC's shares in Middle East Capital Group ("MECG").

3. I became personally involved with these matters in January 2006. At the start of my involvement, Mr. Osseiran had had discussions with IFC about purchasing IFC's shares, but no sale has been concluded. Mark Alloway, Jan van Bilsen and I had a conference call with Mr. Osseiran about IFC's shares on January 25, 2006, which Mr. Osseiran appears to be discussing in paragraphs 15(c) of his declaration. His description of that conversation is inaccurate and misleading.

4. On that call, Mr. Osseiran asked us to sell him IFC's shares in MECG as he had discussed at earlier points in time with Mr. van Bilsen and Mr. Alloway. Speaking for IFC, Mr. Alloway informed him that IFC was not prepared to sell him the shares, but wanted to wait for an upcoming shareholders meeting to hear from the committee that had been established to find a buyer for the shareholders and to learn if there were any other offers to be considered. Mr. Osseiran asked us for a letter confirming that IFC would agree to sell him the shares. Mr. Alloway said that we would not sign any documents that would bind IFC at that time. Mr.

Osseiran said he was concerned that the meeting of the shareholders would not take place any time soon and wanted to buy the shares before the meeting.

5. In his declaration at paragraph 15(c), Mr. Osseiran states that we told him that "the *only* impediment to closing sale was IFC's desire to hear directly from other MECG shareholders." That is not correct, as this issue was only one impediment. I agree with his next statement that IFC was free to sell its MECG shares to anyone without shareholder approval, but that does not mean that IFC had agreed to sell them to Mr. Osseiran. He then states that I assured him that IFC was not soliciting other offers for its MECG stock. It is true that IFC was not independently soliciting other offers, but that does not mean that IFC would not consider any offers obtained by the shareholders as a group. Regarding the threat of legal action he mentions, on the January 25, 2006 telephone call Mr. Osseiran said he had spoken to his lawyer and could sue IFC for "triple damages" if IFC did not convey the shares immediately. Mr. Alloway advised him that there would be nothing to gain by such action and asked him to be patient.

6. Despite Mr. Osseiran's concerns about whether a shareholder's meeting would take place, a meeting did in fact take place in Beirut, Lebanon on February 8, 2006, as referenced in his declaration at paragraph 15(d). The meeting was led by the Chairman of MECG, Mr. Khalid Al Turki. Mr. Al Turki informed the shareholders that there were a number of offers and serious expressions of interest to purchase the shares of MECG (i.e., both IFC's holdings and the shares of others). Those offers included an offer from the former CEO of MECG and a group of investors, expressions of interests from several banks and Mr. Osseiran's offer. It was agreed that the banks would be asked to provide firm offers in writing by the following Monday. Mr. Osseiran responded to the news by saying he would increase his offer from $44 to $50 per share, which he said he would confirm in writing but never did. It was also announced at this meeting

2

that Mr. Osseiran had recently acquired 92,000 shares and now controlled 34.6% of the company. I was asked at the meeting whether IFC had made any agreements to sell its shares yet. I said that IFC had not concluded any sale agreement with anyone and did not consider itself bound under any legal or other obligation to sell its shares to anyone in particular. Notably, Mr. Osseiran did not object or contradict my statement that we did not have an agreement.

7. In paragraph 15(d) of this declaration, Mr. Osseiran makes some misleading and inaccurate statements about the February 8 meeting and statements I made to him. First, he states that "[a]ll of MECG shareholders who were present" informed me that IFC and the other shareholders were free to sell their shares as they saw fit. In fact, there were differing views on this topic. Some of the shareholders thought that there may be a legal obligation to sell in a block with the group and others thought that there was no legal obligation, but that there may be an ethical obligation. As noted above, I stated that IFC's position was that IFC was not bound by any obligation to anyone. Mr. Osseiran also states that I informed him that IFC "remained committed to the stock sale" to him. This is untrue, as I did not voice any commitment to him. Instead, I merely told him that we would have to consider all the offers to be presented.

8. In paragraph 15(d) of his declaration, Mr. Osseiran also makes the somewhat bizarre statement that I "enticed" him by offering him an interest in two Yemeni companies. I did no such thing. I believe he may be referring to a casual conversation I had with him where I asked him if he did a lot of investing in distressed companies. He said that that was all he did, and asked if I knew about any. I mentioned that I was involved with two distressed companies in Yemen, but contrary to his implications, I did not make any direct offer to him to sell IFC's interests in those companies. Rather, I said that we should talk about them some other time. The conversation certainly had nothing to do with MECG.

9. Another meeting of the shareholders took place in Beirut, Lebanon on February 16, 2006. The purpose of this meeting was to consider the five offers that had been submitted and circulated on February 13. *See* Letter to Shareholders dated February 13, 2006 (attached at Exhibit 1). The meeting began with a review of all the offers and the potential liquidation value of the company. Mr. Osseiran contended that the liquidation value was at least $12 per share overstated. With the exception of Mr. Osseiran, the shareholders then agreed that they should work together to maximize their returns. It was agreed that the offer from First National Bank ("FNB") appeared to be the most attractive and discussions should begin with them. Jan van Bilsen and I stated that we would recommend to our management that IFC sign the agreements to proceed if a majority (i.e., 51%) of the shareholders agreed and if the sale could be concluded in a timely fashion. It was agreed among the shareholders except for Mr. Osserian that we would pursue the FNB offer on the condition that the sale could be concluded by the end of March 2006. A draft agreement with such conditions was drawn up at IFC's request and we said we would take it to IFC management for approval.

10. In paragraph 17 of his declaration, Mr. Osseiran states that I proposed "that all MECG shareholders other than [Mr. Osseiran] enter into an agreement to sell their shares to [FNB]" at $60 per share. I did not make such a proposal and did not try to exclude Mr. Osseiran from participating with the other shareholders. Mr. Osseiran was given the full opportunity to join the other shareholders in selling their shares at $60 per share, but said he would not sell. He was also asked if his verbal offer of $ 50 per share from the meeting of February 8 which he had agreed to commit in writing was withdrawn. He said he would not be increasing his offer from his initial offer made prior to the February 8, 2006 meeting.

4

11. We took the FNB proposal to our management, as we told Mr. Osseiran and the other shareholders we would, and obtained approval. Jan van Bilsen executed the document on February 19, 2006, and it is attached to Mr. Osseiran's declaration as Exhibit F.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of March in Istanbul, Turkey.

_____
Carmen Genovese

5

# C. Genovese

# EXHIBIT 1

**Middle East Capital Group**
Finance Companies Registration No. 19 C.R. 70376 Beirut Capital L.B.P. 11,000,000,000. Fully Paid.

Monday, 13 February 2006

Dear MECG Shareholders,

The shareholders meeting will reconvene at 11:00am on Thursday, February 16th, 2006.

As requested by the shareholders, the MECG management has prepared a valuation of MECG's shares. The details are in the attached spreadsheet. Please review the footnotes which are an integral part of the valuation.

All potential bidders were contacted last week and asked to resubmit their bids by end-of-day Monday. Following is a summary of the status of the offers as of 6 pm (copies attached):

1) Saad Haidar – he did not provide supporting evidence of availability of funds
2) First National Bank – offer attached
3) Credit Libanais – offer attached
4) Trisax Investment Holding (Henry Sarkissian) – offer attached
5) Salah Osseiran – has declined to revise the written offer he previously submitted to the chairman

With kind regards,


Walid Musallam

*Page 1 of 1*

BAC Center, 11 Floor, Justinian Street, Sanayeh, Beirut, Lebanon, Tel +961 (1) 738-740, Fax +961 (1) 738-752