# EXHIBIT D

OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION
No. 06-cv-366 (D.D.C)

FIRST AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER

I, MARK GIDEON ANDREW DUNSTER of 7 New Street, St. Peter Port, Guernsey, Channel Islands GY1 4BZ, HEREBY MAKE OATH and SAY as follows:-

1. I am an Advocate of the Royal Court of Guernsey and was called to the Guernsey Bar in 1997. Prior to that I was called to the English Bar in 1994. I hold the Certificat D'Étude Juridique Français et Normande from the Université de Caen, France and a Masters degree in Advanced Civil and Commercial Litigation. I am a Partner in the Litigation and Dispute Resolution Team of Carey Olsen, of the above address, a law firm based in Guernsey and Jersey. I am based in Guernsey. The Bailiwick of Guernsey is a British Crown Dependency, but is in all respects a distinct and independent jurisdiction and has, for the purposes of this affidavit, judicial and legislative independence from English process.

2. Subject to the assumptions and qualifications I make below, the contents of this affidavit are a true statement of my opinion as to matters of Guernsey law.

**Instructions**

3. I am instructed by the London office of White & Case, a law firm which is retained by the Defendant, International Finance Corporation ("IFC"), which is a member of the World Bank Group and is headquartered in Washington D.C. in the United States of America. IFC promotes sustainable private sector investment in developing countries and is the largest multilateral source of loan and equity financing for private sector projects in the developing world.

4.  The Plaintiff, Mr. Salah. N. Osseiran ("**Osseiran**") is an individual businessman, and a citizen and resident of Lebanon.

5.  The dispute between Osseiran and IFC centres around each party's shareholding in Middle East Capital Group ("**MECG**"), a financial institution dedicated to merchant and investment banking, and which was incorporated and registered in Guernsey, the Channel Islands, on 8 December 1995. The registered address of MECG is 1 Le Marchant Street, St. Peter Port, Guernsey GY1 4HP. MECG operates out of its headquarters at BAC Center, Tower A, Justinian Street, Sanayeh, P.O. Box 113 – 7310, Beirut, Lebanon.

6.  I have been instructed to provide my professional opinion on the merits of the case being brought by the Plaintiff against IFC, from a Guernsey perspective, as though the matters alleged were to be heard under the jurisdiction of the Guernsey courts.

7.  For the purpose of drafting this Affidavit I have examined the following documents:

    a.  Copy (undated) Complaint for Preliminary and Permanent Injunctive Relief and Damages of the Plaintiff (the "**Complaint**"); and
    b.  Copy (undated) Motion for a Temporary Restraining Order of the Plaintiff; and
    c.  Copy (undated) Motion for a Preliminary Injunction; and
    d.  Copy (undated) Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion for a Preliminary Injunction (the "**Memorandum**"); and
    e.  Copy signed Declaration of Salah N. Osseiran dated 26 February 2006 (the "**Osseiran Declaration**") and Exhibits 'A' to 'F' thereof.

8.  I understand that the documents at 7 (a) to (e) above were filed with the United States District Court for the District of Columbia on Monday 27 February 2006.

9.  For the purposes of this opinion I have made the following assumptions, without making any investigation thereof:

    a. the completeness and the conformity to original documents or instruments, including transcripts, of all documents or instruments, including transcripts, submitted to me as copies of originals; and

    b. the genuineness of all signatures and seals on the documents and instruments submitted to me for the purposes of this affidavit; and

    c. that there are no provisions of the laws of any jurisdiction outside Guernsey which would have any implication for the opinions I express and that, insofar as the laws of any jurisdiction outside Guernsey may be relevant, such laws have been or will be complied with.

10. For the purposes of this opinion, I am also assuming that the Plaintiff's allegations and factual submissions are true, although I understand that IFC will be contesting them.

11. I have not independently verified these assumptions.

12. I am unable to advise on matters of English law, so where necessary, I may mention the general principles of English law as I believe them to be, but in turn would need to rely on the opinion of English solicitors or barristers to advise on the accuracy of those statements.

**Circumstances of the Case**

13. The brief facts surrounding the dispute between Osseiran and IFC are that in or about the summer of 2005, Osseiran alleges that he formed an intention to acquire a controlling interest in MECG through the purchase of a majority shareholding. In this respect, in about September 2005, Osseiran approached IFC with a view to purchasing its shareholding in MECG. IFC held approximately 30,000 MECG shares, amounting to approximately 10.8% of MECG's stock (the "**IFC Shareholding**").

14. It is pleaded by Osseiran that, as negotiations for the purchase of the IFC Shareholding proceeded into the Autumn of 2005, IFC was fully aware that

Osseiran's intention was to acquire a majority shareholding in MECG and, thereby, a controlling interest in the company.

15. On 18 November 2005, Osseiran received an e-mail from Jan Van Bilsen, the Field & Portfolio Manager for the Middle East, North Africa and South Asia in the Global Financial Markets team at IFC setting out various matters (the "**18.11.05 Email**") in response to an initial e-mail from Osseiran of the same date. A copy of this e-mail appears at Exhibit 'A' to the Osseiran Declaration. Osseiran replied to this e-mail on 19 November 2005 (the "**19.11.05 Email**") noting and accepting the matters set out in the 18.11.05 Email. A copy of the 19.11.05 Email appears at Exhibit 'B' to the Osseiran Declaration. Osseiran pleads that this exchange of e-mails (the "**Alleged November Agreement**") constituted a binding contract or otherwise amounted to a confirmation of terms so as to give rise to some binding contract.

16. On 26 November 2005 IFC sent to Osseiran, by an e-mail from Jan Van Bilsen, a "*draft share sale agreement*" (the "**Draft SSA**"). There followed an exchange of e-mails between Osseiran and IFC over the terms of the Draft SSA. On 19 December 2005 IFC informed Osseiran that it would not proceed with the sale at that time.

17. Despite this development, Osseiran, and eventually his lawyers, put pressure on IFC to complete the sale of the IFC Shareholding by signing the Draft SSA. More particularly, Osseiran alleges that he was given assurances, or was otherwise led to believe, that IFC was still proposing to sell the IFC Shareholding to him.

18. It is alleged by Osseiran that in verbal communications between himself and members of IFC, the negotiations for the sale of the IFC Shareholding continued through to 19 February 2006, whereafter he learned that IFC had agreed to a consortium sale of the IFC Shareholding, along with shares owned by other MECG shareholders, to First National Bank in Lebanon ("**FNB Lebanon**") on 31 March 2006.

**The Allegations made by Osseiran against IFC**

19. The allegations are set out in detail in the Complaint, but are, broadly, that:

   a. IFC is in breach of "*the* [Alleged] *November Agreement*" [see Count I of
      the Complaint], namely an agreement memorialised in an exchange of e-
      mails between IFC and Osseiran dated 18 and 19 November 2005; and

   b. IFC is estopped by virtue of its alleged conduct from proceeding with a
      sale of its shareholding in MECG to any party other than Osseiran [see
      Count II of the Complaint]; and

   c. IFC was in breach of a provision or agreement with Osseiran to keep all
      discussions and agreements between them confidential [see Count III of
      the Complaint]; and

   d. IFC is guilty of a fraud by virtue of allegedly making false representations
      of material fact with the intent to deceive Osseiran [see Count IV of the
      Complaint]; and

   e. IFC negligently misrepresented to Osseiran that it was not "*soliciting other
      offers for its MECG stock and that it would soon be consummating the sale
      of its MECG stock to Osseiran*" [see Count V of the Complaint].

20. I set out my opinion, based on Guernsey law, of the merits of these allegations as
    follows.

**General Analysis of the Status of the Claims**

21. The essence or purpose of Count I and Count II of the Complaint, the allegations
    of breach of the Alleged November Agreement and the claim based on promissory
    estoppel, is to seek an order for specific performance of the obligations Osseiran
    perceives have been entered into by IFC. Count I and II seek to compel IFC to sell
    its shares to Osseiran. To that extent, it is noted that Count I and Count II are the
    only Counts under which specific performance is requested as a remedy.

22. Counts III, IV and V are distinct and discrete legal allegations and remedies,
    unrelated to the requirement for specific performance requested by virtue of

Counts I and II. Osseiran has requested damages as the remedy for Counts III, IV and V.

**Brief Introduction to Guernsey Law and Equitable Remedies**

23. To truly understand the Guernsey approach to law, one must acquaint oneself with its history. In the 10th Century AD, the islands that now comprise the Bailiwick of Guernsey were incorporated into the near-sovereign Norman state established in 911 by Viking Rollon, the first Duke of Normandy. Guernsey's political links to England were acquired through the Conquest of 1066 and the creation of the Norman Empire. In 1204, John King of England and Duke of Normandy was dispossessed of his Norman lands by King Phillipe Auguste of France, except for the Channel Islands. Because of their loyalty to the King of England, the Islands were granted privileges which survive to this day.

24. Thus, to this day, the foundation of Guernsey law is Norman customary law, or *coutume*. Although a feature of customary law is that it is uncodified, the laws were collated in the *Trés Ancien Coutumier* and then in the *Grand Coutumier* in the early 13th Century. Guernsey, at the instigation of Elizabeth I, adopted the work of the greatest commentator of the *Grand Coutume*, Terrien, and codified the written report called *L'Approbation des Lois*, which became law on 27 October 1583.

25. This customary law has become, for all intents and purposes, the modern common law of Guernsey, and case law precedent is the primary source of Guernsey law in the absence of statute, passed by the States of Deliberation, and *Ordonnances* or statutory instruments. Guernsey common law is a constantly evolving jurisprudence and the courts will, in the absence of local case law and precedent, rely on Jersey, and then English and other commonwealth countries' common law to assist it in its decision making process. The decisions of the courts of these jurisdictions (such as England) are persuasive, but not binding. English statute is not considered persuasive, and unless extended to the island of Guernsey, is not binding.

26. The main distinction between England and Guernsey is that the courts of Guernsey do not regard themselves, such as those in England, as courts of equity. Guernsey does not recognise equitable remedies as such, though there have been in-roads made into this area in the field of trusts litigation. A decree of specific performance is a form of relief in England that is purely equitable in origin and nature[1]. The exercise of the equitable jurisdiction to grant specific performance in England is not an *in personam* matter of right in the person seeking relief, but of the discretion of the English court[2].

27. In refusing the equitable remedy of specific performance, the Master of the Rolls in the English case of _Flint v. Brandon_[3] stated that, "*This court does not profess to decree a specific performance of contracts of every description. It is only where the legal remedy is inadequate or defective that it becomes necessary for courts of equity to interfere...*"

28. The system of court reporting in Guernsey is not as advanced as in England and the United States of America, but the summary in the Guernsey case of the Bailiff, Sir de Vic Carey, in _R G Phillips v. Hill and Hill_[4] suffices to state the position of specific performance at Guernsey law: "*HELD by the Bailiff, the Court had no power to require DD* [the Defendants] *to consent to the judgment as this would be an order for specific performance*".

29. Because Guernsey law is constantly developing, especially commercially with the needs and progress attached to its financial services industry, it is not possible to state with any certainty whether a judge sitting in a Guernsey court, dealing with areas of law that may thus far have been unexplored or analysed in detail before a Guernsey court, such as equitable relief, will maintain the *status quo* with respect to refusing to allow equitable remedies in certain circumstances where there is clearly no other alternative method of compensating a party for an act or omission that is unlegislated for, or adopt foreign common law or precedent to assist it in modernising the Island's jurisprudence. However, at present, Guernsey law does

---

[1] _Cud v Rutter_ [1720] 1 P Wms 570. See **Annexe 1**.
[2] _Lamare v Dixon_ [1873] LR 6 HL 414 at 423, per Lord Chelmsford. See **Annexe 2**.
[3] [1803] 8 Ves. 159. See **Annexe 3**.
[4] Ordinary Court 16 April 1999, Judgment 1999/52. See **Annexe 4**.

not recognise the equitable remedy of specific performance and will, where required, seek to provide for an alternative remedy such as damages, where possible.

**Breach of the Alleged November Agreement**

30. Before even assessing the merits of the pleaded complaint on a factual basis, as stated at para. 21 above it is clear that the essence of Count I of the Complaint is a request for equitable relief in the form of specific performance. As outlined in paras. 26 to 29 inclusive, above, the remedy of specific performance is unavailable in this jurisdiction. As such, and in the absence of an alternative pleading for damages, the starting point for assessing the claim for breach of the Alleged November Agreement, under Guernsey law, is that it must fail as a matter of law.

31. What, in actuality, is the Alleged November Agreement? The exchange of e-mails as described at para. 15 above amount to what is alleged by Osseiran to be the Alleged November Agreement.

32. At para. 3 of the Complaint it is pleaded that "*In November 2005...Osseiran and IFC...entered into an agreement wherein they agreed upon all material terms by which IFC...would sell their MECG shares to Osseiran and to incorporate those terms into a standard stock purchase agreement, to be provided by IFC*". At para. 36 of the Complaint, Osseiran suggests that the Alleged November Agreement "*as documented by the e-mails referenced above, is a legally binding contract between Osseiran and IFC*". The breach is further documented at page 3 of the Memorandum by reference to the Osseiran Declaration. Nothing further appears in the Memorandum by way of particularisation of the alleged breach.

33. Para. 5 of the Osseiran Declaration particularises the Alleged November Agreement as follows: "*On November 19, 2005, IFC and I reached an agreement for my purchase of the shares of MECG from IFC and Barclays. This agreement, which included all material terms of the transaction including the price that I would pay for each seller's shares and the schedule of payments, is evidenced by*

*electronic mail messages...between IFC's Jan Van Bilsen and me on November 18, 2005 and November 19, 2005*".

34. An assessment of the material e-mails at Exhibit 'A' of the Osseiran Declaration confirms the following:

    a.  Osseiran e-mailed Jan Van Bilsen of IFC at 3.54am on 18 November 2005 to advise that, I assume, the purchase price of the IFC Shareholding would be US$1,500,000.00. Osseiran also sets out the proposed timing of payments ("*At signature 40% payment...*"etc.) including the need for bank guarantees of the last two payments (the "**Bank Guarantee Provision**"), mentions "*necessary discharge*", the meaning of which is unclear to me, and notes additional payments relating to "*social insurance issue...three years after signature of sale and purchase contract*".

    b.  Jan Van Bilsen replies in the 18.11.05 Email by stipulating, in no uncertain terms, that "*1. you* [Osseiran] *accept that our acceptance is subject to documentation – meaning separate sales agreements with ifc and barclays, and acceptable bank guarantees from either HSBC and/or UBS Switzerland for the 40% after 6 months and the 20% payable 6 months thereafter, as well as the 180thd and 300thd*" (the "**Subject to Documentation Provision**"). Jan Van Bilsen further states that, "*the full discharge of any obligation or liability to ifc and barclays is at signing of sales agreements with us*" (the "**Discharge Provision**"). Jan Van Bilsen goes on to stipulate that, "*The sales agreements come into force and affect* [sic] *after signing of the sales agreements and receipt of above mentioned bank guarantees acceptable to us, as well as the first 40%*" (the "**Force and Effect Provision**"). Point 4 of Jan Van Bilsen's e-mail deals with a "*top up*" of the sales price of the MECG shares (the "**Top-Up Provision**") and at point 5 of Jan Van Bilsen's e-mail he states that "*The waiting period for the 180thd and the 300thd is not 3 years but 2 years...*" (the "**Social Security Contribution Provision**").

    c.  Osseiran's reply is set out in the 19.11.05 Email in which he accepts the Subject to Documentation Provision, the Discharge Provision and the Force and Effect Provision. However, Osseiran does not accept the Top-

Up Provision as stated in the 18.11.05 Email and stipulates agreement only *"if I purchase at a lower price you would agree to deduct and return the difference, otherwise delete this idea"*. As for the Social Security Contribution Provision, Osseiran does not accept the term set out in the 18.11.05 Email and states that the *"waiting period"* should stay at 3 years as opposed to 2 years.

d.  At Exhibit 'B' to the Osseiran Declaration is Jan Van Bilsen's reply timed at 7.01pm on 23 November 2005. This e-mail is not pleaded in the Complaint as forming part of the Alleged November Agreement. In the Osseiran Declaration, this e-mail is only described as *"confirming the agreement"* reached, namely the Alleged November Agreement.

35. I am unable to see how, as a matter of Guernsey contract law, the Alleged November Agreement, as pleaded, can amount to any form of contract, lacking as it does any certainty. It seems that the parties are still in the process of negotiating terms. Certainly, after Osseiran's 19.11.05 Email, there is still no certainty as to whether the IFC will agree to the stipulations that Osseiran makes with respect to the Top-Up Provision and the Social Security Contribution Provision. Fundamentally, however, Osseiran, in the 19.11.05 Email confirms that IFC's acceptance *"is subject to contract"*, that the *"full discharge of any obligation or liability to IFC and Barclays is at signing of sales agreement"* and that the *"sales agreements come into force and affect* [sic] *after signing of the sales agreements and receipt of above mentioned bank guarantees acceptable to* [IFC]".

36. As of 19 November 2005, a fundamental element of the purported agreement, namely the receipt of bank guarantees, was outstanding. In fact, by an e-mail from Osseiran to Jan Van Bilsen dated 1 December 2005, at 2.33pm, Osseiran confirms that *"Both banks are reluctant to accept the proposed wording of both types of guarantee"*.

37. The matters set out in paras. 34, 35 and 36 above are a clear demonstration that the pleading at para. 3 of the Complaint that *"In November 2005...Osseiran and IFC...entered into an agreement wherein they agreed upon all material terms by which IFC...would sell their MECG shares to Osseiran"* and that *"the e-mails*

*referenced above, is a legally binding contract between Osseiran and IFC*" [para. 36 of the Complaint] are, at best, misconceived.

38. Osseiran appears to contend that the words "*we confirm agreement*" in IFC's response to the matters raised in the 19.11.05 Email, which was received by Osseiran on 23 November 2005 when Jan Van Bilsen sent an e-mail to Osseiran timed at 7.01pm, created an enforceable obligation. However, in the first instance, this e-mail (of 23 November 2005) is not pleaded as forming part of the Alleged November Agreement (though it is mentioned at page 9 of the Memorandum) upon which Osseiran relies. Second, in any event, giving the words commercial efficacy, it would appear that this is merely a confirmation as to the agreement of the terms mentioned in the 19.11.05 Email, which in turn confirmed that such agreement was subject to contract. The e-mail from Jan Van Bilsen of 23 November 2005 refers to sending a "*share sale agreement*" to Osseiran for review.

39. The Draft SSA is finally sent by Jan Van Bilsen to Osseiran on 26 November 2005, by e-mail. That e-mail further confirms that the Draft SSA is a "*draft*", and advises Osseiran that there may be a need to incorporate terms as to a share transfer form, "*or other documents required regarding the transfer process*". There is further confirmation from Jan Van Bilsen that the Bank Guarantee Provision has not been complied with. In any event, on Osseiran's pleaded case, this e-mail does not form part of the Alleged November Agreement.

40. The Draft SSA, as sent by Jan Van Bilsen on 26 November 2005 [see Exhibit 'D' of the Osseiran Declaration], states incontrovertibly and prominently, on the front page, that "***This draft document is not a contract or an offer to enter into a contract. Only the document as executed by IFC and Mr. Osseiran will contain the terms that bind them. Until the document is executed by IFC and Mr. Osseiran, neither IFC nor Mr. Osseiran intends to be bound***". This clearly confirms the agreement of the parties as set out at points 1, 2 and 3 of the 18.11.05 Email, as accepted by Osseiran at points 1, 2 and 3 of the 19.11.05 Email.

41. Indeed, Osseiran e-mails Jan Van Bilsen on 1 December 2005, at 2.33pm, [see Exhibit 'D' of the Osseiran Declaration] confirming that the Draft SSA, which included the term set out at para. 40 above, was *"generally Ok"*. He does not query the above clause. In fact, Osseiran goes on to mention queries and amendments to the Draft SSA, as well as raising the issue of the reluctance of the material banks to enter into the Bank Guarantee Provision as set out in the Draft SSA. There is no clearer *prima facie* evidence that the terms of agreement between Osseiran and IFC had not been finalised.

42. Though not particularised in the Complaint or the Memorandum, if what is alleged by Osseiran is, in actuality, that the parties had reached 'an agreement to agree', or a contract to make a contract, then, in my opinion, the conclusion as to the merits of Count I is the same. In the absence of Guernsey case law on the matter, the court would look to English case law as persuasive. To that extent, distinctions need to be drawn between a contract to execute a document incorporating terms previously agreed, and an agreement to negotiate. With respect to a 'contract to contract'[5], the expression can refer to either a contract to execute a document incorporating terms previously agreed, which is binding on the parties, such as in *Morton v. Morton*[6], or to an agreement to negotiate which is not binding because *"it is too uncertain to have any binding force"*, as per *Courtney & Fairbairn Ltd. v. Tolaini Bros (Hotels) Ltd.* [7]. For all the reasons stated at paras. 30 to 42 above, inclusive, it is my opinion that the terms were insufficiently set out, and certainly not agreed to the extent of certainty, in the 18.11.05 Email and the 19.11.05 Email which Osseiran pleads are the e-mails that give rise to the Alleged November Agreement, for there to be considered a contract to execute a document incorporating terms previously agreed. Indeed, this much seems to be accepted by Osseiran in the Memorandum [see page 10 Memorandum], when it is stated that whilst such *"preliminary agreements may not bind the parties to their ultimate contractual objective, they do bind them to negotiate any open issues in good faith"*. This is the crucial statement. By Osseiran's own pleading, he admits that the exchange of e-mails amounts only to

---

[5] *Van Hatzfeld-Wildenburg v. Alexander* [1912] 1 Ch. 284, 288-289. See **Annexe 5**.
[6] [1942] 1 All ER 273. See **Annexe 6**.
[7] [1975] 1 WLR 297, 301. See **Annexe 7**.

an agreement to negotiate which, at English law, and thus persuasive to the courts of Guernsey, is not binding, as per the *Courtney & Fairbairn* judgment.

43. To conclude the analysis of Count I, I believe that Osseiran's claim for breach of contract would fail under Guernsey law.

**Promissory Estoppel**

44. What is clear from the development of the doctrine of promissory estoppel through the English courts, since the judgment of Denning J in *Central London Property Trust Limited v. High Trees House Limited*[8], is that such was founded on a stream of authority based in equity arising from the decision of Lord Cairns in the 1877 case of *Hughes v. Metropolitan Rly Co.* As such, it is an equitable remedy that is unavailable to the courts in Guernsey, and I have been unable to find any case law to suggest that performance of a contract has been sought or granted in Guernsey on this basis.

45. Further, promissory estoppel is, I believe, a doctrine available in English law only by way of defence and not as a cause of action as was enunciated by the Court of Appeal in *Combe v. Combe*[9] where Denning LJ asserted that the principle stated in the *High Trees* case "*does not create new causes of action where none existed before...*", and the famous statement of Birkett and Asquith LJJ that the doctrine must be used as a "*shield and not as a sword*".

46. Even if the courts of Guernsey recognised this relief, which at the time of writing is not clear, it is difficult to see, based on the matters set out in paras. 30 to 43 above, inclusive, what IFC has done to so prevent or preclude it from asserting its strict legal rights (in this case to contract with whomsoever it chooses). As noted in my conclusion with respect to the allegation of a breach of the Alleged November Agreement, in my opinion, there is no basis for suggesting that there was a contract, or a contract to execute a document incorporating terms previously agreed, to give rise to such relief in any event.

---

[8] [1947] KB 130. See **Annexe 8**.
[9] *Combe v. Combe* [1951] 2 KB 215. See **Annexe 9**.

47. On this basis, I believe that the promissory estoppel claim would fail under Guernsey law.

**Confidentiality Agreement**

48. Having assessed all the papers before me, I am only able to find five fragmented references to breach of a confidentiality agreement. The first appears at para. 20 of the Complaint stating that "*IFC agreed with Osseiran that the parties would keep all information concerning the proposed sale of IFC's and Barclays' MECG stock to Osseiran strictly confidential until the sales were consummated*". As raised at para. 37 above, this does not sit well with the belief that there was an agreement between Osseiran and IFC "*wherein they agreed upon all material terms by which IFC...would sell...to Osseiran*" [see para. 3 of the Complaint – emphasis added]. That is plainly not the case. Further, there is no particularisation of how this alleged confidentiality agreement was reached and with whom, e.g. by telephone, a meeting, fax or e-mail.

49. The next mention of the alleged confidentiality agreement is at para. 20 of the Complaint and then again at paras. 44 to 47. Again there is no particularisation of how the alleged confidentiality agreement was reached, or concluded, and with whom. The same applies to the only mention of the alleged confidentiality agreement at the bottom of page 2 of the Memorandum.

50. In the Osseiran Declaration, the only references to the alleged confidentiality agreement are at para. 4, which also fails to advise how the alleged confidentiality agreement came into being and with whom the agreement was reached, and at para. 12 which refers to Osseiran being "*aware that IFC employees had apparently breached our confidentiality agreement...*" [emphasis added]. This refers, in turn, to an e-mail from Osseiran to IFC timed at 6.15pm on 22 December 2005 [see Exhibit 'E' of the Osseiran Declaration] wherein he states that "*Suddenly I started hearing noises all over town that MR* [sic] *Osseiran concluded with IFC and Barclays to buy their shares. When I asked you, said it is because*

*most probably your representative in MECG board disclosed it verbally to the chairman after he sent him his resignation* [sic]..."

51. Based on this, it is hard to see, absent particularisation of the confidentiality agreement, whether such agreement would have bound a *"representative of the MECG board"* in any event, and clearly, as the *"noises all over town"* were incorrect in stating that *"Osseiran concluded with IFC and Barclays to buy their shares"*, there being no such conclusion, the hearsay upon which Osseiran relies is, at best, unreliable and less than persuasive evidence of any formal confidentiality agreement, let alone a breach of such.

52. The particularisation of a breach of a confidentiality agreement is woefully and inadequately pleaded. From the documentation available, it is impossible to ascertain that such an agreement was made. Certainly, the only particularisation of breach is at Exhibit 'E' to the Osseiran Declaration as quoted above [para. 50]. There is simply no material, or any evidence to suggest that such a confidentiality agreement existed, let alone to suggest that IFC breached it. From what appears before me, I can only conclude that a claim for breach of a confidentiality agreement would fail before a Guernsey court.

**Fraud and Negligent Misrepresentation**

53. Counts IV and V are broadly similar in that they are allegations that IFC either fraudulently misrepresented, or negligently misrepresented that IFC:

  a. *"was not soliciting other offers for its MECG stock"* [see para. 49 of the Complaint]; and
  b. *"would soon be consummating the sale of its MECG stock to Osseiran"* [see para. 49 of the Complaint].

54. In respect of these allegations, Osseiran claims that he suffered loss because:

    a. he had "*set aside funds*" for the purchase of the IFC Shareholding, by which I assume that he is claiming that these funds were unavailable for alternative investment (in essence a claim for loss of opportunity); and

    b. he had expended "*millions of dollars to acquire MECG shares from Barclays and other shareholders only to end up with a large minority interest in a money losing company over which he had no control*".

55. In respect of both allegations of fraudulent misrepresentation and negligent misrepresentation, the time frame of the pleaded representations that are alleged to be fraudulent or negligent, are between 19 December 2005 and 8 February 2006.

56. Guernsey has no equivalent statute to the Misrepresentation Act 1967 in England. The Misrepresentation Act 1967 is not persuasive law in Guernsey. Thus, Guernsey will rely on the pre-statutory English common law to assist it in deciding on such matters.

57. The common law relating to the law of fraudulent misrepresentation was established by the House of Lords in *Derry v. Peek*[10], where it was stipulated that in order to prove fraud, it was necessary to prove the absence of an honest belief in the truth of that which has been stated. Fraud is proved by showing that there has been a false representation that was made (a) knowlingly, (b) without belief in its truth, or (c) recklessly, careless whether it be true or false, as per Lord Herschell in *Derry v. Peek* at 374.

58. The common law position relating to negligent misrepresentation was set out in *Hedley Byrne & Co Ltd v. Heller & Partners Ltd* [1964][11], some three years prior to codification in the Misrepresentation Act. The most essential element of this case was its finding that a negligent pre-contractual misrepresentation may give rise to an action for damages in tort, based on a 'special relationship' between the proposed plaintiff and the defendant.

---

[10] [1889] 14 App. Cas. 337. See **Annexe 10**.
[11] AC 465. See **Annexe 11**.

59. A thorough analysis of the law relating to fraudulent misrepresentation and negligent misrepresentation will require an English law opinion to assist in ascertaining the likely Guernsey law outcome of the merits. I am able to comment on the following issues of fact, however, so as to assist in how a determination may be reached as matters currently stand.

60. As I have stated in paras. 30 to 43 above, inclusive, I have seen no documentation that amounts to, or provides *prima facie* evidence of, a contract or a contract to enter into a document incorporating terms formally and previously agreed. My opinion on the papers before me is that a Guernsey court would find that no agreement was reached or finalised, and that negotiations for the sale of the IFC Shareholding to Osseiran were still continuing and subject to contract. On that basis, it is difficult to see how a Guernsey court could read any of the e-mails exhibited to the Osseiran Declaration as making any form of misrepresentation, whether fraudulent or negligent.

61. There has certainly been no particularisation of documentary evidence of an intention to deceive, and Osseiran's allegations are based on his 'witness statement' or proposed oral evidence solely and not on substantive documentation. I am therefore unable to opine as to what the Guernsey courts would conclude. Certainly on the papers alone, there is no documentary evidence upon which a Guernsey court could make a finding of fraudulent or negligent misrepresentation.

62. In respect of the allegation that IFC advised Osseiran that it was not soliciting other offers for MECG stock, there is no documentary evidence or equivalent mention of such in any of the papers annexed to the Osseiran Declaration. It was not stipulated as a term of the Alleged November Agreement. On that basis, it is unlikely that a Guernsey court would find that there had been a fraudulent or negligent misrepresentation on the papers which I understand to be currently before the U.S. court.

63. In respect of the allegation that IFC advised Osseiran that it would soon be consummating its sale of the IFC Shareholding to him, the only documentary evidence or equivalent mention of such in any of the papers annexed to the

Osseiran Declaration are in the 18.11.05 Email where Jan Van Bilsen advises that IFC "*will seek final confirmation internally on those terms, which are expected within a few days only, and we will start sending you draft documentation*" and in Jan Van Bilsen's e-mail timed at 7.01pm on 23 November 2005 when he states that "*...we will soon send you the share sale agreements for your review. As these are rather standard documents, we are hopeful to be in a position to close this transaction at short notice*". On that basis, it is unlikely that a Guernsey court would find that there had been a fraudulent or negligent misrepresentation on the papers currently before the U.S. court.

64. Also of note is that Osseiran does not stipulate the dates upon which he purchased the "*57,000 additional shares of MECG stock from five other MECG shareholders for a total purchase price of nearly US$3 million*" [see para. 16 of the Osseiran Declaration]. Clearly, to give rise to a loss attributable to the alleged fraudulent misrepresentation and/or negligent misrepresentation by IFC, those shares must have been acquired sometime after 19 December 2005 at the very earliest. There is no particularisation, however, and I am therefore unable to ascertain if there has been a loss attributable to the actions of IFC.

65. The Barclays Capital shareholding in MECG (the "**BarCap Shareholding**"), it is pleaded, was acquired by Osseiran on 9 January 2006 [see para. 26 of the Complaint]. Notably, Osseiran proceeded with the purchase of the BarCap Shareholding despite stating, in his e-mail to Jan Van Bilsen of IFC on 22 December 2005, that he had heard that IFC were "*suspending the transaction*". If he was so aware, as is his evidence, then it is confusing to see why he would have proceeded with the BarCap Shareholding purchase, and, in respect of the allegations of negligent misrepresentation, further evidence will need to be adduced to rebut a presumption of contributory negligence on the part of Osseiran.

66. As to the loss of opportunity claim set out at para. 54 (a) above, as alleged by Osseiran, there is absolutely no evidence, whether in the form of documentation or witness statement evidence in the Osseiran Declaration, particularising or otherwise setting out the alternative investments he would have made, or as to the loss suffered on a comparison basis with the value of his shareholding in MECG.

On that basis, a Guernsey court would be entirely unable, on the case as currently pleaded, to make any determination that Osseiran has suffered a loss as a consequence of the alleged fraudulent or negligent misrepresentations.

67. As to the purported loss attributable to Osseiran having expended "*millions of dollars to acquire MECG shares from Barclays and other shareholders only to end up with a large minority interest in a money losing company over which he had no control*", as set out at para. 54 (b) above, as alleged by Osseiran, there is absolutely no evidence in the form of documentation in the Osseiran Declaration, particularising or otherwise setting out that the condition or contingency of becoming a majority shareholder in MECG was the basis of Osseiran proceeding with the proposed transaction, or that IFC knew this.

68. Whilst he has alleged this, I have not seen any e-mail or other documentary proof of Osseiran having stipulated this as a term of the Alleged November Agreement or any other contract alleged. It is not particularised how a minority interest in MECG should give rise to a loss. As a minority shareholder who may be discontent with the operation of the company, there are remedies available under the Companies (Guernsey) Law, 1994 that would enable Osseiran to petition the Guernsey court for relief if the company's actions are considered to be not in the best interests of its members and shareholders.

69. On that basis, a Guernsey court would be entirely unable, on the case as currently pleaded, to make any determination that Osseiran has suffered a loss in this respect as a consequence of the alleged fraudulent or negligent misrepresentations.

**Conclusion**

70. As a result of the matters more fully detailed above, I believe that even if the matters set forth in the Plaintiff's papers were to be taken as true, his claims would fail under Guernsey law.

| | |
|---|---|
| Sworn by the said | ) |
| **MARK GIDEON ANDREW** | ) |
| **DUNSTER** | ) |
| at 7 New Street, St Peter Port, | ) |
| this 9 [th] day of March 2006 | ) |

M G A Dunster.

BEFORE ME

NOTARY PUBLIC

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

---

**ANNEXE 1 TO THE**
**FIRST AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

---

BEFORE ME

NOTARY PUBLIC

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

If the depositions *de bene esse* in the present case were to be published, or any ways made use of against the witness so examined *de bene esse*, such witness ought to have a copy of the depositions before he is examined in chief ; to the intent that he may have due cautionary means allowed him, to prevent his contradicting himself, which is always done in the like cases ; also many questions might arise, if it should happen [569] that the depositions *de bene esse* were quite contradictory to the depositions in chief ; for I do not think it can be perjury at (1) law, there being no issue joined, as there must be before the depositions are taken in chief.  (See *The Queen's case*, 2 Bro. & B. 284, 286, 299.)

And as to seeing these depositions *myself*, it is true, Lord *Sommers* and Lord *Cowper* did order copies to be brought to them to inspect ; but that was for enabling them the better to judge whether the plaintiff in those causes, after so long time elapsed since the commencement of them, and so many transactions in them, should be allowed after the plea to proceed to a hearing ; but as this cause has since proceeded to a hearing, for me to read these depositions *de bene esse*, in my study, if I should here form any judgment upon them, it would be strange that *that* should guide me, which no other person is to know any thing of.

No, let all people be at liberty to know what I found my judgment upon ; that so when I have given it in any cause, others may be at liberty to judge of *me.*

Whereupon the petition was dismissed, the Court refusing to publish the depositions taken *de bene esse.*

*Note :* Mr. *Vernon* who was against publishing these depositions insisted very much, that what was asked was without precedent ; tho' what was now surmised must have often before happened, and nothing was sworn in the depositions after issue joined, but what was very probable, namely, that a father who had made his will in favour of his younger son, on that younger son's drawing his sword against his father, and attempting to take away his life, should afterwards revoke this will which he had before made in favour of such younger son.

(1) Gro. Car. 352 ; 3 Inst. 167.  And yet it seems as if such depositions taken *de bene esse*, upon a bill to perpetuate the testimony of witnesses, where there is no issue joined, on the death of the witnesses may be read in evidence.  Carth. 265.  (See *King* v. *Allen*, 4 Mad. 247.  *Rex* v. *Aylett*, 1 T. R. 69.  *Crew* v. *Vernon*, Cro. Car. 97. *Calliand* v. *Vaughan*, 1 Bos. & P. 210.)

---

[570] DE TERM. S. MICHAELIS, 1719.

Case 166.—CUD *versus* RUTTER.  [1719.]

(S. C. more fully reported, 5 Vin. Abr. 538, pl. 21 [S. C. with full notes, 2 Wh. & T. L. C. 416].)

*At the Rolls.*

See this case cited in Pre. Cha. 534, by the name of *Scould* v. *Butter*, 2 Eq. Ca. Ab. 18, pl. 8.

Bill in equity will not lie for a specific performance of an agreement to transfer South Sea Stock.  (See Stat. 7 G. 2, c. 8, made perpetual by 10 G. 2, c. 8.)

The defendant, in consideration of two guineas paid down, did by note under hand agree to transfer £1000 *South-Sea* stock at a fixed price at the end of three weeks ; the plaintiff on the day demanded the stock, and offered to pay the price ; but on the defendant's insisting that he would only pay the difference, and not transfer the stock, the plaintiff brings this bill for a specific performance, and to have the stock assigned.

Objected, That the compelling a specific execution of contracts must be allowed to be discretionary in this Court, and there was not a single instance or precedent, where it had been done in such a case as this ; that the plaintiff was put to no inconvenience, since the defendant had offered, and by his answer continued to offer, to pay the difference ; that the plaintiff might for asking have the same quantity of stock any [571] where upon the exchange.  Indeed, had the agreement been for a house or land, which might be a matter of moment and use, in that case (supposing all things to have

C. IV.—17*

been fairly transacted) there might be some reason why equity should execute such agreement ; but in a matter of so little consequence as the present case, there could be no necessity for this Court to interpose.

*Cur'* : The plaintiff ought to have an execution of the contract ; for the agreement is a fair one, and in writing, and part of the money paid. Suppose the whole money had been paid, should not equity have executed it ? if so, where is the difference betwixt a great sum and a small one ? if the agreement had been to transfer stock or pay the difference, this might have looked like stock-jobbing ; but the plaintiff, as is proved in the cause, refused to let the note be so penned, notwithstanding that the defendant had desired it. Decreeing an execution of such an agreement, is beating down and preventing stock-jobbing. Wherefore let the defendant transfer £1000 *South Sea* stock accounting for the dividends, and paying the costs ; and let the plaintiff pay the defendant interest for the money from the time that it ought to have been paid, according to the contract. (Reg. Lib. A. 1719, fol. 35.)

But afterwards on an appeal, the Lord Chancellor *Parker* reversed this decree, delivering his opinion with great clearness, that a court of equity ought not to execute any of these contracts, but to leave them to (1) law, where the party is to recover damages, and with the money may if he pleases buy the quantity of stock agreed to be transferred to him ; for there can be no difference between one man's stock and another's. It is true, one parcel of land may vary from, and be more commodious, pleasant, or convenient than another parcel [572] of land, but £1000 *South-Sea* stock, whether it be A. B. C. or D.'s is the same thing, and in no sort variant ; and therefore let the plaintiff, if he has a right, recover in damages, with which, when received, he may buy the stock himself.(2)

(1) So, *Cappur* v. *Harris*, Bunb. 135, but cases of this kind depend so much on their own particular circumstances, that it seems, no general rule can be laid down. *Colt* v. *Netlerville*, post, Vol. II. 304. *Thompson* v. *Harcourt*, 2 Bro. P. C. 415 [1 Bro. P. C. 193]. *Buxton* v. *Lister*, 3 Atk. 383. And see *Arundell* v. *Phipps*, 10 Ves. 139. *Nutbrown* v. *Thornton*, ib. 159. *Wright* v. *Bell*, 5 Price 325 ; *Daniell*, 95, and note there, p. 101. *Withy* v. *Cottle*, 1 S. & S. 174. *Doloret* v. *Rothschild*, ib. 590. *Adderly* v. *Dixon*, ib. 607.

(2) Reg. Lib. B. 1719, fol. 411. " His Lordship declared he did not think a specific " performance of the said agreement to be reasonable, and doth therefore order that " the plaintiff's bill, so far as seeks a specific performance of the said agreement, be " dismissed. But his lordship declared that the defendant not having acted fairly, " but having given occasion to the plaintiff to hope that he would transfer the stock, " he thought it reasonable that the defendant should not only lose his costs which he " would otherwise have been entitled to, but that he should pay the plaintiff the differ- " ence of the stock, not only as it was upon the 20th of *November* 1718, but as it was " when the plaintiff bought his stock " (*i.e.* the 23d of *December* following, on which day plaintiff gave notice to the defendant that he should attend at the South-Sea house, to accept the stock to be transferred by the defendant, and upon the defendant's not attending the plaintiff purchased £1000 stock on that day at 118¾ *per cent.*), " and it " appearing that the plaintiff bought afterwards at 118¾ *per cent.* which is £14, 5s. more " than the defendant was to deliver the stock at, doth therefore order that the defendant " do pay the plaintiff after the rate of £14, 5s. *per cent.* for £1000, with interest for the " same from the time the plaintiff bought his stock."

Case 167.—WIND *versus* JEKYL and ALBONE. [1719.]

*Lord Chancellor Parker.*

A. devises a term for years to B. for life, remainder to C. C. in the life of B. devises his remainder. This is good, and amounts to C.'s declaring by his will, that his executor shall stand possessed of the term, in trust for the devisee. Vide Pollexf. Rep. 44, *Veizy* v. *Pinwell*, this very point determined 16 Car. 1, by the then Lord Keeper. (See *Hyde* v. *Parratt*, ante, 1. *Roe* v. *Jones*, 1 H. Bl. 30. *Moor* v. *Hawkins*, 2 Eden, 342. *Jones* v. *Roe*, 3 T. R. 88. *Doe* v. *Tomkinson*, 2 M. & S. 165.)

One possessed of a term for years devised it to A. for life, remainder to B. B. in the life-time of A. devised his remainder to J. S. who devised it over ; upon which

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

---

**ANNEXE 2 TO THE**
**FIRST AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

---

**BEFORE ME**

**NOTARY PUBLIC**

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

by reason of the circumstance that the grounds are not the same, the costs were not to follow the result, this consequence would happen, that in every case in which the decision below is confirmed, if the grounds upon which the confirmation proceeds are not the same as the *ratio decidendi* of the Court below, the unsuccessful party must be absolved from paying the costs of his unsuccessful appeal.

*Order appealed from affirmed ; and appeal dismissed with costs.*

*Lords' Journals*, 31st July, 1873.

Solicitor for the Appellant : *W. A. Downing.*

Solicitors for the various Respondents : *Young, Jones, Roberts, & Hale ; Bevan & Whitting ; Wilson, Bristows, & Carpmael ; Young, Maples, Teesdale, Nelson, & Co. ; Uptons, Johnson, Upton, & Budd.*

---

CÆSAR LAMARE . . . . . . . . . . Appellant;

AND

THOMAS DIXON . . . . . . . . . . Respondent.

*Agreement—Specific Performance—Acquiescence—Form of Decree—Costs.*

A decree for specific performance of a contract cannot be accompanied by directing an inquiry whether a matter which was a consideration for entering into the contract has been, or can be, properly performed.

Where a suit is instituted for specific performance of a contract, and the defence set up is, that the contract was made in consideration of certain promises which the Plaintiff had not fulfilled, a delay to defeat that defence must be such as amounts to an acquiescence in the nonfulfilment of the alleged promises.

Where the subject of the contract was an agreement to take the lease of a house, and the proposed tenant went into possession at once, and occupied for two years, but, while continuing in occupation, from time to time called on the landlord to fulfil promises which the tenant alleged to have been the inducement for the contract, and paid rent, but always paid it under protest :—

*Held*, that these circumstances did not amount to such acquiescence as to prevent the tenant from ultimately refusing to perform the contract, but

Case 1:06-cv-00336-RWR    Document 8-5    Filed 03/10/2006    Page 27 of 217

that the payments were to be treated as merely made in respect of the actual use and occupation, and in no other character.

*Per* LORD CHELMSFORD:—The exercise of the jurisdiction of Equity as to enforcing specific performance of agreements, is not a matter of right in the party seeking relief, but of discretion in the Court.

*Per* LORD CAIRNS:—The law implies that a person who takes possession of premises before the agreed works to render them fit for occupation are at an end, does so without prejudice to his rights under the agreement.

*A.* was the owner of some land, on which he was about to erect buildings, *B.* wished to have cellars there for wine vaults. *A.* promised that they should be made dry, but would not introduce that promise into the written agreement. *B.*, however, confiding in the promise, signed the agreement, by which he undertook to accept from *A.* a lease of the vaults for a certain term and at a certain rent. *B.* was to pay down £100, and was to pay another £100 on the execution of the lease. *B.* paid the first £100, and, for his own convenience, before the day fixed, took possession of the vaults, and placed therein a large quantity of wine, but soon complained that the vaults had not been made dry. These complaints he constantly renewed, and every time he paid the rent paid it under protest; and, finally, after more than two years' actual occupation of the cellars, refused to sign the lease on the ground that the cellars had not been made fit for his occupation, and he did not pay the second sum of £100, but removed his stock of wines to another place. On a bill for specific performance, the Court below granted a decree against *B.*, but accompanied it with a direction that there should be an inquiry whether a certain thing suggested by *B.* in the course of the long correspondence between the parties, but neglected by *A.*, should not be done:—

*Held,* that the decree in this form was erroneous:

*Held,* also, that the taking possession of the vaults and the payment of the rent, which payment must be attributed to the actual use and occupation of the premises, did not prevent *B.* from setting up as a defence the non-performance of the promise which had been the inducement to the contract.

*Held,* also, that as there had been delay on both sides, though the Plaintiff's bill ought to be dismissed, it must be dismissed without costs.

APPEAL against a decree of Lord Chancellor *Hatherley,* which, reversing a previous decree of the Master of the Rolls, had granted a decree for specific performance, accompanied by a direction for an inquiry. *Dixon* was the holder of some land in *Eaton Lane, Pimlico,* and was about to build upon it; *Lamare* was a wine merchant, dealing especially in French wines, for which, as he alleged, he required very dry cellars. He entered into negotiations with *Dixon* for the hire of the cellars under the buildings which *Dixon* proposed to erect. *Dixon,* as it was alleged, promised that the walls and floors of the cellars should be concreted, and said that would make them dry. The terms of the conversations

1873
~~~
LAMARE
*v.*
DIXON.

1873
LAMARE
*v.*
DIXON.

on this matter were differently represented in the affidavits in the cause, and formed the subject of comments in the judgments delivered in the House. There was not introduced into the written agreement any specific promise as to making the cellars dry, but *Lamare* became satisfied through his conversations with *Dixon* that they would be made dry, and, on the 10th of July, 1867, he signed an agreement for a lease. By the terms of this agreement he was at once to pay down a sum of £100, and on the execution of the lease he was to pay another sum of £100; the tenancy, beginning on Christmas Day, 1867, was to be for twenty-one years, at a yearly rent of £130. The cellars were to be of the height of 8 ft. 6 in., and *Dixon* engaged before the 24th of December to cause the floor and exterior side of the walls of the cellars to be well concreted, and that there should be a water-closet, cistern, and sink constructed in the cellars, with water laid on, and that the premises should be completely finished for occupation by the 25th of December then next.

*Lamare* having at the time a large quantity of wine on hand, proposed to enter on the premises at an earlier period, and he did so on the 5th of December, and deposited his wines in the cellars. That this was to be without prejudice to *Lamare's* right under the agreement was asserted on one side and denied on the other. As the buildings above were to be on the level with the road, and the cellars were to be of the height of 8 ft. 6 in., it became necessary to sink the flooring of the cellars lower than had been at first intended, and the result was to bring the cellar flooring below the level of the main sewer of the place. The cellars, therefore, could not be drained in the usual way, and they were stated to be very damp. *Lamare* complained of this; but nothing was done to his satisfaction to cure the evil. The day for signing the lease arrived; the draft lease was sent to him, but he would not execute it. A long correspondence ensued, and, among other things, the erection of catch-pits was suggested by *Lamare's* surveyor, but the suggestion was never acted on by *Dixon*. During all this time *Lamare* continued in occupation of the cellars, and always regularly paid the rent stipulated for in the agreement, but always paid it under protest. On the 14th of October, 1869, a pipe burst on the premises, and *Lamare* called on *Dixon* to remedy the mischief.

This was not done, and *Lamare* wrote to say that if *Dixon* did not do what was necessary to make the cellars dry, he would himself do it and charge *Dixon* with the amount.  *Dixon* refused to do anything, and, finally, *Lamare* gave notice of his intention to quit the premises, and he did quit them.  *Dixon*, on the 23rd of December, 1869, filed his bill for specific performance of the agreement.  *Lamare*, by his answer, admitted having taken possession of the premises, and paid rent, but only under protest, and he alleged that it was of the essence of the agreement that the cellars should be dry, but that they were not so, and had not been made dry, but were unfit for the purpose for which he had agreed to take them, and he had therefore been compelled to leave them.  Evidence was taken on both sides, and, on the hearing, the Master of the Rolls dismissed the bill.  On appeal, Lord Chancellor *Hatherley*, looking at the conduct of *Lamare*, in taking, and so long retaining possession, as having precluded him from finally refusing to execute the lease, thought he could not resist the claim for specific performance, but must be left to his remedy against *Dixon* for any damages he might have suffered.  His Lordship therefore reversed the decision of the Master of the Rolls, and decreed specific performance of the agreement ; and he accompanied this decree with a direction that there should be an inquiry whether the catch-pools and pumps, as suggested by *Lamare's* surveyor, were necessary or proper for the fit occupation of the premises for *Lamare's* business, and if so, what compensation or allowances ought to be made to *Lamare* in respect thereof.

This was an appeal against that decree.

Mr. *Southgate*, Q.C., and Mr. *Kekewich*, for the Appellant :—

The Lord Chancellor, although in favour of *Lamare* up to a certain point, namely, to the effect that everything proper had not been done, and that there might have been something else done, which ought to have been done, and still desiring to know whether something else might not be done, yet decreed specific performance.  This was erroneous.  The two parts of the decree were inconsistent with each other.  In form therefore the decree was wrong.  It was also wrong in substance.  The circumstances

1878
LAMARE
*v.*
DIXON.

in this case were such that the Court ought not to have granted specific performance: *Day* v. *Newman* (1); *Townsend* v. *Standgroom* (2); and where representations are made and really constitute the bases of a contract, but are not carried into effect, they may become the ground for refusing specific performance of the contract though the execution of them might not be enforceable against the person who made them: *Myers* v. *Watson* (3), where the representations were made, not by the vendor himself but by his agent, and yet, those representations being unfulfilled, specific performance was refused.

Mr. *Kay*, Q.C., and Mr. *W. Pearson*, Q.C., for the Respondent:—

*Myers* v. *Watson* does not establish what is supposed, or does not apply here. There the vendor undertook to do certain specific things, which things were never done. When, therefore, it was sought to obtain against the vendee specific performance of his part of the agreement, he could well answer the demand by saying that the other part of the same agreement had been left unperformed. Here there was no undertaking that *Dixon* would do any specific thing which he had left undone, or that he had left undone anything that he really contracted to do. He denied that he ever gave an absolute promise that the cellars should be dry; he had said that he would put down concrete, and then that they would be dry. That was a matter of opinion as to a future fact, and could not be a ground for refusing specific performance. He put down the concrete, and he had done all in his power to make the cellars dry, and thoroughly performed what he contracted to do. If the cellars were not dry it was no fault of his. There was no agreement whatever that they should be made dry at all cost; but, in fact, they were sufficiently dry for all purposes of use. *Lamare* had shewn this by remaining in them so long a time. His own conduct therefore was an answer to his own complaint, both in equity and in fact. There was no concealment here, and consequently no ground on which *Lamare* could base his refusal to perform. Whatever objection he might have had he had waived:

(1) 2 Cox. 77; and see *Callaghan* v. *Callaghan*, 8 Cl. & F. 374.
(2) 6 Ves. 328.

(3) 1 Sim. (N.S.) 523; see Sug. V. & P., 13th Ed. p. 20, see also pp. 131, 231.

*Burnell* v. *Brown* (1). The contract here was in writing, and was conclusive; the alleged parol understanding could not control nor even affect it: *Haywood* v. *Cope* (2). *Lamare,* who had had cellars in the neighbourhood, knew as well as *Dixon* what the place was, and he could not, after taking possession and so long remaining in possession, set up a claim to be released from his contract on the ground that his expectations had been disappointed.

Mr. *Southgate* replied.

LORD CHELMSFORD :—

My Lords, this is an appeal from a decree of Lord Chancellor *Hatherley,* which reversed a previous decree of the Master of the Rolls dismissing the bill filed by the Respondent for the purpose of compelling specific performance of the agreement between the parties.

The Respondent is the lessee of a piece of land in *Eaton Lane, Pimlico,* upon which he was about to build. The Appellant, a wine merchant, was in want of vaults for his business, and negotiations took place for an agreement between the parties, that the Respondent should build cellars, and the Appellant take them upon lease. In the discussions as to the terms of the lease the necessity of dryness of the cellars was mentioned, and the Respondent assured the Appellant that the concrete on the outer walls and on the floor provided for by the agreement would keep the cellars perfectly dry. The agreement was entered into upon the 10th of July, 1867. The Respondent, in consideration of £100 paid down, and of another £100 which was to be paid upon the execution of the lease, agreed to "construct, erect, and completely finish on and under the site of the messuages and premises" in *King's Row* and *Eaton Lane, Pimlico,* "a messuage, coachhouses, and stable, with rooms and loft above the said coach-houses and stable, and the said vaults thereunder, according to the elevations and measurements shewn upon a plan signed by both parties," and to grant a lease to the Appellant, which was to commence upon Christmas Day following, at the rent of £130 a year. It was agreed by the Respondent that the premises should be fit

(1) 1 Jac. & W. 168.        (2) 25 Beav. 140.

1873

LAMARE
*v.*
DIXON.

for occupation on Christmas Day, 1867, the day upon which the lease was to begin. The agreement contained a clause that *Dixon* should be "at liberty from time to time to enter the premises to be demised at all reasonable times, to open, repair, and cleanse all or any of the drains or sewers under the said premises." And it was agreed by *Dixon* that he would construct the vaults to be "of the height of 8 ft. 6 in. at least;" and that he would "cause the floor and exterior side of the walls of the vaults to be well concreted."

The Appellant entered upon the premises before the day fixed, and while the works to be done were still in an incomplete state. The agreement appears to contemplate that there would be drains to the premises. But as there was to be a coach-house over the wine vaults, and the vaults by the agreement were to be 8 ft. 6 in. in height, it was found necessary, in order to give the requisite height to the vaults, and also to provide for convenient access to the coach-house, to lower the vaults, and thus to bring the bottom of them to a depth of two or three feet below the level of the main sewer; a system of self-acting drainage, therefore, became impossible. A short time after the occupation commenced the premises were far from being in the dry state the necessity of which had been pressed upon the Respondent's attention. He had agreed that they should be fit for the Appellant's occupation as a wine merchant, and both the Master of the Rolls and the Lord Chancellor held that they never were in a proper state for a wine merchant's business.

It is unnecessary to go minutely into evidence upon this subject, but I will just point your Lordships' attention to the evidence given by two servants of the Appellant, and also by two wine merchants. *John Saunders*, who had been in the employment of the Appellant for upwards of nine years, says: "During the whole of the time of the occupation of the Defendant, after the first two months, there was always water running down the walls of the cellars, and coming up through the floor, to such an extent that I have myself more than once laid down boards to walk on when working in the cellars, and I have also seen other persons lay down boards for the same purpose when working in the said cellars."

And *Edouard Prieur*, also in the service of the Appellant, says:

1873

LAMARE
v.
DIXON.

"At the time the said Defendant stowed the said hogsheads of wine upon the said premises there was no appearance of dampness in the said cellars, but after the Defendant had been in occupation for some time the water commenced to come into the said cellars in considerable quantities; it used to drip from the ceilings and to pour down the walls, and run in little streams under the wine-bins; and I have sometimes seen the water standing on the floor of the said cellar to a depth of about two inches at different parts, on which occasion I have had boards put along for persons to walk over." Then we have the evidence of two wine merchants. The first is *George Ridley*, who says: "I know the cellars in *Eaton Lane* lately occupied by the Defendant, and I well remember visiting them in the early part of the present year, when the condition of the said cellars was such as to render them utterly unfit for use as wine cellars. The walls were very wet, and the water seemed to me to be oozing through them and to be rising up through the floors, whereon in some places it stood in little pools. The sawdust throughout the vaults was saturated with water, and I noticed little streams of water trickling under the bins of wine towards the centre of the said vaults. I did not see any means of getting rid of the water I saw in the said vaults. I am enabled to say with confidence, from my very long experience in the trade, that the said vaults are utterly unfit for use as vaults for the storage of French wine." And *Pannot* says: "I have no hesitation in saying that the said cellars are quite unfit for the storage of wine, and that great damage may have been occasioned to the wine of the Defendant by the wet during the time it was stored in the said cellars."

Upon this ground, my Lords, *Lamare* would undoubtedly have succeeded in resisting the specific performance of the agreement before the Lord Chancellor, as he had done before the Master of the Rolls; but the Lord Chancellor held that he, by remaining upon the premises, and insisting upon the performance of the agreement, had deprived himself of the defence to the suit which he would otherwise have had. I apprehend that upon an objection that delay has taken away a person's right to resist a suit for specific performance, it must be a delay under such circumstances as to amount to a presumption of acquiescence. Upon that matter

the facts were these: After taking possession, *Lamare* was continually complaining that *Dixon* had not performed his agreement. *Lamare* paid his rent at first with reserves, as it was called, and afterwards under protest; and on the 9th of July, 1868, he stated that he should continue to pay in the same manner, until *Dixon* had performed his agreement. *Dixon* sent back the letter with these words written upon it: "I have done all I agreed to do, and shall do no more." Matters remained in this state until the 30th of September, 1868, when *Lamare* wrote to *Dixon* this letter: "Being just returned from my usual two months' journey in *France*, and finding that my premises are still incomplete, and wanting in many matters mentioned to you and to your solicitor by myself and by my solicitor, and in other matters not specifically mentioned, but which present themselves at once upon inspection of the premises, and particularly that the cellar must be drained before the winter, to make it at all fit for my business, I beg hereby to give you notice that if you do not cause all the above matters to be done upon the premises, or at least commenced before this day fortnight, I shall myself do what is necessary, and charge you with the amount of my outlay." The Lord Chancellor says that this was an adhering to and insisting upon the agreement, and undoubtedly, in a sense, that is correct. But we must have some regard to the situation in which *Lamare* was placed. He had upwards of 30,000 bottles of wine in the vaults. The inconvenience and expense of this stock being removed would have been very great, and he was most anxious to remain, and willing to do so, if *Dixon* would but put the premises in a proper state. The letter of the 30th of September was intended to compel *Dixon* to perform his agreement, by *Lamare* threatening to do something, which he could have no right to do under the agreement itself.

From September, 1868, to October, 1869, there was a pause on both sides. As Mr. *Kekewich* very tersely observed, quiescence is not acquiescence. But *Lamare* cannot be said to have been entirely passive, as he continued to pay his rent, though under protest. This was intended to warn *Dixon* that he must not consider the payment of the rent as a submission to the agreement. *Lamare* was bound to pay, and could have been compelled to pay, for the use and occupation of the premises, and in an action of this

description the rent would probably have been taken as the measure of his liability.  *Dixon*, by his conduct, might well have led *Lamare* to believe that the question as to the agreement was still open.  He accepted the rent paid under protest, without any objection.  He never pressed for payment of the £100 originally payable; he did not insist upon the draft lease being accepted, so that, on delivery of the lease, the other £100 might become due.

Now, my Lords, the exercise of the jurisdiction of equity as to enforcing the specific performance of agreements, is not a matter of right in the party seeking relief, but of discretion in the Court —not an arbitrary or capricious discretion, but one to be governed as far as possible by fixed rules and principles.  The conduct of the party applying for relief is always an important element for consideration.  Now *Dixon* from first to last had not performed the agreement by making the vaults fit for the occupation of a wine merchant.  Of this opinion, as I have already remarked, were both the Master of the Rolls and the Lord Chancellor.  He has, therefore, no merit in himself to entitle him to the consideration of the Court.  His claim rests entirely upon the assumed acquiescence of *Lamare*.  *Lamare* took possession before all the works were done, but he did so upon the faith that they would be afterwards completed according to the agreement.  His position would have been different if he had waited to take possession until the day mentioned in the agreement, and had then taken possession of them upon the assumption that everything had been completed which *Dixon* was bound to do.  If *Lamare*, without ascertaining for himself whether this was so or not, had entered upon the premises, and had placed his wine in the vaults, and had kept possession of them after finding out that the agreement had not been performed, his case would have been very different.  But relying upon the agreement being performed on *Dixon's* part, he placed himself in a situation in which he was almost under duresse as to remaining in the premises.  He held on, hoping from time to time that something would be substituted for self-acting drainage.  *Dixon* admitted his obligation to do something, by putting up a catch-pool and pump, which, however, were quite insufficient to keep the vaults dry.  If he had put up sufficient catch-pools, *Lamare* would have been very glad to remain in the premises.

1873

LAMARE
v.
DIXON.

18/3
LAMARE
*v.*
DIXON.

And the Lord Chancellor, in his decree for specific performance, directs an inquiry whether the catch-pools suggested on behalf of *Lamare* were necessary for the fit occupation of the cellars.

Looking to the fact that the agreement has never been performed on the part of *Dixon*, and that he permitted *Lamare* to take possession under the belief that he would complete what was necessary to be done, which he has not done; and having regard to the difficulties in which he has placed *Lamare*, which made him anxious not to quit the premises if *Dixon* would render them fit for his occupation; though *Lamare* may have delayed too long insisting upon his extreme right to abandon the agreement, yet *Dixon*, never having from first to last performed his part, he comes before a Court of Equity with no merit of his own to entitle him to relief, and assuming that there are faults on both sides, *Lamare*, who is upon the defensive, is in the more favourable position of the two. I do not think, upon the exercise of a fair and just discretion, that this is a case in which specific performance ought to have been decreed.

I submit, therefore, that the decree of the Lord Chancellor ought to be reversed. But I suggest to your Lordships that the Master of the Rolls, in dismissing the Respondent's bill ought not to have dismissed it with costs. I would therefore suggest that, reversing the decree of the Lord Chancellor, the case should be remitted with a declaration that the Respondent's bill ought to be dismissed without costs. There should be no costs of the appeal before the Lord Chancellor, and no costs of the present appeal.

LORD COLONSAY was of the same opinion; and had no doubt, upon the evidence, that these premises were not fit for the business of the Appellant.

Under these circumstances, the Respondent was not in a position to insist upon the specific performance of the agreement.

LORD CAIRNS:—

My Lords, the decree in this case which is under appeal has been framed, I have no doubt, with the most scrupulous desire to do exact justice between the parties; but it has adopted a form which appears to me to be unusual in cases of specific perform-

ance, and to be attended with considerable danger.  The decree, as your Lordships will observe, declares that the agreement ought to be specifically performed; it orders the specific performance of the agreement, and orders the Defendant (*Lamare*) to pay the costs of the suit.  The Lord Chancellor at the same time expressed an opinion that it was an essential part of the agreement that the premises, the subject of the agreement, should be fit for occupation by *Lamare*, and directed this inquiry: "Ordered, that an inquiry be made whether the other catchpools and pump suggested by the surveyor of the Defendant were necessary or proper for the fit occupation of the said vaults and premises for use, and if so what compensation or allowance ought to be made."  Now, my Lords, it is abundantly clear upon the case, as indeed the decree assumes, that these catchpools and pump were suggested by the surveyor of *Lamare* at a very early period.  When they were suggested they were refused on the part of *Dixon*, and the refusal was repeated more than once at subsequent periods; and after that suggestion and after that refusal, *Lamare* claimed the right (I do not at present speak of the question of delay) to relinquish the premises and not to be bound by the agreement, and he left the premises.

Now, my Lords, if it should turn out that the inquiry, the order for which I have read, should result in the finding that the catchpools and pump were necessary for the fit occupation by *Lamare* of the vaults and premises, the result would be this: there would be a claim made by the Defendant in the suit to have that done, which was necessary for the fit and proper occupation of the premises; there would be a refusal on the part of the Plaintiff in the suit, before the suit was instituted, to do that which was thus found to be necessary and proper; there would then be a relinquishment of the premises by the Defendant in the suit, and still there would be, after that, a decree for specific performance and costs against him.  My Lords, I own that it appears to me that a decree framed in that way would shew inconsistency even upon the face of it.

But now let me direct your Lordships' attention to the facts of the case so far as they appear to me to be material.  At the time the agreement was entered into between *Lamare* and *Dixon*, the

cellars in question were not constructed, but we find upon the evidence of *Dixon* that he possessed this knowledge with regard to the place where he was about to construct the cellars. He says: "I called at the Local Board of Works in January, 1867" (the agreement was in July of that year), "to know the depth of the main sewer in reference to building my house, and Mr. *Richmond*, the surveyor, told me the depth from the crown of the road. This was before I intended to construct the cellars. I know the depth of the sewer, but I never informed the Defendant of it. I was not asked." *Dixon*, therefore, at the time he entered into the agreement had himself become aware of what the depth of the main sewer was. He knew the depth at which he proposed to construct the cellars, and he must have known, therefore, that the level of the cellars would be below the level of the sewer; and he must, consequently, have known that no self-acting plan of drainage could be put into operation in those cellars.

In that state of things *Lamare* in his evidence says that this was the statement made to him, and upon this part of his evidence I ought to observe that *Lamare* has not been cross-examined. He says: "During the negotiation, and before the signing of the agreement," "I on different occasions pressed upon the Plaintiff the necessity of making the cellars quite dry and well ventilated, and it was with the view of making the said cellars quite dry that the agreement contains the provision that the floor and exterior walls of the said vaults should be well concreted; and in reply to my remarks upon this subject I have more than once been assured by the Plaintiff that the cellars would be quite dry and that no water could come in." Mr. *Bartlett*, the solicitor, gives evidence on the same side to the same effect, and I may observe that he is not cross-examined at all upon any part of his evidence. He says: "From what passed between the Plaintiff and the Defendant in my presence I am enabled to say positively that the Plaintiff well knew at the time of signing the said agreement that the said vaults were required by the Defendant for the purpose of storing his wine, and that it was of the greatest importance to the Defendant to have possession of the said vaults at the earliest moment, in order that he might take his stock there." "I also

1873
~~
LAMARE
*v.*
DIXON.

recollect that the necessity of dryness of the cellars was discussed between the Plaintiff and the Defendant in my presence at the interview before mentioned; and the Plaintiff assured the Defendant that the concrete in the outer walls and on the floors, as provided for in the said agreement, would keep the said cellars quite dry, and this discussion is what I referred to in my letter to the Plaintiff's solicitor, dated 20th October, 1869."

Now I must call your Lordships' attention to the denial of this on the part of *Dixon.* Your Lordships have the evidence of two witnesses, who are not cross-examined upon this subject, on the side of *Lamare*; but *Dixon* says: "the Defendant never informed me that the vaults must be dry, and I never assured him that they should be so, and he never stipulated that they should be drained. He was always fully aware that the vaults were not drained" (that, of course, must have been the case at a subsequent period). "I never assured him that they should be dry." Then, afterwards, he says: "I absolutely deny that I ever said to the Defendant, as stated by him in his affidavit, that the cellars should be quite dry, and that no water could come in, or anything to that effect. I knew that cellars generally could not, from their underground construction, be quite dry." In his cross-examination he says this: "The Defendant said nothing to me as to the reason why the walls should be concreted. He never mentioned it to me at all. It was my suggestion to my builder. I suggested it to keep the walls dry. My show-room for bright goods was over the cellars. I was anxious that the cellars should be as dry as possible, and I was anxious to keep the cellars dry for my own sake, but I did not think it was necessary for a wine merchant. I did not tell the Defendant and Mr. *Bartlett* at the solicitor's office, before signing the agreement, that the concrete on the outside of the walls and floors would keep the cellars dry. I did not conceive it possible to keep the cellars quite dry. I do not recollect saying anything at that interview about keeping the cellars dry."

My Lords, I own that upon this balance of testimony, without resorting to the rule which used to obtain in the Court of Chancery, that great, and perhaps unusual, weight should be given in a suit for specific performance to the oath of the Defendant; without

resorting to that rule, but taking the evidence as it stands, it appears to me that this contradiction by *Dixon* dwindling down, on his cross-examination, to his not recollecting saying anything at the interview with Mr. *Bartlett* about keeping the cellars dry, cannot be taken to countervail the positive statements of *Lamare* and of *Bartlett*. And I am the more disposed to come to that conclusion when I add, as I must, that I cannot accept this statement of *Dixon's*, that the idea of having concrete on the walls was his own; that it was never mentioned by the Appellant at all, but put into the agreement for his own sake, in order that, there being concrete below, he might have his own dry stores in a proper condition above. I cannot imagine that when he was building his own cellars he would for his own sake have put into the agreement with *Lamare* that there should be concrete on the walls. He could have done that perfectly well, if it was only to be done for his own sake, without stipulating for it in the agreement. I, therefore, arrive at the conclusion that the representation was made as stated by *Lamare* and by his solicitor, Mr. *Bartlett*.

My Lords, I quite agree that this representation was not a guarantie. It was not introduced into the agreement on the face of it, and the result of that is, that in all probability *Lamare* could not sue in a Court of Law for a breach of any such guarantie or undertaking; and very probably he could not maintain a suit in a Court of Equity to cancel the agreement on the ground of misrepresentation. At the same time, if the representation was made, and if that representation has not been and cannot be fulfilled, it appears to me upon all the authorities, that that is a perfectly good defence in a suit for specific performance, if it is proved in point of fact that the representation so made has not been fulfilled.

That brings me to the next question, namely, were the cellars, in point of fact, wet? That question may be dealt with very shortly, because I observe that the Master of the Rolls pronounced an unhesitating opinion upon the subject, and the Lord Chancellor stated what appears to me to sum up entirely this part of the case : "I also hold, so far with the Defendant, that a place which is constantly damp and submerged in water, from five to six inches of water in some cases lying on the floor, would not be a place for a wine merchant's cellar. I do not think we need go much into the

1873

LAMARE
*v.*
DIXON.

evidence upon that, and I shall not comment upon it. Certain people have been brought forward to shew that to a certain peculiar class of wines it did not signify. Other witnesses have been called to prove that for some wines it did signify a great deal; but I apprehend this Court would never say that a place which was liable to be submerged in water, to the extent of six inches, would be a fit place for occupation as a wine cellar."

My Lords, I have marked the evidence upon this subject of *Ridley*, of *Pannot*, of *Finke*, and of *Fenwick*, all wine merchants. They speak to the condition in which they found the cellars, and their evidence is not contradicted, and they are not cross-examined upon it. But I will only now ask your Lordships to observe the evidence on cross-examination of a person named *Chapman*, one of the witnesses for *Dixon* himself. *Chapman* says, that he went over the cellars with Mr. *Bartlett* and another gentleman: "I walked with them holding a candle. Water was not at that time standing on the floor of the cellar, except at the eastern end. I lit the gas, and I shewed Mr. *Bartlett* the water trickling down the walls; I remember telling Mr. *Bartlett* that the inner cellar was always wet, but not that the water was trickling under the bins in the front cellar. I don't remember Mr. *Bartlett* saying in a joke, 'Are you sure it is not wine?' He might have said so, but I do not remember it. I don't remember anything being then said as to the water trickling under the bins in the front cellar. The water was sometimes trickling under the bins in the inner cellar." . . . "The catch-pit has never been emptied twice a day that I know of; I cannot say what is the size of the waste pipe. On two occasions we had to put boards down in both the cellars to walk upon." That is the evidence given by a witness for *Dixon* himself.

In addition to this, I will only observe upon what was suggested in argument, namely, that some of this wet was to be attributed to the fact that *Lamare* had broken the concrete by letting down some of his partitions for bins into the floor. I do not think that that explains the evidence which I have read. It clearly would not explain the water trickling down the walls; and, moreover, there is no witness who says that breaking the concrete for the purpose of letting down that which might operate as a plug into

1873
LAMARE
v.
DIXON.

it, would itself allow the water to come into the cellar. But, my Lords, I go farther than that, and say that it must have been perfectly well known to the Respondent that if these premises were to be used as cellars, and bins fixed in them, it would be absolutely impossible to fix the bins in any way without, to a greater or less degree, puncturing the floor, and of course puncturing the concrete on the floor.

That being so, the representation being such as I have mentioned, and the facts as to the cellars being such as is proved by the evidence, it appears to me that there would be entirely an end of the case as to specific performance, unless the right to object has been given up by *Lamare*. That it was given up by taking possession is out of the case. Possession was taken before the time appointed for the completion of the works, at a time when the works were clearly incomplete. And without entering upon the question whether the words that are stated by *Lamare* were actually used, namely, that he took possession without prejudice to his rights under the agreement, the law would imply that incident to his taking possession from the mere fact that he took possession before the works were at an end. Clearly, my Lords, nothing was settled; nothing was accepted before the month of April, 1868. *Lamare* says that the want of drainage was objected to by his surveyor in January of that year. *Dixon* denies this, but he admits that in the month of April, when the rent was first asked for, an objection was made. Indeed, your Lordships will find this fact put beyond doubt by two sentences in letters to which I will refer you. In a letter of the 9th of April, *Lamare's* solicitors say, speaking of other objections which they made to different parts of the work, "The surveyor insists that the drainage must be amended, as, under existing arrangements, the cellars are liable at any time to be overflowed; we need not tell you that such an accident would cause considerable damage, and that the objection is not a vexatious one." And again, in the same month, on the 18th of April, the solicitors say, "The drainage is not complete, nor do we believe that Mr. *Lamare* knew anything as to its defects until he came down one morning and found his cellar covered with water. It is idle, as it appears to us, to say that 'Mr. *Dixon* never undertook to do any other drainage.'" And then, on or soon after

the 18th of April, 1868, came the inspection by Mr. *Hayton*, and the suggestion which he made with regard to the catch-pits. That is stated in this way by *Dixon* himself: "Mr. *Hayton* did suggest when he saw my workmen" (this is in April, 1868) "making the catch-pit, that I should put in a pump and make other catch-pits; but I declined to do so, as I did not think that catch-pits were necessary, or that I was bound to put them in, and I said that Mr. *Lamare* might find the pump himself."

My Lords, after this, when there was this suggestion made by *Hayton*, and this refusal which I have read, the rent was always paid under protest; the return of the draft lease was not asked for, nor the payment of the £100. I take the meaning of paying the rent under protest to be, that the person paying indicated that he paid the rent for the use and occupation of the premises, but not as under the agreement, nor as recognising the validity or the binding character of the agreement.

Then, my Lords, we find that the next fact is this.—On the 9th of July, 1868, on the payment of the rent, a letter was written, with these words: "Mr. *C. Lamare* pays the rent under protest until Mr. *Dixon* has fulfilled his agreement, and delivered place in tenantable condition," to which *Dixon* answers: "I have done all I agreed to do; shall do no more." Again, on the 30th of September *Lamare* writes: "Being returned from my usual journey in *France*, and finding that my premises are still incomplete and wanting in the many matters mentioned to you and to your solicitors by myself and by my solicitor, and in other matters not specially mentioned; and particularly that the cellars must be drained before the winter to make it at all fit for my business, I beg hereby to give you notice that if you do not cause all the above matters to be done upon the premises, or at least commenced, before this day fortnight, I shall myself do what is necessary, and charge you with the amount of my outlay. I send you the last quarter's rent, but you will, of course, understand that I in no way abandon my claim against you for damages on account of the non-performance of your agreement in many respects." To which *Dixon* answers: "I have already done more than I agreed to do, and shall do no more, as I before informed you."

It is quite true that *Lamare* said in this letter that he would do

1873
LAMARE
*v.*
DIXON.

the work and sue for damages. I do not at all hold him to be concluded by that. I apprehend that he was perfectly free a week after that letter, as he was free a week before, to maintain and hold his position on the non-performance of the agreement, to say, that although he had used the threat of doing the work, and suing for damages, he was not bound to pursue that course, but was at liberty to repudiate the agreement *in toto*.

We then come to the only part of the case which appears to me to present any difficulty. From that time, the 30th of September, 1868, till about a year afterwards, there occurred nothing whatever except the payment of the rent, when it became due, under protest. During the whole of that time *Lamare* took no farther steps. Nor did *Dixon*. He never required the draft lease to be returned to him for the purpose of execution. He did not demand and require the payment of the £100 which, on its execution, would have become payable under the agreement. There is no doubt that there was delay on both sides, but the question is, against whom does the delay operate most severely. In my opinion, clearly against *Dixon*. *Lamare* had a perfect right to say, As long as I am allowed to do it, I will continue here, not holding under the agreement, but holding either as tenant at will, or tenant from year to year. I will pay my rent for use and occupation from time to time as it is demanded, but I will keep up my protest to shew that I occupy, only in fact, but without admitting the validity of the agreement. But *Dixon* had the matter entirely in his own hands. If he was dissatisfied with that state of things, if he was dissatisfied with having a tenant in that equivocal position, if he wished to have it decided, once and for all, that *Lamare* was there under the agreement, and not holding merely upon terms of use and occupation, he had nothing to do but to insist upon the return of the draft lease and the payment of the money, and, in default of that demand being complied with, to have instituted at that time, if he was in a condition to maintain it, his suit for specific performance. He thought fit not to do so; and I am of opinion that the delay which occurred at that time operates most severely against him.

What took place after that time? At the end of the year 1869 there came, from the bursting of a pipe, an extraordinary addition

to the wet in the cellars, and thereupon the tenant obtained other premises, and after some weeks removed his wine from the cellars in question.

My Lords, although agreeing that there has been a delay, yet I hold that, at the commencement of that delay, *Lamare* clearly had a right to repudiate the agreement and throw up the premises; and I am of opinion that he did not lose that right by remaining in the premises and paying his rent with the protests to which I have referred. The delay from that time onwards was more peculiarly the delay of *Dixon*, and he, as it appears to me, cannot obtain a right to specific performance grounded upon the delay of *Lamare*, when he clearly would not have had that right at the commencement of the period which is called the period of delay.

My Lords, the only alteration that I should have thought ought to be made in the decree of the Master of the Rolls was this: inasmuch as the delay which occurred was chargeable, though in different proportions, to both parties, I should have thought that the more usual course would be to dismiss the bill for specific performance without costs; and I think your Lordships would act rightly in making that alteration in the decree of the Master of the Rolls.

*Decree appealed from reversed with declaration.*

*Lords' Journals,* 31st July, 1873.

Solicitors for the Appellant: *Nicholson & Herbert.*
Solicitor for the Respondent: *Joseph Needham.*

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

---

**ANNEXE 3 TO THE**
**FIRST AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

---

**BEFORE ME**

**NOTARY PUBLIC**

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

DARWIN v. CLARKE. *Feb.* 12*th,* 1803.

[See *Hardman* v. *Ellames,* 1835, 2 My. & K. 756.]

Answer admitting the execution of an instrument, and craving leave to refer to it, when produced, is not a ground to move for the production ; not admitting, that it is in the possession or power of the Defendant.

Mr. *Bell* for the Plaintiff moved that the Defendant should produce a power of attorney to collect the effects of a bankrupt, who absconded from his Commission about twenty years ago, upon the answer ; [159] admitting, that such power was executed, and in the usual way craving leave to refer to the same, when it shall be produced. But there was no admission, that it was in his possession, custody or power.

Mr. *Grimwood* for the Defendant objected, that there was no charge in the bill, that the power of attorney was in his possession or power.

Mr. *Bell* mentioned *Gardiner* v. *Mason* (4 *Bro. C. C.* 479.)

The *Lord Chancellor* said, he was aware, such sweeping orders had been made : but the answer would not do ; not being an admission, that the instrument is in the Defendant's possession or power.

The motion was refused.(1)

(1) *Lady Shaftesbury* v. *Arrowsmith,* 4 Ves. 66. *Taylor* v. *Milner,* 11 Ves. 41. *Atkyns* v. *Wright,* 14 Ves. 211. *Beckford* v. *Wildman,* 16 Ves. 438. *Marsh* v. *Sibbald,* 2 Ves. & Bea. 375. *Evans* v. *Richard, The Princess of Wales* v. *The Earl of Liverpool,* 1 Swanst. 7, 114.

FLINT v. BRANDON. *Rolls. Feb.* 16*th,* 17*th,* 1803.

Specific performance of a covenant to make good a Gravel Pit refused.

By indentures of lease, dated the 29th of *July* 1789, *Samuel* and *Thomas Brandon* demised to the Plaintiff, his executors, &c., a piece of ground, called the *Gravel Pits,* at *Newington,* containing two acres, twelve poles, then in the possession of *Thomas Clutton,* to hold from the 29th of *September* 1799, the day on which the lease to *Clutton* would expire, for the term of twenty-one years : nevertheless the same to be put into the possession of Plaintiff in the same state and condition as it was so expressly covenanted, declared, and agreed, to be yielded up by the said *Thomas Clutton,* his executors, &c., unto the original landlord in and by the lease granted to [160] *Clutton* ; paying the yearly rent of £12, with all the usual covenants.

This lease contained a covenant by the lessors, that the Plaintiff, his executors, &c., should at the expiration of the then existing lease to *Clutton* be put into possession of the said premises thereby demised ; and that the same premises should be then in the same state and condition as he the said *Thomas Clutton* for himself, his executors, &c., did covenant, &c., to and with the original landlord, his heirs, &c., to leave and yield up the said premises. They also covenanted to grant to the Plaintiff two farther terms of twenty years each in succession on payment of a fine of £2.

The original lease was granted by *Henry Penton* to *Clutton* for a term, which expired on the 29th of *September* 1799 ; and by a memorandum indorsed, dated the 8th of *June* 1779, it was declared, that it should be lawful for *Clutton,* his executors, administrators, and assigns, to break up or dig for gravel, any part of the land ; and he thereby for himself, his executors, administrators, and assigns, covenanted to pay the sum of £20 for every acre he should so break up, or dig, and to make good the same at or before the expiration of the within lease.

*Samuel* and *Thomas Brandon* purchased this piece of ground from *Penton.* *Thomas Brandon* and *Clutton* died.

The bill, filed in 1800 against *Samuel Brandon* and the executors of *Thomas,* prayed, that the Defendants may be decreed specifically to perform and carry into

execution the grant, covenants, and agreements, made with the Plaintiff by the said indenture ; and that they may [161] be ordered to put the Plaintiff in possession of the piece of ground so demised to him in such state and condition as *Clutton*, his executors, &c., ought to have made good the same.

The answer stated, that the Plaintiff was in possession ; and submitted, that, if the Plaintiff has any demand, it is by action of covenant, and not by suit in this Court.

Mr. *Richards* and Mr. *Wingfield*, for the Plaintiff. This covenant to fill up a gravel pit is clear ; and not like the case of building a house ; as to which however there is a distinction taken according to Lord *Rosslyn's* opinion in *Mosely v. Virgin* (3 *Ves.* 184), referring to the case of the Clergyman's House (*Allen v. Harding, Eq. Ca. Ab.* 17). This is as specific as the covenant in that case and the *City of London v. Nash* (3 *Atk.* 512 ; 1 *Ves. sen.* 12) ; being merely a covenant to level the ground. It would be difficult to frame a declaration from the uncertainty of the expence.

Mr. *Romilly* and Mr. *Martin* for the Defendant. The prayer of this bill cannot be complied with : the Plaintiff being in possession. If such a bill as this can be filed, why not for specific performance of a covenant, that a lessee ploughing up meadow shall lay it down in grass ; or that a tenant shall cultivate in a husband-like manner, &c. The point upon a covenant to build is very doubtful, upon the *City of London v. Nash*, and *Lucas v. Comerford* (3 *Bro. C. C.* 166 ; 1 *Ves. jun.* 235) ; upon which last case it has rested. In the *Monmouthshire Case*, as to the wharfs, [162] the *Lord Chancellor* cautiously avoided giving his opinion. That was a case of the wharfs, &c., being particularly pointed out by the Act of Parliament. What can be more vague than the words of this covenant " make good the " same " ? It must open to a great deal of inquiry, what this land was, before it was broken up. But this is clearly matter of pecuniary compensation. Without doubt an action of covenant would lie ; and evidence might be given as to the expence of putting the land in that condition. In the instance of the common covenant to drain land, a specific performance, though much more convenient, was never heard of. Bills of this kind have been confined to sales of estates with the single exception of the *City of London v. Nash* ; which is much shaken by the later authorities. Why should not this relief be given equally upon any personal undertaking : to transfer stock : to deliver a certain quantity of hops : to roof or new-floor a house ? The object in those cases is as specific and certain ; yet upon every such attempt the bill has been dismissed with costs. The true ground of a specific performance is a remedy more efficacious than that the law can give ; and, that a verdict would not give the specific thing. How is this to be followed up ? When will the covenant be satisfied ? Is the Master to report upon it ?

Mr. *Richards*, in Reply. The mere question is, whether this Plaintiff is to have what it was agreed he should have. That the engagement is clear, to fill up a gravel pit, and leave it, as it was before, cannot be disputed. If the meaning is to deliver the land, as the original lessee ought to have delivered it, the performance will be compelled ; though the time has expired. Though a compensation by damages might be given, there is a right to a specific performance. So a covenant to build a house admits compensation, yet if the object is suffici-[163]-ently defined, a specific performance may be had. Upon a covenant to sell free from incumbrances an action would lie : but this Court would compel the vendor to pay off the incumbrance.

*Feb.* 17*th.* The *Master of the Rolls* [Sir Wm. Grant]. This Court does not, I apprehend, profess to decree a specific performance of contracts of every description. It is only where the legal remedy is inadequate or defective, that it becomes necessary for Courts of Equity to interfere. In *Errington v. Aynesley* (2 *Bro. C. C.* 341), Lord *Kenyon* says, " a specific performance is only decreed, where the party wants " the thing in specie ; and cannot have it any other way." I will not say, Courts of Equity have in every instance confined themselves within this line : but this being the principle, I will not deviate from it farther than I am bound from deference to precedent and authority. In the present case complete justice can be done at law. The matter in controversy is nothing more than the sum it will cost to put the ground in the condition, in which by the covenant it ought to be. The Plaintiff will be entitled to recover damages in an action for breach of the contract. In some

respects the legal remedy is better than any this Court can give ; for the Plaintiff recovering, and having the disposition of the money, may perform the work in such manner as he thinks proper : whereas, if a specific performance is decreed, a question may arise, whether the work is sufficiently performed. The jury may also take into consideration any injury to him by not having performed at the commencement of the lease : but this Court can only decree a performance now.

[164] As to the cases upon building contracts, it is unnecessary to make observations upon them. If it is settled, that such contracts should be specifically performed, I should think myself bound to follow that course, without inquiring, whether it is strictly consonant to principle. But I am not barred from that inquiry, where a contract of another species is for the first time brought into this Court for a specific performance. No instance of a specific performance of such a covenant as this has been produced. Therefore I am at liberty to do, what upon principle ought to be done, to dismiss this bill.

SPERLING *v.* ROCHFORT.  *Feb. 19th, 21st, 24th,* 1803.

[See *Godber v. Laurie,* 1822, 10 Price, 153.]

Whether a jurisdiction in equity, to permit a married woman to give up her interest for life in a trust fund, not settled to her separate use, or subject to her appointment, analogous to a Fine, can be maintained, *Quære.* The bill by the husband and wife against the trustees for this purpose was dismissed, as premature ; the funds not being ascertained : the husband accountable to the trustees in respect of his receipts by their permission, unliquidated ; and as to part of the capital, the trust of which was for her appointment by deed or will notwithstanding coverture, no absolute appointment having been executed, but merely by way of indemnity to the trustees.

*John Kilpatrick* by his will, dated the 15th of *December* 1779, bequeathed all his mortgages, bonds, judgments, and other his fortune, of what nature or kind soever, to trustees, in trust for the payment of his debts and funeral expences ; and then for payment of certain legacies and an annuity ; and as to all the rest and residue of his real and personal fortune of what nature or kind soever he directed, that his said trustees should pay and assign the same over to his son *John Thomas Kilpatrick,* his executors, administrators, and assigns, at his age of twenty-one years, together with the interest and savings thereof, as also the fortune provided for the testator's issue on his marriage, which should accrue during the minority of his said son ; and in case [165] the said *John Thomas Kilpatrick* should die before he arrived at the age of twenty-one years, and without having issue, then he directed, that his trustees should as well out of the fortune provided by the said settlement (which in such event the testator devised and bequeathed to his said trustees) as out of the fund thereinbefore vested in his said trustees pay certain legacies ; and in case the said several legacies thereinbefore bequeathed on the death of his said son, as aforesaid, should not happen to amount to the whole of the testator's property, or should happen to be lapsed legacies, then he directed, that his said trustees, as also the trustee of the said settlement, should convey and assign to *Harriot,* his then wife, her heirs, executors, and administrators, all the residue of his real and personal fortune, for her and their sole and proper use.

The testator died ; and his widow in *February* 1789 married *John Sperling.* By indentures, dated the 10th of *February* 1789, reciting, that *Harriot Kilpatrick* was entitled to a rent-charge of £300 for her life, under some settlement made upon her marriage with her late husband, and reciting his will, and the intended marriage between the said *Harriot* and *Sperling,* and that it had been agreed, that certain estates of *John Sperling* and of his father *Henry Sperling* should be settled, subject to the life estates of *Henry Sperling* and *Mary* his wife, upon *John Sperling* for life ; and after his decease to the intent, that *Harriot Kilpatrick* might have thereout a rent-charge of £300 for her life, for her jointure, with remainders to the issue of the intended marriage, with divers remainders over ; and that it had been agreed, that for the purpose of making provision for *John Sperling* and his intended wife and the issue of their marriage, during the lives of *Henry Sperling* and his wife, certain estates belonging to *Henry Sperling* and *John Sperling*

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

**ANNEXE 4 TO THE**
**FIRST AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

**BEFORE ME**

**NOTARY PUBLIC**

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

**Judgment 1999/52**

# R G Phillips Limited v. Hill and Hill - Ordinary Court 16.4.99

Summary -- 27.GLJ.9&71 -------------- Specific performance - non-availability in Guernsey Courts - Settlement out of Court - application to require party to consent to judgment in compliance with settlement - powers of Court

P and DD compromised a claim relating to building works and one of the provisions of the compromise was that if DD did not pay they would consent to judgment in a liquidated amount. P summoned DD seeking an order that DD consent to judgment. DD did not appear despite good service on them. HELD by the Bailiff, the Court had no power to require DD to consent to judgment as this would be an order for specific performance of a contract. However, leave would be given to amend the cause to provide for a default judgment against DD in the amount agreed to be paid under the compromise.(deVGC).

[R G Phillips Limited v. Hill and Hill - Ordinary Court 16.4.99 (NLP/unrep)]

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
No. 06-cv-366 (D.D.C)

---

**ANNEXE 5 TO THE**
**FIRST AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

---

**BEFORE ME**

**NOTARY PUBLIC**

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

284                           CHANCERY DIVISION.                    [1912]

WARRING-        I think, therefore, that the trustees in the present case have
TON J.       complied also with the final requirement of the sub-section, and
1911         sufficiently made it appear to the Court that the loan was made
SOLOMON,     under the advice of the surveyor or valuer, and that the advice
*In re.*     was expressed in the report.
NORE              That being the conclusion at which I have arrived, it follows
*v.*         that the trustees in the present case are not chargeable with the
MEYER.       breach of trust which is alleged against them, and the result is
             that I must dismiss this action against all the defendants with
             costs.

             Solicitors: *J. T. Goddard; Farrar, Porter & Co.; Lewis &*
             *Yglesias.*

                                                              W. I. C.

PARKER J.      VON HATZFELDT-WILDENBURG *v.* ALEXANDER.
1911
                            [1911 V. 326.]
July 21, 26.
             *Vendor and Purchaser—Specific Performance—Agreement for Sale—Contract*
             *in Correspondence—Stipulation for Formal Contract—Construction.*

             An alleged contract for the sale of a leasehold house, contained in
             letters wherein it was stipulated by the purchaser that her acceptance
             was subject to, amongst others, a condition that her solicitors should
             "approve the title to and covenants contained in the lease, the title
             from the freeholder and the form of contract":—
                  *Held*, on the construction of the documents, not to be a complete
             contract susceptible of being enforced by way of specific performance.
                  *North* v. *Percival* [1898] 2 Ch. 128, doubted.

             IN this action Princess Clara Elizabeth Von Hatzfeldt-
             Wildenburg asked for specific performance of an agreement
             alleged to be contained in three letters for the sale to her by the
             defendant of the leasehold house No. 13, Grosvenor Square, with
             the stabling. The letters in question passed between Messrs.
             Walton & Lee, house agents, acting for the plaintiff, and Messrs.
             Curtis & Henson, house agents, acting for the defendant. There
             was no question of their authority to bind their respective clients,
             nor was there any suggestion of any contract outside the corre-
             spondence. The first letter was written to Messrs. Walton & Lee

by Messrs. Curtis & Henson on April 18, 1911, and was as
follows :—

"Dear Sirs,—We have received a letter from our client
Mr. Granville Alexander, as follows—'I authorize you as my
agents to accept on my behalf the sum of twenty-five thousand
pounds (25,000*l.*) for the lease of No. 13, Grosvenor Square,
possession and completion to be on the 11th day of August next.
This is absolutely my very lowest price as I have no wish to sell
and the property is not really in the market. It is further to be
understood that the purchaser is to take the tenant's fixtures and
fittings at a valuation as usual.' We should be glad to hear from
you with as little delay as possible."

This was answered by Messrs. Walton & Lee on April 25, 1911,
as follows :—

"Dear Sirs,—Referring to your letter to us of the 18th inst., in
accordance with instructions received from our client, Her Serene
Highness the Princess Hatzfeldt, we accept Mr. Granville
Alexander's offer of the above property at the price therein named,
namely 25,000*l.* This acceptance is subject to the following con-
ditions:—(1.) That the lease is from the freeholder and has between
thirty and thirty-one years to run, and that the annual ground
rent is 400*l.* (2.) That Her Serene Highness's solicitors approve
the title to, and covenants contained in the lease, the title from
the freeholder and the form of contract. (3.) That Her Serene
Highness approves her surveyors' report on the condition of the
structure, the condition of the drains and drainage system, the
heating and water supply and system, and the electric light
system and arrangement, and the system and condition of the
electric lift. (4.) Tenant's fixtures and fittings to be taken at a
valuation in the usual way. Her Highness signifies that the
29th September next, owing to certain arrangements she has
made, would be more agreeable to her for completion and
possession than August 11th if equally suitable to Mr. Alexander.
It is of course understood that the panelling, bedroom fitments
and similar fitments are included in the price of 25,000*l.* We
shall be glad of a confirmation of the bargain and also to hear
when Her Highness's surveyors can make their survey and
examination."

PARKER J.

1911

VON
HATZFELDT-
WILDEN-
BURG
*v.*
ALEXANDER.

PARKER J.

1911

VON
HATZFELDT-
WILDEN-
BURG
*v.*
ALEXANDER.

There followed a letter from Messrs. Curtis & Henson to Messrs. Walton & Lee dated April 26, 1911 :—

"Dear Sirs,—We are in receipt of your letter of yesterday's date written on behalf of your client, Her Serene Highness the Princess Hatzfeldt, and we have now seen Mr. Granville Alexander thereon : that gentleman instructs us as his agents to confirm the acceptance of our offer for the sale of the lease of the above, and further that gentleman is agreeable to the date for the completion and possession being on the 29th September next, instead of August 11th, as previously mentioned. It should be noted that the lease is for a term of thirty years from November last, and is held direct from the freeholder, and if you refer to our letter of March 6th last we then mentioned about thirty years. Our client requests that you will kindly inform us of the name of the solicitors who will act on behalf of Princess Hatzfeldt so [sic] we may place those gentlemen in communication with Mr. Granville Alexander's solicitors. Further as it is proposed to prepare the house for occupation early next week it is essential that your client's surveyor should immediately proceed with what is desired to be done as after that date the house cannot be seen. We may mention that there is some further painting &c. that was ordered and this will still be carried out notwithstanding that Mr. Granville Alexander has undertaken to sell."

The plaintiff did not approve of her surveyor's report and demanded a contribution of 1000*l.* from Mr. Alexander towards making good deficiencies and wants of repair. The defendant withdrew the offer to sell, and the plaintiff brought this action.

*Buckmaster,* K.C., and *Douglas M. Hogg,* for the plaintiff. The Court will look at all the documents and, if it finds that two or three of the letters form a complete contract, it will hold that to be the contract, and that it cannot be altered except by agreement : *Hussey* v. *Horne-Payne.* (1) Subsequent letters are only relevant for the purpose of shewing whether there was in fact a complete bargain : *Bristol, Cardiff and Swansea Aerated Bread Co.* v. *Maggs* (2) ; *Bellamy* v. *Debenham.* (3) Here

(1) (1879) 4 App. Cas. 311.          (2) (1890) 44 Ch. D. 616.
(3) (1890) 45 Ch. D. 481 ; [1891] 1 Ch. 412.

there was a complete agreement and ·the defendant is bound
by it. A formal condition like the stipulation that the free-
hold title shall be approved is immaterial and we might have
waived it; the question is one of construction of the documents :
Fry on Specific Performance, 5th ed. p. 261 ; *Winn* v. *Bull* (1);
*Crossley* v. *Maycock.* (2)

PARKER J.

1911

*Von
Hatzfeldt-
Wilden-
burg
v.
Alexander.*

  *A. Grant, K.C.,* and *H. Greenwood,* for the defendant. The
plaintiff is not entitled to specific performance. The prin-
ciple of law is well settled. If an agreement is expressly
made subject to a condition that a formal contract shall be
drawn up, it is not an agreement which can be enforced. If
at one stage of the negotiations there·appears to be a concluded
agreement, it is not binding if the subsequent correspondence
shews that other terms were in the contemplation of the
parties : *Bristol, Cardiff and Swansea Aerated Bread Co.* v.
*Maggs.* (3) The letters· in the present case do not form a com-
pleted contract ; but if they do the plaintiff has herself tried to
reopen it. The judgment of North J. in *Bellamy* v. *Deben-
ham* (4) was not accepted by the Court of Appeal (5) and cannot
be relied on. The plaintiff could not have waived the condition
as to the freehold title : *Lloyd* v. *Nowell.* (6) There is no con-
tract so long as it is subject to the preparation of a formal
contract : *Winn* v. *Bull.* (1) There was only a conditional
acceptance in the present case ; we could not have sued the
plaintiff : *Hudson* v. *Buck* (7) ; *Harvey* v. *The Principal and
Ancients of Barnard's Inn* (8) ; *Watson* v. *McAlhun* (9) ; *Jones*
v. *Daniel* (10) ; *Honeyman* v. *Marryat.* (11)

  *Buckmaster, K.C.,* in reply. No new question of principle is
involved in this case. The argument that we cannot waive the
condition as to the freehold title implies that there is a com-
pleted contract. The question whether there was to be a formal
contract depends upon the construction of the letters. In this
case the agreement was completed, although approval was

(1) (1877) 7 Ch. D. 29.        (6) [1895] 2 Ch. 744.
(2) (1874) L. R. 18 Eq. 180.    (7) (1877) 7 Ch. D. 683.
(3) 44 Ch. D. 616.            (8) (1881) 50 L. J. (Ch.) 750.
(4) 45 Ch. D. 481.            (9) (1902) 87 L. T. 547.
(5) [1891] 1 Ch. 412, 419—423.  (10) [1894] 2 Ch. 332.
(11) (1855) 21 Beav. 14.

PARKER J.

1911

VON
HATZFELDT-
WILDEN-
BURG
*v.*
ALEXANDER.

stipulated for and a formal contract: *North* v. *Percival* (1) ;
*Rossiter* v. *Miller* (2) ; *Chipperfield* v. *Carter.* (3)

*A. Grant, K.C.,* in reply on the authorities. *North* v.
*Percival* (1) is doubted in Williams on Vendor and Purchaser,
vol. i. p. 17.

July 26.  PARKER J. read the letters and said that the first
seemed to be a firm offer by the defendant to sell the premises in
question for 25,000*l.*, the tenant's fixtures and fittings to be taken
at a valuation.  It was clear that the second letter was not an
acceptance of the defendant's offer to sell, but was an offer on the
part of the plaintiff to purchase the hereditaments on different
terms.  His Lordship continued : In my opinion the third letter
is an acceptance of the offer made in the letter of April 25.  The
question I have to determine is whether this acceptance resulted
in a binding contract.  The defendant says it did not and
contends (1.) that upon the true construction of the letters
themselves there is no binding contract, and (2.) that at any rate
there is no such contract if on the principle of *Hussey* v. *Horne-
Payne* (4) those letters be looked at in the light of the rest of the
correspondence between the parties.

The argument on the true construction of the letters themselves
depends on the reference contained in the offer of April 25 to the
form of contract being approved by the purchaser's solicitors.
This no doubt shews that the approval of the purchaser's
solicitors of a more formal document containing the terms of the
agreement between the parties for the sale and purchase of the
premises in question was in the contemplation of Messrs. Walton
& Lee, and if a formal document was to be approved, it was no
doubt also contemplated that it would be executed.  I think I
must take it that Messrs. Curtis & Henson in accepting the
terms offered by the letter of April 25 accepted them on the
same footing.

It appears to be well settled by the authorities that if the
documents or letters relied on as constituting a contract con-
template the execution of a further contract between the parties,

(1) [1898] 2 Ch. 128.                    (4) (1878) 8 Ch. D. 670 ; 4 App.
(2) (1878) 3 App. Cas. 1124.         Cas. 311.
(3) (1895) 72 L. T. 487.

it is a question of construction whether the execution of the
further contract is a condition or term of the bargain or whether
it is a mere expression of the desire of the parties as to the
manner in which the transaction already agreed to will in fact
go through.   In the former case there is no enforceable contract
either because the condition is unfulfilled or because the law does
not recognize a contract to enter into a contract.   In the latter
case there is a binding contract and the reference to the more
formal document may be ignored.   The fact that the reference to
the more formal document is in words which according to their
natural construction import a condition is generally if not
invariably conclusive against the reference being treated as the
expression of a mere desire.   *North* v. *Percival* (1) appears to be
an exception to this rule, but I doubt whether that case was
correctly decided : see the earlier decision of Sir George Jessel in
*Winn* v. *Bull.* (2)   What then is the true construction of
the letters said to constitute the contract ?   The letter of April 25,
unlike the letter of April 18, is in form a conditional and not a
firm offer.   It is expressed to be subject to four conditions.   The
first condition is in the nature of a condition precedent making
the acceptance dependent on the existence of a certain state of
facts.   That state of facts existed and the condition may there-
fore be disregarded.   The third condition in effect provides that
the plaintiff is not to be bound by her offer unless she approves a
report to be made by her surveyors on the drains and other
matters.   It also is a condition either precedent or subsequent.
The fourth condition is not really a condition at all, but a term
of the bargain.   It is the second condition which contains the
reference to the formal contract.   It provides that the plaintiff's
solicitors approve the title to and covenants contained in the
lease, the title from the freeholder and the form of contract.
There is some authority for saying that where a purchaser
stipulates that his solicitor shall approve the title of the property
such stipulation may possibly be construed as a recognition that
the title will be examined in the usual way and need not be con-
strued as a condition at all.   But such a construction is impossible
in this case, for the plaintiff's solicitors have to approve also the

PARKER J.

1911

VON
HATZFELDT-
WILDEN-
BURG
*v.*
ALEXANDER.

(1) [1898] 2 Ch. 128.                    (2) 7 Ch. D. 29, 32.

CHANCERY DIVISION.         [1912]

PARKER J.

1911

VON
HATZFELDT-
WILDEN-
BURG
v.
ALEXANDER.

freehold title, which cannot be called for on an open contract for the sale of a lease. The second condition must therefore, at any rate as to this, be treated as a real condition. It does not in terms compel the vendor to shew the freehold title, but unless he does so to the satisfaction of the purchaser's solicitors he cannot hold the purchaser to her bargain. I do not think it would be in accordance with principle or sound sense to treat the second condition as in part a real condition and in part only the expression of a mere desire on the part of the purchaser. Further, having regard to the fact that the vendor's acceptance is the acceptance of an offer conditional on the execution of a more formal contract, I do not think the condition is one which the purchaser can waive as solely in her own favour. The vendor may well have allowed the condition as to the freehold title to pass in reliance on the fact that his own advisers would insert in the more formal agreement proper provisions in his favour.

My conclusion is that this case is within the principle of *Winn* v. *Bull* (1) and numerous other similar cases, and that the letters do not constitute a binding contract. I need not therefore consider the argument based on *Hussey* v. *Horne-Payne*. (2)

Solicitors : *Guedalla & Jacobson ; Cohen & Cohen.*

(1) 7 Ch. D. 29.                    (2) 4 App. Cas. 311.

H. C. R.

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

---

**ANNEXE 6 TO THE**
**FIRST AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

---

**BEFORE ME**

**NOTARY PUBLIC**

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

# MORTON v. MORTON.

[PROBATE, DIVORCE AND ADMIRALTY DIVISION (Lord Merriman, P., and Hodson, J.), **January 14. 1942.**]

*Divorce—Summary jurisdiction—Maintenance—Agreement to pay weekly sum in compromise of proceedings—Payments under agreement duly made—Whether jurisdiction to make new order.*

In 1930, a wife brought proceedings against her husband in a court of summary jurisdiction for maintenance. These proceedings were compromised, the husband undertaking to pay £1 per week to the wife and 10s. per week in respect of a son then 11 years of age. The undertaking was set out in an informal form under the title of " heads of agreement." Its terms had never been embodied in a formal document but, at all material times, had been acted on by the husband. As soon as the son became a wage-earner, the husband ceased to pay the 10s. per week in respect of the boy. The wife unsuccessfully contested the matter both in the court of summary jurisdiction and the county court. In 1941, after the son had become of full age and the husband having continuously paid £1 per week to his wife in respect of her own maintenance, the wife applied to a court of summary jurisdiction for an order on the ground of wilful neglect to provide reasonable maintenance for herself. The magistrate made an order for a payment of 30s. per week :—

HELD : (i) the heads of agreement were a binding contract, and not a contract to make a contract. The existence of this contract was not necessarily a bar to making of a subsequent order, and, as its terms had been faithfully carried out, the husband could not be said to be guilty of an offence of wilful neglect to maintain and there was no ground on which the magistrate could make an order.

(ii) An agreement to provide maintenance for a child terminates upon the child attaining full age. *Quaere* : whether it terminates upon the child attaining 16 years of age.

[EDITORIAL NOTE. The question here is really whether it can be said that a husband who has regularly paid all sums due under an agreement for maintenance is guilty of neglect to maintain. The Act requires that the husband shall be found guilty of neglect to provide reasonable maintenance before an order can be made and, if, therefore, such payments rebut a charge of neglect, there is no jurisdiction to make such an order. It is not clear whether, if the circumstances had so changed as to make the terms of the agreement an unreasonable provision for the wife, an order could have been made. In most cases where there is such an agreement, the summons will have been withdrawn with leave of the court and no order made. It would seem advisable, therefore, to take an order of the court in all cases, which, if the circumstances can be shown to have changed, can be varied upon a proper application under the Act.

As TO MAINTENANCE, see HALSBURY, Hailsham Edn., Vol. 10, pp. 838, 839, paras. 1340 ; and FOR CASES, see DIGEST, Vol. 27, pp. 558, 559, Nos. 6134-6150.]

Cases referred to :
(1) *Whittaker v. Whittaker*, [1939] 3 All E.R. 833 ; Digest Supp.
(2) *Jones v. Jones*, [1924] P. 203, 27 Digest 565, *6241* ; 93 L.J.P. 94 ; 132 L.T. 63.
(3) *Diggins v. Diggins*, [1927] P. 88 ; Digest Supp. ; 96 L.J.P. 14 ; 136 L.T. 224.
(4) *Matthews v. Matthews*, [1932] P. 103 ; Digest Supp. ; 101 L.J.P. 41 ; 147 L.T. 240.
(5) *Morris v. Edmonds* (1897), 77 L.T. 56 ; 37 Digest 358, *1609*.
(6) *Briggs v. Burridge* (1924), 89 J.P. 75.

APPEAL by the husband from an order of the stipendiary magistrate sitting at Merthyr Tydfil against an order adjudging him guilty of wilful neglect to provide reasonable maintenance for his wife and ordering him to pay his wife 30s. per week. The facts are fully set out in the judgment of LORD MERRIMAN, P.

*W. Latey* for the appellant.
*Ifor B. Lloyd* for the respondent.

LORD MERRIMAN, P. : It is unnecessary to attempt, as other judges have consistently refused to do, to give an exhaustive definition of " wilful neglect to provide reasonable maintenance." I am not satisfied that cases dealing solely with the meaning of the word " wilful," or cases dealing solely with the meaning of the word " neglect," are of very great assistance. Justices have to be satisfied affirmatively that the husband has been guilty of the subject-matter of the complaint, which involves, in the words of the statute, that he has been guilty

of something, and that something is "wilful neglect to provide reasonable maintenance." The phrase must be considered as a whole, and, as I have already indicated in *Whittaker* v. *Whittaker* (1), I agree with the view of LORD MERRIVALE, P., expressed in *Jones* v. *Jones* (2), that the phrase imports some element of matrimonial misconduct. Further than that, for the purposes of this case, it seems to me to be unnecessary to go. However, the fact that the charge is brought in a court of summary jurisdiction imports also that the offence has been committed, in whole or in part, within the six months preceding the complaint. As the complaint was made in Aug. or Sept., 1941, it follows that the six months fell wholly within that year, so that we have to see whether there is evidence that in the year 1941 the husband had been guilty of wilful neglect to provide reasonable maintenance for the wife.

In the present case, it is not disputed that, at all material times in 1941, the husband was punctually paying his wife maintenance at the rate of £1 per week, and that the only son of the marriage was then over the full age of 21 years. These facts being uncontroverted, we must go back to consider the other circumstances affecting the husband's position in that year. The parties were married in 1913, and beyond saying that the only two children were a daughter, who has long since been married, and the son to whom I have already referred, nothing calls for notice until the month of Aug., 1930. In that month the wife made a complaint in the local court of summary jurisdiction that her husband had been guilty of desertion and had been guilty of persistent cruelty, and asked, accordingly, for an order for maintenance for herself and the son. Although the parties attended at the court prepared to fight the case, it was, in fact, compromised. Both parties were represented by solicitors, and heads of agreement of the terms on which the wife withdrew her summons for maintenance, were drawn up and signed by the respective solicitors. Having regard to certain observations of the stipendiary magistrate upon this document, I must refer to it in detail. It begins as follows :

In consideration of the wife withdrawing the summons for maintenance against the husband, the wife and the husband hereby mutually agree to enter into separation deed containing the following clauses (1) husband to pay wife £1 a week and boy 10s. a week, the first payment to be made on Saturday next ; (2) while unemployed husband to pay the wife for herself and boy amount of dependants' benefit only.

I pause there. It might appear that the first stipulation provided for two separate liabilities, a liability to the wife and a liability to the boy. I do not so read it. All the articles are left out, and I think it is shorthand, so to speak, for an obligation on the husband to pay maintenance, which could only be payable to the wife, of £1 for herself and 10s. in respect of the boy, and that is how it is expressed in the second clause substituting the dependants' benefit if the husband were unemployed. Then the heads of agreement go on :

(3) Husband to deliver to the wife her goods and furniture. (4) Wife to have custody of boy, with right of access by husband. (5) Usual clause that no proceedings be taken while terms of agreement kept. (6) Mutual *dum casta* clause. (7) Husband to contribute 3 guineas to wife's costs.

These terms have been carried out, except that no formal agreement has ever been prepared or executed. The stipendiary magistrate described this document in one place as being a mere *nudum pactum*, but has construed it as meaning plainly that the wife was entitled to receive 30s. in perpetuity, irrespective of the age of the son. He has held, putting it another way, that there was, in fact, no contract between the parties at all and has based his judgment on that ground, but he has held that, if there was a contract, it does not express any termination of liability in respect of the 10s., and that, if there was to be any such limitation, the contract should have said so. As I am in complete disagreement with the stipendiary magistrate on all those points, I will proceed at once to say why that is so. It seems to me to be vital, in the first instance, not merely to look at the surrounding circumstances in the broad general sense, but to see what the parties themselves said they were about when they drew up these heads of agreement. They were compromising a claim for maintenance under the Summary Jurisdiction (Married Women) Act, 1925, before a court of summary jurisdiction, and they were providing instead for a consensual separation, which, of course, included a provision for maintenance, and a provision for the custody of the boy and the like. The court, if the wife had proceeded, could have granted her a maintenance order, and could have included in that

tenance order provision for the custody of the boy, and, having given the the custody of the boy, could, under the statute, have given her a maintenorder in respect of the child of whom it was giving her the custody for a sum exceeding 10s. a week, and, what is more important for our present purpose, d not have made that order in respect of the boy for one moment after he ned the age of 16 years. That is provided in the statute. That was the ject-matter of these heads of agreement, and I am bound to say that. I not understand the decision that this was a *nudum pactum*. The commonest g in the world, in these matrimonial causes, whether in courts below or in court, is to draw up heads of agreement, which are afterwards to be put more solemn form, if the parties so require ; but to say, in effect, that this hing more than a contract to make a contract seems to me to be impossible. ject only to this question of the age of the child, with which I shall deal in a ment, every requisite of the agreement between the parties was here, and I nk it is the clearest possible case of a concluded agreement, which no doubt. her party could have insisted on being put into more formal shape. When omes to this question of the maintenance in respect of the son, I agree that re is an ambiguity, because nothing is said about the age at which that vision is to cease ; but it seems to me to be impossible to infer from that t the agreement meant that that sum was to be payable in perpetuity, dis-rding altogether the subject-matter with which they were dealing. If her party had insisted on a formal document, and there had been a dispute ether the age was to be limited to 14 or to 16, it might have been a question ceptible of some argument, but the point which impresses me is that it is nceivable that any court, being asked to decide what the form of the deed ould take, could possibly have ordered that the maintenance for the son should payable after he had attained the age of 16 years at the latest. I am pre-red to hold that there is no question about the enforceability of this contract, d that, if the question had arisen at the time, a court could very well have compelled the execution of a deed in that sense. Now, it was said by the wife before the magistrate (though he has not expressed any decision about the matter, but has merely alluded to the wife's evidence without comment), that she never signed the deed, and never assented to it. Again I must say I think it is impossible for her to put forward any such contention. I have already said that all the things which had to be done at once were done, and from the following Saturday, when the first payment was to be made, it is common ground that for three years, at least, the wife received this £1 and this 10s. regularly. Under what did she receive it if it was not under this agreement ? Under what did she get her furniture back, if it was not under this agreement ? It seems to me to be perfectly impossible for her to suggest that she was no party to the agreement. And that is not all. In 1933 the boy was 14. Erroneously, as I think, the husband took the view, based, I gather, on something which was said in the course of the negotiations between the solicitors at court, that the boy having become 14 and a wage-earner, his liability for the 10s. had ceased. From that time up to the time of the present complaint, he has paid the £1 for the wife, and no more. In Feb., 1934, she took out, in the same court, a summons for wilful neglect to maintain and, although the formal record does not show precisely what the issue involved was, it is clear from the wife's own evidence that she was maintaining that she was entitled to receive that 10s. in respect of the boy, and was not precluded from receiving it by the fact that the boy had become a wage-earner. That summons was dismissed, the magis-trates holding, in effect, that the withholding of that 10s. disclosed no ground of complaint, but that, if she relied on the terms of the agreement, she could make such a claim in the county court. Accordingly, in Oct., 1934, she sued in the local county court for £18 10s. arrears of maintenance, and failed. Now, it is necessary to be a little precise here. It might well be that, on the lines which Henn Collins, J., and I discussed in this court in *Whittaker* v. *Whittaker* (1), it would have been possible to show that, so far as a court of summary jurisdiction was concerned, her right to recover anything in respect of that 10s. was com-pletely barred, so far as it depended on the agreement, but, in my opinion—and I think, that on consideration counsel for the appellant did not dissent from this view—in this case the elements were lacking from which such a conclusion could be arrived at. The claim in the county court and the affidavit of jurisdiction verify

ing it do not show on the face of them that she was claiming in respect of the 10s. payable in respect of the son under the agreement. It is left vague, and there is nothing on the face of the certificate of judgment itself which shows that that was so. Evidence would, therefore, have had to be adduced to show that that was the matter decided. As no such evidence has been given, I think that she is not precluded from raising the question ; but, of course, it is really clear beyond the slightest doubt, on her own evidence again, that she was suing for the 37 weeks in which the husband had withheld the 10s. in respect of the boy, and I have not the slightest doubt in my own mind that that is what the county court judge decided. Of course, it is possible that he may have taken the view that it was not a contract at all, and that the case failed on that ground, but I doubt it. However, I say no more than that the matter is not shown to have been *res judicata*. This, at any rate, appears. Twice in 1934, according to her own story to the tribunal from whom we are hearing this appeal, she had tried to get an order for the 10s. payable in respect of the boy, and had failed, both parties knowing all the circumstances that I have related up to that moment. For 7 years after that, without a murmur, she accepted the £1 per week, the son, in the meanwhile, having become, first of all, 16 years of age, then ultimately 21 years of age, and, as he grew up, earning, no doubt, more and more, until shortly before the subject-matter of this complaint arose he was bringing in a nice wage, and he and his mother were living contentedly together. Then came the war, and the young man joined His Majesty's Forces, with the result that, instead of being able to pay his wages to his mother, he was only able to make her an allotment from his pay of 3s. 6d. a week. That was a very un-fortunate change in her circumstances, and, without more ado, nothing else having happened, she took out this summons alleging that the husband, who has been paying her punctually and faithfully £1 per week, has been guilty of wilful neglect to provide her with reasonable maintenance.

After very helpful citation of the authorities by counsel on each side, I think that the position on this summons is now free from doubt. The existence of an agreement is not a bar to the jurisdiction of the magistrates, neither on the question whether the offence has been committed, or on the point of amount ; but I think it is desirable to emphasise, as applied to the circumstances of this case, how high a value such an agreement should have had in guiding the magis-trate in the exercise of his jurisdiction, which unquestionably remains not-withstanding the agreement. I think that it might be helpful to cite two passages from judgments of LORD MERRIVALE, P. The first, in point of time, was in *Diggins* v. *Diggins* (3). I should like, first of all, to point out that this was a separation agreement providing for a weekly sum by way of maintenance, and that the husband, after two weeks, had made no payment at all, basing himself on the fact that the wife had, contrary to the terms of the agreement, so he alleged, molested him and that the weekly sum had therefore ceased to be payable. The maintenance, in fact, had not been paid. Of course, even if it were open to us, it would be quite absurd to doubt the propriety of the decision that the jurisdiction of the justices was not barred in those circum-stances. Having alluded to the fact that the man had not paid that which he was liable to pay under the agreement, LORD MERRIVALE, P., said, at p. 92 :

Apart from the deed, the case is clear. The husband has wilfully neglected to provide reasonable maintenance for the wife. What remains is to ascertain whether the deed excludes the jurisdiction of the justices. Then he says this : It must not be supposed that there is an unlimited right in a wife under the amended statute, wherever she has entered into a deed, at her volition to proceed to the justices to get the terms of the deed reviewed. That would be contrary to good sense, and I do not doubt, if any case arise where a wife who has entered into a deed proceeds in disregard of it to seek something different from the justices, that she will meet with an answer which will prevent the possibility of further question. If she does not meet with it at first instance, she may meet with it here.

What LORD MERRIVALE, P., was saying in the plainest possible language was, that, if it is shown that the deed provides for periodical payments which have been punctually made, the evidential value of that deed, as showing that the husband has, by making the payments regularly, been providing reasonable maintenance for his wife, is extremely high. To put it the other way, the wife will have the very greatest difficulty in making out a case in such circumstances ; but the jurisdiction, as such, is not excluded.

I now turn to *Matthews v. Matthews* (4). There the husband had, so to speak, attempted to contract out of liability to pay his wife by providing her with a lump sum in settlement. The details do not matter, but he had, in fact, provided her with money to help her to set up in business. Nevertheless, things had gone awry, and at the material time the wife was left with no support from her business, and, as a matter of fact, it was common ground that the husband having, as he thought, discharged all his liability, and having certainly discharged all his liability under the deed, had not provided her at the material period with any maintenance at all. LORD MERRIVALE, P., said, at p. 106 :

A    What he [the stipendiary] had to determine was whether the husband had been guilty of wilful neglect to provide reasonable maintenance for his wife, and in order to determine that, he had, of course, to look at what had taken place between the parties, and to look at the agreement and to see what the husband had done and was doing, but he still had to determine judicially whether the husband had been guilty of wilful neglect to provide reasonable maintenance for his wife. That depended on two things :

B    First, whether he had failed to maintain her ; secondly, whether he had done it wilfully. He then deals with the question of the deed, operating as an estoppel, and held that it did not. Of course, where, in fact, no maintenance has been provided, and there has been a complete change of circumstances, the wife is, no doubt, in a stronger position to succeed, in spite of the provisions of a deed, and I do not think it is necessary to cite authorities. I am content, as counsel

C    were content, to deal with it on the basis that a deed like this, providing for periodical payments, the obligation to make which has been punctually performed, is very strong evidence indeed against a complaint of wilful neglect to provide reasonable maintenance. I think it is possible to put the matter in another way, but I prefer not to base my decision upon it. There are two cases which have arisen in the Divisional Court of the King's Bench Division, on what, I think, is an indistinguishable point, in one of which, *Morris v. Edmonds* (5),

D    it was held that a mistaken belief *bona fide* held in the fact of the wife's adultery is an answer, while on the other hand, a mistaken belief on the question of law whether the husband was liable to maintain his wife at all has been held, in *Bigge v. Burridge* (6), to be no answer. Incidentally, that case emphasised the difference between the decision in *Morris v. Edmonds* (5), which was approved, and the facts then in question.

E    Now it seems to me to be quite clear that if the true construction of these heads of agreement was that in 1941 the husband was liable to pay the wife 10s. in respect of his 22-year-old son, the mistaken and genuine belief that the construction of the agreement did not provide for that would not help him, because that would be a matter of law. On the other hand, assuming that the construction which I have put upon the heads of agreement is right, and that he was not in law obliged to pay anything but the £1 per week under the deed,

F    then I think it would be possible for the husband to say (though I am not deciding the case on this ground) that he had reasonable ground for believing that £1 per week was reasonable maintenance, and, therefore, having acted on that belief, he could not be found guilty of wilful neglect to provide reasonable maintenance. The question what is reasonable maintenance is a question of degree, which in turn is a question of fact to be decided having regard to all the circumstances of the case. However, I am not sure that that really advances

G    the matter, as it seems to come back very much to the same point.

I am content to decide this case on the ground that it is, in my opinion, impossible, taking all the circumstances of the case into consideration—the heads of agreement, the two attempts by the wife to obtain orders for the payment of the 10s. in 1934, and her apparent acquiescence in those decisions for seven years thereafter, till her son, being of full age, joined the Army—to

H    hold that this man has been guilty of the offence complained of. I am not overlooking the consideration that in the year 1934, if my view of the contract is right, there may have been no ground for the refusal of the 10s. per week, either by the court of summary jurisdiction or by the county court ; but that does not seem to me to be either here or there. The question we have to consider is whether, taking this agreement into account, it is possible to hold him guilty of wilful neglect to maintain in 1941.

It is quite true that the magistrate appears, in the last paragraph of his findings, to say, in effect, that 30s. is the reasonable amount of maintenance ; but, though, where there is nothing else, we are very reluctant to interfere with

Case 1:06-cv-00336-RWR    Document 8-5    Filed 03/10/2006    Page 66 of 217

assessments of amounts as such, it is perfectly plain that this decision was arrived at on the basis that there was no separation agreement in existence at all. Since there was such an agreement, that conclusion, in my opinion, is wrong. It seems to me to be clear that the decision here on the mere question of amount is based upon an incorrect appreciation of the legal position. For these reasons I think that this appeal must be allowed.

HODSON, J.: On Aug. 19, 1930, an agreement was entered into between the parties to this appeal in compromise of proceedings before a court of summary jurisdiction. The agreement, on its true construction, having regard to the circumstances in which it was entered into, provided for the allowance of £1 per week to the wife and 10s. per week to the wife for the boy until he attained the age of 16 years. If I am wrong about that, at the most it provided for an allowance for the boy payable to the wife ceasing when he ceased to be a boy, namely, at 21 years of age. The agreement does not in terms provide for or preclude a subsequent application to a court of summary jurisdiction. Now, in 1941, the wife was receiving £1 per week for herself, and the boy was over the age of 21. The husband was, as he always had been during all the material time, from the time of the agreement, complying with the agreement in so far as the allowance to his wife for herself was concerned. In those circumstances, on Sept. 2, 1941, the wife applied to the stipendiary magistrate at Merthyr Tydfil for an order on the ground that the husband was guilty of wilful neglect to provide reasonable maintenance for her. It is quite clear that in order to determine that question one of the matters which the magistrate had before him for consideration was the existence of this agreement, as well as the amount, if any, of payments made to the wife by the husband under the agreement, or at all, and the stipendiary has found, in the reasons given in support of his decision, that there was no agreement at all, and that, if there was an agreement, that it was one providing for a payment to the wife of 30s. per week for an indefinite period. After consideration of this matter, and after consideration also, no doubt, of the husband's income, the stipendiary assessed the maintenance payable to the wife at the figure of 30s. per week.

In my judgment, the stipendiary was wrong in saying that there was no agreement at all, and he was wrong in construing it in the way in which he did. Taking the agreement into consideration on its proper construction, and taking into account, also, the history of this case which my Lord has stated, in particular taking into account the regular payments which have been made under the agreement by the husband to the wife, I do not think there was any evidence at all upon which the stipendiary could find that the husband had been guilty of an offence, namely, that of wilful neglect to provide reasonable maintenance for his wife, and for those reasons I agree that this appeal should be allowed.

*Appeal allowed. Order discharged.*

Solicitors: *Cunliffe & Airey*, agents for *Taliesin Griffiths & Son*, Merthyr Tydfil (for the appellant); *Gregory Rowcliffe & Co.*, agents for *Harry W. Hughes & Son*, Shrewsbury (for the respondent).

[*Reported by* D. ARMSTEAD FAIRWEATHER, ESQ., *Barrister-at-Law.*]

---

## Re BOWER'S SETTLEMENT TRUSTS, BOWER v. RIDLEY-THOMPSON.

[CHANCERY DIVISION (Morton, J.), **November 28, 1941.**]

*Settlements—Construction—Beneficial trusts—Accruer clause—Trusts for children and grandchildren in unequal shares—Accruing share accrues to other beneficiaries equally.*

The terms of a settlement provided that the proceeds of sale of the property settled were to be divided into eight equal shares, and that the shares, or fractions thereof, were to be held on trust for the children and grandchildren of the settlor in unequal shares. The settlement went on to provide that, in the event of the trusts of any share failing, that share was to accrue "by way of addition to the other shares." The trusts of the share

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

---

**ANNEXE 7 TO THE**
**FIRST AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

---

**BEFORE ME**

**NOTARY PUBLIC**

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

A   When the facts of this case are considered against the general principles to which we have referred we find both aggravating and mitigating factors. The defendant is suffering from a personality disorder: he is dull-witted and he is still a young man. It cannot be said that the boys tempted him; but the circumstances in which he came to commit buggery presented him with an opportunity which he had not the will power to resist. As against these mitigating factors there are a number which go to show
B   that he is a danger to small boys. He committed some of the indecent assaults whilst he was on bail. His previous convictions for assaults on girls show that he gives way to his sexual urges whenever opportunity offers. He seems to have no aim in life except the gratification of his immediate desires and to be incapable of understanding the effect of his actions on others. In our judgment, when the danger to small boys is
C   balanced against the mitigating factors, the result indicates that the appropriate sentence is one which is likely to keep the defendant out of trouble for a fairly long period and give him enough time to mature mentally, if he ever is going to do so. In our judgment the sentences passed upon him by Judge Streeter achieved this result. It was for these reasons we dismissed the appeal.

*Appeal dismissed.*

D

Solicitor: *Registrar of Criminal Appeals.*

E                    [COURT OF APPEAL]

\* COURTNEY & FAIRBAIRN LTD. *v.* TOLAINI BROTHERS (HOTELS) LTD. AND ANOTHER

[1971 C. No. 6262]

F   1974  Nov. 28                    Lord Denning M.R., Lord Diplock and Lawton L.J.

Contract—Formation—Agreement to negotiate—Building contract —Agreement to negotiate fair and reasonable price—Whether binding contract

G       The defendants, who wanted to develop a site, discussed their plans with the plaintiffs, who were building contractors well placed to obtain finance for the development. It was proposed that the plaintiffs should introduce someone to provide finance to the defendants and should themselves be employed to do the construction work. On April 10, 1969, the plaintiffs wrote to the defendants saying that they were able to introduce someone who had the necessary finance.
H   The letter, which stressed the plaintiffs' interest as builders, asked whether, if their introduction led to an acceptable financial arrangement, the defendants would instruct their quantity surveyor "to negotiate fair and reasonable sums" for the projects based on agreed estimates of net cost and overheads with a 5 per cent. profit margin. In reply on April 28 the defendants wrote to the plaintiffs agreeing "to the terms specified" in the letter of April 10.
    The plaintiffs introduced a financier who provided money for the projects. After differences of opinion about the price

298

Courtney Ltd. v. Tolaini Bros. Ltd. (C.A.)                [1975]

of the building work the defendants did not employ the
plaintiffs but engaged other contractors for that work. Shaw
J. held that the letters of April 10 and 28, 1969, gave rise
to a binding and enforceable contract whereby the defendants
undertook to employ the plaintiffs to carry out the work at a
price to be calculated by the addition of 5 per cent. to the
fair and reasonable cost and overheads.

On the defendants' appeal:—

*Held,* allowing the appeal, (1) that since there had been
no agreement upon such a fundamental matter as the price
in a building contract, or the method by which it was to be
calculated, there was no contract.

(2) That the law did not recognise a contract to negotiate
and where a fundamental matter was left to be the subject of
negotiation there was no contract.

Dictum of Lord Wright in *Hillas & Co. Ltd.* v. *Arcos Ltd.*
(1932) 147 L.T. 503, 515 disapproved.

Decision of Shaw J. reversed.

The following cases are referred to in the judgments:

*Hillas & Co. Ltd.* v. *Arcos Ltd.* (1932) 147 L.T. 503, H.L.(E.).
*Mountford* v. *Scott* [1973] 3 W.L.R. 884; [1974] 1 All E.R. 245.

The following additional cases were cited in argument:

*Brown* v. *Gould* [1972] Ch. 53; [1971] 3 W.L.R. 334; [1971] 2 All E.R.
 1505.
*National Coal Board* v. *Galley* [1958] 1 W.L.R. 16; [1958] 1 All E.R.
 91, C.A.
*Smith* v. *Morgan* [1971] 1 W.L.R. 803; [1971] 2 All E.R. 1500.

INTERLOCUTORY APPEAL from Shaw J.

The plaintiffs, Courtney & Fairbairn Ltd., claimed against the defen-
dants, Tolaini Brothers (Hotels) Ltd. and the Thatched Barn Ltd., declara-
tions that the defendants were in breach of contract with an inquiry as to
damages and that the plaintiffs were entitled to a reasonable sum in respect
of the services rendered to the defendants.

At the trial before Shaw J. the parties (the first defendants being the
effective defendants) agreed to proceed on the question " whether there was
concluded any enforceable agreement in law between the plaintiffs and the
defendants or one of them and if yes who were the parties to the agree-
ment and what were its terms." Shaw J. gave judgment for the plaintiffs
holding:

  ". . . the letter written by Mr. Courtney on behalf of the plaintiffs,
  dated April 10, 1969, addressed to Mr. Sidney Tolaini, and the reply
  thereto, dated April 28, 1969, gave rise to a binding and enforceable
  contract whereby the defendants undertook to employ the plaintiffs
  to do and the plaintiffs undertook to carry out the work referred to in
  their said letter at a price to be calculated by the addition of 5 per
  cent. to the fair and reasonable cost of the work and the general
  overheads relating thereto."

The first defendants appealed on the grounds that (1) the judge was
wrong in law in holding that the letters of April 10 and 28, 1969, between
the parties amounted to an enforceable agreement; (2) the letters con-
stituted, on their clear and natural meaning, an agreement to agree con-
tract sums before any work should be carried out, and such agreement was
not enforceable; (3) if and in so far as the judge gave any weight to the
terms of a conversation between Mr. Tolaini and Mr. Courtney on

The Weekly Law Reports, February 21, 1975

299

1 W.L.R.             Courtney Ltd. v. Tolaini Bros. Ltd. (C.A.)

A   April 21, 1969, in construing the letters in any sense other than their clear
    and natural meaning, he was not entitled in law to do so in the absence
    of any plea for rectification of the written agreement; (4) alternatively the
    judge was wrong in law in not holding that the letters constituted an
    enforceable agreement whereby (in the event of the plaintiffs finding
    finance) the first defendants agreed to instruct their quantity surveyor to
    negotiate contract sums on the basis of estimates to be made of net costs
B   plus 5 per cent., and accordingly that if such negotiation did not produce
    an agreement as to the estimates, there was no further obligation on the
    defendants; (5) if and in so far as the judge purported to make any
    findings or express any views about the eventual negotiation of figures
    between the parties in October 1970 and/or attached any weight thereto,
    he erred in so doing in that, inter alia, no issue as to the breach of any
C   enforceable agreement was before the judge.
       The facts are stated in the judgment of Lord Denning M.R.

       *David Sullivan* for the defendants.
       *John Dyson* for the plaintiffs.

D      LORD DENNING M.R.  The question in this case is whether two letters
    give rise to a concluded contract.
       Mr. Tolaini, managing director of the defendants, wanted to develop a
    site in Hertfordshire.  It was the Thatched Barn Hotel together with five
    acres of land.  He got in touch with a property developer, a Mr. Courtney,
    the managing director of the plaintiffs.  It appears that Mr. Courtney
    was well placed to obtain finance for building development.  He was also
E   a building contractor himself.  The two met and discussed ways and means
    at the office of Mr. Sacks, an architect.  The proposal was that Mr.
    Courtney should introduce some one to provide the money and lend it to
    Mr. Tolaini.  Mr. Tolaini was to develop the site by building a motel and
    other things.  But he was to employ Mr. Courtney or his company to do
    the construction work.  After the meeting, on April 10, 1969, Mr. Courtney
F   wrote to Mr. Tolaini this letter:

          " *Re: Thatched Barn Hotel.*

       " . . . I am now in a position to introduce you to those who: (a) are
    interested in your proposals, (b) have access to the necessary finance,
    subject to agreement on terms. . . .
       " I think I should mention, at this point, that my commercial
G   interest in this matter is that of a building contractor.  I am interested
    in it due to the fact that Mr. Sacks, whom I have known for some years,
    is aware that I work for a number of large investing and development
    concerns, and thought it possible that I might be in a position to be
    of service to you.
       " You will understand, therefore, that in addition to making myself
    useful to you, my objective is to build the three projects mentioned,
H   namely, the motel, the filling station, and the future hotel, or other
    development, on the ' Green Belt ' area of your site."

    Then follow these important words:
       " Accordingly I would be very happy to know that, if my discussions
    and arrangements with interested parties lead to an introductory
    meeting, which in turn leads to a financial arrangement acceptable to
    both parties you will be prepared to instruct your quantity surveyor

The Weekly Law Reports, February 21, 1975

300

Lord Denning M.R.    Courtney Ltd. v. Tolaini Bros. Ltd. (C.A.)    [1975]

to negotiate fair and reasonable contract sums in respect of each of the three projects as they arise. (These would, incidentally be based upon agreed estimates of the net cost of work and general overheads with a margin for profit of 5 per cent.) which, I am sure you will agree, is indeed reasonable. . . ."

On April 21, 1969, there was a meeting between the parties at the Thatched Barn Hotel. Mr. Courtney said he wanted to have something in writing from Mr. Tolaini before he went further. Accordingly Mr. Tolaini did write a letter on April 28, 1969, in the terms:

"In reply to your letter of April 10, I agree to the terms specified therein, and I look forward to meeting the interested party regarding finance."

Those are the two letters on which the issue depends. But I will tell the subsequent events quite shortly. Mr. Courtney did his best. He found a person interested who provided finance of £200,000 or more for the projects. Mr. Tolaini on his side appointed his quantity surveyor with a view to negotiating with Mr. Courtney the price for the construction work. But there were differences of opinion about the price. And nothing was agreed. In the end Mr. Tolaini did not employ Mr. Courtney or his company to do the construction work. Mr. Tolaini instructed other contractors and they completed the motel and other works. But then Mr. Tolaini took advantage of the finance which Mr. Courtney had made possible, but he did not employ Mr. Courtney's company to do the work. Naturally enough, Mr. Courtney was very upset. He has brought this action in which he says that there was a contract by which his company were to be employed as builders for the work, and it was a breach of contract by Mr. Tolaini or his company to go elsewhere and employ somebody else. Mr. Courtney's company claimed the loss of profits which they would have made if they had been employed as builders for this motel. At the trial the parties agreed to proceed on the following question:

"Whether there was concluded any enforceable agreement in law between the plaintiffs and the defendants or one of them and if yes, who were the parties to the agreement and what were its terms."

Shaw J. heard the evidence on the point, both as to the initial interview and as to the circumstances in which Mr. Courtney's company were not employed to do the work. He held that there was an enforceable agreement. He found that the parties were Mr. Courtney's company and Mr. Tolaini's company: and that the terms were inter alia, contained in the letters of April 10 and 28, 1967, which I have read. He said in his judgment that the letters

"gave rise to a binding and enforceable contract whereby the defendants undertook to employ the plaintiff to carry out the work referred to in [Mr. Courtney's letter of April 10, 1969] at a price to be calculated by the addition of 5 per cent. to the fair and reasonable cost of the work and the general overheads relating thereto."

I am afraid that I have come to a different view from the judge. The reason is because I can find no agreement on the price or on any method by which the price was to be calculated. The agreement was only an agreement to "negotiate" fair and reasonable contract sums. The words of the letter are "your quantity surveyor to *negotiate* fair and reasonable contract sums in respect of each of the three projects as they arise." Then

The Weekly Law Reports, February 21, 1975

301

**1 W.L.R.**          Courtney Ltd. v. Tolaini Bros. Ltd. (C.A.)          Lord Denning M.R.

A  there are words which show that estimates had not yet been agreed, but were yet to be agreed. The words are: "These" (the contract sums) "would, incidentally be based upon agreed estimates of the net cost of work and general overheads with a margin for profit of 5 per cent." Those words show that there were no estimates agreed and no contract sums agreed. All was left to be agreed in the future. It was to be agreed between the parties themselves. If they had left the price to be agreed B  by a third person such as an arbitrator, it would have been different. But here it was to be agreed between the parties themselves.

Now the price in a building contract is of fundamental importance. It is so essential a term that there is no contract unless the price is agreed or there is an agreed method of ascertaining it, not dependent on the negotiations of the two parties themselves. In a building contract both C  parties must know at the outset, before the work is started, what the price is to be, or, at all events, what agreed estimates are. No builder and no employer would ever dream of entering into a building contract for over £200,000 without there being an estimate of the cost and an agreed means of ascertaining the price.

In the ordinary course of things the architects and the quantity surveyors get out the specification and the bills of quantities. They are sub-
D  mitted to the contractors. They work out the figures and tender for the work at a named price: and there is a specified means of altering it up or down for extras or omissions and so forth, usually by means of an architect's certificate. In the absence of some such machinery, the only contract which you might find is a contract to do the work for a reasonable sum, or for a sum to be fixed by a third party. But here there is no such E  contract at all. There is no machinery for ascertaining the price except by negotiation. In other words, the price is still to be agreed. Seeing that there is no agreement on so fundamental matter as the price, there is no contract.

But then this point was raised: even if there was not a contract actually to build, was not there a contract to negotiate? In this case Mr. Tolaini did instruct his quantity surveyor to negotiate, but the negotia-
F  tions broke down. It may be suggested that the quantity surveyor was to blame for the failure of the negotiations. But does that give rise to a cause of action? There is very little guidance in the books about a contract to negotiate. It was touched upon by Lord Wright in *Hillas & Co. Ltd.* v. *Arcos Ltd.* (1932) 147 L.T. 503, 515, where he said:

G      " There is then no bargain except to negotiate, and negotiations may be fruitless and end without any contract ensuing; yet even then, in strict theory, there is a contract (if there is good consideration) to negotiate, though in the event of repudiation by one party the damages may be nominal, unless a jury think that the opportunity to negotiate was of some appreciable value to the injured party."

That tentative opinion by Lord Wright does not seem to me to be
H  well founded. If the law does not recognise a contract to enter into a contract (when there is a fundamental term yet to be agreed) it seems to me it cannot recognise a contract to negotiate. The reason is because it is too uncertain to have any binding force. No court could estimate the damages because no one can tell whether the negotiations would be successful or would fall through: or if successful, what the result would be. It seems to me that a contract to negotiate, like a contract to enter into a contract, is not a contract known to the law. We were referred to

The Weekly Law Reports, February 21, 1975

302

Lord Denning M.R.    Courtney Ltd. v. Tolaini Bros. Ltd. (C.A.)                    [1975]

the recent decision of Brightman J. about an option, *Mountford* v. *Scott*
[1933] 3 W.L.R. 884: but that does not seem to me to touch this point.
I think we must apply the general principle that when there is a funda-
mental matter left undecided and to be the subject of negotiation, there
is no contract. So I would hold that there was not any enforceable agree-
ment in the letters between the plaintiff and the defendants. I would allow
the appeal accordingly.

LORD DIPLOCK. I agree and would only add my agreement that the
dictum, for it is no more, of Lord Wright in *Hillas & Co. Ltd.* v. *Arcos
Ltd.,* 147 L.T. 503, 515, to which Lord Denning M.R. has referred, though
an attractive theory, should in my view be regarded as bad law.

LAWTON L.J. I agree with both the judgments which have been
delivered.

*Appeal allowed with costs in Court
of Appeal and below.
Action dismissed.*

Solicitors: *Pollards, Boreham Wood, Herts; Doyle, Devonshire, Box
& Co.*

A. H. B.

---

[CHANCERY DIVISION]

* E.M.I. LTD. AND OTHERS *v.* PANDIT

[1974 E. No. 706]

1974  Dec. 5                                                    Templeman J.

*Practice—Discovery—Motion for—Action for infringement of copy-
    right—Interlocutory injunction and order for inspection—
    Affidavit of defendant—Evidence of falsity of affidavit—Appli-
    cation ex parte for order to enter premises to inspect and
    remove documents and articles—Court's jurisdiction—R.S.C.,
    Ord. 29, r. 2* [1]

In an action to restrain infringement of copyright in certain
sound recordings, the plaintiffs had been granted an inter-
locutory injunction and an order requiring the defendant to
supply, on affidavit, certain information concerning the alleged
infringement. The plaintiffs adduced evidence to show that the
affidavit sworn by the defendant was false and that there were
very probably more documents in existence than those disclosed
in the affidavit.

On an application made by the plaintiffs ex parte for an
order under R.S.C., Ord. 29 that persons authorised by the
plaintiffs should be allowed, within specified hours, to enter
certain premises occupied by the defendant to inspect, photo-
graph and remove allegedly infringing articles, to photograph
certain documents and to inspect, photograph and test type-
writers: —

---

[Reported by MRS. F. ALLEN McLEAN, Barrister-at-Law]

[1] R.S.C., Ord. 29, r. 2: see post, p. 305D–G.

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

---

**ANNEXE 8 TO THE**
**FIRST AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

---

**BEFORE ME**

**NOTARY PUBLIC**

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

130                KING'S BENCH DIVISION.                [1947]

1946

*July* 18.

Denning J.

CENTRAL LONDON PROPERTY TRUST LIMITED *v.*
HIGH TREES HOUSE LIMITED.

*Contract—Agreement intended to create legal relations—Promise made
thereunder—Knowledge of promisor that promise will act on promise
—Promise acted on—Enforceability of agreement without strict
consideration—Agreement under seal—Variation of by agreement
of lesser value—Estoppel.*

By a lease under seal dated September 24, 1937, the plaintiff
company let to the defendant company (a subsidiary of the
plaintiffs) a block of flats for a term of ninety-nine years from
September 29, 1937, at a ground rent of 2,500*l.* a year. In the
early part of 1940, owing to war conditions then prevailing, only
a few of the flats in the block were let to tenants and it became
apparent that the defendants would be unable to pay the rent
reserved by the lease out of the rents of the flats. Discussions
took place between the directors of the two companies, which were
closely connected, and, as a result, on January 3, 1940, a letter
was written by the plaintiffs to the defendants confirming that the
ground rent of the premises would be reduced from 2,500*l.* to
1,250*l.* as from the beginning of the term. The defendants there-
after paid the reduced rent. By the beginning of 1945 all the flats
were let but the defendants continued to pay only the reduced
rent. In September, 1945, the plaintiffs wrote to the defendants
claiming that rent was payable at the rate of 2,500*l.* a year and,
subsequently, in order to determine the legal position, they
initiated friendly proceedings in which they claimed the difference
between rent at the rates of 2,500*l.* and 1,250*l.* for the quarters
ending September 29 and December 25, 1945. By their defence the
defendants pleaded that the agreement for the reduction of the
ground rent operated during the whole term of the lease and, as
alternatives, that the plaintiffs were estopped from demanding
rent at the higher rate or had waived their right to do so down to
the date of their letter of September 21, 1945.

*Held* (1.) that where parties enter into an arrangement which is
intended to create legal relations between them and in pursuance
of such arrangement one party makes a promise to the other which
he knows will be acted on and which is in fact acted on by the
promisee, the court will treat the promise as binding on the promisor
to the extent that it will not allow him to act inconsistently with it
even although the promise may not be supported by consideration
in the strict sense and the effect of the arrangement made is to
vary the terms of a contract under seal by one of less value ; and

(2.) that the arrangement made between the plaintiffs and the
defendants in January, 1940, was one which fell within the above
category and, accordingly, that the agreement for the reduction
of the ground rent was binding on the plaintiff company, but that
it only remained operative so long as the conditions giving rise to it
continued to exist and that on their ceasing to do so in 1945 the

Case 1:06-cv-00336-RWR    Document 8-5    Filed 03/10/2006    Page 76 of 217

plaintiffs were entitled to recover the ground rent claimed at the rate reserved by the lease.

1946

CENTRAL
LONDON
PROPERTY
TRUST, LD.
v.
HIGH TREES
HOUSE, LD.

ACTION tried by Denning J.

By a lease under seal made on September 24, 1937, the plaintiffs, Central London Property Trust Ld., granted to the defendants, High Trees House Ld., a subsidiary of the plaintiff company, a tenancy of a block of flats for the term of ninety-nine years from September 29, 1937, at a ground rent of 2,500l. a year. The block of flats was a new one and had not been fully occupied at the beginning of the war owing to the absence of people from London. With war conditions prevailing, it was apparent to those responsible that the rent reserved under the lease could not be paid out of the profits of the flats and, accordingly, discussions took place between the directors of the two companies concerned, which were closely associated, and an arrangement was made between them which was put into writing. On January 3, 1940, the plaintiffs wrote to the defendants in these terms, " we confirm the arrangement made " between us by which the ground rent should be reduced as " from the commencement of the lease to 1,250l. per annum," and on April 2, 1940, a confirmatory resolution to the same effect was passed by the plaintiff company. On March 20, 1941, a receiver was appointed by the debenture holders of the plaintiffs and on his death on February 28, 1944, his place was taken by his partner. The defendants paid the reduced rent from 1941 down to the beginning of 1945 by which time all the flats in the block were fully let, and continued to pay it thereafter. In September, 1945, the then receiver of the plaintiff company looked into the matter of the lease and ascertained that the rent actually reserved by it was 2,500l. On September 21, 1945, he wrote to the defendants saying that rent must be paid at the full rate and claiming that arrears amounting to 7,916l. were due. Subsequently, he instituted the present friendly proceedings to test the legal position in regard to the rate at which rent was payable. In the action the plaintiffs sought to recover 625l., being the amount represented by the difference between rent at the rate of 2,500l. and 1,250l. per annum for the quarters ending September 29, and December 25, 1945. By their defence the defendants pleaded (1.) that the letter of January 3, 1940, constituted an agreement that the rent reserved should be 1,250l. only, and that such agreement related to the whole term of the lease,

Case 1:06-cv-00336-RWR    Document 8-5    Filed 03/10/2006    Page 77 of 217

1946
_____
CENTRAL
LONDON
PROPERTY
TRUST, LD.
*v.*
HIGH TREES
HOUSE, LD.

(2.) they pleaded in the alternative that the plaintiff company were estopped from alleging that the rent exceeded 1,250l. per annum and (3.) as a further alternative, that by failing to demand rent in excess of 1,250l. before their letter of September 21, 1945 (received by the defendants on September 24), they had waived their rights in respect of any rent, in excess of that at the rate of 1,250l., which had accrued up to September 24, 1945.

*Fortune* for the plaintiffs. The plaintiffs are entitled to recover rent on the basis of it being at the rate of 2,500l. a year, the amount reserved by the lease. The document in question was under seal and consequently could not be varied by a parol agreement or an agreement in writing not under seal. If there was a fresh agreement, it was void since it was made without consideration and in any event it was only an agreement of a purely temporary character necessitated by the difficult conditions prevailing when it was made, and coming to an end when those conditions ceased to exist at the end of 1944 or the beginning of 1945. Even supposing that the plaintiffs were held to be estopped from denying the existence of a new agreement, such estoppel would only operate so long as the conditions giving rise to the arrangement on which the estoppel was based, continued. [Denning J. This subject was considered by Simonds J. in *Re William Porter & Co., Ld.* (1).] It has recently been considered by Humphreys J. in *Buttery* v. *Pickard* (2). He also referred to *Forquet* v. *Moore* (3), *Crowley and Others* v. *Vitty* (4) and Foa, Landlord and Tenant, 6th ed., p. 701.

*Ronald Hopkins* for the defendants. The company are only liable to pay rent at the rate of 1,250l. per annum. The letters passing between the parties and the entry in the minute book of the plaintiff company constitute evidence of an agreement, which, although possibly not supported by such consideration as would strictly be necessary at common law, was of a type which a court of equity would enforce if it were satisfied that the parties intended to give contractual efficacy to that to which they were agreeing. The reduction in rent was made so that the defendants might be enabled to continue to run their business and that was sufficient to enable a court to hold the agreement binding on the plaintiff company. With regard

(1) [1937] 2 All E. R. 361.                    (3) (1852) 22 L. J. (Ex.) 35.
(2) [1946] W. N. 25.                           (4) (1852) 21 L. J. (Ex.) 135.

to the variation of an agreement under seal by a parol agreement or an agreement in writing, in *Berry* v. *Berry* (1), Swift J. said it was true that a covenant could not be varied except by some contract of equal value, but, he continued " although " that was the rule of law, the courts of equity have always " held themselves at liberty, to allow the rescission or variation " by a simple contract of a contract under seal by preventing " the party who has agreed to the rescission or variation from " suing under the deed. In *Nash* v. *Armstrong* (2) it was held " that a parol agreement not to enforce performance of a deed " and to substitute other terms for some of its covenants was a " good consideration for a promise to perform the substituted " contract . . . " If the above contentions fail, the defendants rely on the doctrine of estoppel. The propositions of law laid down in *Re William Porter & Co., Ld.* (3) exactly apply to the present case. The reduction in the rent was made in order that the defendants might be able to carry on their business. As a result of the reduction the business was carried on and the defendants arranged their affairs on the basis of the reduced rent with the result that the plaintiffs are estopped from claiming any rent beyond 1,260*l.* per annum for the whole period of the lease. Finally, the letters passing between the parties constituted a waiver by the plaintiffs of their right to a higher rent than 1,250*l.* down to the date of their letter of September 21, 1945.

*Fortune* in reply.

DENNING J. stated the facts and continued : If I were to consider this matter without regard to recent developments in the law, there is no doubt that had the plaintiffs claimed it, they would have been entitled to recover ground rent at the rate of 2,500*l.* a year from the beginning of the term, since the lease under which it was payable was a lease under seal which, according to the old common law, could not be varied by an agreement by parol (whether in writing or not), but only by deed. Equity, however stepped in, and said that if there has been a variation of a deed by a simple contract (which in the case of a lease required to be in writing would have to be evidenced by writing), the courts may give effect to it as is shown in *Berry* v. *Berry* (4). That equitable doctrine, however, could hardly apply in the present case because the variation here

1946

CENTRAL
LONDON
PROPERTY
TRUST, LD.
*v.*
HIGH TREES
HOUSE, LD.

(1) [1929] 2 K. B. 316, 319.        (3) [1937] 2 All E. R. 361.
(2) (1861) 10 C. B. (N. S.) 259.    (4) [1929] 2 K. B. 316.

·1946

CENTRAL
LONDON
PROPERTY
TRUST, LD.
*v.*
HIGH TREES
HOUSE, LD.
———
Denning J.

might be said to have been made without consideration. With regard to estoppel, the representation made in relation to reducing the rent, was not a representation of an existing fact. It was a representation, in effect, as to the future, namely, that payment of the rent would not be enforced at the full rate but only at the reduced rate. Such a representation would not give rise to an estoppel, because, as was said in *Jorden* v. *Money* (1), a representation as to the future must be embodied as a contract or be nothing.

But what is the position in view of developments in the law in recent years ?  The law has not been standing still since *Jorden* v. *Money* (1).  There has been a series of decisions over the last fifty years which, although they are said to be cases of estoppel are not really such.  They are cases in which a promise was made which was intended to create legal relations and which, to the knowledge of the person making the promise, was going to be acted on by the person to whom it was made, and which was in fact so acted on.  In such cases the courts have said that the promise must be honoured.  The cases to which I particularly desire to refer are : *Fenner* v. *Blake* (2), *In re Wickham* (3), *Re William Porter & Co., Ld.* (4) and *Buttery* v. *Pickard* (5).  As I have said they are not cases of estoppel in the strict sense. They are really promises—promises intended to be binding, intended to be acted on, and in fact acted on.  *Jorden* v. *Money* (1) can be distinguished, because there the promisor made it clear that she did not intend to be legally bound, whereas in the cases to which I refer the proper inference was that the promisor did intend to be bound.  In each case the court held the promise to be binding on the party making it, even though under the old common law it might be difficult to find any consideration for it.  The courts have not gone so far as to give a cause of action in damages for the breach of such a promise, but they have refused to allow the party making it to act inconsistently with it.  It is in that sense, and that sense only, that such a promise gives rise to an estoppel.  The decisions are a natural result of the fusion of law and equity : for the cases of *Hughes* v. *Metropolitan Ry. Co.* (6), *Birmingham and District Land Co.* v. *London & North Western Ry. Co.* (7) and *Salisbury (Marquess)* v. *Gilmore* (8), afford a suffi-

(1) (1854) 5 H. L. C. 185.
(2) [1900] 1 Q. B. 426.
(3) (1917) 34 T. L. R. 158.
(4) [1937] 2 All E. R. 361.

(5) [1946] W. N. 25.
(6) (1877) 2 App. Cas. 439, 448.
(7) (1888) 40 Ch. D. 268, 286.
(8) [1942] 2 K. B. 38, 51.

cient basis for saying that a party would not be allowed in equity to go back on such a promise. In my opinion, the time has now come for the validity of such a promise to be recognized. The logical consequence, no doubt is that a promise to accept a smaller sum in discharge of a larger sum, if acted upon, is binding notwithstanding the absence of consideration : and if the fusion of law and equity leads to this result, so much the better. That aspect was not considered in *Foakes* v. *Beer* (1). At this time of day however, when law and equity have been joined together for over seventy years, principles must be re-considered in the light of their combined effect. It is to be noticed that in the Sixth Interim Report of the Law Revision Committee, pars. 35, 40, it is recommended that such a promise as that to which I have referred, should be enforceable in law even though no consideration for it has been given by the promisee. It seems to me that, to the extent I have mentioned, that result has now been achieved by the decisions of the courts.

I am satisfied that a promise such as that to which I have referred is binding and the only question remaining for my consideration is the scope of the promise in the present case. I am satisfied on all the evidence that the promise here was that the ground rent should be reduced to 1,250l. a year as a temporary expedient while the block of flats was not fully, or substantially fully let, owing to the conditions prevailing. That means that the reduction in the rent applied throughout the years down to the end of 1944, but early in 1945 it is plain that the flats were fully let, and, indeed the rents received from them (many of them not being affected by the Rent Restrictions Acts), were increased beyond the figure at which it was originally contemplated that they would be let. At all events the rent from them must have been very considerable. I find that the conditions prevailing at the time when the reduction in rent was made, had completely passed away by the early months of 1945. I am satisfied that the promise was understood by all parties only to apply under the conditions prevailing at the time when it was made, namely, when the flats were only partially let, and that it did not extend any further than that. When the flats became fully let, early in 1945, the reduction ceased to apply.

In those circumstances, under the law as I hold it, it seems to me that rent is payable at the full rate for the quarters ending September 29 and December 25, 1945.

<div align="right">

1946
———
CENTRAL
LONDON
PROPERTY
TRUST, LD.
*v.*
HIGH TREES
HOUSE, LD.
———
Denning J.

</div>

(1) (1884) 9 App. Cas. 605.

L 2

2

1946

CENTRAL
LONDON
PROPERTY
TRUST, LD.
*v.*
HIGH TREES
HOUSE, LD.
——
Denning J.

If the case had been one of estoppel, it might be said that in any event the estoppel would cease when the conditions to which the representation applied came to an end, or it also might be said that it would only come to an end on notice. In either case it is only a way of ascertaining what is the scope of the representation. I prefer to apply the principle that a promise intended to be binding, intended to be acted on and in fact acted on, is binding so far as its terms properly apply. Here it was binding as covering the period down to the early part of 1945, and as from that time full rent is payable.

I therefore give judgment for the plaintiff company for the amount claimed.

*Judgment for plaintiffs.*

Solicitors for the plaintiffs : *Henry Boustred & Sons.*
Solicitors for the defendants : *Callingham, Griffith & Bates.*

P. B. D.

---

1946
*Oct.* 21, 23.
—
Wrottesley J.

# DUFFIELD *v.* GREAT WESTERN RAILWAY COMPANY.

*Emergency legislation—Essential work—Scheduled undertaking—Master and servant—Railway—Failure of employee to pass examination for promotion—Transference of employee to lower grade under term of service contract—Rate of wages payable—Essential Work (General Provisions) (No. 2), 1942 (St. R. & O. 1942, No. 1594), art. IV. (1.), (d).*

An employee of the defendant railway company who, after three attempts, had failed to pass an examination for promotion to engine-driver, was reduced from the position of locomotive fireman to lower grade work with lower pay, in accordance with the terms of the company's conditions of service, of which the employee was aware. The employee, who had been in the service of the company since 1921, was willing to do the lower grade work but claimed that under art. IV. (1.) (d), of the Essential Work (General Provisions) (No. 2) Order, 1942 (1), he was entitled to be paid the higher wages of a fireman :—

(1) Essential Work (General Provisions) (No. 2) Order, 1942, art. IV. (1.) (d) : " without pre- " judice to any terms and condi- " tions of employment more " favourable to persons employed " in the undertaking that may be " provided for by the Conditions

" of Employment and National " Arbitration Order, 1940, or by " that order as amended by any " subsequent order, the person " carrying on the undertaking shall " in respect of every prescribed " period pay to every specified " person (except as otherwise pro-

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

---

**ANNEXE 9 TO THE**
**FIRST AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

---

**BEFORE ME**

**NOTARY PUBLIC**

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

**2 K. B.**     KING'S BENCH DIVISION.                                    **215**

defendants, and judgment for the third defendants against the
plaintiff with costs, and ordered the second defendants to pay
those costs direct to the third defendants.]

1950

PRATT
*v.*
RICHARDS.

*Judgment accordingly.*

Solicitors: *Stephenson, Harwood & Tatham; Masons; L.
Bingham & Co.*

S. C.

---

## COMBE *v.* COMBE.

[1950 C. 3344]

C. A.

1951
*Mar.* 5, 6.

Asquith,
Denning and
Birkett, L.JJ.

*Divorce—Promise by husband in 1943 to pay wife* 100l. *a year free of
income tax—Promise made after decree nisi but before decree
absolute—Wife's forbearance to apply to Divorce Court for main-
tenance—No request, express or implied, by husband for forbear-
ance—Action in 1950 in King's Bench Division by wife on husband's
promise—Absence of consideration.*

The principle stated in *Central London Property Trust Ld.
v. High Trees House Ld.* [1947] K. B. 130 and *Robertson v.
Minister of Pensions* [1949] 1 K. B. 227, is that, where one party
has, by his words or conduct, made to the other a promise or
assurance which was intended to affect the legal relations between
them and to be acted on accordingly, then, once the other party
has taken him at his word and acted on it, the party who gave the
promise or assurance cannot afterwards be allowed to revert to the
previous legal relationship as if no such promise or assurance had
been made by him, but he must accept their legal relations subject
to the qualification which he himself has so introduced, even
though it is not supported in point of law by any consideration, but
only by his word.

But this principle does not create any new cause of action where
none existed before; so that, where a promise is made which is
not supported by any consideration, the promisee cannot bring an
action.

Between the dates of decree nisi and decree absolute on a petition
for divorce a husband promised his wife to allow her 100l. a year
free of tax. The wife forbore to apply to the Divorce Court for
maintenance, but not on any request by the husband, express or
implied, that she should so forbear. The husband did not pay to
his wife the payments he had promised, and, after the lapse of
seven years, the wife brought an action in the King's Bench Division
on her husband's promise to make those payments to her.

216                    KING'S BENCH DIVISION.        **[1951]**

*Held,* that there was no consideration for the husband's promise, since (1.) the wife had not promised not to apply for maintenance to the Divorce Court, and (2.) even if she had so promised, she could not have deprived herself of that right (see *Hyman* v. *Hyman* [1929] A. C. 601, as explained in *Gaisberg* v. *Storr* [1950] 1 K. B. 107); and also (3.) the wife's actual forbearance to make such an application was not made at the request of her husband, express or implied.

*Held,* further, that in these circumstances, the principle stated in *Central London Property Trust Ld.* v. *High Trees House Ld.* (supra) and *Robertson* v. *The Minister of Pensions* (supra) afforded the wife no cause of action.

*Per* Asquith, L.J.  It was unnecessary to express any views on the correctness of the decision in *Central London Property Trust Ld.* v. *High Trees House Ld.* (supra), though he, certainly, must not be taken as questioning it.  The decision of the House of Lords in *Hyman* v. *Hyman* (supra) was not to be construed as applying only to agreements made before the date of decree absolute.

*Per* Denning, L.J.  He had always understood that no agreement for maintenance, which was made in the course of proceedings for divorce before the date of decree absolute, was valid, unless it should be sanctioned by the Divorce Court.  Indeed, he had said so in *Emanuel* v. *Emanuel* [1946] P. 115, 117.  He knew that such agreements were often made, but their only valid purpose was to serve as a basis for a consent application to the Divorce Court.  The reason why such agreements, unless approved by the court, were invalid, was because they were so apt to be collusive.

Decision of Byrne, J., approved on the issue of consideration, disapproved on the applicability of the principle stated in *Central London Property Trust Ld.* v. *High Trees House Ld.* (supra).

APPEAL from Byrne, J.

The parties, a husband and wife, were married in 1915, but separated in 1939.  On February 1, 1943, on the wife's petition, a decree nisi of divorce was pronounced.  On February 9, 1943, the wife's solicitor wrote to the husband's solicitor: "With "regard to permanent maintenance, we understand that your "client is prepared to make her an allowance of 100*l.* per year, "free of income tax".  On February 19, 1943, the husband's solicitor replied that the husband had "agreed to allow your client "100*l.* per annum, free of tax".  On August 11, 1943, the decree was made absolute.  The wife's solicitor wrote for the first instalment of 25*l.* on August 26, and asking that future instalments should be paid on November 11, February 11, May 11, and August 11.  The husband, himself, replied that he could not be expected to pay in advance.  In fact, he never made any payment.  The wife pressed for payment but made no application to the Divorce Court for maintenance.  She had an income of

**2 K. B.**        KING'S BENCH DIVISION.                    217

C. A.

1951

COMBE
*v.*
COMBE.

between 700*l.* and 800*l.* a year.  Her husband had only 650*l.* a year.

On July 28, 1950, the wife brought an action in the King's Bench Division claiming from her husband 675*l.*, being arrears of payment at the rate of 100*l.* per year for six and three-quarter years.  Byrne, J., held that the first three quarterly instalments of 25*l.* were barred by the Limitation Act, 1939, but gave judgment for the wife for 600*l.*  He held on the authority of *Gaisberg v. Storr* (1) that there was no consideration for the husband's promise to pay his wife 100*l.*, but nevertheless he held that the promise was enforceable on the principle stated in *Central London Property Trust Ld.* v. *High Trees House Ld.* (2) and *Robertson* v. *Minister of Pensions* (3), because it was an unequivocal acceptance of liability, intended to be binding, intended to be acted on and, in fact, acted on.

The husband appealed.

*Kee* for the husband.  The trial judge was right in holding that there was no consideration for this promise by the husband to pay his wife 100*l.* per annum free of income tax.  There was no promise by the wife that she would not apply for maintenance to the Divorce Court, and, indeed, had she made such a promise there would have been no consideration for it, since no agreement by her with her husband could deprive her of this right: see *Hyman* v. *Hyman* (4), as interpreted in the Court of Appeal in *Gaisberg* v. *Storr* (5).  Though in fact the wife did forbear from applying to the Divorce Court for maintenance, there was no request by the husband, express or implied, that she should do so, and if the wife now made that application she would have to explain the long delay in making the application.

But Byrne, J., held that the husband's promise was enforceable on the principle stated by Denning, J., in *Central London Property Trust Ld.* v. *High Trees House Ld.* (6) and *Robertson* v. *Minister of Pensions* (7).  But the principle stated by his Lordship in those cases cannot of itself give a cause of action.  Where consideration is an essential part of the cause of action, the doctrine stated in the *High Trees* case (6), in the absence of consideration, cannot take its place.  The doctrine does not decide that a promisee can sue on a promise.  In neither of the two cases

(1) [1950] 1 K. B. 107.
(2) [1947] K. B. 130.
(3) [1949] 1 K. B. 227.
(4) [1929] A. C. 601.
(5) [1950] 1 K. B. 107.
(6) [1947] K. B. 130.
(7) [1949] 1 K. B. 227.

218                    KING'S BENCH DIVISION.            **[1951]**

cited was the action brought by the promisee on a promise. This doctrine, it has been said, may be used as a shield and not as a sword; it does not decide that a promisee can sue on such a promise.

Finally, no agreement for maintenance made in the course of divorce proceedings before the date of decree absolute between husband and wife is valid, unless it is sanctioned by the court: see the observations of Denning, J., in *Emanuel* v. *Emanuel* (8).

*Peter Robinson* for the wife. Where a promise is given which (a) is intended to create legal relations, and (b) is intended to be acted on by the promisee, and (c) is, in fact, acted on, the promisor cannot bring an action against the promisee which involves the repudiation of his promise or is inconsistent with it: see the *High Trees* case (6) and *Robertson* v. *Minister of Pensions* (7). Such a promise acts as an estoppel or quasi-estoppel. It is just and equitable that if such a promise with those conditions can be used as a shield by the promisee, he can also use it as a sword and sue upon it, and in such case the promisor should not be allowed to plead that his promise is not binding on him: the promisor is estopped from denying his promise. The reasoning which it has been established affords the promisee in such a case a defence, is good to afford him also the weapon of a cause of action. Consideration is not necessary in such a case, where such a promise has been acted on to the detriment of the promisee.

[Counsel then contended that from the correspondence it appeared that the agreement of the husband to pay the wife 100*l.* a year free of income tax was made after the date of decree absolute.]

The agreement having been made after the date of decree absolute, there was no agreement not to invoke the jurisdiction of the court or to control the process of the court when its jurisdiction had been invoked: see the speech of Lord Hailsham, L.C., in *Hyman* v. *Hyman* (9). Such an agreement was not open to objection and was made for valid consideration.

Further, in any case, there was consideration for the promise: the wife forbore from doing what she was entitled to do—to apply to the Divorce Court for maintenance. This she did in consequence of her husband's promise. And thus a forbearance was to her detriment, in that at the present time she must apply to the court for leave to make the application, with the probability

(8) [1946] P. 115. 117.            (9) [1929] A. C. 601, 609, 614.

**2 K. B.**          KING'S BENCH DIVISION.                    219

C. A.

1951

COMBE
*v.*
COMBE.

that permanent maintenance would not be granted from the date of decree absolute—some seven years ago. Such forbearance was good consideration for the promise and a request for such forbearance, if necessary, will be implied on the part of the husband.

*Kee* replied.

DENNING, L.J. [after stating the facts:] Much as I am inclined to favour the principle stated in the *High Trees* case (10), it is important that it should not be stretched too far, lest it should be endangered. That principle does not create new causes of action where none existed before. It only prevents a party from insisting upon his strict legal rights, when it would be unjust to allow him to enforce them, having regard to the dealings which have taken place between the parties. That is the way it was put in *Hughes* v. *Metropolitan Railway* (11), the case in the House of Lords in which the principle was first stated, and in *Birmingham, etc., Land Company* v. *London and North-Western Railway Co.* (12), the case in the Court of Appeal where the principle was enlarged. It is also implicit in all the modern cases in which the principle has been developed. Sometimes it is a plaintiff who is not allowed to insist on his strict legal rights. Thus, a creditor is not allowed to enforce a debt which he has deliberately agreed to waive, if the debtor has carried on business or in some other way changed his position in reliance on the waiver: *In re William Porter & Co. Ld.* (13); *Buttery* v. *Pickard* (14); the *High Trees* case (10); and *Ledingham and Others* v. *Bermejo Estancia Co. Ld.* (15). A landlord, who has told his tenant that he can live in his cottage rent free for the rest of his life, is not allowed to go back on it, if the tenant stays in the house on that footing: *Foster* v. *Robinson* (16). On other occasions it is a defendant who is not allowed to insist on his strict legal rights. His conduct may be such as to debar him from relying on some condition, denying some allegation, or taking some other point in answer to the claim. Thus a government department, which had accepted a disease as due to war service, were not allowed afterwards to say it was not, seeing that the soldier, in reliance on the assurance, had abstained from getting further evidence about it: *Robertson* v. *Minister of Pensions* (17). A buyer who had waived the contract

(10) [1947] K. B. 130.
(11) (1877) 2 App. Cas. 439, 448.
(12) (1888) 40 Ch. D. 268, 286.
(13) [1937] 2 All E.R. 361.
(14) [1946] W. N. 25.
(15) [1947] 1 All E. R. 749.
(16) [1951] 1 K. B. 149, 156.
(17) [1949] 1 K. B. 227.

220                    KING'S BENCH DIVISION.        **[1951]**

C. A.
1951

COMBE
v.
COMBE.

Denning, L.J.

date for delivery was not allowed afterwards to set up the stipu-
lated time as an answer to the seller: *Charles Rickards Ld.* v.
*Oppenhaim* (18). A tenant who had encroached on an adjoining
building, asserting that it was comprised in the lease, was not
allowed afterwards to say that it was not included in the lease:
*J. F. Perrott & Co. Ld.* v. *Cohen* (19). A tenant who had lived
in a house rent-free by permission of his landlord, thereby assert-
ing that his original tenancy had ended, was not afterwards
allowed to say that his original tenancy continued: *Foster* v.
*Robinson* (16). In none of these cases was the defendant sued on
the promise, assurance, or assertion as a cause of action in itself:
he was sued for some other cause, for example, a pension or a
breach of contract, and the promise, assurance or assertion only
played a supplementary rôle—an important rôle, no doubt, but
still a supplementary rôle. That is, I think, its true function.
It may be part of a cause of action, but not a cause of action in
itself.

The principle, as I understand it, is that, where one party has,
by his words or conduct, made to the other a promise or assurance
which was intended to affect the legal relations between them
and to be acted on accordingly, then, once the other party has
taken him at his word and acted on it, the one who gave the
promise or assurance cannot afterwards be allowed to revert to
the previous legal relations as if no such promise or assurance had
been made by him, but he must accept their legal relations
subject to the qualification which he himself has so introduced,
even though it is not supported in point of law by any considera-
tion but only by his word.

Seeing that the principle never stands alone as giving a cause
of action in itself, it can never do away with the necessity of
consideration when that is an essential part of the cause of action.
The doctrine of consideration is too firmly fixed to be overthrown
by a side-wind. Its ill-effects have been largely mitigated of late,
but it still remains a cardinal necessity of the formation of a con-
tract, though not of its modification or discharge. I fear that it
was my failure to make this clear which misled Byrne, J., in the
present case. He held that the wife could sue on the husband's
promise as a separate and independent cause of action by itself,
although, as he held, there was no consideration for it. That
is not correct. The wife can only enforce it if there was

(16) [1951] 1 K. B. 149, 156.          (19) [1951] 1 K. B. 705.
(18) [1950] 1 K. B. 616, 621-3.

**2 K. B.**     KING'S BENCH DIVISION.     221

consideration for it. That is, therefore, the real question in the case: was there sufficient consideration to support the promise?

If it were suggested that, in return for the husband's promise, the wife expressly or impliedly promised to forbear from applying to the court for maintenance—that is, a promise in return for a promise—there would clearly be no consideration, because the wife's promise was not binding on her and was therefore worth nothing. Notwithstanding her promise, she could always apply to the Divorce Court for maintenance—maybe only with leave—and no agreement by her could take away that right: *Hyman* v. *Hyman* (20), as interpreted by this court in *Gaisberg* v. *Storr* (21).

There was, however, clearly no promise by the wife, express or implied, to forbear from applying to the court. All that happened was that she did in fact forbear—that is, she did an act in return for a promise. Is that sufficient consideration? Unilateral promises of this kind have long been enforced, so long as the act or forbearance is done on the faith of the promise and at the request of the promisor, express or implied. The act done is then in itself sufficient consideration for the promise, even though it arises ex post facto, as Parker, J., pointed out in *Wigan* v. *English and Scottish Law Life Assurance Association* (22). If the findings of Byrne, J., were accepted, they would be sufficient to bring this principle into play. His finding that the husband's promise was intended to be binding, intended to be acted upon, and was, in fact, acted on—although expressed to be a finding on the *High Trees* principle—is equivalent to a finding that there was consideration within this long settled rule, because it comes to the same thing expressed in different words: see *Oliver* v. *Davis* (23). But my difficulty is to accept the finding of Byrne, J., that the promise was " intended to be acted upon ". I cannot find any evidence of any intention by the husband that the wife should forbear from applying to the court for maintenance, or, in other words, any request by the husband, express or implied, that the wife should so forbear. He left her to apply if she wished to do so. She did not do so, and I am not surprised, because it is very unlikely that the Divorce Court would have then made any order in her favour, seeing that she had a bigger income than her husband. Her forbearance was not intended by him, nor was it done at his request. It was therefore no consideration.

C. A.

1951

COMBE
*v.*
COMBE.

Denning, L.J.

(20) [1929] A. C. 601.
(21) [1950] 1 K. B. 107.
(22) [1909] 1 Ch. 291, 298.
(23) [1949] 2 K. B. 727.

C. A.

1951

COMBE
v.
COMBE.

Denning, L.J.

It may be that the wife has suffered some detriment because, after forbearing to apply to the court for seven years, she might not now be given leave to apply : *Scott* v. *Scott* (24). The court is, however, nowadays much more ready to give leave than it used to be (see *Fisher* v. *Fisher* (25) and *Hasting* v. *Hasting* (26) ), and I should have thought that, if she fell on hard times, she would still obtain leave. Assuming, however, that she has suffered some detriment by her forbearance, nevertheless, as the forbearance was not at the husband's request, it is no consideration. In *Scott* v. *Scott*, where a maintenance agreement was made during divorce proceedings, Scrutton, L.J., did say that he had no doubt about there being consideration for it (27), but this must now be taken to be erroneous, having regard to *Hyman* v. *Hyman* (28) and *Gaisberg* v. *Storr* (29).

The doctrine of consideration is sometimes said to work injustice, but I see none in this case, nor was there any in *Oliver* v. *Davis* (30) or *Gaisberg* v. *Storr* (29). I do not think it would be right for this wife, who is better off than her husband, to take no action for six or seven years and then come down on him for the whole 600*l.*

The truth is that in these maintenance cases the real remedy of the wife is, not by action in the King's Bench Division, but by application in the Divorce Court. I have always understood that no agreement for maintenance, which is made in the course of divorce proceedings prior to decree absolute, is valid unless it is sanctioned by the court. Indeed, I said so in *Emanuel* v. *Emanuel* (31). I know that such agreements are often made, but their only valid purpose is to serve as a basis for a consent application to the court. The reason why such agreements are invalid, unless approved, is because they are so apt to be collusive. Some wives are tempted to stipulate for extortionate maintenance as the price of giving the husband his freedom. It is to remove this temptation that the sanction of the court is required. It would be a great pity if this salutary requirement could be evaded by taking action in the King's Bench Division. The Divorce Court can order the husband to pay whatever maintenance is just. Moreover, if justice so requires, it can make the order retrospective to decree absolute. That is the proper

(24) [1921] P. 107.
(25) [1942] P. 101.
(26) [1948] P. 68.
(27) [1921] P. 107, 127.

(28) [1929] A. C. 601.
(29) [1950] 1 K. B. 107.
(30) [1949] 2 K. B. 727.
(31) [1946] P. 115.

**2 K. B.**        KING'S BENCH DIVISION.                              223

remedy of the wife here, and I do not think she has a right to

C. A.

1951

any other.

For these reasons I think the appeal should be allowed.

COMBE
v.
COMBE.

BIRKETT, L.J.    I agree.    There were two points before the

Birkett, L.J.

judge, both clearly stated and both clearly argued.    The first,
whether there was consideration for this agreement to pay 100*l.*
a year free of tax, was disposed of by the judge almost in a
sentence.    He said in fact that on the authority of *Gaisberg* v.
*Storr* (32) there could be no doubt that the decision in that case
applied to the facts of the case before him.    After reciting
*Gaisberg* v. *Storr* (32), he said : " In that case it was held that
" the only consideration moving from the wife for the husband's
" undertaking, which could be deduced by inference from the
" circumstances, would be an undertaking by the wife not to
" apply to the court for alimony pendente lite or for permanent
" maintenance, but that any promise by the wife to refrain from
" so applying was void and unenforceable, and the learned Lords
" Justices all gave judgment to that effect. . . .    At first sight
" that would appear to be conclusive, but Mr. Rawlinson, on
" behalf of the plaintiff, pointed out that the whole of the argu-
" ment in the case of *Gaisberg* v. *Storr* (32), and, therefore, the
" whole matter to which the court was directing its attention,
" was concerned with the question whether forbearance to apply
" for permanent maintenance was good consideration, and from
" an examination of the judgments in that case, and of the
" arguments, it plainly appears that that was the matter, and
" the only matter, which was being considered in that case ".
Then he continued : " But Mr. Rawlinson says : ' In this case
" ' it is not suggested that there was consideration ' ".

I have been looking at the evidence which was given in the
court below ; and the agreement, about which all this subsequent
trouble has arisen, was made as early as February in 1943, the
decree absolute in the case not being made until August 11.
But there does not appear, as I read it, anywhere in the evidence
a request by the husband that the wife should refrain from going
to the court, or a promise by the wife that she would not go to
the court, or any matter of that kind.    It appears simply to
have been that after some little talk in February, 1943, there
was an agreement come to that the husband would pay 100*l.* a
year ; and then the wife amended it to 100*l.* a year free of tax ;

(32) [1950] 1 K. B. 107.

C. A.

1951
———
COMBE
*v.*
COMBE.
———
Birkett, L.J.
———

and then by March 5 that was recorded in a letter. It seems on the first point, therefore, that there was no consideration for this agreement. If I may be permitted to do so, I will quote the words of Asquith, L.J., in *Gaisberg* v. *Storr* (33): "The only "consideration which could be deduced by inference from the "circumstances would be an undertaking by the wife, in "exchange for the husband's undertaking, not to apply to the "court for alimony pendente lite or permanent maintenance; "but any promise given by her to refrain from so applying would "have been void and unenforceable on the principle laid down "in *Hyman* v. *Hyman* (34). In those circumstances I think "that there is no evidence at all of any consideration moving "from the wife to the husband, and that the agreement in the "document is not a binding contract". The judge, as I said, dismissed this matter in a sentence by saying that the law was so clear that it was not possible for the case to be argued on that ground.

With regard to the second point, I think that the description given by Mr. Kee of the doctrine enunciated in the two cases to which Denning, L.J., has referred, as one to be used as a shield and not as a sword, is very vivid. Denning, J., in *Central London Property Trust Ld.* v. *High Trees House Ld.*, concluded his judgment with these words (35): "I prefer to apply "the principle that a promise intended to be binding, intended "to be acted upon, and in fact acted upon, is binding so far as "its terms properly apply.". If a husband who admittedly had entered into an agreement of this kind were in some way to try and take advantage of it, the doctrine would apply. So far as the wife is concerned, it would appear to be plain that her rights of applying to the court for maintenance are still theoretically in full force, for in *Fisher* v. *Fisher* Lord Greene, M.R., discussing *Scott* v. *Scott* (36), said (37): "Scrutton, L.J., "expressed his conclusion where he said: 'Without going "'through the other cases, seven or eight of which I have "'referred to while counsel have been arguing this case, I think "'in this particular case the application ought to have been "'made within a reasonable time after the decree for dissolu-"'tion, and I see nothing whatever in the circumstances of this "'case to justify an application being made seven years after

(33) Ibid. 114.
(34) [1929] A. C. 601.
(35) [1947] K. B. 130, 136.

(36) [1921] P. 107.
(37) [1942] P. 101, 106.

**2 K. B.**         KING'S BENCH DIVISION.                              225

C. A.

1951

COMBE
v.
COMBE.

Birkett, L.J.

"'the decree'''. Then Lord Greene, M.R., continued: "He
"carefully refrained from saying that in any circumstances seven
"years would have been too long. Warrington, L.J., is equally
"cautious in the language which he used. It seems to me that
"that authority does not in any way preclude us from saying
"that, on the facts of any particular case, a reasonable time may
"be as much as seven years or even longer".

Mr. Kee argued that if an application were made to the court
at this date for maintenance, it would be necessary to explain
the long delay in the making of the application. As one of the
material circumstances for the court to consider, I cannot con-
ceive of a better one than that the wife mistakenly relied upon
an agreement which, much to her surprise, when it came before
the court was held to be invalid.

In all those circumstances I agree with the judgment which
has been given. The trial judge was certainly right in saying
that there was no consideration for the agreement; and I think
that he misunderstood and misapplied the principle laid down in
the two cases which have been cited.

ASQUITH, L.J. I agree with my Lords and would add nothing
but for the fact that we are disagreeing with the judgment of
Byrne, J.

The judge has decided that, while the husband's promise was
unsupported by any valid consideration, yet the principle in
*Central London Property Trust Ld.* v. *High Trees House Ld.* (38)
entitles the wife to succeed. It is unnecessary to express any
view as to the correctness of that decision, though I certainly
must not be taken to be questioning it; and I would remark, in
passing, that it seems to me a complete misconception to suppose
that it struck at the roots of the doctrine of consideration. But
assuming, without deciding, that it is good law, I do not think,
however, that it helps the plaintiff at all. What that case decides
is that when a promise is given which (1.) is intended to create
legal relations, (2.) is intended to be acted upon by the promisee,
and (3.) is in fact so acted upon, the promisor cannot bring an
action against the promisee which involves the repudiation of his
promise or is inconsistent with it. It does not, as I read it,
decide that a promisee can sue on the promise. On the contrary,
Denning, J., expressly stated the contrary. Neither in the *High
Trees* case (38) nor in *Minister of Pensions* v. *Robertson* (39)

(38) [1947] K. B. 130.          (39) [1949] 1 K. B. 227.

226                              KING'S BENCH DIVISION.            **[1951]**

C. A.
1951

COMBE
*v.*
COMBE.

Asquith, L.J.

(another decision of my Lord which is relied upon by the plain-
tiff) was an action brought by the promisee on the promise. In
the first of those two cases the plaintiff was in effect the promisor
or a person standing in the shoes of the promisor, while in the
second the claim, though brought by the promisee, was brought
upon a cause of action which was not the promise, but was an
alleged statutory right.

Then it is said for the wife that the husband's agreement to
pay 100*l.* a year was supported by good consideration, which
consisted either of an implied undertaking by the wife not to
apply to the court for an order for permanent maintenance, or of
an actual forbearance so to apply. As to the first of these, if
the agreement was made before the decree absolute *Hyman* v.
*Hyman* (40), beyond question, decided that such agreement to
abstain from resorting to the court is not valid consideration.

It is said, however, first that the material agreement was not
made before the decree absolute, but was made after, and that
such an agreement made after the decree absolute is not open to
objection and is made for valid consideration. Alternatively, it
is argued that even if such an agreement is not good consideration, an actual forbearance to apply to the court, is.

As to the first of these points, in my judgment the material
agreement was made shortly after the decree nisi and long before
the decree absolute. The correspondence after the decree
absolute contained merely a request by the wife that an agree-
ment assumed to have been validly made in the previous
February should be carried out by means of quarterly payments,
followed in the October letters, by a consent by the husband to
pay quarterly with a suggestion of different quarter days. This
cannot, in my view, constitute a contract—a contract made after
the decree absolute; but if it were so, I consider on the whole
that *Hyman* v. *Hyman* (40), a decision of the House of Lords,
is not to be construed as applying only to agreements made before
decree absolute. I think that its application is perfectly general.
It contains no such limitation in time as has been suggested.
I am of opinion, further, that *Hyman* v. *Hyman* (40) is inci-
dentally inconsistent with the dicta of Scrutton, L.J., in *Scott*
v. *Scott* (41). Finally, I do not think an actual forbearance, as
opposed to an agreement to forbear to approach the court, is a
good consideration unless it proceeds from a request, express or

(40) [1929] A. C. 601.            (41) [1921] P. 107, 127.

**2 K. B.**      KING'S BENCH DIVISION.      227

implied, on the part of the promisor.   If not moved by such a
request, the forbearance is not in respect of the promise.

For these reasons, and for the others given by my Lords, I
agree that the appeal should be allowed.

<div align="right"><i>Appeal allowed.</i></div>

C. A.

1951

COMBE
v.
COMBE.

Solicitors: *Braikenridge & Edwards; Lee & Pembertons.*

<div align="right">C. G. M.</div>

---

<div align="center">

NATIONAL COAL BOARD *v.* AMALGAMATED
ANTHRACITE COLLIERIES LD.

</div>

C. A.

1951
*March 12,*
*13, 21.*

Somervell,
Singleton and
Denning, L.JJ.

*Mines—Industrial diseases—Workmen's compensation—Disease certified*
*after nationalization of mines—Compensation paid by National*
*Coal Board—Contribution by "other employers"—Workmen's*
*Compensation Act,* 1925 (15 & 16 Geo. 5, c. 84), *s. 43, sub-s. 1*
*(iii) (c) (iii)—Coal Mining Industry (Pneumoconiosis) Compensation*
*Scheme,* 1943 (St. R. & O. 1943, No. 885), *s. 8—Coal Industry*
*Nationalization Act,* 1946 (9 & 10 Geo. 6, c. 59), *s. 10, sub-s. 3.*

The Workmen's Compensation Act of 1925, by s. 43, provides
that where a workman is duly certified to be disabled by an indus-
trial disease which is due to the nature of the employment in which
he is employed, compensation shall be recoverable from the employer
who last employed him in that employment, provided that if the
disease was of such a nature as to be contracted by a gradual process
" any other employers " who during a specified period employed the
workman in the employment to the nature of which the disease was
due should be liable to make to the employer from whom compensa-
tion was recoverable such contributions as, in default of agreement,
might be determined by arbitration under the Act.

After the Coal Industry Nationalization Act, 1946, came into
operation on January 1, 1947, two miners who had previously been
employed by the defendant colliery company, and after the vesting
date had continued to work in the same mine and in the same
employment for the National Coal Board, were certified to be
suffering, one from miner's nystagmus, and the other from
pneumoconiosis, both industrial diseases " of a nature to be con-
" tracted by a gradual process ".  The board, having paid the
workmen compensation, claimed contributions from the defendant
colliery owners as " other employers " within the meaning of s. 43.
The defendants contended that they were not " other employers "
within the meaning of s. 43 of the Act of 1925, that the Act of 1946

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

---

**ANNEXE 10 TO THE**
**FIRST AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

---

**BEFORE ME**

**NOTARY PUBLIC**

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

[HOUSE OF LORDS.]

WILLIAM DERRY, J. C. WAKEFIELD,
M. M. MOORE, J. PETHICK, AND S. J. } APPELLANTS;
WILDE . . . . . . . . . .

H. L. (E.)

1889

July 1.

AND

SIR HENRY WILLIAM PEEK, BARONET.      RESPONDENT.

*Action of Deceit—False Representation—Fraud—"Legal Fraud"—Company*
*—Misrepresentation in Prospectus.*

In an action of deceit the plaintiff must prove actual fraud.  Fraud is
proved when it is shewn that a false representation has been made know-
ingly, or without belief in its truth, or recklessly, without caring whether
it be true or false.

A false statement, made through carelessness and without reasonable
ground for believing it to be true, may be evidence of fraud but does not
necessarily amount to fraud.  Such a statement, if made in the honest
belief that it is true, is not fraudulent and does not render the person
making it liable to an action of deceit.

A special Act incorporating a tramway company provided that the
carriages might be moved by animal power, and, with the consent of the
Board of Trade, by steam power.  The directors issued a prospectus con-
taining a statement that by their special Act the company had the right to
use steam power instead of horses.  The plaintiff took shares on the faith
of this statement.  The Board of Trade afterwards refused their consent
to the use of steam power and the company was wound up.  The plaintiff
having brought an action of deceit against the directors founded upon the
false statement :—

*Held,* reversing the decision of the Court of Appeal and restoring the
decision of Stirling J. (37 Ch. D. 541), that the defendants were not liable,
the statement as to steam power having been made by them in the honest
belief that it was true.

APPEAL from a decision of the Court of Appeal.  The facts
are set out at length in the report of the decisions below (1).
For the present report the following summary will suffice :—

By a special Act (45 & 46 Vict. c. clix.) the Plymouth, Devon-
port and District Tramways Company was authorized to make
certain tramways.

(1) 37 Ch. D. 541.

H. L. (E.)

1889

DERRY
v.
PEEK.

By sect. 35 the carriages used on the tramways might be moved by animal power and, with the consent of the Board of Trade, by steam or any mechanical power for fixed periods and subject to the regulations of the Board.

By sect. 34 of the Tramways Act 1870 (33 & 34 Vict. c. 78), which section was incorporated in the special Act, "all carriages used on any tramway shall be moved by the power prescribed by the special Act, and where no such power is prescribed, by animal power only."

In February 1883 the appellants as directors of the company issued a prospectus containing the following paragraph :—

"One great feature of this undertaking, to which considerable importance should be attached, is, that by the special Act of Parliament obtained, the company has the right to use steam or mechanical motive power, instead of horses, and it is fully expected that by means of this a considerable saving will result in the working expenses of the line as compared with other tramways worked by horses."

Soon after the issue of the prospectus the respondent, relying, as he alleged, upon the representations in this paragraph and believing that the company had an absolute right to use steam and other mechanical power, applied for and obtained shares in the company.

The company proceeded to make tramways, but the Board of Trade refused to consent to the use of steam or mechanical power except on certain portions of the tramways.

In the result the company was wound up, and the respondent in 1885 brought an action of deceit against the appellants claiming damages for the fraudulent misrepresentations of the defendants whereby the plaintiff was induced to take shares in the company.

At the trial before Stirling J. the plaintiff and defendants were called as witnesses. The effect given to their evidence in this House will appear from the judgments of noble and learned Lords.

Stirling J. dismissed the action; but that decision was reversed by the Court of Appeal (Cotton L.J., Sir J. Hannen, and Lopes L.J.) who held that the defendants were liable to make good to the plaintiff the loss sustained by his taking the shares,

and ordered an inquiry (1).  Against this decision the defen-
dants appealed.

March 28, 29; April 5, 9, 11.  Sir *Horace Davey* Q.C. and
*Moulton* Q.C. (*M. Muir Mackenzie* with them) for the appellants :—

The law as laid down by the Court of Appeal goes much
further than any previous decision and is unsound.  To support
an action of deceit it always was necessary at common law and
still is both there and in Chancery to prove fraud, i.e., that the
thing was done fraudulently.  Fraud never has been and never
will be exhaustively defined, the forms which deceit may take
being so many and various.  There is a negative characteristic :
it must be something which an honest man would not do ; not
merely what a logical or clear-headed man would not do.  How-
ever unbusinesslike a man may be he is not fraudulent if he acts
honestly.  The natural consequences of words or acts must be
taken to have been intended, but not so as to impute fraud to
honesty.  No honest mistake, no mistake not prompted by a dis-
honest intention, is fraud.  The shape of the mistake does not
make it more or less a fraud if it is a mistake.  Once establish
that a man honestly intended to do his duty, the consequences
cannot turn his words or acts into a fraud.  There may be an
obligation to see that no untrue statement is made, but the failure
to meet that obligation is not fraud, if there is no dishonest
intention.  The statement may be inaccurate, yet if the defendants
honestly—though mistakenly—believed that it substantially
represented the truth, there is no fraud, and an action of deceit
will not lie.  The decision of the Court of Appeal is that to such
a statement the law attaches a meaning which makes it fraudulent.
A material misstatement may be a ground for rescinding the
contract, but the consequences of fraud and of breach of contract
are widely different.  In an action for breach of contract the
defendant must make good his words.  In an action founded on
fraud he must bear the whole of the consequences which have
been induced by the fraudulent statement, which may be very
extensive.  The essence of fraud is the tricking a person into
the bargain.  If the fact that the consent of the Board of Trade

(1) 37 Ch. D. 541, 591.

3        2 A 2

H. L. (E.)
1889
DERRY
*v.*
PEEK.

was necessary was suppressed by these defendants in order to make the bait more alluring there was fraud. The issue then is one of fact, was there an intention to make the bait more alluring? It is not the carelessness leading to an untrue statement which makes fraud; it is the carelessness whether the statement is untrue or not. It is in this sense that the authorities have held defendants liable for fraud when they have made untrue statements "recklessly." The above propositions are the result of the authorities. The law laid down in the earlier cases is well exemplified by *Taylor* v. *Ashton* (1), where, however, the headnote does not truly represent the effect of the decision, and *Joliffe* v. *Baker* (2). In *Polhill* v. *Walter* (3)—which may be relied on by the respondent—the Court considered that the misrepresentation was made by the defendant *knowing it to be untrue*. The idea that something less than fraud was necessary to found an action of deceit crept in first in Lord Chelmsford's observations in *Western Bank of Scotland* v. *Addie* (4), and was extended by Cotton L.J. in *Weir* v. *Bell* (5), where he treats "recklessly" as if it meant "negligently," whereas it means "indifferent whether the statement be true or false." This confusion has arisen mainly since the Judicature Act, actions of deceit being tried in Chancery by judges who, sitting without juries, have confounded issues of fact with issues of law. Here the Court of Appeal held that an action of deceit lies if the defendant makes an untrue statement, without reasonable ground for believing it to be true, though he did in fact honestly believe it to be true. If that be the law a negligent, improvident, or wrong-headed man is a fraudulent man. A want of reasonable ground may be evidence of fraud, but it is not the same thing as fraud.

As to the facts, Stirling J. found that the defendants believed the misstatement to be true, and that finding ought to be conclusive. The Court of Appeal do not contradict that finding.

The misstatement complained of really meant that the company had obtained the necessary statutory authority to use steam power, without which authority no consents could have given

---

(1) 11 M. & W. 401.    (3) 3 B. & Ad. 114.
(2) 11 Q. B. D. 255.    (4)·Law Rep. 1 H. L. (Sc.) 145, 162.
(5) 3 Ex. D. at p. 242.

authority, because by the Tramways Act 1870 (33 & 34 Vict. c. 78 s. 34) steam power is 'prohibited except where the special Act authorizes steam power. It may be that the defendants knew the statement was not strictly accurate, but if so they honestly thought that the statement conveyed a substantially accurate representation of the fact, either because they thought it not worth while to encumber the prospectus with the qualifications, or because those qualifications were not present to their minds when they made the statement. In the prospectus reference is made to the special Act, so that any one who consulted the Act could see for himself what the authority was.

Lastly, the plaintiff was no doubt in some degree influenced by the misstatement, but there was no evidence that he would not have taken the shares if the statement had contained the full truth as to the necessary consents being obtained.

*Bompas* Q.C., and *Byrne* Q.C. (*Patullo* with them) for the respondent:—

The decision of the Court of Appeal is right and for the reasons there given. Directors are liable not only for a false statement which they know to be false, but for a false statement which they ought to have known to be false. This proposition is supported by the obiter dictum of Lord Westbury in *New Brunswick &c. Co.* v. *Conybeare* (1), and by the obiter dicta of the Lords in *Peek* v. *Gurney* (2) as to what the liability of the defendants would have been as original shareholders, and by the judgment of Jessel M.R. in *Smith* v. *Chadwick* (3).

It is not necessary that there should be carelessness whether the statement is true or not: it is enough if there be carelessness or negligence in making the statement. Making an untrue statement without reasonable ground is negligence which will support an action of deceit. In support of the respondent's contention the following authorities are relied on: *Slim* v. *Croucher* (4); *Evans* v. *Bicknell* (5); *Brownlie* v. *Campbell* (6); *Polhill* v. *Walter* (7); *Milne* v. *Marwood* (8); *Denton* v. *Great*

(1) 9 H. L. C. 725, 726.
(2) Law Rep. 6 H. L. 377.
(3) 20 Ch. D. 44.
(4) 1 D. F. & J. 518, 523.

(5) 6 Ves. at p. 183.
(6) 5 App. Cas. 925, 935, 950.
(7) 3 B. & Ad. 114.
(8) 15 C. B. 778, 781.

H. L. (E.)
1889
DERBY
v.
PEEK.

*Northern Railway Company* (1); *Thorn v. Bigland* (2); *Smout v. Ilbery* (3); *Rawlins v. Wickham* (4); *Hallows v. Fernie* (5); *Mathias v. Yetts* (6); *Smith v. Chadwick* (7); *Pasley v. Freeman* (8); *Chandelor v. Lopus* (9). [LORD HALSBURY L.C. referred to *Haycraft v. Cressy* (10).]

But it is not necessary to go the full length of the propositions contended for. Even if the fourth proposition of Lopes L.J. is not law, the appellants are nevertheless liable; for the evidence shews that the statements were made either with the knowledge that they were untrue or with no belief on the subject.

It was stated that it was fully expected that a considerable saving would be effected by the use of steam. In fact the directors had not considered the matter, and when they did so afterwards there was a majority of one only in favour of steam. The effect of the evidence is not the same as to all the directors. As to Derry, the inference is that he never took the trouble to consider whether the statement was true or false. Wakefield and Wilde had complete knowledge but made statements which they knew not to be true at the time, thinking the requisite consents would be given. Pethick's evidence is inconsistent with itself. At one moment he says that he thought the Board of Trade had no right to refuse consent if its reasonable requirements were met, at another that he thought they had an absolute right to refuse. Moore, it must be admitted, stands in a different position, and can only be held liable under the fourth proposition of Lopes L.J.

The respondents are entitled to judgment on the grounds accepted by Lord Cranworth in *Western Bank of Scotland v. Addie* (11) and by the Earl of Selborne in *Smith v. Chadwick* (12): The belief which would justify the appellants must be one founded on an exercise of judgment. Grounds which would be sufficient in some cases would not be so in others, where uberrima fides is required, e.g. in statements made to an intending partner. As

(1) 25 L. J. (Q.B.) 129.
(2) 8 Ex. 725.
(3) 10 M. & W. 1, 10.
(4) 3 D. & J. 304, 312.
(5) Law Rep. 3 Ch. 467.
(6) 46 L. T. (N.S.) 497, 502.
(7) 20 Ch. D. 27, 44.
(8) 2 Sm. L. C., 9th ed. p. 74.
(9) 1 Ibid. p. 186.
(10) 2 East, 92.
(11) Law Rep. 1 H. L. (Sc.) 145, 164.
(12) 9 App. Cas. 187, 190.

to the duty of a director to persons about to take shares in a company, see *New Brunswick and Canada Railway Company* v. *Muggeridge* (1) and *Henderson* v. *Lacon* (2).

The House took time for consideration, LORD HALSBURY L.C. saying that notice would be given to the appellants if their Lordships desired to hear a reply.

July 1.  LORD HALSBURY L.C. :—

My Lords, I have so recently expressed an opinion in the Court of Appeal on the subject of actions of this character that I do not think it necessary to do more than say that I adhere to what I there said (3).    To quote the language now some centuries old in dealing with actions of this character, "fraud without damage or damage without fraud" does not give rise to such actions.    I have had also the opportunity of reading the judgment of my noble and learned friend Lord Herschell, and I could desire to add nothing to his exhaustive and lucid treatment of the authorities.

My Lords, when I turn to the question of fact I confess I am not altogether satisfied.    In the first place I think the statement in the prospectus was untrue,—untrue in fact, and to the minds of such persons as were likely to take shares I think well calculated to mislead.    I think such persons would have no idea of the technical division between tramways that had rights to use mechanical means and tramways that had not.    What I think they would understand would be that this particular tramway was in an exceptionally advantageous position,—that the statement was of a present existing fact, that it had at the time of the invited subscription for shares the right to use steam.    And I think such a statement if wilfully made with the consciousness of its inaccuracy would give rise to an action for deceit, provided that damage had been sustained if a person had acted upon a belief induced by such a prospectus.

But upon the question whether these statements were made with a consciousness of their misleading character, I cannot but

(1) 1 Dr. & S. 363, 381.          (2) Law Rep. 5 Eq. 249.
(3) See *Arnison* v. *Smith*, 41 Ch. D. 348, 367.

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Halsbury,
L.C.

be influenced by the opinions entertained by so many of your Lordships that they are consistent with the directors' innocence of any intention to deceive.

The learned judge who saw and heard the witnesses acquitted the defendants of intentional deceit, and although the Court of Appeal held them liable, overruling the decision of the learned judge below, they appear to me to have justified their decision upon grounds which I do not think tenable, namely, that they, the directors, were liable because they had no reasonable ground for the belief which nevertheless it is assumed they sincerely entertained.

My Lords, I think it would have been satisfactory to have had a more minute and exact account of how this prospectus was framed, the actual evidence of the draftsman of it, and the discussions which took place upon the alteration in form; which alteration gave such marked and peculiar prominence to the special feature of this particular tramway, in respect of the possession of power to use steam. Nevertheless, if, as I have said, the facts are reconcilable with the innocence of the directors, and with the absence of the mens rea which I consider an essential condition of an action for deceit, the mere fact of the inaccuracy of the statement ought not to be pressed into constituting a liability which appears to me not to exist according to the law of England.

As to the question whether Sir Henry Peek was induced to take his shares by reliance on the misleading statement, I admit that I have very considerable doubt. On the one hand I do not believe that any one can so far analyse his mental impressions as to be able to say what particular fact in a prospectus induced him to subscribe. On the other hand the description of Sir Henry Peek, even now that the question has been pointedly raised and brought to his mind, of what did or did not induce him to take his shares is hardly reconcilable with his having been substantially induced by the statement in question to take them.

On the whole I acquiesce in the judgment which one of your Lordships is about to move, namely, that the judgment appealed from be reversed.

LORD WATSON :—

My Lords, I agree with Stirling J. that, as matter of fact, the
appellants did honestly believe in the truth of the representation
upon which this action of deceit is based. It is by no means
clear that the learned judges of the Court of Appeal meant to
differ from that conclusion ; but they seem to have held that a
man who makes a representation with the view of its being acted
upon, in the honest belief that it is true, commits a fraud in the
eye of the law, if the court or a jury shall be of opinion that he
had not reasonable grounds for his belief. I have no hesitation
in rejecting that doctrine, for which I can find no warrant in
the law of England. But I shall not trouble your Lordships
with any observations of mine, because I accept without reserve
the opinion about to be delivered by my noble and learned
friend upon my left (Lord Herschell).

LORD BRAMWELL :—

My Lords, I am of opinion that this judgment should be
reversed. I am glad to come to this conclusion ; for, as far as
my judgment goes, it exonerates five men of good character and
conduct from a charge of fraud, which, with all submission, I
think wholly unfounded, a charge supported on such materials as
to make all character precarious. I hope this will not be mis-
understood ; that promoters of companies will not suppose that
they can safely make inaccurate statements with no responsi-
bility. I should much regret any such notion ; for the general
public is so at the mercy of company promoters, sometimes dis-
honest, sometimes over sanguine, that it requires all the protec-
tion that the law can give it. Particularly should I regret if it
was supposed that I did not entirely disapprove of the conduct
of those directors who accepted their qualification from the con-
tractor or intended contractor. It is wonderful to me that
honest men of ordinary intelligence cannot see the impropriety
of this. It is obvious that the contractor can only give this
qualification because he means to get it back in the price given
for the work he is to do. That price is to be fixed by the direc-
tors who have taken his money. They are paid by him to give

H. L. (E.)

1889

DERBY
v.
PEEK.

H. L. (E.)
1889
DERRY
v.
PEEK.
Lord Bramwell.

him a good price, as high a price as they can, while their duty to their shareholders is to give him one as low as they can.

But there is another thing. The public, seeing these names, may well say, "These are respectable and intelligent men who think well enough of this scheme to adventure their money in it; we will do the same," little knowing that those thus trusted had made themselves safe against loss if the thing turned out ill, while they might gain if it was successful. I am glad to think that Mr. Wilde, a member of my old profession, was not one of those so bribed. The only shade of doubt I have in the case is, that this safety from loss in the directors may have made them less careful in judging of the truth of any statements they have made.

There is another matter I wish to dispose of before going into the particular facts of the case. I think we need not trouble ourselves about "legal fraud," nor whether it is a good or bad expression; because I hold that actual fraud must be proved in this case to make the defendants liable, and, as I understand, there is never any occasion to use the phrase "legal fraud" except when actual fraud cannot be established. "Legal fraud" is only used when some vague ground of action is to be resorted to, or, generally speaking, when the person using it will not take the trouble to find, or cannot find, what duty has been violated or right infringed, but thinks a claim is somehow made out. With the most sincere respect for Sir J. Hannen I cannot think the expression "convenient." I do not think it is "an explanation which very clearly conveys an idea;" at least, I am certain it does not to my mind. I think it a mischievous phrase, and one which has contributed to what I must consider the erroneous decision in this case. But, with these remarks, I have done with it, and will proceed to consider whether the law is not that actual fraud must be proved, and whether that has been done.

Now, I really am reluctant to cite authorities to shew that actual fraud must be established in such a case as this. It is one of the first things one learned, and one has never heard it doubted until recently. I am very glad to think that my noble and learned friend (Lord Herschell) has taken the trouble to go into the authorities fully; but to some extent I deprecate it,

because it seems to me somewhat to come within the principle
Qui s'excuse s'accuse.   When a man makes a contract with
another he is bound by it; and, in making it, he is bound not to
bring it about by fraud.   Warrantizando vendidit gives a cause
of action if the warranty is broken.   Knowingly and fraudulently
stating a material untruth which brings about, wholly or partly,
the contract, also gives a cause of action.   To this may now be
added the equitable rule (which is not in question here), that a
material misrepresentation, though not fraudulent, may give a
right to avoid or rescind a contract where capable of such rescis-
sion.   To found an action for damages there must be a contract
and breach, or fraud.   The statement of claim in this case states
fraud.   Of course that need not be proved merely because it is
stated.   But no one ever heard of or saw a statement of claim or
declaration for deceit without it.   There is not an authority at
common law, or by a common law lawyer, to the contrary; none
has been cited, though there may be some incautious, hesitating,
expressions which point that way.   Every case from the earliest
in Comyns' Digest to the present day alleges it.   Further, the
learned judges of the Court of Appeal hardly deny it.   There is
indeed an opinion to the contrary of the late Master of the
Rolls, but it must be remembered that his knowledge of actions
of deceit was small, if any.   I did not think, then, that it was
necessary to cite cases to shew that to maintain this action
fraud in the defendant must be shewn, though I am glad it has
been done.

   Now, as to the evidence.   The plaintiff's case is that the
defendants made an untrue statement, which they knew to be
untrue, and likely to influence persons reading it; therefore they
were fraudulent.   It is not necessary to consider whether a
primâ facie case was made out by the plaintiff.   We have all
the evidence before us, and must judge on the whole.   The
alleged untrue statement is that, "The company has the right to
use steam or mechanical power instead of horses," and that a
saving would be thereby effected.   Now, this is certainly untrue,
because it is stated as an absolute right, when in truth it was
conditional on the approval of the Board of Trade, and the sanc-
tion or consent of two local boards; and a conditional right is

H. L. (E.)
1889
DERRY
*v.*
PEEK.
Lord Bramwell.

not the same as an absolute right. It is also certain that the defendants knew what the truth was, and therefore knew that what they said was untrue. But it does not follow that the statement was fraudulently made. There are various kinds of untruth. There is an absolute untruth, an untruth in itself, that no addition or qualification can make true; as, if a man says a thing he saw was black, when it was white, as he remembers and knows. So, as to *knowing* the truth. A man may know it, and yet it may not be present to his mind at the moment of speaking; or, if the fact is present to his mind, it may not occur to him to be of any use to mention it. For example, suppose a man was asked whether a writing was necessary in a contract for the making and purchase of goods, he might well say "Yes," without adding that payment on receipt of the goods, or part, would suffice. He might well think that the question he was asked was whether a contract for goods to be made required a writing like a contract for goods in existence. If he was writing on the subject he would, of course, state the exception or qualification.

Now, consider the case here. These directors naturally trust to their solicitors to prepare their prospectus. It is prepared and laid before them. They find the statement of their power to use steam without qualification. It does not occur to them to alter it. They swear they had no fraudulent intention. At the very last they cannot see the fraud. There is their oath, their previous character unimpeached, and there is to my mind this further consideration: the truth would have served their purpose as well. "We have power to use steam, etc., of course with the usual conditions of the approval of the Board of Trade and the consent of the local authorities, but we may make sure of these being granted, as the Board of Trade has already allowed the power to be inserted in the Act, and the local authorities have expressed their approbation of the scheme." (See plaintiff's answer, 313 (1), which shews that he would have been content with that statement.)

During the argument I said I am not sure that I should not have passed the prospectus. I will not say so now, because

(1) The references are to the Appendix printed for the House.

certainly I would not pass it now after knowing the unfortunate use made of the statement, and no one can tell what would have been the state of his mind if one of the factors influencing it was wanting. But I firmly believe it might have been, and was, honestly done by these defendants. Stirling J. saw and heard them, and was of that opinion. It is difficult to say that the plaintiff was not. The report of the 6th of November 1884 shewed that the consent of the Board of Trade was necessary, shewed also that the corporation of Devonport would not consent, shewed therefore the "untruth" and the defendants' knowledge of it, and yet the plaintiff "had every confidence in the directors;" and see his answers to questions 53 and 365.

<div align="right">

H. L. (E.)

1889

DERBY
v.
PEEK.

Lord Bramwell.

</div>

I now proceed to consider the judgments that have been delivered. It is not necessary to declare my great respect for those who have delivered them. Stirling J. refuses to say whether actual fraud must be shewn, and deals with the case on the footing that the question is whether the defendants had reasonable grounds for making the statement they did. He holds, as I do, that they thought the company had the right, as put in the prospectus, to use steam. Then he says he must "come to the conclusion that they had reasonable grounds for their belief; at all events, that their grounds were not so unreasonable as to justify me in charging them with being guilty of fraud." It is singular that the learned judge seems to consider that unreasonableness must be proved to such an extent as to shew fraud. He then proceeds, for what seem to me unanswerable reasons, to shew that they did every one believe that they had the right stated in the prospectus. He refers to what he saw of them in the box. He says he cannot come to the conclusion that their belief was so unreasonable and so unfounded, and their proceedings so reckless or careless that they ought to be fixed with the consequences of deceit. He makes an excellent remark, that "mercantile men dealing with matters of business would be the first to cry out if I extended the notion of deceit into what is honestly done in the belief that these things would come about, and when they did not come about, make them liable in an action of fraud." My only variation of this would be that it may be that the objection did not, and naturally did not, occur to them. It has

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord Bramwell.

not been argued, and I will say no more on the question, whether had the plaintiff known the contents of the Act he would or would not have applied for the shares, than that I agree with Stirling J.

Cotton L.J. says the law is "that where a man makes a statement to be acted on by others which is false, and which is known by him to be false, or is made by him recklessly, or without care whether it is true or false, that is without any reasonable ground for believing it to be true," he is liable to an action for deceit. Well, I agree to all before the "that is" and I agree to what comes after if it is taken as equivalent to what goes before, viz., "recklessly or without care whether it is true or false," understanding "recklessly" as explained by "without care whether it is true or false." For a man who makes a statement without care and regard for its truth or falsity commits a fraud. He is a rogue. For every man who makes a statement says "the truth is so and so, and I know it or believe it." I say I agree to this as I understand it.

It seems to me, with great respect, that the learned Lord Justice lost sight of his own definition, and glided into a different opinion. He says (p. 451, F.), "There is a duty cast upon a director who makes that statement to take care that there are no statements in it which in fact are false; to take care that he has reasonable ground for the material statements which are contained in that document (prospectus), which he intends to be acted on by others. And although in my opinion it is not necessary there should be what I should call fraud, there must be a departure from duty, . . . and he has violated the right which those who receive the statement have to have true statements only made to them." This seems to be a most formidable matter. I agree there is some such duty. I agree that not only directors in prospectuses, but all persons in all dealings should tell the truth. If they do not they furnish evidence of fraud; they subject themselves to have the contract rescinded. But to say that there is "a right to have true statements only made," I cannot agree, and I think it would be much to be regretted if there was any such right. Mercantile men, as Stirling J. says, would indeed cry out. No qualification is stated.

If this is law the statement may be reasonably believed to be true by him who makes it, but if untrue there is to be a cause of action ; and that although he may have refused a warranty. I hope not. There is a duty to tell the truth, or, rather, what is believed to be the truth. At page 452, B., his Lordship says : " Where a man makes a false statement without reasonable ground to suppose it to be true, and without taking care to ascertain if it is true, he is liable civilly as much as a person who commits what is usually called fraud." I say I agree if that means making a statement of which he knows or believes not the truth. His Lordship proceeds to examine whether the defendants had reasonable ground for believing what they said, and comes to the conclusion that they had not, and so holds them liable, not because they were dishonest, but because they were unreasonable. I say they never undertook to be otherwise. He says (461 G.) : " It is not that I attribute to them any intention to commit fraud, but they have made a statement without any sufficient reason for believing it to be true."

Sir James Hannen says that he agrees with Cotton L.J.'s state- ment of the law, and adds : " If a man takes upon himself to assert a thing to be true, which he does not know to be true, and has no reasonable ground to believe to be true," it is sufficient in an action of deceit. I agree, if he knows he has no such reasonable ground and the knowledge is present to his mind ; otherwise, with great respect, I differ. He cites Lord Cairns (465 F.), that, " if persons take upon themselves to make assertions as to which they are ignorant whether they are true or untrue, they must in a civil point of view be held as responsible as if they had asserted that which they knew to be untrue." So say I, but this does not support Sir James's proposition. Nor does he deal with what he quotes from Lord Cranworth. But further (466), he speaks of legal fraud as meaning " that degree of moral culpability in the statement of an untruth to induce another to alter his position, to which the law attaches responsibility." But if there is moral culpability, I agree there is responsibility. But to believe with- out reasonable grounds is not moral culpability, but, (if there is such a thing) mental culpability. He says, " the word 'fraud' is in common parlance reserved for actions of great turpitude, but

H. L. (E.)

1889

DERRY
v.
PEEK.

Lord Bramwell.

H. L. (Œ.)
1889.
DERBY
v.
PEEK.

Lord Bramwell.

the law applies it to lesser breaches of moral duty." I agree the law applies it to all breaches of the moral duty to tell the truth in dealing with others; but that duty cannot be honestly broken. To be actionable, a breach of that duty must be dishonest. Nay, it is a man's duty sometimes to tell an untruth. For instance, when asked as to a servant's character, he must say what he believes is the truth, however he may have formed his opinion, and however wrong it may be. His Lordship says he cannot think the directors had any reasonable ground for believing the prospectus to be true. But had they the matter present to their minds? Even if this were the question I should decide in their favour.

As to the judgment of Lopes L.J., I quite agree with what he says: " I know of no fraud which will support an action of deceit to which some moral delinquency does not belong." I think that shews the meaning of what he says " fourthly," though that is made doubtful by what he says at 472 D.

I think, with all respect, that in all the judgments there is, I must say it, a confusion of unreasonableness of belief as evidence of dishonesty, and unreasonableness of belief as of itself a ground of action.

I have examined these judgments at this length owing to my sense of their importance and the importance of the question they deal with. I think it is most undesirable that actions should be maintainable in respect of statements, made unreasonably perhaps, but honestly. I think it would be disastrous if there was "a right to have true statements only made." This case is an example. I think that in this kind of case, as in some others, Courts of Equity have made the mistake of disregarding a valuable general principle in their desire to effect what is, or is thought to be, justice in a particular instance. It might, perhaps, be well to enact that in prospectuses of public companies there should be a warranty of the truth of all statements except where it was expressly said there was no warranty. The objection is to exceptional legislation, and to the danger of driving respectable and responsible men from being promoters, and of substituting for them those who are neither.

In this particular case I hold that unless fraud in the defendants could be shewn, the action is not maintainable. I am

satisfied there was no fraud.     Further, if an unreasonable mis-
statement were enough, I hold there was none.     Still further, I
do not believe that the plaintiff was influenced by the mis-
statement, though I am entirely satisfied that he was an honest
witness.

H. L. (E.)

1889

DERBY
v.
PEEK.

LORD FITZGERALD :—

My Lords, the pleadings and the facts have been already
referred to by the noble Lords who have addressed the House.
The action is for deceit.     The writ was sued out in February
1885, and originally claimed rescission of the contract with the
company.     It was subsequently amended by striking out the
company as defendants, and also the prayer for rescission, and it
assumed the character of an action for deceit against the present
appellants (five of the directors), and claimed "damages for the
fraudulent misrepresentations of the defendants."

The statement of claim, which is sufficient in form to raise the
real question, alleged the misrepresentation to exist in the pro-
spectus issued in February 1883, and to consist of the paragraph
so often read, that the company had a right to use steam or other
mechanical motive power; and it was further alleged "that the
defendants intended thereby to represent that the company had
an absolute right to use steam and other mechanical power," and
that such representation was made fraudulently, and with the
view to induce the plaintiff to take shares in the company.

So far, my Lords, the real issue seems to have been raised
fairly and clearly, and to depend on matters of fact.     There were
circumstances connected with the promotion of the company,
and the procuring of four of the defendants to act as directors,
which tended to create suspicion as to their statements and their
bona fides, and attracted directly the attention of the learned
judge before whom the case was tried.     The defendants, who
were severally produced as witnesses at the trial, were exposed
to a very lengthened and searching cross-examination by counsel
for the plaintiff, and were also carefully examined by the judge
as to these transactions, with the result apparently of freeing
them from any imputation therein of moral misconduct.

The question which I am about to examine in the first in-

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord FitzGerald.

stance, and excluding for the present the element of fraud, is, whether the impugned statement in the prospectus was a false statement in the sense of being untrue. That it was inaccurate so far as it purported to give the legal effect of the special Act I do not doubt, but was it untrue as representing the position of the company in a popular and business sense? The General Tramways Act (33 & 34 Vict. c. 78), which regulates tramways generally, but subject to the provisions of the special Act, if any, of each company, places them under the supervision of the Board of Trade with a view to public safety, and for public protection generally, and by its 34th section it provides "that all carriages used on tramways shall be moved by the power prescribed by the special Act."

The special Act of this company became law on the 24th of July 1882, and by ss. 4 and 5 the company incorporated by the Act is empowered to make the seven tramways in question in all respects in accordance with the plans and sections. Sect. 15 provides minutely for their formation, subject to the orders of the Board of Trade, and by sect. 16 the tramway is not to be opened for public traffic until it shall have been inspected and certified by the Board of Trade to be fit for such traffic.

Before referring to the 35th section of the special Act we may glance at sect. 37 of that Act, which empowers the Board of Trade to make bye-laws as to any of the tramways on which steam may be used under the authority of the Act, and sect. 44, which provides that where the company intends to use steam they shall give two months' notice.

There are several other sections providing for the use of steam power if the company should elect to use it as the motor.

In the light of those sections of the special Act, and of sect. 34 of the general Act, let us now look at the particular paragraph of the prospectus, and sect. 35 of the special Act. By that section Parliament has done that which Parliament could do, and which the Board of Trade could not do. It has conferred on the company authority to use steam as its motive power. It has not imposed on the company the use of steam power, but it says that they may use it if they elect to do so. Before dealing with the consent of the Board of Trade I desire to call attention

to the proviso in the 35th section, "that the exercise of the powers hereby conferred with respect to the use of steam shall be subject to the regulations in Schedule 'A,' and to any regulations which may be added thereto or substituted therefor by the Board of Trade for securing to the public all reasonable protection against danger in the exercise of the powers by this Act conferred with respect to the use of steam."

Schedule A., referred to in sect. 35, contains no less than ten regulations for the direction of the company in the exercise of the right so conferred to use steam power.

Now, turning back to the words "with the consent of the Board of Trade," in sect. 35 of the special Act, that consent could not confer, nor would its absence take away, the right conferred by the legislature to use steam as a motor. Its true character is that of a precaution imposed by the legislature to defer the actual exercise of the right conferred until the supervision of the Board of Trade secures to the public all reasonable protections against danger. To attain these objects the legislature provides that the powers it has conferred should not be actually exercised without the consent of the Board of Trade.

My Lords, I have, though with difficulty, arrived at the conclusion that the statement in the prospectus, that by the special Act the company had the right to use steam power, was not untrue in a popular or business sense.

Let us see for a moment in what way and with what meaning General Hutchinson used similar expressions. In his report of the 12th of July 1884 he says: "The Act of 1882 gives, however, the company authority to use mechanical power over all their system, and I think it would be most objectionable that this power should be exercised on parts of Tramway No. 1 on account of the narrowness of three of the roads."

The remainder of the incriminated paragraph of the prospectus is, "and it is fully expected that by means of this (i.e., the use of steam) a considerable saving will result in the working expenses of the line as compared with other tramways worked by horses." This was not untrue: there had been a division of opinion in the directory on the subject, which was finally and before the issue of the prospectus resolved in favour of steam.

H. L. (E.)

1889

DERBY
v.
PEEK.

Lord FitzGerald.

3        2 B 2

Case 1:06-cv-00336-RWR     Document 8-5     Filed 03/10/2006     Page 116 of 217

H. L. E.)
1889
DERBY
*v.*
PEEK.
Lord FitzGerald.

The conclusion I have arrived at, my Lords, is that this paragraph of the prospectus, though inaccurate in point of law in one particular, seems on the whole to have been morally true.

If this view is correct it is an answer to the action, but assuming that it is not correct, or that your Lordships are not prepared to adopt it, I proceed to express my opinion on the remaining substance of the action. Cotton L.J. describes the action as "an action of deceit, a mere common law action." The description is accurate, and I proceed to deal with it as a mere common law action. It has not been in the least altered in its characteristics by having been instituted in the Chancery Division, or tried by a judge without the aid of a jury, nor are your Lordships necessarily driven to consider on the present appeal some of the subtle and refined distinctions which have been engrafted on the clear and simple principles of the common law. The action for deceit at common law is founded on fraud. It is essential to the action that moral fraud should be established, and since the case of *Collins* v. *Evans* (1), in the Exchequer Chamber, it has never been doubted that fraud must concur with the false statement to maintain the action. It would not be sufficient to shew that a false representation had been made. It must further be established that the defendant knew at the time of making it that the representation was untrue, or, to adopt the language of the learned editors of the Leading Cases, that "the defendant must be shewn to have been actually and fraudulently cognisant of the falsehood of his representation or to have made it fraudulently without belief that it was true." The leading counsel for the respondent met the argument fairly on the allegations of fact. He alleged "that the defendants were not honest; that they stated in the prospectus a definite lie, and knew that it was a lie." That is the very issue, in fact, in the case.

The whole law and all the cases on the subject will be found in the notes to *Chandelor* v. *Lopus* (2) and *Pasley* v. *Freeman* (3). There is also a clear and able summary of the decisions, both in law and in equity, brought down to the present time in the recent edition of Benjamin on Sales, by Pearson-Gee and Boyd.

(1) 5 Q. B. 804, 820.          (2) 1 Smith's L. C. 9th Ed. p. 186.
          (3) 2 Smith's L. C. 9th Ed. p. 74.

I desire to make an observation on *Chandelor* v. *Lopus* (1). The report in Cro. Jac. 4 would seem to have but little direct bearing on the present case were it not for the opinion attributed to Anderson J.; but there is a valuable note in 1 Dyer by Vaillant (75a) which is as follows: Lopus brought an action upon the case against Chandelor, and shewed that, whereas the defendant was a goldsmith, and skilled in the nature of precious stones, and being possessed of a stone which the defendant asserted and assured the said plaintiff to be a true and perfect stone called a bezoar stone &c., upon which the plaintiff bought it &c. There the opinion of Popham C.J. was "that if I have any commodities which are damaged (whether victuals or otherwise), and I, *knowing them to be so*, sell them for good, and affirm them to be so, an action upon the case lies for the deceit: but although they be damaged, if I, *knowing not that*, affirm them to be good, still no action lies, without I warrant them to be good." The action seems originally to have been on a warranty which failed in fact, as there had been no warranty, and it was then sought to support it as an action for deceit; but it was not alleged in the count that the defendant knew the representation to be untrue. It was in reference to that that the observation of Popham C.J. was made. He had the reputation of being a consummate lawyer.

The note in 1 Dyer (75a) was probably by Mr. Treby, afterwards Chief Justice Treby. He edited an edition of Dyer published in 1688. I have not had an opportunity of referring to it, but it is said that he gave the public some highly authoritative notes in that edition. I have quoted from Mr. Vaillant's edition, published in 1794.

The whole evidence given on this appeal has been laid before your Lordships, and we have to deal with it as a whole. That evidence has been already so fully stated and criticised that it is not necessary for me to do more than to state the conclusions of fact which in my opinion are reasonably to be deduced from it, viz. that the several defendants did not know that the incriminated statement in the prospectus was untrue, and that, on the contrary, they severally and in good faith believed it to be

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord FitzGerald.

(1) 1 Smith's L. C. 9th Ed. p. 186.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord FitzGerald.

true. The conclusions, in fact, at which I have arrived, render it unnecessary for me to consider the long and rather bewildering list of authorities to which your Lordships were referred, or to criticise the reasons given in the Court of Appeal for their decision in the present case. I desire, however, to make a single observation.

There is one characteristic which, as it seems to me, pervades each of the several judgments in the Court of Appeal, viz. that the bonâ fide belief of the defendants in the truth of the representation was unavailing unless it was a reasonable belief resting on reasonable grounds. If this is correct, it seems to me that in an action for "deceit" it would be necessary to submit to the jury (if tried before that tribunal) not only the existence of that belief bonâ fide, but also the grounds on which it was arrived at, and their reasonableness.

I am by no means satisfied that such is the law, and if now driven to express an opinion on it, I would prefer following the opinion of Lord Cranworth in *Western Bank of Scotland* v. *Addie* (1), in which he said: "I confess that my opinion was that in what his Lordship (the Lord President) thus stated, he went beyond what principle warrants. If persons in the situation of directors of a bank make statements as to the condition of its affairs, which they bonâ fide believe to be true, I cannot think they can be guilty of fraud, because other persons think, or the Court thinks, or your Lordships think, that there was no sufficient ground to warrant the opinion which they had formed. If a little more care and caution must have led the directors to a conclusion different from that which they put forth, this may afford strong evidence to shew that they did not really believe in the truth of what they stated, and so that they were guilty of fraud. But this would be the consequence, not of their having stated as true what they had not reasonable ground to believe to be true, but of their having stated as true what they did not believe to be true."

A director is bound in all particulars to be careful and circumspect, and not, either in his statements to the public or in the performance of the duties he has undertaken, to be careless

(1) Law Rep. 1 H. L., Sc. 145, 168.

or negligent, or rash.  Want of care or circumspection, as well
as recklessness, may in such a case as the present be taken into
consideration in determining at every stage the question of
bona fides.

H. L. (E.)

1889

DERRY
v.
PEEK.

My Lords, I am of opinion that the decision of the Court of
Appeal should be reversed.

LORD HERSCHELL :—

My Lords, in the statement of claim in this action the respon-
dent, who is the plaintiff, alleges that the appellants made in
a prospectus issued by them certain statements which were
untrue, that they well knew that the facts were not as stated in
the prospectus, and made the representations fraudulently, and
with the view to induce the plaintiff to take shares in the
company.

"This action is one which is commonly called an action of
deceit, a mere common law action."  This is the description of
it given by Cotton L.J. in delivering judgment.  I think it
important that it should be borne in mind that such an action
differs essentially from one brought to obtain rescission of a
contract on the ground of misrepresentation of a material fact.
The principles which govern the two actions differ widely.
Where rescission is claimed it is only necessary to prove that
there was misrepresentation ; then, however honestly it may have
been made, however free from blame the person who made it,
the contract, having been obtained by misrepresentation, cannot
stand.  In an action of deceit, on the contrary, it is not enough
to establish misrepresentation alone ; it is conceded on all hands
that something more must be proved to cast liability upon the
defendant, though it has been a matter of controversy what
additional elements are requisite.  I lay stress upon this because
observations made by learned judges in actions for rescission
have been cited and much relied upon at the bar by counsel for
the respondent.  Care must obviously be observed in applying
the language used in relation to such actions to an action of
deceit.  Even if the scope of the language used extend beyond
the particular action which was being dealt with, it must be
remembered that the learned judges were not engaged in deter-

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Herschell.

mining what is necessary to support an action of deceit, or in discriminating with nicety the elements which enter into it.

There is another class of actions which I must refer to also for the purpose of putting it aside. I mean those cases where a person within whose special province it lay to know a particular fact, has given an erroneous answer to an inquiry made with regard to it by a person desirous of ascertaining the fact for the purpose of determining his course accordingly, and has been held bound to make good the assurance he has given. *Burrowes* v. *Lock* (1) may be cited as an example, where a trustee had been asked by an intended lender, upon the security of a trust fund, whether notice of any prior incumbrance upon the fund had been given to him. In cases like this it has been said that the circumstance that the answer was honestly made in the belief that it was true affords no defence to the action. Lord Selborne pointed out in *Brownlie* v. *Campbell* (2) that these cases were in an altogether different category from actions to recover damages for false representation, such as we are now dealing with.

One other observation I have to make before proceeding to consider the law which has been laid down by the learned judges in the Court of Appeal in the case before your Lordships. "An action of deceit is a common law action, and must be decided on the same principles, whether it be brought in the Chancery Division or any of the Common Law Divisions, there being, in my opinion, no such thing as an equitable action for deceit." This was the language of Cotton L.J. in *Arkwright* v. *Newbould* (3). It was adopted by Lord Blackburn in *Smith* v. *Chadwick* (4), and is not, I think, open to dispute.

In the Court below Cotton L.J. said : "What in my opinion is a correct statement of the law is this, that where a man makes a statement to be acted upon by others which is false, and which is known by him to be false, or is made by him recklessly, or without care whether it is true or false, that is, without any reasonable ground for believing it to be true, he is liable in an action of deceit at the suit of anyone to whom it was addressed or anyone of the class to whom it was addressed and who was

(1) 10 Ves. 470.            (3) 17 Ch. D. 320.
(2) 5 App. Cas. at p. 935.  (4) 9 App. Cas. 193.

materially induced by the misstatement to do an act to his pre-
judice." About much that is here stated there cannot, I think,
be two opinions. But when the learned Lord Justice speaks of
a statement made recklessly or without care whether it is true or
false, *that is* without any reasonable ground for believing it to be
true, I find myself, with all respect, unable to agree that these are
convertible expressions. To make a statement careless whether
it be true or false, and therefore without any real belief in its
truth, appears to me to be an essentially different thing from
making, through want of care, a false statement, which is never-
theless honestly believed to be true. And it is surely conceiv-
able that a man may believe that what he states is the fact,
though he has been so wanting in care that the Court may
think that there were no sufficient grounds to warrant his belief.
I shall have to consider hereafter whether the want of reasonable
ground for believing the statement made is sufficient to support
an action of deceit. I am only concerned for the moment to
point out that it does not follow that it is so, because there is
authority for saying that a statement made recklessly, without
caring whether it be true or false, affords sufficient foundation
for such an action.

That the learned Lord Justice thought that if a false statement
were made without reasonable ground for believing it to be true
an action of deceit would lie, is clear from a subsequent passage
in his judgment. He says that when statements are made in a
prospectus like the present, to be circulated amongst persons in
order to induce them to take shares, "there is a duty cast upon
the director or other person who makes those statements to take
care that there are no expressions in them which in fact are false;
to take care that he has reasonable ground for the material state-
ments which are contained in that document which he prepares
and circulates for the very purpose of its being acted upon by
others."

The learned judge proceeds to say : "Although in my opinion
it is not necessary that there should be what I should call fraud,
yet in these actions, according to my view of the law, there must
be a departure from duty, that is to say, an untrue statement
made without any reasonable ground for believing that statement

H. L. (E.)
1889
DERBY
*v.*
PEEK.
Lord Herschell.

H. L. (E.)
1889
DERBY
v.
PEEK.

Lord Herschell.

to be true ; and in my opinion when a man makes an untrue state-
ment with an intention that it shall be acted upon without any
reasonable ground for believing that statement to be true he
makes a default in a duty which was thrown upon him from the
position he has taken upon himself, and he violates the right
which those to whom he makes the statement have to have true
statements only made to them."

Now I have first to remark on these observations that the
alleged "right" must surely be here stated too widely, if it is
intended to refer to a legal right, the violation of which may
give rise to an action for damages. For if there be a right to
have true statements only made, this will render liable to an
action those who make untrue statements, however innocently.
This cannot have been meant. I think it must have been
intended to make the statement of the right correspond with
that of the alleged duty, the departure from which is said to be
making an untrue statement without any reasonable ground for
believing it to be true. I have further to observe that the Lord
Justice distinctly says that if there be such a departure from
duty an action of deceit can be maintained, though there be not
what he should call fraud. I shall have by-and-by to consider
the discussions which have arisen as to the difference between
the popular understanding of the word "fraud" and the inter-
pretation given to it by lawyers, which have led to the use of
such expressions as "legal fraud," or "fraud in law;" but I may
state at once that, in my opinion, without proof of fraud no action
of deceit is maintainable. When I examine the cases which have
been decided upon this branch of the law, I shall endeavour
to shew that there is abundant authority to warrant this pro-
position.

I return now to the judgments delivered in the Court of
Appeal. Sir James Hannen says : "I take the law to be that if
a man takes upon himself to assert a thing to be true which he
does not know to be true, and has no reasonable ground to believe
to be true, in order to induce another to act upon the asser-
tion, who does so act and is thereby damnified, the person so
damnified is entitled to maintain an action for deceit." Again,
Lopes L.J. states what, in his opinion, is the result of the

cases. I will not trouble your Lordships with quoting the first three propositions which he lays down, although I do not feel sure that the third is distinct from, and not rather an instance of, the case dealt with by the second proposition. But he says that a person making a false statement, intended to be and in fact relied on by the person to whom it is made, may be sued by the person damaged thereby: "Fourthly, if it is untrue in fact, but believed to be true, but without any reasonable grounds for such belief."

It will thus be seen that all the learned judges concurred in thinking that it was sufficient to prove that the representations made were not in accordance with fact, and that the person making them had no reasonable ground for believing them. They did not treat the absence of such reasonable ground as evidence merely that the statements were made recklessly, careless whether they were true or false, and without belief that they were true, but they adopted as the test of liability, not the existence of belief in the truth of the assertions made, but whether the belief in them was founded upon any reasonable grounds. It will be seen, further, that the Court did not purport to be establishing any new doctrine. They deemed that they were only following the cases already decided, and that the proposition which they concurred in laying down was established by prior authorities. Indeed, Lopes L.J. expressly states the law in this respect to be well settled. This renders a close and critical examination of the earlier authorities necessary.

I need go no further back than the leading case of *Pasley* v. *Freeman* (1). If it was not there for the first time held that an action of deceit would lie in respect of fraudulent representations against a person not a party to a contract induced by them, the law was at all events not so well settled but that a distinguished Judge, Grose J., differing from his brethren on the Bench, held that such an action was not maintainable. Buller J., who held that the action lay, adopted in relation to it the language of Croke J., in 3 Bulstrode 95, who said: "Fraud without damage, or damage without fraud, gives no cause of action, but where these two concur an action lies." In reviewing the case

(1) 2 Smith's L. C. 74.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord Herschell.

of *Crosse* v. *Gardner* (1) he says: "Knowledge of the falsehood of the thing asserted is fraud and deceit;" and further, after pointing out that in *Risney* v. *Selby* (2) the judgment proceeded wholly on the ground that the defendant knew what he asserted to be false, he adds: " The assertion alone will not maintain the action, but the plaintiff must go on to prove that it was false, *and that the defendant knew it to be so*," the latter words being specially emphasised. Kenyon C.J. said: " The plaintiffs applied to the defendant, telling him that they were going to deal with Falch, and desired to be informed of his credit, when the defendant fraudulently, and knowing it to be otherwise, and with a design to deceive the plaintiffs, made the false affirmation stated on the record, by which they sustained damage. Can a doubt be entertained for a' moment but that this is injurious to the plaintiffs?" In this case it was evidently considered that fraud was the basis of the action, and that such fraud might consist in making a statement known to be false.

*Haycraft* v. *Creasy* (3) was again an action in respect of a false affirmation made by the defendant to the plaintiff about the credit of a third party whom the plaintiff was about to trust. The words complained of were, " I can assure you of my own knowledge that you may credit Miss R. to any amount with perfect safety." All the judges were agreed that fraud was of the essence of the action, but they differed in their view of the conclusion to be drawn from the facts. Lord Kenyon thought that fraud had been proved, because the defendant stated that to be true within his own knowledge which he did not know to be true. The other judges thinking that the defendant's words vouching his own knowledge were no more than a strong expression of opinion, inasmuch as a statement concerning the credit of another can be no more than a matter of opinion, and that he did believe the lady's credit to be what he represented, held that the action would not lie. It is beside the present purpose to inquire which view of the facts was the more sound. Upon the law there was no difference of opinion. It is a distinct decision that knowledge of the falsity of the affirmation made is essential to the

(1) Carth. 90.                    (2) 1 Salk. 211.
                    (3) 2 East, 92.

maintenance of the action, and that belief in its truth affords a defence.

I may pass now to *Foster* v. *Charles* (1). It was there contended that the defendant was not liable, even though the representation he had made was false to his knowledge, because he had no intention of defrauding or injuring the plaintiff. This contention was not upheld by the Court, Tindal C.J. saying: " It is fraud in law if a party makes representations which he knows to be false, and injury ensues, although the motives from which the representations proceeded may not have been bad." This is the first of the cases in which I have met with the expression " fraud in law." It was manifestly used in relation to the argument that the defendant was not actuated by a desire to defraud or injure the person to whom the representation was made. The popular use of the word " fraud " perhaps involves generally the conception of such a motive as one of its elements. But I do not think the Chief Justice intended to indicate any doubt that the act which he characterised as a fraud in law was in truth fraudulent as a matter of fact also. Wilfully to tell a falsehood, intending that another shall be led to act upon it as if it were the truth, may well be termed fraudulent, whatever the motive which induces it, though it be neither gain to the person making the assertion nor injury to the person to whom it is made.

*Foster* v. *Charles* (1) was followed in *Corbett* v. *Brown* (2), and shortly afterwards in *Polhill* v. *Walter* (3). The learned counsel for the respondent placed great reliance on this case, because although the jury had negatived the existence of fraud in fact the defendant was nevertheless held liable. It is plain, however, that all that was meant by this finding of the jury was, that the defendant was not actuated by any corrupt or improper motive, for Lord Tenterden says, " It was contended that . . . in order to maintain this species of action it is not necessary to prove that the false representation was made from a corrupt motive of gain to the defendant or a wicked motive of injury to the plaintiff; it was said to be enough if a representation is made which the party

H. L. (E.)
1889
DERBY
*v.*
PEEK.
Lord Herschell.

(1) 7 Bing. 105.                    (2) 8 Bing. 33.
            (3) 3 B. & Ad. 114.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord Herschell.

making it knows to be untrue, and which is intended by him, or which from the mode in which it is made is calculated, to induce another to act on the faith of it in such a way as that he may incur damage, and that damage is actually incurred. A wilful falsehood of such a nature was contended to be in the legal sense of the word *a fraud*, and for this position was cited *Foster* v. *Charles* (1), to which may be added the recent case of *Corbett* v. *Brown* (2). The principle of these cases appears to us to be well founded, and to apply to the present."

In a later case of *Crawshay* v. *Thompson* (3) Maule J. explains *Polhill* v. *Walter* (4) thus : "If a wrong be done by a false representation of a party who knows such representation to be false, the law will infer an intention to injure. That is the effect of *Polhill* v. *Walter*" (4). In the same case, Cresswell J. defines "fraud in law," in terms which have been often quoted. "The cases," he says, "may be considered to establish the principle that fraud in law consists in knowingly asserting that which is false in fact to the injury of another."

In *Moens* v. *Heyworth* (5), which was decided in the same year as *Crawshay* v. *Thompson* (3), Lord Abinger having suggested that an action of fraud might be maintained where no moral blame was to be imputed, Parke B. said : "To support that count (viz., a count for fraudulent representation) it was essential to prove that the defendants *knowingly*" (and I observe that this word is emphasised), "by words or acts, made such a representation as is stated in the third count, relative to the invoice of these goods, as they knew to be untrue."

The next case in the series, *Taylor* v. *Ashton* (6), is one which strikes me as being of great importance. It was an action brought against directors of a bank for fraudulent representations as to its affairs, whereby the plaintiff was induced to take shares. The jury found the defendants not guilty of fraud, but expressed the opinion that they had been guilty of gross negligence. Exception was taken to the mode in which the case was left to the jury, and it was contended that their verdict was sufficient

(1) 7 Bing. 105.                (4) 3 B. & Ad. 114.
(2) 8 Bing. 33.                 (5) 10 M. & W. at p. 157.
(3) 4 M. & Gr. 357.             (6) 11 M. & W. 401.

H. L. (E.)

1889

DERBY
v.
PEEK.

Lord Herschell.

to render the defendants liable ; Parke B., however, in delivering the opinion of the Court said : " It is insisted that even that (viz., the gross negligence which the jury had found), accompanied with a damage to the plaintiff in consequence of that gross negligence, would be sufficient to give him a right of action. From this proposition we entirely dissent, because we are of opinion that, independently of any contract between the parties, no one can be made responsible for a representation of this kind unless it be *fraudulently made.* . . . But then it was said that in order to constitute that fraud, it was not necessary to shew that the defendants *knew* the fact they stated to be untrue, that it was enough that the fact *was* untrue if they communicated that fact for a deceitful purpose, and to that proposition the Court is prepared to assent. It is not necessary to shew that the defendants knew the facts to be untrue ; if they stated a fact which was untrue for a fraudulent purpose, they at the same time *not believing* that fact to be true, in that case it would be both a legal and moral fraud."

Now it is impossible to conceive a more emphatic declaration than this, that to support an action of deceit fraud must be proved, and that nothing less than fraud will do. I can find no trace of the idea that it would suffice if it were shewn that the defendants had not reasonable grounds for believing the statements they made. It is difficult to understand how the defendants could, in the case on which I am commenting, have been guilty of gross negligence in making the statements they did, if they had reasonable grounds for believing them to be true, or if they had taken care that they had reasonable grounds for making them.

All the cases I have hitherto referred to were in courts of first instance. But in *Collins* v. *Evans* (1) they were reviewed by the Exchequer Chamber. The judgment of the Court was delivered by Tindal C.J. After stating the question at issue to be " whether a statement or representation which is false in fact, but not known to be so by the party making it, but, on the contrary, made honestly and in the full belief that it is true, affords a ground of action," he proceeds to say : " The current of

(1) 5 Q. B. 804, 820.

H. L. (E.)
1889
DERRY
*v.*
PEEK.

Lord Herschell.

the authorities, from *Pasley* v. *Freeman* (1) downwards, has laid down the general rule of law to be, that fraud must concur with the false statement in order to give a ground of action." Is it not clear that the Court considered that fraud was absent if the statement was "made honestly, and in the full belief that it was true"?

In *Evans* v. *Edmonds* (2) Maule J. expressed an important opinion, often quoted, which has been thought to carry the law further than the previous authorities, though I do not think it really does so. He said: "If a man having no knowledge whatever on the subject takes upon himself to represent a certain state of facts to exist he does so at his peril, and if it be done either with a view to secure some benefit to himself or to deceive a third person he is in law guilty of a fraud, for he takes upon himself to warrant his own belief of the truth of that which he so asserts. Although the person making the representation may have no knowledge of its falsehood the representation may still have been fraudulently made." The foundation of this proposition manifestly is, that a person making any statement which he intends another to act upon must be taken to warrant his belief in its truth. Any person making such a statement must always be aware that the person to whom it is made will understand, if not that he who makes it *knows*, yet at least that he *believes* it to be true. And if he has no such belief he is as much guilty of fraud as if he had made any other representation which he knew to be false, or did not believe to be true.

I now arrive at the earliest case in which I find the suggestion that an untrue statement made without reasonable ground for believing it will support an action for deceit. In *Western Bank of Scotland* v. *Addie* (3) the Lord President told the jury "that if a case should occur of directors taking upon themselves to put forth in their report statements of importance in regard to the affairs of the bank false in themselves and which they did not believe, or had no reasonable ground to believe to be true, that would be a misrepresentation and deceit." Exception having been taken to this direction without avail in the Court of Session, Lord Chelmsford in this House said: "I agree in the propriety of this

(1) 2 Smith's L. C. 74.               (2) 13 C. B. 777.
          (3) Law Rep. 1 H. L., Sc. 145, 162.

interlocutor.  In the argument upon this exception the case was put of an honest belief being entertained by the directors, of the reasonableness of which it was said the jury, upon this direction, would have to judge.  But supposing a person makes an untrue statement which he asserts to be the result of a bonâ fide belief in its truth, how can the bona fides be tested except by considering the grounds of such belief?  And if an untrue statement is made founded upon a belief which is destitute of all reasonable grounds, or which the least inquiry would immediately correct, I do not see that it is not fairly and correctly characterised as misrepresentation and deceit."

I think there is here some confusion between that which is evidence of fraud, and that which constitutes it.  A consideration of the grounds of belief is no doubt an important aid in ascertaining whether the belief was really entertained.  A man's mere assertion that he believed the statement he made to be true is not accepted as conclusive proof that he did so.  There may be such an absence of reasonable ground for his belief as, in spite of his assertion, to carry conviction to the mind that he had not really the belief which he alleges.  If the learned Lord intended to go further, as apparently he did, and to say that though the belief was really entertained, yet if there were no reasonable grounds for it, the person making the statement was guilty of fraud in the same way as if he had known what he stated to be false, I say, with all respect, that the previous authorities afford no warrant for the view that an action of deceit would lie under such circumstances.  A man who forms his belief carelessly, or is unreasonably credulous, may be blameworthy when he makes a representation on which another is to act, but he is not, in my opinion, fraudulent in the sense in which that word was used in all the cases from *Pasley* v. *Freeman* (1) down to that with which I am now dealing.  Even when the expression "fraud in law" has been employed, there has always been present, and regarded as an essential element, that the deception was wilful either because the untrue statement was known to be untrue, or because belief in it was asserted without such belief existing.

(1) 2 Smith's L. C. 74.

H. L. (E.)

1889

DERRY
v.
PEEK.

Lord Herschell.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

I have made these remarks with the more confidence because they appear to me to have the high sanction of Lord Cranworth. In delivering his opinion in the same case he said: "I confess that my opinion was that in what his Lordship (the Lord President) thus stated, he went beyond what principle warrants. If persons in the situation of directors of a bank make statements as to the condition of its affairs which they bonâ fide believe to be true, I cannot think they can be guilty of fraud because other persons think, or the Court thinks, or your Lordships think, that there was no sufficient ground to warrant the opinion which they had formed. If a little more care and caution must have led the directors to a conclusion different from that which they put forth, this may afford strong evidence to shew that they did not really believe in the truth of what they stated, and so that they were guilty of fraud. But this would be the consequence not of their having stated as true what they had not reasonable ground to believe to be true, but of their having stated as true what they did not believe to be true."

Sir James Hannen, in his judgment below, seeks to limit the application of what Lord Cranworth says to cases where the statement made is a matter of opinion only. With all deference I do not think it was intended to be or can be so limited. The direction which he was considering, and which he thought went beyond what true principle warranted, had relation to making false statements of importance in regard to the affairs of the bank. When this is borne in mind, and the words which follow those quoted by Sir James Hannen are looked at, it becomes to my mind obvious that Lord Cranworth did not use the words " the opinion which they had formed" as meaning anything different from "the belief which they entertained."

The opinions expressed by Lord Cairns in two well-known cases have been cited as though they supported the view that an action of deceit might be maintained without any fraud on the part of the person sued. I do not think they bear any such construction. In the case of *Reese Silver Mining Co.* v. *Smith* (1) he said: "If persons take upon themselves to make assertions as to which they are ignorant whether they are true or untrue

(1) Law Rep. 4 H. L. 64, 79.

they must, in a civil point of view, be held as responsible as if
they had asserted that which they knew to be untrue." This
must mean that the persons referred to were conscious when
making the assertion that they were ignorant whether it was
true or untrue.   For if not it might be said of any one who
innocently makes a false statement.   He must be ignorant that
it is untrue, for otherwise he would not make it innocently; he
must be ignorant that it is true, for by the hypothesis it is false.
Construing the language of Lord Cairns in the sense I have
indicated, it is no more than an adoption of the opinion expressed
by Maule J. in *Evans* v. *Edmonds* (1).   It is a case of the
representation of a person's belief in a fact when he is conscious
that he knows not whether it be true or false, and when he has
therefore no such belief.   When Lord Cairns speaks of it as not
being fraud in the more invidious sense, he refers, I think, only
to the fact that there was no intention to cheat or injure.

In *Peek* v. *Gurney* (2) the same learned Lord, after alluding to
the circumstance that the defendants had been acquitted of fraud
upon a criminal charge, and that there was a great deal to shew
that they were labouring under the impression that the concern
had in it the elements of a profitable commercial undertaking,
proceeds to say : " They may be absolved from any charge of a
wilful design or motive to mislead or defraud the public.   But
in a civil proceeding of this kind all that your Lordships have
to examine is the question, was there, or was there not, misrepre-
sentation in point of fact ?   If there was, however innocent the
motive may have been, your Lordships will be obliged to arrive
at the consequences which properly would result from what was
done."   In the case then under consideration it was clear that
if there had been a false statement of fact it had been knowingly
made.   Lord Cairns certainly could not have meant that in an
action of deceit the only question to be considered was whether
or not there was misrepresentation in point of fact.   All that he
there pointed out was that in such a case motive was immaterial :
that it mattered not that there was no design to mislead or
defraud the public if a false representation were knowingly made.
It was therefore but an affirmation of the law laid down in *Foster*

H. L. (E.)

1889

DERBY
v.
PEEK.

Lord Herschell.

(1) 13 C. B. 777.                    (2) Law Rep. 6 H. L. 377, 409.

3          2 C 2

H. L. (E.)
1889
DERRY
*v.*
PEEK.

Lord Herschell.

v. *Charles* (1), *Polhill* v. *Walter* (2), and other cases I have already referred to.

I come now to very recent cases. In *Weir* v. *Bell* (3) Lord Bramwell vigorously criticised the expression "legal fraud," and indicated a very decided opinion that an action founded on fraud could not be sustained except by the proof of fraud in fact. I have already given my reasons for thinking that, until recent times at all events, the judges who spoke of fraud in law did not mean to exclude the existence of fraud in fact, but only of an intention to defraud or injure.

In the same case Cotton L.J. stated the law in much the same way as he did in the present case, treating "recklessly" as equivalent to "without any reasonable ground for believing" the statements made. But the same learned judge in *Arkwright* v. *Newbold* (4) laid down the law somewhat differently, for he said: "In an action of deceit the representation to found the action must not be innocent, that is to say, it must be made either with knowledge of its being false, or with a reckless disregard as to whether it is or is not true." And his exposition of the law was substantially the same in *Edgington* v. *Fitzmaurice* (5). In this latter case Bowen L.J. defined what the plaintiff must prove in addition to the falsity of the statement, as "secondly, that it was false to the knowledge of the defendants, or that they made it not caring whether it was true or false."

It only remains to notice the case of *Smith* v. *Chadwick* (6). The late Master of the Rolls there said, "A man may issue a prospectus or make any other statement to induce another to enter into a contract, believing that his statement is true, and not intending to deceive; but he may through carelessness have made statements which are not true, and which he ought to have known were not true, and if he does so he is liable in an action for deceit; he cannot be allowed to escape merely because he had good intentions, and did not intend to defraud." This, like everything else that fell from that learned judge, is worthy of respectful consideration. With the last sentence I quite agree,

(1) 7 Bing. 105.            (4) 17 Ch. D. 301.
(2) 3 B. & Ad. 114.        (5) 29 Ch. D. 459.
(3) 3 Ex. D. 238.          (6) 20 Ch. D. 27, 44, 67.

but I cannot assent to the doctrine that a false statement made through carelessness, and which ought to have been known to be untrue, of itself renders the person who makes it liable to an action for deceit. This does not seem to me by any means necessarily to amount to fraud, without which the action will not, in my opinion, lie.

It must be remembered that it was not requisite for Sir George Jessel in *Smith* v. *Chadwick* (1) to form an opinion whether a statement carelessly made, but honestly believed, could be the foundation of an action of deceit. The decision did not turn on any such point. The conclusion at which he arrived is expressed in these terms: " On the whole I have come to the conclusion that this, although in some respects inaccurate, and in some respects not altogether free from imputation of carelessness, was a fair, honest, and bonâ fide statement on the part of the defendants, and by no means exposes them to an action for deceit."

I may further note that in the same case, Lindley L.J. said : "The plaintiff has to prove, first, that the misrepresentation was made to him ; secondly, he must prove that it was false ; thirdly, that it was false to the knowledge of the defendants, or at all events that they did not believe the truth of it." This appears to be a different statement of the law to that which I have just criticised, and one much more in accord with the prior decisions.

The case of *Smith* v. *Chadwick* was carried to your Lordships' House (2). Lord Selborne thus laid down the law : " I conceive that in an action of deceit it is the duty of the plaintiff to establish two things : first, actual fraud, which is to be judged of by the nature and character of the representations made, considered with reference to the object for which they were made, the knowledge or means of knowledge of the person making them, and the intention which the law justly imputes to every man to produce those consequences which are the natural result of his acts ; and secondly, he must establish that this fraud was an inducing cause to the contract." It will be noticed that the noble and learned Lord regards the proof of actual fraud as essential, all the other matters to which he refers are elements to be considered in determining whether such fraud has been

(1) 20 Ch. D. 27, 44, 67.                (2) 9 App. Cas. 187, 190.

H. L. (E.)
1889
DERBY
*v.*
PEEK.
Lord Herschell.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord Herschell.

established. Lord Blackburn indicated that although he nearly agreed with the Master of the Rolls, that learned judge had not quite stated what he conceived to be the law. He did not point out precisely how far he differed, but it is impossible to read his judgment in this case, or in that of *Brownlie* v. *Campbell* (1) without seeing that in his opinion proof of actual fraud or of a wilful deception was requisite.

Having now drawn attention, I believe, to all the cases having a material bearing upon the question under consideration, I proceed to state briefly the conclusions to which I have been led. I think the authorities establish the following propositions: First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice. Secondly, fraud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement being fraudulent, there must, I think, always be an honest belief in its truth. And this probably covers the whole ground, for one who knowingly alleges that which is false, has obviously no such honest belief. Thirdly, if fraud be proved, the motive of the person guilty of it is immaterial. It matters not that there was no intention to cheat or injure the person to whom the statement was made.

I think these propositions embrace all that can be supported by decided cases from the time of *Pasley* v. *Freeman* (2) down to *Western Bank of Scotland* v. *Addie* (3) in 1867, when the first suggestion is to be found that belief in the truth of what he has stated will not suffice to absolve the defendant if his belief be based on no reasonable grounds. I have shewn that this view was at once dissented from by Lord Cranworth, so that there was at the outset as much authority against it as for it. And I have met with no further assertion of Lord Chelmsford's view until

(1) 5 App. Cas. 925.                    (2) 2 Smith's L. C. 74.
(3) Law Rep. 1 H. L., Sc. 145.

the case of *Weir* v. *Bell* (1), where it seems to be involved in Lord Justice Cotton's enunciation of the law of deceit. But no reason is there given in support of the view, it is treated as established law. The dictum of the late Master of the Rolls, that a false statement made through carelessness, which the person making it ought to have known to be untrue, would sustain an action of deceit, carried the matter still further. But that such an action could be maintained notwithstanding an honest belief that the statement made was true, if there were no reasonable grounds for the belief, was, I think, for the first time decided in the case now under appeal.

In my opinion making a false statement through want of care falls far short of, and is a very different thing from, fraud, and the same may be said of a false representation honestly believed though on insufficient grounds. Indeed Cotton L.J. himself indicated, in the words I have already quoted, that he should not call it fraud. But the whole current of authorities, with which I have so long detained your Lordships, shews to my mind conclusively that fraud is essential to found an action of deceit, and that it cannot be maintained where the acts proved cannot properly be so termed. And the case of *Taylor* v. *Ashton* (2) appears to me to be in direct conflict with the dictum of Sir George Jessel, and inconsistent with the view taken by the learned judges in the Court below. I observe that Sir Frederick Pollock, in his able work on Torts (p. 243, note), referring, I presume, to the dicta of Cotton L.J. and Sir George Jessel M.R., says that the actual decision in *Taylor* v. *Ashton* (2) is not consistent with the modern cases on the duty of directors of companies. I think he is right. But for the reasons I have given I am unable to hold that anything less than fraud will render directors or any other persons liable to an action of deceit.

At the same time I desire to say distinctly that when a false statement has been made the questions whether there were reasonable grounds for believing it, and what were the means of knowledge in the possession of the person making it, are most weighty matters for consideration. The ground upon which an alleged belief was founded is a most important test of its reality. I can conceive many cases where the fact that an alleged belief was

H. L. (E.)
1889
DERRY
*v.*
PEEK.
Lord Herschell.

(1) 3 Ex. D. 238.                      (2) 11 M. & W. 401.

H. L. (E.)
1889
DERRY
v.
PEEK.
Lord Herschell.

destitute of all reasonable foundation would suffice of itself to convince the Court that it was not really entertained, and that the representation was a fraudulent one. So, too, although means of knowledge are, as was pointed out by Lord Blackburn in *Brownlie* v. *Campbell* (1), a very different thing from knowledge, if I thought that a person making a false statement had shut his eyes to the facts, or purposely abstained from inquiring into them, I should hold that honest belief was absent, and that he was just as fraudulent as if he had knowingly stated that which was false.

I have arrived with some reluctance at the conclusion to which I have felt myself compelled, for I think those who put before the public a prospectus to induce them to embark their money in a commercial enterprise ought to be vigilant to see that it contains such representations only as are in strict accordance with fact, and I should be very unwilling to give any countenance to the contrary idea. I think there is much to be said for the view that this moral duty ought to some extent to be converted into a legal obligation, and that the want of reasonable care to see that statements, made under such circumstances, are true, should be made an actionable wrong. But this is not a matter fit for discussion on the present occasion. If it is to be done the legislature must intervene and expressly give a right of action in respect of such a departure from duty. It ought not, I think, to be done by straining the law, and holding that to be fraudulent which the tribunal feels cannot properly be so described. I think mischief is likely to result from blurring the distinction between carelessness and fraud, and equally holding a man fraudulent whether his acts can or cannot be justly so designated.

It now remains for me to apply what I believe to be the law to the facts of the present case. The charge against the defendants is that they fraudulently represented that by the special Act of Parliament which the company had obtained they had a right to use steam or other mechanical power instead of horses. The test which I purpose employing is to inquire whether the defendants knowingly made a false statement in this respect, or whether, on the contrary, they honestly believed what they stated to be a true and fair representation of the facts. Before considering whether the charge of fraud is proved, I may say that I

(1) 5 App. Cas. at p. 952.

approach the case of all the defendants, except Wilde, with the
inclination to scrutinise their conduct with severity.  They most
improperly received sums of money from the promoters, and this
unquestionably lays them open to the suspicion of being ready
to put before the public whatever was desired by those who were
promoting the undertaking.  But I think this must not be
unduly pressed, and when I find that the statement impeached
was concurred in by one whose conduct in the respect I have
mentioned was free from blame, and who was under no similar
pressure, the case assumes, I think, a different complexion.

I must further remark that the learned judge who tried the
cause, and who tells us that he carefully watched the demeanour
of the witnesses and scanned their evidence, came without hesi-
tation to the conclusion that they were witnesses of truth, and
that their evidence, whatever may be its effect, might safely be
relied on.  An opinion so formed ought not to be differed from
except on very clear grounds, and after carefully considering the
evidence, I see no reason to dissent from Stirling J.'s conclusion.
I shall therefore assume the truth of their testimony.

I agree with the Court below that the statement made did not
accurately convey to the mind of a person reading it what the
rights of the company were, but to judge whether it may never-
theless have been put forward without subjecting the defendants
to the imputation of fraud, your Lordships must consider what
were the circumstances.  By the General Tramways Act of 1870
it is provided that all carriages used on any tramway shall be
moved by the power prescribed by the special Act, and where
no such power is prescribed, by animal power only (1).  In order,
therefore, to enable the company to use steam-power, an Act of
Parliament had to be obtained empowering its use.  This had
been done, but the power was clogged with the condition that it
was only to be used with the consent of the Board of Trade.  It
was therefore incorrect to say that the company had the right to
use steam; they would only have that right if they obtained the
consent of the Board of Trade.  But it is impossible not to see
that the fact which would impress itself upon the minds of those
connected with the company was that they had, after submitting

(1) 33 & 34 Vict. c. 78, s. 34.

H. L. (E.)

1889

DERBY
v.
PEEK.

Lord Herschell.

H L. (E.)
1889
~~~
DERRY
v.
PEEK.
———
Lord Herschell.
———

the plans to the Board of Trade, obtained a special Act empower-
ing the use of steam. It might well be that the fact that the
consent of the Board of Trade was necessary would not dwell in
the same way upon their minds, if they thought that the consent
of the Board would be obtained as a matter of course if its
requirements were complied with, and that it was therefore a
mere question of expenditure and care. The provision might
seem to them analogous to that contained in the General Tram-
ways Act, and I believe in the Railways Act also, prohibiting the
line being opened until it had been inspected by the Board of
Trade and certified fit for traffic, which no one would regard as a
condition practically limiting the right to use the line for the
purpose of a tramway or railway. I do not say that the two
cases are strictly analogous in point of law, but they may well
have been thought so by business men.

I turn now to the evidence of the defendants. I will take first
that of Mr. Wilde, whose conduct in relation to the promotion of
the company is free from suspicion. He is a member of the Bar
and a director of one of the London tramway companies. He
states that he was aware that the consent of the Board of Trade
was necessary, but that he thought that such consent had been
practically given, inasmuch as, pursuant to the Standing Orders,
the plans had been laid before the Board of Trade with the state-
ment that it was intended to use mechanical as well as horse-
power, and no objection having been raised by the Board of
Trade, and the Bill obtained, he took it for granted that no
objection would be raised afterwards, provided the works were
properly carried out. He considered, therefore, that, practically
and substantially they had the right to use steam, and that the
statement was perfectly true.

Mr. Pethick's evidence is to much the same effect. He thought
the Board of Trade had no more right to refuse their consent
than they would in the case of a railway; that they might have
required additions or alterations, but that on any reasonable re-
quirements being complied with they could not refuse their
consent. It never entered his thoughts that after the Board had
passed their plans, with the knowledge that it was proposed to
use steam, they would refuse their consent.

Mr. Moore states that he was under the impression that the passage in the prospectus represented the effect of sect. 35 of the Act, inasmuch as he understood that the consent was obtained. He so understood from the statements made at the board by the solicitors to the company, to the general effect that everything was in order for the use of steam, that the Act had been obtained subject to the usual restrictions, and that they were starting as a tramway company, with full power to use steam as other companies were doing.

Mr. Wakefield, according to his evidence, believed that the statement in the prospectus was fair; he never had a doubt about it. It never occurred to him to say anything about the consent of the Board of Trade, because as they had got the Act of Parliament for steam he presumed at once that they would get it.

Mr. Derry's evidence is somewhat confused, but I think the fair effect of it is that though he was aware that under the Act the consent of the Board of Trade was necessary, he thought that the company having obtained their Act the Board's consent would follow as a matter of course, and that the question of such consent being necessary never crossed his mind at the time the prospectus was issued. He believed at that time that it was correct to say they had the right to use steam.

As I have said, Stirling J. gave credit to these witnesses, and I see no reason to differ from him. What conclusion ought to be drawn from their evidence? I think they were mistaken in supposing that the consent of the Board of Trade would follow as a matter of course because they had obtained their Act. It was absolutely in the discretion of the Board whether such consent should be given. The prospectus was therefore inaccurate. But that is not the question. If they believed that the consent of the Board of Trade was practically concluded by the passing of the Act, has the plaintiff made out, which it was for him to do, that they have been guilty of a fraudulent misrepresentation? I think not. I cannot hold it proved as to any one of them that he knowingly made a false statement, or one which he did not believe to be true, or was careless whether what he stated was true or false. In short, I think they honestly believed that what they asserted was true, and I am of opinion that the charge of fraud made against them has not been established.

H. L. (E.)

1889

DERRY
v.
PEEK.

Lord Herschell.

H. L. (E.)
1889
DERBY
*v.*
PEEK.
Lord Herschell.

It is not unworthy of note that in his report to the Board of Trade, General Hutchinson, who was obviously aware of the provisions of the special Act, falls into the very same inaccuracy of language as is complained of in the defendants, for he says: " The Act of 1882 gives the company authority to use mechanical power over all their system."

I quite admit that the statements of witnesses as to their belief are by no means to be accepted blindfold. The probabilities must be considered. Whenever it is necessary to arrive at a conclusion as to the state of mind of another person, and to determine whether his belief under given circumstances was such as he alleges, we can only do so by applying the standard of conduct which our own experience of the ways of men has enabled us to form ; by asking ourselves whether a reasonable man would be likely under the circumstances so to believe. I have applied this test, with the result that I have a strong conviction that a reasonable man situated as the defendants were, with their knowledge and means of knowledge, might well believe what they state they did believe, and consider that the representation made was substantially true.

Adopting the language of Jessel M.R. in *Smith* v. *Chadwick* (1), I conclude by saying that on the whole I have come to the conclusion that the statement, " though in some respects inaccurate and not altogether free from imputation of carelessness, was a fair, honest and bonâ fide statement on the part of the defendants, and by no means exposes them to an action for deceit."

I think the judgment of the Court of Appeal should be reversed.

> *Order of the Court of Appeal reversed ; order of Stirling J. restored ; the respondent to pay to the appellants their costs below and in this House : cause remitted to the Chancery Division.*
>
> *Lords Journals* 1st July 1889.

Solicitors for appellants: *Linklater, Hackwood, Addison & Brown.*

Solicitors for respondent : *Tamplin, Tayler & Joseph.*

(1) 20 Ch. D. at p. 67.

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

---

**ANNEXE 11 TO THE**
**FIRST AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

---

**BEFORE ME**

**NOTARY PUBLIC**

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

**A.C.**                AND PRIVY COUNCIL.                                    465

offence unless they are satisfied that on the facts a jury properly                P. C.
directed could not have acquitted of it.  Their Lordships cannot                   ────
put it as high as that.  In the first place it is at least doubtful                1963
whether the credit of the McKinnells was fairly presented to the          ────────────
jury, and without their evidence there was no proof of any offence        BROADHURST
at all.  In the second place, on the footing that the McKinnells'              v.
evidence was acceptable, there has to be considered the mis-              THE QUEEN.
direction on the facts relating to accident which their Lordships             ────
have already referred to.  While it is difficult to reconcile the
theory of accident with the statements made by the appellant to
the McKinnells, it is not impossible.  Their Lordships do not
think this is a case in which a conviction for the lesser offence
can, without a verdict of a jury, be imposed on the appellant.

For these reasons their Lordships have humbly advised Her
Majesty that the appeal should be allowed, the conviction set
aside and the sentence quashed.

   Solicitors: *Norton, Rose, Botterell & Roche; Charles Russell &
Co.*

                                     C. C.

─────────

[HOUSE OF LORDS.]

HEDLEY BYRNE & CO. LTD.    .    .    .   APPELLANTS;        H. L. (E.) *
                        AND                                                  ────
HELLER & PARTNERS LTD.    .    .    .   RESPONDENTS.         1963
                                                            Feb. 25, 26,
                                                               27, 28;
*Negligence—Duty of care to whom?—Careless misrepresentation—*       Mar. 4, 5, 6,
   *Bankers—References regarding company given by bankers to other*         7;
   *bankers at customer's request—Communicated to customers inquiring*     May 28.
   *about company's credit-worthiness—Express disclaimer of responsi-*
   *bility—Whether a special relationship creating duty of care—*
   *Whether action against bankers maintainable.*
*Banking—Reference by bankers—Careless misrepresentation—References*
   *not justified—Plaintiffs' financial loss—Whether a special relation-*
   *ship creating a duty of care — Whether action against bankers*
   *maintainable.*

    The appellants were advertising agents, who had placed sub-
stantial forward advertising orders for a company on terms by
which they, the appellants, were personally liable for the cost of the

─────────

    * *Present*: LORD REID, LORD MORRIS OF BORTH-Y-GEST, LORD
HODSON, LORD DEVLIN and LORD PEARCE.

466                        HOUSE OF LORDS                    **[1964]**

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

orders. They asked their bankers to inquire into the company's financial stability and their bankers made inquiries of the respondents, who were the company's bankers. The respondents gave favourable references but stipulated that these were "without responsibility." In reliance on these references the appellants placed orders which resulted in a loss of £17,000. They brought an action against the respondents for damages for negligence :—

*Held,* that a negligent, though honest, misrepresentation, spoken or written, may give rise to an action for damages for financial loss caused thereby, apart from any contract or fiduciary relationship, since the law will imply a duty of care when a party seeking information from a party possessed of a special skill trusts him to exercise due care, and that party knew or ought to have known that reliance was being placed on his skill and judgment (post, pp. 486, 502, 514). However, since here there was an express disclaimer of responsibility, no such duty was, in any event, implied.

*Nocton* v. *Lord Ashburton* [1914] A.C. 932 ; 30 T.L.R. 602, H.L. applied.

*Candler* v. *Crane, Christmas & Co.* [1951] 2 K.B. 164 ; [1951] 1 T.L.R. 371 ; [1951] 1 All E.R. 426, C.A., overruled. *Le Lievre* v. *Gould* [1893] 1 Q.B. 491 ; 9 T.L.R. 243, C.A. explained and not followed (post, pp. 488, 502, 519, 532, 535).

*Per* Lord Morris of Borth-y-Gest and Lord Hodson. *Semble,* if a banker gives a reference in the form of a brief expression of opinion in regard to credit-worthiness, he does not accept, and there is not expected of him, any higher duty than that of giving an honest answer (post, pp. 504, 513).

*Per* Lord Devlin. The duty of care arises where the responsibility is voluntarily accepted or undertaken either generally, where a general relationship is created, or specifically in relation to a particular transaction (post, p. 529).

*Per* Lord Pearce. To import such a duty the representation must normally concern a business or professional transaction whose nature makes clear the gravity of the inquiry and the importance and influence attached to the answer (post, p. 539).

Decision of the Court of Appeal [1962] 1 Q.B. 396 ; [1961] 3 W.L.R. 1225 ; [1961] 3 All E.R. 891, C.A. affirmed on different grounds.

APPEAL from the Court of Appeal (Ormerod, Pearson and Harman L.JJ.).

This was an appeal (by leave of the Court of Appeal) by the appellants, Hedley Byrne & Co. Ltd., who were the plaintiffs in the action, from an order of the Court of Appeal dated October 18, 1961, affirming the judgment of McNair J., dated December 20, 1960, in favour of the respondents, Heller & Partners Ltd., the defendants in the action, whereby it was held that the action failed on a point of law, but that otherwise the damages recoverable by the appellants would have been £15,454 3s. 6d. with

interest at the rate of 4 per cent. per annum from January 1, 1959.

The appellants were a firm of advertising agents.  The respondents were merchant bankers.  Towards the end of 1957 the appellants on behalf of a customer, Easipower Ltd. placed some small orders for advertising.  Later proposals were made to them for an advertising programme involving the expenditure of £100,000 and in November, 1957, they received indirectly from Martin's Bank Ltd., Easipower's then bankers, a reference reporting Easipower to be " a respectably constituted company " whose trading connection is expanding speedily.  We consider " the company to be quite good for its engagements."  They placed on behalf of Easipower on credit terms substantial orders for advertising time on television programmes and for advertising space in certain newspapers on terms that they themselves became personally liable to the television and newspaper companies.

The appellants, becoming doubtful of the financial position of Easipower, wanted a bankers' report concerning the company which then had an account with the respondents.  They themselves banked at the Piccadilly branch of the National Provincial Bank Ltd. which they asked to obtain a report.  The Piccadilly branch communicated with its City office, a representative of which telephoned the respondents on August 18, 1958, and it was common ground that a contemporaneous note of the ensuing conversation was accurate:  " Heller & Partners Ltd. Minute of " telephone conversation.  Call from National Provincial Bank " Ltd., 15, Bishopsgate, E.C.2.  18.8.58.  Person called: " L. Heller, re Easipower Ltd.  They wanted to know in confi-" dence and without responsibility on our part, the respectability " and standing of Easipower Ltd., and whether they would be " good for an advertising contract for £8,000 to £9,000.  I " replied, the company recently opened an account with us. " Believed to be respectably constituted and considered good for " its normal business engagements.  The company is a sub-" sidiary of Pera Industries Ltd., which is in liquidation, but we " understand that the managing director, Mr. Williams, is " endeavouring to buy the shares of Easipower Ltd. from the " liquidator.  We believe that the company would not undertake " any commitments they were unable to fulfil."  In due course this answer was communicated orally by the Piccadilly branch of National Provincial to the appellants.  On August 21, 1958,

H. L. (E.)

1963
————
HEDLEY
BYRNE & Co.
LTD.
v.
HELLER &
PARTNERS
LTD.
——

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

a letter of confirmation was sent to them by that branch. The
letter had the headings " confidential " and " for your private
" use and without responsibility on the part of this bank or the
" manager." In the letter the oral answer which the respon-
dents had given to the City office was passed on with the prefatory
words " In reply to your telephoned inquiry of August 18,
" bankers say . . ." The information had been given by the
respondents gratuitously.

On November 4, 1958, a letter was sent to the Piccadilly
branch of National Provincial on behalf of the appellants saying:
" I have been requested by the directors to again ask you to
" check the financial structure and status of Easipower Ltd."
After some particular references, the letter concluded: " I
" would be appreciative if you could make your check as exhaus-
" tive as you reasonably can." On November 7, 1958, the City
office of National Provincial wrote the respondents a letter headed
" private and confidential " in the following terms: " Dear Sir,
" We shall be obliged by your opinion in confidence as to the
" respectability and standing of Easipower Ltd., 27 Albemarle
" Street, London, W.1, and by stating whether you consider
" them trustworthy, in the way of business, to the extent of
" £100,000 per annum advertising contract. Yours faithfully
" . . ." On November 11, 1958, the respondents replied in a
letter headed:

" CONFIDENTIAL

" For your private use and without responsibility on the part
" of this bank or its officials."

The letter continued:

" Dear Sir, In reply to your inquiring letter of 7th instant
" we beg to advise:

" Re E . . . . . Ltd.

" Respectably constituted company, considered good for its
" ordinary business engagements. Your figures are larger than
" we are accustomed to see.

" Yours faithfully,

" Per pro. Heller & Partners Ltd."

On November 14, 1958, the Piccadilly branch of National
Provincial wrote to the appellants, passing on what the respon-
dents had stated in this letter, heading their own letter
" Confidential. For your private use and without responsibility
" on the part of this bank or the manager " and prefacing it

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

with the words: " In reply to your inquiry letter of November 4, " bankers say . . ."

The appellants relied on these statements and as a result they lost sums, calculated as £17,661 18s. 6d. in their statement of claim, when Easipower went into liquidation. In this action they sought to recover this loss from the respondents as damages on the ground that their replies were given negligently and in breach of the respondents' duty to exercise care in giving them. An allegation of fraud was originally made but was abandoned. McNair J. held that the respondents were negligent but that they owed no duty of care to the appellants. The Court of Appeal likewise held that there was no duty of care and it was therefore unnecessary to consider whether the finding of negligence was correct.

*Gerald Gardiner Q.C., D. G. A. Lowe* and *B. Anns* for the appellants. It is submitted: (1) *Donoghue* v. *Stevenson* [1] is part of the law of England in its statement of the duty to act with care. It is authority for holding that a false statement made carelessly and acted upon by the person to whom it is made to his detriment is actionable, though no contractual relationship may exist between them. In *Heaven* v. *Pender* [2] the majority of the court were wrong and the minority view was right. (2) Where a man holds himself out as exercising special skill or where he exercises a particular profession, he is under a duty to exercise skill and care. A surgeon or a doctor or a solicitor or a surveyor owes a duty to act with reasonable skill and care, whether or not he is acting gratuitously. (3) These particular defendants in the particular and highly peculiar circumstances of this case did owe a duty of care to these particular plaintiffs.

The old cases on professional services are relevant: *Shiells* v. *Blackburne* [3]; *Wilkinson* v. *Coverdale* [4]; *Gladwell* v. *Steggall* [5] and *Donaldson* v. *Haldane*. [6] *George* v. *Skivington* [7] was followed in *Cann* v. *Willson*, [8] a case rightly decided and wrongly overruled in *Le Lievre* v. *Gould*, [9] which is a troublesome case for the appellants, because it was rightly decided, but on the wrong

[1] [1932] A.C. 562; 48 T.L.R. 494, H.L.
[2] (1883) 11 Q.B.D. 503, C.A.
[3] (1789) 1 H.Bl. 158.
[4] (1793) 1 Esp. 75.
[5] (1839) 5 Bing.N.C. 733.
[6] (1840) 7 Cl. & F. 762.
[7] (1869) L.R. 5 Ex. 1.
[8] (1888) 39 Ch.D. 39; 4 T.L.R. 588.
[9] [1893] 1 Q.B. 491; 9 T.L.R. 243, C.A.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

basis.  *Derry* v. *Peek* [10] did not establish that innocent but negligent misrepresentation cannot give rise to a cause of action. *Nocton* v. *Lord Ashburton*, [11] which is relied on, indicates that a duty of care can be inferred in the present circumstances. Estoppel is not put forward.

*Donoghue* v. *Stevenson* [12] is in the main stream of judicial decision.  Already *Macpherson* v. *Buick Motor Co.* [13] had been decided in the same way in the United States.  The distinction between a negligent act and a negligent word in England is not clear.  It would be strange if a person who handled his pen so carelessly as to put out X's eye were liable to pay damages, but not if he handled it so carelessly in writing, that X was financially ruined.  The great advantage of the common law is the readiness of the judges to adapt the law to changing conditions.

As to the application of *Donoghue* v. *Stevenson*, [14] see *Grant* v. *Australian Knitting Mills Ltd.* [15] and *Barnes* v. *Irwell Valley Water Board*. [16]  *Old Gate Estates Ltd.* v. *Toplis & Harding & Russell* [17] was wrongly decided.  See also *Sharp* v. *Avery and Kenwood* [18]; *Watson* v. *Buckley, Owen, Garrett & Co. Ltd.* [19]; *Haseldine* v. *C. A. Daw & Son Ltd.* [20]; *Bourhill* v. *Young* [21]; *Woods* v. *Duncan* [22]; *Morrison Steamship Co. Ltd.* v. *Greystoke Castle (Cargo Owners)* [23] and *Denny* v. *Supplies & Transport Co. Ltd.* [24]  *Candler* v. *Crane, Christmas & Co.* [25] was wrongly decided by the majority and the dissenting judgment of Denning L.J. was correct.  On the law as there laid down compare the American Restatement of the Law of Torts, Vol. III, pp. 122–123, para. 552, comment (a); *Glanzer* v. *Shepherd* [26]; *International Products Co.* v. *Erie Railroad Co.* [27]; *Mulroy* v. *Wright* [28];

---

[10] (1889) 14 App.Cas. 337; 5 T.L.R. 625, H.L.

[11] [1914] A.C. 932; 30 T.L.R. 602, H.L.

[12] [1932] A.C. 562.

[13] (1916) 217 N.Y. 382.

[14] [1932] A.C. 562.

[15] [1936] A.C. 85, 102; 52 T.L.R. 38, P.C.

[16] [1939] 1 K.B. 21; 54 T.L.R. 815; [1938] 2 All E.R. 650, C.A.

[17] (1939) 161 L.T. 227, 229; [1939] 3 All E.R. 209.

[18] [1938] 4 All E.R. 85, C.A.

[19] [1940] 1 All E.R. 174.

[20] [1941] 2 K.B. 343; 58 T.L.R. 1; [1941] 3 All E.R. 156, C.A.

[21] [1943] A.C. 92, 101; [1942] 2 All E.R. 369, H.L.

[22] [1946] A.C. 401, 421, 438, 443; 62 T.L.R. 283; [1946] 1 All E.R. 420, H.L.

[23] [1947] A.C. 265, 270, 279; 63 T.L.R. 11; [1946] 2 All E.R. 696, H.L.

[24] [1950] 2 K.B. 374; 66 (1) T.L.R. 1168, C.A.

[25] [1951] 2 K.B. 164; [1951] 1 T.L.R. 371; [1951] 1 All E.R. 426, C.A.

[26] (1922) 233 N.Y. 236.

[27] (1927) 244 N.Y. 331.

[28] (1931) 240 N.W. 116.

*Doyle* v. *Chatham & Phoenix National Bank* [29]; *Ultramares Corporation* v. *Touche* [30] and *Edwards* v. *Lamb.* [31] The result reached in a large number of the American cases shows that, even though there is no contract, there may be special circumstances giving rise to a fiduciary relationship. In *Candler's* case [32] the accountants were persons who had assumed a special skill and were in a position to know the facts required by the investor, who would act on the information given and would suffer damage if it was not accurate. On those facts the defendants should have been held liable and in the present case the same principles should apply to bankers in a state of facts which produces the same situation. It makes no difference whether or not the person giving the information is interested in the result.

Reliance is placed on *Swift* v. *Jewsbury,* [33] in which the manager of a bank was held liable for knowingly making a false statement of this kind. See also *Hosegood* v. *Bull* [34] and *Hirst* v. *West Riding Union Banking Co. Ltd.* [35] It is conceded that, as was held in *Parsons* v. *Barclay & Co. Ltd.,* [36] the bankers were under no duty to make special inquiries before giving the references. *Robinson* v. *National Bank of Scotland Ltd.,* [37] should not be followed in modern times, and, in any event, the facts were different from those of the present case, because in that case the pursuer did not rely on the report given as the report in the present case was relied on. Although up to the time of the decision of that case it may have been reasonable to confine the obligation arising out of the giving of a banker's reference to giving an honest answer, modern business practice imposes the further obligation that there must be no negligence. In that case Lord Haldane did not exclude the possibility that in special circumstances a duty might arise.

Reliance is also placed on *Banbury* v. *Bank of Montreal* [38]; *Evans* v. *Barclays Bank* [39]; *Batts Combe Quarry Co.* v. *Barclays Bank Ltd.* [40]; *Woods* v. *Martins Bank Ltd.* [41]; *Plowright* v.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

[29] (1930) 253 N.Y. 369.
[30] (1931) 255 N.Y. 170.
[31] (1899) 69 N.H. 599.
[32] [1951] 2 K.B. 164.
[33] (1874) L.R. 9 Q.B. 301.
[34] (1876) 36 L.T. 617.
[35] [1901] 2 K.B. 560; 17 T.L.R. 629, C.A.

[36] (1910) 103 L.T. 196; 26 T.L.R. 628, C.A.
[37] 1916 S.C.(H.L.) 154.
[38] [1918] A.C. 626; 34 T.L.R. 518, H.L.
[39] [1924] W.N. 97.
[40] (1931) 48 T.L.R. 4.
[41] [1959] 1 Q.B. 55; [1958] 1 W.L.R. 1018; [1958] 3 All E.R. 166.

472                            HOUSE OF LORDS                    **[1964]**

H. L. (E.)'    *Lambert* [42] and *Clayton* v. *Woodman & Son (Builders) Ltd.*[43]
1963     See also Halsbury's Laws of England, 3rd ed., Vol. II, p. 241,
─────    para. 455; Emanuel on Banking, 3rd ed., p. 19, and Paget on
HEDLEY   Banking, 6th ed., pp. 139–143.  As to the application of the
BYRNE & CO.  principle stare decisis, see *Caledonian Railway Co.* v. *Walker's*
LTD.     *Trustees* [44]; *Quinn* v. *Leatham* [45] and *Midland Silicones Ltd.* v.
v.
HELLER & *Scruttons Ltd.*[46]
PARTNERS
LTD.          In the present case if English law did not provide a remedy,
─────    it would be an unfortunate gap.  It would be a discredit to
         English law if, however fraudulent or negligent a bank might be
         in giving such information, there was no remedy against it.  If
         there is no such duty as the appellants submit, it could be said
         successfully that the information given was either not given in
         writing or not under seal.  But on the correct application of
         *Donoghue* v. *Stevenson* [47] there should be judgment for the
         appellants.  It should apply to words as well as deeds.  Behind
         it are the principles which have been applied to distributors of
         goods, to architects in relation to workmen on a building, to
         advice given by bankers and to motor-cyclists playing " follow
         " my leader."  It was evident that if the bank in the present
         case did not exercise due care it would be likely to cause loss to
         the person for whom the report was made and who could do
         nothing to avert the damage.  The bank was in a special position
         to know the facts.  The correct application of the principle in
         *Donoghue* v. *Stevenson*,[47] which is not limited to damage to
         person or property, imposes on it a duty to take reasonable
         care.  *Robinson's case* [48] is not to be treated as a decision that
         no banker can ever owe such a duty to a person to whom he gives
         a reference; it only held that the bank there in question was not
         liable in fraud because it had not been fraudulent.  Giving
         references and certificates is part of a banker's professional work
         in which, like a doctor, he is to exercise reasonable care and skill.
         Bank customers are now taken to have consented impliedly to
         their banks giving references with regard to them, unless they
         specifically forbid it.  At the time when *Tournier* v. *National*

42 (1885) 52 L.T. 646, 652.            45 [1901] A.C. 495, 498, 506; 17
43 [1962] 2 Q.B. 533; [1962] 1    T.L.R. 749, H.L.
W.L.R. 585; [1962] 2 All E.R. 33,      46 [1962] A.C. 446, 475; [1962] 2
C.A.                              W.L.R. 186; [1962] 1 All E.R. 1,
44 (1882) 7 App.Cas. 259, 260, 275,    H.L.
H.L.                                   47 [1932] A.C. 562.
                                       48 1916 S.C.(H.L.) 154.

*Provincial and Union Bank of England* [49] was decided, it was the reverse. Bankers' references are important in the business world. They should be integrated in the banking system and there should be a duty of care in regard to them. It has never been suggested that if a person with professional skill undertakes work so that he is bound to exercise reasonable care and skill, there is a rule limiting liability to a particular sort of damage, physical damage and damage to property, for example, in the case of a doctor who misdiagnoses a patient.

In summary, the information as to creditworthiness given was intended by the respondents to be communicated by the National Provincial Bank to a customer, whose identity was immaterial to the respondents, for that customer's use, and in giving that information, knowing that it would be relied on by some third party, such as the appellants, there was a duty imposed on the respondents to use reasonable care. In fact the information the respondents gave was calculated to give a false impression and the person giving it should have realised that. There is no reason in principle or authority why losses flowing from a careless state-ment of this description should not be recoverable, since there is the necessary relationship of proximity.

*John Foster Q.C., J. M. Shaw* and *L. Blom-Cooper* for the respondents. Bankers in giving references use guarded terms because to speak straight out would be a breach of duty to their customers. Because of that duty it is necessary for them to say " light grey " instead of " black." In giving this informa-tion the respondents had no interest of their own. The service was given gratuitously. Further, the evidence shows that they did not know that the National Provincial Bank required this information for the appellants or any other customer and in giving it they did not have in mind any definite person or class of persons. They knew nothing of the appellants and never intended the information to be communicated to them. The reference was marked " confidential " and given on the express understanding that no responsibility was incurred. So far as the respondents were concerned, the National Provincial Bank might have been wanting to know the financial standing of a would-be customer. At most it might have been inferred that the National Provincial Bank required the information as background for advising one of their customers. An undisclosed principal is not

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
___

[49] [1924] 1 K.B. 461; 40 T.L.R. 214, C.A.

H. L. (E.)
1963
─────
HEDLEY
BYRNE & Co.
LTD.
v.
HELLER &
PARTNERS
LTD.
─────

a " neighbour " within the rule in *Donoghue* v. *Stevenson.*[50] This case does not come within the ambit of the principle enunciated in that decision. There is no liability here. The information was only an expression of opinion. If there had been a liability, it would not be one which could be taken over by third parties like the appellants, to whom no duty was owed. The attitude of the respondents was: (1) They did not contemplate anyone but the National Provincial Bank being interested. (2) The information was given personally and confidentially to the National Provincial Bank and so, even if the person who gave it contemplated that there might be a customer who was interested, it would be a customer hearing the National Provincial Bank's version of the situation. (3) Even in the case of a written document sent to the National Provincial Bank, there would be ample opportunity for that bank to check its contents. The spoken or written word is not packaged, so that it cannot be examined like the ginger-beer bottle in *Donoghue* v. *Stevenson,*[50] which allowed no chance of intermediate examination and so created a proximity. This information could be examined.

There is no liability for negligent misrepresentation unless through a careless misstatement something is created or a situation arises which is dangerous to life or limb or harmful to property, for example, a negligent misstatement that it is safe to go into a cellar or to use a lift, when it is not, or a statement by a doctor that a person has not got leprosy when he has. In those cases the safety is part of the res gestae. There is no liability for innocent misrepresentation: see *Heilbut, Symons & Co.* v. *Buckleton.*[51]

There being no general duty not to make careless statements, liability can only arise under three categories, which are exhaustive and under which a special duty is created. That duty (a) must be contractual or (b) must be fiduciary or (c) must arise from a relationship of proximity, the breach causing financial loss which flows from physical damage to the person or property of the plaintiff. To extend the law to create a general duty would open the floodgates of litigation.

As to the dichotomy between warranty and representation, see *Hopkins* v. *Tanqueray* [52]; *Angus* v. *Clifford* [53]; *Low* v.

─────

[50] [1932] A.C. 562.
[51] [1913] A.C. 30, 48–49, H.L.
[52] (1854) 15 C.B. 130, 140, 142.

[53] [1891] 2 Ch. 449, 463, 470; 7 T.L.R. 447, C.A.

Bouverie [54]; *Scholes* v. *Brook* [55] and *Thiodon* v. *Tindall*. [56]
Where there is a warranty there is a condition, and the person
who gives it is liable in damages if he gives an untrue answer.
The test in the case of a warranty is whether there is an intention
to contract. It is an old-established principle that damages cannot
be obtained for innocent misrepresentation unless there is a
warranty.

When a person sets up as an investment adviser, that imposes
on him a duty to the persons he advises. But no duty is raised
simply by asking a person for advice. By asking a policeman
the way one does not make him one's traffic adviser. Compare
*Woods* v. *Martins Bank Ltd.* [57] See also *De la Bere* v. *Pearson
Ltd.* [58] If the appellants' contentions are right the anomalous
result might be produced that on the decision of *Akerhielm* v.
*De Mare* [59] a negligent defendant might be under a heavier
liability than a fraudulent defendant.

*Derry* v. *Peek* [60] ruled out any liability not arising from a
fiduciary relationship and that indicates that the area was not
covered by *Nocton's* case. [61] See also *Humphrey* v. *Bowers*. [62]
If A is under a duty of care to B in contract, it is clear that no
jus quaesitum tertio arises. Nor does a right of action in X arise
when A has agreed with B to do something for the benefit of X.
Accordingly, it would be strange if a jus quaesitum tertio could
be inferred here. See also *Morrison Steamship Co. Ltd.* v.
*Greystoke Castle (Cargo Owners)*. [63] In *Love* v. *Mack* [64] such a
special duty as is here suggested would certainly have been
invoked if it had existed. See also *Heskell* v. *Continental
Express Ltd.* [65]; *Groom* v. *Crocker* [66]; *Everett* v. *Griffiths* [67];
*Herschel* v. *Mrupi* [68] and *Tournier* v. *National Provincial &
Union Bank of England.* [69] The present case cannot be distin-
guished from *Robinson* v. *National Bank of Scotland* [70] in the

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

[54] [1891] 3 Ch. 82, 100, 105; 7
T.L.R. 582, C.A.
[55] (1891) 63 L.T. 837; 7 T.L.R.
214; 64 L.T. 674, C.A.
[56] (1891) 65 L.T. 343; 7 T.L.R.
581, D.C.
[57] [1959] 1 Q.B. 55, 72; [1958] 1
W.L.R. 1018; [1958] 3 All E.R. 166.
[58] [1908] 1 K.B. 280; 24 T.L.R.
120, C.A.
[59] [1959] A.C. 289; [1959] 3
W.L.R. 108; [1959] 3 All E.R. 485,
P.C.
[60] 14 App.Cas. 337, 347, 360
[61] [1914] A.C. 932, 950.

[62] (1929) 45 T.L.R. 297, 298.
[63] [1947] A.C. 265, 280; 63 T.L.R.
11; [1946] 2 All E.R. 696, H.L.
[64] (1905) 93 L.T. 352, C.A.
[65] [1950] 1 All E.R. 1033; 83
Ll.L.Rep. 438.
[66] [1939] 1 K.B. 194, 222, 223; 54
T.L.R. 861; [1938] 2 All E.R. 394,
C.A.
[67] [1920] 3 K.B. 163; 36 T.L.R.
491, C.A.
[68] 1954 (3) S.A. 464, 477.
[69] [1924] 1 K.B. 461; 40 T.L.R.
214, C.A.
[70] 1916 S.C.(H.L.) 154.

H. L. (E.)
1963
———
HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
———

House of Lords, where it was laid down as a general rule that a banker giving an inquirer a reference as to the credit of a customer owed no duty to that inquirer except to answer honestly. No relationship fitting that case can now be formulated so as to create a liability.

One transaction, such as the one in the present case, cannot raise a relationship. In the end it is a matter of degree. To give advice is also quite different from expressing an opinion. To say " I advise you to go to Manchester " is very different from saying " In my opinion the road to Manchester is clear." A person asking one's advice about investments is in a very different position from a person asking one's opinion. In the latter case there can be no fiduciary relationship. To give advice does not correspond to the situation when one bank asks another about the credit situation of X. Banks must clearly reserve to themselves the right not to answer questions about their customers. There is no difference in principle between a query by a bank on behalf of one of its customers and a query by that customer. No duty arose here. See by analogy *Australian Steam Shipping Co. Ltd.* v. *Devitt* [71] and *Fish* v. *Kelly.* [72] If one goes into a plumber's shop to ask his advice about one's plumbing system, that mere situation does not create a fiduciary relationship so that, if he gives one bad advice, he is liable in damages. *Thomson* v. *Schmitt* [73] is relied on. From a study of *Nocton's* case, [74] on which the appellants relied, it appears that their case depends on a distinction made a long time ago, brought in by a side-wind and not in accordance with the current of the law. See also *Kennedy* v. *Panama, New Zealand & Australian Royal Mail Co. Ltd.* [75]

The categories in which there exists a special duty to take care are fixed and exhaustive, as was rightly decided in *Candler* v. *Crane, Christmas & Co.,* [76] which is in accordance with the earlier authorities and with established principle.

When one is testing the duty of care there is a difference in kind between a physical act and words. The approach to negligent misstatement must be different. In the case of words, in order to create a liability, there must be an intention that the person to whom they are directed shall act on them in the manner

71 (1917) 33 T.L.R. 178.
72 (1864) 17 C.B.N.S. 194.
73 (1891) 8 T.L.R. 120, C.A.

74 [1914] A.C. 932, 944, 945–946, 950–951, 952, 956, 963, 967, 968, 972.
75 (1867) L.R. 2 Q.B. 580, 585–586.
76 [1951] 2 K.B. 164.

which occasions the loss to him. Otherwise the effect on the whole community would be very grave and confusion would be created in many aspects of the law. One must distinguish in principle between cases where financial loss is caused through physical injury and where it is caused directly. The thing done is different when it is a case of mere words.

As to the American decisions, in *Glanzer* v. *Shepherd* [77] there were special facts on which it was held that there existed a duty. See also *International Products Co.* v. *Erie Railroad Co.* [78] But the *Ultramares* case [79] is helpful. It demonstrates that *Candler's* case [80] would have been decided in the same way in America as in England. It indicates that in such circumstances as the present there is no intention to create a legal relationship and no duty should be inferred. See also the American Restatement of the Law of Torts, Vol. III, p. 71, para. 531.

Reliance is also placed on *Peek* v. *Gurney* [81]; *Halsey* v. *Brotherhood* [82]; *Scholfield* v. *Earl of Londesborough* [83]; *Rutter* v. *Palmer* [84]; *Ashdown* v. *Samuel Williams & Sons Ltd.* [85] and *Sinclair* v. *Cleary.* [86] See also "Misrepresentation as Deceit, "Negligence or Warranty," by Francis H. Bohlen (1929) 42 Harvard Law Review 733; "Liability in Negligence for False "Statements," by W. L. Morrison (1951) 67 Law Quarterly Review 212, 214–215, and "Liability in Tort for Negligent "Statements," by G. W. Paton (1947) 25 Canadian Bar Review 123.

In summary, the finding of McNair J. that there was negligence in giving the reference was incorrect on the evidence. Even if there had been negligence, the respondents would not have been liable, because there was no duty on them to take care. No special relationship was created imposing such a duty on them. They were acting gratuitously and they expressly disclaimed all responsibility. The appellants had ample opportunity to check the information given and the damage they suffered did not flow from the misrepresentation. If the law had

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
. *v.*
HELLER &
PARTNERS
LTD.

[77] 233 N.Y. 236, 237, 240, 241.
[78] 244 N.Y. 331.
[79] 255 N.Y. 170.
[80] [1951] 2 K.B. 164.
[81] (1873) L.R. 2 Q.B. 580.
[82] (1881) 19 Ch.D. 386, 392.
[83] [1896] A.C. 514, 537; 12 T.L.R. 604, H.L.

[84] [1922] 2 K.B. 87, 93; 38 T.L.R. 555, C.A.
[85] [1957] 1 Q.B. 409, 429; [1956] 3 W.L.R. 1104; [1957] 1 All E.R. 35, C.A.
[86] [1946] Q.S.R. 74.

H. L. (E.)
1963
———
HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.
———

been as the appellants submit, many authorities would have been decided otherwise than they were.

*J. M. Shaw* following. In the statement of claim there was no allegation of any special duty owed by the respondents to the appellants. The relationship between the respondents and Easipower, which was said to constitute a special relationship, was pleaded in the statement of claim as particulars of negligence and this was the only relevance of it. There is nothing to distinguish *Robinson's* case [87] from the present one.

*Gerald Gardiner Q.C.* in reply. In considering the development of this branch of the law the American cases are significant: *Macpherson* v. *Buick Motor Co.* [88] and *Devlin* v. *Smith.* [89] The *Ultramares* case [90] is the American equivalent of *Le Lievre* v. *Gould.* [91] Though South Africa has a different system of law, its decisions in this field are almost identical with the American: *Perlman* v. *Zoukendyk* [92] and *Herschel* v. *Mrupi.* [93] It is substantially similar to the law expressed in the American Restatement.

In *Candler's* case [94] the accounts were got out for the sole purpose of the plaintiff seeing them. The duty was imposed on the defendants when they started getting out those accounts, knowing that Candler was going to see them for the purpose of deciding whether or not to invest in the business in question. There is no difficulty in developing the law laid down in *Donoghue* v. *Stevenson* [95] to cover cases of this kind. The law imposes a duty to take care on a person acting in such circumstances that, if he stopped to think, he would know that someone else's person or property would be injured by his negligence. This principle should be extended to the field of skilled persons who know that, if they do not use their skill and care, someone will be damaged. When a professional man undertakes to do a professional job and provides information or advice, whether directly or through an agent, knowing that a sum of money depends on it, this imposes on him a duty of care. The fact that in the case of a warranty there must be an intention to contract is true but irrelevant because that is in the realm of contract, while this is in the realm of tort. Section 14 of the

---

87 1916 S.C. (H.L.) 154.
88 217 N.Y. 382.
89 (1882) 89 N.Y. 470.
90 255 N.Y. 170.
91 [1893] 1 Q.B. 491.

92 1934 C.P.D. 151.
93 1954 (3) S.A. 464.
94 [1951] 2 K.B. 164.
95 [1932] A.C. 562.

Sale of Goods Act, 1893, which was a consolidating Act, dealing with the law as it already stood, embodied the conception that if a seller sold something knowing that it was for a particular purpose, he owed a duty to the purchaser. Reliance is placed on *Nocton's case*,[96] treating *Derry* v. *Peek*[97] wholly as an action founded on deceit. See also *Scholes* v. *Brook*[98]; *De la Bere* v. *Pearson Ltd.*[99]; *Thiodon* v. *Tindall*[100]; *Edwards* v. *Mallan*[101]; *Thomson* v. *Schmitt*[102]; *Everett* v. *Griffiths*[103]; *Love* v. *Mack*[104]; *Shiells* v. *Blackburne*[105]; *Doorman* v. *Jenkins*[106]; *Whitehead* v. *Greetan*[107]; *Fish* v. *Kelly*[108] and *Sorrell* v. *Smith*.[109] In *Robinson* v. *National Bank of Scotland*[110] the decision turned on the Lord Ordinary's view of the facts,[111] which was accepted by the House of Lords. *Candler's* case[112] was discussed in an article by Warren A. Seavey (1951) 67 Law Quarterly Review 466.

Here a tort was committed and accordingly it does not matter what was in the mind of the person who gave the information. If what one has done amounts to a tort, it is no answer to an action to say that one acted from the best of motives. If one is in the field of the imposition of a duty, that duty is imposed whether or not the defendant thought that he owed it. In the present case the law imposed on the respondents a duty towards anyone who might be injured by their negligence, as in *Donoghue* v. *Stevenson*.[113] A banker is not obliged to give this sort of information, but, if he does, the law imposes on him a duty to take care. In such a case a defendant has open to him all the usual defences, just as in a case of negligent driving, when an injured passenger is suing, the defendant may rely on the principle volenti non fit injuria or that the passenger has agreed that there is to be no liability for any negligence by the driver. It would be strange if in the present circumstances there was a tort in which one could not recover pecuniary loss suffered. The

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.
—

[96] [1914] A.C. 932, 947, 969-971, 978.
[97] 14 App.Cas. 337.
[98] 63 L.T. 837, 838.
[99] [1908] 1 K.B. 280.
[100] 65 L.T. 343, 347-348.
[101] [1908] 1 K.B. 1002, 1005; 24 T.L.R. 376, C.A.
[102] 8 T.L.R. 120.
[103] [1920] 3 K.B. 163, 181, 193, 211.
[104] 93 L.T. 352.
[105] 1 H.Bl. 158.
[106] (1834) 2 A. & E. 256.
[107] (1825) 2 Bing. 464.
[108] 17 C.B.N.S. 194.
[109] [1925] A.C. 700, 722, 723-724, H.L.
[110] 1916 S.C.(H.L.) 154.
[111] 1916 S.C. 46, 56.
[112] [1951] 2 K.B. 164.
[113] [1932] A.C. 562.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.
—

result of upholding the appellants' contentions would not be to open the floodgates of litigation.

The primary contentions of the appellants are: (1) The correct application of *Donoghue* v. *Stevenson* [113] results in the conclusion that the appellants are entitled to recover and that *Candler's* case [114] was wrongly decided. (2) The appellants are entitled to recover because due care was not exercised by the respondents. (3) On the evidence a fiduciary relationship was created: see *Plowright* v. *Lambert*.[115]  *Woods* v. *Martins Bank Ltd.*[116] was rightly decided.

If liability for negligence is to be limited, it must be limited in clear terms: *Olley* v. *Marlborough Court Ltd.*,[117]; *Canada Steamship Lines Ltd.* v. *The King* [118] and *White* v. *John Warwick & Co. Ltd.*[119]

There is no hardship or unfairness in making a bank responsible for exercising care in giving references. If the respondents wanted to make a contract whereby the persons on whose behalf the inquiries were made were to have no right of action for negligence, they should have made this clear. To mark the communication '' confidential '' and '' without responsibility '' is a mere '' rubber stamp '' routine. Such vague language cannot save the bank from liability.

Their Lordships took time for consideration.

May 28.  LORD REID. My Lords, this case raises the important question whether and in what circumstances a person can recover damages for loss suffered by reason of his having relied on an innocent but negligent misrepresentation. I cannot do better than adopt the following statement of the case from the judgment of McNair J.: '' This case raised certain interesting '' questions of law as to the liability of bankers giving references '' as to the credit-worthiness of their customers. The plaintiffs '' are a firm of advertising agents. The defendants are merchant '' bankers. In outline, the plaintiffs' case against the defendants '' is that, having placed on behalf of a client, Easipower Ltd., on '' credit terms substantial orders for advertising time on television '' programmes and for advertising space in certain newspapers on

[113] [1932] A.C. 562.
[114] [1951] 2 K.B. 164.
[115] 52 L.T. 646.
[116] [1959] 1 Q.B. 55.
[117] [1949] 1 K.B. 532, 547, 549; 65 T.L.R. 95; [1949] 1 All E.R. 127, C.A.

[118] [1952] A.C. 192; [1952] 1 T.L.R. 261; [1952] 1 All E.R. 305, P.C.
[119] [1953] 1 W.L.R. 1285, 1289-1291; [1953] 2 All E.R. 1021, C.A.

**A.C.**            AND PRIVY COUNCIL.            481

H. L. (E.)

1963
———
HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
———
Lord Reid.

" terms under which they, the plaintiffs, became personally liable
" to the television and newspaper companies, they caused inquiries
" to be made through their own bank of the defendants as to the
" credit-worthiness of Easipower Ltd. who were customers of the
" defendants and were given by the defendants satisfactory refer-
" ences. These references turned out not to be justified, and the
" plaintiffs claim that in reliance on the references, which they
" had no reason to question, they refrained from cancelling the
" orders so as to relieve themselves of their current liabilities."

[His Lordship stated the facts and continued: ] The appellants
now seek to recover this loss from the respondents as dam-
ages on the ground that these replies were given negligently
and in breach of the respondents' duty to exercise care
in giving them. In his judgment McNair J. said: " On the
" assumption stated above as to the existence of the duty, I have
" no hesitation in holding (1) that Mr. Heller was guilty of negli-
" gence in giving such a reference without making plain—as he
" did not—that it was intended to be a very guarded reference,
" and (2) that properly understood according to its ordinary and
" natural meaning the reference was not justified by facts known
" to Mr. Heller."

Before your Lordships the respondents were anxious to contest
this finding, but your Lordships found it unnecessary to hear
argument on this matter, being of opinion that the appeal must
fail even if Mr. Heller was negligent. Accordingly I cannot and
do not express any opinion on the question whether Mr. Heller
was in fact negligent. But I should make it plain that the appel-
lants' complaint is not that Mr. Heller gave his reply without
adequate knowledge of the position, nor that he intended to
create a false impression, but that what he said was in fact
calculated to create a false impression and that he ought to have
realised that. And the same applies to the respondents' letter of
November 11.

McNair J. gave judgment for the respondents on the ground
that they owed no duty of care to the appellants. He said: " I
" am accordingly driven to the conclusion by authority binding
" upon me that no such action lies in the absence of contract or
" fiduciary relationship. On the facts before me there is clearly
" no contract, nor can I find a fiduciary relationship. It was
" urged on behalf of the plaintiff that the fact that Easipower
" Ltd. were heavily indebted to the defendants and that the defen-
" dants might benefit from the advertising campaign financed by

482                    HOUSE OF LORDS                    **[1964]**

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Reid.

" the plaintiffs, were facts from which a special duty to exercise
" care might be inferred. In my judgment, however, these facts,
" though clearly relevant on the question of honesty if this had
" been in issue, are not sufficient to establish any special relation-
" ship involving a duty of care even if it was open to me to extend
" the sphere of special relationship beyond that of contract and
" fiduciary relationship."

This judgment was affirmed by the Court of Appeal both
because they were bound by authority and because they were not
satisfied that it would be reasonable to impose upon a banker the
obligation suggested.

Before coming to the main question of law, it may be well to
dispose of an argument that there was no sufficiently close relation-
ship between these parties to give rise to any duty. It is said that
the respondents did not know the precise purpose of the inquiries
and did not even know whether the National Provincial Bank
wanted the information for its own use or for the use of a
customer: they knew nothing of the appellants. I would reject
that argument. They knew that the inquiry was in connection
with an advertising contract, and it was at least probable that the
information was wanted by the advertising contractors. It seems
to me quite immaterial that they did not know who these con-
tractors were: there is no suggestion of any speciality which could
have influenced them in deciding whether to give information or
in what form to give it. I shall therefore treat this as if it were a
case where a negligent misrepresentation is made directly to the
person seeking information, opinion or advice, and I shall not
attempt to decide what kind or degree of proximity is necessary
before there can be a duty owed by the defendant to the plaintiff.

The appellants' first argument was based on *Donoghue* v.
*Stevenson.*[1] That is a very important decision, but I do not think
that it has any direct bearing on this case. That decision may
encourage us to develop existing lines of authority, but it cannot
entitle us to disregard them. Apart altogether from authority, I
would think that the law must treat negligent words differently
from negligent acts. The law ought so far as possible to reflect
the standards of the reasonable man, and that is what *Donoghue*
v. *Stevenson*[1] sets out to do. The most obvious difference
between negligent words and negligent acts is this. Quite careful
people often express definite opinions on social or informal
occasions even when they see that others are likely to be

[1] [1932] A.C. 562; 48 T.L.R. 494, H.L.

**A.C.**          AND·PRIVY·COUNCIL.                    485

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
——
Lord Reid.

influenced by them; and they often do that without taking that care which they would take if asked for their opinion professionally or in a business connection.  The appellant agrees that there can be no duty of care on such occasions, and we were referred to American and South African authorities where that is recognised, although their law appears to have gone much further than ours has yet done.  But it is at least unusual casually to put into circulation negligently made articles which are dangerous.  A man might give a friend a negligently-prepared bottle of home-made wine and his friend's guests might drink it with dire results.  But it is by no means clear that those guests would have no action against the negligent manufacturer.

Another obvious difference is that a negligently made article will only cause one accident, and so it is not very difficult to find the necessary degree of proximity or neighbourhood between the negligent manufacturer and the person injured.  But words can be broadcast with or without the consent or the foresight of the speaker or writer.  It would be one thing to say that the speaker owes a duty to a limited class, but it would be going very far to say that he owes a duty to every ultimate " consumer " who acts on those words to his detriment.  It would be no use to say that a speaker or writer owes a duty but can disclaim responsibility if he wants to.  He, like the manufacturer, could make it part of a contract that he is not to be liable for his negligence : but that contract would not protect him in a question with a third party, at least if the third party was unaware of it.

So it seems to me that there is good sense behind our present law that in general an innocent but negligent misrepresentation gives no cause of action.  There must be something more than the mere misstatement.  I therefore turn to the authorities to see what more is required.  The most natural requirement would be that expressly or by implication from the circumstances the speaker or writer has undertaken some responsibility, and that appears to me not to conflict with any authority which is binding on this House.  Where there is a contract there is no difficulty as regards the contracting parties : the question is whether there is a warranty.  The refusal of English law to recognise any jus quaesitum tertii causes some difficulties, but they are not relevant, here.  Then there are cases where a person does not merely make a statement but performs a gratuitous service.  I do not intend to examine the cases about that, but at least they show that in some cases that person owes a duty of care apart from any con-tract, and to that extent they pave the way to holding that there

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

Lord Reid.

can be a duty of care in making a statement of fact or opinion which is independent of contract.

Much of the difficulty in this field has been caused by *Derry* v. *Peek*.[2] The action was brought against the directors of a company in respect of false statements in a prospectus. It was an action of deceit based on fraud and nothing else. But it was held that the directors had believed that their statements were true although they had no reasonable grounds for their belief. The Court of Appeal held that this amounted to fraud in law, but naturally enough this House held that there can be no fraud without dishonesty and that credulity is not dishonesty. The question was never really considered whether the facts had imposed on the directors a duty to exercise care. It must be implied that on the facts of that case there was no such duty. But that was immediately remedied by the Directors' Liability Act, 1890, which provided that a director is liable for untrue statements in a prospectus unless he proves that he had reasonable ground to believe and did believe that they were true.

It must now be taken that *Derry* v. *Peek*[2] did not establish any universal rule that in the absence of contract an innocent but negligent misrepresentation cannot give rise to an action. It is true Lord Bramwell said[3]: "To found an action for damages "there must be a contract and breach, or fraud." And for the next 20 years it was generally assumed that *Derry* v. *Peek*[4] decided that. But it was shown in this House in *Nocton* v. *Lord Ashburton*[5] that that is much too widely stated. We cannot, therefore, now accept as accurate the numerous statements to that effect in cases between 1889 and 1914, and we must now determine the extent of the exceptions to that rule.

In *Nocton* v. *Lord Ashburton*[5] a solicitor was sued for fraud. Fraud was not proved but he was held liable for negligence. Viscount Haldane L.C. dealt with *Derry* v. *Peek*[6] and pointed out[7] that while the relationship of the parties in that case was not enough, the case did not decide " that where a different sort " of relationship ought to be inferred from the circumstances the " case is to be concluded by asking whether an action for deceit " will lie . . . There are other obligations besides that of honesty " the breach of which may give a right to damages. These " obligations depend on principles which the judges have worked

---

[2] (1889) 14 App.Cas. 337; 5 T.L.R. 625. H.L.
[3] 14 App.Cas. 337, 347.
[4] Ibid. 337.

[5] [1914] A.C. 932; 30 T.L.R. 602. H.L.
[6] 14 App.Cas. 337.
[7] [1914] A.C. 932, 947.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
—
Lord Reid.

" out in the fashion that is characteristic of a system where much
" of the law has always been judge-made and unwritten." It
hardly needed *Donoghue* v. *Stevenson* [8] to show that that process
can still operate. Then [9] Lord Haldane quoted a passage from
the speech of Lord Herschell in *Derry* v. *Peek* [10] where he
excluded from the principle of that case " those cases where a
" person within whose special province it lay to know a particular
" fact has given an erroneous answer to an inquiry made with
" regard to it by a person desirous of ascertaining the fact for the
" purpose of determining his course." Then [11] he explained the
expression " constructive fraud " and said: " What it really
" means in this connection is, not moral fraud in the ordinary
" sense, but breach of the sort of obligation which is enforced by
" a court which from the beginning regarded itself as a court of
" conscience." He went on to refer to " breach of special duty "
and said [12]: " If such a duty can be inferred in a particular case
" of a person issuing a prospectus, as, for instance, in the case of
" directors issuing to the shareholders of the company which they
" direct a prospectus inviting the subscription by them of further
" capital, I do not find in *Derry* v. *Peek* [13] an authority for the
" suggestion that an action for damages for misrepresentation
" without an actual intention to deceive may not lie." I find no
dissent from these views by the other noble and learned Lords.
Lord Shaw also quoted the passage I have quoted from the speech
of Lord Herschell, and, dealing with equitable relief, he
approved [14] a passage in an argument of Sir Roundell Palmer in
*Peek* v. *Gurney* [15] which concluded, " . . . in order that a person
" may avail himself of relief founded on it he must show that
" there was such a proximate relation between himself and the
" person making the representation as to bring them virtually
" into the position of parties contracting with each other," an
interesting anticipation in 1871 of the test of who is my neighbour.

Lord Haldane gave a further statement of his view in *Robin-
son* v. *National Bank of Scotland Ltd.*,[16] a case to which I shall
return. Having said that in that case there was no duty excepting
the duty of common honesty, he went on to say: " In saying
" that I wish emphatically to repeat what I said in advising this
" House in the case of *Nocton* v. *Lord Ashburton*,[17] that it is a

[8] [1932] A.C. 562.
[9] [1914] A.C. 932, 950.
[10] 14 App.Cas. 337, 360.
[11] [1914] A.C. 932, 954.
[12] Ibid. 955.
[13] 14 App.Cas. 337.
[14] [1914] A.C. 932, 971.
[15] (1871) L.R. 13 Eq. 79, 97.
[16] 1916 S.C.(H.L.) 154, 157.
[17] [1914] A.C. 932.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Reid.

" great mistake to suppose that, because the principle in *Derry* v.
" *Peek* [18] clearly covers all cases of the class to which I have
" referred, therefore the freedom of action of the courts in
" recognising special duties arising out of other kinds of relation-
" ship which they find established by the evidence is in any way
" affected. I think, as I said in *Nocton's* case,[19] that an
" exaggerated view was taken by a good many people of the
" scope of the decision in *Derry* v. *Peek*.[20] The whole of the
" doctrine as to fiduciary relationships, as to the duty of care
" arising from implied as well as express contracts, as to the duty
" of care arising from other special relationships which the courts
" may find to exist in particular cases, still remains, and I should
" be very sorry if any word fell from me which should suggest
" that the courts are in any way hampered in recognising that the
" duty of care may be established when such cases really occur."
This passage makes it clear that Lord Haldane did not think that
a duty to take care must be limited to cases of fiduciary relation-
ship in the narrow sense of relationships which had been recog-
nised by the Court of Chancery as being of a fiduciary character.
He speaks of other special relationships, and I can see no logical
stopping place short of all those relationships where it is plain
that the party seeking information or advice was trusting the
other to exercise such a degree of care as the circumstances
required, where it was reasonable for him to do that, and where
the other gave the information or advice when he knew or ought
to have known that the inquirer was relying on him. I say
" ought to have known " because in questions of negligence we
now apply the objective standard of what the reasonable man
would have done.

A reasonable man, knowing that he was being trusted or that
his skill and judgment were being relied on, would, I think, have
three courses open to him. He could keep silent or decline to
give the information or advice sought: or he could give an answer
with a clear qualification that he accepted no responsibility for it
or that it was given without that reflection or inquiry which a
careful answer would require: or he could simply answer without
any such qualification. If he chooses to adopt the last course he
must, I think, be held to have accepted some responsibility for
his answer being given carefully, or to have accepted a relation-
ship with the inquirer which requires him to exercise such care
as the circumstances require.

[18] 14 App.Cas. 337.                    [20] 14 App.Cas. 337.
[19] [1914] A.C. 932.

**A.C.**                    AND PRIVY COUNCIL.                                487

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

Lord Reid.

If that is right, then it must follow that *Candler* v. *Crane, Christmas & Co.*[21] was wrongly decided. There the plaintiff wanted to see the accounts of a company before deciding to invest in it. The defendants were the company's accountants, and they were told by the company to complete the company's accounts as soon as possible because they were to be shown to the plaintiff who was a potential investor in the company. At the company's request the defendants showed the completed accounts to the plaintiff, discussed them with him, and allowed him to take a copy. The accounts had been carelessly prepared and gave a wholly misleading picture. It was obvious to the defendants that the plaintiff was relying on their skill and judgment and on their having exercised that care which by contract they owed to the company, and I think that any reasonable man in the plaintiff's shoes would have relied on that. This seems to me to be a typical case of agreeing to assume a responsibility: they knew why the plaintiff wanted to see the accounts and why their employers, the company, wanted them to be shown to him, and agreed to show them to him without even a suggestion that he should not rely on them.

The majority of the Court of Appeal held that they were bound by *Le Lievre* v. *Gould*[22] and that *Donoghue* v. *Stevenson*[23] had no application. In so holding I think that they were right. The Court of Appeal have bound themselves to follow all *rationes decidendi* of previous Court of Appeal decisions, and, in face of that rule, it would have been very difficult to say that the ratio in *Le Lievre* v. *Gould*[24] did not cover *Candler's* case.[25] Denning L.J., who dissented, distinguished *Le Lievre* v. *Gould*[26] on its facts, but, as I understand the rule which the Court of Appeal have adopted, that is not sufficient if the ratio applies; and this is not an appropriate occasion to consider whether the Court of Appeal's rule is a good one. So the question which we now have to consider is whether the ratio in *Le Lievre* v. *Gould*[26] can be supported. But before leaving *Candler's* case[27] I must note that Cohen L.J. (as he then was) attached considerable importance to a New York decision, *Ultramares Corporation* v. *Touche*,[28] a decision of Cardozo C.J. But I think that another

[21] [1951] 2 K.B. 164; [1951] 1 T.L.R. 371; [1951] 1 All E.R. 426, C.A.

[22] [1893] 1 Q.B. 491; 9 T.L.R. 243, C.A.

[23] [1932] A.C. 562.

[24] [1893] 1 Q.B. 491.

[25] [1951] 2 K.B. 164.

[26] [1893] 1 Q.B. 491.

[27] [1951] 2 K.B. 164.

[28] (1931) 255 N.Y. 170.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Reid.

decision of that great judge, *Glanzer* v. *Shepherd*,[29] is more in point because in the latter case there was a direct relationship between the weigher who gave a certificate and the purchaser of the goods weighed, who the weigher knew was relying on his certificate: there the weigher was held to owe a duty to the purchaser with whom he had no contract. The *Ultramares* case[30] can be regarded as nearer to *Le Lievre* v. *Gould*.[31]

In *Le Lievre* v. *Gould*[31] a surveyor, Gould, gave certificates to a builder who employed him. The plaintiffs were mortgagees of the builder's interest and Gould knew nothing about them or the terms of their mortgage; but the builder, without Gould's authority, chose to show them Gould's report. I have said that I do not intend to decide anything about the degree of proximity necessary to establish a relationship giving rise to a duty of care, but it would seem difficult to find such proximity in this case, and the actual decision in *Le Lievre* v. *Gould*[31] may therefore be correct. But the decision was not put on that ground: if it had been *Cann* v. *Willson*[32] would not have been overruled.

Lord Esher M.R. held that there was no contract between the plaintiffs and the defendant and that this House in *Derry* v. *Peek*[33] had " restated the old law that, in the absence of contract, " an action for negligence cannot be maintained when there is " no fraud."[34] Bowen L.J. gave a similar reason; he said[35]: " Then *Derry* v. *Peek*[36] decided this further point—viz., that in " cases like the present (of which *Derry* v. *Peek*[36] was itself an " instance) there is no duty enforceable in law to be careful "; and he added[37] that the law of England " does not consider that " what a man writes on paper is like a gun or other dangerous " instrument, and, unless he intended to deceive, the law does " not, in the absence of contract, hold him responsible for drawing " his certificate carelessly." So both he and Lord Esher held that *Cann* v. *Willson*[38] was wrong in deciding that there was a duty to take care. We now know on the authority of *Donoghue* v. *Stevenson*[39] that Bowen L.J. was wrong in limiting duty of care to guns or other dangerous instruments, and I think that, for reasons which I have already given, he was also wrong in limiting the duty of care with regard to statements to cases where

[29] (1922) 233 N.Y. 236.
[30] 255 N.Y. 170.
[31] [1893] 1 Q.B. 491.
[32] (1888) 39 Ch.D. 39; 4 T.L.R. 588.
[33] 14 App.Cas. 337.
[34] [1893] 1 Q.B. 491, 498.
[35] Ibid. 501.
[36] 14 App.Cas. 337.
[37] [1893] 1 Q.B. 491, 502.
[38] 39 Ch.D. 39.
[39] [1932] A.C. 562.

**A.C.**                    AND PRIVY COUNCIL.                    489

there is a contract.  On both points Bowen L.J. was expressing what was then generally believed to be the law, but later statements in this House have gone far to remove those limitations. I would therefore hold that the ratio in *Le Lievre* v. *Gould*[40] was wrong and that *Cann* v. *Willson*[41] ought not to have been overruled.

Now I must try to apply these principles to the present case. What the appellants complain of is not negligence in the ordinary sense of carelessness, but rather misjudgment, in that Mr. Heller, while honestly seeking to give a fair assessment, in fact made a statement which gave a false and misleading impression of his customer's credit.  It appears that bankers now commonly give references with regard to their customers as part of their business. I do not know how far their customers generally permit them to disclose their affairs, but, even with permission, it cannot always be easy for a banker to reconcile his duty to his customer with his desire to give a fairly balanced reply to an inquiry.  And inquirers can hardly expect a full and objective statement of opinion or accurate factual information such as skilled men would be expected to give in reply to other kinds of inquiry.  So it seems to me to be unusually difficult to determine just what duty beyond a duty to be honest a banker would be held to have undertaken if he gave a reply without an adequate disclaimer of responsibility or other warning.  It is in light of such considerations that I approach an examination of the case of *Robinson* v. *National Bank of Scotland Ltd.*[42]

It is not easy to extract the facts from the report of the case in the Court of Session.[43]  Several of the witnesses were held to be unreliable and the principal issue in the case, fraud, is not relevant for present purposes.  But the position appears to have been this.  Harley and two brothers Inglis wished to raise money. They approached an insurance company on the false basis that Harley was to be the borrower and the Inglis brothers were to be guarantors.  To satisfy the company as to the financial standing of the Inglis brothers Harley got his London bank to write to M'Arthur, a branch agent of the National Bank of Scotland, and M'Arthur on July 28, 1910, sent a reply which was ultimately held to be culpably careless but not fraudulent.  Robinson, the pursuer in the action, said that he had been approached by Harley

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
———
Lord Reid.

[40] [1893] 1 Q.B. 491.
[41] 39 Ch.D. 39.
[42] 1916 S.C.(H.L.) 154.
[43] 1916 S.C. 46.

H. L. (E.)
1963
———
HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
———
Lord Reid.
———

to become a guarantor before the inquiry was made by Harley, but he was disbelieved by the Lord Ordinary who held that he was not brought into the matter before September. This was accepted by the majority in the Inner House and there is no indication that any of their Lordships in this House questioned the finding that the letter of July 28 was not obtained on behalf of Robinson. Harley and the brothers Inglis did not proceed with their scheme in July but they resumed negotiations in September. The company wanted an additional guarantor and Harley approached Robinson. A further reference was asked and obtained from M'Arthur on October 1 about the Brothers Inglis, but no point was made of this. The whole case turned on M'Arthur's letter of July 28. After further negotiation the company made a loan to Harley with the brothers Inglis and Robinson as guarantors. . Harley and the brothers Inglis all became bankrupt and Robinson had to pay the company under his guarantee.

Robinson sued the National Bank and M'Arthur. He alleged that M'Arthur's letter was fraudulent and that he had been induced by it to guarantee the loan. He also alleged that M'Arthur had a duty to disclose certain facts about the brothers Inglis which were known to him, but this alternative case played a very minor part in the litigation. Long opinions were given in the Court of Session on the question of fraud but the alternative case of a duty to disclose was dealt with summarily. The Lord Justice-Clerk said [44]: " It appears to me that there was no such " duty of disclosure imposed upon Mr. M'Arthur towards the " pursuer as would justify us in applying the principle on which " *Nocton's* case [45] was decided." Lord Dundas referred [46] to cases of liability of a solicitor to his client for erroneous advice and of similar liability arising from a fiduciary relationship and said : " Such decisions seem to me to have no bearing on, or " application to, the facts of the present case." He also drew attention to the last sentence of the letter of July 28 which he said would become important if fraud were out of the case. That sentence is : " The above information is to be considered strictly " confidential, and is given on the express understanding that we " incur no responsibility whatever in furnishing it." Lord Salvesen, who dissented, did not deal with the point: and

[44] 1916 S.C. 46, 63.          [46] 1916 S.C. 46, 67.
[45] [1914] A.C. 932.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Reid.

Lord Guthrie merely said [47] that here there was no fiduciary relationship.

In this House an unusual course was taken during the argument [48]: "... after counsel for the respondents (Mr. Blackburn "K.C.) had been heard for a short time, Earl Loreburn informed "him that their Lordships, as at present advised, thought that "there was no special duty on M'Arthur toward the pursuer; "that the respondents were not liable unless M'Arthur's repre- "sentations were dishonest; and that their Lordships had not "been satisfied as yet that the representations were dishonest "... that under the circumstances the House was prepared to "dismiss the appeal; but that they considered the pursuer "had been badly treated, though he had not any cause of action "at law, and that, therefore, their Lordships were disposed to "direct that there should be no costs of the action on either side. "Earl Loreburn said that Mr. Blackburn might prefer to argue "the case further and endeavour to alter these views, but of "course he would run the risk of altering their Lordships' views "as to the legal responsibility as well as upon the subject of "costs." Mr. Blackburn then—wisely no doubt—said no more, and judgment was given for the bank but with no costs here or below.

That case is very nearly indistinguishable from the present case. Lord Loreburn regarded the fact that M'Arthur knew that his letter might be used to influence others besides the immediate inquirer as entitling Robinson to found on it if fraud had been proved. But it is not clear to me that he intended to decide that there would have been sufficient proximity between Robinson and M'Arthur to enable him to maintain that there was a special relationship involving a duty of care if the other facts had been sufficient to create such a relationship. I would not regard this as a binding decision on that question.

With regard to the bank's duty Lord Haldane said [49]: "There "is only one other point about which I wish to say anything, and "that is the question which was argued by the appellant, as to "there being a special duty of care under the circumstances "here. I think the case of *Derry* v. *Peek* [50] in this House has "finally settled in Scotland, as well as in England and Ireland, "the conclusion that in a case like this no duty to be careful is "established. There is the general duty of common honesty, and

[47] 1916 S.C. 46, 85.
[48] 1916 S.C.(H.L.) 154–5.
[49] Ibid. 157.
[50] 14 App.Cas. 337.

492                          HOUSE OF LORDS                    **[1964]**

H. L. (E.)
1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
—
Lord Reid.

"that duty, of course, applies to the circumstances of this case
"as it applies to all other circumstances. But when a mere
"inquiry is made by one banker of another, who stands in no
"special relation to him, then, in the absence of special
"circumstances from which a contract to be careful can be
"inferred, I think there is no duty excepting the duty of common
"honesty to which I have referred."

I think that by "a contract to be careful" Lord Haldane must
have meant an agreement or undertaking to be careful. This
was a Scots case and by Scots law there can be a contract without
consideration: Lord Haldane cannot have meant that similar
cases in Scotland and England would be decided differently on
the matter of special relationship for that reason. I am, I think,
entitled to note that this was an extempore judgment. So Lord
Haldane was contrasting a "mere inquiry" with a case where
there are special circumstances from which an undertaking to be
careful can be inferred. In *Robinson's* case [51] any such under-
taking was excluded by the sentence in M'Arthur's letter which I
have quoted and in which he said that the information was given
"on the express understanding that we incur no responsibility
"whatever in furnishing it."

It appears to me that the only possible distinction in the
present case is that here there was no adequate disclaimer of
responsibility. But here the appellants' bank, who were their
agents in making the inquiry, began by saying that "they wanted
"to know in confidence and without responsibility on our part,"
that is, on the part of the respondents. So I cannot see how the
appellants can now be entitled to disregard that and maintain
that the respondents did incur a responsibility to them.

The appellants founded on a number of cases in contract
where very clear words were required to exclude the duty of care
which would otherwise have flowed from the contract. To that
argument there are, I think, two answers. In the case of a
contract it is necessary to exclude liability for negligence, but in
this case the question is whether an undertaking to assume a
duty to take care can be inferred: and that is a very different
matter. And, secondly, even in cases of contract general words
may be sufficient if there was no other kind of liability to be
excluded except liability for negligence: the general rule is that
a party is not exempted from liability for negligence "unless
"adequate words are used"—*per* Scrutton L.J. in *Rutter* v.

[51] 1916 S.C.(H.L.) 154.

*Palmer.*[52]  It being admitted that there was here a duty to give an honest reply, I do not see what further liability there could be to exclude except liability for negligence: there being no contract there was no question of warranty.

I am therefore of opinion that it is clear that the respondents never undertook any duty to exercise care in giving their replies. The appellants cannot succeed unless there was such a duty and therefore in my judgment this appeal must be dismissed.

H. L. (E.)

1963

HEDLEY
BYRNE & Co.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

LORD MORRIS OF BORTH-Y-GEST.  My Lords, the important question of law which has concerned your Lordships in this appeal is whether, in the circumstances of the case, there was a duty of care owed by the respondents, whom I will call " the bank," to the appellants, whom I will call " Hedleys."  In order to recover the damages which they claim Hedleys must establish that the bank owed them a duty, that the bank failed to discharge such duty, and that as a consequence Hedleys suffered loss.

An allegation of fraud was originally made but was abandoned. The learned judge held that the bank had been negligent but that they owed no duty to Hedleys to exercise care.  The Court of Appeal agreed with the learned judge that no such duty was owed and it was therefore not necessary for them to consider whether the finding of negligence ought or ought not to be upheld.  In your Lordships' House the legal issues were debated and again it did not become necessary to consider whether the finding of negligence ought or ought not to be upheld.  It is but fair to the bank to state that they firmly contend that they were not in any way negligent and that they were prepared to make submissions by way of challenge of the conclusions of the learned judge.

[His Lordship stated the facts and continued:]  It is, I think, a reasonable and proper inference that the bank must have known that the National Provincial were making their inquiry because some customer of theirs was or might be entering into some advertising contract in respect of which Easipower Ltd. might become under a liability to such customer to the extent of the figures mentioned.  The inquiries were from one bank to another.  The name of the customer (Hedleys) was not mentioned by the inquiring bank (National Provincial) to the answering bank (the bank): nor did the inquiring bank (National Provincial) give to the customer (Hedleys) the name of the answering bank (the bank).  These circumstances do not seem to me to be material. The bank must have known that the inquiry was being made by

[52] [1922] 2 K.B. 87, 92; 38 T.L.R. 555, C.A.

494          HOUSE OF LORDS          **[1964]**

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

Lord Morris of
Borth-y-Gest.

someone who was contemplating doing business with Easipower Ltd. and that their answer or the substance of it would in fact be passed on to such person. The conditions subject to which the bank gave their answers are important but the fact that the person to whom the answers would in all probability be passed on was unnamed and unknown to the bank is not important for the purposes of a consideration of the legal issue which now arises. It is inherently unlikely that the bank would have entertained a direct application from Hedleys asking for a report or would have answered an inquiry made by Hedleys themselves: even if they had, they would certainly have stipulated that their answer was without responsibility. The present appeal does not raise any question as to the circumstances under which a banker is entitled (apart from direct authorisation) to answer an inquiry. I leave that question as it was left by Atkin L.J. in *Tournier* v *National Provincial & Union Bank of England* [53] when he said: " I do not desire to express any final opinion on the practice of " bankers to give one another information as to the affairs of their " respective customers, except to say it appears to me that if it is " justified it must be upon the basis of an implied consent of the " customer."

The legal issue which arises is, therefore, whether the bank would have been under a liability to Hedleys if they had failed to exercise care. This involves the questions whether the circumstances were such that the bank owed a duty of care to Hedleys, or would have owed such a duty but for the words " without " responsibility," or whether they owed such a duty but were given a defence by the words " without responsibility " which would protect them if they had failed to exercise due care.

My Lords, it seems to me that if A assumes a responsibility to B to tender him deliberate advice, there could be a liability if the advice is negligently given. I say " could be " because the ordinary courtesies and exchanges of life would become impossible if it were sought to attach legal obligation to every kindly and friendly act. But the principle of the matter would not appear to be in doubt. If A employs B (who might, for example, be a professional man such as an accountant or a solicitor or a doctor) for reward to give advice and if the advice is negligently given there could be a liability in B to pay damages. The fact that the advice is given in words would not, in my view, prevent liability from arising. Quite apart, however, from employment or contract

[53] [1924] 1 K.B. 461, 486; 40 T.L.R. 214, C.A.

there may be circumstances in which a duty to exercise care will arise if a service is voluntarily undertaken. A medical man may unexpectedly come across an unconscious man, who is a complete stranger to him, and who is in urgent need of skilled attention: if the medical man, following the fine traditions of his profession, proceeds to treat the unconscious man he must exercise reasonable skill and care in doing so. In his speech in *Banbury* v. *Bank of Montreal*[54] Lord Atkinson said: " It is well " established that if a doctor proceeded to treat a patient " gratuitously, even in a case where the patient was insensible " at the time and incapable of employing him, the doctor would " be bound to exercise all the professional skill and knowledge he " possessed, or professed to possess, and would be guilty of gross " negligence if he omitted to do so." To a similar effect were the words of Lord Loughborough in the much earlier case of *Shiells* v. *Blackburne*[55] when he said: " . . . if a man gratuitously " undertakes to do a thing to the best of his skill, where his " situation or profession is such as to imply skill, an omission of " that skill is imputable to him as gross negligence." Compare also *Wilkinson* v. *Coverdale*.[56] I can see no difference of principle in the case of a banker. If someone who was not a customer of a bank made a formal approach to the bank with a definite request that the bank would give him deliberate advice as to certain financial matters of a nature with which the bank ordinarily dealt the bank would be under no obligation to accede to the request: if, however, they undertook, though gratuitously, to give deliberate advice (I exclude what I might call casual and perfunctory conversations) they would be under a duty to exercise reasonable care in giving it. They would be liable if they were negligent although, there being no consideration, no enforceable contractual relationship was created.

In the absence of any direct dealings between one person and another, there are many and varied situations in which a duty is owed by one person to another. A road user owes a duty of care towards other road users. They are his " neighbours." A duty was owed by the dock owner in *Heaven* v. *Pender*.[57] Under a contract with a shipowner he had put up a staging outside a ship in his dock. The plaintiff used the staging because he was employed by a ship painter who had contracted with the shipowner to paint the outside of the ship. The presence of the

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Morris of
Borth-y-Gest.

[54] [1918] A.C. 626, 689; 34 T.L.R. 518, H.L.(E.).
[55] (1789) 1 H.Bl. 158.
[56] (1793) 1 Esp. 75.
[57] (1883) 11 Q.B.D. 503, C.A.

H. L. (E.)
1963
———
HEDLEY
BYRNE & Co.
LTD.
v.
HELLER &
PARTNERS
LTD:
———
Lord Morris of
Borth-y-Gest.

plaintiff was for business in which the dock owner was interested and the plaintiff was to be considered as having been invited by the dock owner to use the staging. The dock owner was therefore under an obligation to take reasonable care that at the time when the staging was provided by him for immediate use it was in a fit state to be used. For an injury which the plaintiff suffered because the staging had been carelessly put up he was entitled to succeed in a claim against the defendant. The chemist in *George* v. *Skivington* [58] sold the bottle of hair wash to the husband knowing that it was to be used by the wife. It was held on demurrer that the chemist owed a duty towards the wife to use ordinary care in compounding the hair wash. In *Donoghue* v. *Stevenson* [59] it was held that the manufacturer of an article of food, medicine, or the like, is under a duty to the ultimate consumer to take reasonable care that the article is free from defect likely to cause injury to health.

My Lords, these are but familiar and well known illustrations, which could be multiplied, which show that irrespective of any contractual or fiduciary relationship and irrespective of any direct dealing, a duty may be owed by one person to another. It is said, however, that where careless (but not fraudulent) misstatements are in question there can be no liability in the maker of them unless there is either some contractual or fiduciary relationship with a person adversely affected by the making of them or unless, through the making of them, something is created or circulated or some situation is created which is dangerous to life, limb or property. In logic I can see no essential reason for distinguishing injury which is caused by a reliance upon words from injury which is caused by a reliance upon the safety of the staging to a ship or by a reliance upon the safety for use of the contents of a bottle of hair wash or a bottle of some consumable liquid. It seems to me, therefore, that if A claims that he has suffered injury or loss as a result of acting upon some misstatement made by B who is not in any contractual or fiduciary relationship with him, the inquiry that is first raised is whether B owed any duty to A: if he did the further inquiry is raised as to the nature of the duty. There may be circumstances under which the only duty owed by B to A is the duty of being honest: there may be circumstances under which B owes to A the duty not only of being honest but also a duty of taking reasonable care.

[58] (1869) L.R. 5 Ex. 1.          [59] [1932] A.C. 562.

The issue in the present case is whether the bank owed any duty to Hedleys and if so what the duty was.

Leaving aside cases where there is some contractual or fiduciary relationship, there may be many situations in which one person voluntarily or gratuitously undertakes to do something for another person and becomes under a duty to exercise reasonable care. I have given illustrations. But apart from cases where there is some direct dealing there may be cases where one person issues a document which should be the result of an exercise of the skill and judgment required by him in his calling and where he knows and intends that its accuracy will be relied upon by another. In this connection it will be helpful to consider the case of *Cann* v. *Willson*.[60] The owner of some property wished to obtain an advance of money on mortgage of the property and applied to a firm of solicitors for the purpose of their finding a mortgagee. Being informed by the solicitors that, for the purpose of finding a mortgagee, he should have a valuation made of the property, he consulted the defendants and asked them to make a valuation. They surveyed and inspected the property and then made a valuation which they sent to the solicitors. The solicitors then particularly called the defendants' attention to the purpose for which the valuation was wanted and to the responsibility they were undertaking. The defendants stated that their valuation was a moderate one and certainly was not made in favour of the borrower. The valuation and representations so made by the defendants to the solicitors were communicated to the plaintiff (and a co-trustee of his) by the solicitors. The plaintiff (and his co-trustee, who died before the commencement of the action) then advanced money to the owner upon the security of a mortgage of his property. Chitty J. held [61] on the evidence (1) that the defendants were aware of the purpose for which the valuation was made, and (2) that the " valuation was sent by the defen-" dants direct to the agents of the plaintiff for the purpose of " inducing the plaintiff and his co-trustee to lay out the trust " money on mortgage." The owner made default in payment and the property proved insufficient to answer the mortgage. The plaintiff alleged that the value of the property was not anything like the value given by the defendants in their valuation. Chitty J. held [61] that " the valuation as made was, in fact, no " valuation at all." In those circumstances, the claim made was on the basis that the plaintiff had sustained loss through the

[60] 39 Ch.D. 39.                    [61] Ibid. 42.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Morris of
Borth-y-Gest.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
——
Lord Morris of
Borth-y-Gest.

negligence, want of skill, breach of duty and misrepresentation of the defendants.  Chitty J. held the defendants liable.  His decision was principally based upon his finding that the defendants owed a duty of care to the plaintiff.  It had been argued that there was also liability in the defendants in contract (referred to in the judgment as the first ground) and on the ground of fraud (referred to as the third ground).  At the end of his judgment Chitty J. said [62]: " I have entirely passed by the question of " contract.  It is unnecessary to decide that point.  I consider " on these two last grounds—and if I were to prefer one to the " other it would be the second ground—that the defendant is " liable for the negligence."  In the course of his judgment he said [63]: " It is not necessary, in my opinion, to decide the case " with reference to the third point, but even on the third point " I think the defendants are liable—and that is what may be " termed fraudulent misrepresentation."  He then (that is, on June 7, 1888) referred to the judgment in the Court of Appeal in *Peek* v. *Derry*.[64]  That judgment was reversed in the House of Lords on July 1, 1889.  Chitty J. compared the situation with that which arose in *Heaven* v. *Pender*.[65]  He pointed out [66] that in that case there was " no contractual relation between the " plaintiff and the dock-owner, and there was no personal direct " invitation to the plaintiff to come and do the work on that ship, " yet it was held that the dock-owner had undertaken an obliga-" tion towards the plaintiff, who was one of the persons likely to " come and do the work to the vessel, and that he was liable to " him and was under an obligation to him to use due diligence " in the construction of the staging."  Chitty J. went on, there-fore, to hold [67] that, as the defendants had " knowingly placed " themselves " in the position of sending their valuation " direct " to the agents of the plaintiff for the purpose of inducing the " plaintiff," then they " in point of law incurred a duty towards " him to use reasonable care in the preparation of the document."  He likened the case to *George* v. *Skivington* [68] and continued [69]: " In this case the document supplied appears to me to stand " upon a similar footing and not to be distinguished from that " case, as if it had been an actual article that had been handed " over for the particular purpose of being so used.  I think, there-" fore, that the defendants stood with regard to the plaintiff—

[62] 39 Ch.D. 39, 44.
[63] *Ibid.* 43.
[64] (1887) 37 Ch.D. 541, C.A.
[65] 11 Q.B.D. 503.

[66] 39 Ch.D. 39, 42.
[67] *Ibid.* 42–3.
[68] L.R. 5 Ex. 1.
[69] 39 Ch.D. 39, 43.

**A.C.**                AND PRIVY COUNCIL.                                 499

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

Lord Morris of
Borth-y-Gest.

" quite apart from any question of there being a contract or not
" in the peculiar circumstances of this case—in the position of
" being under an obligation or duty towards him." My Lords, I
can see no fault or flaw in this reasoning and I am prepared to
uphold it. If it is correct, then it is submitted that in the present
case the bank knew that some existing (though to them by name
unknown) person was going to place reliance upon what they said
and that accordingly they owed a duty of care to such person. I
will examine this submission. Before doing so I must, however,
further consider *Cann* v. *Willson*.[70] It was overruled by the Court
of Appeal in *Le Lievre* v. *Gould*.[71] The latter case, binding on
the Court of Appeal, in turn led to the decision in *Candler* v.
*Crane, Christmas & Co.*[72] It is necessary, therefore, to consider
the reasons which governed the Court of Appeal in *Le Lievre* v.
*Gould*[73] in overruling *Cann* v. *Willson*.[74] I do not propose to
examine the facts in *Le Lievre* v. *Gould*[75]; nor need I consider
whether the result would have been no different had *Cann* v.
*Willson*[76] not been overruled. Lord Esher M.R. said[77]: " But
" I do not hesitate to say that *Cann* v. *Willson* is not now law.
" Chitty J., in deciding that case, acted upon an erroneous pro-
" position of law, which has been since overruled by the House
" of Lords in *Derry* v. *Peek*[78] when they restated the old law
" that, in the absence of contract, an action for negligence cannot
" be maintained when there is no fraud." Bowen L.J. said[79]
that he considered that *Derry* v. *Peek*[80] had overruled *Cann* v.
*Willson*.[81] He considered that *Heaven* v. *Pender*[82] gave no
support for that decision because it was no more than an instance
of the class of cases where one who, having the conduct and
control of premises which may injure those whom he knows will
have a right to and will use them, owes a duty to protect them.
He said[83]: " Then *Derry* v. *Peek*[84] decided this further point,—
" viz., that in cases like the present (of which *Derry* v. *Peek*[84]
" was itself an instance) there is no duty enforceable in law to be
" careful." He followed the view expressed by Romer J. in
*Scholes* v. *Brook*[85] that the decision of the House of Lords in

---

[70] 39 Ch.D. 39.
[71] [1893] 1 Q.B. 491.
[72] [1951] 2 K.B. 164.
[73] [1893] 1 Q.B. 491.
[74] 39 Ch.D. 39.
[75] [1893] 1 Q.B. 491.
[76] 39 Ch.D. 39.
[77] [1893] 1 Q.B. 491, 497–8.
[78] 14 App.Cas. 337.

[79] [1893] 1 Q.B. 491, 499.
[80] 14 App.Cas. 337.
[81] 39 Ch.D. 39.
[82] 11 Q.B.D. 503.
[83] [1893] 1 Q.B. 491, 501.
[84] 14 App.Cas. 337.
[85] (1891) 63 L.T. 837; 7 T.L.R.
214; 64 L.T. 674, C.A.

500    HOUSE OF LORDS    **[1964]**

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Morris of
Borth-y-Gest.

*Derry* v. *Peek* [86] by implication negatived the existence of any such general rule as laid down in *Cann* v. *Willson*.[87] The reasoning of A. L. Smith L.J. in overruling *Cann* v. *Willson* [87] was on similar lines.

The inquiry is thus raised as to whether it was correct to say that *Derry* v. *Peek* [88] had either directly or at least by implication overruled that part of the reasoning in *Cann* v. *Willson* [89] which led Chitty J. to say that, quite apart from contract and quite apart from fraud, there was a duty of care owed by the defendants to the plaintiffs. My Lords, whatever views may have been held at one time as to the effect of *Derry* v. *Peek*,[90] authoritative guidance as to this matter was given in your Lordships' House in 1914 in the case of *Nocton* v. *Lord Ashburton*.[91] In his speech in that case Viscount Haldane L.C. said [92]: " My " Lords, the discussion of the case by the noble and learned " Lords who took part in the decision appears to me to exclude " the hypothesis that they considered any other question to be " before them than what was the necessary foundation of an " ordinary action for deceit. They must indeed be taken to have " thought that the facts proved as to the relationship of the " parties in *Derry* v. *Peek* [93] were not enough to establish any " special duty arising out of that relationship other than the " general duty of honesty. But they do not say that where a " different sort of relationship ought to be inferred from the cir- " cumstances the case is to be concluded by asking whether an " action for deceit will lie. I think that the authorities subsequent " to the decision of the House of Lords show a tendency to " assume that it was intended to mean more than it did. In " reality the judgment covered only a part of the field in which " liabilities may arise. There are other obligations besides that " of honesty the breach of which may give a right to damages. " These obligations depend on principles which the judges have " worked out in the fashion that is characteristic of a system " where much of the law has always been judge-made and " unwritten." After a review of many authorities Lord Haldane said [94]: " But side by side with the enforcement of the duty of " universal obligation to be honest and the principle which gave " the right to rescission, the courts, and especially the Court of

[86] 14 App.Cas. 337.
[87] 39 Ch.D. 39.
[88] 14 App.Cas. 337.
[89] 39 Ch.D. 39.
[90] 14 App.Cas. 337.

[91] [1914] A.C. 932.
[92] Ibid. 947.
[93] 14 App.Cas. 337.
[94] [1914] A.C. 932, 955.

**A.C.**                    AND PRIVY COUNCIL.                    501

H. L. (E.)

1968

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

Lord Morris of
Borth-y-Gest.

" Chancery, had to deal with the other cases to which I have
" referred, cases raising claims of an essentially different character,
" which have often been mistaken for actions of deceit. Such
" claims raise the question whether the circumstances and
" relations of the parties are such as to give rise to duties of
" particular obligation which have not been fulfilled." Lord
Haldane pointed out that from the circumstances and relations
of the parties a special duty may arise: there may be an implied
contract at law or a fiduciary obligation in equity. What *Derry*
v. *Peek* [95] decided was that the directors were under no fiduciary
duty to the public to whom they had addressed the invitation to
subscribe. (I need not here refer to statutory enactments since
*Derry* v. *Peek*.[95])

In his speech in the same case Lord Dunedin pointed out [96]
that there can be no negligence unless there is a duty but that a
duty may arise in many ways. There may be duties owing to the
world at large: alterum non laedere. There may be duties arising
from contract. There may be duties which arise from a relation-
ship without the intervention of contract in the ordinary sense of
the term, such as the duties of a trustee to his cestui que trust or
of a guardian to his ward.

Lord Shaw in his speech pointed out [97] that *Derry* v. *Peek* [98]
" was an action wholly and solely of deceit, founded wholly and
" solely on fraud, was treated by this House on that footing alone,
" and that—this being so—what was decided was that fraud must
" ex necessitate contain the element of moral delinquency.
" Certain expressions by learned Lords may seem to have made
" incursions into the region of negligence, but *Derry* v. *Peek* [98]
" as a decision was directed to the single and specific point just
" set out." Lord Shaw [99] formulated the following principle:
" That once the relations of parties have been ascertained to be
" those in which a duty is laid upon one person of giving informa-
" tion or advice to another upon which that other is entitled to
" rely as the basis of a transaction, responsibility for error amount-
" ing to misrepresentation in any statement made will attach to
" the adviser or informer, although the information and advice
" have been given not fraudulently but in good faith."

Lord Parmoor in his speech said [100] in reference to *Derry* v.
*Peek* [101]: " That case decides that in an action founded on deceit,

---

[95] 14 App.Cas. 337.
[96] [1914] A.C. 932, 964.
[97] Ibid. 970-1.
[98] 14 App.Cas. 337.
[99] [1914] A.C. 932, 972.
[100] Ibid. 978.
[101] 14 App.Cas. 337.

502                    HOUSE OF LORDS                    [1964]

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Morris of
Borth-y-Gest.

" and in which deceit is a necessary factor, actual dishonesty,
" involving mens rea, must be proved. The case, in my opinion,
" has no bearing whatever on actions founded on a breach of duty
" in which dishonesty is not a necessary factor."

My Lords, guided by the assistance given in *Nocton* v. *Lord Ashburton*,[102] I consider that it ought not to have been held in *Le Lievre* v. *Gould* [103] that *Cann* v. *Willson* [104] was wrongly decided. Independently of contract, there may be circumstances where information is given or where advice is given which establishes a relationship which creates a duty not only to be honest but also to be careful.

In his speech in *Heilbut, Symons & Co.* v. *Buckleton* [105] Lord Moulton said that it was of the greatest importance to " maintain " in its full integrity the principle that a person is not liable in " damages for an innocent misrepresentation, no matter in what " way or under what form the attack is made." That principle is, however, in no way impeached by recognition of the fact that if a duty exists there is a remedy for the breach of it. As Bowen L.J. said in *Low* v. *Bouverie* [106]: " . . . the doctrine that negli- " gent misrepresentation affords no cause of action is confined to " cases in which there is no duty, such as the law recognises, to " be careful."

The inquiry in the present case, and in similar cases, becomes, therefore, an inquiry as to whether there was a relationship between the parties which created a duty and, if so, whether such duty included a duty of care.

The guidance which Lord Haldane gave in *Nocton* v. *Lord Ashburton* [107] was repeated by him in his speech in *Robinson* v. *National Bank of Scotland Ltd.*[108] He clearly pointed out that *Derry* v. *Peek* [109] did not affect (1) the whole doctrine as to fiduciary relationship, (2) the duty of care arising from implied as well as express contracts, and (3) the duty of care arising from other special relationships which the courts may find to exist in particular cases.

My Lords, I consider that it follows and that it should now be regarded as settled that if someone possessed of a special skill undertakes, quite irrespective of contract, to apply that skill for the assistance of another person who relies upon such skill, a duty

102 [1914] A.C. 932.
103 [1893] 1 Q.B. 491.
104 39 Ch.D. 39.
105 [1913] A.C. 30, 51, H.L.

106 [1891] 3 Ch. 82, 105; 7 T.L.R.
582, C.A.
107 [1914] A.C. 932.
108 1916 S.C.(H.L.) 154.
109 14 App.Cas. 337.

**A.C.**                 AND PRIVY COUNCIL.                     503

of care will arise. The fact that the service is to be given by
means of or by the instrumentality of words can make no differ-
ence. Furthermore, if in a sphere in which a person is so placed
that others could reasonably rely upon his judgment or his skill or
upon his ability to make careful inquiry, a person takes it upon
himself to give information or advice to, or allows his information
or advice to be passed on to, another person who, as he knows or
should know, will place reliance upon it, then a duty of care will
arise.

H. L. (E.)

1963
___
HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.
___
Lord Morris of
Borth-y-Gest.

I do not propose to examine the facts of particular situations
or the facts of recently decided cases in the light of this analysis
but I proceed to apply it to the facts of the case now under review.
As I have stated, I approach the case on the footing that the bank
knew that what they said would in fact be passed on to some
unnamed person who was a customer of the National Provincial
Bank. The fact that it was said that "they," that is, the
National Provincial Bank, "wanted to know" does not prevent
this conclusion. In these circumstances, I think some duty
towards the unnamed person, whoever it was, was owed by the
bank. There was a duty of honesty. The great question, however,
is whether there was a duty of care. The bank need not have
answered the inquiry from the National Provincial Bank. It
appears, however, that it is a matter of banking convenience or
courtesy and presumably of mutual business advantage that
inquiries as between banks will be answered. The fact that it is
most unlikely that the bank would have answered a direct inquiry
from Hedleys does not affect the question as to what the bank
must have known as to the use that would be made of any answer
that they gave but it cannot be left out of account in considering
what it was that the bank undertook to do. It does not seem to
me that they undertook before answering an inquiry to expend
time or trouble " in searching records, studying documents,
" weighing and comparing the favourable and unfavourable
" features and producing a well-balanced and well-worded
" report." (I quote the words of Pearson L.J.[110]) Nor does it
seem to me that the inquiring bank (nor therefore their customer)
would expect such a process. This was, I think, what was denoted
by Lord Haldane in his speech in *Robinson* v. *National Bank of
Scotland Ltd.*[111] when he spoke of a " mere inquiry " being made
by one banker of another. In *Parsons* v. *Barclay & Co. Ltd.*[112]

[110] [1962] 1 Q.B. 396, 414; [1961]
3 W.L.R. 1225; [1961] 3 All E.R.
891, C.A.

[111] 1916 S.C.(H.L.) 154.
[112] (1910) 103 L.T. 196; 26 T.L.R.
628, C.A.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

Lord Morris of
Borth-y-Gest.

Cozens-Hardy M.R. expressed the view that it was no part of a banker's duty, when asked for a reference, to make inquiries outside as to the solvency or otherwise of the person asked about or to do more than answer the question put to him honestly from what he knew from the books and accounts before him. There was in the present case no contemplation of receiving anything like a formal and detailed report such as might be given by some concern charged with the duty (probably for reward) of making all proper and relevant inquiries concerning the nature, scope and extent of a company's activities and of obtaining and marshalling all available evidence as to its credit, efficiency, standing and business reputation. There is much to be said, therefore, for the view that if a banker gives a reference in the form of a brief expression of opinion in regard to credit-worthiness he does not accept, and there is not expected from him, any higher duty than that of giving an honest answer. I need not, however, seek to deal further with this aspect of the matter, which perhaps cannot be covered by any statement of general application, because, in my judgment, the bank in the present case, by the words which they employed, effectively disclaimed any assumption of a duty of care. They stated that they only responded to the inquiry on the basis that their reply was without responsibility. If the inquirers chose to receive and act upon the reply they cannot disregard the definite terms upon which it was given. They cannot accept a reply given with a stipulation and then reject the stipulation. Furthermore, within accepted principles (as illustrated in *Rutter* v. *Palmer* [113]) the words employed were apt to exclude any liability for negligence.

I would therefore dismiss the appeal.

LORD HODSON. My Lords, the appellants, who are advertising agents, claim damages for loss which they allege they have suffered through the negligence of the respondents, who are merchant bankers. The negligence attributed to the respondents consists of their failure to act with reasonable skill and care in giving references as to the credit-worthiness of a company called Easipower Ltd. which went into liquidation after the references had been given so that the appellants were unable to recover the bulk of the costs of advertising orders which Easipower Ltd. had placed with them. The learned judge at the trial found that the respondent bankers had been negligent in the advice which they gave in

[113] [1922] 2 K.B. 87.

**A.C.**          AND PRIVY COUNCIL.                              505

the form of bankers' references, the appellants being a company
which acted in reliance on the references and suffered financial
loss accordingly, but that he must enter judgment for the respon-         1963
dents since there was no duty imposed by law to exercise care in     HEDLEY
giving these references, the duty being only to act honestly in so   BYRNE & CO.
doing.                                                                 LTD.
                                                                        v.
    The respondents have at all times maintained that they were     HELLER &
in no sense negligent and further that no damage flowed from the    PARTNERS
                                                                        LTD.
giving of references, but first they took the point that, whether or
no they were careless and whether or no the appellants suffered     Lord Hodson.
damage as a result of their carelessness, they must succeed on the
footing that no duty was owed by them. This point has been
taken throughout as being, if the respondents are right, decisive
of the whole matter. I will deal with it first, although the under-
lying question is whether the respondent bankers who at all times
disclaimed responsibility ever assumed any duty at all.

    The appellants depend on the existence of a duty said to be
assumed by or imposed on the respondents when they gave a
reference as to the credit-worthiness of Easipower Ltd. knowing
that it would or might be relied upon by the appellants or some
other third party in like situation.

    The case has been argued first on the footing that the duty
was imposed by the relationship between the parties recognised
by law as being a special relationship derived either from the
notion of proximity introduced by Lord Esher in *Heaven* v.
*Pender*,[114] or from those cases firmly established in our law which
show that those who hold themselves out as possessing a special
skill are under a duty to exercise it with reasonable care.

    The important case of *Donoghue* v. *Stevenson*[115] shows that
the area of negligence is extensive, for, as Lord Macmillan said:
" The grounds of action may be as various and manifold as human
" errancy; and the conception of legal responsibility may develop
" in adaptation to altering social conditions and standards. The
" criterion of judgment must adjust and adapt itself to the
" changing circumstances of life. The categories of negligence
" are never closed. . . . Where there is room for diversity of view,
" it is in determining what circumstances will establish such a
" relationship between the parties as to give rise, on the one side,
" to a duty to take care, and on the other side to a right to have
" care taken."

    In that case the necessary relationship was held to have been

---

[114] 11 Q.B.D. 503, 509.          [115] [1932] A.C. 562, 619.

    A.C. 1964.                                              33

506                            HOUSE OF LORDS                    [**1964**]

H. L. (E.)
1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Hodson.

established where the manufacturer of an article, ginger beer in a bottle, sold it to a distributor in circumstances which prevented the distributor or the ultimate purchaser or consumer from discovering by inspection any defect. He is under a legal duty to the ultimate purchaser or consumer to take reasonable care that the article is free from injurious defect. No doubt that was the actual decision in that case, and indeed it was thought by Wrottesley J. in *Old Gate Estates Ltd.* v. *Toplis & Harding & Russell* [116] that he was precluded from awarding damages in tort for a negligent valuation made by a firm of valuers which knew it was to be used by the plaintiffs since the doctrine of *Donoghue* v. *Stevenson* [117] was confined to negligence which results in danger to life, limb or health. I do not think that this is the true view of *Donoghue* v. *Stevenson,*[117] but the decision itself, although its effect has been extended to cases where there was no expectation as contrasted with opportunity of inspection (see *Grant* v. *Australian Knitting Mills Ltd.*[118]) and to liability of repairers (see *Haseldine* v. *C. A. Daw & Son Ltd.*[119]), has never been applied to cases where damages are claimed in tort for negligent statements producing damage. The attempt so to apply it failed as recently as 1951, when in *Candler* v. *Crane, Christmas & Co.*[120] the Court of Appeal by a majority held that a false statement made carelessly, as contrasted with fraudulently, by one person to another, though acted on by that other to his detriment, was not actionable in the absence of any contractual or fiduciary relationship between the parties and that this principle had in no way been modified by the decision in *Donoghue* v. *Stevenson.*[121] Cohen L.J., one of the majority of the court, referred [122] to the language of Lord Esher M.R. in *Le Lievre* v. *Gould,*[123] who, repeating the substance of what he had said in *Heaven* v. *Pender,*[124] said: " If " one man is near to another, or is near to the property of another, " a duty lies upon him not to do that which may cause a personal " injury to that other, or may injure his property." Asquith L.J., the other member of the majority of the court, held that the " neighbour " doctrine had not been applied where the damage complained of was not physical in its incidence to either person or property. The majority thus went no further than Wrottesley J.,

[116] (1939) 161 L.T. 227; [1939] 3 All E.R. 209.
[117] [1932] A.C. 562.
[118] [1936] A.C. 85; 52 T.L.R. 38, P.C.
[119] [1941] 2 K.B. 343; 58 T.L.R. 1; [1941] 3 All E.R. 156, C.A.

[120] [1951] 2 K.B. 164.
[121] [1932] A.C. 562.
[122] [1951] 2 K.B. 164, 199.
[123] [1893] 1 Q.B. 491, 497.
[124] 11 Q.B.D. 503, 509.

**A.C.**          AND PRIVY COUNCIL.                    507

H. L. (E.)
1963
HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.
——
Lord HODSON.

in the *Old Gate Estates* case [125] save that injury to property was said to be contemplated by the doctrine expounded in *Donoghue v. Stevenson*. [126] It is desirable to consider the reasons given by the majority for their decision in the *Candler* case, [127] for the appellants rely upon the dissenting judgment of Denning L.J. in the same case. The majority, as also the learned trial judge, held that they were bound by the decision of the Court of Appeal in *Le Lievre* v. *Gould*, [128] in which the leading judgment was given by Lord Esher M.R. and referred to as authoritative by Lord Atkin in *Donoghue* v. *Stevenson*. [129]

It is true that Lord Esher refused to extend the proximity doctrine so as to cover the relationship between the parties in that case and the majority in *Candler's* case [130] were unable to draw a valid distinction between the facts of that case and the case of *Le Lievre* v. *Gould*. [131] Denning L.J., however, accepted the argument for the appellant which has been repeated before your Lordships, that the facts in *Le Lievre* v. *Gould* [131] were not such as to impose a liability, for the plaintiff mortgagees who alleged that the owner's surveyor owed a duty to them not only had the opportunity but had stipulated for inspection by their own surveyor. The defendant's employee who prepared the accounts in *Candler's* case [132] knew that the plaintiff was a potential investor in the company of which the accounts were negligently prepared and that the accounts were required in order that they might be shown to the plaintiff. In these circumstances I agree with Denning L.J. that there is a valid distinction between the two cases. In *Le Lievre* v. *Gould* [133] it was held that an older case of *Cann* v. *Willson* [134] was overruled. That is a case where the facts were in pari materia with those in *Candler's* case [135] and Chitty J. held the defendants liable because (1) they independently of contract owed a duty to the plaintiff which they failed to discharge, (2) that they had made reckless statements on which the plaintiff had acted. This case was decided before this House, in *Derry* v. *Peek*, [136] overruled the Court of Appeal on the second proposition but the first proposition was untouched by *Derry* v. *Peek*, [136] and, in so far as it depended on the authority of *George*

125 161 L.T. 227.
126 [1932] A.C. 562.
127 [1951] 2 K.B. 164.
128 [1893] 1 Q.B. 491.
129 [1932] A.C. 562.
130 [1951] 2 K.B. 164

131 [1893] 1 Q.B. 491.
132 [1951] 2 K.B. 164.
133 [1893] 1 Q.B. 491.
134 39 Ch.D. 39.
135 [1951] 2 K.B. 164.
136 14 App.Cas. 337.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Hodson.

v. *Skivington*,[137] the latter case was expressly affirmed in *Donoghue* v. *Stevenson* [138] although it had often previously been impugned. It is true that, as Asquith L.J. pointed out in referring to *George* v. *Skivington*,[139] the hair wash, put into circulation with the knowledge that it was intended to be used by the purchaser's wife, was a negligently compounded hair wash so that the case was so far on all fours with *Donoghue* v. *Stevenson*,[140] but the declaration also averred that the defendant had said that the hair wash was safe. I cannot see that there is any valid distinction in this field between a negligent statement, for example, an incorrect label on a bottle which leads to injury and a negligent compounding of ingredients which leads to the same result. It may well be that at the time when *Le Lievre* v. *Gould* [141] was decided the decision of this House in *Derry* v. *Peek* [142] was thought to go further than it did. It certainly decided that careless statements recklessly but honestly made by directors in a prospectus issued to the public were not actionable on the basis of fraud, and inferentially that such statements would not be actionable in negligence (which had not in fact been pleaded), but it was pointed out by this House in *Nocton* v. *Lord Ashburton* [143] that an action does lie for negligent misstatement where the circumstances disclose a duty to be careful. It is necessary in this connection to quote the actual language of Lord Haldane [144]: " Such a special duty may arise " from the circumstances and relations of the parties. These may " give rise to an implied contract at law or to a fiduciary obliga- " tion in equity. If such a duty can be inferred in a particular " case of a person issuing a prospectus, as, for instance, in the " case of directors issuing to the shareholders of the company " which they direct a prospectus inviting the subscription by them " of further capital, I do not find in *Derry* v. *Peek* [145] an authority " for the suggestion that an action for damages for misrepresenta- " tion without an actual intention to deceive may not lie. What " was decided there was that from the facts proved in that case " no such special duty to be careful in statement could be inferred, " and that mere want of care therefore gave rise to no cause of " action. In other words, it was decided that the directors stood

[137] L.R. 5 Ex. 1.
[138] [1932] A.C. 562.
[139] L.R. 5 Ex. 1.
[140] [1932] A.C. 562.
[141] [1893] 1 Q.B. 491.

[142] 14 App.Cas. 337.
[143] [1914] A.C. 932.
[144] Ibid. 955–956.
[145] 14 App.Cas. 337.

A.C.        AND PRIVY COUNCIL.        509

" in no fiduciary relation and therefore were under no fiduciary
" duty to the public to whom they had addressed the invitation
" to subscribe. I have only to add that the special relationship
" must, whenever it is alleged, be clearly shown to exist."

So far I have done no more than summarise the argument
addressed to the Court of Appeal in *Candler's* case [146] to which
effect was given in the dissenting judgment of Denning L.J., with
which I respectfully agree in so far as it dealt with the facts of
that case. I am therefore of opinion that his judgment is to be
preferred to that of the majority, although the opinion of the
majority is undoubtedly supported by the ratio decidendi of *Le
Lievre* v. *Gould* [147] which they cannot be criticised for following.
This, however, does not carry the appellants further than this,
that, provided they can establish a special duty, they are entitled
to succeed in an action based on breach of that duty.

I shall later refer to certain cases which support the view that,
apart from what are usually called fiduciary relationships such as
those between trustee and cestui que trust, solicitor and client,
parent and child, or guardian and ward, there are other circum-
stances in which the law imposes a duty to be careful, which is
not limited to a duty to be careful to avoid personal injury or
injury to property but covers a duty to avoid inflicting pecuniary
loss provided always that there is a sufficiently close relationship
to give rise to a duty of care.

The courts of equity recognised that a fiduciary relationship
exists " in almost every shape," to quote from Field J. in
*Plowright* v. *Lambert*.[148] He went on to refer to a case (*Tate
v. Williamson* [148a]) which had said that the relationship could
be created " voluntarily, as it were, by a person coming into a
" state of confidential relationship with another by offering to
" give advice in a matter, and so being disabled thereafter from
" purchasing."

It is difficult to see why liability as such should depend on the
nature of the damage. Lord Roche in *Morrison Steamship Co.
Ltd.* v. *Greystoke Castle (Cargo Owners)* [149] instanced damage
to a lorry by the negligence of the driver of another lorry
which, while it does no damage to the goods in the second
lorry, causes the goods owner to be put to expense which is recover-
able by direct action against the negligent driver.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Hodson.

146 [1951] 2 K.B. 164.
147 [1893] 1 Q.B. 491.
148 (1885) 52 L.T. 646, 652.

148a (1866) L.R. 2 Ch. 55.
149 [1947] A.C. 265, 280; 63 T.L.R.
11: [1946] 2 All E.R. 696, H.L.

HOUSE OF LORDS                    [1964]

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.
———
Lord Hodson.

It is not to be supposed that the majority of the Court of Appeal who decided as they did in *Candler's* case [150] were unmindful of the decision in *Nocton* v. *Lord Ashburton*,[151] to which their attention was drawn, but they seem to have been impressed with the view that in the passage I have quoted Lord Haldane had in mind only fiduciary relationships in the strict sense, but, in my opinion, the words need not be so limited. I am fortified in this opinion by examples to be found in the old authorities such as *Shiells* v. *Blackburne*,[152] *Wilkinson* v. *Coverdale* [153] and *Gladwell* v. *Steggall*,[154] which are illustrations of cases where the law has held that a duty to exercise reasonable care (breach of which is remediable in damages) has been imposed in the absence of a fiduciary relationship where persons hold themselves out as possessing special skill and are thus under a duty to exercise it with reasonable care. The statement of Lord Loughborough in *Shiells* v. *Blackburne* [155] is always accepted as authoritative and ought not to be dismissed as dictum, although the plaintiff failed to establish facts which satisfied the standard he set. He said: " . . . if a man gratuitously undertakes to do " a thing to the best of his skill, where his situation or profession " is such as to imply skill, an omission of that skill is imputable " to him as gross negligence." True that proximity is more difficult to establish where words are concerned than in the case of other activities and mere casual observations are not to be relied upon (see *Fish* v. *Kelly* [156]), but these matters go to difficulty of proof rather than principle.

A modern instance is to be found in the case of *Woods* v. *Martins Bank Ltd.*,[157] where Salmon J. held that on the facts of the case the defendant bank which had held itself out as being advisers on investments (which was within the scope of their business) and had not given the plaintiff reasonably careful or skilful advice so that he suffered loss were held in breach of duty and so liable in damages even though the plaintiff may not have been a customer of the bank at the material time.

True that the learned judge based this part of his conclusion on a fiduciary relationship which he held to exist between the plaintiff and the bank and thus brought himself within the scope of the decision in *Candler's* case [158] by which he was bound. For

[150] [1951] 2 K.B. 164.
[151] [1914] A.C. 932.
[152] 1 H.Bl. 158.
[153] 1 Esp. 75.
[154] (1839) 5 Bing.N.C. 733.

[155] 1 H.Bl. 158, 163.
[156] (1864) 17 C.B.N.S. 194.
[157] [1959] 1 Q.B. 55; [1958] 1 W.L.R. 1018; [1958] 3 All E.R. 166.
[158] [1951] 2 K.B. 164.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
——
Lord Hodson.

my part, I should have thought that even if the learned judge put a strained interpretation on the word " fiduciary " which is based on the idea of trust, the decision can be properly sustained as an example involving a special relationship.

I do not overlook the point forcefully made by Harman L.J. in his judgment [159] and elaborated by counsel for the respondents before your Lordships, that it may in certain cases appear to be strange that, whereas innocent misrepresentation does not sound in damages, yet in the special cases under consideration an injured party may sue in tort a third party whose negligent misrepresentation has induced him to enter into the contract. As was pointed out by Lord Wrenbury, however, in *Banbury* v. *Bank of Montreal*,[160] innocent misrepresentation is not the cause of action but evidence of the negligence which is the cause of action.

Was there, then, a special relationship here? I cannot exclude from consideration the actual terms in which the reference was given and I cannot see how the appellants can get over the difficulty which these words put in their way. They cannot say that the respondents are seeking, as it were, to contract out of their duty by the use of language which is insufficient for the purpose, if the truth of the matter is that the respondents never assumed a duty of care nor was such a duty imposed upon them.

The first question is whether a duty was ever imposed, and the language used must be considered before the question can be answered. In the case of a person giving a reference I see no objection in law or morals to the giver of the reference protecting himself by giving it without taking responsibility for anything more than the honesty of his opinion—which must involve without taking responsibility for negligence in giving that opinion. I cannot accept the contention of the appellants that the responsibility disclaimed was limited to the bank to which the reference was given, nor can I agree that it referred only to responsibility for accuracy of detail.

Similar words were present in the case of *Robinson* v. *National Bank of Scotland Ltd.*,[161] a case in which the facts cannot, I think, be distinguished in any material respect from this. Moreover, in the Inner House the words of disclaimer were, I think, treated as not without significance.

In this House the opinion was clearly expressed that the representations made were careless, inaccurate and misleading but

[159] [1962] 1 Q.B. 396, 415.          [161] 1916 S.C. (H.L.) 154.
[160] [1918] A.C. 626.

H. L. (E.)

1963

HEDLEY
BYRNE & Co.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
___

Lord Hodson.
___

that the pursuer had no remedy since there was no special duty on the bank's representative towards the pursuer. This conclusion was reached quite apart from the disclaimer of responsibility contained in the defender bank's letters.

Viscount Haldane recalled the case of *Nocton* v. *Lord Ashburton* [162] in the following passage [163]: "In saying that I "wish emphatically to repeat what I said in advising this House "in the case of *Nocton* v. *Lord Ashburton*,[164] that it is a great "mistake to suppose that, because the principle in *Derry* v. "*Peek* [165] clearly covers all cases of the class to which I have "referred, therefore the freedom of action of the courts in recog- "nising special duties arising out of other kinds of relationship "which they find established by the evidence is in any way "affected. I think, as I said in *Nocton's* case,[166] that an "exaggerated view was taken by a good many people of the "scope of the decision in *Derry* v. *Peek*.[167] The whole of the "doctrine as to fiduciary relationships, as to the duty of care "arising from implied as well as express contracts, as to the "duty of care arising from other special relationships which the "courts may find to exist in particular cases, still remains, and "I should be very sorry if any word fell from me which should "·suggest that the courts are in any way hampered in recognising "that the duty of care may be established when such cases "really occur."

This authority is, I think, conclusive against the appellants and is not effectively weakened by the fact that the case came to an end before that matter had been fully argued upon the House intimating that it was prepared to dismiss the appeal without costs on either side since the pursuer had, in its opinion, been badly treated. Since no detailed reasons were given by the House for the view that a banker's reference given honestly does not in the ordinary course carry with it a duty to take reasonable care, that duty being based on a special relationship, it will not, I hope, be out of place if I express my concurrence with the observations of Pearson L.J. who delivered the leading judgment in the Court of Appeal and said [168]: "Apart from authority, I "am not satisfied that it would be reasonable to impose upon a "banker the obligation suggested, if that obligation really adds

" anything to the duty of giving an honest answer.  It is conceded
" by Mr. Cooke that the banker is not expected to make outside
" inquiries to supplement the information which he already has.
" Is he then expected, in business hours in the bank's time, to
" expend time and trouble in searching records, studying docu-
" ments, weighing and comparing the favourable and unfavour-
" able features and producing a well-balanced and well-worded
" report?  That seems wholly unreasonable.  Then, if he is not
" expected to do any of those things, and if he is permitted to
" give an impromptu answer in the words that immediately come
" to his mind on the basis of the facts which he happens to
" remember or is able to ascertain from a quick glance at the
" file or one of the files, the duty of care seems to add little, if
" anything, to the duty of honesty.  If the answer given is
" seriously wrong, that is some evidence—of course, only some
" evidence—of dishonesty.  Therefore, apart from authority, it is
" far from clear, to my mind, that the banker, in answering such
" an inquiry, could reasonably be supposed to be assuming any
" duty higher than that of giving an honest answer."

This is to the same effect as the opinion of Cozens Hardy
M.R. in *Parsons* v. *Barclay & Co. Ltd.*[169]: " I desire for myself
" to repudiate entirely the suggestion that when one banker is
" asked by another for a customer such a question as was asked
" here, it is in any way the duty of the banker to make inquiries
" other than what appears from the books of account before him,
" or, of course, to give information other than what he is
" acquainted with from his own personal knowledge . . . I think
" that if we were to take the contrary view . . . we should neces-
" sarily be putting a stop to that very wholesome and useful
" habit by which the banker answers in confidence and answers
" honestly, to another banker."

It would, I think, be unreasonable to impose an additional
burden on persons such as bankers who are asked to give
references and might, if more than honesty were required, be put
to great trouble before all available material had been explored
and considered.

It was held in *Low* v. *Bouverie* [170] that if a trustee takes upon
himself to answer the inquiries of a stranger about to deal with
the cestui que trust, he is not under a legal obligation to do
more than to give honest answers to the best of his actual

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Hodson.

---

[169] 103 L.T. 196, 199.            [170] [1891] 3 Ch. 82; 7 T.L.R. 582,
                                    C.A.

514                          HOUSE OF LORDS                     **[1964]**

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

Lord Hodson.

knowledge and belief, he is not bound to make inquiries himself. I do not think a banker giving references in the ordinary exercise of business should be in any worse position than the trustee. I have already pointed out that a banker, like anyone else, may find himself involved in a special relationship involving liability, as in *Woods* v. *Martins Bank Ltd.*,[171] but there are no special features here which enable the appellants to succeed.

I do not think it is possible to catalogue the special features which must be found to exist before the duty of care will arise in a given case, but since preparing this opinion I have had the opportunity of reading the speech which my noble and learned friend, Lord Morris of Borth-y-Gest, has prepared. I agree with him that if in a sphere where a person is so placed that others could reasonably rely upon his judgment or his skill or upon his ability to make careful inquiry such person takes it upon himself to give information or advice to, or allows his information or advice to be passed on to, another person who, as he knows, or should know, will place reliance upon it, then a duty of care will arise.

I would dismiss the appeal.

LORD DEVLIN. My Lords, the bare facts of this case, stated sufficiently to raise the general point of law, are these. The appellants, being anxious to know whether they could safely extend credit to certain traders with whom they were dealing, sought a banker's reference about them. For this purpose their bank, the National Provincial, approached the respondents who are the traders' bank. The respondents gave, without making any charge for it and in the usual way, a reference which was so carelessly phrased that it led the appellants to believe the traders to be creditworthy when in fact they were not. The appellants seek to recover from the respondents the consequent loss.

Mr. Foster, for the respondents, has given your Lordships three reasons why the appellants should not recover. The first is founded upon a general statement of the law which, if true, is of immense effect. Its hypothesis is that there is no general duty not to make careless statements. No one challenges that hypothesis. There is no duty to be careful in speech as there is a duty to be honest in speech. Nor indeed is there any general duty to be careful in action. The duty is limited to those who

[171] [1959] 1 Q.B. 55.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
—
Lord Devlin..

can establish some relationship of proximity such as was found to exist in *Donoghue* v. *Stevenson*.[172] A plaintiff cannot, therefore, recover for financial loss caused by a careless statement unless he can show that the maker of the statement was under a special duty to him to be careful. Mr. Foster submits that this special duty must be brought under one of three categories. It must be contractual; or it must be fiduciary; or it must arise from the relationship of proximity and the financial loss must flow from physical damage done to the person or the property of the plaintiff. The law is now settled, Mr. Foster submits, and these three categories are exhaustive. It was so decided in *Candler* v. *Crane, Christmas & Co.*[173] and that decision, Mr. Foster submits, is right in principle and in accordance with earlier authorities.

Mr. Gardiner, for the appellants, agrees that outside contractual and fiduciary duty there must be a relationship of proximity—that is *Donoghue* v. *Stevenson*[174]—but he disputes that recovery is then limited to loss flowing from physical damage. He has not been able to cite a single case in which a defendant has been held liable for a careless statement leading, otherwise than through the channel of physical damage, to financial loss. But he submits that in principle such loss ought to be recoverable and that there is no authority which prevents your Lordships from acting upon that principle. Unless Mr. Gardiner can persuade your Lordships of this, his case fails at the outset. This, therefore, is the first and the most fundamental of the issues which the House is asked to decide.

Mr. Foster's second reason is that, if it is open to your Lordships to declare that there are or can be special or proximate relationships outside the categories he has named, your Lordships cannot formulate one to fit the case of a banker who gives a reference to a third party who is not his customer; and he contends that your Lordships have already decided that point in *Robinson* v. *National Bank of Scotland Ltd.*[175] His third reason is that if there can be found in cases such as this a special relationship between bankers and third parties, on the facts of the present case the appellants fall outside it; and here he relies particularly on the fact that the reference was marked " Strictly confidential and given on the express understanding " that we incur no responsibility whatever in furnishing it."

My Lords, I approach the consideration of the first and

172 [1932] A.C. 562.          174 [1932] A.C. 562.
173 [1951] 2 K.B. 164.         175 1916 S.C.(H.L.) 154.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Devlin.

fundamental question in the way in which Lord Atkin approached the same sort of question—that is, in essence the same sort, though in particulars very different—in *Donoghue* v. *Stevenson*.[176] If Mr. Foster's proposition is the result of the authorities, then, as Lord Atkin said,[177] " I should consider the result a grave defect " in the law, and so contrary to principle that I should hesitate " long before following any decision to that effect which had not " the authority of this House.'' So before I examine the authorities, I shall explain why I think that the law, if settled as Mr. Foster says it is, would be defective. As well as being defective in the sense that it would leave a man without a remedy where he ought to have one and where it is well within the scope of the law to give him one, it would also be profoundly illogical. The common law is tolerant of much illogicality, especially on the surface; but no system of law can be workable if it has not got logic at the root of it.

Originally it was thought that the tort of negligence must be confined entirely to deeds and could not extend to words. That was supposed to have been decided by *Derry* v. *Peek*.[178] I cannot imagine that anyone would now dispute that if this were the law, the law would be gravely defective. The practical proof of this is that the supposed deficiency was in relation to the facts in *Derry* v. *Peek*[178] immediately made good by Act of Parliament. Today it is unthinkable that the law could permit directors to be as careless as they liked in the statements they made in a prospectus.

A simple distinction between negligence in word and negligence in deed might leave the law defective but at least it would be intelligible. This is not, however, the distinction that is drawn in Mr. Foster's argument and it is one which would be unworkable. A defendant who is given a car to overhaul and repair if necessary is liable to the injured driver (a) if he overhauls it and repairs it negligently and tells the driver it is safe when it is not; (b) if he overhauls it and negligently finds it not to be in need of repair and tells the driver it is safe when it is not; and (c) if he negligently omits to overhaul it at all and tells the driver that it is safe when it is not. It would be absurd in any of these cases to argue that the proximate cause of the driver's injury was not what the defendant did or failed to do but his negligent statement on the faith of which the driver

176 [1932] A.C. 562.                178 14 App.Cas. 337.
177 Ibid. 582.

drove the car and for which he could not recover. In this type
of case, where if there were a contract there would undoubtedly
be a duty of service, it is not practicable to distinguish between
the inspection or examination, the acts done or omitted to be
done, and the advice or information given. So neither in this
case nor in *Candler* v. *Crane, Christmas & Co.*[179] (Denning L.J.
noted the point [180] where he gave the example of the analyst who
negligently certifies food to be harmless) has Mr. Foster argued
that the distinction lies there.

This is why the distinction is now said to depend on whether
financial loss is caused through physical injury or whether it is
caused directly. The interposition of the physical injury is said
to make a difference of principle. I can find neither logic nor
common sense in this. If irrespective of contract, a doctor
negligently advises a patient that he can safely pursue his occupa-
tion and he cannot and the patient's health suffers and he loses
his livelihood, the patient has a remedy. But if the doctor negli-
gently advises him that he cannot safely pursue his occupation
when in fact he can and he loses his livelihood, there is said to
be no remedy. Unless, of course, the patient was a private
patient and the doctor accepted half a guinea for his trouble:
then the patient can recover all. I am bound to say, my Lords,
that I think this to be nonsense. It is not the sort of nonsense
that can arise even in the best system of law out of the need
to draw nice distinctions between borderline cases. It arises, if
it is the law, simply out of a refusal to make sense. The line is
not drawn on any intelligible principle. It just happens to be
the line which those who have been driven from the extreme
assertion that negligent statements in the absence of contractual
or fiduciary duty give no cause of action have in the course of
their retreat so far reached.

I shall now examine the relevant authorities, and your Lord-
ships will, I hope pardon me if with one exception I attend only
to those that have been decided in this House, for I have made
it plain that I will not in this matter yield to persuasion but only
to compulsion. The exception is the case of *Le Lievre* v. *Gould,*[181]
for your Lordships will not easily upset decisions of the Court of
Appeal if they have stood unquestioned for as long as 70 years.
The five relevant decisions of this House are *Derry* v. *Peek,*[182]

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
—
Lord Devlin.

[179] [1951] 2 K.B. 164.
[180] Ibid. 179.

[181] [1893] 1 Q.B. 491.
[182] 14 App.Cas. 337.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.
—
Lord Devlin.

*Nocton* v. *Lord Ashburton*,[183] *Robinson* v. *National Bank of Scotland Ltd.*,[184] *Donoghue* v. *Stevenson*,[185] and *The Greystoke Castle*.[186] The last of these I can deal with at once, for it lies outside the main stream of authority on this point. It is a case in which damage was done to a ship as the result of a collision with another ship. The owners of cargo on the first ship, which cargo was not itself damaged, thus became liable to the owners of the first ship for a general average contribution. They sued the second ship as being partly to blame for the collision. Thus they were claiming for the financial loss caused to them by having to make the general average contribution although their property sustained no physical damage. This House held that they could recover. Their Lordships did not in that case lay down any general principle about liability for financial loss in the absence of physical damage; but the case itself makes it impossible to argue that there is any general rule showing that such loss is of its nature irrecoverable.

I turn back to the earlier authorities beginning with *Derry* v. *Peek*.[187] The facts in this case are so well known that I need not state them again. Nor need I state in my own words the effect of the decision. That has been done authoritatively by this House in *Nocton* v. *Lord Ashburton*.[188] I quote Lord Haldane [189] as stating most comprehensively the limits of the decision, noting that his view of the case is fully supported by Lord Shaw [190] and Lord Parmoor [191]: " My Lords, the discussion " of the case by the noble and learned Lords who took part in the " decision appears to me to exclude the hypothesis that they " considered any other question to be before them than what was " the necessary foundation of an ordinary action for deceit. They " must indeed be taken to have thought that the facts proved as " to the relationship of the parties in *Derry* v. *Peek* [192] were not " enough to establish any special duty arising out of that relation- " ship other than the general duty of honesty. But they do not " say that where a different sort of relationship ought to be " inferred from the circumstances the case is to be concluded by " asking whether an action for deceit will lie."

There was in *Derry* v. *Peek*,[192] as the report of the case [193]

183 [1914] A.C. 932.
184 1916 S.C.(H.L.) 154.
185 [1932] A.C. 562.
186 [1947] A.C. 265.
187 14 App.Cas. 337.
188 [1914] A.C. 932.

189 Ibid. 947.
190 Ibid. 970.
191 Ibid. 978.
192 14 App.Cas. 337.
193 Ibid. 338.

**A.C.**          AND PRIVY COUNCIL.                    519

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

Lord Devlin.

shows, no plea of innocent or negligent misrepresentation and so their Lordships did not make any pronouncement on that.  I am bound to say that had there been such a plea I am sure that the House would have rejected it.  As Lord Haldane said, their Lordships must " be taken to have thought " that there was no liability in negligence.  But what your Lordships may be taken to have thought, though it may exercise great influence upon those who thereafter have to form their own opinion on the subject, is not the law of England.  It is impossible to say how their Lordships would have formulated the principle if they had laid one down.  They might have made it general or they might have confined it to the facts of the case.  They might have made an exception of the sort indicated by Lord Herschell [194] or they might not.  This is speculation.  All that is certain is that on this point the House laid down no law at all.

Clearly in *Le Lievre* v. *Gould* [195] it was thought that the House had done so.  Lord Esher M.R. [196] treated *Derry* v. *Peek* [197] as restating the old law " that, in the absence of contract, an action " for negligence cannot be maintained when there is no fraud." A. L. Smith L.J. stated the law in the same way. [198]  This is wrong and the House, in effect, said so in *Nocton* v. *Lord Ashburton*. [199]

My Lords, I need not consider how far thereafter a court of equal authority was bound to follow *Le Lievre* v. *Gould*. [200]  It may be that the decision on the facts was correct even though the reasoning was too wide.  There has been a difference of opinion about the effect of the decision: compare Asquith L.J. in *Candler* v. *Crane, Christmas & Co.* [201] with Denning L.J. [202]  Nor need I consider what part of the reasoning, if any, should be held to survive *Nocton* v. *Lord Ashburton*. [203]  It is clear that after 1914 it would be to *Nocton* v. *Lord Ashburton* [203] and not to *Le Lievre* v. *Gould* [204] that the lawyer would look in order to ascertain what the exceptions were to the general principle that a man is not liable for careless misrepresentation.  I cannot feel, therefore, that there is any principle enunciated in *Le Lievre* v. *Gould* [204] which is now so deeply embedded in the law that your Lordships ought not to disturb it.

[194] 14 App.Cas. 337, 360.
[195] [1893] 1 Q.B. 491.
[196] [1893] 1 Q.B. 491, 498.
[197] 14 App.Cas. 337.
[198] [1893] 1 Q.B. 491.
[199] [1914] A.C. 932.

[200] [1893] 1 Q.B. 491.
[201] [1951] 2 K.B. 164, 193.
[202] Ibid. 181.
[203] [1914] A.C. 932.
[204] [1893] 1 Q.B. 491.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.'
*v.*
HELLER &
PARTNERS
LTD.

Lord Devlin.

I come now to the case of *Nocton* v. *Lord Ashburton*,[205] which both sides put forward as the most important of the authorities which your Lordships have to consider. The appellants say that it removed the restrictions which *Derry* v. *Peek*[206] was thought to have put upon liability for negligent misrepresentation. The respondents say that it removed those restrictions only to a very limited extent, that is to say, by adding fiduciary obligation to contract as a source of special duty; and that it closed the door on any further expansion. I propose, therefore, to examine it with some care because it is not at all easy to determine exactly what it decided. Lord Haldane L.C.[207] began his speech by saying: "Owing to the mode in which this case has been treated both by "the learned judge who tried it and by the Court of Appeal, the "question to be decided has been the subject of some uncertainty "and much argument." He went on to say that the difficulties in giving relief were concerned with form and not with substance. The main difficulty, I think, lies in discovering from the statement of claim what the cause of action was. Lord Ashburton sought relief from the consequences of having advanced money on mortgage to several persons of whom the defendant Nocton was one. The statement of claim consists of a long narrative of events interspersed with complaints. Although in the end the vital fact was that Nocton was Lord Ashburton's solicitor, there is no allegation of any retainer and nothing is pleaded in contract. The fact that Nocton was a solicitor emerges only in the framing of the complaint in paragraph 13[208] where it was said that Nocton's advice to make the advance of £65,000 "was not that of a solicitor "advising his client in good faith, but was given for his own "private ends." The relief asked for in respect of this transaction[209] is a declaration "that [the plaintiff] was improperly "advised and induced by the defendant Nocton whilst acting as "the plaintiff's confidential solicitor" to advance £65,000. In paragraphs 31 to 33 of the statement of claim[209] it is related that the plaintiff was asked to release part of his security for the loan; and it is said that: "The defendant Nocton in advising the plain- "tiff to execute the said release allowed the plaintiff to believe that "he was advising the plaintiff independently and in good faith "and in the plaintiff's interest." No separate relief was sought in respect of this transaction.

[205] [1914] A.C. 932.
[206] 14 App.Cas. 337.
[207] [1914] A.C. 932, 943.
[208] [1914] A.C. 932, 938.
[209] Ibid. 939.

Until the case reached this House no substantial point of law was raised. Neville J. at the trial held that the only issue raised by the statement of claim was whether the defendant Nocton was guilty of fraud and that the plaintiff had failed to prove it. The Court of Appeal agreed with the judge's view of the pleadings. Cozens-Hardy M.R. said that if damages had been claimed on the ground of negligence, the action would have been practically undefended. But it was then too late to amend the statement of claim, if only because a new cause of action would have been statute-barred. On the facts the Court of Appeal reversed in part the judge's finding of fraud, holding that there was fraud in relation to the release.

In this House at the conclusion of the appellant's argument the respondent's counsel was told that the House was unlikely to differ from the judgment of Neville J. on fraud. The pith of the respondent's argument is reported as follows [210]: "Assuming "that fraud is out of the question, the allegations in the state-"ment of claim are wide enough to found a claim for dereliction "of duty by a person occupying a fiduciary relation. In the old "cases in equity the term 'fraud' was frequently applied to "cases of a breach of fiduciary obligation." He was then stopped.

It can now be understood why Lord Haldane regarded the question as one of form rather than of substance. The first question which the House had to consider was whether the statement of claim was wide enough to cover negligence. Lord Parmoor thought that it was [211] and decided the appeal on that ground. So, I think, in the end did Lord Dunedin,[212] but he also expressed his agreement with the opinion of Lord Haldane L.C. Lord Haldane, with whom Lord Atkinson concurred, thought that possibly negligence was covered, but he did not take the view that the statement of claim must be interpreted either as an allegation of deceit or as an allegation of negligence. He said [213]: "There "is a third form of procedure to which the statement of claim "approximated very closely, and that is the old bill in Chancery "to enforce compensation for breach of a fiduciary obligation. "There appears to have been an impression that the necessity "which recent authorities have established of proving moral fraud "in order to succeed in an action of deceit has narrowed the scope "of this remedy. For the reasons which I am about to offer to

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
_v._
HELLER &
PARTNERS
LTD.

Lord Devlin

[210] [1914] A.C. 932, 943.     [212] Ibid. 965.
[211] Ibid. 977.                [213] Ibid. 946.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Devlin

" your Lordships, I do not think that this is so." The Lord Chancellor then went on to examine *Derry* v. *Peek* [214] in order to determine exactly what it had decided.

I find most interest for present purposes in the speech of Lord Shaw. He held [215] that the pleadings disclosed " a claim for " liability upon a ground quite independent of fraud, namely, " of misrepresentations and misstatements made by a person " entrusted with a duty to another, and in failure of that duty." He posed [216] what he considered to be the crucial question: " What was the relation in which the parties stood to each other " at the time of the transaction? " He stated [217] that the defendant was Lord Ashburton's solicitor and so under a duty to advise. He concluded [218] in the following terms: " . . . once the relations " of parties have been ascertained to be those in which a duty is " laid upon one person of giving information or advice to another " upon which that other is entitled to rely as the basis of a trans- " action, responsibility for error amounting to misrepresentation " in any statement made will attach to the adviser or informer, " although the information and advice have been given not " fraudulently but in good faith. It is admitted in the present " case that misrepresentations were made; that they were " material; that they were the cause of loss; that they were " made by a solicitor to his client in a situation in which the " client was entitled to rely, and did rely, upon the information " received. I accordingly think that that situation is plainly open " for the application of the principle of liability to which I have " referred, namely, liability for the consequences of a failure of " duty in circumstances in which it was a matter equivalent to " contract between the parties that that duty should be fulfilled." Lord Shaw does not anywhere in his speech refer to the relationship as being of a fiduciary character.

Lord Haldane L.C. [219] laid down the general principle in much the same terms. He said: " Although liability for negligence " in word has in material respects been developed in our law " differently from liability for negligence in act, it is nonetheless " true that a man may come under a special duty to exercise care " in giving information or advice. I should accordingly be sorry " to be thought to lend countenance to the idea that recent " decisions have been intended to stereotype the cases in which

[214] 14 App.Cas. 337.
[215] [1914] A.C. 932, 967.
[216] Ibid. 968.
[217] Ibid. 969.
[218] Ibid. 972.
[219] Ibid. 948.

**A.C.**                     AND PRIVY COUNCIL.                          523

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

Lord Devlin

" people can be held to have assumed such a special duty.
" Whether such a duty has been assumed must depend on the
" relationship of the parties, and it is at least certain that there
" are a good many cases in which that relationship may be properly
" treated as giving rise to a special duty of care in statement."
It is quite true that Lord Haldane L.C. applied this principle only
to cases of breach of fiduciary duty.  But that was inevitable on
the facts of the case since upon the view of the pleadings on which
he was proceeding it was necessary to show equitable fraud.

In my judgment, the effect of this case is as follows.  The
House clearly considered the view of *Derry* v. *Peek*,[220] exemplified
in *Le Lievre* v. *Gould*,[221] too narrow.  It considered that outside
contract (for contract was not pleaded in the case), there could
be a special relationship between parties which imposed a duty to
give careful advice and accurate information.  The majority of
their Lordships did not extend the application of this principle
beyond the breach of a fiduciary obligation but none of them said
anything at all to show that it was limited to fiduciary obligation.
Your Lordships can, therefore, proceed upon the footing that there
is such a general principle and that it is for you to say to what
cases, beyond those of fiduciary obligation, it can properly be
extended.

I shall not at this stage deal in any detail with *Robinson* v.
*National Bank of Scotland Ltd.*[222]  Its chief relevance is to Mr.
Foster's second point.  All that need be said about it on his first
point is that it is no authority for the proposition that those
relationships which give rise to a special duty of care are limited
to the contractual and the fiduciary.  On the contrary, it is a
clear authority for the view that Lord Haldane did not mean the
general principle he stated in *Nocton* v. *Lord Ashburton*[223] to be
limited to fiduciary relationships.  He said[224] that he wished
emphatically to repeat what he had said in *Nocton* v. *Lord
Ashburton*,[225] that it would be a great mistake to suppose that
the principle in *Derry* v. *Peek*[226] affected the freedom of action
of the courts in recognising special duties arising out of other
kinds of relationship.  He went on: " The whole of the doctrine
" as to fiduciary relationships, as to the duty of care arising from
" implied as well as express contracts, as to the duty of care
" arising from other special relationships which the courts may find

[220] 14 App.Cas. 337.
[221] [1893] 1 Q.B. 491.
[222] 1916 S.C.(H.L.) 154.
[223] [1914] A.C. 932.
[224] 1916 S.C.(H.L.) 154, 157.
[225] [1914] A.C. 932.
[226] 14 App.Cas. 337.

524                    HOUSE OF LORDS                **[1964]**

H. L. (E.)

1963

HEDLEY
BYRNE & Co.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Devlin

" to exist in particular cases, still remains, and I should be very
" sorry if any word fell from me which should suggest that the
" courts are in any way hampered in recognising that the duty of
" care may be established when such cases really occur."

I come next to *Donoghue* v. *Stevenson.*[227] In his celebrated
speech in that case Lord Atkin did two things. He stated[228]
what he described as a " general conception " and from that con-
ception he formulated[229] a specific proposition of law. In
between[230] he gave a warning " against the danger of stating
" propositions of law in wider terms than is necessary, lest
" essential factors be omitted in the wider survey and the
" inherent adaptability of English law be unduly restricted."

What Lord Atkin called[231] a " general conception of relations
" giving rise to a duty of care " is now often referred to as the
principle of proximity. You must take reasonable care to avoid
acts or omissions which you can reasonably foresee would be likely
to injure your neighbour. In the eyes of the law your neighbour
is a person who is so closely and directly affected by your act that
you ought reasonably to have him in contemplation as being so
affected when you are directing your mind to the acts or omissions
which are called in question.

The specific proposition arising out of this conception[232] is
that " a manufacturer of products, which he sells in such a form
" as to show that he intends them to reach the ultimate consumer
" in the form in which they left him with no reasonable possibility
" of intermediate examination, and with the knowledge that the
" absence of reasonable care in the preparation or putting up of
" the products will result in an injury to the consumer's life or
" property, owes a duty to the consumer to take that reasonable
" care."

Now, it is not, in my opinion, a sensible application of what
Lord Atkin was saying for a judge to be invited on the facts of
any particular case to say whether or not there was " proximity "
between the plaintiff and the defendant. That would be a misuse
of a general conception and it is not the way in which English law
develops. What Lord Atkin did was to use his general conception
to open up a category of cases giving rise to a special duty. It
was already clear that the law recognised the existence of such a
duty in the category of articles that were dangerous in themselves.

[227] [1932] A.C. 562.          [230] Ibid. 584.
[228] Ibid. 580.               [231] Ibid. 580.
[229] Ibid. 599.               [232] Ibid. 599.

**A.C.**              AND PRIVY COUNCIL.                         525

What *Donoghue* v. *Stevenson* [233] did may be described either as the widening of an old category or as the creation of a new and similar one. The general conception can be used to produce other categories in the same way. An existing category grows as instances of its application multiply until the time comes when the cell divides.

Lord Thankerton and Lord Macmillan approached the problem fundamentally in the same way, though they left any general conception on which they were acting to be implied. They inquired directly—Lord Thankerton [234] and Lord Macmillan [235]—whether the relationship between the plaintiff and the defendant was such as to give rise to a duty to take care. It is significant, whether it is a coincidence or not, that the term "special relationship" used by Lord Thankerton [236] is also the one used by Lord Haldane in *Nocton* v. *Lord Ashburton*. [237] The field is very different but the object of the search is the same.

In my opinion, the appellants in their argument tried to press *Donoghue* v. *Stevenson* [238] too hard. They asked whether the principle of proximity should not apply as well to words as to deeds. I think it should, but as it is only a general conception it does not get them very far. Then they take the specific proposition laid down by *Donoghue* v. *Stevenson* [238] and try to apply it literally to a certificate or a banker's reference. That will not do, for a general conception cannot be applied to pieces of paper in the same way as to articles of commerce or to writers in the same way as to manufacturers. An inquiry into the possibilities of intermediate examination of a certificate will not be fruitful. The real value of *Donoghue* v. *Stevenson* [238] to the argument in this case is that it shows how the law can be developed to solve particular problems. Is the relationship between the parties in this case such that it can be brought within a category giving rise to a special duty? As always in English law, the first step in such an inquiry is to see how far the authorities have gone, for new categories in the law do not spring into existence overnight.

It would be surprising if the sort of problem that is created by the facts of this case had never until recently arisen in English law. As a problem it is a by-product of the doctrine of consideration. If the respondents had made a nominal charge for the reference, the problem would not exist. If it were possible in

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Devlin

[233] [1932] A.C. 562.
[234] Ibid. 603.
[235] Ibid. 619–620.
[236] Ibid. 603.
[237] [1914] A.C. 932, 956.
[238] [1932] A.C. 562.

526                    HOUSE OF LORDS              **[1964]**

H. L. (E.)
1963
———
HEDLEY
BYRNE & Co.
LTD.
*v.*
HELLER &
PARTNERS
LTD.
———
Lord Devlin
———

English law to construct a contract without consideration, the problem would move at once out of the first and general phase into the particular; and the question would be, not whether on the facts of the case there was a special relationship, but whether on the facts of the case there was a contract.

The respondents in this case cannot deny that they were performing a service. Their sheet anchor is that they were performing it gratuitously and therefore no liability for its performance can arise. My Lords, in my opinion this is not the law. A promise given without consideration to perform a service cannot be enforced as a contract by the promisee; but if the service is in fact performed and done negligently, the promisee can recover in an action in tort. This is the foundation of the liability of a gratuitous bailee. In the famous case of *Coggs* v. *Bernard*,[239] where the defendant had charge of brandy belonging to the plaintiff and had spilt a quantity of it, there was a motion in arrest of judgment " for that it was not alleged in the declaration " that the defendant was a common porter, nor averred that he " had anything for his pains." The declaration was held to be good notwithstanding that there was not any consideration laid. Gould J. said [239]: " The reason of the action is, the particular " trust reposed in the defendant, to which he has concurred by " his assumption, and in the executing which he has miscarried " by his neglect." This proposition is not limited to the law of bailment. In *Skelton* v. *London & North Western Railway Co.*[240] Willes J. applied it generally to the law of negligence. He said: " Actionable negligence must consist in the breach of some duty " . . . if a person undertakes to perform a voluntary act, he is " liable if he performs it improperly, but not if he neglects to " perform it. Such is the result of the decision in the case of " *Coggs* v. *Bernard.*" [241] Likewise in *Banbury* v. *Bank of Montreal*,[242] where the bank had advised a customer on his investments, Lord Finlay L.C. said: " He is under no obligation " to advise, but if he takes upon himself to do so, he will incur " liability if he does so negligently."

The principle has been applied to cases where as a result of the negligence no damage was done to person or to property and the consequential loss was purely financial. In *Wilkinson* v. *Coverdale*[243] the defendant undertook gratuitously to get a fire

[239] (1703) 2 Ld.Raym. 909.
[240] (1867) L.R. 2 C.P. 631, 636.
[241] 2 Ld.Raym. 909.

[242] [1918] A.C. 626, 654.
[243] 1 Esp. 75.

**A.C.**　　　　　AND PRIVY COUNCIL.　　　　　527

H. L. (E:)

1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

Lord Devlin

policy renewed for the plaintiff, but, in doing so, neglected formalities, the omission of which rendered the policy inoperative. It was held that an action would lie. In two similar cases the defendants succeeded on the ground that negligence was not proved in fact. Both cases were thus decided on the basis that in law an action would lie. In the first of them, *Shiells* v. *Blackburne*,[244] the defendant had, acting voluntarily and without compensation, made an entry of the plaintiff's leather as wrought leather instead of dressed leather, with the result that the leather was seized. In *Dartnall* v. *Howard & Gibbs*[245] the defendants purchased an annuity for the plaintiff but on the personal security of two insolvent persons. The court, after verdict, arrested the judgment upon the ground that the defendants appeared to be gratuitous agents and that it was not averred that they had acted either with negligence or dishonesty.

Many cases could be cited in which the same result has been achieved by setting up some nominal consideration and suing in contract instead of in tort. In *Coggs* v. *Bernard*[246] Holt C.J. put the obligation on both grounds. He said: " . . . secondly, " it is objected, that there is no consideration to ground this " promise upon, and therefore the undertaking is but nudum " pactum. But to this I answer, that the owners trusting him with " the goods is a sufficient consideration to oblige him to a careful " management. Indeed, if the agreement had been executory, " to carry these brandies from the one place to the other such a " day, the defendant had not been bound to carry them. But " this is a different case, for assumpsit does not only signify a " future agreement, but in such a case as this, it signifies an " actual entry upon the thing, and taking the trust upon himself. " And if a man will do that, and miscarries in the performance " of his trust, an action will lie against him for that, though " nobody could have compelled him to do the thing."

*De La Bere* v. *Pearson Ltd.*[247] is an example of a case of this sort decided on the ground that there was a sufficiency of consideration. The defendants advertised in their newspaper that their city editor would answer inquiries from readers of the paper desiring financial advice. The plaintiff asked for the name of a good stockbroker. The editor recommended the name of a person whom he knew to be an outside broker and whom he ought to

[244] 1 H.Bl. 158.
[245] (1825) 4 B. & C. 345.
[246] 2 Ld.Raym. 909, 919.

[247] [1908] 1 K.B. 280; 24 T.L.R. 120. C.A.

H. L. (E.)
1963

HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

Lord Devlin

have known, if he had made proper inquiries, to be an undischarged bankrupt. The plaintiff dealt with him and lost his money. The case being brought in contract, Vaughan Williams L.J. thought [248] that there was sufficient consideration in the fact that the plaintiff consented to the publication of his question in the defendants' paper if the defendants so chose. For Barnes P.[249] the consideration appears to have lain in the plaintiff addressing an inquiry as invited. In the same way when in *Everett* v. *Griffiths* [250] the Court of Appeal was considering the liability of a doctor towards the person he was certifying, Scrutton L.J. said that the submission to treatment would be a good consideration.

My Lords, I have cited these instances so as to show that in one way or another the law has ensured that in this type of case a just result has been reached. But I think that today the result can and should be achieved by the application of the law of negligence and that it is unnecessary and undesirable to construct an artificial consideration. I agree with Sir Frederick Pollock's note on the case of *De La Bere* v. *Pearson Ltd.*[251] where he said in Contracts, 13th ed., p. 140, that " the cause of action is better " regarded as arising from default in the performance of a volun- " tary undertaking independent of contract."

My Lords, it is true that this principle of law has not yet been clearly applied to a case where the service which the defendant undertakes to perform is or includes the obtaining and imparting of information. But I cannot see why it should not be: and if it had not been thought erroneously that *Derry* v. *Peek* [252] negatived any liability for negligent statements, I think that by now it probably would have been. It cannot matter whether the information consists of fact or of opinion or is a mixture of both, nor whether it was obtained as a result of special inquiries or comes direct from facts already in the defendant's possession or from his general store of professional knowledge. One cannot, as I have already endeavoured to show, distinguish in this respect between a duty to inquire and a duty to state.

I think, therefore, that there is ample authority to justify your Lordships in saying now that the categories of special relationships which may give rise to a duty to take care in word as well as in deed are not limited to contractual relationships or

248 [1908] 1 K.B. 280, 287.
249 Ibid. 289.
250 [1920] 3 K.B. 163, 191; 36 T.L.R. 491, C.A.

251 [1908] 1 K.B. 280.
252 14 App.Cas. 337.

to relationships of fiduciary duty, but include also relationships which in the words of Lord Shaw in *Nocton* v. *Lord Ashburton* [253] are " equivalent to contract," that is, where there is an assumption of responsibility in circumstances in which, but for the absence of consideration, there would be a contract. Where there is an express undertaking, an express warranty as distinct from mere representation, there can be little difficulty. The difficulty arises in discerning those cases in which the undertaking is to be implied. In this respect the absence of consideration is not irrelevant. Payment for information or advice is very good evidence that it is being relied upon and that the informer or adviser knows that it is. Where there is no consideration, it will be necessary to exercise greater care in distinguishing between social and professional relationships and between those which are of a contractual character and those which are not. It may often be material to consider whether the adviser is acting purely out of good nature or whether he is getting his reward in some indirect form. The service that a bank performs in giving a reference is not done simply out of a desire to assist commerce. It would discourage the customers of the bank if their deals fell through because the bank had refused to testify to their credit when it was good.

I have had the advantage of reading all the opinions prepared by your Lordships and of studying the terms which your Lordships have framed by way of definition of the sort of relationship which gives rise to a responsibility towards those who act upon information or advice and so creates a duty of care towards them. I do not understand any of your Lordships to hold that it is a responsibility imposed by law upon certain types of persons or in certain sorts of situations. It is a responsibility that is voluntarily accepted or undertaken, either generally where a general relationship, such as that of solicitor and client or banker and customer, is created, or specifically in relation to a particular transaction. In the present case the appellants were not, as in *Woods* v. *Martins Bank Ltd.*,[254] the customers or potential customers of the bank. Responsibility can attach only to the single act, that is, the giving of the reference, and only if the doing of that act implied a voluntary undertaking to assume responsibility. This is a point of great importance because it is, as I understand it, the foundation for the ground on which in the end the House dismisses the appeal. I do not think it possible to

[253] [1914] A.C. 932, 972.            [254] [1959] 1 Q.B. 55.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Devlin

HOUSE OF LORDS          **[1964]**

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Devlin L.J.

formulate with exactitude all the conditions under which the law will in a specific case imply a voluntary undertaking any more than it is possible to formulate those in which the law will imply a contract. But in so far as your Lordships describe the circumstances in which an implication will ordinarily be drawn, I am prepared to adopt any one of your Lordships' statements as showing the general rule; and I pay the same respect to the statement by Denning L.J. in his dissenting judgment in *Candler* v. *Crane, Christmas & Co.*[255] about the circumstances in which he says a duty to use care in making a statement exists.

I do not go further than this for two reasons. The first is that I have found in the speech of Lord Shaw in *Nocton* v. *Lord Ashburton* [256] and in the idea of a relationship that is equivalent to contract all that is necessary to cover the situation that arises in this case. Mr. Gardiner does not claim to succeed unless he can establish that the reference was intended by the respondents to be communicated by the National Provincial Bank to some unnamed customer of theirs, whose identity was immaterial to the respondents, for that customer's use. All that was lacking was formal consideration. The case is well within the authorities I have already cited and of which *Wilkinson* v. *Coverdale* [257] is the most apposite example.

I shall therefore content myself with the proposition that wherever there is a relationship equivalent to contract, there is a duty of care. Such a relationship may be either general or particular. Examples of a general relationship are those of solicitor and client and of banker and customer. For the former *Nocton* v. *Lord Ashburton* [258] has long stood as the authority and for the latter there is the decision of Salmon J. in *Woods* v. *Martins Bank Ltd.*[259] which I respectfully approve. There may well be others yet to be established. Where there is a general relationship of this sort, it is unnecessary to do more than prove its existence and the duty follows. Where, as in the present case, what is relied on is a particular relationship created ad hoc, it will be necessary to examine the particular facts to see whether there is an express or implied undertaking of responsibility.

I regard this proposition as an application of the general conception of proximity. Cases may arise in the future in which

[255] [1951] 2 K.B. 164.          [258] [1914] A.C. 932.
[256] [1914] A.C. 932.          [259] [1959] 1 Q.B. 55.
[257] 1 Esp. 75.

a new and wider proposition, quite independent of any notion of contract, will be needed. There may, for example, be cases in which a statement is not supplied for the use of any particular person, any more than in *Donoghue* v. *Stevenson* [260] the ginger beer was supplied for consumption by any particular person; and it will then be necessary to return to the general conception of proximity and to see whether there can be evolved from it, as was done in *Donoghue* v. *Stevenson*,[260] a specific proposition to fit the case. When that has to be done, the speeches of your Lordships today as well as the judgment of Denning L.J. to which I have referred—and also, I may add, the proposition in the American Restatement of the Law of Torts, Vol. III, p. 122, para. 552, and the cases which exemplify it—will afford good guidance as to what ought to be said. I prefer to see what shape such cases take before committing myself to any formulation, for I bear in mind Lord Atkin's warning, which I have quoted, against placing unnecessary restrictions on the adaptability of English law. I have, I hope, made it clear that I take quite literally the dictum of Lord Macmillan,[261] so often quoted from the same case, that " the categories of negligence are never " closed." English law is wide enough to embrace any new category or proposition that exemplifies the principle of proximity.

I have another reason for caution. Since the essence of the matter in the present case and in others of the same type is the acceptance of responsibility, I should like to guard against the imposition of restrictive terms notwithstanding that the essential condition is fulfilled. If a defendant says to a plaintiff: " Let me do this for you; do not waste your money in employing " a professional, I will do it for nothing and you can rely on me," I do not think he could escape liability simply because he belonged to no profession or calling, had no qualifications or special skill and did not hold himself out as having any. The relevance of these factors is to show the unlikelihood of a defendant in such circumstances assuming a legal responsibility, and as such they may often be decisive. But they are not theoretically conclusive and so cannot be the subject of definition. It would be unfortunate if they were. For it would mean that plaintiffs would seek to avoid the rigidity of the definition by bringing the action in contract as in *De Le Bere* v. *Pearson Ltd.*[262] and setting up something that would do for consideration. That, to my mind,

H. L. (E.)

1963

HEDLEY
BYRNE & Co.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Devlin L.J.

[260] [1932] A.C. 562.
[261] Ibid. 639.
[262] [1908] 1 K.B. 280.

H. L. (E.)
1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Devlin L.J.

would be an undesirable development in the law; and the best way of avoiding it is to settle the law so that the presence or absence of consideration makes no difference.

Your Lordships' attention was called to a number of cases in courts of first instance or of appeal which it was said would have been decided differently if the appellants' main contention was correct. I do not propose to go through them in order to consider whether on the facts of each it should or should not be upheld. I shall content myself with saying that, in my opinion, *Le Lievre* v. *Gould* [263] and all decisions based on its reasoning (in which I specifically include, lest otherwise it might be thought that generalia specialibus non derogant, the decision of Devlin J. in *Heskell* v. *Continental Express Ltd.* [264]) can no longer be regarded as authoritative; and, when similar facts arise in the future, the case will have to be judged afresh in the light of the principles which the House has now laid down.

My Lords, I have devoted much time and thought to considering the first reason given by Mr. Foster for rejecting the appellants' claim. I have done so not only because his reason was based on a ground so fundamental that it called for a full refutation, but also because it is impossible to find the correct answer on the facts to the appellants' claim until the relevant criteria for ascertaining whether or not there is a duty to take care have been clearly established. Once that is done, their application to the facts of this case can be done very shortly, for the case then becomes a very simple one.

I am satisfied, for the reasons I have given, that a person for whose use a banker's reference is furnished is not, simply because no consideration has passed, prevented from contending that the banker is responsible to him for what he has said. The question is whether the appellants can set up a claim equivalent to contract and rely on an implied undertaking to accept responsibility. Mr. Foster's second point is that in *Robinson* v. *National Bank of Scotland Ltd.* [265] this House has already laid it down as a general rule that in the case of a banker furnishing a reference that cannot be done. I do not agree. The facts in that case have been stated by my noble and learned friend Lord Reid, and I need not repeat them. I think it is plain upon those facts that the bank in that case was not furnishing

263 [1893] 1 Q.B. 491.                265 1916 S.C.(H.L.) 154.
264 [1950] 1 All E.R. 1033, 1044;
83 Ll.L.Rep. 438, 455.

the reference for the use of the pursuer; he was not a person
for whose use of the reference they were undertaking any responsibility, and that quite apart from their general disclaimer.
Furthermore, the pursuer never saw the reference; he was given
only what the Lord Justice-Clerk [266] described as "a gloss of it."
This makes the connection between the pursuer and the defendants
far too remote to constitute a relationship of a contractual
character.

On the facts of the present case Mr. Foster has under his
third head argued for the same result. He submits, first, that
it ought not to be inferred that the respondents knew that the
National Provincial Bank were asking for the reference for the
use of a customer. If the respondents did know that, then
Mr. Foster submits that they did not intend that the reference
itself should be communicated to the customer; it was intended
only as material upon which the customer's bank could advise the
customer on its own responsibility. I should consider it necessary
to examine these contentions were it not for the general disclaimer
of responsibility which appears to me in any event to be conclusive. I agree entirely with the reasoning and conclusion on this
point of my noble and learned friend, Lord Reid. A man cannot
be said voluntarily to be undertaking a responsibility if at the very
moment when he is said to be accepting it he declares that in
fact he is not. The problem of reconciling words of exemption
with the existence of a duty arises only when a party is claiming
exemption from a responsibility which he has already undertaken
or which he is contracting to undertake. For this reason alone,
I would dismiss the appeal.

LORD PEARCE. My Lords, "although liability for negligence
"in word," said Lord Haldane in *Nocton* v. *Lord Ashburton*,[267]
"has in material respects been developed in our law differently
"from liability for negligence in act, it is none the less true that
"a man may come under a special duty to exercise care in giving
"information or advice. I should accordingly be sorry to be
"thought to lend countenance to the idea that recent decisions
"have been intended to stereotype the cases in which people can
"be held to have assumed such a special duty. Whether such a
"duty has been assumed must depend on the relationship of the
"parties, and it is at least certain that there are a good many

H. L. (E.)

1963

HEDLEY
BYRNE & Co.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Devlin L.J.

[266] 1916 S.C. 46, 58.        [267] [1914] A.C. 932, 948.

534                    HOUSE OF LORDS                    **[1964]**

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Pearce

" cases in which that relationship may be properly treated as
" giving rise to a special duty of care in statement."

The law of negligence has been deliberately limited in its
range by the courts' insistence that there can be no actionable
negligence in vacuo without the existence of some duty to the
plaintiff.  For it would be impracticable to grant relief to every-
body who suffers damage through the carelessness of another.

The reason for some divergence between the law of negligence
in word and that of negligence in act is clear.  Negligence in
word creates problems different from those of negligence in act.
Words are more volatile than deeds.  They travel fast and far
afield.  They are used without being expended and take effect
in combination with innumerable facts and other words.  Yet
they are dangerous and can cause vast financial damage.  How
far they are relied on unchecked (by analogy with there being no
probability of intermediate inspection—see *Grant* v. *Australian
Knitting Mills Ltd.*[268]) must in many cases be a matter of doubt
and difficulty.  If the mere hearing or reading of words were held
to create proximity, there might be no limit to the persons to
whom the speaker or writer could be liable.  Damage by negligent
acts to persons or property on the other hand is more visible and
obvious; its limits are more easily defined, and it is with this
damage that the earlier cases were more concerned.  It was not
until 1789 that *Pasley* v. *Freeman* [269] recognised and laid down a
duty of honesty in words to the world at large—thus creating a
remedy designed to protect the economic as opposed to the physi-
cal interests of the community.  Any attempts to extend this
remedy by imposing a duty of care as well as a duty of honesty in
representations by word were curbed by *Derry* v. *Peek*.[270]

In *Cann* v. *Willson* [271] it had been held that a valuer was liable
in respect of a negligent valuation which he had been employed
by the owner of property to make for the purpose of raising a
mortgage, and which the valuer himself put before the proposed
mortgagee's solicitor.  Chitty J. there said [272]: " It seems to me
" that the defendants knowingly placed themselves in that posi-
" tion, and in point of law incurred a duty towards him to use
" reasonable care in the preparation of the document called a
" valuation.  I think it is like the case of the supply of an article
" —the supply of the hairwash in the case of *George* v.

[268] [1936] A.C. 85.          [271] 39 Ch.D. 39.
[269] (1789) 3 Term Rep. 51.   [272] Ibid. 42–43.
[270] 14 App.Cas. 337.

**A.C.**              AND PRIVY COUNCIL.                    535

" *Skivington*,[273] " later approved in *Donoghue* v. *Stevenson*.[274] Thus in the case of economic damage alone he was drawing an analogy from a case where physical damage to the wife of a purchaser was held to give rise to an action for negligence.

*Cann* v. *Willson*[275] was, however, overruled by *Le Lievre* v. *Gould*[276] on the ground, erroneous as it seems to me, that it could not stand with *Derry* v. *Peek*.[277] The particular facts in *Le Lievre* v. *Gould*[278] justified the particular decision, as Denning L.J. explained in *Candler* v. *Crane, Christmas & Co.*[279] But the ratio decidendi was wrong since it attributed to *Derry* v. *Peek*[280] more than that case decided. In *Nocton* v. *Lord Ashburton*[281] this House pointed out that too much had been ascribed to *Derry* v. *Peek*.[282] Lord Haldane said[283]: " The discussion of the case " by the noble and learned lords who took part in the decision " appears to me to exclude the hypothesis that they considered " any other question to be before them than what was the neces- " sary foundation of an ordinary action for deceit. They must " indeed be taken to have thought that the facts proved as to the " relationship of the parties in *Derry* v. *Peek*[284] were not enough " to establish any special duty arising out of that relationship " other than the general duty of honesty. But they do not say " that where a different sort of relationship ought to be inferred " from the circumstances the case is to be concluded by asking " whether an action for deceit will lie. I think that the authorities " subsequent to the decision of the House of Lords, show a " tendency to assume that it was intended to mean more than " it did. In reality the judgment covered only a part of the " field in which liabilities may arise. There are other obligations " besides that of honesty, the breach of which may give a right to " damages. These obligations depend on principles which the " judges have worked out in the fashion that is characteristic of " a system where much of the law has always been judge-made " and unwritten." Lord Haldane spoke to a like effect in *Robinson* v. *National Bank of Scotland Ltd.*[285]: " I think, as " I said in *Nocton's* case,[286] that an exaggerated view was taken " by a good many people of the scope of the decision in *Derry* v.

H. L. (E.)

1963

HEDLEY BYRNE & CO. LTD. *v.* HELLER & PARTNERS LTD.

Lord Pearce

---

[273] L.R. 5 Ex. 1.
[274] [1932] A.C. 562.
[275] 39 Ch.D. 39.
[276] [1893] 1 Q.B. 491.
[277] 14 App.Cas. 337.
[278] [1893] 1 Q.B. 491.
[279] [1951] 2 K.B. 164, 151.

[280] 14 App.Cas. 337.
[281] [1914] A.C. 932.
[282] 14 App.Cas. 337.
[283] [1914] A.C. 932, 947.
[284] 14 App.Cas. 337.
[285] 1916 S.C.(H.L.) 154, 157.
[286] [1914] A.C. 932.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Pearce

" *Peek*.[287]  The whole of the doctrine as to fiduciary relation-
" ships, as to the duty of care arising from implied as well as
" express contracts, as to the duty of care arising from other
" special relationships which the court may find to exist in par-
" ticular cases, still remains, and I should be very sorry if any
" word fell from me which should suggest that the courts are in
" any way hampered in recognising that the duty of care may be
" established when such cases really occur."  Lord Haldane was
thus in terms preserving unencumbered the area of special
relationships which created a duty of care; and he was not
restricting the area to cases where courts of equity would find a
fiduciary duty.

The range of negligence in act was greatly extended in
*Donoghue* v. *Stevenson* [288] on the wide principle of the good
neighbour; sic utere tuo ut alienum non laedas.  It is argued that
the principles enunciated in *Donoghue* v. *Stevenson* [288] apply fully
to negligence in word.  It may well be that Wrottesley J. in
*Old Gate Estates Ltd.*[289] put the matter too narrowly when he
confined the applicability of the principles laid down in *Donoghue*
v. *Stevenson* [290] to negligence which caused damage to life, limb
or health.  But they were certainly not purporting to deal with
such issues as, for instance, how far economic loss alone, without
some physical or material damage to support it, can afford a
cause of action in negligence by act.  See *Morrison Steamship
Co. Ltd.* v. *Greystoke Castle (Cargo Owners)*,[291] where it was
held that it could do so.  The House in *Donoghue* v. *Stevenson* [292]
was, in fact, dealing with negligent acts causing physical damage,
and the opinions cannot be read as if they were dealing with
negligence in word causing economic damage.  Had it been other-
wise some consideration would have been given to problems
peculiar to negligence in words.  That case, therefore, can give
no more help in this sphere than by affording some analogy from
the broad outlook which it imposed on the law relating to physical
negligence.

How wide the sphere of the duty of care in negligence is to
be laid depends ultimately upon the courts' assessment of the
demands of society for protection from the carelessness of others.
Economic protection has lagged behind protection in physical
matters where there is injury to person and property.  It may

[287] 14 App.Cas. 337.
[288] [1932] A.C. 562.
[289] 161 L.T. 227.

[290] [1932] A.C. 562.
[291] [1947] A.C. 265.
[292] [1932] A.C. 562.

**A.C.**          AND PRIVY COUNCIL.                    537

be that the size and the width of the range of possible claims has
acted as a deterrent to extension of economic protection.

In this sphere the law was developed in the United States in
*Glanzer* v. *Shepherd*,[293] where a public weigher employed by a
vendor was held liable to a purchaser for giving him a certificate
which negligently overstated the amount of the goods supplied
to him. The defendant was thus engaged on a task in which, as
he knew, vendor and purchaser alike depended on his skill and
care and the fact that it was the vendor who paid him was merely
an accident of commerce. This case was followed and developed
in later cases.

In the *Ultramares* case,[294] however, the court felt the
undesirability of exposing defendants to a potential liability " in
" an indeterminate amount for an indefinite time to an indeter-
" minate class." It decided that auditors were not liable for
negligence in the preparation of their accounts (of which they
supplied thirty copies, although they were not aware of the specific
purpose, namely, to obtain financial help) to a plaintiff who lent
money on the strength of them.

In South Africa, under a different system of law, two cases
show a similar advance and subsequent restriction (*Perlman* v.
*Zoukendyk* [295] and *Herschel* v. *Mrupi* [296]).

Some guidance may be obtained from the case of *Shiells* v.
*Blackburne*.[297] There a general merchant undertook voluntarily
and without reward to enter a parcel of the goods of another,
together with a parcel of his own of the same sort, at the Customs
House for exportation. Acting, it was contended, with gross
negligence, he made the entry under a wrong denomination
whereby both parcels were seized. The plaintiff failed on the facts
to make out a case of gross negligence. But Lord Loughborough
said [298]: " . . . where a bailee undertakes to perform a gratuitous
" act, from which the bailor alone is to receive benefit, there the
" bailie is only liable for gross negligence; but if a man gratuitously
" undertakes to do a thing to the best of his skill, where his
" situation or profession is such as to imply skill, an omission
" of that skill is imputable to him as gross negligence. If in
" this case a ship-broker, or a clerk in the Custom House, had
" undertaken to enter the goods, a wrong entry would in them
" be gross negligence, because their situation and employment

H. L. (E.)
1963
HEDLEY
BYRNE & CO.
LTD.
v.
HELLER &
PARTNERS
LTD.

Lord Pearce

[293] 233 N.Y. 236.          [296] 1954 (3) S.A. 464.
[294] 255 N.Y. 170.          [297] 1 H.Bl. 158.
[295] 1934 C.P.D. 151.       [298] Ibid. 163.

538                    HOUSE OF LORDS                    **[1964]**

H. L. (E.)
1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Pearce

" necessarily imply a competent degree of knowledge in making
" such entries." Heath J. said [299]: " . . . the surgeon would
" also be liable for such negligence, if he undertook gratis to attend
" a sick person, because his situation implies skill in surgery; but
" if the patient applies to a man of a different employment or
" occupation for his gratuitous assistance, who either does not
" exert all his skill, or administers improper remedies to the best
" of his ability, such person is not liable."

In *Gladwell* v. *Steggall* [300] an infant plaintiff, 10 years old,
recovered damages for injury to health from a surgeon and
apothecary who had treated her. She did not sue in contract
but brought an action ex delicto alleging a breach of duty arising
out of his employment by her, although it was her father to
whom the bill was made out. And in *Wilkinson* v. *Coverdale* [301]
Lord Kenyon accepted the proposition that a defendant who had
gratuitously undertaken to take out an insurance policy, and who
did it negligently, could be liable in damages.

In those cases there was no dichotomy between negligence in
act and in word, nor between physical and economic loss. The
basis underlying them is that if persons holding themselves out
in a calling or situation or profession take on a task within that
calling or situation or profession, they have a duty of skill and
care. In terms of proximity one might say that they are in par-
ticularly close proximity to those who, as they know, are relying
on their skill and care although the proximity is not contractual.

The reasoning of *Shiells* v. *Blackburne* [302] was applied in
*Everett* v. *Griffiths*,[303] where the Court of Appeal held that a
doctor owed a duty of care to a man by whom he was not employed
but whom he had a duty to examine under the Lunacy Act. It was
also relied on by Denning L.J. in his dissenting judgment in
*Candler* v. *Crane, Christmas & Co.*[304] He reached the conclusion
that in respect of reports and work that resulted in such reports
there was a duty of care laid on " those persons such as
" accountants, surveyors, valuers and analysts, whose profession
" and occupation it is to examine books, accounts and other things,
" and to make reports on which other people—other than their
" clients—rely in the ordinary course of business." The duty is, in
his opinion,[305] owed (apart from contractual duty to their empoyer)
" to any third person to whom they themselves show the accounts,

[299] 1 H. Bl. 158, 162.
[300] 5 Bing. N.C. 733.
[301] 1 Esp. 75.
[302] 1 H. Bl. 158.

[303] [1920] 3 K.B. 163, 182, 217.
[304] [1951] 2 K.B. 164, 179.
[305] Ibid. 180-181.

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Pearce.

" or to whom they know their employer is going to show the
" accounts, so as to induce him to invest money or take some
" other action on them." He excludes strangers of whom they
have heard nothing and to whom their employer without their
knowledge may choose to hand their accounts. " The test of
" proximity in these cases is: did the accountants know that the
" accounts were required for submission to the plaintiff and use
" by him? " [306] (It is to be noted that these expressions of
opinion produce a result somewhat similar to the American Re-
statement of the Law of Tort, vol. III, p. 122, para. 552.) I agree
with those words. In my opinion, they are consonant with the
earlier cases and with the observations of Lord Haldane.

It is argued that so to hold would create confusion in many
aspects of the law and infringe the established rule that innocent
misrepresentation gives no right to damages. I cannot accept
that argument. The true rule is that innocent misrepresentation
per se gives no right to damages. If the misrepresentation was
intended by the parties to form a warranty between two contract-
ing parties, it gives on that ground a right to damages (*Heilbutt,
Symons & Co.* v. *Buckleton* [307]). If an innocent misrepresenta-
tion is made between parties in a fiduciary relationship it may,
on that ground, give a right to claim damages for negligence. There
is also, in my opinion, a duty of care created by special relation-
ships which, though not fiduciary, give rise to an assumption that
care as well as honesty is demanded.

Was there such a special relationship in the present case as
to impose on the defendants a duty of care to the plaintiffs as
the undisclosed principals for whom the National Provincial Bank
was making the inquiry? The answer to that question depends
on the circumstances of the transaction. If, for instance, they
disclosed a casual social approach to the inquiry, no such special
relationship or duty of care would be assumed (see *Fish* v.
*Kelly* [308]). To import such a duty the representation must
normally, I think, concern a business or professional transaction
whose nature makes clear the gravity of the inquiry and the
importance and influence attached to the answer. It is conceded
that Salmon J. rightly found a duty of care in *Woods* v. *Martins
Bank Ltd.* [309] but the facts in that case were wholly different from
those in the present case. A most important circumstance is the
form of the inquiry and of the answer. Both were here plainly

[306] [1951] 2 K.B. 164, 181.
[307] [1913] A.C. 30, H.L.
[308] 17 C.B.N.S. 194.
[309] [1959] 1 Q.B. 55.

540                    HOUSE OF LORDS              **[1964]**

H. L. (E.)

1963

HEDLEY
BYRNE & CO.
LTD.
*v.*
HELLER &
PARTNERS
LTD.

Lord Pearce.

stated to be without liability. Mr. Gardiner argues that those words are not sufficiently precise to exclude liability for negligence. Nothing, however, except negligence could, in the facts of this case, create a liability (apart from fraud, to which they cannot have been intended to refer and against which the words would be no protection, since they would be part of the fraud). I do not, therefore, accept that even if the parties were already in contractual or other special relationship the words would give no immunity to a negligent answer. But in any event they clearly prevent a special relationship from arising. They are part of the material from which one deduces whether a duty of care and a liability for negligence was assumed. If both parties say expressly (in a case where neither is deliberately taking advantage of the other) that there shall be no liability, I do not find it possible to say that a liability was assumed.

In *Robinson* v. *National Bank of Scotland Ltd.*[310] also the correspondence expressly excluded responsibility. Possibly that factor weighed with Lord Haldane when he said[311]: " But when " a mere inquiry is made by one banker of another, who stands " in no special relation to him, then, in the absence of special " circumstances from which a contract to be careful can be in- " ferred, I think there is no duty excepting the duty of common " honesty to which I have referred." I appreciate Mr. Gardiner's emphasis on the general importance to the business world of bankers' references and the desirability that in an integrated bank- ing system there should be a duty of care with regard to them, but on the facts before us it is in my opinion not possible to hold that there was a special duty of care and a liability for negligence.

I would therefore dismiss the appeal.

*Appeal dismissed.*

Solicitors: *Evill & Coleman; Franks, Charlesly & Co.*

F. C.

[310] 1916 S.C.(H.L.) 154.          [311] Ibid. 157.