UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| SALAH N. OSSEIRAN, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| *v.* ) | Civil Action No. 1-06-CV-0336 RWR |
| ) | |
| INTERNATIONAL FINANCE CORPORATION, ) | |
| ) | |
| *Defendant.* ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION
TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

It comes as no surprise that an institution the size and stature of IFC does not conclude sales of its assets without formal documentation. It does not follow, however, that such institutions do not enter into binding preliminary agreements to sell assets or that stipulating that the sale will not occur until execution of the formal documentation of the agreed-upon terms, as here, renders the preliminary agreement non-binding or allows the seller to refuse to execute the formal documentation. Despite IFC's attempt to paint a complicated picture of cautionary statements, required approvals, conditions and uncertainties, its Opposition fails to show that the exchange of correspondence between plaintiff and IFC's representative did not constitute IFC's binding preliminary agreement upon all material terms of its sale of its MECG shares to plaintiff and its promise to sell the shares upon those terms. Nor, as demonstrated below, can IFC succeed in its attempt to avoid the issue altogether through its extraordinary claim that the preliminary injunction sought would somehow constitute an attachment of its property from which it is immune.

**A. The Preliminary Injunction Sought by Plaintiff Would Not Contravene IFC's Claimed Immunity from Prejudgment Attachment.**

IFC's immunity claim is illusory. It claims to be immune from all forms of judicial process except to the extent that it has waived its immunity in the following provision of its Articles of Agreement:

> Actions may be brought against [IFC] only in a court of competent jurisdiction in the territories of a member in which the Corporation has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities. No actions shall, however, be brought by members or persons acting for or deriving claims from members. The property and assets of [IFC] shall, wheresoever located and by whomsoever held, be immune from all forms of seizure, attachment or execution before the delivery of final judgment against the Corporation.

Articles of Agreement of the International Finance Corporation, Art. VI, § 3 (May 25, 1955, *amended* April 28, 1993) 7 U.S.T. 2197.

Speaking of identical language in the World Bank's Articles of Agreement, the Court of Appeals concluded, "When the language [quoted above] is approached from this viewpoint [—the interrelationship between the functions of the Bank set forth in the Articles of Agreement and the underlying purposes of international immunities—] it is evident that the World Bank's members could only have intended to waive the Bank's immunity from suits by its debtors, creditors, bondholders, and those other potential plaintiffs to whom the Bank would have to subject itself to suit in order to achieve its chartered objectives." *Mendaro v. World Bank*, 717 F.2d 610, 615 (D.C. Cir. 1983); *accord Atkinson v. Inter-American Dev. Bank*, 156 F.3d 1335, 1338-39 (D.C. Cir. 1998) (construing identical language in the Articles of Agreement for the Inter-American Development Bank).

In rejecting a Title VII sexual harassment suit by an employee in *Mendaro* and a wage garnishment action in *Atkinson*, the court contrasted those suits "with suits based

2

on commercial transactions with the outside world, where the benefits of a waiver would outweigh the costs...." *Atkinson*, 156 F.3d at 1338. In *Atkinson*, the Court further noted that in *Mendaro* it explained its previous decision in *Lutcher S.A. Celulose e Papel v. Inter-Am. Dev. Bank*, 382 F.2d 454 (D.C. Cir. 1967), as "holding that the Bank had waived suits by borrowers on the ground that such waiver 'would directly aid the Bank in attracting responsible borrowers.'" 156 F.3d at 1338, *quoting Mendaro*, 717 F.2d at 620.

In *Bro Tech Corp. v. European Bank for Reconstr. & Dev.*, 2000 U.S. Dist. LEXIS 17049, *14-15 (E.D. Pa. 2000), the court, applying the *Mendaro/Atkinson* "corresponding benefit test," concluded that identical language in the Articles of Agreement of the European Bank for Reconstruction and Development (EBRD) constituted a waiver of the Bank's immunity for suits by investors in the Bank's projects. Similarly, the Court of Appeals' corresponding-benefits test quite clearly would allow suits, as here, by purchasers of IFC's equity investments. IFC's Articles require it to "revolve its funds by selling its investments to private investors whenever it can do so on satisfactory terms." IFC Articles Art. III, § 3 (vi). *See also* IFC's Memorandum in Opposition ("Opposition") at 31-32 (citing van Bilsen Declaration at 3). Thus IFC advances its ability to attract purchasers of its equity investments by permitting them to sue IFC for breach of contract and other IFC malfeasances. *Cf Bro Tech Corp.*, 2000 U.S. Dist. LEXIS 17049 at *15-16 ("in order to attract investors around the world, the EBRD must provide some sort of security to them, protecting the investors from unreasonable and arbitrary action by EBRD").

The protection afforded purchasers by the ability to sue would be of little benefit if it were not accompanied by the ability to prevent irreparable harm pending final judgment

by means of a preliminary injunction.  Such preliminary injunctions, even if they did have a minimal effect on the international agency's ability to divest its assets, simply are not equivalent to the prejudgment attachments barred by the usual articles of agreement for such organizations.

IFC cites three cases in support of its position: *S & S Mach. Co. v. Masinexportimport*, 706 F.2d 411 (2d Cir. 1983); *Stephens v. National Distillers & Chem. Corp.*, 69 F.3d 1226 (2d Cir. 1995); and *Globe Nuclear Servs. & Supply, Ltd. v. AO Techsnabexport*, No. DKC-03-3339 (Transcript of Motions Hrg. Sept. 24, 2004; attached to IFC's Opposition as Exhibit F).  All three are easily distinguished.  None involved an effort by a plaintiff to preserve the status quo, thereby preserving the court's ability ultimately to prevent irreparable harm and confirm the *plaintiff's* interest in the property at issue.  In fact, all three were actions at law in which the plaintiffs sought only money damages and the preliminary injunctions were truly in the nature of prejudgment attachments to preserve the plaintiffs' ability to collect on a money judgment.  *S & S Mach.*, 706 F.2d at 413; *Stephens*, 69 F.3d at 1228; *Globe Nuclear*, Tr. at 130.  Consequently, these cases are not relevant to the motion now before the Court.

The Supreme Court, in a case decided after the Second Circuit decisions on which IFC relies, has expressly recognized the distinction between a preliminary injunction and a prejudgment attachment.  "In the case of the usual preliminary injunction, the plaintiff seeks to enjoin, pending the outcome of the litigation, action that he claims is unlawful.... [An order of pretrial attachment, on the other hand, is] issued not to enjoin unlawful conduct, but rather to render unlawful conduct that would otherwise be permissible, in order to protect the anticipated judgment of the court ...."  *Grupo Mexicano De Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 315 (1999).  "The

4

preliminary relief available in a suit seeking equitable relief has nothing to do with the preliminary relief available in a creditor's bill seeking equitable assistance in the collection of a legal debt." *Id.*, 527 U.S. at 325. "A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212 (1945), *quoted in Grupo Mexicano De Desarrollo*, 527 U.S. at 327. Indeed, acceptance of IFC's attachment argument would effectively constitute a decision that IFC is immune from suit for specific performance of any agreement to sell its equity investments.

Even if an injunction to preserve the status quo could somehow be regarded as a prejudgment attachment of property, the preliminary injunction sought here would not have even a minimal effect on IFC's property interests. If Osseiran, as he claims, has entered into a specifically enforceable contract to purchase IFC's shares, he is already the equitable owner of those shares. *Freeman v. Fabiniak*, 1985 Del. Ch. LEXIS 486 at *21-22 (Del. Ch. 1985) (concluding that equitable ownership of stock passes to a party who has a contract to purchase the stock); *Len v. Fuller*, 1997 Del. Ch. LEXIS 78 at *10-11 (Del Ch. 1998); 17 RICHARD A. LORD, WILLISTON ON CONTRACTS § 51-47 (4th ed. 2000). Similarly, if IFC, as it claims, has no agreement with Osseiran but has entered into an enforceable contract to sell the same shares to another party, then it is that party that is the equitable owner of the shares. Thus in no event would the preliminary injunction plaintiff seeks here interfere with IFC's property rights.

Accordingly, the Court should conclude that IFC has waived its immunity to this lawsuit and that issuance of the requested preliminary injunction, not being equivalent to a prohibited prejudgment attachment, is included in that waiver.

**B. Plaintiff Is Entitled to the Requested Preliminary Injunction.**

IFC's rejoinder to plaintiff's motion is based on misstatements of law and fact combined with clever half truths designed to mislead the Court. Each will be addressed in the context of the legal issues relevant to the requested preliminary injunction.

**1. IFC's Recital of the Facts Is Misleading and Inaccurate.**

For some reason IFC is now unwilling to come forward with the rationale for its mid-December 2005 change of heart with respect to the sale of its MECG shares to Osseiran. Until that time, the parties had proceeded in an amicable, businesslike manner toward consummating the transaction contemplated by their November 18-23 e-mail exchanges. In fact, the transaction had been on a fast track and could have been closed in a matter of days. Then suddenly, sometime between December 15 and 19, IFC decided not to conclude the deal.

IFC suggests (Opposition at 7) that the impetus for this change was other MECG shareholders' reaction to Osseiran's disclosure to them that he had already purchased IFC's shares. In fact, Osseiran did discuss his impending purchase of IFC's shares with other MECG shareholders, but only after they asked him if it were true that he had agreed to purchase IFC's shares. Upon receiving such inquiries, Osseiran asked van Bilsen if IFC had disclosed the parties' transaction. Van Bilsen informed him that IFC's representative on MECG's Board of Directors, Daoud Khairallah, probably disclosed the impending transaction to MECG's Chairman in explaining why Khairallah was resigning from the MECG Board, *i.e.*, that he was leaving the Board because IFC had sold its shares to Osseiran. Osseiran Second Declaration at ¶ 5.

Van Bilsen also informed Osseiran that, upon learning of IFC's impending sale to Osseiran, MECG's chairman sent IFC a letter threatening to sue IFC if it consummated

its transaction with Osseiran. *Id.* IFC's response to this assertion is symptomatic of the manner in which it is willing to mislead this Court. Its declarant van Bilsen says only that he did not relay that information to Osseiran in the conference call on December 19, 2005. Opposition at 7 (citing van Bilsen Declaration at ¶ 15). This is true; van Bilsen relayed that information to Osseiran during an earlier telephone conversation. Osseiran Second Declaration at ¶ 6 (correcting Osseiran First Declaration at ¶ 15.a). IFC fails altogether to address the substance of Osseiran's assertion. It does not deny that IFC received such a letter from MECG's chairman or that IFC's change of heart with respect to the sale of its MECG shares to Osseiran was attributable to such threats. In fact, plaintiff has now obtained a copy of a similar letter that the chairman sent to Barclays Capital, which confirms the substance of Osseiran's assertion. Osseiran Second Declaration ¶ 6 and Exhibit G.

The chairman's letter to Barclays also confirms plaintiff's position in other important respects. For example, the chairman says that after hearing that IFC had sold its shares to Osseiran, he contacted IFC and "was informed that *IFC and Barclays had, indeed, sold their interests.*" *Id.* (emphasis added). He also informs Barclays that in response to his complaints, IFC had "decided *to rescind the sale* of their shares." *Id.* (emphasis added). The chairman's account of what happened in December 2005 coincides exactly with plaintiff's claim. IFC acknowledged that it had agreed to sell its MECG shares to Osseiran and then, upon receiving the chairman's complaint, "rescinded" that agreement. IFC can no longer credibly contend otherwise.

In any event, it is clear that, contrary to IFC's suggestion (Opposition at 6 , 24), IFC's failure to consummate the transaction contemplated by the November 18-23 e-mail exchange was not due to the parties' inability to reach agreement on any open terms. It

7

is also clear that IFC's suggestion that it never binds itself to investment agreements without completion and execution of formal documents (Oppositon at 3, 26) is belied by its current assertion that it has a binding agreement to sell its MECG shares to FNB, based solely on a half-page, informal shareholders agreement (*id.* at 2).

Nor was the failure to consummate the deal attributable to any lack of authority in van Bilsen, who had repeatedly assured Osseiran that he was "fully authorized" to sell IFC's MECG shares to him. Osseiran Second Declaration at ¶ 3; see also Osseiran First Declaration at ¶ 4.[1] Rather, the failure to close was attributable solely to IFC's bad faith refusal to proceed. This is confirmed by the MECG chairman's letter to Barclays Capital and by Osseiran's experience with Barclays Capital, whose transaction with him was at an identical stage of completion in mid-December 2005. Unlike IFC, Barclays did not rescind its agreement with plaintiff. Rather, it proceeded in good faith to complete the transaction on January 9, 2006, using the same standard formal share purchase agreement that IFC had proposed in November for both itself and Barclays.

IFC compounded its misfeasance by leading Osseiran to believe that it still intended to sell its MECG shares to him, causing him to continue to purchase other shares at a cost of millions of dollars. Even IFC's self-serving declarations indirectly support Osseiran's understanding of IFC's reassurances. They confirm that IFC's representatives informed him on several occasions that IFC was not willing to complete the stock sale agreement "at that time," but that he should just be "patient." Opposition at 7, 9, 24. These statements are entirely consistent with Osseiran's understanding, based on IFC's representations to him, that IFC had encountered some problems with

---

[1] In any event, any further authorizations needed by van Bilsen were mere formalities, as evidenced by the single day required to obtain approval of the FNB proposal. Van Bilsen Declaration at ¶ 23; Genovese Declaration at ¶ 11.

8

other MECG shareholders and that it would consummate its agreement with him as soon as those problems were resolved. They are inconsistent with IFC's implication that it informed Osseiran that it had decided not to sell its MECG shares to him.

The MECG chairman's December letter to Barclay's makes clear that all of IFC's representations after mid-December 2005, including those made in its Opposition to the pending motion, were intended to disguise its attempted unilateral rescission of its previously acknowledged agreement with plaintiff. Its arguments to the contrary are nothing more than *post hoc* attempts to justify its devious words and actions.[2]

IFC's tale is also misleading in another respect. It says that upon being asked, at the February 8, 2006 MECG shareholders' meeting, whether IFC had sold its shares, IFC's representative, Carmen Genovese, responded that "IFC had not concluded any sale agreement with anyone and did not consider itself bound under any obligation to sell its shares to anyone." Opposition at 10. It then misleadingly proclaims that Osseiran "did not object or contradict Mr. Genovese's statement...." Osseiran had no reason to contradict the statement because, as IFC fails to disclose, another participant, MECG's CEO, Walid Mussalam, challenged Genovese's statement by informing the group that he

---

[2] Another of IFC's excuses for postponing the closure of its deal with Osseiran—its doubts about its ability to sell without the consent of other shareholders—was also a subterfuge. Van Bilsen's December 28 e-mail to MECG's Board of Directors reveals that IFC knew at least as early as September 2005, that there was no such restriction on its ability to sell its shares. Osseiran Second Declaration at ¶ 7 and Exhibit H. Significantly, this e-mail was sent after IFC had received the MECG chairman's December 2005 letter, in which he apparently alleged that IFC was so restricted. *See id.*, Exhibit G.

was aware of internal IFC documents that asserted that IFC had sold its shares to Osseiran. Osseiran Second Declaration at ¶ 8.[3]

When it comes to its own silence in the face of adverse allegations, IFC apparently contradicts its foregoing stance on the inference to be drawn from such silence. Thus IFC admits that it received Osseiran's December 22, 2005 e-mail asserting that IFC was bound to sell its shares to him, but failed altogether to respond to it. Van Bilsen Declaration at ¶ 17.

### 2. Choice of Law: The Issues Presented Are Governed by District of Columbia Law.

IFC correctly recites, but misapplies, the District of Columbia's choice-of-law rules. District of Columbia courts do indeed examine the following five factors in determining the applicable law in contract cases: (1) the place of contracting; (2) the place of negotiations; (3) the place of performance; (4) the location of the subject matter; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188, as recited in *Ideal Elect. Sec. Co. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997). Contrary to IFC's distorted analysis, these factors point to the District of Columbia.

The place of contracting, if the formal share purchase agreement had been executed as the parties anticipated, would probably have been the District of Columbia, where IFC would have been the last to sign. Or perhaps IFC, acting from the District of Columbia, might have authorized van Bilsen to sign at his office in Dubai.

---

[3] As he confirmed at the time, Mussalam is a former IFC employee who still has contacts within IFC. It was those contacts who had reportedly seen the documents confirming IFC's sale to Osseiran. Osseiran Second Declaration at ¶ 8.

10

The negotiations occurred primarily by e-mail and telephone from various locations, several sent to and from the District of Columbia. Contrary to IFC's suggestion (Opposition at 19), van Bilsen was not always at his place of work in Dubai when he conferred with plaintiff. On at least two occasions, he was at IFC's headquarters in the District of Columbia. Osseiran Second Declaration at ¶ 2. In addition, Alloway's contributions to the discussions were made in the District of Columbia. Opposition at 19. And among the "others" who participated in Osseiran's telephone conference with IFC on December 19, 2005 (see van Bilsen Declaration at ¶ 14) was Becher Atassi, who participated from IFC's headquarters in the District of Columbia. Osseiran Second Declaration at ¶ 2. Osseiran's participation occurred primarily, if not exclusively, from Beirut. Van Bilsen, Genovese, Alloway and Atassi were at all material times acting as agents for IFC, their principal, which instructed them from its headquarters in the District of Columbia, regardless of where they were when they interacted with Osseiran.

The place of performance would have been the District of Columbia, where IFC holds, and would have transferred, its MECG stock. Again, IFC, acting from the District of Columbia, might have authorized van Bilsen to transfer the shares at his office in Dubai. Similarly, the location of the subject matter, IFC's shares of MECG stock (which IFC fails to mention), was the District of Columbia.

One party to the contract (Osseiran) is a resident of, and domiciled in Beirut, Lebanon; the other (IFC) is a resident of, and has its headquarters in, the District of

Columbia. Contrary to IFC's suggestion (Opposition at 19), neither Guernsey nor Dubai is implicated by this factor.[4]

The clear center of gravity of all these activities was the District of Columbia. None of them occurred in, or implicates, Guernsey. In addition, IFC's Articles of Agreement, which IFC says are dispositive, were signed in the District of Columbia. IFC Articles at 12.

If the Court concludes that the factors do not point to any one jurisdiction, it should apply the law of the District of Columbia, which is the default position in such situations. "'The forum State's interest in the fair and efficient administration of justice' together with the 'substantial savings [that] can accrue to the State's judicial system' when its judges are 'able to apply law with which [they are] thoroughly familiar or can easily discover,' tilt the balance in favor of applying the law of the forum state when the interests of both jurisdictions are equally weighty." *Kaiser-Georgetown Cmty. Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985) (alterations in original; quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 326 & n.14 (Stevens, J., concurring)). The simple fact is that this case involves a dispute between a Lebanese citizen and an organization headquartered in the District of Colombia. The Lebanese citizen has elected to litigate the dispute in the District of Columbia under this jurisdiction's laws. There is nothing unfair about applying District of Columbia law to an organization that has chosen to establish its headquarters in this jurisdiction. The Court should reject the District of Columbia defendant's invitation to disregard that law.

---

[4] MECG does not reside in Guernsey. Its headquarters are in Beirut; it is incorporated in Guernsey. Neither fact is relevant to the choice-of-law analysis, however, because MECG was not a party to the negotiations or the contract.

### 3. Plaintiff Is Likely to Succeed on the Merits of His Breach of Contract or Promissory Estoppel Claim.

Plaintiff will likely prevail on either his breach of contract claim or his promissory estoppel claim.

**Breach of Contract.** Plaintiff has demonstrated the existence of an enforceable agreement through the parties' exchange of written correspondence by which they reached agreement on all the basic substantive terms of the stock purchase (*i.e.*, the amount of shares, the purchase price, and the terms of payment), subject only to documentation through a formal share purchase agreement. In attempting to overcome the effect of the correspondence, IFC emphasizes that the draft formal agreement provided that it would not be binding until signed by both parties (Opposition at 23), that in forwarding the draft formal agreement to plaintiff, IFC's representative advised plaintiff that IFC reserved the right to amend the draft (*id.* at 25), and that plaintiff himself proposed various changes to the draft (*id.* at 25-26). Whether the *draft formal agreement* would be binding prior to execution and accurately reflected the terms to which the parties had previously agreed, however, says nothing about whether in fact they had *previously reached* an enforceable agreement. Thus none of these factors creates any doubt as to whether the prior exchange of e-mails resulted in a binding agreement as to all the material terms of the sale of IFC's shares to Osseiran.

IFC makes much of the fact that plaintiff agreed not only that IFC's acceptance of his offer was subject to formal documentation, but also that the formal purchase agreement would not "come into effect" until after it was executed and the 40 percent down payment and bank guarantees had been provided. Opposition at 23. As one would not reasonably expect that the down payment and guarantees would be provided prior to

13

closing, the phrase "come into effect" could only have meant the actual consummation of the transaction. Again, this has no bearing upon the existence of a binding agreement.

IFC also points out that the parties had not reached agreement on the "form" of the bank guarantees and that the draft provided by plaintiff's bank was simply a draft (*id.* at 26). But IFC does not dispute that the parties had agreed that payment of the deferred portion of plaintiff's purchase price would by secured by acceptable bank guarantees. Whether they would be in IFC's proposed form or plaintiff's bank's form was just that—a matter of form, not substance.

IFC correctly points out that under District of Columbia law a preliminary agreement can bind the parties to negotiate the terms of the formal agreement in good faith only if the formal agreement is understood to be a mere memorial of the agreement already reached. Opposition at 27. Its further statement that the parties "had not agreed upon terms" (*id.* at 28), however, is belied by the exchange of e-mails setting forth the terms. Importantly, IFC nowhere points to any essential substantive term of the transaction that had not been agreed upon, and its own draft of the formal purchase agreement contradicts its current suggestion that the contemplated formal documentation was to be something more than a memorial of the agreement already reached.

Finally in this connection, the recently obtained MECG letter indicating that IFC had confirmed to MECG in December that it had sold its shares to plaintiff demonstrates that all of IFC's present arguments—including van Bilsen's self-serving declaration that he did not intend to bind IFC—are merely belated attempts to distance itself from an agreement that it contemporaneously knew full well it had entered into. Plaintiff is thus

likely to succeed on the merits of its claim that it had a binding agreement with IFC and that IFC breached that agreement.

**Promissory Estoppel.**  IFC's arguments (Opposition at 28-32) that plaintiff will not likely succeed on his promissory estoppel claim all rest on the faulty premise that IFC made no promise with definite terms on which plaintiff might reasonably be expected to rely.  As shown above, and at page 3 of plaintiff's opening memorandum and the exhibits there cited, the terms of IFC's agreement to sell its shares were quite definite and all-inclusive.  IFC's version of the facts is simply not credible.

### 4. Plaintiff Will Suffer Irreparable Harm if the Preliminary Injunction Is Not Issued.

IFC tries hard to obfuscate, but in the final analysis does not deny, that plaintiff will suffer irreparable harm if the preliminary injunction is not issued.  It recognizes (Opposition at 32-33) that "preventing a ready, willing and able buyer from purchasing a majority interest in a corporation" constitutes irreparable harm, but distorts the facts to assert that Osseiran was not such a buyer, relying principally on claims that it did not know that Osseiran wanted to obtain a majority position.  Regardless of the state of IFC's knowledge with respect to Osseiran's stock ownership or his plans, the fact is that IFC's refusal to sell its MECG shares to Osseiran, who was a ready, willing and able buyer, prevented Osseiran from acquiring a majority interest in MECG.  As noted, IFC recognizes that courts have found this to constitute irreparable harm.  *See Pac. Elect. Wire & Cable Co. v. Set Top Int'l Inc.*, No. 03 Civ. 9623, 2004 U.S. Dist. LEXIS 3400 at *7-8 (S.D.N.Y. Jan. 20, 2004).

The parties disagree on when Osseiran first informed IFC that he intended to purchase a majority of MECG's stock.  IFC does not specifically deny Osseiran's

assertion (Osseiran First Declaration ¶ 4) that he so informed IFC early on in their discussions.  It says only that "*according to Plaintiff's emails*, his attempt to buy IFC's shares ... was not begun as an attempt to gain majority control of MECG."  Opposition at 33 (citing van Bilsen exhibit 3) (emphasis added).  Its declarant van Bilsen hedges, saying, "I do not believe that he told me that his ultimate goal was to acquire a majority of MECG's shares until our conversation on December 30, 2005."  Van Bilsen Declaration ¶24.  In fact, Osseiran informed van Bilsen of his plans by telephone, not by e-mail.  Osseiran Second Declaration at ¶ 4[5]

Even if Osseiran had not expressly informed IFC of his plans to purchase a controlling interest in MECG, IFC should have, and most likely did, deduce that Osseiran intended to take control.  There simply is no logical reason for a minority shareholder in a money-losing, closely held corporation to increase his minority position.  As Osseiran informed van Bilsen at the beginning of their negotiations, MECG was, during the summer of 2005, exhausting its funds at a rate of US$120,000 per month.  *Id.*  Any additional investment that did not permit the investor to change the corporation's management would have been, at best, foolhardy.[6]  Surely a sophisticated portfolio manager like van Bilsen would have appreciated this fact from the beginning.

IFC's allegations concerning the percentage of MECG stock that Osseiran accumulated after December 2005 are also misleading.  Based on Carmen Genovese's

---

[5] Van Bilsen's assertion (Opposition at 8; van Bilsen Declaration ¶ 24) that Osseiran claimed already to have acquired a majority of MECG shares as of December 30, 2005, is probably a result of a misunderstanding.  Osseiran actually informed van Bilsen that he had commitments to sell from the holders of a majority of the shares.  This included IFC's commitment.  Osseiran Second Declaration at ¶ 4.

[6] This obvious conclusion was confirmed by the terms of FNB's offer of February 2006, which was conditioned on FNB's ability to purchase at least 51 percent of MECG's stock.  Opposition at 10.

16

declaration, IFC says that as of February 8, 2006, Osseiran had accumulated only 34.6 percent of MECG's shares.  Opposition at 33.  IFC then boldly proclaims that even with IFC's 10.8 percent, Osseiran would not have obtained control.  It is true that at the beginning of the February 8, 2006 shareholders' meeting, Osseiran announced, as all shareholders were required to do, his percentage of ownership, which was then 34.6 percent, of MECG's stock.  What IFC fails to disclose is that at the beginning of the subsequent February 16, 2006 shareholders' meeting, which Genovese also attended, Osseiran announced that he then owned 41 percent of MECG's stock.  Osseiran Second Declaration at ¶ 9.

### 5.  The Balance of Harms Favors Plaintiff.

IFC's balance-of-harms analysis is based on its erroneous conclusion that plaintiff will suffer no harm if IFC is permitted to sell its MECG shares to a third party during the pendency of this action.  If that were true, plaintiff would not be attempting to obtain a preliminary injunction.  As previously shown, IFC's sale of its shares to a third party not only would prevent plaintiff from attaining his legitimate objective of acquiring a majority interest in MECG, it would also leave him with a large minority position in a money-losing company over which he has no control.  Both of these consequences will injure plaintiff in ways that cannot be measured in or compensated by monetary damages.

IFC, on the other hand, will not be harmed by a preliminary injunction.  IFC has long made clear that its objective is to sell its MECG stock to a private investor.  A preliminary injunction will merely delay its ability to sell to anyone other than the plaintiff.  That delay can be minimized by expediting discovery and disposition of this case on its merits.  To the extent that any such delay is subsequently found to have been

improper, IFC will be able to recover any resulting damages from the security that plaintiff will post upon issuance of the injunction.[7]

### 6. A Preliminary Injunction Would Serve the Public Interest.

IFC's argument with respect to public interest is tantamount to saying that the actions of IFC and other international organizations should be free from judicial scrutiny at any time in any place.  The Court of Appeals, however, concluded just the opposite in *Mendaro* and *Atkinson*:  international organizations will benefit by permitting judicial intervention at the behest of "debtors, creditors, bondholders, and those other potential plaintiffs to whom the Bank would have to subject itself to suit in order to achieve its chartered objectives."  *Mendaro*, 717 F.2d at 615; *Atkinson*, 156 F.3d at 1338-39.

---

[7] In one sense the preliminary injunction would actually benefit IFC.  During their negotiations, van Bilsen informed Osseiran that IFC would prefer not to sell its shares to an entity that intended to liquidate MECG, because such an outcome would be seen as a failure of IFC's objective of establishing successful enterprises.  Osseiran Second Declaration at ¶ 11.  Apparently FNB intends to dismantle and liquidate MECG upon its acquisition of a controlling interest.

**CONCLUSION**

For the foregoing reasons and those set out in plaintiff's opening memorandum, the Court should enjoin IFC from selling its MECG stock to any person or entity other than plaintiff during the pendency of this action.

                                             **Respectfully submitted,**

                                             /s/ ALEX BLANTON
                                             Alex Blanton (D.C. Bar No. 169623)
                                             Joseph O. Click (DC Bar No. 417294)
                                             BLANK ROME, LLP
                                               600 New Hampshire Ave., NW
                                               Washington, D.C. 20037
                                               202-772-5909
                                               Fax: 202-572-8357
                                               E-mail: Blanton@BlankRome.com

                                             *Counsel for plaintiff Salah N. Osseiran*

Of Counsel:
Sharon J. Zealey
William M. Huse
  Blank Rome LLP
  1700 PNC Center
  201 East Fifth Street
  Cincinnati, Ohio 45202
  (513) 362-8716
  zealey@blankrome.com