## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| SALAH N. OSSEIRAN,      ) | |
|      ) | |
|      *Plaintiff,*      ) | |
|      ) | |
|      *v.*      ) | Civil Action No. 1-06-CV-0336 RWR |
|      ) | |
| INTERNATIONAL FINANCE      ) | |
| CORPORATION,      ) | |
|      ) | |
|      *Defendant.*      ) | |
|      ) | |

### DEFENDANT INTERNATIONAL FINANCE CORPORATION'S
### MEMORANDUM OF LAW IN SUPPORT OF
### ITS MOTION TO DISMISS THE COMPLAINT

**WHITE & CASE** LLP

Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
Frank Panopoulos (D.C. Bar No. 459365)
701 Thirteenth Street, N.W.
Washington, D.C. 20005-3807
(202) 626-3600

*Attorneys for International Finance
Corporation*

March 20, 2006

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .................................................................................................................1

BACKGROUND ...................................................................................................................2

I.    PRELIMINARY AND PROCEDURAL MATTERS ...........................................2

II.    SUMMARY OF PLAINTIFF'S ALLEGATIONS .............................................3

    A.    Alleged Facts .................................................................................................3

    B.    Counts And Request For Relief .....................................................................4

ARGUMENT .........................................................................................................................5

I.    THE COMPLAINT SHOULD BE DISMISSED UNDER THE DOCTRINE OF FORUM NON CONVENIENS ........................................................5

    A.    Guernsey Is An Adequate Alternative Forum And Possesses Jurisdiction Over the Whole Case ...................................................................6

    B.    Private Interest Factors Weigh Heavily In Favor Of Guernsey .............................8

    C.    Public Interest Factors Weigh Heavily In Favor Of Guernsey .............................11

    D.    Plaintiff Can Reinstate His Suit In Guernsey Without Undue Inconvenience Or Prejudice ..........................................................................12

II.    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED ...................................13

    A.    Applicable Standard ....................................................................................13

    B.    A Choice Of Law Analysis Points To The Law Of Guernsey As The Law Applicable to Resolve Plaintiff's Claims ...............................................14

    C.    Plaintiff Fails To State A Claim Under Guernsey Law ........................................15

    D.    Plaintiff Fails To State A Claim Under The Law Of The District Of Columbia For Breach Of Contract ..............................................................17

        1.    The Parties Did Not Intend To Be Bound ......................................17

        2.    The Parties Did Not Reach Agreement On All Material Terms ...............19

i

## TABLE OF CONTENTS

Page

         3.      Additional Factors Weighed By District Of Columbia Courts Reaffirm That The Parties Did Not Enter Into An Enforceable Agreement ..................................................................................21

    E.      Plaintiff Fails To State A Claim Under District Of Columbia Law For Promissory Estoppel ...............................................................22

         1.      IFC Did Not *Promise* To Conclude A Final Agreement ..........................22

         2.      Plaintiff Did Not *Reasonably Rely* On IFC's Representations ................22

         3.      Compelling IFC To Sell Its Shares To Plaintiff Would Create, Rather Than Avoid, Injustice ...................................................23

    F.      Plaintiff Fails To State A Claim Under District Of Columbia Law For Breach Of A Confidentiality Agreement ...............................................24

    G.      Plaintiff Fails To State A Claim Under District of Columbia Law For Fraudulent Misrepresentation ..................................................26

    H.      Plaintiff Fails To State A Claim Under District of Columbia Law For Negligent Misrepresentation ...................................................28

III.    IFC IS IMMUNE FROM THIS SUIT UNDER THE INTERNATIONAL ORGANIZATION IMMUNITIES ACT AND IFC'S ARTICLES OF AGREEMENT ..............................................................29

    CONCLUSION...................................................................33

## TABLE OF AUTHORITIES

Federal Cases                                                                                    Page(s)

*Atkinson v. Inter-Am. Dev. Bank,* 156 F.3d 1335 (D.C. Cir. 1998) ...................................... 29-31

*BCCI Holdings (Luxembourg), S.A. v. Mahfouz,* 828 F.Supp. 92 (D.D.C. 1993) .........................6

*Bortell v. Eli Lilly & Co.,* 406 F.Supp.2d 1 (D.D.C. 2005) ...............................................14

*Building Servs. Co. v. Nat'l R.R. Passenger Corp.,* 305 F.Supp.2d 85 (D.D.C. 2004) ................22

*Burman v. Phoenix Worldwide Indus., Inc.,* 384 F.Supp.2d 316 (D.D.C. 2005)....................26, 28

*Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42 (2d Cir. 1991) ...........................................3

*Chedick v. Nash,* 151 F.3d 1077 (D.C. Cir. 1998) ........................................................................27

*Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil,*
    212 F.Supp.2d 30 (D.D.C. 2002) ................................................................................ 12-13

*Dujardin v. Int'l Bank for Reconstr. & Dev.,* 9 Fed. Appx. 19 (D.C. Cir. 2001) .........................32

*Doll v. Grand Union Co.,* 925 F.2d 1363 (11th Cir. 1991) ...........................................................23

*\*EEOC v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621 (D.C. Cir. 1997)................................2

*Foltz v. U.S. News & World Report, Inc.,* 627 F.Supp. 1143 (D.D.C. 1986) ......................... 28-29

*Franklin Asaph Ltd. v. FDIC,* 794 F.Supp. 402 (D.D.C. 1992) ...................................................14

*Friends For All Children, Inc. v. Lockheed Aircraft Corp.,* 717 F.2d 602 (D.C. Cir. 1983)...........5

*Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012 (1st Cir. 1988) .......................................................3

*Granfield v. Catholic Univ. of Am.,* 530 F.2d 1035 (D.C. Cir. 1976) .................................... 22-23

*Gulf Oil Corp. v. Gilbert,* 330 U.S. 501 (1947).................................................................... 8, 11-12

*\*Haynesworth v. Miller,* 820 F.2d 1245 (D.C. Cir. 1987)............................................................13

*Henthorn v. Dep't of Navy,* 29 F.3d 682 (D.C. Cir. 1994) ..........................................................13

*In re Am. Express Co. S'holder Litig.,* 39 F.3d 395 (2d Cir. 1994)........................................ 13-14

*In re Disaster at Riyadh Airport,* 540 F.Supp. 1141 (D.D.C. 1982)..........................................6, 10

*In re U.S. Office Prods. Co. Sec. Litig.,* 251 F.Supp.2d 77 (D.D.C. 2003) ...................................22

*Jaffe v. Pallotta Teamworks,* 374 F.3d 1223 (D.C. Cir. 2004) ............................................... 14-15

*Koster v. Am. Lumbermens Mut. Casualty Co.*, 330 U.S. 518 (1947) ............................................10

*\*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ................................................13

*Lutcher S.A. Celulose e Papel v. Inter-Am. Dev. Bank*, 382 F.2d 454 (D.C. Cir. 1967) ..............30

*Mendes Junior Int'l Co. v. Banco do Brasil, S.A.*, 15 F.Supp.2d 332 (S.D.N.Y. 1998).............7-8

*\*Mendaro v. World Bank*, 717 F.2d 610 (D.C. Cir. 1983) ................................................29, 30, 32

*M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972) .............................................................7

*\*Novecon, Ltd. v. Bulgarian-American Enter. Fund*, 967 F.Supp. 1382 (D.D.C. 1997),
    *aff'd*, 190 F.3d 556 (D.C. Cir. 1999) ...................................................................... *passim*

*Novecon, Ltd. v. Bulgarian-American Enter. Fund*, 190 F.3d 556 (D.C. Cir. 1999) .............17, 22

*\*Overseas Partners, Inc. v. Progen Musavirlik Ve Yonetim Hizmetleri, Ltd.*, 15 F.Supp.2d 47
    (D.D.C. 1998) .........................................................................................................7-8

*\*Pain v. United Techs. Corp.*, 637 F.2d 775 (D.C. Cir. 1980) ............................................ *passim*

*Paley v. Estate of Ogus*, 20 F.Supp.2d 83 (D.D.C. 1998).................................................................3

*Park v. Arnott*, No. Civ. A. 89-3257, 1992 WL 184521 (D.D.C. July 14, 1992)...................24-25

*\*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981)................................................................ *passim*

*Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64 (2d Cir. 2003) ...............................10

*PT United Can Co. Ltd. v. Crown Cork & Seal Co.*, 138 F.3d 65 (2d Cir. 1998).........................6

*Raymen v. United Senior Ass'n, Inc.*, 409 F.Supp.2d 15(D.D.C. 2006) ........................................3

*Rommel v. Laffey*, 194 F.R.D. 441 (N.D.N.Y. 2000)..................................................................25

*Saunders v. White*, 191 F.Supp.2d 95 (D.D.C. 2002) ..................................................................13

*United States. v. Martin-Banker Aircraft Co.*, 389 F.3d 1251 (D.C. Cir. 2004) ..........................13

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429 (7th Cir. 1993) ..........................3

*Wiggins v. Hitchens*, 853 F.Supp. 505 (D.D.C. 1994)................................................................13

State Cases

*Bender v. Design Store Corp.*, 404 A.2d 194 (D.C. 1979) ....................................................... 22-23

*D.C. Area Comm. Council, Inc. v. Jackson*, 385 A.2d 185 (D.C. 1978) ...................................... 19

*Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543 (D.C. 1981) ......................................................... 20

*Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A.2d 916 (D.C. 1992) ........................... 27

*\*Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236 (D.C. 1995)........................ *passim*

*Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.*,
   878 A.2d 1226 (D.C. 2005) ..................................................................................... 26


Federal Statutes

22 U.S.C. § 288, International Organizations Immunities Act of 1945 ("IOIA")........................ 29

Executive Order 10680, 21 Fed. Reg. 194 (Oct. 5, 1956) ........................................................... 29

Fed. R. Civ. P. 9(b) ..................................................................................................................... 26

Fed. R. Civ. P. 12(b)(1)............................................................................................................. 1, 33

Fed. R. Civ. P. 12(b)(6).......................................................................................................... *passim*

Fed. R. Civ. P. 45 ...........................................................................................................................9


Other Authorities

Articles of Agreement of the International Finance Corporation, May 25, 1955,
   *amended* Apr. 28, 1993, 7 U.S.T. 2197 ................................................................. *passim*

2A James Wm. Moore et al., Moore's Federal Practice ¶ 12.07 (2d ed. 1986)............................13

2 James Wm. Moore et al., Moore's Federal Practice ¶ 10.05[4] (3d ed. 1999) ...........................3

Restatement (Second) of Conflict of Laws § 145(2) (1971) .................................................. 14-15

Restatement (First) of Contracts § 90 (1932) ..............................................................................22

Restatement (Second) of Contracts § 90 cmt. b (1981)...............................................................23

## INTRODUCTION

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and the doctrine of *forum non conveniens*, International Finance Corporation ("IFC") respectfully moves to dismiss Plaintiff's Complaint for Preliminary and Permanent Injunctive Relief and Damages ("Complaint"). Plaintiff's Complaint should be dismissed on three grounds.

First, Guernsey provides an alternative forum that is substantially more convenient and appropriate to hear this case. This case concerns the dispute of shares of a Guernsey corporation. Guernsey courts permit litigation of the subject matter of this dispute and, according to the draft share sale agreement that Plaintiff incorporates in his Complaint, at the IFC's option any dispute was to be brought in Guernsey court and decided under Guernsey law. The District of Columbia is an inconvenient forum, its sole nexus to this dispute being IFC is located here.[1]

Second, the Complaint fails to state any claim upon which relief can be granted under either Guernsey or District of Columbia law. The documents Plaintiff incorporates into his Complaint reveal that the parties never reached a binding agreement and any alleged reliance by Plaintiff was unreasonable under the circumstances. Therefore, Plaintiff's breach of contract and promissory estoppel claims fail as a matter of law. Moreover, without a binding agreement, Plaintiff's claims based on breach of an alleged confidentiality agreement and fraudulent and negligent misrepresentation also fail as a matter of law.

Third, none of Plaintiffs' claims are of the type for which IFC has waived immunity in its Articles of Agreement. Plaintiff does not have a debtor, creditor, or bondholder relationship with IFC. Moreover, the lack of any agreement with Plaintiff means that Plaintiff is not the type of person to whom IFC would have subjected itself to suit in order to achieve its chartered

---

[1] IFC submits the Second Affidavit of Mark Gideon Andrew Dunster dated March 20, 2006 ("Second Dunster") (IFC Exhibit A) in support of its *forum non conveniens* argument.

objectives, which is required for any alleged waiver to be valid.  Indeed, any such waiver of its immunity would hamper IFC's functioning and hinder it from conducting its activities.  IFC, therefore, remains immune from suit on Plaintiff's claims.

## BACKGROUND

## I.     PRELIMINARY AND PROCEDURAL MATTERS

Plaintiff filed his Complaint on February 27, 2006, together with a Motion for a Preliminary Injunction, a Motion for a Temporary Restraining Order, and a declaration from Plaintiff with attached emails and other documents.  The Motion for a Temporary Restraining Order was withdrawn.  [Docket Entry Nos. 5 and 6.]  The Motion for Preliminary Injunction has been fully briefed and is set for hearing on March 28, 2006.

The Complaint contains a series of largely conclusory allegations.  The factual matters that underlie the Complaint, however, are presented in Plaintiff's declaration and attachments, and are incorporated by reference into the Complaint.  These materials include:  (1) an "exchange of emails between [Plaintiff] and IFC on November 18 and 19, 2005," *id.* ¶ 21; (2) a November 26 email to Plaintiff attaching a draft stock purchase agreement, *id.* ¶¶ 21, 23; and (3) Plaintiff's email dated December 1, 2005, *id.* ¶ 24. These emails and draft documents form an integral part of Plaintiff's claims that there was a binding agreement IFC and Plaintiff, and that Plaintiff could rely on that alleged agreement.  *Id.* ¶¶ 4, 6, 21-22, 26-27, 32.

Because these emails and documents are incorporated by reference into the Complaint and are integral to the Plaintiff's claims, they are part of the pleadings and may be considered on a motion to dismiss under Rule 12(b)(6).  *See, e.g.*, *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, we may consider . . . any documents either attached to *or incorporated in* the complaint . . . .")

2

(emphasis added).[2]  Copies of these emails and the draft share sale agreement are attached to the Declaration of Salah N. Osseiran dated February 26, 2006 ("Osseiran") [Docket Entry No. 2-3], that was submitted in support of Plaintiff's Motion for a Temporary Restraining Order [Docket Entry No. 2] and Motion for a Preliminary Injunction [Docket Entry No. 3].  For ease of reference, the Osseiran Declaration and its attached documents are attached hereto as IFC Exhibit B.

## II.    SUMMARY OF PLAINTIFF'S ALLEGATIONS

### A.    Alleged Facts

This case concerns the shares of Middle East Capital Group ("MECG") that are owned by IFC.  Complaint at 1.  MECG is a merchant banking and investment company registered and headquartered in Guernsey, a Channel Island off the Southeast coast of England.  *Id.* ¶ 1.  In the summer of 2005, Plaintiff Salah N. Osseiran owned approximately 1.5% of MECG's shares and IFC owned about 10.8 % of MECG's shares.  *Id.* ¶¶ 15-16.

The Complaint alleges in a conclusory manner that "an exchange of emails between Osseiran and IFC on November 18 and 19, 2005" memorialized an "agreement upon the terms of [Plaintiff's] purchase of IFC's . . . shares of MECG stock."  *Id.* ¶ 21.  Plaintiff denominates this alleged agreement as the "November agreement."  *Id.*  IFC allegedly agreed to the terms on

---

[2]  *Accord Raymen v. United Senior Ass'n, Inc.*, 409 F.Supp.2d 15, 20 (D.D.C. 2006) ("[I]n deciding whether to dismiss a claim under Rule 12(b)(6), the Court can . . . consider the facts alleged in the complaint [and] documents attached as exhibits *or incorporated by reference* into the complaint . . . .") (emphasis added); *Paley v. Estate of Ogus*, 20 F. Supp.2d 83, 89 (D.D.C. 1998) (same).  The rule is the same in virtually every other federal circuit.  *See, e.g.*, *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."); *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (allowing defendant attacking complaint for failure to state a claim to produce document that plaintiff did not attach to or incorporate by reference in its complaint, but upon which plaintiff relied and which was integral to complaint); *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988) ("[W]hen plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading."); *see generally* 2 James Wm. Moore et al., Moore's Federal Practice ¶ 10.05[4], at 10-34 (3d ed. 1999).

November 23, 2005, and on November 26 "forwarded its draft stock purchase agreement to [Plaintiff] by email." *Id.* ¶¶ 21, 23.

As discussed in more detail below, the emails incorporated into Plaintiff's Complaint state expressly that the alleged agreement is subject to documentation. The draft agreement itself bears the following legend:

> **This draft document is not a contract or an offer to enter into a contract. Only the document as executed by IFC and Mr. Osseiran will contain the terms that bind them. Until the document is executed by IFC and Mr. Osseiran, neither IFC nor Mr. Osseiran intends to be bound.**

Osseiran Exh. C at 2.

No agreement was ever finalized or executed by either Plaintiff or IFC. Despite these obvious limitations, Plaintiff contends that: (a) he had a binding agreement with IFC, and (b) he was entitled to rely on representations that IFC allegedly made between December 2005 and February 2006 concerning the alleged agreement. Complaint ¶¶ 3, 4, 6, 20, 22, 31–32, 42.

According to the Complaint, Plaintiff relied on these representations, "including the November agreement," to proceed to purchase MECG shares from other shareholders so that "after completion of the IFC transaction" he would hold 51% of all outstanding shares of MECG stock. *Id.* ¶ 32. The Complaint also alleges that IFC's "deception" ended at an MECG shareholders meeting on February 16, 2006, during which the IFC representative proposed that all shareholders except Plaintiff enter into an agreement to sell their shares to First National Bank in Lebanon ("FNB") for US$ 60 per share. *Id.* ¶ 33.

### B.    Counts And Request For Relief

Based on these allegations, the Complaint asserts five counts. Count I is for "Breach of the November Agreement." *Id.* ¶ 36. Count II is for "Promissory Estoppel: Stock Sale." *Id.* ¶ 42. Count III is for "Breach of Confidentiality Agreement." *Id.* ¶¶ 45-46. Counts IV and V

are, respectively, for "Fraud" and "Negligent Misrepresentation." *Id.* ¶¶ 49, 53.  Plaintiff requests (a) a declaration that the "November agreement" is a valid and legally enforceable contract, (b) preliminary and permanent injunctive relief enjoining IFC from selling its shares of MECG to anyone other than Plaintiff, (c) an order for specific performance of the "November agreement," and (d) damages, costs, and attorneys' fees. *Id.* at 14.

## ARGUMENT

### I.    THE COMPLAINT SHOULD BE DISMISSED UNDER THE DOCTRINE OF FORUM NON CONVENIENS

The doctrine of *forum non conveniens* permits courts to decline jurisdiction if an alternative forum would be substantially more convenient or appropriate.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981); *Friends For All Children, Inc. v. Lockheed Aircraft Corp.,* 717 F.2d 602, 605 n.5 (D.C. Cir. 1983).  In this jurisdiction, a *forum non conveniens* inquiry involves four steps:

> [1] As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case.  [2] Next, the trial judge must consider all relevant factors of *private* interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice.  [3] If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum.  [4] If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

*Pain v. United Techs. Corp*., 637 F.2d 775, 784-85 (D.C. Cir. 1980) (numbers added).

The four-part test is easily satisfied in this case.

## A.     Guernsey Is An Adequate Alternative Forum And Possesses Jurisdiction Over the Whole Case

An "adequate alternative forum" is ordinarily satisfied "when the defendant is amenable to process in another jurisdiction."  *BCCI Holdings (Luxembourg), S.A. v. Mahfouz*, 828 F.Supp. 92, 95 (D.D.C. 1993) (quoting *Piper Aircraft*, 454 U.S. at 255 n.22) (internal quotations omitted).  The discretion of the court as to the viability of an alternative forum is limited and it is only in "*rare circumstances . . .* where the remedy offered by the alternative forum is clearly unsatisfactory" that a court should find an alternative forum inadequate.  *In re Disaster at Riyadh Airport*, 540 F.Supp. 1141, 1145 (D.D.C. 1982) (quoting *Piper Aircraft*, 454 U.S. at 255 n.22).

Moreover, a foreign forum is not inadequate merely because it has less favorable substantive law, employs different adjudicative procedures, or because of general allegations of corruption in the judicial system.  *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir. 1996) (internal citations omitted); *see also PT United Can Co. Ltd. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998) (emphasizing that the availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum).  Rather, only if the foreign forum would deprive the plaintiffs of "*any* remedy," treat them "unfairly" or "not permit litigation of the subject matter of the dispute," is dismissal on *forum non conveniens* grounds inappropriate.  *See Piper Aircraft*, 454 U.S. at 255, n.22.

Guernsey is an adequate alternative forum under these standards.  The Royal Court of Guernsey has unlimited first instance civil jurisdiction to hear and try this dispute.  Second Dunster ¶¶ 10, 19.  The Plaintiff has access to the Royal Court of Guernsey and that court permits litigation of the subject matter of this dispute under Guernsey Law, including the 1994 Companies (Guernsey) Law that legislates for issues pertaining to Guernsey company shareholder disputes.  Second Dunster ¶¶ 16, 23.  Indeed, because of its status as a leading

6

financial center, the Royal Court of Guernsey regularly adjudicates complex, international and multi-jurisdictional cases. *Id.* ¶¶ 15, 19.

Guernsey also abides by recognized principles of civil procedure and due process, and there is no indication that plaintiff will be treated unfairly in the Guernsey courts. *Id.* ¶¶ 20-23. In fact, Guernsey's legal framework for company and trust services providers was found fully consistent with IMF best practices guidelines. *Id.* ¶ 14. Further, Guernsey recognizes the types of contract and tort claims Plaintiff asserts. First Dunster ¶¶ 30-69.[3] The parties, moreover, contemplated in the draft share sale agreement that Guernsey law would govern the final agreement and Guernsey courts would provide the forum for enforcing the agreement. Osseiran Exh. C at 9. The draft agreement states explicitly that the agreement may be enforced, "[a]t the option of IFC . . . in the courts of Guernsey . . . ." *Id.*

The documents Plaintiff incorporates into his Complaint clearly show there was no "November agreement' or any other agreement between him and IFC—Plaintiff's conclusory allegations notwithstanding. However, assuming arguendo there was such an agreement, the forum-selection clause controls in a *forum non conveniens* analysis. *See, e.g.*, *Overseas Partners, Inc. v. Progen Musavirlik Ve Yonetim Hizmetleri, Ltd.*, 15 F.Supp.2d 47, 54 (D.D.C. 1998) ("[I]n light of present-day commercial realities and expanding international trade . . . the forum [selection] clause should control absent a strong showing that it should be set aside.") (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). In the presence of a forum selection clause favoring Guernsey, the Court should discount any contention by Plaintiff that it would be far less convenient for a Guernsey court to handle the case than an American court. *See, e.g.*, *Mendes Junior Int'l Co. v. Banco do Brasil, S.A.*, 15 F.Supp.2d 332, 338

---

[3]  First Affidavit of Mark Gideon Andrew Dunster dated March 9, 2006 ("First Dunster"), submitted as IFC Exhibit D in support of IFC's Opposition to Plaintiff's Motion for a Preliminary Injunction [Docket Entry No. 8-4].

(S.D.N.Y. 1998). Rather, the burden is on Plaintiff to show that litigating this case in Guernsey

would deprive him of his day in court. *Overseas Partners*, 15 F.Supp.2d at 54.

### B.    Private Interest Factors Weigh Heavily In Favor Of Guernsey

In *Piper Aircraft*, the Supreme Court identified the following relevant private interest

factors in a *forum non conveniens* inquiry:

> (1) the relative ease of access to sources of proof; (2) availability
> of compulsory process for attendance of unwilling witnesses, and
> the cost of obtaining attendance of willing witnesses; (3)
> possibility of view of premises, if view would be appropriate to the
> action; and (4) all other practical problems that make trial of a case
> easy, expeditious and inexpensive.

*Piper Aircraft*, 454 U.S. at 241 n.6 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

Review of the private interest factors demonstrates that Guernsey would be the more convenient

forum to litigate this action.

First, Guernsey has a relative ease of access to the sources of proof in the case. None of

the relevant witnesses who are familiar with the alleged formation of the "November agreement"

are located in the District of Columbia. Plaintiff lives and works in Lebanon. Complaint ¶ 10.

IFC's Mr. Jan van Bilsen resides and works in Dubai, United Arab Emirates. Osseiran Exh. C at

1; J. van Bilsen ¶ 1.[4]   IFC's Mr. Carmen Genovese resides and works in Istanbul, Turkey.

Genovese ¶ 1.[5]   Only IFC's Mark Alloway is in Washington DC, and his involvement in this

matter was limited. Alloway ¶¶ 1, 3.[6]   In this regard, the cost of obtaining attendance of willing

witnesses is cheaper if the case is tried in Guernsey than it would be if it were tried in the District

of Columbia.

---

[4]   Declaration of Jan van Bilsen dated March 7, 2006 ("J. van Bilsen"), submitted as IFC Exhibit A in support of
IFC's Opposition to Plaintiff's Motion for a Preliminary Injunction [Docket Entry No. 8-1].
[5]   Declaration of Carmen Genovese dated March 7, 2006 ("Genovese"), submitted as IFC Exhibit B in support of
IFC's Opposition to Plaintiff's Motion for a Preliminary Injunction [Docket Entry No. 8-2].
[6]   Declaration of Mark Alloway dated March 9, 2006 ("Alloway"), submitted as IFC Exhibit C in support of IFC's
Opposition to Plaintiff's Motion for a Preliminary Injunction [Docket Entry No. 8-3].

Nor does Plaintiff allege that any of the critical events occurred in the District of Columbia. In fact, the opposite is true. The emails allegedly constituting the "November agreement" were sent presumably from where Plaintiff resides in Lebanon and from where Mr. van Bilsen works in Dubai. Osseiran Exh. A. Similarly, the November 26, 2005 email from Mr. van Bilsen to Plaintiff attaching the draft share sale agreement was sent from Dubai to Lebanon. Osseiran Exh. C. The conference calls with Plaintiff involved persons in Lebanon (Plaintiff), Dubai (Mr. van Bilsen) and on other occasions Istanbul, Turkey (Mr. Genovese) and the District of Columbia (Mr. Alloway). Complaint ¶ 31. The MECG shareholder meetings in February 2006 occurred in Lebanon. Genovese ¶¶ 6, 9. The place of performance of the alleged agreement was Guernsey, as that is where MECG resides and, therefore, where its shares are registered. Complaint ¶ 1. The District of Columbia simply has no nexus to this case other than the fact that IFC is headquartered here—a fortuitous fact that has no legal significance to the claims raised by Plaintiff, which are based on events and acts outside the District of Columbia.

Second, compulsory process for attendance of unwilling witnesses is just as available in Guernsey as it is in a U.S. court. Rule 49 of the 1989 Royal Court Civil Rules provides for the issuance of a summons for witnesses found within the jurisdiction of Guernsey, while Rule 43(a) of the 1989 Royal Court Civil Rules provides for a commissioner to collect evidence from a cooperative witness outside the jurisdiction of Guernsey. Second Dunster ¶¶ 21-22. Moreover, Guernsey courts can issue letters rogatory via the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters in cases where a witnesses is unwilling to cooperate. *Id.* ¶ 22. Comparable procedures are available to a litigant in a U.S. court through the subpoena provisions of Rule 45 of the Federal Rules of Civil Procedure.

9

Third, trial of the case is easier, more expeditious, and less expensive in Guernsey. As noted, MECG resides in Guernsey and its shares are registered there. It will be less expensive for the parties and witnesses to get there than to the District of Columbia. Moreover, given that a choice of law analysis points to Guernsey law to resolve Plaintiff's claims, it will be easier and more expeditious to have Guernsey courts, rather than a U.S. court, apply and interpret Guernsey law. *Id.* ¶ 16 (noting that 1994 Companies (Guernsey) Law governs shareholder disputes of Guernsey companies). *See Koster v. Am. Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 527 (1947) (discussing that if a case involves issues relating to the internal affairs of a foreign corporation, that is one "factor which may show convenience of parties or witnesses, the appropriateness of trial in a forum familiar with the law of the corporation's domicile, and the enforceability of the remedy if one be granted").

Finally, the presumption in favor of Plaintiff's chosen forum is given less deference in this case because plaintiff is a foreign national. *See Piper Aircraft*, 454 U.S. at 255; *Pain*, 637 F.2d at 786; *In re Disaster at Riyadh Airport*, 540 F. Supp. at 1144. Indeed, a foreign plaintiff's choice of the defendant's home forum over other fora where defendant is amenable to suit, and to which the Plaintiff and the circumstances of the case are much more closely connected, suggests the possibility that Plaintiff's choice was made for reasons of trial strategy and forum shopping. *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 71, 74 (2d Cir. 2003) (holding that where foreign Plaintiff's interactions with New York bank were centered in London, "wire transfers, faxes and the involvement of [bank] officials" in New York were "only a faint connection to the United States" and plaintiff's choice to bring suit in bank's home jurisdiction was not "driven by considerations of convenience").

In sum, IFC's location in the District of Columbia does not make this Court a convenient forum, given the context of this case. The private interest factors weigh heavily in favor of dismissing this action on *forum non conveniens* grounds.

### C.     Public Interest Factors Weigh Heavily In Favor Of Guernsey

In *Piper Aircraft*, the Supreme Court also identified the following relevant public interest factors in a *forum non conveniens* inquiry:

> (1) the burdens associated with trying the case in a particular forum such as court congestion, other administrative difficulties, and the burden of jury duty; (2) the local interest in having localized controversies decided at home; and (3) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law.

*Piper Aircraft*, 454 U.S. at 241 (citing *Gulf Oil*, 330 U.S. at 509). Consideration of the public interest factors also favors dismissal of this action in favor of a Guernsey forum.

First, the burden on the District of Columbia community and this Court to try this case is unnecessary and disproportionate in light of the faint connection between the events relevant to Plaintiff's claims and this forum. *See Pain*, 637 F.2d at 792; *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F.Supp.2d 73, 86 (D.D.C. 2003) (holding that the local community is unlikely to have any special interest in litigation against Sweden, Swedish national telephone company, and Swedish corporation where none of the parties has a connection with Washington, D.C., except the location of Sweden's Embassy in Washington, D.C.).

Second, the District of Columbia has no interest in having this litigation occur here. As noted, none of the events are alleged to have occurred in the District of Columbia and neither the Plaintiff nor IFC's employees engaged in significant actions in the District of Columbia. Further, the United States as a whole has no general interest in resolving locally a shareholder dispute that involves control of a Guernsey company doing business in Lebanon, shares

registered in Guernsey, and key events occurring in Beirut, Dubai and Turkey.  *See Pain*, 637 F.2d at 793.  No U.S. party played any critical role in the events at issue and no issues of American policy are implicated by this lawsuit.  Rather, as discussed, Guernsey law governs the dispute, including specifically the 1994 Companies (Guernsey) Law that legislates issues pertaining to shareholder rights and disputes.  Second Dunster ¶ 16.  In such circumstances, where the foreign forum is most interested in resolving a dispute and the District of Columbia is no more interested in resolving the dispute than another state within the United States, dismissal on grounds of *forum non conveniens* is appropriate.  *See Pain*, 637 F.2d at 793.

Third, a Guernsey forum will avoid unnecessary problems in conflicts of law and the application of Guernsey law.  Guernsey law is the law applicable to resolve the dispute.  The Royal Court of Guernsey is in a better position to apply and interpret Guernsey law than a U.S. court.  A court's lack of familiarity with the governing substantive law weighs in favor of dismissal.  *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F.Supp.2d 30, 40 (D.D.C. 2002); *see also Gulf Oil*, 330 U.S. at 509 (noting it is appropriate to favor trial in "forum that is at home with the . . . law that must govern the case, rather than having a court in some other forum untangle problems . . . in law foreign to itself"); *Pain*, 637 F.2d at 793 (dismissing case where foreign law would likely govern resolution of the substantive dispute in the case).

### D.    Plaintiff Can Reinstate His Suit In Guernsey Without Undue Inconvenience Or Prejudice

As discussed, the Royal Court of Guernsey has unlimited first instance civil jurisdiction to hear and try this dispute.  Second Dunster ¶ 10.  Moreover, the Royal Court of Guernsey regularly adjudicates complex, international and multi-jurisdictional cases.  *Id.* ¶¶ 15, 19.  Further, the 1989 Royal Court Civil Rules provide the usual rules of civil procedure governing

commencement of a case, service, conduct of proceedings, discovery, rules of evidence, and obtaining witness testimony.  *Id.* ¶¶ 20-22.  Moreover, the Guernsey court will recognize Plaintiff's claims.  First Dunster ¶¶ 30-70.  Thus, Plaintiff can reinstate his suit in Guernsey without undue inconvenience or prejudice, particularly since the case is still at a very early stage. *See Croesus*, 212 F.Supp.2d at 41.

## II.   THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A.   Applicable Standard

The purpose of a motion to dismiss under Rule 12(b)(6) is to assess the validity of the pleadings.  *See Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994).  Dismissal is appropriate if it appears that no set of facts proffered in support of a plaintiff's claim would entitle him or her to relief.  *See United States v. Martin-Banker Aircraft Co.*, 389 F.3d 1251, 1260 (D.C. Cir. 2004).

A court will construe the complaint in the light most favorable to the plaintiff and give the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Saunders v. White*, 191 F.Supp.2d 95, 99 (D.D.C. 2002).  Nonetheless, the court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  In this regard, "'legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness.'"  *Wiggins v. Hitchens*, 853 F.Supp. 505, 508 n.1 (D.D.C. 1994) (quoting 2A James Wm. Moore et al., Moore's Federal Practice ¶ 12.07, at 63 (2d ed. 1986)) (footnote omitted); *see also Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987) ("A plaintiff's bare conclusions of law, or sweeping and unwarranted averments of fact, will not be deemed admitted for purposes of [a 12(b)(6)] motion."); *In re Am. Express Co. S'holder Litig.*, 39 F.3d

395, 400-01 n.3 (2d Cir. 1994) ("[C]onclusory allegations of the legal status of the defendants' acts need not be accepted as true . . . ."); *Franklin Asaph Ltd. v. FDIC*, 794 F.Supp. 402, 404 (D.D.C. 1992) ("[T]he court will not accept conclusory allegations concerning the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened, or if these allegations are contradicted by the description itself.") (inside quotation and citation omitted).

### B.    A Choice Of Law Analysis Points To The Law Of Guernsey As The Law Applicable to Resolve Plaintiff's Claims

In its Opposition to Plaintiff's Motion for a Preliminary Injunction, IFC conducts a choice of law analysis under District of Columbia conflicts rules with respect to Plaintiff's contract claims.    Opposition at 18-20.    That analysis need not be repeated here but is incorporated by reference.    The analysis pointed to Guernsey as the state with the more substantial interest in resolution of the issues raised by Plaintiff, and to Guernsey law as the law applicable to resolve the Plaintiff's contract claims (i.e., Counts I-III).

A similar outcome results in a conflicts analysis with respect to Plaintiff's tort claims (i.e., Counts IV and V).    Like in contract cases, the District of Columbia follows the "substantial interest" analysis to determine which jurisdiction's law applies in tort cases.    *See, e.g., Jaffe v. Pallotta Teamworks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004); *Bortell v. Eli Lilly & Co.*, 406 F.Supp.2d 1, 4-5 (D.D.C. 2005).    Where two states have an interest in applying their laws to resolve a dispute, courts "apply the law of the jurisdiction with the more substantial interest in the resolution of the issue."    *Jaffe*, 374 F.3d at 1227.

To determine which jurisdiction has the more "substantial interest" in tort issues, District of Columbia courts consider the four factors enumerated in the Restatement (Second) of Conflict of Laws § 145(2) (1971): (1) the place where the injury occurred; (2) the place where the

14

conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Jaffe*, 374 F.3d at 1227.

The first and second factors do not implicate any jurisdiction because the alleged fraud and negligence occurred in telephone calls involving persons from Lebanon, Dubai, and sometimes Turkey or Washington D.C., while the shareholder meetings occurred in Lebanon. The third factor implicates Lebanon, Guernsey, and Washington D.C. As noted, the fact that IFC is located in the District of Columbia is too attenuated a connection to Plaintiff's claims because no significant acts by IFC occurred in the District of Columbia. The fourth factor implicates Guernsey because MECG is a Guernsey company, the shares are registered there, and Guernsey law governs the shareholder relations of the company. The choice of Guernsey as the state with the more substantial interest in resolving the tort claims is also supported by the internal affairs doctrine. Opposition at 19-20.

### C.     Plaintiff Fails To State A Claim Under Guernsey Law

IFC has submitted an opinion of Guernsey law assessing Plaintiff's claims based upon a review of Plaintiff's Complaint and Motion papers. First Dunster ¶¶ 6-7. Mr. Dunster is an advocate of the Royal Court of Guernsey and is well-qualified to opine on the law of that jurisdiction. In forming his opinion, Mr. Dunster assumes that the facts set forth in Plaintiff's papers are true and does not account for the factual statements submitted by IFC. *Id.* ¶ 10. Reviewing these facts, Mr. Dunster concludes that Plaintiff's allegations fail to state a claim, as a matter of law, on any of the five Counts. *Id.* ¶ 70.

With respect to the breach of contract claim, Mr. Dunster notes from the emails and documents incorporated by reference into the Complaint that the alleged contract lacked certainty, *id.* ¶ 35, which reveals that the parties had not reached a binding agreement. *Id.* ¶ 41

("In fact, [Plaintiff] goes on to mention queries and amendments to the Draft SSA, as well as raising the issue of the reluctance of the material banks to enter into the Bank Guarantee Provision as set out in the Draft SSA.  There is no clearer prima facie evidence that the terms of the agreement between [Plaintiff] and IFC had not been finalized.").

Plaintiff's promissory estoppel claim fails under Guernsey law because the allegations fail to evidence any sort of binding agreement that could have been relied upon.  *Id.* ¶ 46; *see also id.* ¶ 47 ("On this basis, I believe that the promissory estoppel claim would fail under Guernsey law.").

Plaintiff's claim for breach of a confidentiality agreement fails under Guernsey law because there is no particularization of how the alleged confidentiality agreement was reached or concluded, with whom, whom it bound and under what terms.  *Id.* ¶¶ 49, 51-52.

Plaintiff's claims for fraudulent and negligent misrepresentation fail under Guernsey law because, without a final agreement between the parties, there would be no basis to make a misrepresentation based on such an agreement.  *Id.* ¶ 60.  Moreover, there is no particularization of an intent by IFC to deceive Plaintiff.  *Id.* ¶ 61.

Mr. Dunster concludes ultimately "[a]s a result of the matters more fully detailed above, I believe that even if the matters set forth in the Plaintiff's papers were to be taken as true, his claims would fail under Guernsey law."  *Id.* ¶ 70.  Since Mr. Dunster has reviewed Plaintiff's papers in the light most favorable to Plaintiff, Mr. Dunster's opinion comports with the standards of Rule 12(b)(6) of the Federal Rules of Civil Procedures and, therefore, the Complaint should be dismissed for failure to state a claim.

D.    **Plaintiff Fails To State A Claim Under The Law Of The District Of Columbia For Breach Of Contract**

Assuming, arguendo, that District of Columbia law applies to resolve Plaintiff's contract claims, the emails and documents Plaintiff incorporates by reference into his Complaint unequivocally show that there was no "November agreement" or any other final, binding agreement between Plaintiff and IFC. Plaintiff's allegations of an agreement are conclusory and are contradicted by the very documents he relies on in his Complaint.

For an enforceable contract to exist under District of Columbia law, there must be both (1) agreement on all material terms; and (2) an intention of the parties to be bound. *See, e.g.*, *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995); *see also Novecon, Ltd. v. Bulgarian-American Enter. Fund*, 190 F.3d 556, 564 (D.C. Cir. 1999) ("*Novecon II*").

1.    **The Parties Did Not Intend To Be Bound**

In order to form a binding agreement, "both parties must have the ***distinct intention to be bound***; without such intent, there can be no assent and therefore no contract." *Jack Baker*, 664 A.2d at 1239 (emphasis added). Here, the documents incorporated into the Complaint clearly establish that this element of a contract claim cannot be met as a matter of law because neither party intended to be bound before the execution of a formal, written contract.

During the email exchange that Plaintiff claims formed the "November agreement," IFC and Plaintiff both stated expressly that any agreement between them was contingent upon the conclusion of separate banking transactions and final documentation. In his November 18, 2005 email, Mr. van Bilsen asked Plaintiff to confirm, "you accept that ***our acceptance is subject to documentation***—meaning separate sales agreements with [IFC] and [B]arclays, and acceptable bank guarantees . . . ." Osseiran Exh. A at 1 (emphasis added); Complaint ¶ 21. Mr. van Bilsen

17

also asked Plaintiff to agree that "[t]he sales agreements come into force and affect [sic] *after*
signing of the sales agreements and receipt of the above mentioned bank guarantees acceptable
to us, as well as the first 40% payable."  Osseiran Exh. A at 1 (emphasis added).

In his November 19, 2005 email responding to Mr. van Bilsen, Plaintiff accepted these
conditions unequivocally:

> 1)  *I accept that your acceptance is subject to documentation*—
> which means separate sales agreements with IFC and Barclays, and
> acceptable bank guarantees . . . .
>
> . . .
>
> 3)  The sales agreements come into force and effect *after* signing
> of the sales agreements and receipt of above mentioned bank
> guarantees acceptable to you, as well as the first 40% paid.

Osseiran Exh. A at 3.  (emphasis added).

One week later, on November 26, 2005, Mr. van Bilsen emailed Plaintiff a draft of the
share sale agreement "for your review."   Osseiran Exh. C at 1; Complaint ¶ 23.   The email
provided that "IFC and/or Barclays reserve the right to make amendments ourselves to this draft,
and/or to Barclays' draft share sale agreement," and noted that the draft agreement "left open for
now" certain requirements concerning share transfer documentation.  Osseiran Exh. C at 1.

The draft agreement stated on its face that the parties did not intend to be bound until the
execution  of  a  final  contract.     The  top  of  the  cover  page  read,  "IFC  Legal
Department/CONFIDENTIAL DRAFT/[Subject to Change]."   Osseiran Exh. C at 2.  On the
same page, the draft provided in bold, underlined text:

> **This draft document is not a contract or an offer to enter into a
> contract.   Only  the  document  as  executed  by  IFC  and  Mr.
> Osseiran  will  contain  the  terms  that  bind  them.    Until  the
> document is executed by IFC and Mr. Osseiran, neither IFC
> nor Mr. Osseiran intends to be bound.**

*Id.*

18

Although Plaintiff reviewed and commented on the draft agreement, he never objected to this condition. Osseiran Exh. D. Instead, he objected to the form of the draft bank guarantee, with respect to which he urged IFC to revise and arrive at a form acceptable to Plaintiff's banks. *Id.*

Under District of Columbia law, "considerable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed." *Novecon, Ltd. v. Bulgarian-American Enter. Fund*, 967 F.Supp. 1382, 1387 (D.D.C. 1997), *aff'd*, 190 F.3d 556 (D.C. Cir. 1999) ("*Novecon I*"). Courts are "reluctant to discount such a clear signal" that a party does not intend to be bound by preliminary writings or negotiations. *Id.* Here, ***both*** parties expressly agreed in writing that there would be no binding agreement between them until they executed a final written contract. Plaintiff's claim that the parties formed a binding and enforceable "November agreement" is, therefore, contrary to law, nothing more than a legal conclusion couched as a fact allegation, and contradicted by both parties' expressed intentions in the very documents Plaintiff incorporates into his Complaint.

### 2.    The Parties Did Not Reach Agreement On All Material Terms

Plaintiff also cannot meet the second element of a contract claim that the written contract contemplated by parties was "understood to be a mere memorial of the agreement already reached." *Jack Baker*, 664 A.2d at 1238-1239 (citing *D.C. Area Comm. Council, Inc. v. Jackson*, 385 A.2d 185, 187 (D.C. 1978)). Plaintiff implies that the draft contract documented a preexisting "November agreement" because Mr. van Bilsen referred to it as a "standard document[]" in a November 23, 2005 email. Complaint ¶ 21. The "standard" nature of the draft agreement, however, does not negate the express condition on its face that the parties were to be bound only by a final, executed contract.

19

Under District of Columbia law, moreover, a contract has not been formed if the final document "is to contain *any material term that is not already agreed on*." *Jack Baker*, 664 A.2d at 1239 (emphasis added); *see also Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 547 (D.C. 1981) ("To be final, contract negotiations must include all of the terms which the parties intended to resolve . . . ."). The documents Plaintiff incorporates into his Complaint clearly establish that the parties had yet to reach final agreement on a number of material terms.

As noted, when Mr. van Bilsen sent the draft agreement to Plaintiff by email dated November 26, 2005, he specifically stated that (i) "IFC and/or Barclays *reserve the right to make amendments* ourselves to this draft, and/or to Barclays' draft share sale agreement," (ii) "we have *left open for now*" the requirements for necessary share transfer documentation, and (iii) Plaintiff "[p]lease let us know if you are in agreement with these terms." Osseiran Exh. C at 1 (emphasis added). These statements hardly evidence that the draft represented the "mere memorial" of a preexisting agreement.

Plaintiff's response to the draft agreement only underscores the fact that negotiations were ongoing and a number of material terms remained unresolved. In his December 1, 2005 email responding to the draft agreements, Plaintiff requested IFC to make certain amendments, to explain the presence of brackets around some provisions, to remove a provision on legal fees, and objected to the wording of contingent liability and contingent bank guarantee provisions, which "[b]oth banks [were] reluctant to accept . . . ." Osseiran Exh. D.

Because the parties had previously agreed that any final agreement was "subject to documentation," including "acceptable bank guarantees," the parties could not proceed without mutually acceptable guarantee language. All of these requests indicate that the agreement was

anything but final.  Thus, absent agreement on such material terms, the parties could not and did

not form a binding contract under District of Columbia law.  *See Jack Baker*, 664 A.2d at 1239.

> **3.    Additional Factors Weighed By District Of Columbia Courts Reaffirm That The Parties Did Not Enter Into An Enforceable Agreement**

In addition to the two-part test articulated above, District of Columbia courts consider

five other factors "useful" and "appropriate" to determine whether an enforceable agreement

exists when parties have not yet executed a formal document:  (1) if the contract is one usually

put in writing; (2) if the transaction involves many or few details; (3) if the amount involved is

large or small; (4) if a full expression of the covenants and promises requires a formal writing;

and (5) if negotiations indicate that a written draft was contemplated as the final conclusion of

negotiations.  *See, e.g.*, *Jack Baker*, 664 A.2d at 1240; *Novecon I,* 967 F.Supp. at 1387.  A

consideration of these five factors further demonstrates that IFC and Plaintiff did not enter into

an enforceable agreement.

As discussed, the parties' contemplated share sale was detailed, involved a large amount

of money, and required a writing for the full expression of all covenants and promises.  As the

November 18 and 19, 2005 emails indicate, as well as the cover page of the draft share sale

agreement sent to Plaintiff on November 26, 2005 and Plaintiff's December 1, 2005 response to

that draft agreement, both parties specifically agreed that the sale would be subject to

documentation and they would not be bound until they had executed a formal written contract.

This being the most important of these five additional factors, the parties' expressed intention

that preliminary negotiations not constitute an enforceable agreement firmly establishes that

there is no such agreement here.  *See Novecon I*, 967 F.Supp. at 1387.

E.     **Plaintiff Fails To State A Claim Under District Of Columbia Law For Promissory Estoppel**

The three principal elements of promissory estoppel under District of Columbia law are: (1) a promise; (2) the promise reasonably induced reliance on it; and (3) the promisee relied on the promise to his detriment. *Building Servs. Co. v. Nat'l R.R. Passenger Corp.*, 305 F.Supp.2d 85, 95 (D.D.C. 2004) (citing *In re U.S. Office Prods. Co. Sec. Litig.*, 251 F.Supp.2d 77, 97 (D.D.C. 2003)). In addition, D.C. courts consider whether "injustice can be avoided only by enforcement of the promise." *Granfield v. Catholic Univ. of Am.*, 530 F.2d 1035, 1039 (D.C. Cir. 1976) (citing Restatement (First) of Contracts § 90 (1932)).

1.     **IFC Did Not *Promise* To Conclude A Final Agreement**

For purposes of promissory estoppel, the promise "must still be a promise with definite terms on which the promisor would expect the promisee to rely." *In re U.S. Office Prods.*, 251 F.Supp.2d at 97. In order to justify reasonable reliance, a promise "must be more than merely a promise to 'bargain in good faith.'" *Novecon II*, 190 F.3d at 565 (citation omitted).

Here, there is an absence of a final agreement with definite terms. Therefore, District of Columbia law does not recognize an enforceable promise. *See, e.g.*, *Bender v. Design Store Corp.*, 404 A.2d 194, 196-97 (D.C. 1979) (holding that no promise existed where there was no agreement in writing and one party had clearly expressed an intention to be bound only by a final written agreement).

2.     **Plaintiff Did Not *Reasonably Rely* On IFC's Representations**

Plaintiff's allegations also fail to state the element that he relied ***reasonably*** on such a promise. *See Building Servs. Co.*, 305 F.Supp.2d at 95. The steps that Plaintiff took—including his alleged purchase of other shares in MECG—were made, however, in reliance on an alleged "promise" that was expressly contingent upon the conclusion and execution of a final written

22

contract.  *See, e.g.*, Osseiran Exh. A at 3 ("I accept that your acceptance is subject to documentation . . . ."); Osseiran Exh. C at 2 (cover of draft share sale agreement stating: "Until the document is executed by IFC and Mr. Osseiran, neither IFC nor Mr. Osseiran intends to be bound.").

Under these circumstances, any reliance by Plaintiff before the execution of formal documentation was unreasonable as a matter of law.  *See Novecon I*, 967 F.Supp. at 1388 (denying recovery under theory of promissory estoppel because promisee unreasonably relied on a promise conditioned on ratification by the promisor's board of directors) (citing *Doll v. Grand Union Co.*, 925 F.2d 1363, 1372 (11th Cir. 1991) (holding that there was no reasonably reliance where the defendant had given "repeated caveats that it did not intend to be bound" until a final agreement was signed)).  Plaintiff's allegations that he reasonably relied on a promise are conclusory and contradicted by the documents incorporated into the Complaint.

In the absence of a definite promise or any reasonable reliance, consideration of whether Plaintiff's reliance was actually detrimental is unnecessary.  *See Bender*, 404 A.2d at 196–97 (denying a claim for promissory estoppel and holding that, where there was no promise, it was not necessary to determine if there had been reasonable or detrimental reliance).

### 3.    Compelling IFC To Sell Its Shares To Plaintiff Would Create, Rather Than Avoid, Injustice

Compelling IFC to sell its shares to plaintiff would create injustice as a matter of law. District of Columbia courts have recognized that satisfaction of the avoiding injustice requirement "may depend on the reasonableness of the promisee's reliance [and] . . . on the formality with which the promise is made."  *Granfield*, 530 F.2d at 1041 n.15 (citing Restatement (Second) of Contracts § 90 cmt. b (1981)).  As discussed above, IFC did not promise to enter into a binding agreement before execution of a written contract.  Plaintiff's

23

reliance on any alleged IFC "promise" prior to the conclusion of a final agreement was entirely unreasonable.

As a result, enforcing IFC's so-called "promise" to sell its MECG shares to Plaintiff would not satisfy the requirement of avoiding injustice. *Id.* Rather, it would bind IFC to a contract that it never made, and violate the express intention of both parties to form an enforceable agreement only through the conclusion and execution of formal documentation.

F. **Plaintiff Fails To State A Claim Under District Of Columbia Law For Breach Of A Confidentiality Agreement**

Plaintiff's claim for Breach of Confidentiality Agreement fails as a matter of law for the same reasons his breach of contract claim fails. Indeed, there is no particularization of this alleged contract whatsoever. Rather, Plaintiff simply asserts in a conclusory manner that there was such an agreement and that it is binding and enforceable.

The extent of Plaintiff's allegations concerning the alleged confidentiality agreement is that "IFC agreed with [Plaintiff] that the parties would keep all information concerning the proposed sale of IFC's and Barclays' MECG stock to [Plaintiff] strictly confidential until the sales were consummated." Complaint ¶ 20. There are no facts alleged about when or how the agreement came to be, who agreed to it for IFC, and whether it was written or oral. Based on this scant, conclusory allegation of an agreement, Plaintiff goes on to make conclusory allegations about its breach. *See, e.g.*, Complaint ¶ 28 ("in clear violation of the parties' agreement to keep all discussions confidential"); *id.* ¶ 46 ("IFC breached the parties' confidentiality agreement").

Conclusory allegations that parties agreed to do something fail as a matter of law to state a key element of a breach of contract claim, namely that there was a binding and enforceable contract. *Park v. Arnott*, No. Civ. A. 89-3257, 1992 WL 184521, *4 (D.D.C. July 14, 1992)

24

(noting complaint failed to show existence of a contract: "[t]o state a claim for breach of contract, a complaint must allege that a contract existed"); *Rommel v. Laffey*, 194 F.R.D. 441, 444 (N.D.N.Y. 2000) (holding claim for breach of confidentiality agreement "lacks merit for failure to allege in nonconclusory language the essential terms of the parties' purported contract [and] whether it [was] written or oral").  Moreover, as discussed above, the parties must have "the distinct intention to be bound; without such intent, there can be no assent and therefore no contract."  *Jack Baker*, 664 A.2d at 1239.

Here, the documents incorporated into the Complaint clearly establish that this element of a contract claim cannot be met as a matter of law because there is no mention anywhere in the emails or documents attached to the emails of a confidentiality agreement between them, let alone a distinct intention to be bound by such an agreement.  *See* Osseiran Exhs. A-D; *supra*, section D.1-2.  Moreover, in his December 22, 2005 email to IFC, Plaintiff does not claim any such agreement, but merely that he "***asked*** to keep this confidential until after we sign the deal." Osseiran Exh. E at 2 (emphasis added); Complaint ¶¶ 27-28.

In such circumstances, where (1) the Complaint fails to plead an intention by the parties to be bound to a confidentiality agreement, (2) the documents referenced in the Complaint show the parties' expressed intention not to be bound until they execute a final written share sale contract, and (3) the documents referenced in the Complaint show that the parties had not reached agreement on all the material terms of their share sale contract, the Plaintiff fails to plead the elements of a claim for breach of a confidentiality agreement.  *See Novecon I*, 967 F.Supp. at 1387; *Jack Baker*, 664 A.2d at 1239.

G.    **Plaintiff Fails To State A Claim Under District of Columbia Law For Fraudulent Misrepresentation**

A plaintiff asserting a common law fraud claim under District of Columbia law must allege *with particularity* that (1) the defendant made a false representation; (2) the representation was in reference to a material fact; (3) the defendant had knowledge of its falsity; (4) the defendant intended to deceive; (5) the plaintiff acted in reliance on the misrepresentation; and (6) the reliance was reasonable. *See, e.g.*, *Burman v. Phoenix Worldwide Indus., Inc.*, 384 F.Supp.2d 316, 336 n.16 (D.D.C. 2005).

With regard to the particularity requirement, D.C. courts have held that "conclusory allegations that a defendant's actions were fraudulent and deceptive are not sufficient to satisfy [Federal Rule of Civil Procedure] 9(b)." *Id.* at 325.[7] Accordingly, Plaintiff must specifically plead the "who, what, when, where and how" with respect to the circumstances of the fraud. *Id.* Fraud is never presumed, but rather must be established by clear and convincing evidence. *See, e.g.*, *Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1233 (D.C. 2005).

Plaintiff has not satisfied the particularity requirement for every element of the fraud claim. *See Burman*, 384 F.Supp.2d at 325. In particular, the documents Plaintiff incorporates into the Complaint show that IFC did not make any representation with the intent to mislead and that Plaintiff's alleged reliance was not reasonable.

D.C. courts have held that a promise or contractual commitment may be actionable as fraud if, at the time of its making, the promisor had no intent of carrying it out. *See, e.g.*, *Virginia Acad.*, 878 A.2d at 1234. That is, "[w]hen a person positively states that something is to be done or is to occur, when he knows the contrary to be true, the statement will support an

---

[7] Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud . . . shall be stated with particularity."

action in fraud." *Chedick v. Nash*, 151 F.3d 1077, 1081 (D.C. Cir. 1998). But "a prophecy or prediction of something which it is merely hoped or expected will occur in the future is not actionable upon its nonoccurrence." *Id.*

As discussed, Plaintiff's emails and documents incorporated into the Complaint establish that the parties were negotiating to conclude a share sale agreement, had not reached agreement on all the material terms of such an agreement, and intended to be bound only by a final executed copy of the agreement. According to the emails and documents, IFC's statements about concluding an agreement were only a future hope or expectation that would depend on documentation, not a positive statement that it would be done. The fact that the parties were negotiating and had not agreed to be bound to any sale agreement until documentation was executed contradicts Plaintiff's conclusory allegation that IFC knew ***at the time*** of negotiations that it would not conclude an agreement with Plaintiff, since at that time conclusion of the agreement was not assured but the very thing being negotiated. Indeed, the suggestion that an international public institution like IFC would enter into negotiations with an intent to undermine an agreement it reached is nonsensical, because there is no reason or benefit to IFC by such a course of conduct.

Finally, under D.C. law, a party "alleging that it was defrauded, at least in the context of commercial dealings at arm's length, must establish not only that it actually relied on a false representation, but also that its reliance was objectively reasonable." *See, e.g.*, *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A.2d 916, 933 (D.C. 1992). As disussed with respect to Plaintiff's promissory estoppel claim, the Complaint fails to plead that Plaintiff's reliance on IFC's purported statements about executing an agreement with him was reasonable. The parties'

expressed intentions that they would be bound only by formal documentation render unreasonable any reliance by Plaintiff before the execution of a final written contract.

###    H.    Plaintiff Fails To State A Claim Under District of Columbia Law For Negligent Misrepresentation

To establish a claim of negligent misrepresentation under D.C. law, a plaintiff must plead that (1) the defendant made a false statement or omission of a fact; (2) the statement was a violation of a duty to exercise reasonable care; (3) the false statement or omission involved a material issue; (4) the plaintiff reasonably relied to his detriment on the false information; and (5) the defendant's challenged conduct proximately caused injury to the plaintiff. *See, e.g.*, *Burman*, 384 F.Supp.2d at 336-37 n.17. As with any negligence claim, a claim for negligent misrepresentation "will not lie unless [IFC] owed [Plaintiff] a duty at the time of the alleged wrong." *Foltz v. U.S. News & World Report, Inc.*, 627 F.Supp. 1143, 1177 (D.D.C. 1986).

The Complaint fails to plead that (1) IFC owed a duty to Plaintiff and (2) Plaintiff reasonably relied on IFC's statements. For his negligent misrepresentation claim, Plaintiff alleges simply that "IFC, with the exercise of reasonable diligence, would and should have know that [its representations] were false." Complaint ¶ 54. But this allegation, like the fraudulent misrepresentation claim, is conclusory. As discussed, the fact that the parties were negotiating and had not agreed to be bound to any sale agreement until documentation was executed contradicts Plaintiff's conclusory allegation that IFC either knew or should have known *at the time* of negotiations that it would not conclude an agreement with Plaintiff, since at that time conclusion of the agreement was not assured but the very thing being negotiated. Therefore, IFC could not have owed Plaintiff a duty of care with respect to the alleged statement about allegedly concluding an agreement with him.

Moreover, "[i]n cases involving negligent misrepresentation or the breach of a professional standard of care, the duty has been most often found in the contractual relationship existing between the parties." *Foltz*, 627 F.Supp. at 1177. Here, there was no contractual relationship between the parties. Without such a relationship, or any other relationship establishing a duty of care, Plaintiff fails to adequately plead negligent misrepresentation.

Further, for the reasons discussed with respect to Plaintiff's fraudulent misrepresentation claim, his negligent misrepresentation claim also fails as a matter of law because the emails and documents incorporated into the Complaint contradict and do not support the conclusory allegation that Plaintiff reasonably relied on IFC's alleged statements.

## III.    IFC IS IMMUNE FROM THIS SUIT UNDER THE INTERNATIONAL ORGANIZATION IMMUNITIES ACT AND IFC'S ARTICLES OF AGREEMENT

In its Opposition to Plaintiff's Motion for a Preliminary Injunction [Docket Entry No. 8], IFC addresses the privileges and immunities to which it is entitled under the International Organizations Immunities Act of 1945 ("IOIA"), 22 U.S.C. § 288, and Executive Order 10680, 21 Fed. Reg. 194 (Oct. 5, 1956). *See* Opposition at 3, 11-16. That discussion is incorporated herein by reference and need not be repeated in its entirety.

As noted in the Opposition, in *Atkinson v. Inter-Am. Dev. Bank,* 156 F.3d 1335, 1341 (D.C. Cir. 1998), the Court of Appeals unequivocally held that an international organization's immunity under the IOIA is absolute and is co-extensive with the absolute immunity accorded to foreign sovereigns in 1945. The only exceptions or waivers to IFC's absolute immunity are those derived from IFC's Articles of Agreement or further Executive Order. *Mendaro v. World Bank*, 717 F.2d 610, 613 (D.C. Cir. 1983). If there is no waiver of immunity under the Articles of Agreement, then the Court cannot accept jurisdiction over the claim. *See id.* at 614.

29

In *Mendaro*, the United States Court of Appeals for the D.C. Circuit clarified and defined the scope of the waiver in the Articles of Agreement of the World Bank, which are identical to those of IFC.[8]  The D.C. Circuit held that the waiver would encompass only "suits by [IFC's] debtors, creditors, bondholders, and those other potential plaintiffs to whom [IFC] would have to subject itself to suit in order to achieve its chartered objectives."  *Id.* at 615; *see also Atkinson*, 156 F.3d at 1338 (quoting *Mendaro* and reasoning that the suit was barred by immunity).

In this case, the Complaint does not allege that Plaintiff is a debtor, creditor, or bondholder of IFC.  Because Plaintiff does not fit into any of these classes of eligible plaintiffs, his ability to overcome IFC's immunity appears to depend upon whether he can be construed as an "other potential plaintiff[] to whom [IFC] would have to subject itself to suit in order to achieve its chartered objectives."  *Mendaro*, 717 F.2d at 615; *see also* IFC Articles of Agreement, Art. I (describing IFC's objectives to "assist in financing," "bring together investment opportunities," and "to help create conditions conducive to, the flow of private capital").

Because there is no binding, final and enforceable agreement between Plaintiff and IFC, Plaintiff is not the type of party for whom IFC would need to waive its immunities and permit suit in order to achieve its chartered objectives.  Put another way, IFC need not permit suit by Plaintiff in order to make loans and enter into contracts to achieve its chartered objectives. *Mendaro*, 717 F.2d at 617 ("[I]t is likely that most organizations would be unwilling to

---

[8]  The status of the immunities of IFC and the other World Bank entities is virtually indistinguishable.  All were granted immunity by similar Executive Order.  *See Lutcher S.A. Celulose e Papel v. Inter-Am. Dev. Bank*, 382 F.2d 454, 457-58 (D.C. Cir. 1967).  Moreover, even the relevant portions of their Articles of Agreement are the same, which provide: "Actions may be bought against the [entity] only in a court of competent jurisdiction in the territories of a member in which the corporation has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities." *Compare Mendaro*, 717 F.2d at 614 (quoting World Bank's Articles of Agreement, Article VII, Section 3) and *Atkinson*, 156 F.3d at 1337 (quoting Inter-American Development Bank's Articles Of Agreement, Article XI, section 3), with IFC's Articles of Agreement Article VI, Section 3, 7 U.S.T. 2197 (attached as IFC Exhibit C).

30

relinquish their immunity without receiving a corresponding benefit which would further the organization's goals.  Thus, most waivers are probably effected when an insistence on immunity would actually prevent or hinder the organization from conducting its activities.").

In fact, Plaintiff's suit would interfere with IFC's functions.  As stated in IFC's Articles of Agreement:

> The purpose of the Corporation is to further economic development by encouraging the growth of productive private enterprise in member countries, particularly in the less developed areas, thus supplementing the activities of the International Bank for Reconstruction and Development (hereinafter called the Bank). In carrying out this purpose, the Corporation shall:
>
> (i)    in association with private investors, assist in financing the establishment, improvement and expansion of productive private enterprises which would contribute to the development of its member countries by making investments, without guarantee of repayment by the member government concerned, in cases where sufficient private capital is not available on reasonable terms;
>
> (ii)   seek to bring together investment opportunities, domestic and foreign private capital, and experienced management; and
>
> (iii)  seek to stimulate, and to help create conditions conducive to, the flow of private capital, domestic and foreign, into productive investment in member countries.
>
> The Corporation shall be guided in all its decisions by the provisions of this Article.

IFC Articles of Agreement, Art. I.

Here, the impact of Plaintiff's suit would be to require IFC to assume to be bound to alleged contracts while it is still negotiating them, even when it has not executed an agreement in accordance with its policies and practices.[9]  *See Atkinson*, 156 F.3d at 1338 ("We observed that

---

[9]  Among those policies and practices with respect to agreements is that "IFC does not enter into binding agreements to buy or sell investments on a casual or informal basis through conversations or emails.  Rather, for each investment, IFC requires formal documentation to be approved and executed before it will bind itself."  J. van Bilsen ¶ 3 [Docket Entry No. 8-1].  Moreover, "managers of IFC's investments [do not] have the authority to conclude

such a waiver would expose the Bank to disruptive interference with its employment practices by requiring the Bank to adopt the local employment policies of each of its member countries, which would imply devastating administrative costs."); *see also Mendaro*, 717 F.2d at 617 ("[C]ourts should be reluctant to find that an international organization has inadvertently waived immunity when the organization might be subjected to a class of suits which would interfere with its functions."). Allowing potential litigants to pursue frivolous lawsuits in U.S. courts when they cannot even produce an executed agreement with IFC would similarly disrupt IFC's functions and threaten its purpose of furthering economic development in developing countries. As an international organization composed of 178 member countries, IFC should not be subject to the threat of U.S.-style litigation and informal contractual standards when there is no actual agreement, especially when the subject matter does not touch or concern U.S. law or interests.

Such suits would clearly hamper IFC's ability to participate in commercial transactions and fulfill its stated purposes of furthering economic enterprise in developing countries. *See* IFC Articles of Agreement, Article 1; *Dujardin v. Int'l Bank for Reconstr. & Dev.*, 9 Fed. Appx. 19, 20 (D.C. Cir. 2001) (finding that a defamation suit "neither furthers the World Bank's objectives nor enhances the Bank's ability to participate in commercial transactions"). Similar to a defamation suit, a suit for alleged fraud and negligence in not selling shares to Plaintiff in circumstances where there was no agreement to do so only undercuts IFC's ability to participate in commercial transactions. Were such suits viable against it, IFC would be much less likely to engage in its chartered objectives.

Accordingly, because Plaintiff is not the type of person, and his claims are not the type of claims, for which IFC has waived immunity in Article VI, section 3 of its Articles of Agreement,

---

transactions with third parties to buy or sell investments without formal approvals and executed documentation. As such, in negotiating with third parties, IFC always conditions its approval of any investment on the execution and completion of formal documentation." *Id.*

IFC remains immune from suit in this case, and it must be dismissed under Rule 12(b)(1) of the

Federal Rules of Civil Procedure for lack of subject matter jurisdiction.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Court should grant IFC's Motion and dismiss the

Complaint.

Dated: Washington, D.C.                                    Respectfully submitted,
       March 20, 2006


                                                   **WHITE & CASE** LLP


                                                   / S / Francis A. Vasquez, Jr.
                                                   Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
                                                   Frank Panopoulos (D.C. Bar No. 459365)
                                                   701 Thirteenth Street, N.W.
                                                   Washington, D.C. 20005-3807
                                                   (202) 626-3600

                                                   *Attorneys for International Finance
                                                   Corporation*


33