# IFC EXHIBIT A

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

---

**SECOND AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

---

**I, MARK GIDEON ANDREW DUNSTER** of 7 New Street, St. Peter Port, Guernsey, Channel Islands GY1 4BZ, **HEREBY MAKE OATH** and **SAY** as follows:-

1. I am an Advocate of the Royal Court of Guernsey and was called to the Guernsey Bar in 1997. Prior to that I was called to the English Bar in 1994. I hold the Certificat D'Étude Juridique Français et Normande from the Université de Caen, France and a Masters degree in Advanced Civil and Commercial Litigation. I am a Partner in the Litigation and Dispute Resolution Team of Carey Olsen, of the above address, a law firm based in Guernsey and Jersey. I am based in Guernsey. The Bailiwick of Guernsey is a British Crown Dependency, but is in all respects a distinct and independent jurisdiction and has, for the purposes of this affidavit, judicial and legislative independence from English process.

**Instructions**

2. I am instructed by the London office of White & Case, a US law firm who are retained by the Defendant, International Finance Corporation ("**IFC**") to defend an action brought by Mr. Salah N. Osseiran ("**Osseiran**") that is the subject of the above proceedings (the "**Dispute**").

3. I have been instructed to provide my professional opinion on whether Guernsey is an adequate jurisdiction for the hearing of the Dispute with regard to whether the Guernsey court permits litigation of the type which is the subject matter of the Dispute and whether there is basic due process for such matters.

1

4. I refer to paragraphs 13 to 22, inclusive, of my first affidavit[1] (the "**First Affidavit**") as evidence of my knowledge of the background circumstances of the Dispute, and to paragraphs 30 to 69, inclusive, of the First Affidavit as evidence of my knowledge of the heads of claim that are alleged by Osseiran against IFC. Where necessary, or for the sake of convenience, I shall use defined terms as set out in the First Affidavit.

5. For the purpose of drafting this affidavit, I have relied on my previous examination of the following documents:

    a. Copy (undated) Complaint for Preliminary and Permanent Injunctive Relief and Damages of the Plaintiff (the "**Complaint**"); and

    b. Copy (undated) Motion for a Temporary Restraining Order of the Plaintiff; and

    c. Copy (undated) Motion for a Preliminary Injunction; and

    d. Copy (undated) Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion for a Preliminary Injunction (the "**Memorandum**"); and

    e. Copy signed Declaration of Salah N. Osseiran dated 26 February 2006 (the "**Osseiran Declaration**") and Exhibits 'A' to 'F' thereof.

6. I understand that the documents at 5 (a) to (e) above were filed with the United States District Court for the District of Columbia on Monday 27 February 2006.

7. For the purposes of this opinion I have made the following assumptions, without making any investigation thereof:

    a. the completeness and the conformity to original documents or instruments, including transcripts, of all documents or instruments, including transcripts, submitted to me as copies of originals; and

    b. the genuineness of all signatures and seals on the documents and instruments submitted to me for the purposes of this affidavit; and

---

[1] The First Affidavit of Mark Gideon Andrew Dunster dated and notarised on 9 March 2006.

2

c. that there are no provisions of the laws of any jurisdiction outside Guernsey which would have any implication for the opinions I express and that, insofar as the laws of any jurisdiction outside Guernsey may be relevant, such laws have been or will be complied with.

8. I have not independently verified these assumptions.

9. I am unable to advise on matters of English law, so where necessary, I may mention the general principles of English law as I believe them to be, but in turn would need to rely on the opinion of English solicitors or barristers to advise on the accuracy of those statements.

**Guernsey Courts (General)**

10. I refer to paragraphs 23 to 29, inclusive, of the First Affidavit insofar as it is necessary to give a brief introduction to Guernsey law. A number of feudal courts survive as vestiges of the Norman jurisprudential heritage of the Island, however in civil matters, the Royal Court of Guernsey (the "**Royal Court**") has unlimited first instance civil jurisdiction. The Royal Court sits as an *Ordinary* Court for most civil purposes. The Ordinary Court is constituted by the Bailiff sitting with a minimum of two, but usually three Jurats. Some matters may be heard before a *Full* Court, which is constituted by the Bailiff sitting with a minimum of 7 Jurats.

11. The Bailiff is appointed by the Crown and Lord Chancellor of England and is the most senior judge on the Island. The Bailiff will decide questions of law and will sit (alone) during all interlocutory stages of a civil case, where most matters are decided.

12. Jurats are a lay panel, acting as a jury and, unlike most common law jurisdictions, will sit on civil trials. The Jurats duty is to decide on matters of fact, and they will receive some assistance from the Bailiff in their deliberations. Jurats are not duty –bound to provide reasons for their decisions. Jurats occupy a full-time appointment and will be drawn from a pool of experienced professional people, including retired trust company or financial services personnel.

3

13. Guernsey law is comprised of Orders in Council, *ordonnances* and the common law. The common law is developed by the Royal Court, the Court of Appeal of Guernsey and the final appellate court, the Judicial Committee of the Privy Council. If appropriate, there is recourse beyond the Privy Council in seeking a declaration of incompatibility under the 1950 <u>European Convention on Human Rights</u>.

**Guernsey Jurisdiction (General)**

14. It is very common for issues of private international law to arise in Guernsey. Guernsey's progressive and successful finance industry equates to a widespread use of Guernsey companies on a truly global scale. By way of example only, at the end of 2003, Guernsey's financial services regulation and money laundering prevention standards were praised in a report published by the International Monetary Fund ("**IMF**") as being of a high level of compliance for each of the international standards against which the Island was judged, namely the Basel Core 'Principles for Effective Banking Supervision', the 'Insurance Core Principles' of the International Association of Insurance Supervisors, the 'Objectives and Principles of Securities Regulation' of the International Organization of Securities Commissions, and the Financial Action Task Force 'Recommendations'[2]. Guernsey's legal framework for company and trust service providers was also found by the IMF to be fully consistent with the Offshore Group of Banking Supervisors 'Statement of Best Practice for Company and Trust Service Providers'. All of these standards have been adopted by Guernsey as the foundations on which to build its reputation as a leading finance centre.

15. As a consequence, all manner of complex, multi-jurisdictional disputes are heard before the Royal Court in Guernsey.

---

[2] International Monetary Fund "Assessment of the Supervision and Regulation of the Financial Sector - Guernsey" Volumes I and II, October 2003.

4

**Guernsey Jurisdiction (Specific)**

16. The Royal Court of Guernsey has *prima facie* jurisdiction over a Guernsey company. The formation, memorandum and articles of association, incorporation, registration and capacity are all proscribed under the <u>Companies (Guernsey) Law, 1994</u>, as amended ("**CGL**"). The CGL further governs the internal regulation of a Guernsey company and legislates for issues pertaining to share capital and shareholders rights, including disputes between shareholders like this Dispute.

17. The Guernsey Financial Services Commission plays an important, and often global, role in the regulatory and compliance aspects of Guernsey companies.

18. Middle East Capital Group ("**MECG**") is a Guernsey company, and *prima facie*, the Royal Court of Guernsey has jurisdiction over it.

19. By way of example of the Royal Court of Guernsey's approach to jurisdiction, in *Pavlos Vardinoyannis v. Ansol Limited (1), Avaz Saidovich Nazarov (2), Ansol AG (3) and Others* [20 November 2001][3] it was found by Catherine Newman QC, sitting as a Lieutenant Bailiff of the Royal Court, that Guernsey was the proper jurisdiction for hearing the matter, which related to an applicant who was a Greek national, Ansol Limited, a Guernsey company, Ansol AG, a Swiss company, Mr Nazarov, a Tadjik national, and various other respondent companies and individuals based in Switzerland and elsewhere, on arguments relating in part to a purported Liechtenstein partnership. Further, English courts have recognised the jurisdiction of the Royal Court of Guernsey, and its adequacy as a *forum* for complex disputes involving parties from all jurisdictions, such as in the recent decision in *NABB Brothers Limited v. Lloyds Bank International (Guernsey) Limited* [2005][4] involving a Ghanaian entity.

---

[3] A copy is attached at **Annexe 1**.
[4] EWCH 405 (CH), All ER (d) 322 (Mar). A copy is attached at **Annexe 2**.

**Civil Procedure**

20. Civil procedure is codified in Guernsey under the <u>Royal Court Civil Rules, 1989</u> (the "**RCCR**"). The RCCR is largely taken from English civil procedure prior to the Woolf Reforms of 1998, which brought about a revolution in English civil procedure. Whilst in England the <u>Civil Procedure Rules 1998</u> ("**CPR**") came into force in about April 1999, Guernsey relied on, and still does, as persuasive, the English <u>Rules of the Supreme Court</u>, as encapsulated in the civil procedure bible, the so-called 1999 White Book, the pre-CPR English civil procedure. The RCCR deals with all the usual steps of civil procedure, from the commencement of a claim, or "*Cause*", through the filing of Defences, interrogatories, further and better particulars, service of documents and disclosure, summary judgment, counterclaims and consolidation, parties to proceedings, general conduct of proceedings, and the general procedures relating to costs, summons, time limits and affidavits.

21. Of specific importance in matters such as this, will be the provision of witness evidence. Within the jurisdiction, <u>Rule 49 RCCR</u> provides, in every case where a witness is to give evidence, whether by consent or not, for the issuance of a witness summons by the Sergeant "*à personne*", in person, four days prior to the hearing in question. The law is also supported by the <u>*Loi Relative Aux Preuves 1865*</u>, an Order in Council which, at Article 18, stipulates that all witnesses who are competent may not refuse to testify. The effect of this does not spread extra-territorially beyond the jurisdiction, and therefore the Royal Court of Guernsey cannot compel a witness from another jurisdiction to attend.

22. However, where a witness is outside the jurisdiction of the Guernsey court, there are still means available to procure his or her evidence. If the witness is co-operative in the giving of evidence, but is unwilling or unable to attend in Guernsey, then <u>Rule 43(c) RCCR</u> provides for the evidence of such a witness to be procured by a commissioner charged with the task. Where the witness is less willing, the formality of a commission rogatoire or letter of request (also know as

'letters rogatory') can be made through the formal operation of the <u>Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters</u>[5].

## Conclusion

23. By virtue of the matters aforesaid, and in any event, it is my opinion that the Royal Court of Guernsey, in civil matters such as those set out in the Complaint and which are the subject matter of the Dispute, is not only an adequate court in which the Dispute is capable of being heard, but a competent court and jurisdiction in which complex, multi-party, multi-jurisdictional matters are heard regularly. Further, there is a form of judicial and civil process that is in place to ensure that this Dispute would be dealt with in an appropriate and thorough fashion.

Sworn by the said                          )

[ Mavu Gideow ]                          )
Andrew Dunken

at 7 New Street, St Peter Port,    )
This 20th day of March 2006       )    ................ M.G.A. Dunken .

BEFORE ME

NOTARY PUBLIC

JOHN PHILIP GREENFIELD
ADVOCATE AND NOTARY PUBLIC
7 NEW STREET
GUERNSEY



---

[5] 18 March 1970.

7

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

---

**ANNEXE 1 TO THE**
**SECOND AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

---

JOHN PHILIP GREENFIELD
ADVOCATE AND NOTARY PUBLIC
7 NEW STREET
GUERNSEY



*Sent b/time for
distribution
18/2/[..]
[..]*

**Judgment
2001/51**

# In the Royal Court of the Island of Guernsey

**The** 20th day of November, 2001 before Lieutenant Bailiff Catherine Mary Newman, Q. C.; sitting alone

BETWEEN

PAVLOS VARDINOYANNIS

Applicant

And

(1) ANSOL LIMITED
(2) AVAZ SAIDOVICH NAZAROV
(3) ANSOL AG
(4) ELSUN INVEST AG
(5) FAIZY INVEST AG
(6) YULDUZ TRADING AG
(7) ASHTON INVESTMENTS LIMITED
(8) THE HONG KONG AND SHANGHAI BANKING CORPORATION
(9) CHANDLER BACKER & CO

Respondents

WHEREAS on the 4th day of April, 2001 the Bailiff made an order prohibiting the disposal of assets worldwide by the Respondents and ordering disclosure of information, hereinafter known as "the freezing order" and WHEREAS on the 4th May, 2001 the Bailiff part heard an application by the Respondents dated 23rd April, 2001 in the terms attached hereto for the discharge of the said order for material non disclosure and WHEREAS on 23rd, 24th and 25th July, 2001

2

the Lieutenant Bailiff considered the said application of the 23rd April, 2001 and heard

thereon Advocates P.T.R. Ferbrache and J.P. Greenfield Counsel for the Applicant and

the Fist and Second Respondents respectively;

The Lieutenant Bailiff THIS DAY handed

down judgment in the terms attached hereto and;

(1) DISMISSED the said application for the discharge of the freezing order of
4th April, 2001;

(2) ORDERED that the said freezing order be continued until the trial of this
action or until further order; and

(3) the Lieutenant Bailiff having this day heard submissions from the said
Counsel further ORDERED that the "collar" level as set out in paragraph
1.1 of the said freezing order be set at US $40 million; and

(4) the Lieutenant Bailiff ORDERED that the Applicants costs for the hearing
of the application for the freezing order on the 4th day of April, 2001 be
DISALLOWED; and

(5) the Lieutenant Bailiff further ORDERED that costs should be awarded to
the Respondents in respect of the adjourned hearing before the Bailiff on
the 4th day of May, 2001 of the Respondents' application dated 23rd April,
2001; and

(6) with regard to this matter generally and to the ancillary orders made the
Lieutenant Bailiff ORDERED that the Applicant should have three quarters
of his recoverable costs.



Her Majesty's Deputy Greffier

AMENDED APPLICATION DATED 23RD APRIL 2001
OZANNES
(PTRF)

## IN THE ROYAL COURT OF GUERNSEY
## ORDINARY COURT

**BETWEEN:**

### PAVLOS VARDINOYANNIS

**Applicant**

-v-

(1) ANSOL LIMITED
(2) AVAZ SAIDOVICH NAZAROV
(3) ANSOL AG
(4) ELSUN INVEST AG
(5) FAIZY INVEST AG
(6) YULDUZ TRADING AG
(7) ASHTON INVESTMENTS LIMITED
(8) HSBC BANK PUBLIC LIMITED COMPANY
(9) CHANDLER BACKER & CO.

**Respondents**

_____

The First and Second, Fourth, Fifth, Sixth and Seventh Respondents, whose address for service in Guernsey is 1 Le Marchant Street in the parish of Saint Peter Port, hereby

### APPLY TO THE COURT

for the following orders:

1    The time limits set out in paragraph 3 of the Order of the Bailiff herein dated 4th April 2001 be suspended pending the final disposal of this application;

2    The proceedings herein be stayed and/or the leave given to serve out of the jurisdiction at paragraph 4 of the said Order of the Bailiff dated 4th April be set aside and, in any event, the Order discharged on the grounds that either:

   a)    the Applicant has no or no good arguable claim against the First Respondent, whether within this jurisdiction or at all, and the other Respondents are accordingly neither necessary nor proper parties thereto; or

    b)    the Court has no jurisdiction in any event with regard to the proposed claim; or

    c)    Guernsey is not the appropriate jurisdiction to be seized of this matter whether for want of jurisdiction or because it is a forum non conveniens; and

    d)    in any event because the criteria set out at RCCR 7(2) are not made out.

3    Further or alternatively, that the said Order be discharged on the grounds inter alia that:

    a)    the Applicant has not made out a good arguable case against the First Respondent and/or any or all of the Respondents; and/or

    b)    the Applicant has not demonstrated a real risk of dissipation of assets by either the First or Second Respondents and/or any or all of the Respondents; and/or

    c)    the affidavits filed on behalf of the Applicant do not make full and frank disclosure of all material facts surrounding the Applicant's claim, alternatively it was not the Applicant's intention to make full and frank disclosure either to the Court or the Respondents in obtaining the said order and/or the affidavits filed on behalf of the Applicant misrepresented material events; and/or

    d)    the said Order is not justified on the balance of convenience between the Parties; and/or

    e)    it would not be just and convenient to continue the said Order having regard to the manner in which the Order was obtained, the evidence relied upon and all of the circumstances.

4    In the further alternative, that paragraphs 3, 4.2, 4.3 and 4.4 of the said Order be discharged or amended on such terms as the Court thinks fit.

5    The Applicant be required to deposit security for any loss and damage suffered by the First and Second Respondents pursuant to his undertaking at schedule 5 paragraph 2 of the said Order in the sum of US$11 million or in such sum and manner as the Court shall deem fit.

<u>6</u>    If notwithstanding the said Order is continued the Respondents seek a reduction of the sum frozen to such figure as the Court deems fit.

<u>7</u>    Costs, to be taxed if not agreed, on an indemnity, alternatively standard basis.

<u>8</u>    Further or other relief.


ADVOCATE

Dated this 23rd day of April 2001

<u>IN THE ROYAL COURT OF GUERNSEY</u>

<u>(ORDINARY DIVISION)</u>


BETWEEN

PAVLOS VARDINOYANNIS

Applicant

And


(1)  ANSOL LIMITED

(2)  AVAZ SAIDOVICH NAZAROVAROV

(3)  ANSOL AG

(4)  ELSUN INVEST AG

(5)  FAIZY INVEST AG

(6)  YULDUZ TRADING AG

(7)  ASHTON INVESTMENTS LIMITED

(8)  THE HONGKONG AND SHANGHAI BANKING CORPORATION

(9)  CHANDLER BACKER & CO

Respondents


**The Parties**


1.  The Applicant is Mr Pavlos Vardinoyannis, a Greek citizen.   The First Respondent ("Ansol Guernsey") is a Guernsey company.   The Second Respondent ("Mr Nazarov") is a Tadjik national.   The Third Respondent ("Ansol AG") is a Swiss company, which I have been told is now defunct. The Fourth to Sixth Respondents, as I understand it, will play no further part in these proceedings.   On 28th June 2001 I discharged the freezing and

1

ancillary orders made against them on the application of the Applicant himself. The Seventh Respondent, Ashton Investments Limited, is an English company controlled by Mr Nazarov. The Eighth Respondent is a bank. It did not appear at the hearing before me, and no further relief is sought against it. The Ninth Respondent is a firm of Guernsey accountants. Ansol Guernsey has its registered office at their premises. Partners in the firm hold the shares in Ansol Guernsey as nominees for Mr Nazarov.

2. The Applicant has intimated, by the production of a new form of cause, an intention to apply to join the Tadjik Aluminium Plant ("TadAz"), a Tadjik state-owned enterprise. TadAz is one of the largest aluminium plants in the former Soviet Union and is the largest single contributor to the GDP of Tadjikistan. The Applicant believes that TadAz has separate corporate personality. In a short letter sent by the Deputy Minister of Justice of the Republic of Tadjikistan to Clyde & Co, the Respondents' English solicitors, dated 11th July 2001, he describes TadAz as "a legal entity". The Applicant proposes, in due course, to apply to join TadAz to the proceedings and to remove other Respondents so that the only parties would be Ansol Guernsey, Mr Nazarov and TadAz.

### The Applications

3. By an Application notice dated 27th March 2001 the Applicant applied to this court for a worldwide injunction prohibiting the disposal of assets by Respondents 1,2,3,4,5, & 6 up to a value of US $55 million. An Application

2

was made at the same time for the disclosure of information by Respondents 1,2,3,4,5 & 6 about their assets, and for the disclosure of information by the 7th Respondent about the assets of Respondents 1,2,3,4,5 & 6 and of TadAz, which was not, at that stage, proposed as a party to the proceedings. The 8th Respondent was to disclose information about bank accounts in Guernsey held by the Respondents 1,2,3,4,5,6. Against the 9th Respondent, the relief sought required them to produce information and paperwork about Respondents 1-7 and TadAz within the jurisdiction, and give information about what documents they held. They were also to disclose to the Applicant the identity of the beneficial owners of the 1st Respondent.

4.  On 4th April 2001, the Bailiff granted an order to the Applicant. A minor amendment, with which I am not concerned, was made on 9th April 2001.

5.  On 20th April 20001 Ansol Guernsey issued an Application notice requesting the immediate release of certain funds referred to in a letter dated 19th April 2001 from Clyde & Co, who act for Ansol Guernsey in England, to Taylor Joynson Garrett, who act for the Applicant in England. This concerned certain transactions, which, the letter of request said, were to be made in the ordinary course of business. On the same day the Bailiff made an order varying the earlier orders which he had made, so as to provide that Ansol Guernsey could deal with its assets in the ordinary and proper course of business provided one working day's notice was given of

3

the proposed disposal with information about what was proposed to be done.

6. On 23rd April 2001, Ansol Guernsey and Mr Nazarov issued a notice of Application to suspend the operation of the orders for disclosure until after a substantive hearing on its Application. The Application notice went on to ask for a stay of proceedings on the grounds that Guernsey is not the appropriate jurisdiction for the case to be heard; that there was no good arguable case, that there was no real risk of dissipation of assets, that there had not been full and frank disclosure of all the material facts surrounding the claim and that the balance of convenience did not justify the making of the order. Security for the cross undertaking in damages was also requested.

7. On 24th April 2001, the Deputy Bailiff heard that Application. However the court was not able, on that occasion, to set aside sufficient time for the effective hearing of the Application. The Deputy Bailiff thus suspended the time limits for compliance with the disclosure orders until 4th May 2001 and adjourned the Application generally.

8. On 4th May, the Bailiff continued the suspension of the time limits and ordered that the Applications should be fixed for hearing, giving directions as to the service of evidence in support and in response.

9. There is an amended notice of the 23rd April Application dated only June 2001 and unsigned. By that amendment the Respondents 4,5,6 and 7 join in the Application earlier made by Ansol Guernsey and Mr Nazarov on

4

23rd April and seek to have leave which was earlier given to serve the worldwide freezing order outside the jurisdiction set aside on the grounds that the Applicant having no good arguable claim against Ansol Guernsey in the jurisdiction or at all, the other Respondents were not necessary or proper parties thereto and this court had no jurisdiction over any part of the claim, nor was it a convenient forum for the resolution of the dispute between the parties. The amendment further requested the discharge of all the orders earlier made on similar grounds to those relied upon by Ansol Guernsey and Mr Nazarov alone and on the additional ground that it would not be just and convenient to continue the order having regard to the manner in which it was obtained, the evidence relied upon and all the circumstances.

10. The Respondents then refined their earlier Application for security for the cross undertaking in damages by asking for a deposit in the amount of US$11 million, and for a reduction in the amount frozen.

11. I gave leave for the amendment to be made on 28th June 2001.

12. By an Application notice dated 22nd June 2001 the Respondents 2,4,5 and 6 applied to the court for discovery and inspection of six categories of documents listed in the Application notice, with liberty to take copies. The documents related to the trading records of or were part of the trading records of Allouette Anstalt ("AA") and Allouette Industry AG ("AIAG"). AA and AIAG were the trading entities used by the Vardinoyannis family and Mr Nazarov as the vehicles for their joint venture trade with TadAz.

These categories of documents were discussed between the party's legal representatives and on 28th June 2001 I heard, amongst other case management matters, an Application for an order in agreed terms. An order was made, effectively by consent, by me on that day, and I gave further directions in preparation for an effective hearing of the amended Application of Respondents 1,2,4,5,6, &7 on 23rd July 2001 with an agreed time estimate of 3 days. In fact, as matters turned out, the parties' time estimate was rather optimistic, and in order to complete the hearing in three consecutive days it was necessary to extend the court hearing hours and shorten the breaks to fit in what was effectively 5 days of court time.

13. By the date of the hearing on 28th June it had been agreed between the parties that the order of the Bailiff dated 4th April 2001 should be discharged as against the Respondents 3,4,5 & 6, with the Applicant paying the costs of Respondents 4,5, & 6.

14. On 27th June the Applicant produced his cause, and his summons to Ansol Guernsey for it to be tabled was returnable before the Bailiff for 6th July 2001. On 28th June 2001 I dispensed with the need to table the cause on 6th July, again by consent.

15. Some time was taken up on 28th June with a discussion of the way in which the earlier orders supervising the circumstances in which and conditions under which Ansol Guernsey was allowed to dispose of its assets in the ordinary and proper course had in fact operated. The parties found that certain practical difficulties had arisen, and the Applicant was content to

accept that some variations were appropriate, with proper safeguards. The scheme for making such payments was varied in the terms of the order which I made dated 28th June 2001, contained in a separate document from the other directions and case management orders.

16. As I understand it, permission has not yet been sought to serve Mr Nazarov with the proceedings, although permission was sought and granted to serve him with the freezing order. If this action is to proceed against him, service issues will have to be attended to. A number of such points have been left over until after the determination of this Application, and that makes sound practical sense.

### Proceedings in England

17. On 6th April 2001, in the High Court in London, Blackburne J, the Vice-Chancellor of the County Palatine, made an order at the behest of Mr Vardinoyannis against Ansol Guernsey, Mr Nazarov, Ashton and two banks, Credit Agricole Indosuez and The Royal Bank of Scotland plc, under the provisions of Section 25 of the Civil Jurisdiction and Judgments Act 1982 as extended, together with orders for ancillary disclosure. The freezing order, in an amount of up to US $55 million of assets in England and Wales, was made until a return date of 6th July 2001. The order contained the usual savings, including permitting disposals of assets in the ordinary course of business provided one working day's notice was given. The disclosure sought and granted against the prospective Defendants was in relation to the affairs not only of Ansol Guernsey, but also in relation to

the affairs of the Respondents 3-7 in the proceedings before this court and TadAz. There were orders made against the two banks to disclose information about the existence and recent movements in any bank accounts in the name of Ansol Guernsey and Mr Nazarov.

18. On 19th April 2001, a claim form was issued in the High Court in London. On 20th April 2001 Lloyd J made an order allowing Ansol Guernsey to make certain specified payments. On 23rd April 2001 the same Judge varied the time limits for compliance with the disclosure orders by extending them until 4pm on 30th April, which gave Ansol Guernsey and Ashton time to issue an Application notice seeking a longer extension. This was done on 29th April, and sought an extension to bring the time for compliance with the English order into line with the limits set in this court. Mr Nazarov applied for a similar order by Application notice dated 25th April. There was a partially effective hearing of these Applications for extensions of time before Lawrence Collins J on 8th May 2001 and they were stood over.

19. Other variations to Blackburne J's order were sought by the Application Notice of 1st May, which sought relief designed to create a more flexible regime under which Ansol Guernsey and Mr Nazarov could make payments in the ordinary course of business. This order was made by Park J on 2nd May 2001

20. Applications to set aside the claim form on the grounds that the English court had no jurisdiction over Ansol Guernsey or Mr Nazarov were issued on 17th May 2001.

21. Finally, on 18th May 2001 an Application was made for production of documents referred to in affidavits sworn by Alexander Shusko ("Mr Shusko") and Stephen Tricks ("Mr Tricks") on behalf of Ansol Guernsey. Among the documents sought was a copy of the contract between Ansol Guernsey and TadAz. This Application was heard by Blackburne J on 23rd May. He permitted Ansol Guernsey to strike out the references to the documents and went on to reject the Claimant's Application for production. However Mr Shusko's affidavit has been deliberately put in the bundles for the hearing before me in its unamended form , containing the reference to the contract.

22. On 6th July the Application for a freezing order and ancillary disclosure, was heard in London by Ferris J. He made the order with effect until 3rd August 2001, against Ansol Guernsey and Mr Nazarov, with the usual saving provisions about payments in the ordinary course of trade, legal expenses and so forth, the detail of which is fully set out in the Order and I need not repeat it here. The banks were also ordered to preserve certain relevant documents identified in a schedule, until the return date. The Applications of 17th and 16th May 2001 were adjourned generally. I have not been told what, if anything, happened on the return date in August.

9

### The claim by the Applicant against the Respondents

23. The Applicant claims to be the victim of a conspiracy between Mr Nazarov, Ansol Guernsey, Ansol AG and others. There is an issue between the parties about whether the agreement really amounted to a partnership or whether it was more properly called a joint venture. That is a question which may very well have to be determined at trial. I need only be satisfied that there is an arguable case that the agreement between the Vardinoyannis family, represented now by the Applicant, and Mr Nazarov amounted to a partnership under Liechtenstein law.

24. The case is that there was a simple partnership in Liechtenstein law following the provisions of Articles 649, 661 and 680 of the Liechtenstein Law on Persons and Companies. Among the duties of partners in such partnership were the following familiar obligations:

    a. To share profits in the partnership shares

    b. To devote themselves diligently to the pursuit of the interests of the partnership and make good any losses caused by improper conduct

    c. Not to engage in any activity which might frustrate or harm the purposes of the partnership

    d. Generally to act in good faith.

25. The Respondents dispute the existence of a partnership in Liechtenstein law. They do not necessarily accept that Liechtenstein law applies at all. They prefer to call the arrangement a joint venture. Both parties have, from time to time, used the expressions "joint venture" and "partnership".

Of course, a partnership is always a joint venture in the ordinary sense of the words. The converse is not necessarily true.

26. I have read the evidence of the Liechtenstein experts called by both parties. It does not assist on the fundamental requirements for a  simple partnership in Liechtenstein law.  I must therefore assume that in Liechtenstein, as in Guernsey, a partnership involves two or more persons going into business together with a view to profit.  The Applicant contends that the relationship of simple partnership survived the interposition of the vehicles AA and AIAG.  The Respondents take a different view.  However both parties acknowledge that the interposition of the vehicle is not fatal to the existence of a relationship involving duties of mutual good faith.  Moreover, the Respondents, in argument, go so far as to say that at best, there was a quasi-partnership of the type discussed in **Ebrahimi v Westbourne Galleries [1973] AC 360.**  Both Ansol Guernsey and Mr Nazarov, therefore, accept that there may be a relationship akin to a quasi partnership as understood by Guernsey lawyers. It is fundamental to the quasi partnership relationship, as it is to the partnership relationship, that the parties should act in good faith to and deal fairly with one another.  Neither party should conspire with a third party to damage the joint trade, nor should either party divert business opportunities from the joint venture.

27. Applying basic principles, I am satisfied that there is an arguable case that there was a Liechtenstein partnership. Nor, in my judgment, would there

11

be any great difference in the duties owed by Mr Nazarov to the Applicant if there were a joint venture agreement and not a simple partnership under Liechtenstein law. Assuming, for the sake of argument, that there was a joint venture agreement akin to a quasi-partnership relationship and that agreement was governed by some other law, Greek or Tadjik, say, I would assume, in the absence of evidence about the duties imposed by that foreign system of law, that the same duties of good faith and fair dealing applied under that system of law. Thus, it seems to me, the principal allegations against Mr Nazarov do not stand or fall depending on whether there was a partnership or not. In this judgment I will use the expression partnership as a convenient label for which I believe there to be some basis in fact. I do not, in so employing that expression, intend in any way to pre-judge the issue before the trial. It will remain open to the Respondents to argue, if they wish to, that the relationship was not a simple partnership governed by Liechtenstein law.

28. It must also not be forgotten that many of the allegations made against Ansol Guernsey and Mr Nazarov flow from Mr Nazarov's alleged breaches of the agreement described as the Athens Agreement, reached between the parties on 11th June 1998 and designed to give both a mutually satisfactory exit from the partnership. This agreement does not specify any governing law. It is for the Defendants to allege that foreign law applies to this agreement, and which law.

29. The partnership was set up after meetings in Athens at which the opportunities to do business with TadAz were discussed between the parties. At the second such meeting, in early June 1996, Mr Ermatov, the director of TadAz, was present, as was Mr Anisimov, who was a director of Coalco, one of TadAz's creditors. Mr Nazarov was present and so were the Applicant and his uncle, Mr Theodore Vardinoyannis, now deceased.

30. At this second meeting, Mr Nazarov proposed that the partnership would enter into barter contracts for aluminium with TadAz. Mr Nazarov had strong relationships with TadAz and ran TadAz's representative office, Tadal, in Moscow. He could procure or persuade TadAz to enter into agreements to trade with the joint venture. The partnership would provide TadAz with raw materials. Mr Nazarov, as an aluminium trader, would be in charge of sourcing the raw materials and the Vardinoyannis family partner would be in charge of providing or arranging for finance for the purchase of the raw materials and generally to support TadAz's need for working capital. The partnership would sell the aluminium on the open market and the profits would be split as to 70% to Mr Nazarov and as to 30% to members of the Vardinoyannis family.

31. The first partner from the Vardinoyannis family side was Theodore. The partners chose to use two corporate vehicles for this trade: the first was AA, a Liechtenstein establishment. Following a re-negotiation of the profit split, the founders' rights in AA were held for Ansol BVI and Aletri International Anstalt ("Aletri") in the proportion 60/40. Aletri is a

13

Vardinoyannis family establishment which was used as a nominee to receive the profit share allocated to the Applicant. It has formally assigned all its claims to the Applicant. This was the vehicle from June 1996 until July 1997. A Liechtenstein corporation, AIAG, was then used from July 1997 until the end of the partnership. The reason for this was that a privatisation of the TadAz plant was being discussed, and the parties were advised that AIAG was a more suitable vehicle to participate in a proposed privatisation than AA. However, nothing came of the privatisation talks.

32. Theodore died in September 1996 and the Applicant became the partner in his place, with the apparent consent of Mr Nazarov. Both the Vardinoyannis family and Mr Nazarov used nominees to receive any profits to be distributed by the partnership. Mr Nazarov used Ansol BVI. The Vardinoyannis family, first Theodore and then the Applicant, used Aletri .

33. It seems that the Applicant was made aware that TadAz owed money to other suppliers of raw materials, but it was the Applicant's evidence that Mr Nazarov told him that they were willing to be postponed to the new joint venture. No enquiries appear to have been made into the accuracy of this. At all events, Mr Nazarov was keen to establish, through the Vardinoyannis family, a new and regular supply of raw materials and working capital for TadAz.

34. AA entered two barter contracts with TaAz, called during the hearing, for convenience, the 1996 and 1997 contracts. When the trading switched to

14

AIAG, there was a written assignment to AIAG of the rights and obligations under the 1997 contract. In the contemporaneous correspondence the name "Allouette" is used for both vehicles interchangeably.

35. Later, the Applicant claims that another aluminium trader called Mr Rosenberg was introduced as a shareholder in the partnership vehicle AIAG. I will explain his involvement shortly. He took 10%, reducing Mr Nazarov's interest to 50%. The Applicant's interest stayed unchanged at 40%. The Applicant claims that Mr Rosenberg also became a partner, by 11th July 1997 at the latest.

36. The 1996 barter agreement is basically a master agreement, as supplies of raw materials were governed by the addition of addenda as and when the need arose. Prices for the raw materials were stipulated in the addenda. The price of aluminium, however, was set in the contract itself, at clause 9, but was formulaic. Under the addendum No 1, TadAz agreed to supply AA with all its production of aluminium on a daily basis. If AA/AIAG did not supply raw materials or the finance for raw materials, TadAz reserved the right to enter into agreements with third parties and ship aluminium to them in exchange for raw materials, but only with the consent of AA/AIAG. Likewise, if AA/AIAG did not provide finance for gas, electricity and reconstruction, but third parties did provide such finance, TadAz reserved the right, again with the consent of AA/AIAG, to supply aluminium to the providers of such funds.

37. The 1996 contract was superseded, on 1st May 1997, by the 1997 contract. It was in broadly similar form. TadAz agreed to supply the partnership with aluminium in quantities equivalent to the values of raw materials delivered to it and amounts paid during the previous month: see Clause 11. Again, the price for the finished aluminium was to be determined by reference to a formula derived from prices on the LME. A new provision, Clause 14, stated that any disputes with regard to deliveries of aluminium were to be governed by English law, and any disputes with regard to the deliveries of raw materials were to be governed by Tadjik law.

38. Neither the 1996 nor the 1997 contracts are expressed to terminate on any particular date. However, it appears that the Applicant was told that Amendments to the contracts, specifying orders, were to run for only a year to satisfy the Tadjik Government's desire to calculate the predicted earnings of the plant on an annual basis. However, Mr Nazarov told the Applicant that the contracts could be extended. Indeed, at the end of March 1998 or thereabouts, the 1997 contract was extended by agreement until 30th April 1998.

39. Theodore and subsequently the Applicant arranged an Export Credit Facility with UEB with an original limit of US$40 million which was subsequently increased to US$60 million. Raw materials and funding were supplied to TadAz, including funding for the payment of other creditors such as, in 1997, Coalco, and aluminium was supplied to AA/AIAG, which assigned ownership of the aluminium to UEB as security for the

debt. Theodore had given UEB a guarantee of AA's liabilities up to US $40 million. After Theodore's death another uncle, Vardis Vardinoyannis, who is regarded as the head of the family, agreed to take over the guarantee. After some delay, Vardis entered a guarantee on 21st January 1998 for US $60 million, which was increased to US $67 million on 10th February 1998. Vardis agreed that the Applicant should take over the complete control of the TadAz trade on behalf of the Vardinoyannis family.

40. There was a good deal of evidence before me about the precise operation of the offices of the joint venture in Moscow and London, which I do not think it necessary to repeat in this judgment. Suffice it to say that the Applicant was obliged to take on trust that the plant was actually receiving the quantities of raw materials which were being supplied through AA/AIAG and funded by the UEB facility. Mr Nazarov had complete control of this side of things, as well as of sales of finished aluminium. After the death of Theodore, and the introduction of the Applicant to the partnership or joint venture, it was agreed, at a meeting in Athens, to introduce an aluminium trader called Mr Rosenberg to the operation. The Applicant's evidence is that, at least in the early days, Mr Rosenberg was worth his hire and increased the profitability of the operation by improving the prices at which its aluminium was sold. A few months later, Mr Rosenberg was given a small share in the partnership. He took 10%, reducing Mr Nazarov's share to 50%. The Applicant's share stayed the same.

17

41. By mid-1997, the production at the TadAz plant did not appear to have improved despite what the Applicant describes as a steady supply of raw materials. When PriceWaterhousecoopers were instructed to and did prepare a report for the Applicant, in May 1997, one of the matters referred as the cause of a deteriorating financial position was a decline in production of aluminium and increased liabilities owing to an irregular supply of raw materials. As Mr Nazarov was in charge of the supply side, running it from the Moscow office, this was a matter of concern to the Applicant. In addition, the world prices for aluminium were in decline.

42. By mid 1997, Mr Nazarov was pressing for Mr Rosenberg 's role to be reduced; he wanted to introduce his colleague, Mr Shusko, as the aluminium salesman for the joint venture. The Applicant was not keen on this plan, principally because he was not happy to allow Mr Nazarov to increase the control which he had over the operation but also because he was content with Mr Rosenberg's performance for the joint venture. Mr Nazarov professed himself to be unhappy with the prices Mr Rosenberg obtained, but the Applicant viewed the criticisms which Mr Nazarov made as unfair and partly motivated by self-interest. This is another dispute between the parties upon which it is not necessary for me to express a view.

43. In June 1997 Mr Nazarov asked the Applicant to supply US $7.5 million by was of additional capital to upgrade the plant, and the Applicant agreed, but asked in return for the office operations to be moved to Athens, thus

giving him greater access to information. Mr Nazarov did not agree to move the office operation to Athens.

44. By the turn of the year, the Applicant contends that TadAz already owed AA/AIAG about 100,000 metric tonnes of aluminium.

45. In early 1998, Mr Nazarov made another request for an injection of US $7.5 million. There was a meeting in Athens on 23rd February 1998 to discuss this and other matters pertaining to the business. Mr Nazarov complained about lack of finance for improvement to the plant. The Applicant and his uncle Vardis said that they had not committed themselves to the capital investments and had therefore provided everything asked of them despite their concerns about whether the plant was really receiving the benefit of all the funding which they had provided. It was shortly after that meeting, the Applicant deposed, that a very considerable further sum was demanded, and the suggestion made by Mr Nazarov that he would seek the introduction of new partners.

46. By early 1998 there is some evidence that Mr Nazarov was not merely asking for further investment, but complaining that TadAz needed more capital investment than AA/ AIAIG was supplying. It is clear from his first affirmation that without substantial capital investment the TadAz plant could not reach its profitable operating level of 18,000 metric tonnes of aluminium per month. It appears to be common ground between the parties that at all times material to this dispute TadAz was not operating at a profit. It was always under considerable financial pressure and lacked

the ability to invest in improvements to the plant which would enable it to operate profitably. However there is little evidence of the reasons for this lack of profitability. What is obvious from the evidence before me is that a number of other people, notably Ansol Guernsey, are making considerable profits out of trade with TadAz.

47. One of the complaints which Mr Nazarov makes is that the Vardinoyannis family never actually bound themselves to investing in the improvement of the plant. Mr Nazarov believed, in 1998, that an investment of US $80-100 million was required over a 2-3 year period. The Vardinoyannis family had talked about investing US $40 million, but this had not got any further. There were a series of meetings in Athens, Istanbul and Paris. On 10th March 1998 Mr Nazarov sent the Applicant a fax referring to discussions which were in train about the provision of a large amount of capital investment by possible new partners, the Sayansk and Nikolaev plants, and imploring him to keep the day to day needs of TadAz supplied. Mr Nazarov assured the Applicant in that fax that whatever the results of the talks might be, the liabilities to the Applicant would be treated as TadAz's first priority.

48. At the Paris meeting, on 18th March 1998, Mr Nazarov says, it was made clear that the Applicant would not make a capital investment in the TadAz plant. It is argued on his behalf that it was agreed that the joint venture would terminate and aluminium would no longer be released to

AA/AIAG/UEB.  In his first affirmation, however,  all Mr Nazarov says is that the joint venture "in its current form" would terminate.

49. Mr Nazarov sent the Applicant a fax of 25th March 1998 to which the Applicant did not refer in his affidavit, although it was in the bundle of documents before the court.  As I understand it, this fax was not drawn to the attention of the Bailiff.  I shall have to say more about that in a later section of this judgment.  It was clear from that fax, sent by Ansol BVI to the Applicant, that Mr Nazarov had unilaterally arranged that with effect from March 19th 1998 TadAz would not be releasing all its metal to UEB because he claimed not to have adequate information about the credit line and the way in which it operated.  Mr Nazarov asserts, in that fax, that he no longer thinks it appropriate to use UEB's financing service.  There are two rival translations of this letter.  One, exhibited to the Applicant's  first affidavit, says that "none of" the metal shipped since 19th March will be consigned to the bank.  Mr Nazarov's translation has " All the metal dispatched from TadAz, starting 19th March, will not be released to the Bank".  The fax also refers to continuing discussions with the proposed new funders and requests an early meeting in Athens.

50. So far as I know, the Bailiff was not told about this fax or exactly what the Applicant would have understood it to mean.  The Applicant does not say where he thought the aluminium was going after he received this fax.  I think that what the Applicant expected to happen to the aluminium after 19th March depends very much on what the arrangements were with UEB.

21

If all aluminium shipped to AIAG automatically fell into the clutches of UEB, because of the provisions of the credit line, then it would follow that the aluminium would have to be shipped to some other recipient if any attempt to avoid the involvement of UEB was to stand any chance of success. The Applicant did not appear to be unduly concerned by this fax. He did not make any protest to Mr Nazarov.

51. The Bailiff was simply told that by April 1998 the supplies of aluminium had dried up and the Applicant believed that aluminium had been diverted to a third party. He does not say that he knew that UEB would not be getting it, but nevertheless expected it to continue to be available to the joint venture partners in some other way.

52. On 31st March 1998 a further extension of the 1997 agreement , until 30th April 1998, was agreed. However, on 1st April 1998, TadAz entered into a similar barter contract with Ansol AG, under which it bound itself to supply over 235,000 metric tonnes of aluminium to AG by the end of the year. The contract itself is open-ended, and rights and the obligations of both parties to the contract cannot be assigned to any third party without the consent of the non-assigning party. On the basis that it had previously supplied AIAG with all its aluminium, TadAz could not possibly produce enough aluminium to satisfy the new obligation, let alone both. There is no evidence to suggest that the Applicant was told about the new obligations which TadAz had entered into, or the new rights to receive aluminium which Mr Nazarov's company, Ansol AG, had acquired.

There is no pretence by Mr Nazarov that Ansol AG was a vehicle used by agreement between the parties further to the 25th March fax.

53. On 2nd April 1998, the Applicant wrote to Mr Ermatov protesting that AA/AIAG was not receiving any shipments of aluminium, despite the fact that it was continuing to supply raw materials. He copied that fax to Mr Nazarov. In a further letter to Mr Nazarov, dated May 12th, written after Mr Nazarov had failed to attend a planned meeting, the Applicant complained that he was not being kept informed of the whereabouts of the metal, and that he had learned from the proposed third party investors that they had withdrawn, but had not been kept informed by Mr Nazarov himself.   He stated that it was crucial that the partners should meet and discuss the way forward.

54. There was a meeting in Paris that month. The exact date of that meeting is not entirely clear, but it was before the 25th May. The meeting was attended by Mr Nazarov, Mr Ermatov and the Applicant.  The Applicant says that Mr Nazarov admitted that he had used his own vehicle to receive the aluminium and the proceeds of sale which should have gone to AIAG.  It is alleged by the Applicant that, at that meeting, it was acknowledged on behalf of TadAz that it was indebted to the partnership in the sum of at least US$20 million (a figure which appears to bear some relation to a particular advance sought for the purpose of refurbishing the cells at the plant); this was subsequently confirmed in writing on 25th May 1998 . Mr Nazarov agreed to repay the overdraft on the partnership account at UEB

and to formulate provisions for the future of the partnership, including safeguards for the Applicant to monitor his future conduct and a plan for further investment. All this is said to have been confirmed in a letter sent by the Applicant to Mr Nazarov on 3rd June 1998. That letter begins with a reference to the discussions in Paris the previous month and refers to steps which Mr Nazarov had agreed to take "to ensure that our project continues". It presses Mr Nazarov for repayment of the UEB overdraft out of the proceeds of sale of metal which, the Applicant appeared to believe, Mr Nazarov was receiving himself; secondly, Mr Nazarov was to have provided information about how the joint venture was to continue, given that Mr Nazarov had taken control of all metal sales and purchasing of raw materials and third, Mr Nazarov was to have presented a plan for the further investment which was to provide the basis of a discussion with the head of the family, Vardis Vardinoyannis . The letter ends with an inquiry as to whether Mr Nazarov really does intend to continue the venture and stating that the writer has reached to the point where he needs to come to final terms.

55. At a meeting in Athens on 11th June 1998, Mr Nazarov did not provide information which satisfied the Applicant, and he decided to end the partnership. It has been contended, on behalf of Mr Nazarov, that the joint venture came to an end in March 1998. The fax of 25th March is relied upon as one of the pieces of evidence supporting this case. I do not read that letter as terminating the partnership. Rather, by asking for a meeting

to discuss the introduction of new partners, it acknowledges its continuation. In my judgment, considering all the evidence, there is a strong arguable case that the partnership or joint venture did not end until June 1998. A written agreement was entered into, called The Athens Agreement, between the Applicant, Mr Nazarov and Mr Rosenberg, under which it was agreed that there would be a winding up, in the context of which there would be an independent audit; liabilities of TadAz to AIAG, including all liabilities to UEB, would be settled by Mr Nazarov from the proceeds of sale of aluminium received by AG from TadAz immediately following the presentation of the results of the audits, subject only to dealing with one matter, called the Nickoaev debt, to which I need not refer in any detail. Mr Nazarov would also pay US $1 million to UEB on or before 15th June and the parties would generally co-operate with one another, which expressly included the possibility of doing further business together, to achieve a settlement of the partnership's affairs. I should add that the Athens Agreement does not appear to operate as a release of the obligations of TadAz to AIAG. It still remains liable for the entire debt. Nor, so far as I understand it, has anything materially changed in the manner in which TadAz settles its debts: it would only do so directly via the supply of aluminium for sale. Ansol Guernsey now appears to have a broader role in settling TadAz debts, and I shall say more about that in due course.

56. It is the Applicant's case that Mr Nazarov has done little or nothing to perform his obligations under the Athens Agreement. The Applicant expressly told the Bailiff that Mr Nazarov failed to make the payment of US $1 million provided for by the Athens Agreement. This statement was wrong because it is clear that Mr Nazarov did arrange for this US$1 million to be paid, albeit late.

57. The Applicant's draft affidavit also said that the agreed payment of US$200,000 to the Applicant for his expenses had not been made, although in fact it had. Advocate Greenfield told the court at the hearing before me that this inaccuracy had been corrected before the Bailiff.

58. There is also a dispute about the audit. An agreement was reached on 27th August 1998 about how the audit was to proceed. This agreement was reached between the parties' representatives, Brett Heenan for the Applicant and Kiril Mazur for Mr Nazarov; but Mr Nazarov contends that the reason why the audit has not progressed is that Mr Heenan has failed to get on with it. Certainly it has not made much progress and even on Mr Nazarov's figures, a substantial amount of money remains owing to UEB and to the joint venture in the course of being wound up. The Applicant contends that Mr Nazarov has obstructed the audit process. This is disputed. The lack of progress on the audit has been cited by Mr Nazarov as not only the reason, but also the excuse for his not having paid off the indebtedness to AIAG as promised in the Athens Agreement: his case is not merely that he does not know how much to pay, but that the time for

26

payment has not yet arrived. I do not have to resolve the issue of why the audit has not yet been completed, and it may be that work done in the context of this application to establish the balance can be used by the parties to provide the certainty the abortive audit has failed to supply. It is open to the parties, if they are genuine in their wish to see the matter of the audit settled, to adopt the work done by their respective accountants in this application as a new starting point.

59. The Bailiff's attention was drawn to the fact that payments had been made to reduce the UEB overdraft, but it is pointed out that a sum in excess of US$6 million was outstanding as at November 2000. The Bailiff would have been aware, from the affidavit itself, that in the summer of 2000 Mr Nazarov had written to UEB querying the amount of the overdraft and asserting that no more than US $2.4 million was due. In fact, when the Applicant became aware of this correspondence, Vardis wrote to Mr Nazarov on 21st July 2000 suggesting that he discharge at least the amount which he believed to be due. But this did not happen.

60. A number of matters are pleaded as instances of breach of the partnership agreement and/or frauds by Mr Nazarov. Some of those were not dwelt on in the evidence or submissions before me, but briefly referred to. At the heart of the case is the allegation that Mr Nazarov set up another company, Ansol AG, in March 1998, in which he was interested but the Applicant was not, and he, AG and TadAz agreed together to enter into a barter contract with AG. This was done on 1st April 1998. Under that contract

TadAz agreed to ship nearly US$3 million worth of aluminium to AG, although there were insufficient deliveries of aluminium to AIAG to keep the account with TadAz in proper balance. The Applicant points out that TadAz bound itself to supply over 26,000 metric tonnes per month to AG, thus creating a situation where not only could it not satisfy its obligations to AG, it could not possibly honour its prior obligations to AIAG. Effectively, they are alleged to have diverted aluminium from the partners vehicle to Mr Nazarov and his vehicle Ansol AG. The existence of this contract between TadAz and AG is said to have been kept secret from the Applicant by Mr Nazarov, Ansol AG and TadAz.

61. Mr Nazarov denies having done this secretly. He relies on the terms of the fax of 25th March 1998 to show that the Applicant knew that AIAG would not be receiving the aluminium after 19th March. I have already referred to the deficiencies of the evidence before the Bailiff on this point. It is clear that Mr Nazarov does not produce evidence that the Applicant knew about Ansol AG, and he has not sought to suggest that the Applicant knew exactly where the aluminium was going after supplies to AIAG dried up. Exactly what the Applicant thought was happening will doubtless be explored at trial.

62. The Applicant contends that it takes about 3 months for aluminium to go through the manufacturing processes at the plant; accordingly, he says, the first shipments of aluminium made to AG could not have been manufactured from raw materials supplied by AG. Instead it would have

28

been manufactured from raw material supplied by AIAG. Mr Nazarov says this is not so, because in fact stocks of alumina were very low. In any event, the contract with AG provided for AG to receive more aluminium than could have been produced from the raw materials which AG agreed to supply. The Applicant was not told about the formation of and contract with Mr Nazarov's company AG.

63. Mr Nazarov contends that the entire UEB overdraft outstanding as at 19th March 1998 was already secured by aluminium released from the plant. Be that as it may, the overdraft was not extinguished. His forensic accountant, Humphrey Creed of Horwath Clark Whitehill, acknowledges an indebtedness of AA/AIAG to UEB of US$3 million as at November 1998, with queries outstanding as to the balance (the total indebtedness as at that date was said to be close to US $ 6 million). He accepts that at that date TadAz owed approximately US $93 million to AA/AIAIG. (The Applicant does not accept the adequacy of this figure). This debt, of course, had arisen because AA/AIAG had supplied TadAz with raw materials and working capital which had not been repaid to it out of the proceeds of sale of aluminium. Mr Nazarov contends that TadAz was at liberty to choose to supply aluminium to new third parties providing new supplies of raw materials, because it was important to keep the plant going. First of all, there is no evidence that TadAz was making these choices at all; to all intents and purposes it was Mr Nazarov who was changing the identity of TadAz's contracting party, and as it suited him, so

TadAz went along with it. After all, from TadAz point of view it was still dealing with Mr Nazarov and his Moscow office. This was important: Mr Ermatov has himself deposed to the fact that TadAz cannot switch suppliers easily, because it takes several months to put the necessary arrangements into place: see paragraph 6 of his affirmation dated 7th June 2001. The evidence discloses a strong case for saying that it was Mr Nazarov's unilateral decision to stop using the credit facility backed by the Applicant's family. Mr Nazarov's argument amounts to a suggestion that a hopelessly insolvent manufacturer is at liberty to decide to keep on trading and to move on from one supplier to another whenever a large balance has been run up. That is an untenable proposition as a matter of law, nor does it make commercial sense.

64. The Applicant alleges that once AG had been exposed Mr Nazarov secretly set up Ansol Guernsey in September 1998 to continue the diversion of aluminium to his own vehicles. In his first affirmation, which was, of course, not before the Bailiff, Mr Nazarov gives an explanation of why he stopped using Ansol AG. His case is that he would have wished to change the directors and knew no suitable Swiss; moreover it was not possible for Russians to work in the AG offices in Zug without work permits, which they could not obtain. He therefore chose to incorporate a Guernsey company, Ansol Guernsey, and make use of an English company, the 7th Respondent, which would provide consultancy and management services to Ansol Guernsey. It may be that the difficulties which Mr Nazarov

speaks of are absolutely true. However that, it seems to me, begs several questions. It does not address the issue of why the Applicant was not kept informed. It does not address the issue of why Mr Nazarov continued to correspond with the Applicant on AG's letterhead; even as recently as 8th August 2000 Mr Nazarov wrote a letter to Vardis Vardinoyannis on the letter headed paper of Ansol AG giving the impression, as I read it, that AG was still actively trading in aluminium with TadAz.    It does not explain why Mr Nazarov changed his mind about the Swiss directors; he describes them as "Rosenberg" men, but the court has  not had any explanation of why, when and how they became objectionable to Mr Nazarov and how he managed to persuade the Swiss directors to allow him to continue to correspond on the AG letterhead and assign a debt owed by TadAz to AG to Ansol Guernsey.  I find the explanation given superficial.  I have also noted the advice given by Mr Shusko to Mr Nazarov in August 1998 that there were advantages in moving the Ansol structure to the Channel Islands chiefly:

    a.  Zero tax compared to 4.9-9.98% in Switzerland; with an estimated annual profit of US $50 million this would confer considerable advantages;

    b.  Political stability;

    c.  No need to appoint local directors;

    d.  Correspondence and audits would be in English, which would be an advantage when dealing with international banks;

31

      e. No problems with cash transactions because no tax liability; contrast the position in Switzerland where the tax authorities would be vigilant about seeking documentary proof for payments;

      f. Better positioning for a flotation on European stock exchanges .

65. I also note that Mr Shusko's note recommends that Mr Nazarov should take the TadAz long term contract in the name of the new proposed Channel Islands Ansol Company and not in AG, thus confirming the strong impression which I have had from the evidence that he makes the choice and TadAz is content to contract with any entity put forward by Mr him.   Mr Shusko describes this a contract concerning the "management" of TadAz.

66. Ansol AG has been defunct for some time.  It may even be in some process of liquidation, as Mr Nazarov suggests.   Contradicting Mr Nazarov's assertion that he could not get the directors of Ansol AG to act in accordance with his instructions, on 30th December 1998 Ansol AG assigned to Ansol Guernsey the right to recover amounts outstanding from TadAz in the sum of US$20 million, such sum to be repaid by the supply of aluminium to that value. On the same day, it is alleged, Ansol Guernsey entered into a contract, described in these proceedings as the First Ansol Guernsey contract, with TadAz, under which it acquired the sole and exclusive rights for one year to sell raw materials to TadAz and TadAz undertook not to supply aluminium to any third party without Ansol's agreement.  A second contract is believed to have been entered into in

December 1999 and a third, in December 2000, for 5 years. These are also, on both sides, said to be exclusive agreements.

67. These contracts meant, the Applicant argues, that Ansol AG was no longer going to receive any aluminium from TadAz and would be unable to discharge its obligations under the Athens Agreement. Equally, the effect of the agreements with Ansol Guernsey was that TadAz could not hope to discharge its liabilities to the partnership because all its production was tied up in shipments to Ansol Guernsey.

68. The manner in which Ansol Guernsey conducts its trade was explained in the affirmations of Mr Shusko. Mr Shushko speaks excellent English and has acted as the translator for Mr Nazarov in these proceedings; his own evidence is given in English and does not require translation.

69. Ansol Guernsey carries on the business of supplying raw materials to TadAz. I am told that Ansol Guernsey has a substantial business. Ansol Guernsey supplies raw materials and other services to TadAz under a barter contract. Unlike the contracts which TadAz entered into with AA/AIAG or even Ansol AG, the Ansol Guernsey contract is an exclusive one. TadAz agreed not to supply aluminium to any third party without Ansol Guernsey's agreement. Thus AA/AIAG was not going to receive aluminium from TadAz in satisfaction of its debt without the consent of Ansol Guernsey. Nor would Ansol AG thereafter receive any aluminium which it could sell to satisfy the debt as provided for by the Athens Agreement.

70. Ansol Guernsey also arranges for the supply of these raw materials and services by others and takes an assignment of the third party's debt. When aluminium is then shipped to Ansol Guernsey, it sells the metal and repays the third party. It takes finished aluminium from TadAz in payment. From this account, it appears that Ansol Guernsey could, if it wished, make arrangements with the Applicant to pay the amounts outstanding to UEB and the partners in AA/AIAG and recoup the balances out of the sales of aluminium.

71. Following production the aluminium is shipped by rail from Tadjikistan to Tallinn, where it is stored. Some consignments go to the Black Sea or Iran. The shipping of aluminium to Ansol Guernsey or its order is financed by CAI in London which advances funds to it against a pledge of the finished aluminium as from the loading of the metal on to the wagons at TadAz. The pledged metal is then held to the order of CAI while on the wagons and while in store at Tallinn. Ansol Guernsey sells the metal to third parties, usually on long term contracts with delivery normally being at Tallinn. The price is usually set by reference to the prevailing prices on the LME at the time of delivery. Ansol Guernsey hedges its exposure on the LME. Immediately prior to delivery to the third party buyer, Ansol fixes the price, closes the forward open hedging contract and raises an invoice at the applicable price. The buyer pays CAI, which releases the goods to the buyer. The proceeds of sale go first to the repayment of the financing loan

34

on the consignment plus interest and bank charges and the balance is credited to Ansol Guernsey's account.

72. Ansol Guernsey also trades aluminium from other sources. For example, it buys aluminium from Russian Aluminium ("Rual") at prices fixed by reference to LME prices.    It turnover is said to be in the order of US$55million per month, about half of which is financed by CAI in the manner which I have outlined.

73. When an unusually high number of shipments are to be made, Ansol Guernsey may have to go to other sources of finance.

74. As might be expected, the major component of the cost of raw materials is the price of alumina. Ansol Guernsey buys alumina from suppliers in the market including Transworld (Aluminium) Limited.    In order to support these purchases, it must provide standby letters of credit for the duration of the contract.  At least one of these letters of credit was issued by UBS. UBS would issue an individual letter of credit for each consignment of alumina shipped against a deposit plus Ansol Guernsey's undertaking to replenish its safekeeping account at UBS up to required levels.  UBS also has custody of the Bills of Lading in relation to the consignments.   This undertaking avoids the necessity for Ansol Guernsey to replenish the account, thus tying up its cash.  The availability of this type of arrangement at any given time will depend upon UBS' willingness to accept an undertaking from Ansol Guernsey in place of the cash or other security.

## Has the court got jurisdiction over this claim

75. The Respondents complain that the only connection which this matter has with Guernsey is the fact that Ansol is a Guernsey company. That may be so, but it is enough; provided that there is a cause of action against Ansol Guernsey this court has jurisdiction over that company as of right. The incorporation of Ansol Guernsey came after the fraud began and it is said to follow from that fact that there is no case against it. It is also pointed out that the law governing the obligations between the partners, including those arising out of the Athens Agreement, is not Guernsey law, and this would appear to be prima facie correct, notwithstanding the difficulties in identifying which law does apply. It is not appropriate for the court to embark on a general inquiry into that issue. It is for the Defendants to raise when an Application is made for leave to serve out of the jurisdiction or to set aside such leave. There is no litigation proceeding in any foreign court at all, and no obvious and convenient jurisdiction which readily presents itself as the obvious forum for the resolution of this dispute: see **The Abidin Daver [1984] 1 AC 398 per Lord Diplock at 411.** There are tort claims also, and indeed the primary claim lies in the torts of conspiracy and inducement to breach. Ansol Guernsey and Mr Nazarov are said to be co-conspirators and it is also alleged that Ansol Guernsey procured various breaches by Mr Nazarov of his partnership obligations and of the Athens Agreement . I accept the submissions made by the Respondents that if there is no good arguable case against Ansol Guernsey then this court has no jurisdiction to entertain the case. The only basis upon which

the court would have jurisdiction to entertain the claims against the other Respondents would be if they were necessary or proper parties to a claim against Ansol Guernsey. The claim has no other real connection with this jurisdiction. I also agree with the Respondents that on an Application for permission to serve out of the jurisdiction it would be open to them to invite the court to examine the claims against Mr Nazarov carefully to ensure that the proper limits of this principle were respected. However that Application is not presently before me, may never come before me and I say no more about it.

### Is Guernsey the proper forum for the Resolution of this dispute?

76. This point is really taken for Mr Nazarov's benefit, since it would be difficult for a Guernsey company to say that Guernsey was not an appropriate jurisdiction in which to try a claim arising out of the common law torts of conspiracy and procuring breach of contract. Mr Nazarov has chosen to use Guernsey for one of his corporate vehicles. As the advice given to him by Mr Shusko to which I have already referred shows, he did not do so by accident but because of the real commercial and fiscal advantages which he believed this jurisdiction offered. The investigation of the claim presently made against him is inextricably intertwined with the investigation into the activities of Ansol Guernsey. The Respondents contend that the Applicant must establish that Guernsey is clearly the appropriate forum for the trial of the action. They say that it is not, and that Tadjikistan would be the appropriate forum. In my judgment the Applicant does not, at this early stage, have to satisfy any more stringent

37

test than that set by RCCR 7 which is generally treated as having a similar meaning to RSC Ord. 11. The Applicant does not have to show that Guernsey is clearly and distinctly the most appropriate forum. It only has to show that there is a claim against a Guernsey national and that Mr Nazarov is a necessary and proper party to that claim. All forum points remain open to Mr Nazarov on an Application for leave to serve the proceedings on him out of the jurisdiction, or, such leave having been given, to set it aside. There is no such Application before me.

77. Evidence has been called by both sides on the question of whether Tadjikistan has a fair system of civil law and whether it would be possible for there to be a fair trial of any issues involving TadAz given the importance of TadAz to the national GDP. Authorities have been cited on the question of whether or not it is permissible to compare the procedures of different countries in establishing the appropriate forum, e.g. **Amin Raheed Shipping Corporation v Kuwait Insurance Co Ltd [1984] AC 50.** It seems to me that such evidence and the arguments which accompany it is entirely premature. The issue is whether the Applicant has a good arguable case against Ansol Guernsey, and whether he has a good arguable case that Mr Nazarov is a necessary and proper party to that case. I say nothing about TadAz, for no argument has yet been advanced on the joinder of TadAz.

**Has the Applicant got a good arguable case against Ansol Guernsey?**

78. This is crucial. In my judgment the Applicant does have a good arguable case against Ansol Guernsey.  I have already stated that the Applicant has a good arguable case that his relationship with Mr Nazarov imposed duties of good faith and fair dealing on Mr Nazarov, and that it would be a breach of Mr Nazarov's duties to divert business, business opportunities or aluminium to his private vehicles during the subsistence of the partnership. It would further be a breach of his duties to his partner to prefer his own interests to the interests of the partnership during the course of the winding up,  The Applicant has a good arguable case that Ansol Guernsey knew, when it entered into the exclusive barter agreement with TadAz, that if aluminium was supplied to it, Ansol AG would not have aluminium to sell and Mr Nazarov would be able, if he wished, to avoid his liabilities under the Athens Agreement. It intended that consequence when it entered the barter agreement. It knew that payment to AIAG was entirely dependent on Mr Nazarov's choosing to make it since Ansol AG was not a party to the Athens Agreement. One of Mr Nazarov's more unattractive points is that the reason why Ansol AG has no responsibilities under the Athens Agreement is because he did not have authority to sign on its behalf.  He correctly points out that it was he personally who bound himself to pay off the liabilities, albeit that he was to do so from the proceeds of sale of aluminium received by Ansol AG. On the true construction of this agreement, therefore, taking his point about authority into account, he bound himself to procure the payment of the

39

liabilities by Ansol AG. Ansol Guernsey helped him to avoid that liability. As to the specific causes of action relied upon, there are many different variations in the pleading and I do not think it necessary to cover each one. Suffice it to say that the Applicant has demonstrated a good arguable case in at least the following respects:

79. **Conspiracy.** The allegation is that Ansol Guernsey and Mr Nazarov, with others, wrongfully and with intent to injure the Applicant by unlawful means conspired to defraud the Applicant and to conceal the fraud from him. The allegations are of an unlawful means conspiracy. Ansol Guernsey entered into trading agreements with TadAz, knowing, because Mr Nazarov's knowledge was its knowledge, that in doing so it was putting aluminium out of the reach of Ansol AG and thus enabling Mr Nazarov to say that there were no proceeds of sale out of which he was obliged to discharge the debt under the Athens Agreement.

80. Can there be a conspiracy between Ansol and Mr Nazarov, its controller? Were the charge to be one of criminal conspiracy, it could not stand: **R v McDonnell [1966] 1 QB 233** approved by the Court of Appeal in **A-G's Reference (No 2 of 1982) 1 QB 624.** In Massachusetts, New South Wales and Canada, the Respondents contend that the position appears to be the same in cases of civil conspiracy: cf **Goulart v Transatlantic Marine Inc v Enos [1970] 2 Lloyds Rep 389; United Breweries v Tooth & Co Ltd (1986) NSW Lexis 6882; 347202 BC Ltd v Canadian Imperial Bank of Commerce [1995] ACWSJ 75928.** However in Ireland, the court did not extend the McDonnell principle to a case of civil conspiracy in **Taylor v**

40

Smyth [1991] IR 142, where McCarthy J held that a company could conspire with the individual who controlled it. It may be that perfect accuracy requires it to be said that in this case persons supplied by Chandler Backer control Ansol Guernsey and, in relation to Ansol Guernsey, Mr Nazarov controls them. In addition, it appears that a power of attorney has been given to a Mr Gabrielan in Moscow, who runs the office and therefore has some sphere of authority, however limited that may be.

81. In England, it has been held in **Belmont Finance Corporation v Williams Furniture Limited No 2 [1980] 1 All ER 393 CA** that a company could conspire with its directors, because the company had a separate legal personality. This was so notwithstanding the fact that the court might have to look to the knowledge of the controller of the company for the company's knowledge.

82. No express agreement need be proved, tacit co-operation is sufficient, so long as all parties to the conspiracy are aware of the surrounding circumstances and share the same object: **Kuwait Oil Tanker Co SAK v Al Badder (unrep) 16th November 1998**. Thus it is sufficient that Mr Nazarov, as the guiding mind of Ansol Guernsey, knew what was going on and he intended that the company should participate in what he planned to do.

83. It is not necessary for all the conspirators to have joined the conspiracy at the same time. The conspiracy can have begun before the formation of Ansol Guernsey; upon its creation and activation, Ansol Guernsey joins the

41

conspiracy. This may, however, mean that it is only liable for losses suffered after it joined the conspiracy.

84. Nor is it necessary for every participant to have taken part in every act, so long as what they are alleged to have done or failed to do falls within the overall scope of the common design: Kuwait Oil Tanker [2000] 2 All ER (Comm.) 271.

85. It has long been the law that fraud, breach of contract and combinations to commit tortious acts can be the basis for allegations of unlawful means: see Crofter Handwoven Harris Tweed Co v Veitch [1942] AC 435 at 432; Rookes v Barnard [1964] AC 1129.

86. The intent to injure need not be the predominant purpose of the conspiracy.

87. The law of conspiracy in Guernsey is the same as the law in England: International Hellenic Operations Limited v Silver Falcon; Guernsey CA 20th October 1994.

88. I am entitled to assume, for present purposes, that Guernsey law is applicable to the alleged conspiracy or, if foreign law is applicable, in the absence of evidence about what system of law is applicable and what it provides, to assume that it is the same as Guernsey law.

89. What was the role of Ansol Guernsey in the conspiracy? Ansol Guernsey, it is said, was instrumental in Mr Nazarov's breaches of the Athens Agreement. It entered the long-term barter agreement with TadAz. Ansol Guernsey co-operated with with Mr Nazarov and TadAz to ensure that TadAz did not repay its debts to the partnership save by direction of Mr

Nazarov. It knew, when it entered the contracts with TadAz, that the aluminium would be supplied to it instead of being supplied to Ansol AG. When it entered into the agreements with TadAz it knew that Mr Nazarov intended that the contracts it was signing should be a means of diverting aluminium from Ansol AG, the entity which the Applicant knew about. It knew that Mr Nazarov was diverting aluminium from Ansol AG so that he could say that Ansol AG had only got such proceeds of sale as it suited him to disclose, and thus avoid the proper performance of his liabilities under the Athens Agreement. It helped him to do that. The Applicant has a good arguable case on all these points. I do not accept the argument that once the partnership was terminated Mr Nazarov was free to pursue his own interests as he saw fit. The Athens agreement was his personal obligation to his former partner and he owed a continuing duty of good faith to the Applicant in relation to all matters to do with the winding up of the partnership or joint venture. Moreover, it is common ground that there was never any prospect of TadAz paying the debt with money. TadAz pays its debts in aluminium; it enters into barter contracts. If TadAz was to pay the debt which it owed the former partners that repayment was only ever going to come from the sale of finished aluminium. Mr Nazarov knew, and Ansol Guernsey knew, that if they tied up all TadAz's aluminium production, it would be unable to pay AIAG. The Applicant would have no means of controlling repayment of his share of the debt and would suffer loss. Mr Nazarov would continue to

have control of the aluminium produced by TadAz and could make further profits out of the TadAz relationship.

90. I accept the Respondents' submissions that allegations about allegedly secret profits made by Mr Nazarov should not be taken into account. I have ignored them.

91. **Procuring breach of contract.** One who knows of the existence of the right of another but does an act which impairs or destroys that right, commits the tort of inducing a breach of contract. It is sufficient if there is some deliberate conduct by a defendant who appreciates or is reckless as to the probable consequences to the person injured. Procurement or inducing is not necessary, though often present. It is sufficient if the defendant deliberately engages in dealings inconsistent with the contract: see **Clerk & Lindsell on Torts, 18th edn, para 24-49.** Thus by deliberately entering into the barter contract with TadAz, Ansol Guernsey did an act which it knew to be inconsistent with the Applicant's right to have the Athens Agreement performed.

92. **Locus.** Has the Applicant any real right to bring the claim? There is a dispute over the question of whether the use of a corporate vehicle to carry out the partnership or joint venture business prevents the Applicant from claiming in his own name. He argues, supported by evidence from his Liechtenstein lawyers, that he is entitled to sue. This is disputed by the Respondents, whose own Liechtenstein lawyers have produced evidence to the opposite effect. However the Applicant also says that the

44

partnership survived the interposition of the company, and in any event the Athens Agreement was a contract to which he was a personal party. Although this is by no means the strongest part of the Applicant's case, I am satisfied that he has shown that he has a good arguable case on locus.

93. The Applicant says that the conspiracy has led to him suffering a loss of US$51 million. Mr Mazur, his witness, originally calculated the total debt of TadAz to AA/AIAG as US $127,704,481. A 40% share of that figure is US $51 million odd. Mr Mazur admits that this does not take account of expense, which would reduce it, or of interest, which would increase it. Thus it would have been plain to the Bailiff that this was not an exact figure. I shall say more about quantum later. The point is taken that the claim for loss is merely a reflection of the loss suffered by AA/AIAG. In **Johnson v Gore Wood & Co [2001] 1 All ER 481 HL**, Lord Bingham of Cornhill, who delivered the leading speech, re-iterated the principle of corporate autonomy and reminded courts to be vigilant in their scrutiny of pleadings to ensure that claims by shareholders were only brought for losses separate and distinct from the losses suffered by the company. In the present case, TadAz owes a debt to AIAG, for the recovery of which the company alone is entitled to sue. The Applicant has, as I have already found, a good arguable case that Mr Nazarov owed him continuing duties of good faith and fair dealing despite the use of the corporate vehicle. He seeks to sue, not for recovery of the TadAz debt, which is unaffected by his claim, but for the loss which he claims to have suffered as a result of the

45

-

wrongful acts which led to the termination of the partnership and the failure to perform the Athens Agreement; further, since the Athens Agreement was a contract to which AIAG and TadAz were not parties, non-performance would not be actionable at the suit of AIAG; a fortiori from any tortious procuring of such breaches. Nor is it alleged that AIAG was the victim of the conspiracy pleaded.

94. The Applicant can allege that he has suffered loss because his partnership with Mr Nazarov came to an end as a result of the latter's wrongful acts. He can allege that he has suffered loss because the Athens Agreement was not performed.    He can allege that he has suffered loss because the Respondents have diverted the barter contract away from Ansol AG to themselves. It seems likely that had Mr Nazarov not diverted aluminium to Ansol AG and kept the Applicant in the dark not only could aluminium have been available to satisfy AA/AIAG and the Athens Agreement, but the partnership might not have ended when it did.    Would aluminium have been supplied to AA/AIAG after the 1997 agreement ended?    The relevant history shows that TadAz enters into agreements to supply aluminium with whichever Ansol entity Mr Nazarov puts forward.    Had he been willing to extend Ansol BVI's or Ansol AG's contracts, I think there is a very strong case for saying that TadAz would not have objected. Had Mr Nazarov and Ansol Guernsey not entered into the 5-year contract with TadAz, it could well have been available to Ansol AG.

95. **Double actionability.**    The Respondents say that in order for the conspiracy to be actionable at all in Guernsey, the test of double actionability set out at **Dicey & Morris 12th Edn rule 203** must be satisfied. Although the law in England has changed since that Edition was published, it has not changed in Guernsey.    Under this rule, it is argued, the conspiracy must be actionable as a tort both according to Guernsey law and also according to the law of the foreign country where the tort took place.    The authority relied upon by the Respondents is **Kuwait Oil Tanker Co SAK v Al Bader [200] 2 All ER (Comm.) 271.** The first thing which I say about that case is that it is an appeal from a judgment after a full trial of the action, which had taken place in front of Moore-Bick J with witnesses. Thus the conclusions reached by the Judge were arrived at after hearing all the evidence.    The claim was for conspiracy to injure by unlawful means. The essence of the tort is injury to the claimant as a result of the unlawful act or acts where two or more people have combined to cause that injury.  The Defendants pleaded that the acts complained of as giving rise to their liability took place (or largely took place) in Kuwait and that Kuwaiti law was the law applicable to the tort.  Since Kuwaiti law contains no tort of conspiracy, the action failed the test of double actionability.    The rule is that generally a tort committed in a foreign country is generally only actionable in Guernsey if it is also actionable in that foreign country.  However, a particular issue between the parties may nonetheless be governed by the law of the country which, with respect to

47

that issue, has the most significant relationship with the occurrence and the parties. It is to be noted that it is not necessary for the foreign country to treat the tort in the same way, or even to recognise the same cause of action, so long as there is a right of recovery by civil action for the consequences of the same acts. Nourse LJ, delivering the judgment of the Court of Appeal, expressly approved the manner in which the Claimants had proceeded: they pleaded their case in conspiracy, without reference to the law of Kuwait, it being their case that English law applied. The Defendants pleaded that the proper law of the tort was Kuwaiti law and that the tort of conspiracy was not actionable in Kuwait. The Claimants then responded with their case on the relevant provisions of the Kuwaiti Civil Code. As the Judge had himself remarked, the Claimant was entitled to rely on the presumption that foreign law is the same as English law until the contrary is proved. It was for the Defendant to raise questions of foreign law, and if he chose not to do so, the case would be disposed of without reference to foreign law. The Court of Appeal stated that the burden lies on the Defendant to plead and prove that foreign law applies to the tort and that his conduct is not actionable under that law. In my judgment, therefore, the Applicant does not have to prove that his claim is actionable under the law of any other jurisdiction. It is for the Respondents, in due course, to plead and prove that a foreign law applies and that this claim is not actionable under that foreign law.

Should the freezing order be discharged for material non-disclosure ?

96. Plainly, the Applicant had a duty to the court to disclose all material facts:
see Brinks Mat Ltd v Elcombe [1998] 1 WLR 1350 at 1356; Thompson v
Thompson (1996) 22 GLJ 82; Hume v Matheson Securities (Channel
Islands) Ltd (1997) 24 GLJ 60 at 72-73. From these cases, I discern the
following principles:

    a. The court must be kept informed about any matters which may
influence the exercise of its discretion. Advisers who are unsure of
whether to include or exclude material are duty bound to err on the
side of inclusion. A high degree of candour is required;

    b. Applicants and their advisers must carry out proper inquiries with a
view to ascertaining the correct facts;

    c. They must make sure that Applications are carefully prepared;

    d. Innocent non-disclosure is treated more leniently than deliberate
non-disclosure: See ABCI v BFT [1996] 1 LL Rep 485 at 490;

    e. It is the duty of the Applicant to make full and fair disclosure of all
the material facts;

    f. Materiality is not a matter to be assessed by the Applicant or his
advisers but by the court;

    g. If material non-disclosure is established the court will be astute to
ensure that an Applicant who obtains an injunction without proper
disclosure is deprived of any advantage which he may have derived
by the breach of duty;

h. Whether the fact not disclosed is sufficiently material to justify discharge of the order without examination of the merits depends on the importance of the fact to the issues which were to be decided by the Judge on the Application;

i. The injunction will not be discharged in every case. The Judge retains a discretion to continue or re-grant the order. This is particularly so where the court would, even if there had been full disclosure, have granted an injunction, or if the punishment would be out of all proportion to the offence.

97. The Respondents say that there was substantial non disclosure in this case and that it falls into 4 categories:

a. Allegations which the Applicant must have known to be false:

i. In the affidavit used before the Bailiff, the Applicant gave the impression that the supply of aluminium to AIAG had simply dried up in April 1998. However, he did know that metal would no longer be released to UEB., because he had received the fax of 25th March 1998. I accept that the omission of any reference to this fax in the affidavit was a serious, if inadvertent, error. The Applicant says that he only saw the translation of the document "late in the day", a rather imprecise term given the seriousness of the matter, and the history of supplying contemporaneous translations with Russian documents to which Mr Nazarov refers. With

some caution, at paragraph 97 of his second affidavit, the Applicant says that he did not accept that metal should be diverted to "unknown third parties".

ii. the Bailiff was told that Mr Nazarov had done nothing at all to fulfil his side of the June 1998 bargain: see paragraph 95 of the draft affidavit which was before the Bailiff. However critical the Applicant feels entitled to be about the conduct of Mr Nazarov, this statement was simply wrong. Two points were relied upon:

1. the US $1 million to which I have referred above had not been paid. As the Applicant deposes in his second affidavit at paragraph 105, this was a mistake. Yet a letter showing that US $1million had been paid was in the bundle, dated September 14th 1998 and originally marked for his attention. What adds to the impression of lack of care is that it is obvious to any reader of the letter that it actually assists the Applicant, because it gives the impression that Ansol AG was still trading. It seems to me that the Applicant is personally responsible for having failed to go through his evidence with sufficient care.

2. The draft affidavit also said that a payment of $200,000 which Mr Nazarov agreed to ensure would be repaid

51

to the Applicant personally in respect of his expenses had not been made. As I have mentioned, this was corrected in submissions. In the sworn version it was accepted that the payment had been made.

b. Failing to disclose material documents.

i. A number of faxes and letters are relied upon as showing that the Applicant gave the Bailiff a false impression about whether or not the Vardinoyannis family had provided all the funding which they were obliged to provide: see, for example, a fax from Mr Nazarov to the Applicant dated 19th February 1998 in which he urges the Applicant to produce more funds as TadAz is in a desperate financial position; a fax from Mr Nazarov to Vardis dated 4th March 1998 to similar effect, imploring the Applicant to provide longer – term investment and insisting that that sales of aluminium should be taken over by the Nazarov side of the joint venture. In my judgment, the Bailiff would have clearly understood, from the affidavit, that the Vardinoyannis family had not provided long-term investment, although doing so had been discussed and the need for such finance was frequently stated by Mr Nazarov to be an urgent priority. Had there been a suggestion that the Vardinoyannis family had failed to provide adequate ordinary working capital I

would take a different view, but that is not what emerges from the evidence presently before me.

    ii.  Correspondence between Mr Nazarov and UEB evidencing a bona fide dispute. In the light of the matters deposed to at paragraph 99 of the draft affidavit of the Applicant, from which it is quite clear that the Bailiff was told that Mr Nazarov had corresponded with UEB to dispute the amount said to be outstanding, I do not accept that any failure to draw particular attention to the correspondence at the hearing created a false impression.

c.  Failure to draw the Bailiff's attention to relevant parts of material documents which were in the evidence before the court. Four particular examples are relied upon:

    i.  The Applicant did not refer to the letter dated 25th March 1998. This is the letter, or fax, sent by Mr Nazarov to the Applicant informing him that no further aluminium would be consigned to UEB since inadequate information had been received about the operation of the credit facility, and requesting a meeting in Athens to discuss the way forward with prospective new funders. I do treat this omission from the affidavit as serious. The Bailiff should not simply have been told that the supply had dried up in April 1998 as if there had been no previous warning of a change in the way

in which the aluminium was to be received. I accept that at the end of the day the Applicant still has a strong arguable case that what Mr Nazarov actually did was wrongful. That is not the point.

ii.  He omitted to mention the significance of the letter dated 3rd June 1998 . That is the letter from the Applicant to Mr Nazarov referring to their discussions in Paris and pressing Mr Nazarov for repayment of the UEB overdraft out of the proceeds of sale of metal which, the Applicant appeared to believe, Mr Nazarov was receiving himself; secondly, Mr Nazarov was to have provided information about how the joint venture was to continue, given that Mr Nazarov had taken control of all metal sales and purchasing of raw materials and third, Mr Nazarov was to have presented a plan for the further investment which was to provide the basis of a discussion with the head of the family, Vardis Vardinoyannis .  The letter ends with an inquiry as to whether Mr Nazarov really does intend to continue the venture and stating that the writer has reached the point where he needs to come to final terms. I do not accept this criticism. The Applicant does  refer to these matters at paragraph 87 of the draft affidavit. In paragraphs 86 and 87

he deals with the discussion at the meeting which the letter merely repeats.

iii. He did not refer to a letter of 2nd April 1998. This is a fax cover sheet from the Applicant to Mr Nazarov enclosing a copy of a letter which the Applicant had sent to Mr Ermatov, seeking to reassure Mr Ermatov that it was "business as usual" notwithstanding the fact that he and Mr Nazarov were in discussions with third parties about new funding. In my judgment this letter cannot be taken in isolation from the letter of 25th March 1998 which preceded it by a few days. The two are obviously linked in some way, as appears from the fax cover sheet to Mr Nazarov. Whether the Applicant chose to send the letter to Mr Ermatov in the hope of getting information from him, or whether it was sent to protect the Applicant's position vis a vis TadAz, I cannot say. I have noted that a question has been raised by Mr Ermatov as to whether or not he actually received this fax, and the Applicant says that faxes for TadAz were usually sent via Mr Nazarov's Moscow office. I propose to focus such criticism as I make on the omission of any reference to the 25th March fax, rather than this one and the consequences, as I see them, of that omission.

55

d. He failed to draw attention to the few pieces of UEB correspondence which were exhibited. This point adds little to the criticism made by the Respondents of the Applicant's failure, as they see it, to draw sufficient attention to the fact that UEB knew about Ansol Guernsey in 1999 and also to the fact that Mr Nazarov had corresponded with UEB about the state of the AA/AIAG indebtedness.

e. He misrepresented the true position in certain important respects. Six specific instances are cited:

  i. At paragraph 75 of his first affidavit he asserted that all monies requested had been paid. At paragraph 48 of Mr Nazarov's first affidavit he says this is not the case. This complaint is linked with the complaint in the next sub-paragraph. I do not accept that the Applicant misrepresented the position about this matter in his draft affidavit. There is a distinction here which the submission glosses over. It is clear that there were talks about the Vardinoyannis family making a longer-term capital investment in the plant; indeed at one stage they were interested in participating in its privatisation. But even Mr Nazarov, in his on evidence, accepts that the talks about longer term investment never came to anything and there is no evidence of any commitment being made still less of any breach of a commitment. On the other hand, they did arrange the UEB credit facility in the amounts required

for ordinary working capital from time to time, despite increasing concerns over whether the goods claimed to have been purchased out of the Moscow office had in fact been purchased or reached the plant. As I read the affidavit which was before the Bailiff, this distinction would have been clear to him, as it is to me.

ii. It is said that paragraph 75 of the Applicant's first affidavit would have given the Bailiff the impression that the Vardinoyannis family had put their hands in their own pockets for US $300 million to fund TadAz. I do not think that it would, as it certainly did not give me that impression when I read the draft affidavit.   The paragraph in question reports what the Applicant told Mr Nazarov at a meeting in Athens on February 23rd 1998 at which there were some mutual recriminations. The evidence before me suggests that Mr Nazarov did not challenge that statement at the meeting in the context in which it was made.  It is clear to me, at any rate, that this was an ongoing credit facility and not a single drawdown.  The total value of raw materials supplied, taxes and creditors paid and plant repairs and upgrades paid for is indeed alleged to be in the order of US $300 million,  as the Applicant confirms in his second affidavit.  In any event, one must always bear in mind that the Vardinoyannis family had

guaranteed the facility and if there was any default they would be personally liable. Thus they were exposed in a very real sense for a very considerable amount of money. That over the life of the partnership something like this figure had been provided is supported elsewhere in the evidence before the Bailiff, where the Applicant deposes to the fact that AA had supplied raw materials to the value of US$209 million and made other payments to or for TadAz's benefit totalling US$60.75 million. These figures can be seen in a schedule produced by Mr Nazarov's company Ansol BVI, by Anna Osadtchaya, and dated 27th August 1997. Thus the Bailiff would have been able to set this point in its proper context.

iii. Concerning the UEB repayments : It is argued that the impression was given to the Bailiff that the repayment of the overdraft facility at UEB was all the doing of the Vardinoyannis family; but documents not drawn to the Bailiff's attention showed that Mr Nazarov had himself been in communication with UEB. He had written to UEB as recently as 30th November 2000, on the headed paper of Ansol AG, which was no longer the trading entity, referring to earlier correspondence and asking for information about the state of the account with UEB. The gist of the complaint

made by Mr Nazarov is not very clear from the letter but it appears to be that he was by no means sure that the bank was keeping separate the indebtedness of AIAG and Metalcor AG, for which he was not liable.   The Applicant had, in fact, deposed to an agreement in May 1999 between AIAG, Ansol AG, Metalcor and UEB regarding the liability to UEB, which at that time was a little over US$4.2 million.  In the summer of 2000, the affidavit makes clear that Mr Nazarov was contending that the indebtedness was only about US $2.4 million, by virtue of releases of metal made to UEB "on behalf of AG" amounting to US $1.8 million .  It is said that the Bailiff's attention was not drawn to the letter itself but in my judgment the affidavit is clear: Mr Nazarov was disputing figures supplied in relation to the account under discussion in the correspondence, asserting that sufficient aluminium had been delivered to reduce the amount to US $2.4 million odd, but that the overdraft was still subsisting. Mr Nazarov contends that he has procured the making of substantial payments to UEB, totalling some US $18 million against an overdraft of US $45 million.  He complains that he has not had clear statements from the bank that more liabilities were run through the account by the Applicant.

iv. About the involvement of Vardis Vardinoyannis in AA : reliance was placed on what were said to be inaccuracies in affidavits sworn in relation to litigation called the Woralco litigation. The Applicant denies any inaccuracy and I do not consider this complaint to be made out or material.

v. About the audit: the Bailiff was told that the Applicant had experienced difficulties with regard to the audit and that the Applicant's case was that Mr Nazarov was not co-operating in the audit. Complaint is made that the Bailiff's attention was not specifically drawn to a letter dated 27th June 1997 sent by the Applicant to Mr Nazarov thanking him for the co-operation which had been given to Brett Heenan, who was at that time an advisor to the Vardinoyannis family engaged in a study about the workings of the TadAz operation. This complaint is completely irrelevant. The letter is referring to a quite different exercise from the audit, which was to take place starting in 1998. In fact, in an affidavit sworn by Brett Heenan which was before me but not before the Bailiff, he makes very clear that even during the earlier exercise he had difficulties in obtaining proper information from Mr Nazarov despite his personal advantages in being a Russian speaker and thus able to communicate with Mr Nazarov directly. I do not accept that the Applicant should be penalised for

60

having thanked Mr Nazarov for seeing Mr Heenan and giving him assistance at the outset of his inquiries in 1997 even if the inquiries ultimately did not prove fruitful.

vi. as regards dividend payments and his active agreement as to the manner in which they should be paid: there is evidence of the payment of dividends and active agreement to that course in the affidavit which was before the Bailiff. Indeed, the Applicant explains how invoices were used, ostensibly for raw materials but coded "D" for "dividend", to get round the restrictions imposed by UEB; however, he says, UEB did come to know of this practice and condoned it. Both Mr Nazarov and the Applicant engaged in this practice and I shall say no more about it.

vii. About the meeting of 18th March and the relevance of the date of 19th March . This criticism might be valid were the Respondents able to show that the Applicant was aware of their case prior to making the application to the Bailiff. I do not understand that to be so.

98. I have therefore, accepted that serious criticism may be made of the Applicant having told the Bailiff that Mr Nazarov had done nothing at all (although I bear in mind the last minute correction at the hearing) to perform his obligations under the Athens Agreement, and of the omission

61

to refer to the fax of 25th March 1998 whilst relying on the 2nd April fax to
Mr Ermatov.

99. How seriously should I view this non-disclosure?  The Applicant says that
any non-disclosure was inadvertent.   I accept that.  But the Applicant
failed to read his own affidavit with sufficient care.  Had he done so, he
would have spotted the errors in relation to the payments.  Had he read
the exhibit to his own affidavit, he would have seen the document showing
that the US$ 1 million had in fact been paid.   He would probably have
remembered that he had in fact received US $200,000.  Careful preparation
is essential to applications made without notice.   I do not think that it
would be right to ignore the fact that the Applicant sought a draconian
order of the type made in this case without having read his own affidavit
with the greatest care.   It is not as if the Application was prepared in a
great rush: time was taken to conduct an investigation and put the
Application together.

100.   As to the treatment, or omission to deal with, the 25th March fax, I find
it extraordinary that this was glossed over.  I accept that there was no
intention to mislead, but given that the fax was in the bundle it should
have been noticed by the Applicant or his advisers, and explained, not
ignored.

101.   I find, therefore, that circumstances have arisen in which it is right for
me to consider whether or not I should exercise my discretion to discharge
the freezing order  for material non-disclosure.  It is within my discretion

to refuse to discharge the freezing order or to discharge it and re-grant it:
Lloyds Bowmaker Ltd v Britannia Arrow Holdings plc [1988] 1 WLR 1337
at 1343H-1344A.

102.    Would the Bailiff have made a different order had these matters been
dealt with properly?  I think not.  After careful thought I have come to the
conclusion that justice can be better served by refusing to discharge the
order but making a special order for costs, and I will hear submissions on
that after judgment.   Subject to submissions, I would be minded to
disallow the costs of the hearing on 4th April, and part of the costs of
preparation , as a proportionate means of expressing the court's
disapproval of what happened.

103.    I should also consider the point made by the Respondents about the
delay in making the application for the freezing order.  The Applicant was
aware that supplies of aluminium from TadAz had dried up for a long
time before he applied to this court. He became suspicious of Mr Nazarov,
he says, in 1999, but he did not order an investigation until July 2000.  Nor,
it is said, is there any explanation for the delay from October 2000 until the
Application in April 2000.  The Applicant does give an explanation of this
delay.  He states, in the affidavit which was before the Bailiff, that he
believed that it would be better to carry on negotiating with Mr Nazarov
rather than to sue him, for some time, and thought this would be a better
way of securing payment.  When he began the investigation in the summer
of 2000, there were very large quantities of documents to be read and he
became aware of Ansol Guernsey via some UEB documents which he saw

in October 2000. The Respondents produced a small bundle of UEB documents during the hearing. It is clear from this bundle that UEB was receiving correspondence from Ansol Guernsey at various times during 1999. The Applicant says that he was unaware of this until he obtained documents from UEB in October 2000. I should say that the Respondents also rely on this correspondence with UEB as evidence supporting their claim that they did not do anything secretly. The Applicant also had to investigate whether it would be better to commence proceedings in Liechtenstein. I accept this explanation. I understand that there was also some delay in serving the order, but this matter was not pressed before me in any detail.

104.    Should the order be discharged if the Applicant has exaggerated his claim? There is copious evidence on quantum, and a considerable dispute, thus making it impossible to decide, without the trial of a number of factual issues, if at all, the final figure for the indebtedness of TadAz to the partnership. The limit sought and granted in the freezing order was $55million. The Applicant puts his losses from the conduct of the Respondents at US$51 million It is pointed out by the Respondents that this fails to give credit for the liabilities and expenses which AIAG would have incurred. An attempt to reconcile the figures has been made by Mr Mazur, for the Applicant and Mr Creed and Mr Gemmell for the Respondents, in their reports. I will take account of the fact that in his

second affirmation Mr Mazur reduces the amount of the alleged debt to US $119,225,417 for various accounting errors. 40 % of that is US$47.6 million.

105.    The Applicant claims to be entitled to add to that the amount owed to UEB and guaranteed by his uncle. The basis for that is not apparent to me and I will not take it into account.    In his supplemental report dated 20th July 2001, Mr Creed appears to accept that UEB were owed US $3 million by AIAG at the end of 1998.

106.    After the hearing had ended, I indicated that I would accept a final submission from the parties by way of reply.    The Respondents have sought to include further evidence from Mr  Creed in their submissions. Both parties have sent me a steady flow of additional materials , both authorities and evidence.  Some of it is not referred to in skeletons, and I am not given any information about why it has been supplied to me: the two lengthy transcripts, which I have not been asked to read, are a case in point.    The liberty which I gave has been exceeded.    Much of it is peripheral and much of it is more suitable for trial than for the present exercise. Much of it is disputed, and I am in no position to resolve the disputes, nor is it my function as this interim stage.

### Dissipation

107.    The Respondents say that there is no evidence of risk of dissipation. The only case made by the Applicant on dissipation is, they say, the allegation of fraud.    If there is a good arguable case that the Respondents have acted fraudulently, and acting together to divert aluminium to the

sole control of Mr Nazarov at a time when a substantial debt was owed to the partnership would be such a claim in my judgment, then it is unnecessary for there to be other evidence of dissipation. Indeed, the case can be said to be about dissipation, in one sense. Bearing in mind what happened after the Athens Agreement, I take the view that there is a risk that the right to receive aluminium from TadAz would once again be moved were the injunction not in place. Indeed, it may be necessary for the Respondents' advisers to explain the effect of the injunction with particular care to these Respondents: I note from the second affidavit of Mr Shusko in the English proceedings, dated 2nd May, the rather disturbing comment at paragraph 19 that there may "come a point at which Ansol has to assign its rights under its various contracts to other parties in order to keep TadAz operating while the injunctions are in force". Without really knowing what Mr Shusko meant by that sentence, suffice it to say that any assignment by Ansol Guernsey of its rights under the barter agreement  would be vulnerable to attack as a breach of the court's order.

### Balance of convenience

108.    The Respondents invite me to decline to make or continue a freezing order on the grounds that the order is disruptive to Ansol Guernsey's trade. The evidence relied upon was for the most part put before the court prior to the agreement between the parties which led to the Order of 28th June to which I refer in paragraph 15 above and which was designed to create, on an agreed basis, a more flexible arrangement allowing Ansol

Guernsey to continue ordinary trading operations. Of course there is no order against TadAz, which remains free to raise finance in the market if it can. I do not doubt that TadAz finds this very difficult, but that is because of its parlous financial circumstances, not because of the order of this court. TadAz's expressed priorities are to pay current suppliers first, leaving existing creditors unpaid until a surplus is achieved. The evidence discloses that in all the years which are material to this dispute TadAz has never achieved a surplus. So there is little, if any, prospect of TadAz paying its debts to AIAG. However, large profits are being made, out of the aluminium trade with TadAz, but by Ansol Guernsey, not TadAz. Ansol Guernsey's accounts for the year ended 31st March 2000 show a gross profit of US $38.2 million and a retained profit for the year of US $27 million. Between 1st April 1999 and 31st March 2000 it made a loan of US $19.6 million to another Nazarov company, Ansol Capital Limited, on an informal basis and paid out nearly US$4.5 million in dividends. The Respondents invite me to discount the apparent profitability of the company on the grounds that the profits are all on paper. I do not see how that can be right, given the loan and the dividends. If the only profits left are paper ones, that is because the money has been stripped out by Mr Nazarov or at his direction.

109.  So far as I know, the new scheme for approving payments in the ordinary course of business has worked well and the only Application which has been made to the court concerned a proposed advance to build a

sports centre, which could hardly be justified as expenditure in the ordinary course of business. Doubtless, as Mr Shusko has deposed since the making of that consent order, there are obstacles in the way of Ansol Guernsey raising new finance to provide for projects of expansion or reconstruction. In my judgment the balance of convenience lies in continuing the injunction to hold the ring and avoid the risk of further movements in the contractual rights., rendering any action against Ansol Guernsey nugatory.

### Fortification

110.    It is said that the Applicant has no assets in Guernsey to support the cross-undertaking in damages. No detailed submissions were made on this Application. Sensibly, it was decided to leave those submissions until after this judgment. I shall hear submissions on fortification.

### Disclosure

111.    Should there be disclosure as ordered by the Bailiff on 4th April or in some other, modified form?

112.    Disclosure before the time has come for trial is always an intrusion into the affairs of the party who has to give it. But disclosure to enable an injunction to be made effective is sometimes a necessary evil and is a tool which is available to the court notwithstanding a challenge to jurisdiction: see **Grupo Torras SA v Sheikh Fahad (unrep) 16th February 1994 CA.**

113.    In Guernsey, no general pre-action discovery order may be made: see **Silver Falcon Enterprises Limited v International Technology Operations Limited [1994] 17 GLJ 42.** However as I read that case, it does not stand

68

for the proposition that disclosure cannot be ordered in support of a freezing order. On the contrary, in endorsing the submission that the court can and does in proper cases make disclosure orders in support of arrest, it suggests that it can. To my mind, if the Guernsey court has power to grant freezing orders, and undoubtedly it does, it must be able to police those orders adequately.

114. The discretion to grant such disclosure should be sparingly exercised; it does not automatically follow from the grant of a freezing order: see **Bekhor v Bilton [1981] 2 All ER 565.** It is said that the current form of the order goes beyond the standard form order and amounts to a fishing expedition. That is not permitted. The Respondents have asked for a hearing on the form of that order and of course they shall have it.

**OSSEIRAN v. INTERNATIONAL FINANCE CORPORATION**
**No. 06-cv-366 (D.D.C)**

**ANNEXE 2 TO THE**
**SECOND AFFIDAVIT OF MARK GIDEON ANDREW DUNSTER**

JOHN PHILIP GREENFIELD
ADVOCATE AND NOTARY PUBLIC
7 NEW STREET
GUERNSEY

9



Neutral Citation No: [2005] EWHC 405 (Ch)

Case No:HC 04 C 0226

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand
London WC2A 2LL

Friday, March 18, 2005

Before
**MR JUSTICE LAWRENCE COLLINS**

Between

**NABB BROTHERS LIMITED**

Claimant

and

**LLOYDS BANK INTERNATIONAL (GUERNSEY) LIMITED**

Defendant

# Approved Judgment

Mr Louis Flannery (of Howes Percival) for the Defendant/Applicant

Miss Rosana Bailey (instructed by Cedars & Co) for the Claimant/Respondent

---

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic

..............................................................
(Mr Justice Lawrence Collins).

**Mr Justice Lawrence Collins:**

## I    Parties and background

1.    This is an application to set aside an order for service out of the jurisdiction in proceedings commenced by NABB Brothers Ltd ("the claimant"), which was incorporated in Ghana in 1969, and carries on business as an importer and exporter of rice, foodstuffs, biscuits, coffee and agricultural products, and is also involved in estate development.

2.    In about 1959 Mr Kwabena Ntem, Mr Daniel Kwabena Brifo, Mr Wilson Kofi Brifo, and Mr Joseph Ernest Kwabena Ansah ("Mr Ansah") formed a partnership known as NABB Brothers.   The partnership was based in Kumasi in Ghana   In 1969 the partners took the view that the partnership should become an incorporated limited company, and NABB Brothers Ltd was incorporated in September 1969.  Mr Ansah became the Managing Director, and remained so until his death in 2000.

3.    Mr Kwabena Ntem, Mr Daniel Kwabena Brifo and Mr Wilson Kofi Brifo are brothers.  Mr. Ansah was a cousin of the brothers.   Mr Ansah died in London on July 6, 2000.

4.    The defendant is a professional trustee.   On May 16, 1997 it changed its name to Lloyds Private Banking (Guernsey) Ltd and on September 24, 1999 there was a further change of name to Lloyds TSB Offshore Private Banking (Guernsey) Ltd. Pursuant to the Migration of Companies Ordinance 1997 and Companies (Jersey) Law 1991, the defendant became a company under the Companies (Jersey) Law 1991, and ceased to be a company under Guernsey law with effect from January 1, 2004. Trusts administered by the defendant have been transferred to Hill Samuel Offshore Trust Company Ltd ("Hill Samuel") under Jersey law.   On March 5, 2004 the winding-up of the defendant commenced, when a special resolution of the defendant was passed pursuant to Article 146 of the Companies (Jersey) Law 1991.  But it will not be dissolved pending the outcome of this claim, and it has been agreed that nothing turns in this action on the transfer.  Some of the correspondence in this matter has been conducted by Hill Samuel, but for convenience I shall refer to it as correspondence by the defendant.

5.    On April 20, 1994 Mr Ansah established a settlement called the Tubuoh Trust ("the Trust"), with the defendant as trustee.  By clause 2 the settlement was established under Guernsey law, which was to be "the forum for the administration thereof".  The Trust was a discretionary trust, and the beneficiaries were Mr Ansah, his wife (Vida Abrokwah), Sarah Osei, the children and remoter issue of Mr Ansah, the sisters and sisters-in-law of Mr Ansah and their issue, Isaac Kojo Ansah, John Kwaku Ansah, the cousins of Mr Ansah, and the Methodist Church at Atonsu.

## II    The claim

6.    According to the claimant, in order to facilitate international and/or other transactions, Mr Ansah made use of bank accounts which were held in his own name with Lloyds Bank plc, now called Lloyds Bank TSB plc ("Lloyds Bank") at its branch at 32 Oxford Street, London, W1A 2LD.  Funds were transferred to and from a sterling

account number and a dollar account for the purposes of conducting the international business of the claimant.

7.    Mr Ansah would use the accounts to establish a letter of credit in favour of a supplier of goods to the claimant. The supplier would confirm its willingness to provide goods which had been agreed previously between the supplier and Mr Ansah acting on behalf of the claimant. The agreement by the supplier would facilitate the transfer of funds to the supplier after the goods were sold to the claimant. On the date when the letter of credit was due to take effect payment would be made by Lloyds Bank to the supplier debiting the relevant bank account.

8.    But at the same time Mr Ansah would make arrangements for the claimant to transfer to the supplier through local banks the amount invoiced by the supplier. As a result the supplier would have received two payments in relation to the same goods. The supplier would then refund one of the payments by transferring the refund to one of the accounts at Lloyds Bank in the name of Mr Ansah.

9.    No explanation is given in the evidence as to why the supplier should be paid twice, and in argument Miss Bailey for the claimant suggested that it was to give comfort to the supplier. But it is obvious that in international transactions sufficient comfort is given by the opening of a letter of credit. If there were such double payments, in the absence of further evidence it is a reasonable inference that they were a device to extract money from Ghana in breach of exchange control regulations.

10.   The claim is that on various occasions between September 19, 1969 and July 6, 2000 Mr Ansah (without the knowledge of the claimant) retained the sums which were refunded to the claimant through the Lloyds Bank accounts. It is also alleged that other sums which were transferred to the Lloyds Bank accounts for business purposes were retained by Mr Ansah. Mr Ansah never accounted to the claimant for the funds, or for interest on the funds.

11.   The claimant says that Mr Ansah was in breach of fiduciary duty, and in effect misappropriated the claimant's funds, and so defrauded the claimant.

12.   According to the particulars of claim, the liability of the defendant is said to arise as follows.    First, the claimant claims the sums being held in the Trust or in the alternative such other sum "as money had and received by [Mr Ansah] and by reason thereof by the Defendant [sic] servants agents or successors in title to the use of the Claimant." Second, the claimant seeks from the defendant or its successors in title "restitution in relation to the monies which have been redirected into the Tubuoh Trust in so far as the same is possible." Third, it is said that Mr Ansah wrongfully deprived the claimant of the use and possession of the sums deposited in the Trust and has converted the sums therein to his own use, and "the Defendant [sic] servants agents or successors in title have failed to return the said sums to the Claimant as required or at all notwithstanding being given ample opportunity to do so." Fourth, it is said that the defendant holds the sums in the Trust on trust for the claimant.

13.   In paragraph 41 of the particulars of claim, the claimant, averred, subject to the production of a valid trust instrument, that the Trust was invalid and had not been set up properly or at all.

14. The prayer claims: (a) a declaration that Mr Ansah and thereby the defendant or its successors in title are liable to account to the claimant for such sums in the Trust as the court thinks fit on the ground of breach of fiduciary duty and/or breach of trust and/or restitution and/or conversion and/or misrepresentation by Mr Ansah; (b) an order that the defendant or its successors in title do pay to the claimant such sums as the court thinks fit; (c) a declaration that the claimant is entitled to trace and/or follow such sums transferred into the Trust and the claimant claims equitable title to the funds sums and/or assets within the Trust and that the defendant or its successors in title hold them or such other assets on trust for the claimant; (d) an order that the defendant's servants agents or successors in title do deliver up the funds sums and/or assets to the claimant

## III    The transfers

### Evidence before Master Bowman

15. The allegations in the particulars of claim and the evidence in support of the application to serve out of the jurisdiction are these:

    (a) on about April 26, 1994 £708,738.01 (the dollar figure of $708,738.01 in the particulars and witness statement is accepted to be in error) was transferred into the Lloyds Bank sterling account, and on May 3, 1994 Mr Ansah transferred £700,000 (the dollar figure of $700,000 also accepted to be in error) into the Trust;

    (b) on about August 22, 1994 a supplier made a payment into the Lloyds Bank dollar account of $699,989.08, and on August 24, 1994 $677,000 was transferred into the Trust;

    (c) on about September 1, 1994 a supplier made a payment of $399,989.20 into the Lloyds Bank dollar account and on about September 2, 1994 $400,000 was transferred into the Trust.

16. The claimant also says that the statements generated in connection with a fixed deposit account 71483020 placed with the defendant by the Trust show substantial deposits, which in several cases it says can be identified as coming from the Lloyds Bank dollar account: (1) $807,256 in May/June 1994; (2) $179,000 at the end of June 1994; (3) $988,826.21 in June/July 1994; (4) $58,000 in July 1994; (5) $100,000 in July 1994; (6) $1,150,088.25 in July/August 1994; (7) $677,000 in August 1994; (8) $1,831,897.69 in August/September 1994; (9) $400,000 in September 1994 (particulars of claim, para 20).

17. The statement of truth in the particulars of claim was made by Mr Emmanuel Ansah, an executive director of the claimant. His witness statement in support of the application for service out of the jurisdiction repeated the allegations, but without exhibiting any documents to support them. Those documents were exhibited to a witness statement of the same date in support of an application against the defendants and Lloyds Bank to compel disclosure of Mr Ansah's bank statements.

18. The documents exhibited consisted of: (1) some pages from the dollar account between February and October 1994; (2) a page from the sterling account showing

entries between April and July 1994; (3) statements of fixed deposits of an account of Lloyds Bank "re J E K Ansah" with the defendant under account number 71483020.

19. Those documents showed the following:

   (1) On April 26, 1994 £708,738.01 was received into the Lloyds Bank sterling account. The bank statement shows the receipt as "TRANSFER 72/11 ISY/MMD RETAIL DEPOSIT REF 579." The claimant's case was that this was a payment by a supplier of the claimant.

   (2) On May 3, 1994 £700,000 was transferred from Lloyds Bank to the defendant. This was said to be the transfer of the bulk of the funds received from a supplier on April 26, 1994.

   (3) On August 22, 1994 and September 2, 1994 there were credits to the Lloyds Bank dollar account of $699,989.08 and $399,989.20 respectively from "Independent Commodity London", which were said to be payments from suppliers.

   (4) On about August 24, 1994 there was a debit of $677,000 to the Lloyds Bank dollar account with the narrative stating "J E K Ansah", which was said by the claimant to be a transfer by Mr Ansah into the Trust;

   (5) On about September 2, 1994 $400,000 was debited to the Lloyds Bank dollar account with the narrative "Lloyds Bank Finance Guernsey", which was said to be a transfer by Mr Ansah into the Trust.

   (6) There are a number of statements of fixed deposit in the name of Lloyds Bank Finance (Guernsey) Ltd addressed to Lloyds Bank re JEK Ansah or to JEK Ansah c/o Lloyds Bank: (a) $807,256 in May 1994; (b) $179,000 in June 1994; (c) $988,826.21 in June 1994; (d) $58,000 in July 1994; (e) $100,000 in July 1994; (f) $1,150,088.25 in July 1994; (g) $677,000 in August 1994; (h) $1,831,897.69 in August/September 1994; (i) $400,000 in September 1994. The claimant relied on these to show that the statements generated in connection with a fixed deposit account numbered 71483020 placed with the defendant by the Trust show substantial deposits, which in several cases it says can be identified as coming from the Lloyds Bank dollar account.

*Evidence adduced in the course of the application*

20. The evidence of the defendant is that the fixed deposit account is an account held in the name of the Lloyds Bank Oxford Street branch with Lloyds Bank Finance (Guernsey) Ltd, which was used to place money from Mr Ansah's dollar current account on deposit in Guernsey. The statements produced by the claimant are not statements which relate to an account in the name of the Trust, and have no connection with the Trust, which has a completely separate bank account with a separate number.

21. The defendant says that there were only four deposits of funds into the Trust's account from Mr Ansah's London account: (1) the initial trust fund of £100 on April 26, 1994; (2) £5,943.64 on April 26, 1994; (3) £700,553.77 on May 3, 1994; and (4) £310,000 on June 27, 1997. Following Mr Ansah's death, the defendant paid Lloyds

Bank £11,461 and US$203,694 in September 2001 under guarantees given by the Trust in respect of Mr Ansah's liability to Lloyds Bank.

22.    As a result of this evidence (which was not challenged) the only payment which could form part of the claim as pleaded was the transfer of about £700,000 on May 3, 1994.

23.    As I have said, on April 26, 1994 £708,738.01 was received into the Lloyds Bank sterling account. The bank statement shows the receipt as "TRANSFER 72/11 ISY/MMD RETAIL DEPOSIT REF 579." The claimant's original case was that this was a payment by a supplier of the claimant.

24.    But in a note in reply to questions put by me, the claimant now says that the reference "TSY/MMD Retail" appearing on the bank statement relates to the repayment of £700,000 plus interest from a Treasury transaction of Lloyds Bank on the Money Market Division. The claimant also says that the additional reference numbers appearing on the bank statement refer to the reference number of the specific transaction, details of which the claimant does not have access to. Mr Ansah placed the £700,000 in a fixed sterling deposit account for a fixed period of time on a date unknown to the claimant. The repayment of the deposit plus interest is the sum which appears on the bank statement on page 73 in the sum of £708,738.01. In the absence of additional bank statements showing the date when the £700,000 was deposited in the fixed deposit account originally, the claimant is not able to identify which suppliers' and/or supplier's monies sourced the original deposit of the £700,000 into the fixed sterling deposit transaction which led to the said repayment of the £708,738.01 in circumstances where the claimant was accustomed to dealing with transactions in the region of this sum.

*Further evidence*

25.    A fourth witness statement by Mr Emmanuel Ansah exhibits documents which are said to show (a) that payments were made to the Lloyds Bank account by suppliers; (b) that some of these payments were placed on deposit; (c) that double payments were made to suppliers, and where the suppliers have sought to repay one of the sums.

26.    The documents show that payments to the Lloyds Bank accounts were made by companies such as Quaker Oats BV (Netherlands), Borden Co Ltd (Ireland), Oxford Biscuits A/S, and Sandoz Nutrition, mainly in the period 1992 to 1993, but with some documents in 1996-1997 and 1999. There are also a number of documents showing payments coming from Nigerian financial institutions to Independent Commodity Supplies Ltd, of Marlow, Bucks, where that company (which would seem to be a commodity broker, but there is no evidence) notifies Mr Ansah that it has received funds, and at least in one case ($400,000 on June 1, 1993) has transferred half to Mr Ansah's account at Lloyds Bank and has retained the other half.

**IV    Issue of proceedings and service out of the jurisdiction**

27.    The claim was first put forward in correspondence from the claimant's Ghanaian lawyers which was not before the court. The correspondence was conducted from July 2003 by the claimant's London solicitors, who made on July 11, 2003 an unparticularised claim that Mr Ansah had misappropriated funds belonging to the claimant. The defendant replied on August 7, 2003 to ask for what it described as "hard evidence". The claimant's solicitors replied at length on November 3, 2003 to

say that large sums of money belonging to the claimant were channelled through Mr Ansah's private accounts, and that these sums were transferred to the defendant. On January 13, 2004 the defendant replied to say that the letter did not contain credible evidence which would stand up to cross-examination, and that in view of the paucity of evidence presented by the claimant, the claimant's best course of action might be to pursue the litigation which it had threatened.

28.    The claim form was issued on July 13, 2004, pursuant to an order of Master Bowman of July 6, 2004, which was made following a without notice application supported by a witness statement of Mr Emmanuel Ansah, which relied on Part 6.20(8)(b) (tort), (14) (constructive trust) and (15) (restitution). The witness statement exhibited the draft particulars of claim, and repeated many of the same allegations. Paragraph 38 of the witness statement said that while the defendant was based in Guernsey, the transactions which were being concluded revolved around the bank accounts which were held with Lloyds Bank in Oxford Street. The witness statement went on:

> "I submit that by reason thereof that the acts of which the Applicant makes complaint occurred within the jurisdiction, as the act of transferring funds took place by the Deceased's servant or agent bankers who were based at Lloyds TSB Bank Plc situated at 32 Oxford Street, London, England. In the premises the Applicant is able to satisfy Part 6.20(8)(b), Part 6.20(14) and Part 6.20(15) of the Civil Procedure Rules 1998."

29.    The witness statement repeated the detailed allegations about the transfers from the Lloyds Bank accounts to the account of the Trust in Guernsey, but did not exhibit any of the bank statements. Those bank statements were exhibited to a witness statement in support of the claimant for non-party disclosure from Lloyds Bank pursuant to CPR Rule 31.17.

30.    On the discretionary aspects, it was said that it might become necessary to gather information from the British suppliers, and to do so would be more difficult were the matter to be tried in Ghana or in Guernsey. Mr Ansah said that he travelled to London from time to time, but the suppliers did not travel to Ghana with the same frequency and he had never been to Guernsey. He said that the claimant was seeking an order for non-party disclosure against Lloyds Bank in respect of the bank statements, and it would be sensible to hold together all the different strands of the case which concerned the release of the funds from the Trust.

31.    On August 12, 2004 the defendant applied for an order that the court had no jurisdiction to try the action, alternatively that it should not exercise any jurisdiction which it might have to try the action, and for an order setting aside the claim form and service. It relied on a witness statement by Mr Acton, a director, which in the material respects was brief, and mainly concerned with a point which the claimant no longer presses, namely the averment that the Trust is invalid. He said:

> "At its simplest, the claim is an attack on the Tubuoh Trust, dressed up as a claim framed alternatively as one made in tort, against the defendant as constructive trustee and by way of restitution.
>
> Clause 2 of the Trust Deed establishes the settlement under the laws of the island of Guernsey *'which said island shall be the forum for the administration thereof'.*

> Paragraph 41 of the Particulars of Claim contains a claim by the Claimant that the Tubuoh Trust is invalid and has not been set up properly or at all. The Defendant considers that that issue is best resolved by the Guernsey courts, which are familiar with how discretionary trusts are set up on the island, and by applying Guernsey law as the proper law of the Trust..."

## V    The arguments

32. This matter first came before the Court on October 4, 2004. Following that hearing, questions were addressed to both parties by me in a note on October 14, 2004. A further short hearing took place on October 19, 2004. A further note from me on October 29, 2004 drew the parties' attention to some further authorities (beyond those relied upon by the parties and cited to me). Further submissions were tendered by the defendant in response to that note. The claimant indicated a wish to reply to those submissions, and as a result, I made a ruling on November 11, 2004, in which I required further material, and asked the parties to arrange a further hearing in January 2005, which in the event the parties did not arrange until February 28, 2005.

### *Defendant's arguments*

33. The defendant argues as follows. First, the emergence of the evidence shows that the application to Master Bowman was made on the basis of incomplete or inaccurate information, and his order should be set aside on the basis of material non-disclosure.

34. There is no serious issue to be tried on the merits. No constructive trusteeship arises as against a fiduciary in respect of money held by that fiduciary in an account *lawfully* mixed with his personal funds: *Henry v Hammond* [1913] 2 K.B. 515; *Re Bond Worth Ltd* [1980] Ch. 228; *Neste Oy v Lloyds Bank plc* [1983] 2 Lloyd's Rep 658; *R v Clowes (No. 2)* [1994] 2 All ER 316; *Paragon Finance plc v D B Thakerar & Co* [1999] 1 All ER 400.

35. The constructive trusteeship as against the defendant would have to be a "knowing receipt" case. The claim under this head would be fundamentally dependent upon the defendant acquiring knowledge that the moneys received into the Trust belonged to the claimant. No such knowledge is, or could be, alleged. But the defendant accepts that it is sufficiently arguable for the purposes of CPR Rule 6.20(14) that notification of a claim some time after receipt of funds may still convert an innocent volunteer into someone liable to account as if it were a constructive trustee.

36. The defendant concedes that it is arguable that an equitable proprietary claim may be made in circumstances where neither constructive trust nor unjust enrichment have any role to play: *Foskett v McKeown* [2001] 1 AC 102. But neither CPR Rule 6.20(14) or (15) would apply to such a claim. English law does not recognise a restitutionary proprietary claim: *Foskett v McKeown* [2001] 1 AC 102, 119-120; Goff and Jones, *Law of Restitution*, 6th ed 2002, para 2-007

37. Even if a constructive trust could arise, there is no evidence to suggest that money standing to the credit of Mr Ansah's account at any time was in fact the claimant's money, and certainly not immediately preceding the transfers into the Trust account.

38. In any event, the last transfer into the Trust account was June 1997 and the claim form was not issued until July 13, 2004, some seven years later. Any claim against the

defendant as constructive trustee (and any restitutionary claim against the defendant to account as if it were a constructive trustee) in respect of any of the transfers is time barred: Limitation Act 1980, section 21(3); *Paragon Finance plc v D. B. Thakerar & Co* [1999] 1 All E.R. 400.

39. On the question of the necessary territorial connection for the purposes of CPR Rule 6.20(14) and (15), the defendant argues that the relevant acts must take place in England. Here the relevant acts are the receipt of funds by the defendant, and the acquisition of knowledge by it through notice of the claim, and both took place in Guernsey.

40. On forum conveniens, the defendant says that the only connection with the jurisdiction is the fact that transfers into the Trust account were made from either of Mr Ansah's personal accounts with Lloyds Bank in London. In any trial of the issues in this action, the evidence as to the transfers is hardly likely to be contested. Any conflict of evidence as to dates and amounts of transfers would be resolved by production of the Lloyds Bank statements. The claimant has not explained when any application for those bank statements by the personal representatives of Mr Ansah was made and (if it was made) by whom and when it was refused. An application by the personal representatives as successors in title to Mr Ansah to Lloyds Bank for production of the bank statements would have resulted in their production.

*Claimant's arguments*

41. The claimant says that because the act of transfer of funds by Mr Ansah's bankers, Lloyds Bank, took place from London, CPR Rule 6.20(14) (constructive trust) and (15) (restitution) are each satisfied. The tort provision of CPR Rule 6.20(8) is no longer relied upon. That is because no action lies for conversion in respect of dealings with money once it has passed into currency (Clerk & Lindsell, *Torts*, 18th ed, 2000, para 14-40, and see *Lipkin Gorman v Karpnael* [1991] 2 AC 548, 563) and a mere equitable interest in property is not sufficient to allow an action in conversion: *MCC Proceeds Inc v Lehman Bros International (Europe)* [1998] 4 All E R 675.

42. The constructive trust provision of CPR Rule 6.20(14) is applicable because the defendant is liable because it now has notice that the funds in the Trust account belong to the claimant: *Bank of Credit and Commerce International (Overseas) Ltd v Akindele* [2001] Ch 437. CPR Rule 6.20(15) applies because the claimant also relies on a restitutionary claim. The fact that the monies were being held in the dollar and sterling accounts which may have held mixed funds does not preclude any finding of a constructive trusteeship: *R v Clowes (No 2)* [1994] 2 All ER 316, CA.

43. The acts occurred within the jurisdiction, as the act of transferring funds took place by Mr Ansah's agents, namely the staff of Lloyds Bank in London. England is the jurisdiction where Mr Ansah repeatedly broke the trust which existed between him and the claimant. The money belonging to the claimant was in London bank accounts, and England was where the breach of fiduciary relationship occurred by reason of the transfer out of the funds to the Trust.

44. On discretion, Ms Bailey submits on behalf of the claimant that the burden of proof that England is not a suitable forum rests upon the defendant and not upon the claimant at this stage. If the matter were heard in Guernsey, the claimant would have

to instruct another firm of solicitors who are not familiar with the matter. The claimant's solicitors have travelled to Ghana to meet the officers of the claimant. The inconvenience which will be experienced by the witnesses for the claimant will be far greater than the inconvenience for the defendant. The defendant's witnesses will be able to travel to London and find somewhere to stay at no personal expense, but the claimant may seek to call a wide range of witnesses, include some of the suppliers, who are based in England. It will be far easier for the witnesses for the claimant to travel from Ghana to England and find accommodation in England, whether with friends or relatives, than to have to find hotel accommodation in Guernsey. She also says that the defendant is an international company with a team of lawyers in England, and the claimant is not in a similar position so it would be forced to instruct another legal team at additional expense. The claimant may need to contact its English suppliers in order to gather evidence, and this will be much easier to do if the matter were to remain within the jurisdiction. The provision in the trust deed that Guernsey law governs does not bind the claimant. The trust deed gives the defendant the power to bring and defend proceedings, and no action has been brought by beneficiaries against the defendant for the failure to release funds in the trust.

45.    The defendant has not disclosed the bank statements relating to the Trust and, notwithstanding requests by the executors of the estate of Mr Ansah, Lloyds Bank has refused to disclose all the bank statements relating to the dollar and sterling accounts. In the absence of a full set of bank statements the claimant is not able to trace back every deposit which has been made into the Trust. That is not the fault of the claimant. The claimant has issued an application against Lloyds Bank for non-party disclosure in relation to these proceedings, which was due to be heard on November 23, 2004, before Master Bragge, and which has been adjourned pending the outcome of this matter. The executors wrote to Lloyds Bank in November 2004, enclosing a copy of the grant, and requesting accounts for the period from 1985 to 2000, and have not received a reply.

46.    The defendant has been aware of the existence of a dispute since about 2000 and has not issued proceedings in England or Guernsey, and the claimant has spent considerable sums on legal fees in England trying to negotiate and thereafter in issuing the proceedings, and it is too late for the defendant to suggest that this is not the appropriate forum.

47.    No specialist knowledge with regard to the operation of the Trust will be required and the dispute concerns whether the defendant is entitled to dissipate the funds in the Trust, or whether they belong properly to the claimant and should be returned. The argument by the defendant that the forum for the administration of the Trust is Guernsey does not take account of the fact that the dispute is not about the administration of the Trust but about Mr Ansah's misapplication of the claimant's funds. There is no longer any issue raised as to the validity of the Trust.

## VI    The position of the beneficiaries

48.    According to Mr Emmanuel Ansah's evidence, the majority of the beneficiaries are supportive of the claim. The brothers, sisters, cousins, nephews and nieces of Mr Ansah were unanimous in their support. The only beneficiaries who had not been supportive were the sons and daughters of Mr Ansah and his wives. I was told at the hearing that there was only one son who was now not supporting the claim.

49.    The defendant wrote to the beneficiaries on August 25, 2004 to notify them of developments and to seek their opinion as to the course of action which the trustees should follow.    The defendant has said that it is not at liberty to disclose which beneficiaries have contacted it, and it is making efforts to complete its enquiries

50.    The Guernsey solicitors for the defendant say that the Guernsey court is the only court which could have jurisdiction to make a *Beddoe* (*Re Beddoe* [1893] 1 Ch 547) order. They say that there would be a problem if the defendant applied for and obtained a *Beddoe* order in Guernsey permitting it to expend trust monies defending the English action, and an English court ultimately decided that the money held by the Trust was in fact subject to the alleged constructive trust. If the proceedings were in Guernsey, then one court would be able to resolve the conflict between the duty of the defendant to use trust funds for the protection of the Trust and the claim by the claimant to have a prior right over the same funds. They do not know whether the English court would consider that it had jurisdiction to make a Beddoe order in favour of the Guernsey trustee of the Guernsey trust with all its assets in Guernsey.    The trust deed expressly makes Guernsey the forum for the administration of the trust to avoid that kind of complication.    The beneficiaries could have no jurisdictional objection to a *Beddoe* order made in Guernsey, because the trust deed permits it.

51.    In January 2005 the defendant applied to the Guernsey court for directions.    There are approximately 44 beneficiaries, of whom 16 had addresses and England, and 29 had addresses in Ghana or elsewhere.    There was a hearing of the application on March 11, 2005, which has been adjourned.    No beneficiary appeared.

**VII    Conclusions**

*Applicable principles*

52.    CPR Rule 6.21(2A) provides that the court will not give permission for service out of the jurisdiction unless it is satisfied that England is the proper place to bring the claim. The claimant has to satisfy the court of three matters: first, that it has a cause of action against the defendant "with a reasonable prospect of success" (CPR Rule 6 21(1)(b)); second, that the case falls within one of the heads of CPR Rule 6.20; and third, that England is the appropriate forum.

53.    On the first question, it was held in *Seaconsar Far East Ltd v Bank Markazi Iran* [1994] 1 AC 438 that the standard of proof which the claimant must satisfy in showing that it has a cause of action is whether, on the written evidence, there is a serious question to be tried, i.e., a substantial question of fact or law, or both, which the claimant *bona fide* desires to have tried.    It has been held that the effect of the test under CPR Rule 6.21(1)(b) of a "reasonable prospect of success" is the same as that in *Seaconsar* (*Ophthalmic Innovations International (UK) Ltd v Ophthalmic Innovations International Inc* [2004] EWHC 2948 (Ch), para [39]) or in substance the same as the test used to determine whether a claimant has a "real prospect of succeeding" for the purposes of summary judgment under CPR Part 24: *De Molestina v Ponton* [2002] 1 Lloyd's Rep 271; *Swiss Reinsurance v United India* [2002] EWHC 741 (Comm), [2004] ILPr 4.

54.    On the second question, the standard to be applied when deciding whether the jurisdiction of the court had been sufficiently established under one or more of the heads of what is now CPR Rule 6.20 is that of good arguable case, which is a concept

with some degree of flexibility depending upon the issue: *Canada Trust Co v Stolzenberg (No 2)* [1998] 1 WLR 547, at 558, per Waller LJ, approved [2002] 1 AC 1, at 10, per Lord Steyn.

55. On the third question, which goes to the discretion of the court, the claimant must show good reason why service on a foreign defendant should be permitted: *Amin Rasheed Shipping Corp v Kuwait Insurance Co* [1984] AC 50, 65-66, 72; *Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460: "The effect is, not merely that the burden of proof rests on the plaintiff to persuade the court that England is the appropriate forum for the trial of the action, but that he has to show that this is clearly so": at 481, *per* Lord Goff of Chieveley.

### *Forum conveniens*

56 I take this aspect first. This case has given rise to some very elaborate arguments on the modern law of restitutionary remedies and their application to cases with a foreign element, but in my judgment the claimant has entirely failed to show one of the essential elements, namely that England is the appropriate forum, and the order of Master Bowman must in any event be set aside on that ground.

57. First, Miss Bailey originally submitted that the burden of showing that England is not a suitable forum rests upon the defendant. That submission was entirely contrary to authority: see *Amin Rasheed Shipping Corp v Kuwait Insurance Co* [1984] AC 50, 65-66, 72; *Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460, 481. Second, she says the witnesses will be officers or employees of the claimant and suppliers based in England, although none is identified. She says that the claimant may need to contact its English suppliers in order to gather evidence, and this will be much easier to do if the matter were to remain within the jurisdiction.

58. But she fails to identify any issues which had actually been raised to which this evidence will relate. I have not been given any information on the reasons for the opposition of those beneficiaries who are opposing the claimant's claim. I was told by Miss Bailey that there was now only one such beneficiary, but the defendant says that it is unaware of any beneficiary being opposed. But the beneficiaries defined by clause 1(1) and Schedule 2 of the Trust Deed include remoter issue of Mr Ansah, and the issue of his sisters and sisters-in-law, and the reality of the matter is that the defendant has to seek directions from a court as to how to proceed, and in particular as to whether it will be directed to remain neutral, and give the opportunity for the claimant and any opposing beneficiaries to fight it out as between themselves: cf *Alsop Wilkinson v Neary* [1996] 1 WLR 1220.

59. If the action were brought in Guernsey, then the Guernsey court would not only be able to give directions to the trustee, but it would also be in a position to consider whether any of the beneficiaries should be parties to a claim by the claimant (and, if so, which), and how to protect the interest of minor and unborn beneficiaries. The natural place for those directions to be given is in the Guernsey court, to which the defendant has already made an application which is pending. The Trust Deed is governed by Guernsey law and is subject to Guernsey jurisdiction, and any opposing beneficiary, even one not appearing, would be bound by any determination of the Guernsey court.

60.    Much was made of the fact that if the matter were heard in Guernsey, the claimant would have to instruct another firm of solicitors who are not familiar with the matter. It was also said that it will be far easier for the witnesses for the claimant to travel from Ghana to England and find accommodation in England, whether with friends or relatives, than to have to find hotel accommodation in Guernsey. I was told that the claimant is a substantial company with major trading interests and I regard these factors of very little weight.

61.    Nor do I place any weight on the fact that the claimant has issued an application against Lloyds Bank for non-party disclosure in relation to these proceedings, which has been adjourned pending the outcome of this matter. Miss Bailey told me that the executors of Mr Ansah support the claim by the claimant, but have been unable to obtain the bank records from Lloyds Bank. Mr Flannery, who acts for the defendant, was instructed by Lloyds Bank to say that if properly appointed executors asked for bank records which still exist they would be produced. At the last hearing Miss Bailey produced a letter of request from the executors to Lloyds Bank (to which I have already referred) for the records to which she said there had been no response. This was produced without notice to the defendant's legal team, which might otherwise have been able to take instructions from Lloyds Bank as to whether the letter had been received, and whether it was being dealt with. I have no reason to believe that the records will not be produced, as they obviously should be to a duly appointed personal representative, as Mr Flannery said they would.

*Merits*

62.    I also consider that the factual matter was first presented to Master Bowman on a wholly inadequate basis, which would also have justified setting aside his order. It was said that in 1994 three substantial payments from suppliers were transferred into the Trust, and that in 1994 6 other payments were made from the Lloyds Bank accounts into the Trust. The impression given was that several million dollars was transferred into the Trust from the Lloyds Bank accounts.

63.    Now the only live allegation relates to the transfer of £700,000 in April 1994. It is not suggested that this was directly derived from a supplier's payments. There is no documentary evidence of any double payments to suppliers, but there are documents showing payments from suppliers, although not in 1994. There is no material to show that the suppliers have been asked about these payments. As I have said, the only obvious explanation for the double payments is exchange control evasion. My conclusion on this aspect would have been that (at least on the factual material presently before the court) there is not sufficient material to show that the claimant has reached the merits threshold.

64.    The defendant also takes the point, as I have said, that on the claimant's own case the money was not impressed with a trust in the hands of Mr Ansah. In *Paragon Finance plc v D B Thakerar & Co* [1999] 1 All ER 400, at 416, Millett LJ said: "It is fundamental to the existence of a trust that the trustee is bound to keep the trust property separate from his own and apply it exclusively for the benefit of his beneficiary." In *R v Clowes (No 2)* [1994] 2 All ER 316, at 325, Watkins LJ said: "As to segregation of funds, the effect of the authorities seems to be that a requirement to keep moneys separate is normally an indicator that they are impressed with a trust,

and that the absence of such a requirement, *if there are no other indicators of a trust,* normally negatives it" (emphasis in original).

65    The particulars of claim plead that Mr Ansah was authorised by the claimant to utilise his Lloyds Bank accounts to facilitate the claimant's international business, and that Mr Ansah was a trustee of money paid into those accounts, and which remained its property. If the merits threshold had been reached, the question whether Mr Ansah was a trustee of the money (as opposed to being merely a person owing fiduciary duties to the claimant with respect to the money) would not have been suitable for determination at the jurisdictional stage. That would have been a factual question dependent on the arrangements made between the claimant and Mr Ansah.

### *Proprietary or restitutionary claims and service out of the jurisdiction*

66.    It is therefore unnecessary to decide the interesting questions on the applicability of CPR Rule 6.20(14) and (15). RSC Order 11, Rule 1(1)(t) allowed service out of the jurisdiction where "the claim is brought for money had and received or for an account or other relief against the defendant as constructive trustee, and the defendant's alleged liability arises out of acts committed, whether by him or otherwise, within the jurisdiction." This provision was added in 1990 after it had been held that a claim based on constructive trust was not founded on a tort for the purposes of Order 11, Rule 1(1): *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1QB 391.

67.    CPR Rule 6.20(14) allows service out of the jurisdiction where "a claim is made for a remedy against the defendant as constructive trustee where the defendant's alleged liability arises out of acts committed within the jurisdiction". CPR Rule 6.20(15) provides for service out of the jurisdiction where "a claim is made for restitution where the defendant's alleged liability arises out of acts committed within the jurisdiction." Neither of these provisions contains the words "whether by him or otherwise" which were in the amended Order 11, rule 1(1)(t).

68.    In this case the essence of the claim is that the director misused money which had been entrusted to him by the claimant by transferring it to the defendant as trustee of the Trust. The defendant still holds most (but not all) of the money which was transferred to it. At the time of receipt the defendant had no reason to know, believe or suspect that the money did not belong to the director. The most that can be said is that the defendant has been put on notice of the claim by the claimant to a beneficial interest.

69.    The first issue which would arise is whether this is a claim for a remedy against the defendant as constructive trustee. On one view this is a claim which falls into the category of a proprietary equitable claim: *Re Montagu's Settlement Trusts* [1987] Ch 264, 285; *Agip (Africa) Ltd v Jackson* [1990] Ch 265, 290, *per* Millett J, affd [1991] Ch 547. Such a claim against a volunteer is not strictly dependent on the imposition of a constructive trust; nor is it dependent on any discretion vested in the court. It does not necessarily follow that the defendant is treated as a trustee of the money: *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] AC 669, at 707.

70.    In *Paragon Finance plc v D B Thakerar & Co* [1999] 1 All ER 400, at 409, Millett LJ classified constructive trusts in two groups: the first class of case was where the person described as a constructive trustee was actually a trustee, as in the *Pallant v*

*Morgan* [1953] Ch 43 line of cases, where the defendant holds on trust for himself and another party. The second class of case is where the defendant is implicated in a fraud and is not a trustee, but is held liable to account as if he were a trustee. In this class are the "knowing assistance" and "knowing receipt" cases.

71. To make a recipient liable as constructive trustee on the basis of knowing receipt, the recipient's state of knowledge must be such as to make it unconscionable for the recipient to retain the benefit of the receipt: *Bank of Credit and Commerce International (Overseas) Ltd v Akindele* [2001] Ch 437, at 455 (CA). That knowledge may be acquired at the time of receipt, or later: cf p 457; and Lewin, *Trusts*, 17th ed 2000, para 42-51.

72. But there is no doubt that the concept of constructive trust is used in relation to proprietary claims where the liability of the defendant to restore the property is not dependant on any "knowing receipt" except possibly in the sense of knowledge of the claim to recovery acquired after the receipt of the funds. Thus in *Boscawen v Bajwa* [1996] 1 WLR 328, at 334-5 Millett LJ treated every case in which a claimant traced his property into the hands of the defendant as one in which the court would treat the defendant as holding the property on a constructive trust. Cf *Clark v Cutland* [2003] 2 BCLC 393, 403-4, where the constructive trust terminology is used in relation to a proprietary remedy. As Sir Peter Millett himself said in *Restitution and Constructive Trusts*, in *Restitution, Past, Present and Future: Essays in Honour of Gareth Jones* (ed Cornish et al, 1998), 199, at 200: "[W]e use [the expression 'constructive trust'] not only to describe the trust itself but also to describe a particular proprietary remedy, and even as shorthand for saying that proprietary relief is available in equity." See also Oakley, *Restitution and Constructive Trusts: A Commentary*, ibid, 219, at 224.

73. Consequently, in my judgment a claim of this kind falls within the concept of "constructive trust" for the purposes of CPR Rule 6.20(14)

74. The next question would be whether it also falls within the category of a claim for "restitution" within the meaning of CPR Rule 6.20(15). That question in turn depends on whether the expression "restitution" is to be limited, as some judicial decisions and textwriters suggest, to cases which are founded on unjust enrichment, or also encompasses proprietary claims of the type involved in this case. There would appear to be no authority on the meaning of restitution for the purposes of CPR Rule 6.20(15). An action for breach of confidence was held to be within that rule: *Douglas v Hello!* [2003] EWCA Civ 139, [2003] EMLR 585, where the publication of the photographs complained of had taken place in England. No doubt that was because such actions have been regarded as being within the field of restitution by such authors as Goff and Jones, who broadly follow the classification established by the American Law Institute, *Restatement of the Law of Restitution (First)*, 1937, which included remedies relating to misuse of confidential information within that field.

75. The present claim is based on the alleged equitable proprietary interest in the trust fund, and not on unjust enrichment. In *Foskett v KcKeown* [2001] 1 AC 102, Lord Millett said (at 127, 129):

> "The transmission of a claimant's property rights from one asset to its traceable proceeds is part of our law of property, not of the law of unjust enrichment. There is no 'unjust factor' to justify restitution (unless 'want

of title' be one, which makes the point). The claimant succeeds if at all by virtue of his own title, not to reverse unjust enrichment. Property rights are determined by fixed rules and settled principles. They are not discretionary. They do not depend upon ideas of what is 'fair, just and reasonable.' Such concepts, which in reality mask decisions of legal policy, have no place in the law of property.

...

... [T]he plaintiffs seek to vindicate their property rights, not to reverse unjust enrichment. The correct classification of the plaintiffs' cause of action may appear to be academic, but it has important consequences. The two causes of action have different requirements and may attract different defences.

A plaintiff who brings an action in unjust enrichment must show that the defendant has been enriched at the plaintiff's expense, for he cannot have been unjustly enriched if he has not been enriched at all. But the plaintiff is not concerned to show that the defendant is in receipt of property belonging beneficially to the plaintiff or its traceable proceeds. The fact that the beneficial ownership of the property has passed to the defendant provides no defence; indeed, it is usually the very fact which founds the claim. Conversely, a plaintiff who brings an action like the present must show that the defendant is in receipt of property which belongs beneficially to him or its traceable proceeds, but he need not show that the defendant has been enriched by its receipt. He may, for example, have paid full value for the property, but he is still required to disgorge it if he received it with notice of the plaintiff's interest."

76.     According to Goff and Jones, para 2-007: "*Foskett v McKeown* leads to the firm conclusion that English law does not recognise a *restitutionary* proprietary claim." See also Burrows, *Quadrating Restitution and Unjust Enrichment: A Matter of Principle* [2000] RLR 257, 268; Burrows, *Law of Restitution* (2nd ed. 2002), pp 5-7. But there is a powerful view that, although restitutionary claims are normally based on unjust enrichment, that does exclude from the scope of the law of restitution proprietary equitable claims: Birks, *Misnomer* in *Restitution, Past, Present and Future: Essays in Honour of Gareth Jones* (ed Cornish et al, 1998), 1 at 22; Birks, *Unjust Enrichment* (2003), p 55. See also Virgo, *Principles of the Law of Restitution* (1999), p 13. *Macmillan Inc v Bishopsgate Investment Trust plc* [1996] 1 WLR 387 (CA) involved an equitable proprietary claim to shares. The Court of Appeal did not disagree with the submission that the claim was restitutionary in nature, but it did not follow that the conflict of laws rules relating to restitution were applicable to the issue in the case, namely who had the better title to the shares in question.

77.     It would not be appropriate to seek to express a definitive view on the ambit of restitution for the purposes of CPR Rule 6.20(15) in a case which, given my other findings, it does not arise, but I would express the tentative view that an equitable proprietary claim of the type involved in this case would come within its ambit.

*Limitation*

78.     I consider that the arguments on limitation put forward on behalf of the defendant have considerable force. There is a 6 year limitation period under section 21(3) of the

1980 Act for actions to recover trust property or in respect of breach of trust. But there is no limitation period with respect to an action by a beneficiary "to recover from the trustee trust property … in the possession of the trustee." The defendant would have the powerful support of *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] AC 669, at 707, for the proposition that a person who comes to hold the legal title is not necessarily a trustee for the equitable owner. But if the court had jurisdiction and had the merits threshold been reached, I would not have considered this a point which should be decided at the jurisdictional stage, depending as it does on a combination of factual issues and difficult questions of law.

### *Territorial link*

79.    CPR Rules 6.20(14) and 6.20(15) apply "where the defendant's alleged liability arises out of acts committed within the jurisdiction". Their predecessor, RSC Order 11, Rule 1(1)(t) allowed service out of the jurisdiction where "the defendant's alleged liability arises out of acts committed, whether by him or otherwise, within the jurisdiction."

80.    There appear to be no authorities on the territorial link for the purposes of CPR 6.20(14) and (15) in a claim of the present kind. There are three decisions bearing upon RSC Order 11, r 1(1)(t), and two decisions in relation to constructive trusts on Article 5(3) of the Brussels Convention (now in Council Regulation 44/2001). The Brussels Convention, the Lugano Convention, and Council Regulation 44/2001 do not have any special provisions for constructive trust and restitution. In Case 189/87 *Kalfelis v Schroeder* [1988] ECR 5565 it was held that the expression "matters relating to tort, delict or quasi-delict" in Article 5(3) covers all actions which seek to establish the liability of a defendant and which are not related to a "contract" within the meaning of Article 5(1).

81.    *ISC Technologies Ltd v Radcliffe,* December 7, 1990, unreported and *ISC Technologies Ltd v Guerin* [1992] 2 Lloyd's Rep 430 both arose out of the fraud committed by James Guerin on the arms manufacturer Ferranti. In *ISC Technologies Ltd v Radcliffe,* Millett J held that the constructive trust provision in RSC Order 11, r 1(1)(t) applied only if all the acts necessary to impose liability were committed in England, and that accordingly it applied to knowing participation by acts in a fraudulent breach of trust committed in England, but not knowing receipt abroad of the proceeds of such fraud.

82.    In *ISC Technologies Ltd v Guerin* [1992] 2 Lloyd's Rep 430 jurisdiction was established under other heads of RSC Order 11, and Hoffmann J recognised that it was unnecessary for him to rule on an alternative submission by the plaintiffs that leave should be given under the constructive trust head. At 433 he said that, although it was not necessary to decide the point, Millett J's construction was too narrow. It was primarily designed for the case of a foreign entity which had not participated in the fraud but had been used as a receptacle for the proceeds. It was not required that every act necessary to create liability should have been committed within the jurisdiction.

83.    In *Polly Peck International plc v Nadir, The Independent,* September 2, 1992 Knox J said that his own preference was for the construction which did not require all the acts constituting the constructive trust to have been committed within the jurisdiction. So to construe the paragraph would empty it of very nearly all its practical utility when

one has regard to the prevalence of foreign corporations whose officers are very likely to be resident abroad and therefore only likely to require the necessary knowledge to establish the claimed constructive trust by events occurring abroad. The decision was reversed on other grounds (*The Times*, March 22, 1993). In the Court of Appeal Hoffmann LJ said that he remained of the view tentatively expressed in the *Guerin* case that it was sufficient if a substantial part of the acts, viewed as a whole, on the part of the original fiduciary and the defendant which gave rise to the alleged liability took place within the jurisdiction. It would be anomalous if jurisdiction over an offshore entity used by a fraudulent fiduciary to receive the proceeds of fraud committed within the jurisdiction depended upon whether or not the entity maintained an English bank account into which the proceeds were paid. A broader construction would reflect a more consistent purpose.

84. The other decisions are on the Brussels Convention. In *Casio Computer Co Ltd v Sayo* [2001] ILPr 694 the claimant sued in respect of moneys taken from it by Japanese employees, some of which was transferred to London bank accounts. The sixth defendant was domiciled in Spain, and was alleged to be a constructive trustee. It was held by the Court of Appeal, affirming the decision of Mr Anthony Mann QC, that the relevant act for jurisdictional purposes had taken place in England, namely payment into and out of a London bank account, which was the place where the harmful event giving rise to the claim for dishonest assistance occurred.

85. In *Dexter Ltd v Harley*, *The Times*, April 2, 2001 an action was brought against a person domiciled in Spain, who held (it was alleged) money which had been removed from the English claimant through a breach of fiduciary duty. All of the facts which gave rise to the claim against the defendant's son, the company secretary, occurred, partly, within England, but all the facts which were relied on to attach liability to the defendant occurred outside the jurisdiction, in the Channel Islands, where money was paid into a bank account in the name of the defendant. Lloyd J held that the claim for constructive trust was within Article 5(3). He said that, in principle, in applying the concept of the harmful event to a constructive trust claim based on knowing receipt or dishonest assistance, it was not relevant to show that the original breach of trust or fiduciary duty by someone other than the defendant took place in the jurisdiction if nothing which involved the defendant occurred within the jurisdiction. The harmful event must be a harmful event on the part of the defendant, whether it was the act or omission of the defendant from which the harm results, or the direct result of such an act or omission through its impact on the claimant.

86. Briggs and Rees, *Civil Jurisdiction and Judgments*, 3rd ed 2001, para 4.47, suggest that there is no reason to suppose that CPR Rule 6.20(14) was intended to restrict the power of the court to deal with fraudsters, but that by analogy with Article 5(3) and the decision in *Dexter Ltd v Harley*, the acts within the jurisdiction must have something to do with the defendant. I accept that there must be some link between acts committed within the jurisdiction and the defendant, but those acts in my judgment do not have to be those of the defendant. I do not consider that the decisions on the Brussels Convention are helpful: first, there is no basis (as there certainly was under RSC Order 11, r 1(1)(t) and may also be under CPR Rules 6.20(14) and (15)) for taking into account acts by persons other than the defendant; second, jurisdiction under the Brussels Convention, the Lugano Convention and Regulation 44/2001 is not discretionary and has no forum conveniens filter to avoid

the exercise of exorbitant jurisdiction; third, in consequence they have to be applied if possible to avoid the exercise of exorbitant jurisdiction.

87.  In my judgment, if the principal fraudster gives instructions for money in London to be paid abroad to a knowing recipient, it is not necessary for jurisdictional purposes that the recipient should have done anything in London for CPR Rule 6.20(14) to apply. In most cases the principal fraudster will be subject to the jurisdiction under another head, and there will be jurisdiction over the accessory party under the necessary and proper party provision of CPR Rule 6.20(3). The jurisdiction is not exorbitant, because in each case the claimant will have to show as against the foreign defendant that England is clearly the appropriate forum.

88.  I would therefore have decided that the defendant's liability to account would have arisen out of acts committed in England by Mr Ansah, namely the alleged misappropriation of funds in English bank accounts by giving instructions for them to be transferred to the defendant in Guernsey.

89.  I will therefore set aside the order of Master Bowman.