# IFC EXHIBIT B

## UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

| | |
|---|---|
| SALAH N. OSSEIRAN,             ) | |
|        *Plaintiff,*        ) | |
|         *v.*            ) | Civil Action No. |
| INTERNATIONAL FINANCE CORPORATION, ) | |
|        *Defendant.*       ) | |

### DECLARATION OF SALAH N. OSSEIRAN

I, Salah N. Osseiran, declare as follows:

1. I am a citizen and resident of Lebanon. I am over 18 years of age and am competent to testify as to the statements made in this declaration, which is made in support of my Motion for a Temporary Restraining Order and Motion for a Preliminary Injunction. Unless otherwise stated, I have personal knowledge of the acts related below, and if sworn as a witness, I would testify to those facts.

2. I am a minority shareholder of Middle East Capital Group (MECG), a closely held merchant banking and finance institution incorporated in Guernsey, Channel Islands and having its principal place of business in Beirut, Lebanon. MECG is a closely-held corporation with only 25 shareholders; it has been losing money since its inception in 1996.

3. In the summer of 2005, having concluded that I could enhance the value of all MECG shareholders' investments in MECG by gaining control of its activities, I formed a plan to purchase additional shares of MECG with a view toward becoming its majority

shareholder. Toward this end, I approached the International Finance Corporation (IFC), which owned approximately 10.8 percent of MECG's shares, and Barclays Capital, which owned approximately 18 percent, and proposed to purchase their MECG shares. I had been informed and believed that IFC had tried unsuccessfully to sell its shares for several years.

4.   IFC represented that it had full authority to negotiate on behalf of both IFC and Barclays. IFC and I agreed that we would keep all information concerning the proposed sale of IFC's and Barclays' MECG stock to me strictly confidential until the sales were consummated. I informed IFC that I intended to obtain sufficient shares to become the majority shareholder of MECG.

5.   On November 19, 2005, IFC and I reached an agreement for my purchase of the shares of MECG from IFC and Barclays. This agreement, which included all material terms of the transaction including the price that I would pay for each seller's shares and the schedule of payments, is evidenced by electronic mail messages (e-mail) between IFC's Jan Van Bilsen and me on November 18, 2005 and November 19, 2005. True and correct copies of these e-mails are attached hereto as **Exhibit A.**

6.   In a subsequent e-mail on November 23, 2005, IFC, after checking with Barclays, confirmed the agreement and told me that it would soon send me the "standard document" by which it wished to document our agreements. A true and correct copy of this communication is attached hereto as **Exhibit B.**

7.   Pursuant to my November agreement with IFC and Barclays, I set aside funds to pay the initial installment of the purchase price and to obtain the necessary bank guarantees for the later payments. This made those funds unavailable for other investment opportunities.

8.    On November 26, 2005, IFC forwarded its standard stock purchase agreement to me by e-mail stating that the draft was "[f]urther to our discussion and confirmation by yourself [Osseiran], Barclays and IFC on the main terms of the sale of IFC's and Barclays' shares to you." The draft stock purchase agreement made no significant change to the terms set forth in the November agreement.  True and correct copies of IFC's e-mail and its proposed stock purchase agreement are attached hereto as **Exhibit C**.

9.    On December 1, 2005, I informed IFC by e-mail that, with the exception of a provision that would have required me to pay the transaction costs of IFC and Barclays, the draft stock purchase agreement was acceptable and provided comments regarding the document and urged IFC to accept a form of bank guarantee less complicated than that included with the draft.  A true and correct copy of this e-mail is attached hereto as **Exhibit D**.  With my authorization, IFC contacted my bank in Switzerland to discuss the specifics of the wording of the bank guarantees.  IFC and the bank developed an acceptable form of guarantee.

10.    After finalizing the language of the formal stock purchase agreement in December 2005, IFC repeatedly postponed the execution and consummation of the agreement.  At the same time, however, IFC assured me that it would consummate the agreement as agreed upon.

11.    On December 20, 2005, Barclays, noting IFC's failure to follow through with the transactions contemplated by the November agreement, informed me that it was prepared to close the transaction on the basis of that agreement and the IFC November 26, 2005 draft stock sale agreement, modified as suggested in my December 1, 2005 e-

3

mail (Exhibit D). I agreed to Barclays' suggestion and purchased Barclays' shares on January 9, 2006 for US$2.8 million.

12. On December 22, 2005, I sent an e-mail to IFC requesting the immediate execution of the stock purchase agreement and telling it that I was aware that IFC employees had apparently breached our confidentiality agreement by telling third parties that IFC and Barclays had agreed to sell their MECG shares to me. A true and correct copy of this e-mail is attached hereto as **Exhibit E.**

13. I am informed and believe that IFC has records, including e-mails and other documents, confirming that IFC believed and understood that it had sold its MECG stock to me.

14. By letter dated January 20, 2006, my attorney informed IFC that unless IFC confirmed its intent to proceed with the stock sale by January 24, 2006, I would institute legal proceedings to enforce my right to purchase IFC's shares of MECG stock.

15. From on or about December 19, 2005 through February 8, 2006, IFC's representatives, knowing that I was attempting to purchase at least 51 percent of MECG's stock and was counting on the purchase of IFC's MECG stock to achieve that objective, put forward various excuses for postponing the closing of the sale of its MECG shares to me, all the while continuing to assure me that IFC intended to abide by its agreement to sell its MECG shares to me as contemplated by the November agreement. Specifically, IFC representatives did the following:

a. On or about December 19, 2005, Jan Van Bilsen and Mike Elloway of IFC told me that IFC wanted to postpone the closing on IFC's sale of its MECG shares to me to avoid problems with the chairman of MECG, Khalid Ali Turki, who was threatening to sue IFC if it proceeded with the sale independent from other

4

shareholders. At the same time, Van Bilsen and Elloway assured me that IFC remained eager to sell its MECG shares to me, that it was not soliciting other buyers, and that once IFC confirmed that it did not need approval from other shareholders to sell its stock, IFC would proceed with the sale.

b.    On or about January 24, 2006, IFC's Elloway told me that the stock sale agreement still needed internal IFC approvals before it could be finalized and that such approval would be forthcoming soon; he also assured me that IFC still intended to sell its MECG shares to me and asked me to postpone the legal action that I had threatened to bring against IFC until the required approvals could be obtained.

c.    On or about January 25, 2006, Van Bilsen and Carmen Genovese of IFC told me that the only impediment to closing the stock sale was IFC's desire to hear directly from other MECG shareholders, at a shareholders' meeting scheduled for February 8, 2006, that all shareholders, including IFC, were free to sell their MECG shares. Van Bilsen and Genovese assured me that IFC was not soliciting other offers for its MECG stock, that IFC still intended to sell its MECG shares to me and Genovese asked me to withhold any legal action until after the February 8th meeting.

d.    All of the MECG shareholders who were present at the February 8, 2006 shareholders' meeting informed IFC, represented there by Genovese, that all shareholders were free to sell their respective MECG shares as they saw fit. Nonetheless, after that meeting, Genovese informed me that, while IFC remained committed to the stock sale, IFC needed to further postpone consummation of that stock sale until after the completion of the MECG shareholders' meeting, which was to resume on February 16, 2006. As a further enticement to me, Genovese suggested that IFC would be interested in making a similar sale to me of IFC's interest in two

Yemeni companies. Once again, Genovese and Van Bilsen asked me to withhold legal action until after the February 16th meeting.

16.    Relying upon the foregoing acts and representations of IFC, including the November agreement and IFC's assurances that it would soon execute the formal stock purchase agreement, I proceeded to purchase 57,000 additional shares of MECG stock from five other MECG shareholders for a total purchase price of nearly US$3 million. These purchases, combined with the 1.5 percent interest that I already owned and the 50,000 shares that I purchased from Barclays for US$2.8 million, brought my holdings to 41 percent of MECG's stock. Thus my MECG holdings, after completion of the IFC transaction, would total 51 percent of all outstanding shares of MECG stock.

17.    During the February 16, 2006 MECG shareholders' meeting, IFC ( represented by Genovese and Sader) proposed that all MECG shareholders other than me enter into an agreement to sell their shares to the First National Bank in Lebanon (FNB), which had, on February 10, 2006, offered to buy no less than 51 percent of MECG's stock at US$60 per share.

18.    On February 20, 2006, I learned that IFC had in fact, on or about February 19, 2006, agreed with other MECG shareholders that they would jointly sell their MECG shares to FNB or another third party under an agreement to be executed with the third party on or before March 31, 2006. A true and correct copy of that agreement is attached hereto as **Exhibit F**.

19.    Because MECG is a closely held corporation and has continuously lost money since its inception, the additional shares I have purchased at a cost in excess of US$5 million are worth very little because I am still a minority shareholder with no ability to influence MECG's management and business plans.

20.  Upon information and belief, I will be unable to become the majority shareholder of MECG unless IFC fulfills its obligation to sell its shares to me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Beirut, Lebanon on February 26, 2006

_____
Salah N. Osseiran

7

Osseiran Exhibit A

----- Original Message -----
From: Jan Van Bilsen
To: Salah N. Oseeiran
Cc: Simon Leathes ; Walid Cherif
Sent: Friday, November 18, 2005 3:37 PM
Subject: Re: MECG agreement

Salah, thank you for your email. Can you please confirm the following:

1.  you accept that our acceptance is subject to documentation - meaning separate
sales agreements with ifc and barclays, and acceptable bank guarantees from either
HSBC and/or UBS Switzerland for the 40% after 6 months and the 20% payable 6 months
thereafter, as well as for the 180thd and 300thd.

2. the full discharge of any obligation or liability to ifc and barclays is at
signing of sales agreements with us.

3. The sales agreements come into force and affect after signing of the sales
agreements and receipt of above mentioned bank guarantees acceptable to us, as well
as the first 40% payable.

4. You agree to top up the sales price for the difference between the sales price
and any higher sales price you may agree with any other potential seller of MECG
shares to you within 3 months from the date of the sales agreements.

5. The waiting period for the 180thd and the 300thd is not 3 years but 2 years, and
these amounts will be payable if after 2 years either MECG discharges itself from
the contingent liability related to the social security contribution of employees,
or no claims or claims not exceeding USd 500thd are made by the authorities within
2 years after signing of the sales agreement.

Please let me have your agreement after which Ifc and barclays will seek final
confirmation internally on those terms, which are expected within a few days only,
and we will start sending you draft documentation.

Thanks and regards,
Jan
------------------
Sent from my BlackBerry Handheld.

----- Original Message -----
From: "Salah N. Osseiran" [bpc@cyberia.net.lb]
Sent: 11/18/2005 03:54 AM
To: Jan Van Bilsen
Subject: agreement

Page 2 of 2

ATT: Mr. Jan Van Bilsen

Dear Jan,
Ref to our last tel call before your trip to India, this is to confirm our agreement on the following:

IFC       = 1.500.000,- $
Barclays  = 2.500.000,- $

A) At signature 40% payment.
   Second payment of 40% six months later
   Third payment of 20% 12 months later
   Last 2 payments will be supported by a bank guarantee of a first class bank acceptable to IFC or Barclays.

B) Necessary discharge will be provided to you.

C) Additional payments relating to social insurance issue will be 180000,-$ to IFC, and 300000,-$ to Barclays three years after signature of sale and purchase contract.

Best regards,
Salah N. Osseiran

1/18/2006

----- Original Message -----
**From:** Salah N. Osseiran
**To:** jvanbilsen@ifc.org
**Sent:** Saturday, November 19, 2005 12:14 PM
**Subject:** CONFENTIAL & PERSONAL

ATT: Mr. Jan Van Bilsen

Dear Jan,
From time to time I can not prevent but to think that somebody is trying to drive an unfair deal with me, by constantly trying to squeeze more or continuously trying to move the goal posts (such as the new idea of Top up), when there is no more because it is becoming not interesting anymore. However here follows my formal answer to your e.mail of yesterday.

## ANSWER I CONFIRM
==================

1) I accept that your acceptance is subject to documentation- which means separate sales agreements with IFC and Barclays, and acceptable bank guarantees from either HSBC or, UBS. Switzerland or equivalent for the 40% after 6 months and the 20% payable after 6 months and 180 thousand and 300 thousand.

2) The full discharge of any obligation or liability to IFC and Barclays is at signing of sales agreement.

3) The sales agreements come into force and effect after signing of the sales agreements and receipt of above mentioned bank guarantees acceptable to you, as well as the first 40% paid.

4) As for the Top up of the sales price within 3 months, although there is no way I will pay higher or even this price again, still I will only accept to include such clause if it stipulates that if I purchase at a lower price you would agree to deduct and return the difference, otherwise delete this idea.

5) The waiting period for the 180 thousand and 300 thousand should stay 3 years, and these amounts will be payable if after 3 years either MECG discharges itself from the contingent liability related to the social security contribution of employees, or no claims or claims not exceeding U.S. Dollars 500000,- are made by the concerned authority within 3 years after signing of the sales agreement.
6) Finally, JAN, as we communicate, and just for your info, more potential liabilities are piling on MECG, as the remaining Top employees have engaged lawyers requesting hundreds of thousands of Dollars of compensation.

1/18/2006

Regards,
Salah N. Osseiran

Best regards,
Salah N. Osseiran

Osseiran Exhibit B

----- Original Message -----
**From:** Jan Van Bilsen
**To:** Salah N. Osseiran
**Cc:** Walid Cherif ; Simon Leathes
**Sent:** Wednesday, November 23, 2005 7:01 PM
**Subject:** Re: MECG

```
Dear Mr. Osseiran,
I tried to reach you but it seems that your cell phone has been forwarded to your
secretary. Thank you for your email. I have discussed this with barclays and we
confirm agreement and will soon send you the share sale agreements for your review.
As these are rather standard documents, we are hopeful to be in a position to close
this transction at short notice.

Please give me a call on my cell or otherwise tomorrow to discuss some details.


With kind regards,
Jan van Bilsen
------------------
Sent from my BlackBerry Handheld.
```

```
  ----- Original Message -----
  From: "Salah N. Osseiran" [bpc@cyberia.net.lb]
  Sent: 11/19/2005 05:14 AM
  To: Jan Van Bilsen
  Subject: CONFENTIAL & PERSONAL
```


ATT: Mr. Jan Van Bilsen

Dear Jan,
From time to time I can not prevent but to think that somebody is trying to drive an unfair deal
with me, by constantly trying to squeeze more or continuously trying to move the goal posts
(such as the new idea of Top up), when there is no more because it is becoming not
interesting anymore. However here follows my formal answer to your e.mail of yesterday.

## ANSWER I CONFIRM
==================
1) I accept that your acceptance is subject to documentation- which means separate sales
agreements with IFC and Barclays, and acceptable bank guarantees from either HSBC or,
UBS. Switzerland or equivalent for the 40% after 6 months and the 20% payable after 6
months and 180 thousand and 300 thousand.

1/18/2006



2) The full discharge of any obligation or liability to IFC and Barclays is at signing of sales agreement.

3) The sales agreements come into force and effect after signing of the sales agreements and receipt of above mentioned bank guarantees acceptable to you, as well as the first 40% paid.

4) As for the Top up of the sales price within 3 months, although there is no way I will pay higher or even this price again, still I will only accept to include such clause if it stipulates that if I purchase at a lower price you would agree to deduct and return the difference, otherwise delete this idea.

5) The waiting period for the 180 thousand and 300 thousand should stay 3 years, and these amounts will be payable if after 3 years either MECG discharges itself from the contingent liability related to the social security contribution of employees, or no claims or claims not exceeding U.S. Dollars 500000,- are made by the concerned authority within 3 years after signing of the sales agreement.

6) Finally, JAN, as we communicate, and just for your info, more potential liabilities are piling on MECG, as the remaining Top employees have engaged lawyers requesting hundreds of thousands of Dollars of compensation.

Regards,
Salah N. Osseiran


Best regards,
Salah N. Osseiran

Osseiran Exhibit C

----- Original Message -----
**From:** Jan Van Bilsen
**To:** Salah N. Osseiran
**Cc:** Simon.Leathes@barclayscapital.com
**Sent:** Saturday, November 26, 2005 6:45 AM
**Subject:** Re. MECG, draft share sale agreement Nov 25, 2005

Dear Mr. Osseiran,

Further to our discussion and confirmation by yourself, Barclays and IFC on the main terms of the sale of IFC's and Barclays' shares to you, please find attached a draft share sale agreement for your review.

This draft concerns the sale of IFC shares only, but the wording has been discussed with Barclays who agree to it. Barclays' draft share sale agreement intends in principle to mirror these terms, except for changes in amounts, shareholding percentages, names, contact details, banking details, etc. Please note the provision at the bottom of the cover page also applies to Barclays. As mentioned, we are conducting a Know Your Client background check, which is a usual procedure. IFC and/or Barclays reserve the right to make amendments ourselves to this draft, and/or to Barclays' draft share sale agreement. You will notice that we have left open for now the potential requirement for a share transfer form, or other documents required regarding the process of transfer.

Please let us know if you are in agreement with these terms. In particular we suggest that you have your bankers involved soonest and have them confirm they are in a position to issue the bank guarantees as per schedules 1 and 2.

With kind regards

Jan van Bilsen
Field & Portfolio Manager for the Middle East, North Africa and South Asia,
Global Financial Markets
International Finance Corporation
10th Floor, West Side, The Gate, D.I.F.C.
PO Box 118071, Dubai, UAE
Tel. 9714 3601000 / 3601005 (dir)
Fax. 9714 3601010
Cell. 97150 6502760
email: jvanbilsen@ifc.org

1/18/2006

(CAR6885.DOC)
IFC Legal Department
CONFIDENTIAL DRAFT
[Subject to Change]
BAtassi:cb
November 25 2005

INVESTMENT NUMBER 7220

# Share Sale Agreement

**in respect of shares in the share capital of
Middle East Capital Group Limited**

between

## MR. SALAH OSSEIRAN

and

## INTERNATIONAL FINANCE CORPORATION

Dated                , 2005

This draft document is not a contract or an offer to enter into a contract. Only the document as executed by IFC and Mr. Osseiran will contain the terms that bind them. Until the document is executed by IFC and Mr. Osseiran, neither IFC nor Mr. Osseiran intends to be bound.

-2-

# SHARE SALE AGREEMENT

AGREEMENT dated [November] _____, 2005 between MR. SALAH OSSEIRAN, a Lebanese national (herein called the "Purchaser"); and INTERNATIONAL FINANCE CORPORATION, an international organization established by Articles of Agreement among its member countries (hereinafter called "IFC").

WHEREAS:

(A)     IFC is the legal and beneficial owner of thirty thousand (30,000) ordinary shares (the "IFC Shares") of Middle East Capital Group Limited, a company limited by shares, organized and existing under the laws of Guernsey, Channel Islands (the "Company") representing nine point thirty-four per cent (9.34%) of the issued and outstanding shares of the capital of the Company.

(B)     IFC has agreed to sell the IFC Shares to the Purchaser pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE I

### Definitions

Section 1.01. Wherever used in this Agreement, unless the context otherwise requires, the following terms have the following meanings:

"Bank Guarantee" means the bank guarantee issued or to be issued by HSBC Bank Geneva or UBS Zurich substantially in the form of Schedule 1;

"Business Day" means a day when banks are open for business in New York, New York and the Lebanese Republic;

"Contingent Bank Guarantee" means a bank guarantee issued or to be issued by HSBC Bank Geneva or UBS Zurich, substantially in the form of Schedule 2, in accordance with Section 2.03;

-3-

"Contingent Liability" means the liability of Middle East Capital Group S.A.L. ("MECG"), a subsidiary of the Company, for its employees' social security and income tax contribution;

"Contingent Premium" means the amount of one hundred eighty thousand Dollars ($180,000) which shall be payable by the Purchaser pursuant to the terms and conditions of with Section 2.03;

"Dollars" means the lawful currency of the United States of America;

"Purchase Price" has the meaning as set forth in Section 2.02(a); and

["Share Transfer Form" means the transfer form to be delivered by IFC to the Company pursuant to Section 2.02 (c) [in the form of _____].]

## ARTICLE II

## Agreement for Purchase and Sale

Section 2.01.  Subject to the terms and conditions of this Agreement, IFC agrees to sell, convey and transfer to the Purchaser, and the Purchaser agrees to buy from IFC, against payment to IFC of the Purchase Price (as defined below) in full, the IFC Shares, in each case free and clear of all liens, charges, security interests and encumbrances of any kind.

Section 2.02.  (a)  The Purchase Price for the IFC Shares, which shall be payable in Dollars, shall be one million five hundred thousand Dollars (US$1,500,000) (hereinafter, the "Purchase Price").

(b)    The Purchaser shall pay the Purchase Price to IFC in three (3) installments as follows:

(i)    the amount of six hundred thousand Dollars ($600,000) shall be paid to IFC in full by the Purchaser upon the execution of this Agreement ("First Installment");

(ii)    the amount of six hundred thousand Dollars ($600,000) shall be paid to IFC in full by the Purchaser on or before six (6) months following the date of this Agreement ("Second Installment"); and

-4-

    (iii)    the amount of three hundred thousand Dollars ($300,000) shall be paid to IFC in full by the Purchaser on or before twelve months following the date of this Agreement ("Third Installment").

    (c)    In order to secure the payment of the Second Installment and the Third Installment, the Purchaser shall arrange for the issuance of the Bank Guarantee substantially in the form of Schedule 1 hereto. The Bank Guarantee shall be delivered to IFC no later than seven (7) days following the date of this Agreement.

    (d)    Payment of each of the First Installment, the Second Installment and the Third Installment of the Purchase Price in accordance with Section 2.02 (b) (i), (ii) and (iii), and payment of the Contingent Premium in accordance with Section 2.03 (b) shall, in each case, be made in Dollars on or prior to the dates specified herein by way of deposit by the Purchaser of the First Installment, the Second Installment, the Third Installment, and the Contingent Premium in favor of IFC at Citibank N.A., 111 Wall Street, New York, N.Y., 10043, U.S.A, ABA N°. 021000089, SWIFT: CITIUS33XXX, for credit to Account N°. 36085579 of International Finance Corporation, Washington, D.C., under Reference: MECG, #7220 MEA – Sale Proceeds.

    (e)    Upon receipt by IFC of: (i) the First Installment in full, (ii) the Bank Guarantee, and (iii) the Contingent Bank Guarantee, IFC shall deliver to the Purchaser, or as the Purchaser may direct in writing, (x) the original share certificates issued by the Company and representing the IFC Shares, and [(y) a copy of the Share Transfer Form, duly executed by IFC, instructing the Company to transfer the IFC Shares to the Purchaser.] IFC agrees to execute and deliver any additional document needed to give effect to the transfer of the IFC Shares to the Purchaser and to give the Company good title to the IFC Shares. In the event of the Purchaser's failure to comply with its obligations as stated in this Agreement, IFC shall be entitled to terminate this Agreement by written notice to the Purchaser, without prejudice to any of its rights against the Purchaser under this Agreement or applicable law.

    (f)    [Upon receipt by the Purchaser of the Share Transfer Form from IFC,] the Purchaser shall, at its cost and expense, be responsible for registering the transfer from IFC to the Purchaser of the IFC Shares in the Company's share register.

-5-

Section 2.03. (a)  In addition to payment of the Purchase Price by the Purchaser, the Purchaser shall pay to IFC the Contingent Premium if:

(i)     MECG is discharged from the Contingent Liability by a competent authority or authorities prior to the date falling on the third anniversary date of this Agreement, it being understood and agreed that the Purchaser shall notify IFC within thirty (30) days of the same and procure from MECG documentary evidence, in form and substance reasonably satisfactory to IFC, including for the avoidance of doubt all documentation received by MECG from the relevant competent authority discharging such Contingent Liability; or

(ii)    no competent authority or authorities bring, prior to the date falling on the third anniversary date of this Agreement, any claim or claims against MECG finally determined by a court of competent jurisdiction with respect to the Contingent Liability in an amount which in the aggregate exceeds the equivalent of five hundred thousand Dollars ($500,000), it being understood and agreed that if any such claim or claims are made for an amount which in the aggregate exceed such amount, the Purchaser shall notify IFC within [thirty (30)] days of the same and procure from MECG documentary evidence, in form and substance reasonably satisfactory to IFC, showing the total amount of such claims and the amount actually paid by MECG in respect of the Contingent Liability.   To the extent the Purchaser does not notify IFC of any such claim under this clause 2.03(a)(ii), the Purchaser hereby understands and agrees that the value of such claim shall not be aggregated to the five hundred thousand Dollar threshold specified hereunder.

(b)     The Purchaser shall pay to IFC, in full, the Contingent Premium within ten (10) days following the occurrence of the applicable event described in Section 2.03 (a) (i) or (ii) above, such payment to be made in accordance with Section 2.02 (d).

(c)     Unless the Contingent Premium is paid in full to IFC in accordance with Section 2.03 (b), or unless IFC is notified in writing prior to the date falling on the third anniversary date of this Agreement that one or more competent authority or authorities has or have brought any claim or claims against MECG

-6-

with respect to the Contingent Liability in an amount which in the aggregate exceeds the equivalent of five hundred thousand Dollars ($500,000) in accordance with Section 2.03(a)(ii),, IFC may make a demand for payment under the Contingent Bank Guarantee at any time following the third anniversary date of this Agreement, without prejudice to IFC's right to make a demand thereunder prior to such date for all or any portion of the Contingent Premium which is due but unpaid under Section 2.03 (b).  The Contingent Bank Guarantee shall be delivered to IFC, substantially in the form of Schedule 2, no later than seven (7) days following the date of this Agreement.


## ARTICLE III

### Representations and Warranties

Section 3.01.  The Purchaser hereby represents and warrants that:

(a)  it has all necessary power and authority to execute this Agreement and any other documents required to be executed and delivered thereunder;

(b)  its obligations under this Agreement constitute the legal, valid and binding obligations of such party, enforceable against him in accordance with the terms hereof;

(c)  neither the making of this Agreement nor the compliance with its terms will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default or require any consent under, any indenture, mortgage, agreement or other instrument or arrangement to which the Purchaser is bound, or violate any of the terms or provisions of any judgment, decree or order or any statute, rule or regulation applicable to the Purchaser; and

(d)  the Purchaser has himself been, and will continue to be, solely responsible for making his own independent appraisal of and investigations into the matters contemplated by this Agreement and of the legality, validity, effectiveness, adequacy and enforceability of this Agreement.

Section 3.02.  IFC represents and warrants to the Purchaser that:

(a)  it is on the date hereof the legal and beneficial owner of the IFC Shares free and clear of any lien, charge, security interest or encumbrance of any kind; and

-7-

(b)     IFC has all necessary corporate power and authority to sell the IFC Shares to the Purchaser as set forth herein.

Section 3.03.  IFC makes no representation or warranty as to the condition, affairs or status of the Company. All warranties, whether written or oral, statutory, express or implied, are hereby expressly excluded.

Section 3.04.  The Purchaser hereby expressly acknowledges that: (a) the status and description of the IFC Shares is as specified in paragraph (A) of the Preamble to this Agreement which are sold by IFC as such; and (b) upon receipt from IFC of the original share certificates representing the IFC Shares and a copy of the Share Transfer Form duly signed by IFC, the Purchaser shall have no recourse to IFC on any grounds whatsoever.

## ARTICLE IV

### Miscellaneous

Section 4.01.  The respective representations and warranties of each of the parties to this Agreement shall survive the completion of the transactions contemplated by this Agreement.

Section 4.02.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. All amendments and other modifications hereof shall be in writing and signed by the parties hereto.

Section 4.03.  This Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter contained herein. This Agreement supersedes all prior discussions, agreements and undertakings between the parties with respect to such subject matter. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Section 4.04.  Any notice or other communication hereunder shall be in writing and may be delivered by hand, established courier service, airmail, or facsimile (confirmed by airmail) and may be sent by either party to the other at its address specified below or to such other address as either party by notice shall have designated. Any such notice or other communication shall be effective upon receipt.

-8-

For the Purchaser:

_____

_____

_____

Attention: _____

Alternative address for communications by facsimile:

_____

For IFC:

International Finance Corporation
2121 Pennsylvania Avenue, N.W.
Washington, D.C. 20433
United States of America

Alternative address for communications by facsimile:

    (202) 974-4872

Attention of the Director, Global Financial Markets Department

Section 4.05.   The Purchaser shall pay or reimburse IFC for all of IFC's legal fees and expenses incurred in connection with the preparation, execution or enforcement of this Agreement.

[Section 4.06. This Agreement shall be governed by, and interpreted in accordance with, Guernsey law.]

Section 4.07. At the option of IFC, this Agreement may be enforced in the courts of Guernsey, the Lebanese Republic or any other courts having jurisdiction.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective authorized officers.

MR. SALAH OSSEIRAN

-9-

By: _____

Name: _____

Title: _____


INTERNATIONAL FINANCE CORPORATION


By: _____

Name: _____

Title: _____

-10-

**SCHEDULE 1**

**Form of Bank Guarantee**

, 2005

To:    International Finance Corporation
       2121 Pennsylvania Avenue, N.W.
       Washington, DC 20433
            U.S.A.

Re:  **Independent Guarantee upon First Demand by IFC**
     **Guarantee Nr..........("Guarantee")**

Dear Sirs:

1.    We, [HSBC Bank Geneva or UBS Zurich] (the "Guarantor"), refer to the Share Sale Agreement dated [          ] (the "Share Sale Agreement") entered into between [                              ] legally domiciled at [                              ] (the "Purchaser"), and International Finance Corporation ("IFC") in relation to, *inter alia*, a sale of the IFC Shares. The Guarantor acknowledges having received a copy of the Share Sale Agreement and that this Guarantee is issued in accordance with Section 2.02 (c) thereof. Capitalized terms used in this Guarantee, unless otherwise defined, have the same meanings specified in the Share Sale Agreement.

2.    In accordance with Section 2.02 of the Share Sale Agreement, the Purchaser is required pay for the Purchase Price for the IFC Shares, in three (3) installments.

3.    The Guarantor as primary obligor and not merely as a surety, hereby absolutely, unconditionally and irrevocably:

    (i)    guarantees to IFC by way of continuing guarantee the full, due and punctual payment of the Second Installment and the Third Installment (hereinafter the "Installments"); and

    (ii)    agrees that upon IFC notifying the Purchaser and the Guarantor, at any time and from time to time during the term hereof, of the

-11-

failure of the Purchaser to pay the Installments in accordance with the terms of Section 2.02 of the Share Sale Agreement;

the Guarantor shall upon first written demand by IFC (without requiring IFC first to take any action or diligence against the Purchaser or any other person) pay to IFC all or any portion of either or both of the Installments not paid by the Purchaser (as to which amount the certificate of IFC shall in the absence of manifest error be conclusive) in Dollars in same day funds, to Citibank, N.A., 111 Wall Street, New York, NY 10043, for credit to Account No. 36085579, ABA#021000089 International Finance Corporation (Ref. IFC Investment No. 7720) or at such other bank or account in New York as IFC from time to time designates, free of all deductions whatsoever. If any mandatory deductions must be made by force of applicable law, then the Guarantor shall also pay to IFC such additional amounts as may be necessary to ensure that IFC receives the amount of the Installments in full.   The Guarantor shall be entitled to rely and shall exclusively rely upon IFC's first demand presented hereunder and shall be under no duty to nor shall inquire into any circumstances relating to IFC's demand. The Guarantor hereby agrees to make such payment of the Installments to IFC notwithstanding any claims, demands or objections obtained by the Purchaser or any other party whatsoever.

4.      The Guarantor's obligations hereunder shall not be affected, released or impaired by any matter or thing which but for this provision might operate to affect such obligations including without limitation (i) any time or indulgence granted to or composition with the Purchaser or any other person, (ii) the taking, variation, renewal or release of, or neglect to perfect or enforce, any rights, remedies or securities against the Purchaser or any other person or (iii) any unenforceability or invalidity of any obligations of the Purchaser so that this Guarantee shall be construed as if there were no such unenforceability or invalidity. The Guarantor hereby agrees that the Share Sale Agreement may be modified, amended or supplemented in any manner without our consent and agrees that no such modification, amendment or supplement shall release, affect or impair our liability under this Guarantee. The Guarantor's obligations hereunder are continuing, absolute and unconditional irrespective of the validity or enforceability of the Share Sale Agreement, and will not be in any way affected by any actions or circumstances which might constitute a legal or equitable discharge or defense of a guarantor, all of which the Guarantor hereby expressly waives.

5.      The Guarantor represents and warrants that this Guarantee is its legally binding obligation enforceable in accordance with its terms and that all necessary governmental and corporate authorizations for the giving and implementation of this Guarantee have been obtained.

12

6.      This Guarantee shall be effective on and as of the date hereof and shall remain valid and in full force and effect until the later of: (i) thirteen (13) months after the date of the Share Sale Agreement if no demand is made by IFC under this Guarantee during that period; (ii) full payment under this Guarantee, or (iii) when IFC has notified the Guarantor that all amounts owing to IFC on account of the Installments have been paid to IFC in full.

7.      The Guarantor shall not assign this Guarantee to any party without the express written consent of IFC.


Yours faithfully,

For and on behalf of the Guarantor:

[HSBC BANK Geneva or UBS Zurich]


_____

Name and Title

43

**SCHEDULE 2**

**Form of Contingent Bank Guarantee**

, 2005

To:    International Finance Corporation
       2121 Pennsylvania Avenue, N.W.
       Washington, DC 20433
       U.S.A.

**Re: Contingent Guarantee**
**Guarantee Nr..........("Guarantee")**

Dear Sirs:

1.    We, [HSBC Bank Geneva or UBS Zurich] (the "Guarantor"), refer to the Share Sale Agreement dated [            ] (the "Share Sale Agreement") entered into between [                              ] legally domiciled at [                              ] (the "Purchaser"), and International Finance Corporation ("IFC") in relation to, *inter alia*, a sale of the IFC Shares. The Guarantor acknowledges having received a copy of the Share Sale Agreement and that this Guarantee is issued in accordance with Section 2.03 thereof. Capitalized terms used in this Guarantee, unless otherwise defined, have the same meanings specified in the Share Sale Agreement.

2.    In accordance with Section 2.03 of the Share Sale Agreement, the Purchaser is required pay the Contingent Premium upon the occurrence of the applicable event as described in Section 2.03 (a) (i) or (ii) thereunder.

3.    The Guarantor as primary obligor and not merely as a surety, hereby absolutely, unconditionally and irrevocably:

    (i)    guarantees to IFC by way of continuing guarantee the full, due and punctual payment of the Contingent Premium in accordance with Section 2.03 of the Share Sale Agreement, and

    (ii)    agrees that upon its receipt from IFC of a notice stating that IFC is entitled to be paid the Contingent Premium or any portion thereof

-14-

in accordance with Section 2.03 of the Share Sale Agreement, it shall pay to IFC such amount of the Contingent Premium;

the Guarantor shall pay to IFC all or any portion of the Contingent Premium not paid by the Purchaser (as to which amount the certificate of IFC shall in the absence of manifest error be conclusive) in Dollars in same day funds, to Citibank, N.A., 111 Wall Street, New York, NY 10043, for credit to Account No. 36085579, ABA#021000089 International Finance Corporation (Ref. IFC Investment No. 7720) or at such other bank or account in New York as IFC from time to time designates, free of all deductions whatsoever. If any mandatory deductions must be made by force of applicable law, then the Guarantor shall also pay to IFC such additional amounts as may be necessary to ensure that IFC receives the amount of the Contingent Premium in full. The Guarantor shall be entitled to rely and shall exclusively rely upon the notification from IFC pursuant to Paragraph 3 (ii) of this Guarantee and shall be under no duty to nor shall inquire into any circumstances relating to such notification from IFC. The Guarantor hereby agrees to make such payment of the Contingent Premium to IFC notwithstanding any claims, demands or objections obtained by the Purchaser or any other party whatsoever.

4.     The Guarantor's obligations hereunder shall not be affected, released or impaired by any matter or thing which but for this provision might operate to affect such obligations including without limitation (i) any time or indulgence granted to or composition with the Purchaser or any other person, (ii) the taking, variation, renewal or release of, or neglect to perfect or enforce, any rights, remedies or securities against the Purchaser or any other person or (iii) any unenforceability or invalidity of any obligations of the Purchaser so that this Guarantee shall be construed as if there were no such unenforceability or invalidity. The Guarantor hereby agrees that the Share Sale Agreement may be modified, amended or supplemented in any manner without our consent and agrees that no such modification, amendment or supplement shall release, affect or impair our liability under this Guarantee. The Guarantor's obligations hereunder are continuing, absolute and unconditional irrespective of the validity or enforceability of the Share Sale Agreement, and will not be in any way affected by any actions or circumstances which might constitute a legal or equitable discharge or defense of a guarantor, all of which the Guarantor hereby expressly waives.

5.     The Guarantor represents and warrants that this Guarantee is its legally binding obligation enforceable in accordance with its terms and that all necessary governmental and corporate authorizations for the giving and implementation of this Guarantee have been obtained.

-15-

6.      This Guarantee shall be effective on and as of the date hereof and shall remain valid and in full force and effect until the earlier of: (i) the date falling three (3) years and six months following the date of the Share Sale Agreement, (ii) full payment under this Guarantee, (iii) when IFC has notified the Guarantor that all amounts owing to IFC on account of the Contingent Premium have been paid to IFC in full, or (iv) when IFC has notified the Guarantor that claims in respect of the Contingent Liability exceeding in the aggregate five hundred thousand Dollars have been made against MECG.

7.      The Guarantor shall not assign this Guarantee to any party without the express written consent of IFC.

Yours faithfully,

For and on behalf of the Guarantor:

[HSBC BANK Geneva or UBS Zurich]

_____
Name and Title

Osseiran Exhibit D

----- Original Message -----
**From:** Salah N. Osseiran
**To:** jvanbilsen@ifc.org
**Sent:** Thursday, December 01, 2005 2:33 PM
**Subject:** Fw: CONFIDENTIAL

Attn: MR. Jan Van Bilsen

Dear Jan,

Our initial review of your proposed draft of the share sale agreement is generally Ok.
We have few comments as follows.

A) - Page 3, ART II, section 2.0.1. (line 4), please amend to "...the IFC shares and rights, ).
   - Please explain in page 4, para (F) and in other places also, the meaning of the sign [  .
   - Page 8, section 4.0.5. Not acceptable.
   - Page 8, last para. who is the authorized officer of IFC signing this agreement.

B) The wording of (1) the conting liability in the agreement, and (2) in the "form of contingent bank guarantee" is too complicated and creating confusion. Could you please propose a simpler wording.

C) Both banks are reluctant to accept the proposed wording of both types of guarantees, because it is implying that they are becoming part of this agreement, and they are not happy with that, and would need to refer to their legal departments, which could take a long time. Could you do something.


Thank you and regards,
Salah N. Osseiran

Osseiran Exhibit E

----- Original Message -----
**From:** Salah N. Osseiran
**To:** jvanbilsen@ifc.org
**Cc:** Michael Leeds ; Ahmed Khalife ; glamb@worldbank.org ; jkoskelo@ifc.org
**Sent:** Thursday, December 22, 2005 6:15 PM
**Subject:** Fw: IFC Shares in MECG

Attn: MR. Jan Van Bilsen

Dear Jan,

I refer to the long negotiations we had concerning the sale of IFC shares in MECG, and to the conference call we had on Monday Dec 19.
I would like to invite you to sign immediately the "Share sale agreement" that has been negotiated, proposed and drafted by IFC. and as you know since you entered directly in contact with my Bank, I am ready and able to pay now the agreed amount, and delaying the signature any further will only cause further damages and loss to me.
Very simply put, we negotiated terms and conditions, you made an offer which I accepted and we now have a binding agreement pursuant to the agreed upon terms.
Let me reiterate quickly some of the facts for your recollection.

1) IFC, a shareholder in MECG like myself, has been for years trying to sell your shares, you made it not only publicly known, but you actually put it on the record, but without success until now.

2) MECG has been continuously losing money since inception, over 10 years now, finally the board and Gen assembly decided to try to sell the company and appointed a party to handle the information availability to potential bidders. This committee established the info package and the data room, and the deadline of 22 Dec to receive bids for the shares. (As of today the deadline passed and not one bid was received).

3) However the management received a legal opinion from MECG legal counsel in Guernsey at the September 23 board meeting, which you attended, stating that since the shareholders agreement in place at the inception of the firm has now expired, and that any potential buyer will only have to buy now from each shareholder separately if he wishes so.

4) That is when I contacted you late September and gave you the opportunity to dispose of your shares, and the ones of Barclays (since you stated that you would be negotiating on their behalf), something you always wanted to do, and because we both felt that the exercise of selling the total shares of the company could, or could not materialize.

1/18/2006



You negotiated with me back and fourth & with the IFC management and Barclays for a long time and you drove a hard deal, I negotiated with you in Bonafide way and genuinely, you clearly stated at multiple occasions that you were authorized to negotiate and conclude. I agree and believed, because I believed that one of the IFC goals in its areas of activity is to promote honest, fair and correct business practices and behavior, which I share belief.

You wished to prepare and draft the agreement, I agreed, I made couple of Typo corrections, I put you in contact directly with my banks in Switzerland to agree the wording of your proposed bank guarantees, I leaned on them and they had to work week ends, proof is with your Emails. I blocked the funds since early October for this deal and passed on other opportunities to keep sufficient funds for your transaction. Suddenly I started hearing noises all over town that MR Osseiran concluded with IFC and Barclays to buy their shares. When I asked you, said it is because most probably your representative in MECG board disclosed it verbally to the chairman after he sent him his resignation from the board, although I clearly asked to keep this confidential until after we sign the deal.

To add insult to injury, 2 weeks later I heard that you are suspending the transaction because you have received an e-mail from MR TURKI the chairman.

This is causing large damage to me both financially and reputation wise, I sincerely urge you to conclude the agreement and to live by the rules of honest and correct business behavior.

 Best regards,
Salah N. Osseiran


CC: ESQ. MR Michael H. Leeds / Blank Rome Comisky & McCauley LLP
CC: ESQ A. Khalifeh. Beirut - Lebanon

CC: MR Jyrki I. Koskelo /
     Director - Global Financial Markets Dep. (by
CC: MR Geoffrey B. Lamb / Vice President and Sr. Counsellor for IDA


1/18/2006

# Osseiran Exhibit F

## Agreement

The undersigned, shareholders of MECG Limited, a company duly established and registered in Guernsey, hereby agree as follows:

To sell to First National Bank or other buyers all their shares in MECG Limited under the following terms and conditions:

1. The price per share is $60 (USD Sixty only) excluding the Real Estate Fund or $66 including the Real Estate Fund.
2. This agreement between shareholders representing 51% of the shares should be signed before February 25, 2006 in order to undertake to sell collectively their shares according to the conditions set forth below.
3. A Sale Agreement should be signed between the signatories of this agreement and FNB or other Purchasers before March 31st, 2006 after the due diligence – if need be – is already done by the Purchaser. On March 31, 2006 the only outstanding condition of such Sale Agreement should be the approval of Central Bank of Lebanon and/or the Guernsey relevant authorities if need be. The Sale Agreement should include a provision stating that it will become null and void in case the above approvals are not obtained and the payment of the price is not done before May 31st 2006, being understood that as soon as if the above approvals are obtained the price should be paid immediately without delay.

Done in Beirut on February 16, 2006 on as many copies as the signatories hereto. Each signatory received a copy hereof.

Name: _Jan van Bilsen_ _February 17, 2006_
Signature: