# IFC
# EXHIBIT D

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SALAH OSSEIRAN, | ) | |
| Plaintiff, | ) | Docket No. CA 06-336 |
| v. | ) | |
| INTERNATIONAL FINANCE CORP., | ) | Washington, D.C. |
| | ) | March 28, 2006 |
| Defendant. | ) | 3:30 p.m. |

*TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE*

APPEARANCES:

For the Plaintiff: BLANK ROME
Michael Joseph, Esq.
Watergate 600 New Hampshire Ave., NW
Washington, DC 20037
202.772.5959

For Defendant IFC: WHITE & CASE
Francis A. Vasquez, Esq.
Frank Panopoulos, Esq.
701 Thirteenth Street, NW
Washington, DC 20005

INTERNATIONAL FINANCE CORPORATION
Becher Atassi, Esq.
Karim Suratgar, Esq.
2121 Pennsylvania Ave., NW F-7P-264
Washtington, DC 20433

Court Reporter: Scott L. Wallace, RDR, CRR
Official Court Reporter
Room 6814, U.S. Courthouse
Washington, D.C. 20001
202.326.0566

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

2

AFTERNOON SESSION, MARCH 28, 2006

(3:31 p.m.)

THE DEPUTY CLERK: Civil action 06-336, *Salah Osseiran versus International Finance Corporation*. Counsel, please state your names and who you represent for the record.

MR. JOSEPH: Michael Joseph for the plaintiff.

THE COURT: All right.

MR. VASQUEZ: Frank Vasquez for the defense. I'm here with Frank Panopoulos, who is also from my firm; Becher Atassi, a lawyer with IFC, and Karim Suratgar, another lawyer with IFC.

THE COURT: All right. Thank you.

Counsel, what I wanted to do is assign about a half hour per side for argument unless you all have reached any other agreement that I need to know about. I would like to proceed in that fashion. And of course, I'll offer the movant the opportunity to go first.

I'd appreciate hearing from you in the beginning, if you can, your address of the threshold issue about immunity claimed by the defendant before you get into the likelihood of success on the merits and the choice of law issues that that spawned and the other factors for consideration under the preliminary injunction.

MR. JOSEPH: I would be happy to do that, Your Honor.

THE COURT: Thank you.

MR. JOSEPH: May it please the Court.

The defendant's claim of immunity is that the -- that IFC

Scott L. Wallace, RDR, CRR
Official Court Reporter

3

is immune from prejudgment attachments. And we agree it is immune from prejudgment attachments.

We don't agree that the preliminary injunction sought here is tantamount to a prejudgment attachment. We believe that issue is pretty well disposed of by the Supreme Court in the *Grupo Mexicano De Desarrollo* case cited in our reply brief, in which the Court clearly distinguishes between injunctions that are restraining lawful conduct -- i.e., a prejudgment attachment of property that the defendant is otherwise free to dispose of -- and an injunction restraining unlawful conduct, such as here, the injunction would restrain conduct in breach of an agreement.

THE COURT: But does *Grupo* address anywhere the immunity of a foreign state or international organization?

MR. JOSEPH: It does not, but it certainly addresses the ultimate question here: Is a preliminary injunction, such as the one sought here merely to preserve the status quo and prevent the case from becoming moot, a prejudgment attachment? If it's not a prejudgment attachment, then by the clear language of the waiver of immunity, IFC has not reserved or has not withheld its waiver of immunity. It has only withheld it for prejudgment attachments.

THE COURT: Help me understand, then, how enjoining IFC from selling its -- is it MECG?

MR. JOSEPH: MECG, Middle East Capital Group.

THE COURT: Enjoining them from selling their MECG shares

Scott L. Wallace, RDR, CRR
Official Court Reporter

4

to anyone other than the plaintiff pending this outcome is different in any way that matters here?

MR. JOSEPH: Different from a prejudgment attachment? I submit, again, Your Honor, it's different from a prejudgment attachment in that a prejudgment attachment restrains a party from conduct that, but for the injunction, is lawful conduct.

THE COURT: For purposes --

MR. JOSEPH: In a typical prejudgment case, as the Court knows, the plaintiff is seeking a money judgment and it is trying to attach otherwise free property of the defendant simply to preserve assets to collect if it wins the case.

That is not the case here. And in the Supreme Court *Grupo Mexicano* case, the question was -- the clear question was: Is this a prejudgment attachment, because it was clear to the Supreme Court that the federal courts did not have jurisdiction to allow prejudgment attachments. And obviously, if you can't -- if you can't allow a prejudgment attachment, you can't achieve that same result by simply issuing a preliminary injunction that has the same effect.

But the Court made it very clear that it is not a prejudgment attachment when, in aid of the Court's jurisdiction, you -- the Court is merely preventing the defendant from engaging in conduct which would foreclose the ultimate remedy sought by the plaintiff; in this case, specific performance.

We're here seeking specific performance. If the shares

Scott L. Wallace, RDR, CRR
Official Court Reporter

1 of 17 sheets Page 1 to 4 of 68 04/26/2006 01:32:05 PM

5

are sold, by definition, we're not going to get specific performance. That doesn't mean, of course, we're out of court, but -- but the remedy of specific performance is very important in this case because of the objective of the plaintiff to acquire an absolute majority of the outstanding stock of MECG.

THE COURT: It sounds as if that parallels your argument in the papers that I should draw a distinction between the purposes for which a preliminary injunction might be sought when you address those cases that IFC had cited, I think principally from the Second Circuit.

MR. JOSEPH: Yes, they are money judgment cases. But I really think -- I really think the Supreme Court decision sharpens that distinction. And that decision came after those decisions from the Second Circuit.

THE COURT: But if I look at those cases and the way you distinguish them, I thought those cases really did not focus on the purpose of the sought-after injunctions, but upon the effect of the foreign entities' use of the property or access to the property.

MR. JOSEPH: I have the same recollection, that those cases did not focus on the purpose of the injunction, but the Supreme Court in its subsequent decision clearly did.

The additional argument we have: Even if this injunction could properly be viewed as a prejudgment attachment, it is prejudgment attachment of IFC's property that is prohibited. We

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6

believe, if we're correct on the merits, that the shares in question are really no longer IFC's property, but that the plaintiff, Mr. Osseiran, is the equitable owner of those shares.

Similarly, IFC claims that it has an agreement to sell the shares to another third party. If IFC is correct, then it would seem that that third party has the equitable ownership of those shares. In neither event does IFC have such ownership.

THE COURT: Might that depend upon whose law I'm using to make that determination?

MR. JOSEPH: It would. And I think we'll address the choice of law and, in our view, it's fairly clear that it is D.C. law that governs these questions.

With the Court's permission, I'll turn to the merits.

THE COURT: Would that include the choice of law analysis?

MR. JOSEPH: It will. If you would like, I will be happy to address that first.

THE COURT: All right. It's a little thickened, so I would like to hear from you.

MR. JOSEPH: I think we both agree that the test of what law to apply -- that is, what factors we look at -- are place of contracting, place of negotiation, place of performance, location of subject matter and where are the parties from?

In terms of the place of contracting, the contract that we contend already exists consists of an exchange of e-mails. The origin and -- the place of origin and receipt of those e-mails

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7

varies. Some of them, I believe, came from Dubai; some of them came from Lebanon; some were sent to and may have come from the United States. But in no event is there any indication that Guernsey, which is defendant's preferred forum, had anything to do with the negotiations, the place -- or the contracting.

The negotiations, similarly --

Well, back to the place of contracting. I did overlook --

If we, in fact, had executed the formal share sale agreement, it's likely that it would have been executed by the last party to execute; namely, IFC in Washington, D.C. or perhaps in Dubai if Mr. van Bilsen was located there at that time. But we really don't know where they would have signed it. It's highly unlikely that either we or they would have signed the agreement in Guernsey.

The negotiation similarly took place through an exchange of e-mails and telephone conversations, some of which did originate or at least take place in the District of Columbia, some in Lebanon, perhaps some in Dubai, but again, there's no indication in this record that any negotiations took place in Guernsey.

THE COURT: Well, does it make any difference that the draft sales agreement has some line on it that says this agreement will be interpreted under the -- or governed by and interpreted in accordance with the law of Guernsey? Am I to make anything of that?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

8

MR. JOSEPH: It's certainly relevant that, had we entered into that agreement, we did not object to that provision. Had the agreement been executed, then Guernsey law would have applied to the interpretation of that formal agreement. And we had no problem with that because that formal agreement was, in essence, a closing document. It was an agreement that would be executed at the time of the down payment, the furnishing of the bank guarantees and the exchange of the shares.

So there wasn't much left to interpret at that point. Under Guernsey law, it would have been insignificant. But I don't think that indicates that anyone agreed or contemplated, or at least that we contemplated that Guernsey law would apply before we saw that draft agreement. And of course, the parties are always free to choose any jurisdiction for the application of laws. I'm not sure that the parties' subsequent indication that they were going to choose that addresses any of the factors that we -- that we applied to determine what law applies when they haven't chosen it.

And I do think that simply -- simply, IFC's addressing of those factors indicates that they're certainly not taking the position that we agreed upon Guernsey or there would be no need to address those factors.

THE COURT: I take it there's nothing in the record that I saw that shows that your plaintiff objected to that or asked for a different --

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

04/26/2006 01:32:05 PM Page 5 to 8 of 68 2 of 17 sheets

9

MR. JOSEPH: He did not. He did not.

THE COURT: Go ahead. I'm sorry.

MR. JOSEPH: The place of performance, the third factor: To perform a contract, IFC would have to deliver shares. We don't know where they would have delivered them. Probably in the District of Columbia or perhaps in Dubai; no indication they would have delivered them in Guernsey.

Mr. Osseiran would have made his down payment and provided the bank guarantees. The down payment at least was indicated by the draft formal agreement to be made at CitiBank in New York to IFC's account there. Again, no connection with Guernsey.

THE COURT: Well, let me just ask: You don't cite any authority that the location of performance would presumptively have been Washington, D.C., where IFC's headquartered?

MR. JOSEPH: We do not and we didn't intend to argue that it would presumptively be there. We simply speculated -- since the agreement was never signed and we never closed, we speculated that the shares are likely held by IFC here and could well have been delivered here, but the record isn't clear where that would have happened. I think there's nothing in the record, however, to suggest that it would have happened in Guernsey.

The location of the subject matter -- again, we speculate that the stock is here in D.C. And again, the funds that Mr. Osseiran has set aside for payment are likely in Switzerland or Lebanon, not in Guernsey.

Scott L. Wallace, RDR, CRR
Official Court Reporter

10

The parties, it is clear, have no relationship to Guernsey. Of course, MECG is a Guernsey corporation, but MECG is not a party and we're looking only to the location of the parties. Clearly, IFC is headquartered here and its principal place of business is here.

As I indicated earlier, Your Honor, our ultimate relief that we seek in the case is specific performance of this contract and we're here seeking a preliminary injunction simply to preserve the Court's ability to grant that relief. If the shares are sold, I don't see how the Court can grant that relief.

The principal criterion that the Court will look to to decide whether we're entitled to that injunction is our likelihood of success on the merits. That, of course, in turn depends upon whether we have made out the existence of an enforceable agreement at this point.

And one thing we haven't done that I would like to do is simply go through the e-mails that we contend constituted that agreement. And it's -- they're very simple. They're at Exhibits A and B to Mr. Osseiran's affidavit submitted with our motion and I can just read you the excerpts that are critical from them.

On November 18th, Mr. Osseiran, who had clearly had telephone conversations with IFC's van Bilsen about this transaction, writes to van Bilsen "to confirm our agreement" -- those are his words -- and he then recites the purchase price,

Scott L. Wallace, RDR, CRR
Official Court Reporter

11

the schedule of payments, the circumstances under which a contingent payment will be made and when that will be made. And he makes it clear that the delayed payments, the installments after the down payments, will be secured by a bank guarantee of a first class bank acceptable to IFC.

The same day, van Bilsen responds --

THE COURT: May I interrupt you for a moment?

MR. JOSEPH: Yes, you may.

THE COURT: Are you contending that this e-mail is evidence of a completed agreement at that point or that a completed contract existed then?

MR. JOSEPH: Not at that point.

THE COURT: Go ahead.

MR. JOSEPH: Later that day, van Bilsen responds to him and he says: "Can you please confirm various points?" One of those points is: "Our acceptance is subject to documentation by a definitive agreement, if you will, and acceptable bank guarantees."

What's critical, though, is the language "our acceptance." And he goes on to make several other points. He takes issue with two of Mr. Osseiran's points in his offer and then at the end he says: "Please let me have your agreement, after which IFC and Barclays will seek final confirmation internally on those terms."

He says that on the 18th. The following day, Mr. Osseiran responds to him and he confirms the understanding about the

Scott L. Wallace, RDR, CRR
Official Court Reporter

12

acceptance being subject to final documentation. And he then rejects the two points that van Bilsen had changed. One was would the price change if -- and to the extent that Osseiran was able to buy shares from someone else for a higher price, would he then increase his price to them? He rejects that. And the contingent payment timing, he had proposed three years; van Bilsen said let's do it in two years; he rejected that. And that is on the 19th.

Five days later -- actually, four days later, on the 23rd, van --

THE COURT: Let me ask you the same question I asked a moment ago.

MR. JOSEPH: Not a contract yet.

THE COURT: Go ahead.

MR. JOSEPH: On the 23rd, however, van Bilsen writes him -- van Bilsen, who several days earlier had said "If you agree, we will submit this for final confirmation internally" -- he then says, "We confirm our agreement".

THE COURT: What are you reading from now? I'm sorry to interrupt.

MR. JOSEPH: I'm reading from the e-mail of November 23rd from van Bilsen to Osseiran.

THE COURT: Go ahead.

MR. JOSEPH: And at the end of the second line, he says: "We confirm agreement."

Scott L. Wallace, RDR, CRR
Official Court Reporter

3 of 17 sheets Page 9 to 12 of 68 04/26/2006 01:32:05 PM

13

Well, in the context of his prior e-mail stating that he would obtain internal confirmation or confirmation internally, this was a very significant statement. And a reasonable interpretation of that statement is certainly "I have now obtained final confirmation internally. That's what I'm going to do; that's what I've done."

And one might reasonably ask, if -- what did van Bilsen mean in his November 18th memo when he said "We will seek final confirmation internally on those terms" if he didn't mean we're going to get approval for our deal. Well, on the 23rd, he said we have it and as far as we're concerned, that -- all those agreements culminating in the 23rd constituted a binding agreement.

THE COURT: That will be the entirety of the contract to which the parties are bound, with no other terms specified?

MR. JOSEPH: Well, certainly no material terms. And --

THE COURT: Bank guarantees aren't material?

MR. JOSEPH: Well, the bank guarantees are one of the terms. The form of the bank guarantees are certainly material, but I think any sophisticated investors understand that bank guarantees are fairly standard documents. They vary as between the banks who are issuing them. Banks prefer their own forms. But everyone knows what a "bank guarantee from a first class bank" means.

THE COURT: Didn't the parties disagree or bicker a little

Scott L. Wallace, RDR, CRR
Official Court Reporter

14

bit about --

MR. JOSEPH: Only over form. And Mr. Osseiran's bickering was simply "This guarantee, I think, our bank is going to find a little too complicated and they're going to submit it to their legal department. Why don't you contact the bank and you and the bank work out what form works?"

And I've examined the two forms, the form that IFC proposed and the form that the Swiss bank ultimately proposed to IFC, and there's no substantive difference. There are differences in form, the words they use, the timing of when the party protected by the guarantee is required to submit his demand for payment.

But there's no question but that all IFC has to do, if it does it within the specified times, is say, "We haven't received our second installment" and the bank is irrevocably bound to pay that installment, irrespective of whether there are any disputes as to whether the installment is due under the sale agreement.

THE COURT: Suppose the parties had not reached any agreement at all and continued to bicker about, let's say, the bank guarantee, is there a contract?

MR. JOSEPH: Well, there's a contract, but there's never a closing, if you will, until a guarantee reasonably acceptable to IFC is produced. And there is some objective standard by which a court could determine, or any independent person could determine, whether IFC's objection to any form of guarantee would be

Scott L. Wallace, RDR, CRR
Official Court Reporter

15

reasonable.

But it's, I believe, highly unlikely that anyone protected by a guarantee would ultimately not be satisfied with the language proposed by USB in this case, which is a very large, prominent Swiss bank.

THE COURT: Well, at this point on the 23rd, do I then hear you to say that I should make nothing of the exchange several days earlier that the deal is subject to ultimate documentation?

MR. JOSEPH: Well, it's certainly relevant and the cases that both parties cite in their briefs are cases involving just that: Preliminary agreements subject to formal documentation in a more formal, if you will, agreement.

THE COURT: Well, help me. Hasn't the D.C. Court of Appeals refused to recognize this preliminary agreement, contract to make a contract notion?

MR. JOSEPH: I don't believe so, Your Honor. I think, as a matter of fact, that the *Jack Baker* case has language in it quoting from a 1978 D.C. case, *Council v. Jackson*, and I'm reading from the *Jack Baker* case: "Parties may make an enforceable contract binding them to prepare and execute a subsequent documentary agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document."

Scott L. Wallace, RDR, CRR
Official Court Reporter

16

THE COURT: Go ahead. I'm sorry.

MR. JOSEPH: That document is understood to be a mere memorial of the agreement already reached. And our view here is that that is exactly what we have in this case. We have what the Fourth Circuit in the *Burbach* case refers to as a "Type I preliminary agreement," one in which the formal agreement that the parties contemplate is not only in the mere memorial; it's desirable, but it's not necessary in order to have a binding agreement.

We believe this also constitutes at least a Type II agreement in which, perhaps, there are some details left to negotiation, but the agreement -- the preliminary agreement is such that it binds the parties to negotiate in good faith to reach those terms.

Again, we don't think any of the remaining terms was material, but even to the extent they were, at a minimum, IFC was bound to negotiate in good faith.

THE COURT: Do you have any authority for the proposition that the D.C. Court of Appeals would take the subsequent draft sales agreement that was sent that day or later that day that says this is not a contract, it's not an offer, there's no intent to be bound, and consider that language in connection with whether there was indeed an agreement made by the 23rd on all material aspects of the --

MR. JOSEPH: I had not seen any authority that would

Scott L. Wallace, RDR, CRR
Official Court Reporter

04/26/2006 01:32:05 PM Page 13 to 16 of 68 4 of 17 sheets

17

address the importance of a statement to that effect that is made subsequent to the preliminary agreement. In effect, what they said in the draft formal agreement was "This draft formal agreement will not be binding until signed," which made perfect sense. Why have an expectation of a subsequent formal agreement if the parties don't intend to sign it?

I have found no case that really dealt with similar facts. But we do think it's critical that those statements came after the fact, after the November 18th through 23rd exchange of e-mails.

THE COURT: Well, let me go back, then, to the acceptance. When IFC accepted plaintiff's, I guess, three proposed terms with the condition that its acceptance be subject to documentation, was that a statement of intent to be bound by any completed sales agreement?

MR. JOSEPH: Well, we believe it was a statement of intent to be bound to the terms of this sale, which the parties expected would be reduced to a formal agreement memorializing those very terms; at a minimum, we think it reflects a clear intent to be bound to negotiate the terms of that formal agreement in good faith.

THE COURT: Which is different from what the D.C. Court of Appeals was talking about in *Jack Baker*. They were talking about an agreement where all of the material terms had been reached and were documented or agreed upon.

Scott L. Wallace, RDR, CRR
Official Court Reporter

18

MR. JOSEPH: That's true. They were talking about what the subsequent courts had referred to as a Type I agreement. They had not addressed -- that was a 1978 decision from which I quoted.

The *Teachers Insurance* case in the Southern District of New York and the Fourth Circuit's decision in *Burbach* were more recent cases and we have found one case in Maryland interpreting Maryland law in which the District Court in Maryland adopts the *Teachers Insurance* test, which includes the Type I and the Type II -- the *Teachers Insurance* analysis. And that case is *Tecart, T-E-C-A-R-T, Industries versus National Graphics* and it's reported at 181 F.Supp.2d at page 451. And that's Judge Harvey of the District Court in Maryland.

And as the Court knows, to the extent D.C. law is silent on something, it is appropriate to look to Maryland law to attempt to predict what the D.C. court would hold if asked to address that question.

THE COURT: What should I make, by the way, of the plaintiff's response to the draft sales agreement with all the disclaimers on it, that it's generally okay and that he did not reject any of it?

MR. JOSEPH: Well, again, it's -- the agreement is generally okay with me. I understand that "this formal agreement will not be binding until we sign it" made perfect sense, but I don't think it said anything about what the prior exchange of

Scott L. Wallace, RDR, CRR
Official Court Reporter

19

e-mails constituted, whether they constituted a binding agreement.

THE COURT: And your argument is, just so I make sure I understand, it's a binding agreement to continue to negotiate the remaining terms of the final sales agreement in good faith?

MR. JOSEPH: It was at least that; we think it was more than that. We think it was a binding agreement on all of the material terms of the transaction, leaving only the formalization of those very same terms, the memorialization of those terms, as the courts phrase it, in another agreement, so that there was really nothing of significance left to negotiate.

And I suggest that in IFC's opposition to this motion, while they say there were material terms outstanding, I don't think they really point to any term that was material that hadn't been decided or hadn't been agreed upon in the exchange of e-mails.

They point to -- oh, there was a reference to "How are we going to document the share transfer," I presume they meant on the books of MECG. Mr. Osseiran thought the language of the contingent payment was unduly complicated. He never took issue with the substance of the contingent payment, the amount or the circumstances under which -- and the timing on which it would become payable.

There was a provision about IFC wanted him to pay their legal fees. He objected to that -- their legal fees in

Scott L. Wallace, RDR, CRR
Official Court Reporter

20

connection with the drafting of this formal agreement. Now, I don't think that was a significant point. In the end, IFC would have given on that or he would have agreed to pay the fees, which would undoubtedly be quite insubstantial.

And then, again, the form of the bank guarantees. He simply said, "I think your form is too complicated. If you want to close this transaction, why don't you talk to the bank and use their form?" So none of these terms was material.

If I may, briefly, as I'm running out of time, if I haven't done so already, Your Honor, I just want to mention briefly the irreparable injury question. I don't think there's much of a serious issue here as to whether the ability or frustration of the ability to obtain control of a privately held corporation constitutes irreparable injury.

IFC's response to that is simply: "When did Mr. Osseiran form that intent?" I don't think it's relevant as to when he exactly formed that intent. He says he informed IFC of that intent early in the negotiations; they disagree with that. But I don't think anyone disagrees that he ultimately formed that intent and that he has that intent today.

THE COURT: And his intent today is to run the company, turn it into a profitable company and not liquidate it; is that correct?

MR. JOSEPH: Exactly. Absolutely, Your Honor.

On the balance of harms, another important point, from

Scott L. Wallace, RDR, CRR
Official Court Reporter

5 of 17 sheets Page 17 to 20 of 68 04/26/2006 01:32:05 PM

21

IFC's standpoint, this is just about money and we are prepared to post a cash deposit with the Court on the entry of any preliminary injunction in approximately the amount of $300,000, which we calculate to be the difference between the price in our agreement with IFC and the price that IFC says it has another agreement to sell the shares at a higher price.

I should note in that connection, Your Honor, that while they indicate they have such an agreement, the only agreement they have put before the Court or have referred to is a one-page agreement that is simply an agreement among shareholders. There's no purchaser that is the subject -- or that is a party to that agreement.

But if indeed they have an agreement that they can enforce to sell those shares for $66, as they say, we're prepared today, if necessary, to post that amount of cash with the Court.

THE COURT: Is it 66 or 60?

MR. JOSEPH: I believe it's 66 if certain real estate assets are included, 60 if they're excluded. Our take on that is that it would be rather impracticable to exclude the real estate assets so we're assuming they're going to get the higher price.

THE COURT: On the balance of harms matter, before you conclude, if the law does make IFC immune from the injunction that you seek, how would there be any greater harm to a party than to enjoin IFC? How could there be any greater harm? If they're immune from the injunction that you're seeking, if I

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

22

impose an injunction, how could there be a greater harm than that?

MR. JOSEPH: If they're immune, then the Court can't impose the injunction. That would be harm. And obviously, our arguments presume that the Court will agree with us that they're not immune, that this is in no sense a prejudgment attachment.

THE COURT: And again, before you sit down, on the question of your client's intention to run the company and what opportunity he's missing, he's missing an opportunity to gain majority control. I take it you're not arguing he would be missing an opportunity to profitably invest his money elsewhere or get a bigger profit on the sale or something else?

MR. JOSEPH: Well, he has missed that opportunity to the extent that he has already purchased a very substantial minority interest in this company and, should he not achieve majority control, he has that money as a -- I think in excess of $5 million invested as a minority stockholder in a money-losing corporation and he has no confidence that the buyer, assuming the buyer is the Lebanese bank that they refer to, will turn this around. In fact, I think the indication is they will liquidate it.

THE COURT: I guess I mean in connection with your claim on Count 2 for promissory estoppel, if he has relied to his detriment on these promises that you have claimed, his principal detrimental reliance was not that he missed a chance to

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

23

participate in the sale to this bank?

MR. JOSEPH: That's correct. He's had that chance.

THE COURT: Okay. I just wanted to make sure --

MR. JOSEPH: That's not included.

THE COURT: All right. I didn't mean to cut you off. Go ahead.

MR. JOSEPH: I'll rest for now and, hopefully, reserve a few minutes for rebuttal if the Court has time.

THE COURT: All right.

MR. JOSEPH: Thank you.

THE COURT: All right.

MR. VASQUEZ: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. VASQUEZ: I will begin by addressing the immunity issue as well.

I do have a handout to give you. It's just some of the authorities that relate to the immunity issue.

THE COURT: Has counsel gotten one?

MR. VASQUEZ: Yes.

THE COURT: All right.

MR. VASQUEZ: Now, I know they've conceded that IFC is immune from prejudgment attachment, but I think this issue is so important to IFC, and since it's never come before a court before in this context, I would like to give a little background and talk about that for a little bit.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

24

IFC is an international public institution that was founded in 1956 and it currently has 178 member countries, including the United States. Over the past 50 years, IFC has made nearly $50 billion in investments in 140 developing countries.

Despite all this activity, IFC does not appear in court very often. I think there are a total of ten reported cases in which IFC has been a party in the past 50 years. There are two reasons for this.

The first is that IFC is a very formal institution. It acts like a government institution. All of its investments are carefully documented; all of its deals are very carefully done. It has, you know, relatively few disputes for the number of deals that it enters into.

And the second reason you don't see it very often is that IFC's immune from most judicial process under the International Organizations Immunities Act and its Articles of Agreement, to which each of the member countries have agreed.

THE COURT: Well, I thought IFC has waived its immunity for certain kinds of lawsuits, including this one?

MR. VASQUEZ: That's the point I want to get to, that we're talking about a different kind of immunity here than the general immunity.

What the D.C. -- as the D.C. Circuit held in *Atkinson*, the immunity that we're talking about -- the immunity that applies to

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

04/26/2006 01:32:05 PM Page 21 to 24 of 68 6 of 17 sheets

25

IFC is the immunity that belonged to sovereigns in 1945. And that immunity -- there's a general immunity, but there's also a separate immunity that applies to foreign sovereigns, an immunity from attachment or execution on property.

Now, in *Atkinson*, the D.C. Circuit held that the IOIA gave this general immunity -- applied this general immunity from 1945 to IFC or to other international organizations.

But as I was saying, traditionally, there are three types of immunity. There's immunity from suit; there's immunity from attachment or execution on profit; and there's something called "archival immunity." These things are all present in the IFC's Articles of Agreement.

Just for reference sake, the immunity from suit was codified by Congress as 28 U.S.C. 1604. And if you read that section, it talks about immunity from suit. The separate immunity from attachment or execution was separately codified by Congress when it went to the FSIA and that appears at 1609, so it gives you an indication that these are actually separate concepts that we're talking about.

And it's the second kind of immunity that's at issue for this hearing today and for this motion because of the type of remedy that's been asked for.

The Second Circuit gives a good description of this in the *De Letelier* case and it's at tab 7 in this binder, also cited in our brief. And I just wanted to focus your attention on one

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

26

thing.

If you go to this opinion, and I'm looking at the page that's 798 -- I'm sorry. It's page 790 of the opinion; it's 748 F.2d. And what the Second Circuit is discussing here is this idea of a right without a remedy. And this was what plaintiff's counsel was just complaining about. Well, look, you know, if you give an injunction here, it will be like we have a right, but we don't have a remedy for it. And that's exactly what this kind of immunity entailed.

And it's described through this provision here. And then, if you go to the conclusion, which we cited in our brief, that this -- when -- that the kind of immunity that was present in 1945 was absolute as to these kind of attempts at attachment, so you could go get a -- you could sue a sovereign; you might be able to get a judgment against them, but you couldn't go and attach assets and try and enforce that judgment. And you certainly couldn't do it before you got a judgment either. That all had to be worked out in other means or politically, frankly, in 1945.

That's the kind of immunity that IFC has retained, subject to its Articles of Agreement. So if you look at those Articles of Agreement now, you'll see where this appears explicitly. And that's in tab 1 of this binder. I'm looking at article 6. It's on page 9.

Now, what *Atkinson* held in interpreting section 3 is that

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

27

the first part of this section was a limited waiver to allow the corporation to be sued in essentially the D.C. courts, in the D.C. Federal Court, for certain things. But if you look at the last section, the last sentence of that section, that deals with the kind of immunity that we're talking about here today, the immunity from attachment or execution.

And it says: "The property and assets of the corporation shall, wherever so located and by whomsoever held, be immune from all forms of seizure, attachment or execution before the delivery of a final judgment against the corporation."

So you see there's an explicit reference here and this is incorporated by law, not only our law, but the law of 178 countries, that IFC is immune from all forms of attachment, which would include the remedy being sought here today.

And maybe for curiosity's sake, archival immunity is also dealt with here in section 5, but we don't need to deal with that here today.

But these Articles of Agreement are very clear and they don't have any exception for this form of attachment.

Now, as to the argument as to whether the remedy sought here is essentially a form of prejudgment attachment, I think that's pretty well disposed of in the *S & S Machinery* case and the other cases that follow that.

THE COURT: One of them is *Grupo*. What's your answer to counsel's assessment of *Grupo* and how it controls?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

28

MR. VASQUEZ: I don't think *Grupo* has anything to do with this case. The -- I think what *Grupo* is really saying is that you can't -- if you can't -- if you don't have a right to a permanent injunction, you can't get a preliminary injunction in that sort of case.

But if you look at what they've cited -- and they have a problem here. They're taken a quote which they cite for the proposition -- and it's completely split. This is on page 1966 of the Supreme Court report and I'll just hold it up so you can see it. The two pieces of their quote where they stick the ellipsis in or the brackets in are this far apart (indicating) and they put like three words in between to sort of create their argument. It just doesn't say what they say it says, is the problem they have with it.

And I don't think it has anything to do with the issue that we have here before us today, which is the extent of IFC's immunity, which is not dealt with at all in this case.

I think the courts that have dealt with this since have dealt with it in the proper way. If you look at the -- in particular, the most recent one we have is the *TENEX* case, which we have a -- we don't have a written opinion; we have a transcript from that case.

And that case is interesting also because it shows you the difference between these two forms of immunity. I've included not only the *TENEX* transcript in this binder, but behind tab 12,

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7 of 17 sheets Page 25 to 28 of 68 04/26/2006 01:32:05 PM

29

there's a Fourth Circuit decision which preceded that hearing. And what happened in that case is when TENEX first made its argument to the District Court, the District Court ruled that it was immune from suit.

The Court of Appeals reversed on that ground and said go back and consider these other types of immunity and other issues. You see that at the very end of the -- at the very end of this case. It's reported at 376 F.3d, page 292. And so when it went back to the District Court in Maryland, the Court in Maryland then had to undertake this analysis of what is 1609 or the immunity from attachment and analyze the situation.

In this case, the plaintiff sought to prevent TENEX from -- I keep saying "TENEX"; that's the abbreviation of this company called AO Technsnabexport, which is very difficult to pronounce. But the Court recognized that in attempting to restrict TENEX from using its uranium, selling its uranium, that they were in violation of this provision preventing a prejudgment attachment and so this preliminary injunction was denied.

And in that case, since the only issue was a preliminary injunction in aid of an arbitration, the whole thing was thrown out. But I think that this is the proper analysis, although it's under an FSIA context and not under the context that arose in 1945, so you have to go back to that *De Letelier* case to get that rule that there's no -- there's no possibility of a prejudgment attachment, because under the FSI, there are exceptions that

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

30

allow it under certain circumstances that don't apply here.

I will move on to the other half of this. Concerning the merits of this case, first going to the choice of law issue, I think you hit it on the head that really, the -- Guernsey does have the closest connection to this. We're talking about a Guernsey corporation; any sale of shares is going to have to be registered there. The parties recognized this in the draft agreement. They put a provision in there indicating that's what they would expect would apply here.

And I think even D.C. authority looks -- when you're talking about the internal affairs of a corporation, and that's what this really concerns, if you accept that what he's really trying to do is take control of this company, that involves -- certainly involves the internal affairs of this company. Under the internal affairs doctrine that D.C. courts have applied, for instance, if it concerned a Delaware company, they would have applied Delaware law.

In this case, it concerns a Guernsey company. A sale of shares which they say the import is it will give them control of the company should require a court to apply Guernsey law in that circumstance.

I'm not going to go over what the Guernsey law is because they haven't opposed it; they haven't contested our opinion, which I think is stated out very clearly and I don't think we need to go over that now.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

31

I will address --

THE COURT: They may not have contested what the opinions were from the lawyers, but I don't think they accepted your proposition that Guernsey law -- the choice of law results in an application of Guernsey law.

MR. VASQUEZ: I agree.

THE COURT: You made a point in the papers that the place of performance would have been Guernsey because that's where the MECG resides and where the stocks are registered. What authority do you have for that proposition?

MR. VASQUEZ: That ultimately, the shareholding -- the registration has to be done where the corporation is. It's that simple.

THE COURT: And what's your authority for that, that that's where the performance is? Because the plaintiff has a very different argument on that score.

MR. VASQUEZ: Well, the corporation -- the shares can only be registered where the corporation is located. I don't think there is -- there isn't anywhere else to register shares of a Guernsey corporation other than the location of the corporation.

THE COURT: I guess the question is what's the authority for the proposition that the location of the registration of the shares determines performance -- location of performance? They say that if the stock certificates are held in the hands of IFC in Washington, D.C., that's where it's got to be

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

32

performed if you sell or turn over the certificates. So I'm asking what authority do you have that that is wrong?

MR. VASQUEZ: I think those are all factors that could be considered in a case as to where the physical item is. But in terms of -- when you're talking about a company, though, the shares are just representative of ownership of the company. They're not a good, if you will, that's being delivered or some kind of real property or something that's tangible. They're merely representative of your interest in this company that's in Guernsey.

In this case, you have people in all different places and all different times doing the talking. We have somebody in Dubai, somebody in Lebanon, sometimes there's somebody in Turkey, sometimes there's somebody in D.C. So as you can see, the sort of the physicality of where these people are talking from or located really doesn't have much relevance at all to the transaction itself, which ultimately is: Who's got an interest in this company in Guernsey and what is the nature of that interest and how much do they have and do they have the majority or not?

So I think that while those factors -- you certainly would consider those factors, I don't think they're very meaningful in a case like this where the interest is a share interest and the parties are in so many different locations that it doesn't seem to really matter to them where they are physically.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

04/26/2006 01:32:05 PM Page 29 to 32 of 68 8 of 17 sheets

33

But I will address – I realize that the Court could simply rule that, well, I'm not going to deal with the conflict of law issue and could just decide it on the D.C. law issue in our favor if it feels that there's no conflict. We don't believe there's any conflict between Guernsey and D.C. law on the merits of this issue.

THE COURT: On the merits of which issue?

MR. VASQUEZ: The contract and promissory estoppel issues.

THE COURT: I thought the plaintiffs had submitted opinions that suggested that the foreign laws have very limited recognition, if any, of equity remedies and cause of action, promissory estoppel and so on.

MR. VASQUEZ: That's right. We've submitted those and we believe that we would prevail under that law, but we also believe we would prevail under D.C. law.

THE COURT: All right. I thought I heard you say that there's no conflict.

MR. VASQUEZ: That there's no conflict in the outcome, we don't think.

THE COURT: In the outcome. Go ahead.

MR. VASQUEZ: I would agree with you that the laws are different. When you're talking about Lebanon, it's a civil law country; Guernsey law is derived from what's called pre-Napoleonic French common law. But I don't think we need to go into all that.

Scott L. Wallace, RDR, CRR
Official Court Reporter

34

I will discuss the arguments under D.C. law that they raise. Fundamentally, what you're looking at for a contract is whether the parties intended their agreement to be binding. And what they've said in their e-mails is it's subject to documentation. There's that big legend on the front of the draft agreement that says the same thing.

THE COURT: But that didn't come until, apparently, two or three days after the plaintiff at least alleges an agreement was reached with respect to material terms. After the amount of the shares, the price for the shares, and the payment schedule, what else was there left to really figure out?

MR. VASQUEZ: Well, as you pointed out to the plaintiff, there was the documentation itself and there was the bank guarantees. And while he doesn't think -- we'll just talk about the bank guarantees.

Well, he doesn't think there's much of a difference between the two of them. We're just looking at them over here and I can tell you that there is a significant difference between them; that in the one proposed by IFC -- and this is -- looks like Exhibit -- it's contained within Exhibit C to Mr. Osseiran's first declaration, in paragraph 3, it talks about the guarantor as the primary obligor and not merely a surety.

If you look at what is the draft proposed by UBS, we don't think it's consistent with that. We think that it looks more like -- that the bank is proposing to be a surety and not the

Scott L. Wallace, RDR, CRR
Official Court Reporter

35

primary obligor.

And while we could debate what that means, the parties never got around -- they never got that far in terms of what went back and forth.

But I think fundamentally, when companies or parties say that what they're doing is subject to documentation, that is an important term in itself. The agreement can't be concluded until that is taken care of.

Now, the cases that we've cited in our opposition are not only the *Jack Baker* case, but also this *Noacon* case, which is both a D.C. District and a D.C. Circuit case. And they haven't addressed those cases at all in their reply or today.

And that case is an application of *Jack Baker* and it clearly says, look, if the parties have conditions on this, it's subject to approval, subject to documentation, you just don't have an agreement. And the *Noacon* -- the D.C. Circuit in *Noacon*, a Court of Appeals case, said not only do you not have an agreement, you can't have any reasonable reliance there; you can't have any promissory estoppel. And on that basis, those claims are rejected on summary judgment in that case.

I don't think they have any way around that case. They haven't come up with one and I think it's pretty dispositive of both of these issues.

THE COURT: Well, let me ask you, if I find it more likely at this stage that the plaintiff made plain to IFC his intent to

Scott L. Wallace, RDR, CRR
Official Court Reporter

36

gain majority control of MECG early on in these discussions, what would be unreasonable about his reliance on IFC's -- the IFC representative's repeated pledges to complete the agreement and the plaintiff's choices to continue to buy stock and not to sell out?

MR. VASQUEZ: Well, I think the -- well, two things. First, as I said, it's subject to documentation. IFC does not and cannot do business essentially by BlackBerry e-mail, which is -- I mean, that's what they're saying: He sent a message on his BlackBerry; that's an agreement. That's not how IFC does business and the plaintiffs recognize that.

The second thing is you have to recognize when he was acquiring these shares. We don't know exactly when he was acquiring all of the shares, but we do know at December 19th, we told him, look, we're not going through with this. We might go through with it; we may never go through with it. We understand there are other offers that need to be considered and we're going to go consider them.

At that point in time, any reliance after that certainly could not have been reasonable for him to continue to buy shares. And we know that he was buying those shares and went up to -- as of February 8th, I guess he had acquired something like 34 percent of them. And even with that amount, ours still wouldn't have put him over.

THE COURT: Do you concede that any share purchases before

Scott L. Wallace, RDR, CRR
Official Court Reporter

9 of 17 sheets Page 33 to 36 of 68 04/26/2006 01:32:05 PM

37

December and after the negotiations would be different?

MR. VASQUEZ: Possibly, although I don't know that there are any. There certainly aren't any identified in the record.

THE COURT: All right.

MR. VASQUEZ: Moving to whether there is any irreparable harm here, I don't think it's correct to say -- the plaintiffs have taken the position that, well, if this concerns a majority interest, it's per se irreparable harm. I don't think that the cases have held that. I think it's a case-by-case basis.

And I think in this case, the real question is, well, could he be compensated monetarily? Could we put a value on these things and could he be compensated? Because if he can, if he can get a damage remedy that's sufficient, then irreparable harm goes out the window. He doesn't have it under any circumstance.

I think here we have another transaction that we can look at that concerns a majority interest in the shares that he himself could have taken advantage of, but that essentially would tell you exactly what the damages ought to be in this case if he were correct on all of his claims.

THE COURT: Well, except he's already represented that he was not after trying to maximize a profit in the resale of the shares; he was looking to try to turn an unprofitable company into an ongoing, profitable concern. And don't the cases make a distinction between those two circumstances?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

38

MR. VASQUEZ: I think the distinction they make is more -- not so much what they might plan to do, but what their relationship was to the company in the past; that for sort of family-run companies or companies where the person that is the aggrieved party has been integral to the operations of those companies, that has been taken into account. In this circumstance, he would be irreparably harmed.

THE COURT: Are you saying there's authority to support the requirement that the plaintiff come here and show that the plaintiff's -- that the plaintiff's connection to the company prior to the attempt to buy the majority shares involved active involvement and closely held circumstances, things you just mentioned? What authority is there that he had to come and show that to show irreparable harm?

MR. VASQUEZ: Well, the --

THE COURT: The relationship to a company showing the kinds of things you just cited?

MR. VASQUEZ: Well, I think the argument comes up in response to their assertion that -- whether he's got a majority interest or not is a per se violation. We looked at the cases and they said, well, no, it's not in all those circumstances.

THE COURT: But in some circumstances, it is.

MR. VASQUEZ: In some circumstances, it can be. And one of those circumstances is when you have somebody who's been actively involved in the management of a company.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

39

THE COURT: Sure, but that's not a *sine qua non* to showing that that would be irreparable harm, where you're looking to get majority control and turning an unprofitable company into a profitable one and making an ongoing concern, is it?

MR. VASQUEZ: No. I agree, it's part of the evidence that should be considered.

THE COURT: All right.

MR. VASQUEZ: But the other evidence about his business is essentially that he's in the business of buying distressed companies, assumably to do something with them to make a profit. I don't think that he's got any particular -- I don't know -- affinity for this particular company. From what we've shown or what we've submitted, he's told our declarants he's just in the business of dealing in distressed companies and that's, you know, part of his business. So it really comes down to not some kind of irreparable interest, but it's simply a monetary interest.

THE COURT: Well, you concede there's no evidence in the record here that the plaintiff plans to liquidate the company and just turn it around and make a profit on it, on the sale of the company?

MR. VASQUEZ: I don't think there's evidence one way or the other. We have his stated intention and we have knowledge as to what his business is. And you can probably infer one thing or another from either one, but I don't think there's a definitive prediction as to what's going to happen with this company.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

40

Certainly, he hasn't put forward, say, a business plan, telling us what he might or might not do with this.

But I think the other issue, and I touched on it before, is whether, even at the -- he's sort of manufactured this issue, if you will, by buying all these other shares, because IFC did not have enough shares to give him a majority interest in the first instance. It didn't have them as late as February 8th.

It was only between then, I guess, and the next week, February 16th, where he acquired more shares, such that our 10 percent interest would have put him over the top, if you will. So it's almost like him creating that by buying the other shares and all of a sudden it's irreparable harm for us.

Well, our shares have never been a controlling interest and have never been anything more than a minority interest. It's just an investment. In fact, IFC under its articles is prohibited from managing its investments. So for IFC, it simply was an investment that it was planning on selling.

THE COURT: Although IFC tries to sell to parties who are going to make going concerns and not just flip them, right?

MR. VASQUEZ: I wouldn't say that's true in all circumstances, but IFC's goal -- you're right -- is to invest in companies that are going to further develop in developing countries and to, you know, hopefully, make sure that those things work out. But as for disposing of investments, you know, IFC is, I think, free to sell them to whoever may want them.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

04/26/2006 01:32:05 PM Page 37 to 40 of 68 10 of 17 sheets

41

Another point on this, I guess, is that they've asserted that this First National Bank is going liquidate this company and I don't think that's in the record. There's certainly no testimony from anybody associated with First National Bank that that's their intention.

THE COURT: Can I just ask you -- this is on a different point perhaps: Is your agreement -- is IFC's agreement with this First National Bank any more final and binding than your agreement with the plaintiff is?

MR. VASQUEZ: Well, the agreement -- we don't have an agreement with First National Bank. The agreement that we had is with the other shareholders, that we would convey as a group to First National Bank.

THE COURT: Well, then, let me phrase it differently. Is your agreement that appears as an attachment to the motion papers any more binding than the agreement that you have with the plaintiff? Or is it a conditional --

MR. VASQUEZ: It has conditions on it as well. I think it's more binding in that it's actually a signed document and there are other parties that signed their documents that aren't included there.

THE COURT: You say it's more binding?

MR. VASQUEZ: In that this actually is a concluded, signed document between parties, whereas there is no such document between us and the plaintiff.

Scott L. Wallace, RDR, CRR
Official Court Reporter

42

THE COURT: I guess the question is: Is this now a binding unconditional final agreement?

MR. VASQUEZ: No, this is not the agreement to sell to FNB because FNB is not a party to this agreement.

THE COURT: Regardless of the parties, is this a final, binding agreement?

MR. VASQUEZ: I believe it is, subject to the conditions that are listed.

THE COURT: Is that -- so a conditional agreement can be a final binding agreement?

MR. VASQUEZ: Well, I think you're talking about two different things. I mean, this is certainly subject to the due diligence of First National Bank and -- I don't think an agreement that's subject to conditions that haven't been fulfilled is a final agreement.

THE COURT: So you can walk away from this without liability?

MR. VASQUEZ: I think we need to make our best efforts to fulfill these conditions because that's what we've signed on to do, but whether there would be liability if the sale actually went through or did not go through, I can't answer that question because I don't have the agreement with First National Bank.

THE COURT: Go ahead.

MR. VASQUEZ: Going to the balance of harms and the public interest, you know, IFC represents the interest of 178 nations,

Scott L. Wallace, RDR, CRR
Official Court Reporter

43

including this one, and was essentially created to serve the public interest. I don't know that you can find a party that's more representative of a public interest that's not the United States government itself.

And when those 178 nations signed on to these Articles of Agreement, they did so with the expectation that the institution they were creating would be free of kind of harassment from lawsuits like this one and attempts to attach assets. The idea was that all of these countries would give up -- would give IFC some immunity; they would give them the right to operate sort of free from being -- from -- in a lot of circumstances even from being sued where IFC does not have an office, but the -- and had not consented.

But I think when it comes to prejudgment attachment, and you talked on that, that it would be directly against the public interest and directly harmful to IFC to issue an injunction. Even if there wasn't -- even if IFC did not have immunity or you weren't sure, I think that this factor would point strongly in IFC's favor.

The other thing that I think you should consider is that even -- I mean, even the plaintiffs in their reply, the first line of their reply, they recognize that IFC is a formal institution and doesn't do business by e-mails from BlackBerries.

But if IFC has to essentially fend off these kinds of lawsuits, it will make its ability to function very difficult,

Scott L. Wallace, RDR, CRR
Official Court Reporter

44

particularly when you're talking about -- because IFC has to function all over the world in all different jurisdictions. It can't be subject to this sort of, "Well, I think I have an agreement with you; I don't have a signed document, but I'm going to sue you anyway."

We think that for an institution like IFC to function properly in the world, that it can't be subject to this kind of preliminary attachment of its assets.

THE COURT: But I mean, isn't the reality here simply that some kind of a preliminary agreement or agreement to keep talking, whatever you might want to call it, has been reached involving the disposition of a 10 percent interest in a company and that if you are required to sell those shares to the plaintiff here, how are you going to be financially harmed if you are going to get the dollar benefit of the sale that you had preferred to make over to FNB? You're going to make it up anyway. How are you going to be financially harmed?

MR. VASQUEZ: I don't think it's just the financial harm. I think fundamentally it's are we going to hold an institution like IFC to agreements that haven't been executed when the parties have agreed that we're supposed to execute the agreements?

I honestly don't think the money is really the issue here. It's whether IFC can operate under these conditions and if they can operate under the threat of these kinds of lawsuits. I think

Scott L. Wallace, RDR, CRR
Official Court Reporter

11 of 17 sheets Page 41 to 44 of 68 04/26/2006 01:32:05 PM

45

the money is a relatively minor matter compared to that harm that would befall IFC if it were to come out -- or an opinion were rendered by this Court that made IFC fair game for this kind of thing.

I don't have anything else.

THE COURT: All right. Did you want another five minutes?

MR. JOSEPH: I'll try to be brief.

On the immunity question, I believe that IFC's only response to our reliance on the *Grupo Mexicano* case is that there were a lot of words between the words that we quoted, that the ellipsis covered several lines of quote. They had no substantive response.

I think if the Court reads the paragraph beginning at 527 U.S. 314 at the bottom of the page, I think the Court will agree that the Court unequivocally concludes that an injunction in a case such as this seeking to restrain action that is allegedly unlawful, seeking to aid the Court in preserving its jurisdiction to prevent that action, is not a prejudgment attachment. And that's really the only issue before the Court on the immunity question.

On the choice of law question --

THE COURT: The unlawful action you're alleging here would be the IFC disposing of its shares in MECG to any party other than the plaintiff?

MR. JOSEPH: In violation of the plaintiff's contract;

Scott L. Wallace, RDR, CRR
Official Court Reporter

46

that's correct.

THE COURT: All right.

MR. JOSEPH: On choice of law, this is not a case involving the internal affairs of a Guernsey corporation. I think that's obvious that we're not implicating these laws. To the extent Guernsey is involved, it's involved in the ministerial task of registering the ultimate transfer of these shares on the records of the corporation, which are, by Guernsey law, maintained in Guernsey. Where those shares are registered, again, is irrelevant to the performance of this purchase contract.

On the question of whether there were any material terms left to be agreed upon, counsel focused on the differing language in the two drafts of the bank guarantees. Their draft expressly called the guarantor a primary obligor. Apparently the bank's version did not. But as far as I can recall, and I haven't looked at them again today before the Court, both guarantees made it very clear that all that IFC had to do was make a demand on the bank and it would be paid. Whether you called the bank a primary obligor or something else, the substance of the obligation is the same. This was not a material term that the parties disagreed on.

And ultimately, Mr. Osseiran had every incentive to persuade his bank to give IFC a guarantee that will fully protect them. And I think either version fully protected them.

Scott L. Wallace, RDR, CRR
Official Court Reporter

47

On the question of intent to contract, I've already covered the manifestations of intent in the actual exchange of e-mails. I did not mention the subsequent manifestations of intent, one being the letter that we more recently obtained from MECG's chairman, in which he indicates that some time in December, IFC told him that they had indeed sold their shares to Mr. Osseiran.

There's also evidence in the record that IFC's designee on the MECG board of directors resigned in December for the stated reason that IFC had sold its shares to Osseiran. That, I think, was in one or more of Mr. Osseiran's declarations.

THE COURT: Well, that at minimum is a disputed issue of material, perhaps, fact?

MR. JOSEPH: Whether in fact they had sold their shares? It's certainly disputed. But I don't think it's disputed that --

THE COURT: You raise it as a matter of the intent of the parties?

MR. JOSEPH: Yes.

THE COURT: Okay.

MR. JOSEPH: But what the evidence of the intent is is his resignation. Why did he resign? The reason, according to Mr. Osseiran's information, was that he resigned because IFC, which had appointed him to the board, was no longer going to be a shareholder.

On December 12th, Mr. Osseiran wrote an e-mail that is in

Scott L. Wallace, RDR, CRR
Official Court Reporter

48

the record to IFC asserting that he had a binding agreement with them. While they're certainly free to assert here that the agreement was not binding, contemporaneously they did not respond or object to his characterization. And a copy of that e-mail was sent to IFC in Washington as well.

And finally, the subsequent assurances that IFC gave to Mr. Osseiran -- he characterizes them as assurances; they of course maintain they never assured him of anything. They certainly said something. And by their own admission, they told him we are genuine in our intent to conclude this transaction and you should be patient.

Each of those statements, which they concede they made, gave him continued reassurance that they intended to conclude this agreement.

Counsel makes much of the fact that the e-mails from Mr. van Bilsen were sent on his BlackBerry, apparently intending to convey even greater informality. The e-mails are writings; they're the modern version of letters. How they are transmitted is completely irrelevant to the issues before the Court today.

IFC has policies. And they are a large organization. I appreciate that they have policies. But whatever policies they may have do not affect the legal effect of the actions they take, whether in violation of those policies or in conformity with them. They're just policies. Those policies were not explained to Mr. Osseiran who, as far as he was concerned, was assured that

Scott L. Wallace, RDR, CRR
Official Court Reporter

04/26/2006 01:32:05 PM Page 45 to 48 of 68 12 of 17 sheets

49

Mr. van Bilsen had all the authority that he needed.

They maintain that they told him they were not going forward as early as December 19th. Here is a very clear dispute as to the facts because Mr. Osseiran maintains that it was not until the February 18th meeting, after he had acquired all his shares, that they finally announced that they were going to sell to someone else.

In the end, on the, I guess, public interest issue, I think IFC finally took the position that the law that we cite in these cases from the Fourth Circuit and the Southern District of New York and even in D.C., that preliminary agreements subject to further documentation can be binding, simply shouldn't apply to IFC because it has a lot of international members and it's too large to cope with that law.

I don't think the Court should apply the law any differently to IFC than it does to any other business entity.

Thank you, Your Honor.

THE COURT: All right. Thank you.

We're here on the plaintiff's motion for a preliminary injunction. The plaintiff is seeking to have an injunction issued by this Court preventing IFC from selling its shares in MECG to anyone other than the plaintiff, pending the outcome of the case on the merits.

The defendant IFC has raised a threshold issue of immunity that I must take up. Since the IFC is a public international

Scott L. Wallace, RDR, CRR
Official Court Reporter

50

organization under the U.S. Code -- that's Title 22, Section 288 -- IFC enjoys immunity provided for in the International Organizations Immunity Act, which says that "international organizations, their property and their assets, wherever located and by whomsoever held, shall enjoy the same immunity from suit and other judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceeding or by the terms of any contract."

Now, in this case IFC's Articles of Agreement have expressly waived immunity from suit in some cases and has expressly retained immunity to "all forms of seizure, attachment or execution before the delivery of final judgment against the corporation as to its property."

Now, the parties are in dispute about whether issuing a preliminary injunction to prevent the IFC from selling its shares of MECG to a third party would constitute a prejudgment seizure or attachment or execution of IFC's property.

IFC claims its immunity from prejudgment attachment is analogous to the immunity enjoyed by foreign countries under the FSIA, Foreign Sovereign Immunities Act.

The Second Circuit has held that a court can't use a preliminary injunction to produce the same result as a prohibited attachment. In the *S & S Machinery Company versus Masinexportimport* case that's reported at 706 F.2d 411 with a

Scott L. Wallace, RDR, CRR
Official Court Reporter

51

jump cite at 418 in 1983, that circuit noted that "the Foreign Sovereign Immunities Act would become meaningless if courts could eviscerate its protections merely by denominating their restraints as injunctions against the negotiation or use of property rather than as attachments of that property."

In addition, in *Stephens, S-T-E-P-H-E-N-S, versus National Distillers and Chemical Corporation*, reported at 69 F.3d 1226, the Second Circuit held that foreign companies covered under the FSIA were not required to post a prejudgment security because a prejudgment security can't be distinguished from a prejudgment attachment where it would place some of their assets in the hands of United States courts for an indefinite period and the companies would have no access to those assets. They emphasized that that principle behind the prohibition against attachments should apply broadly.

Now, the plaintiff argues that any protection afforded the purchasers by the ability to sue would be of little benefit if it were not accompanied by some ability to prevent irreparable harm pending final judgment, although plaintiff did not provide support or authority for why this inference should be overcome by the IFC's clearly and strongly worded immunity.

Now, the plaintiff distinguish the *S & S Machinery Company* case and the *Stephens* case as involving actions at law for money damages, where the injunctions were meant only to preserve the plaintiff's ability to collect a money judgment and not to

Scott L. Wallace, RDR, CRR
Official Court Reporter

52

prevent irreparable harm. But the focus of those cases when interpreting immunity under FSIA was not the purpose of the injunction, but the resulting effect on the ability of the foreign sovereign to access, negotiate or use its assets.

The plaintiff cites instead the *Grupo* case, *Grupo Mexicano De Desarrollo versus Alliance Bond Fund, Incorporated*, decided by the Supreme Court in 1999. But that case did not address the immunity of a foreign state or international organization.

And finally, the plaintiff does argue that even if a preliminary injunction is considered a prejudgment attachment, a preliminary injunction can still be granted here because IFC's shares in the MECG belong either to the plaintiff or to the First National Bank, the FNB.

But the broad grant of immunity to international organizations and IFC's explicit reservation of its immunity to prejudgment seizure or attachment of its property that's reflected in its Articles of Agreement and the policy of protecting public international organizations from unilateral control by member nations and their judiciaries seem to me to caution against skirting immunity on a narrow-based ground before final disposition in this case.

Nevertheless, I do think it appropriate to assess the plaintiff's motion for a preliminary injunction on its merits.

Certainly a court assessing whether to grant a preliminary injunction must consider the four familiar factors. First, if

Scott L. Wallace, RDR, CRR
Official Court Reporter

13 of 17 sheets Page 49 to 52 of 68 04/26/2006 01:32:05 PM

there's a substantial likelihood that the plaintiff will succeed on the merits of its claims, and in this case, it's the first two claims in the plaintiff's complaint; second, if the plaintiff will be irreparably injured if an injunction is not granted; ıird, if an injunction will substantially injure the other party; and fourth, if the public interest will be furthered by issuing the injunction. And of course the factors have to be viewed on a continuum with more of one factor compensating for less of another.

Now, the likelihood of success on the merits has to begin, I think, with a discussion about the choice of law issue here.

When deciding state law claims ordinarily, a federal court is supposed to apply the choice of law rules in the jurisdiction in which it sits. Now, the parties have proceeded on the assumption that the District of Columbia choice of law rules would apply, but this Court has jurisdiction under a federal statute and federal choice of law rules may apply, although it turns out, and I agree with one assertion at least, that this will not alter the choice of law analysis, because the federal choice of law rules use the same tests as the District of Columbia does.

The D.C. courts adopt the modified interest analysis and under that analysis, you have to identify first if there is -- if there are multiple jurisdictions with a possible interest in the litigation and you have to find out whether those laws of those

jurisdictions are in fact different. If there is a conflict, the Court has to determine which of the relevant jurisdictions has the more substantial interest in having this law applied.

Now, in the District of Columbia, the more substantial interest test is reflected in the Restatement (Second) of Conflict of Laws at section 188 that considers the factors that have been mentioned; namely, the place of contracting, the place of negotiation, the place of performance, the location of the subject matter of the contract and the domicile, residence, nationality, place of incorporation and place of business of the parties. And these are factors that are to be evaluated according to their relative importance with respect to this issue.

In this case, the laws of Guernsey, of Lebanon and of the District of Columbia are possibly implicated. And it does appear that a conflict may exist among those jurisdictions. Guernsey law would not recognize any equitable relief apparently, Lebanese law won't recognize a claim of promissory estoppel and the District of Columbia law recognizes promissory estoppel and equitable relief for a breach of contract.

So there does appear to be a true conflict among these jurisdictions.

So I have to apply the factors under the Restatement (Second) of Conflicts section 188 to determine which jurisdiction has the most significant contacts.

The place of contracting, the place where the last act necessary to make the contract binding occurred, is not necessarily clear in this case where the whole dispute is about whether or not there is a contract that was made. The plaintiff says that if a formal purchase agreement had been executed, it would have been done in the District of Columbia since IFC would have been the last to sign. Counsel agrees that that's some conjecture.

Under the plaintiff's claim that the November e-mails did create a binding contract, the last acceptance came from Bilsen, the defendant, who was located in Dubai and was acting on behalf of the IFC, although that was located in Washington, D.C. The IFC contends that there was no one place of alleged contracting.

With respect to the factor concerning the place of negotiation, that covers multiple areas here, including Dubai, where Bilsen was located, Lebanon, where the plaintiff was located, apparently Istanbul, where one of the IFC principals, Genovese, was located, and D.C., where another IFC principal named Alloway, A-L-L-O-W-A-Y, is located. So the place of negotiation does not strongly implicate any one jurisdiction.

Now, the parties do disagree as to the place of performance. The plaintiff claims it would have been Washington, D.C., where IFC holds its stock and would have transferred its stock, and the IFC claims it should have been Guernsey, where the company, MECG, resides and where the stocks are registered,

although neither party has offered authority for those conclusions.

The location of the subject matter of the contract theoretically is Washington, D.C., where IFC presumably holds the stock certificates, although that may be also some degree of -- some degree of speculation.

This type of contact is the most significant, though, when the contract deals with some specific physical thing, like a chattel or some land, or it affords protection against a localized risk, such as dishonesty of an employee in a fixed place of employment under section 188 of the Restatement. So this factor does not weigh necessarily strongly one way or the other or particularly towards Washington.

The domicile and residence and nationality and place of incorporation and place of business of the party certainly implicates Washington, D.C., where IFC has its principal place of business, and Lebanon, where the plaintiff resides and is domiciled.

So in sum, Washington is implicated in four of the factors considered, Guernsey is implicated in two of the factors and Lebanon is implicated in two of the factors, so no jurisdiction, though, has a strong contact to the transaction and none can be the considered the center of gravity of this dispute.

Because no single jurisdiction appears as the leading jurisdiction for the choice of law under the particularized

57

substantial interests tests, the more generalized factors under section 6 of the Restatement should be considered.

Those factors include the needs of the interstate and international systems; the relevant policies of the forum; the relevant policies of other interested states and the relative interests of those states in a determination of a particular issue; the protection of the justified expectations; the basic policies underlying the particular field of law; certainty, predictability and uniformity of result; and ease in the determination and application of the law to be applied.

First, because of the -- because the laws of Guernsey and Lebanon may not recognize certain laws of equity, the interests of our forum in applying its own law, including all equitable remedies designed to avoid injustice and in promoting its own policy seem to me to be significant.

The record does not provide sufficient information to assess the needs of the international system or the relevant policies of the other governments. This forum's interest in preventing injustice may outweigh the countervailing considerations that point to the other jurisdictions that do not have equitable remedies.

Protection of the parties' justified expectations and certainty, predictability and uniformity of result may favor Guernsey because it was contemplated, at least in the draft agreement, that the relationship of the parties is linked to

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

58

their status as shareholders in the corporation, which is incorporated in Guernsey.

The basic policies, finally, underlying the particular field of law -- here breach of contract and promissory estoppel -- favor applying the laws of the District of Columbia because this forum is the only forum which recognizes promissory estoppel and which has specific performance as an available remedy.

Now, the defendant also argues that the laws of Guernsey should apply under the internal affairs doctrine. Now, while this contract dispute is between two shareholders in a corporation, the dispute of the parties -- the dispute of whether a contract exists between the parties or whether the parties are bound by promissory estoppel is not one that directly implicates the corporate affairs of MECG, nor would it subject MECG to competing demands. In the broader context, the outcome of this case determines who will have control of the corporation, but the narrow dispute, the sale of stock, is not about how and by whom the internal affairs of the MECG are managed.

On balance, I believe that the laws of this forum, the District of Columbia, should apply to this case. Although the parties seemed to presume that that would be the case, I did think it useful or necessary, actually, to go through the analysis, thick as the conflict of laws analyses tend to be, to make sure that the basis for my using the D.C. law was made

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

59

clear. And in the event this has to be reviewed by the Court of Appeals, they would certainly know what I did and why I did it.

With respect to the likelihood of success on the merits under D.C. law, the first claim in the complaint is the breach of contract claim. And certainly in D.C. for an enforceable agreement to exist, the parties both must agree on all material terms and intend to be bound. And the party asserting the existence of the contract bears the burden of proof, which is particularly onerous where the parties had contemplated ultimately a written contract.

The undisputed evidence in this case shows that at no time in the November 2005 e-mails or in the exchange of draft agreements in December 2005 that either party intended to be bound. In e-mail exchanges in November, the plaintiff accepted that IFC's acceptance is subject to documentation and that the agreement will come into force for the sale of the shares only after the written sales agreement is signed. The draft sales agreement explicitly notes on the front of it that neither party intends to be bound by the draft agreement.

Now, the plaintiff argues that the November e-mails created an enforceable contract to proceed in good faith to document and execute a formal stock sale agreement. Now, even if the District of Columbia were to follow the modern trend in contracts law, I don't think that plaintiff's claim would succeed because the parties explicitly intended not to be bound by their

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

60

negotiations under the evidence before me, and the District of Columbia, by my reading of these cases, did not recognize binding preliminary agreement of this type.

Under D.C. law, a binding preliminary agreement is one that binds the parties to prepare and execute a subsequent documentary agreement after all terms have been agreed upon. The so-called contract to make a contract is not a contract at all, according to the D.C. Court of Appeals and the *D.C. Area Community Council, Incorporated versus Jackson* case, reported at 385 Atlantic.2d 185, with a jump cite at 187. That was reported in 1978. The *Jack Baker* case also supports that proposition. That's reported at 664 Atlantic.2d at 1239.

I don't find, then, that the plaintiff has shown a likelihood of success on the merits of his claim for breach of contract.

But the plaintiff has also filed a claim in Count 2 of promissory estoppel. The doctrine of promissory estoppel has three elements: First, a promise; second, the promise reasonably induced reliance on it; and third, the promisee relied on the promise to his or her detriment.

Now, the promise here has to be definite, as reliance on an indefinite promise is not reasonable.

With respect to the promise here, the plaintiff argues that the defendant repeatedly promised the plaintiff that it would sell the MECG stock to the plaintiff under the terms of the

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

15 of 17 sheets Page 57 to 60 of 68 04/26/2006 01:32:05 PM

61

November 2005 exchange of e-mails.

Now, the promises from IFC to the plaintiff did not seem to meet the legal threshold of promissory estoppel. Considering that a promise must be definite, the terms of an agreement in this case were far from clear and firm.

Bilsen and Alloway saying that IFC was eager to sell its MECG shares to the plaintiff and that it was not soliciting other buyers and that it was willing to proceed with the sale does not rise to the level of a definite promise of a specific act.

With respect to whether the promise reasonably induced reliance, the undisputed written documents here show that the plaintiff could not have reasonably relied on any assurances or promises that Bilsen or anybody else from IFC provided over the phone where the documents indicate that a negotiation was in progress and that IFC was not bound by the discussions.

With respect to the plaintiff's detriment, if the plaintiff did reasonably rely on sufficiently certain promises, I do think the plaintiff has shown that he was harmed by relying on any IFC promise of a stock sale. In order to gain a controlling share of this stock, the plaintiff made a number of purchases from other parties beside IFC. He claims he made these other purchases because of his expectation of a sale from IFC, and after the failed IFC transaction, the plaintiff owned 41 percent of the MECG stock, 10 percent shy of a majority vote.

All told, however, the plaintiff has not shown he will

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

62

likely succeed on the merits of his promissory estoppel claim.

With respect to irreparable harm, the plaintiff claims that his inability to obtain a controlling interest in the MECG corporation does constitute irreparable injury. The loss or denial of a controlling interest in a corporation may constitute irreparable harm in some cases. Where the outcome of a transaction can be valued in monetary terms, though, a remedy of law exists and there is no irreparable harm. In the case of *Gelco, G-E-L-C-O, Corporation versus Coniston, C-O-N-I-S-T-O-N, Partners*, reported at 811 F.2d 414 by the Eighth Circuit in 1987, the plaintiff, who was a corporate raider, failed to show irreparable harm even though the defendants' unlawful actions had prevented the plaintiff from getting a controlling share of the corporation. The District Court had found that the plaintiff planned to liquidate the corporation once he gained control of it. Because his damages would be the difference between the cost of the company's purchase and the liquidation value, the plaintiff could be fully remedied at a trial for damages.

But the Eighth Circuit was careful to distinguish between cases where the plaintiff was attempting to acquire a business for operational purposes and where the plaintiff planned to liquidate the corporation, calling this distinction critical. Where the plaintiff attempts to gain a controlling share of a corporation and where the plaintiff plans to continue the corporation and the operation of that corporation, the injury

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

63

cannot easily be measured in monetary terms. The case of *San Francisco Real Estate Investors versus Real Estate Investment Trust of America* also supports that principle. That's reported at 701 F.2d 1000, decided by the First Circuit in 1983.

Now, the plaintiff claims that he sought the controlling share in order to influence the company's management and business plan and perhaps transform the MECG into a money making enterprise. And in fact, IFC indicated that it was initially interested in selling its shares to the plaintiff because it believed that the plaintiff would not liquidate MECG.

I do think the plaintiff has shown satisfactorily that by at least February 16th, 2006, he had acquired 41 percent of the MECG shares and he had indicated previously that, with IFC's shares, he believed he had commitments from holders of the majority of MECG's shares. I do think that this factor would favor the plaintiff.

With respect to the balance of harms, I have to assess whether issuing an injunction would substantially injure other interested parties. The plaintiff argues that the balance of harms favors him because a preliminary injunction would not prevent IFC from selling its MECG shares at the sale price offered currently by the First National Bank or FNB. IFC counters that it would be substantially harmed by the injunction because it would be subject to a remedy from which it is immune and it would bind IFC to a contract that it did not make.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

64

If, after litigation on the merits, IFC is found to be bound by its agreement with the plaintiff, then no harm has come to IFC because it would be required to fulfill its contractual obligation to Osseiran, at least financially. If IFC wins on the merits, then it is free to sell its shares to anyone or recoup its lost profit with the sale to the plaintiff.

Because the plaintiff's injury cannot be remedied by damages, this factor does tip slightly in favor of the plaintiff, although only slightly since the damage to the IFC in requiring it to participate in a remedy that it says immunity shields it from is a significant harm.

With respect to the public interest, I have to consider whether the public interest is advanced by issuing the injunction. The parties here essentially assert two larger competing interests, the sanctity and enforcement of contracts and the independence of public multinational organizations from member states, the policy that provides the foundation for immunity.

Although these interests are both tied closely to the merits of the claims, each party provides a viable and important public interest and I don't find that this factor favors one party over the other.

On balance, though, because the IFC does appear to me to enjoy immunity from a preliminary injunction on its property, and because I don't find that the plaintiff has shown a likelihood of

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

04/26/2006 01:32:05 PM Page 61 to 64 of 68 16 of 17 sheets

65

success on the merits of the claims in Counts 1 and 2, those are substantial enough reasons in my judgment, given the neutrality of the balancing of the ultimate factor on the public interest and this only slight tipping of the balance -- the balance of arms in favor of the plaintiff, notwithstanding the strong interests -- the strong finding in favor of the plaintiff on the irreparable harm prong -- I find that the failure to prove a likelihood of success on the merits in conjunction with the likely finding that the plaintiff is immune from having this injunction issued in any event cautions against the issuance of a preliminary injunction.

The plaintiff's motion, then, for preliminary injunction will be denied.

I do need to ask the counsel to come back up to the podium because the next steps are important. Ordinarily, we would wait to have a defendant file an answer and then schedule a Rule 16.3 scheduling conference. We can go ahead and have you all move forward and do that.

I'm wondering, given, however, the ruling that I've just issued, if it might be worthwhile to encourage the parties to get together and discuss what, if anything, might come next by way of a need to continue full bore. I think that's B-O-R-E.

Have you all had any discussions about what you think would be the most appropriate way to proceed in the event I denied the motion for preliminary injunction?

Scott L. Wallace, RDR, CRR
Official Court Reporter

66

MR. VASQUEZ: We really have not. We have filed, though, a motion to dismiss the complaint. That's already been filed and their answer is -- their response to that is pending. Obviously, this ruling may impact some of how that comes out, but it addresses all five counts of the complaint. So that's where we are procedurally at this point.

MR. JOSEPH: We're prepared to respond to the motion to dismiss, although we're planning to seek at least a one-week extension for the response that's currently due, I believe, on Monday.

I would think it might be worthwhile to allow the parties some time to confer before the Court proceeds to establish a schedule for further proceedings.

THE COURT: You certainly have the time, in any event, if I ask you all to confer under Rule 16. The filing of the -- Rule 16.3 of the local rules. The filing of the motion to dismiss does not automatically prevent us from getting together to schedule something.

But I guess I raise this in part, obviously, given the pendency of the couple of deadlines that are in place now with respect to the disposition of those shares. I do think it useful if you all talk, see if the pending deadlines have any impact on how quickly and how diligently we should be going forward, how much more attorney time needs to be spent in research and writing with respect to the pending dispositive motion.

Scott L. Wallace, RDR, CRR
Official Court Reporter

67

I'm prepared to go forward. I get paid to handle these cases and will do that. I did want to try to be sensitive, though, to the charge that we try to have these cases proceed in the least costly and most cost effective manner. If it's a circumstance where the pending deadlines might make moot some of the issues, I wanted to just give you all an opportunity to think about that, make some proposal about that if it would save some time or money for anybody.

If it's not going to make any difference, that's fine. But why don't you all talk about that and perhaps file some joint status report in a week letting me know what you propose as to how this case ought to proceed. Does that make sense?

MR. JOSEPH: Makes sense to us.

MR. VASQUEZ: Okay.

THE COURT: All right. Let me ask -- what's a week. Today is the 28th. Can you get me something by April the 4th?

MR. VASQUEZ: I have a week-long hearing next week. Can we make it the following Monday or Tuesday?

THE COURT: Any objection to that?

MR. JOSEPH: No objection.

THE COURT: Why don't you all file something by April the 10th, then, a joint written status report with your proposals about how this case ought to proceed.

MR. VASQUEZ: Okay.

THE COURT: Anything else we should take up?

Scott L. Wallace, RDR, CRR
Official Court Reporter

68

01:56 MR. JOSEPH: Nothing from the plaintiff, Your Honor.

01:56 THE COURT: All right.

01:56 MR. VASQUEZ: Nothing from the defense.

01:56 THE COURT: All right. Thank you very much for coming in. Let me thank Mr. Wallace for staying beyond our normal closing time.

01:56 And, counsel, well argued. I appreciate your argument and your participation. We'll look to hear from you on April 10th.

01:57 MR. VASQUEZ: Thank you, Your Honor.

01:57 THE COURT: All right. You may be excused.

01:58 (Proceedings adjourned at 5:26 p.m.)

C E R T I F I C A T E

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

---------------------------

Scott L. Wallace, RDR, CRR
Official Court Reporter

Scott L. Wallace, RDR, CRR
Official Court Reporter

17 of 17 sheets Page 65 to 68 of 68 04/26/2006 01:32:05 PM