1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SALAH OSSEIRAN,                    )
                                   )
        Plaintiff,                 )  Docket No. CA 06-336
                                   )
        v.                         )
                                   )
INTERNATIONAL FINANCE CORP.,       )  Washington, D.C.
                                   )  March 28, 2006
        Defendant.                 )  3:30 p.m.

TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:      BLANK ROME
                        Michael Joseph, Esq.
                        600 New Hampshire Ave., NW
                        Washington, DC  20037
                        202.772.5959

For Defendant IFC:      WHITE & CASE
                        Francis A. Vasquez, Esq.
                        Frank Panopoulos, Esq.
                        701 Thirteenth Street, NW
                        Washington, DC  20005

                        INTERNATIONAL FINANCE CORPORATION
                        Becher Atassi, Esq.
                        Karim Suratgar, Esq.
                        2121 Pennsylvania Ave., NW F-7P-264
                        Washington, DC  20433

Court Reporter:         Scott L. Wallace, RDR, CRR
                        Official Court Reporter
                        Room 6814, U.S. Courthouse
                        Washington, D.C. 20001
                        202.326.0566

03:27PM    Proceedings reported by machine shorthand, transcript produced
           by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

2

1    AFTERNOON SESSION, MARCH 28, 2006

2    (3:31 p.m.)

3        THE DEPUTY CLERK: Civil action 06-336, *Salah Osseiran*

4    *versus International Finance Corporation*. Counsel, please state

5    your names and who you represent for the record.

6        MR. JOSEPH: Michael Joseph for the plaintiff.

7        THE COURT: All right.

8        MR. VASQUEZ: Frank Vasquez for the defense. I'm here

9    with Frank Panopoulos, who is also from my firm; Becher Atassi, a

10   lawyer with IFC, and Karim Suratgar, another lawyer with IFC.

11       THE COURT: All right. Thank you.

12       Counsel, what I wanted to do is assign about a half hour

13   per side for argument unless you all have reached any other

14   agreement that I need to know about. I would like to proceed in

15   that fashion. And of course, I'll offer the movant the

16   opportunity to go first.

17       I'd appreciate hearing from you in the beginning, if you

18   can, your address of the threshold issue about immunity claimed

19   by the defendant before you get into the likelihood of success on

20   the merits and the choice of law issues that that spawned and the

21   other factors for consideration under the preliminary injunction.

22       MR. JOSEPH: I would be happy to do that, Your Honor.

23       THE COURT: Thank you.

24       MR. JOSEPH: May it please the Court.

25       The defendant's claim of immunity is that the -- that IFC

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

3

1    is immune from prejudgment attachments. And we agree it is

2    immune from prejudgment attachments.

3        We don't agree that the preliminary injunction sought here

4    is tantamount to a prejudgment attachment. We believe that issue

5    is pretty well disposed of by the Supreme Court in the *Grupo*

6    *Mexicano De Desarrollo* case cited in our reply brief, in which

7    the Court clearly distinguishes between injunctions that are

8    restraining lawful conduct -- i.e., a prejudgment attachment of

9    property that the defendant is otherwise free to dispose of --

10   and an injunction restraining unlawful conduct, such as here, the

11   injunction would restrain conduct in breach of an agreement.

12       THE COURT: But does *Grupo* address anywhere the immunity

13   of a foreign state or international organization?

14       MR. JOSEPH: It does not, but it certainly addresses the

15   ultimate question here: Is a preliminary injunction, such as the

16   one sought here merely to preserve the status quo and prevent the

17   case from becoming moot, a prejudgment attachment? If it's not a

18   prejudgment attachment, then by the clear language of the waiver

19   of immunity, IFC has not reserved or has not withheld its waiver

20   of immunity. It has only withheld it for prejudgment

21   attachments.

22       THE COURT: Help me understand, then, how enjoining IFC

23   from selling its -- is it MECG?

24       MR. JOSEPH: MECG, Middle East Capital Group.

25       THE COURT: Enjoining them from selling their MECG shares

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

4

1    to anyone other than the plaintiff pending this outcome is

2    different in any way that matters here?

3        MR. JOSEPH: Different from a prejudgment attachment? I

4    submit, again, Your Honor, it's different from a prejudgment

5    attachment in that a prejudgment attachment restrains a party

6    from conduct that, but for the injunction, is lawful conduct.

7        THE COURT: For purposes --

8        MR. JOSEPH: In a typical prejudgment case, as the Court

9    knows, the plaintiff is seeking a money judgment and it is trying

10   to attach otherwise free property of the defendant simply to

11   preserve assets to collect if it wins the case.

12       That is not the case here. And in the Supreme Court *Grupo*

13   *Mexicano* case, the question was -- the clear question was: Is

14   this a prejudgment attachment, because it was clear to the

15   Supreme Court that the federal courts did not have jurisdiction

16   to allow prejudgment attachments. And obviously, if you can't --

17   if you can't allow a prejudgment attachment, you can't achieve

18   that same result by simply issuing a preliminary injunction that

19   has the same effect.

20       But the Court made it very clear that it is not a

21   prejudgment attachment when, in aid of the Court's jurisdiction,

22   you -- the Court is merely preventing the defendant from engaging

23   in conduct which would foreclose the ultimate remedy sought by

24   the plaintiff; in this case, specific performance.

25       We're here seeking specific performance. If the shares

Scott L. Wallace, RDR, CRR
Official Court Reporter

1 there's a substantial likelihood that the plaintiff will succeed
2 on the merits of its claims, and in this case, it's the first two
3 claims in the plaintiff's complaint; second, if the plaintiff
4 will be irreparably injured if an injunction is not granted;
5 third, if an injunction will substantially injure the other
6 party; and fourth, if the public interest will be furthered by
7 issuing the injunction. And of course the factors have to be
8 viewed on a continuum with more of one factor compensating for
9 less of another.
10     Now, the likelihood of success on the merits has to begin,
11 I think, with a discussion about the choice of law issue here.
12     When deciding state law claims ordinarily, a federal court
13 is supposed to apply the choice of law rules in the jurisdiction
14 in which it sits. Now, the parties have proceeded on the
15 assumption that the District of Columbia choice of law rules
16 would apply, but this Court has jurisdiction under a federal
17 statute and federal choice of law rules may apply, although it
18 turns out, and I agree with one assertion at least, that this
19 will not alter the choice of law analysis, because the federal
20 choice of law rules use the same tests as the District of
21 Columbia does.
22     The D.C. courts adopt the modified interest analysis and
23 under that analysis, you have to identify first if there is -- if
24 there are multiple jurisdictions with a possible interest in the
25 litigation and you have to find out whether those laws of those

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 jurisdictions are in fact different. If there is a conflict, the
2 Court has to determine which of the relevant jurisdictions has
3 the more substantial interest in having this law applied.
4     Now, in the District of Columbia, the more substantial
5 interest test is reflected in the Restatement (Second) of
6 Conflict of Laws at section 188 that considers the factors that
7 have been mentioned; namely, the place of contracting, the place
8 of negotiation, the place of performance, the location of the
9 subject matter of the contract and the domicile, residence,
10 nationality, place of incorporation and place of business of the
11 parties. And these are factors that are to be evaluated
12 according to their relative importance with respect to this
13 issue.
14     In this case, the laws of Guernsey, of Lebanon and of the
15 District of Columbia are possibly implicated. And it does appear
16 that a conflict may exist among those jurisdictions. Guernsey
17 law would not recognize any equitable relief apparently, Lebanese
18 law won't recognize a claim of promissory estoppel and the
19 District of Columbia law recognizes promissory estoppel and
20 equitable relief for a breach of contract.
21     So there does appear to be a true conflict among these
22 jurisdictions.
23     So I have to apply the factors under the Restatement
24 (Second) of Conflicts section 188 to determine which jurisdiction
25 has the most significant contacts.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

55

1     The place of contracting, the place where the last act
2 necessary to make the contract binding occurred, is not
3 necessarily clear in this case where the whole dispute is about
4 whether or not there is a contract that was made. The plaintiff
5 says that if a formal purchase agreement had been executed, it
6 would have been done in the District of Columbia since IFC would
7 have been the last to sign. Counsel agrees that that's some
8 conjecture.
9     Under the plaintiff's claim that the November e-mails did
10 create a binding contract, the last acceptance came from Bilsen,
11 the defendant, who was located in Dubai and was acting on behalf
12 of the IFC, although that was located in Washington, D.C. The
13 IFC contends that there was no one place of alleged contracting.
14     With respect to the factor concerning the place of
15 negotiation, that covers multiple areas here, including Dubai,
16 where Bilsen was located, Lebanon, where the plaintiff was
17 located, apparently Istanbul, where one of the IFC principals,
18 Genovese, was located, and D.C., where another IFC principal
19 named Alloway, A-L-L-O-W-A-Y, is located. So the place of
20 negotiation does not strongly implicate any one jurisdiction.
21     Now, the parties do disagree as to the place of
22 performance. The plaintiff claims it would have been Washington,
23 D.C., where IFC holds its stock and would have transferred its
24 stock, and the IFC claims it should have been Guernsey, where the
25 company, MECG, resides and where the stocks are registered,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

56

1 although neither party has offered authority for those
2 conclusions.
3     The location of the subject matter of the contract
4 theoretically is Washington, D.C., where IFC presumably holds the
5 stock certificates, although that may be also some degree of --
6 some degree of speculation.
7     This type of contact is the most significant, though, when
8 the contract deals with some specific physical thing, like a
9 chattel or some land, or it affords protection against a
10 localized risk, such as dishonesty of an employee in a fixed
11 place of employment under section 188 of the Restatement. So
12 this factor does not weigh necessarily strongly one way or the
13 other or particularly towards Washington.
14     The domicile and residence and nationality and place of
15 incorporation and place of business of the party certainly
16 implicates Washington, D.C., where IFC has its principal place of
17 business, and Lebanon, where the plaintiff resides and is
18 domiciled.
19     So in sum, Washington is implicated in four of the factors
20 considered, Guernsey is implicated in two of the factors and
21 Lebanon is implicated in two of the factors, so no jurisdiction,
22 though, has a strong contact to the transaction and none can be
23 the considered the center of gravity of this dispute.
24     Because no single jurisdiction appears as the leading
25 jurisdiction for the choice of law under the particularized

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

57

1  substantial interests tests, the more generalized factors under
2  section 6 of the Restatement should be considered.
3       Those factors include the needs of the interstate and
4  international systems; the relevant policies of the forum; the
5  relevant policies of other interested states and the relative
6  interests of those states in a determination of a particular
7  issue; the protection of the justified expectations; the basic
8  policies underlying the particular field of law; certainty,
9  predictability and uniformity of result; and ease in the
10  determination and application of the law to be applied.
11       First, because of the -- because the laws of Guernsey and
12  Lebanon may not recognize certain laws of equity, the interests
13  of our forum in applying its own law, including all equitable
14  remedies designed to avoid injustice and in promoting its own
15  policy seem to me to be significant.
16       The record does not provide sufficient information to
17  assess the needs of the international system or the relevant
18  policies of the other governments. This forum's interest in
19  preventing injustice may outweigh the countervailing
20  considerations that point to the other jurisdictions that do not
21  have equitable remedies.
22       Protection of the parties' justified expectations and
23  certainty, predictability and uniformity of result may favor
24  Guernsey because it was contemplated, at least in the draft
25  agreement, that the relationship of the parties is linked to

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

58

1  their status as shareholders in the corporation, which is
2  incorporated in Guernsey.
3       The basic policies, finally, underlying the particular
4  field of law -- here breach of contract and promissory
5  estoppel -- favor applying the laws of the District of Columbia
6  because this forum is the only forum which recognizes promissory
7  estoppel and which has specific performance as an available
8  remedy.
9       Now, the defendant also argues that the laws of Guernsey
10  should apply under the internal affairs doctrine. Now, while
11  this contract dispute is between two shareholders in a
12  corporation, the dispute of the parties -- the dispute of whether
13  a contract exists between the parties or whether the parties are
14  bound by promissory estoppel is not one that directly implicates
15  the corporate affairs of MECG, nor would it subject MECG to
16  competing demands. In the broader context, the outcome of this
17  case determines who will have control of the corporation, but the
18  narrow dispute, the sale of stock, is not about how and by whom
19  the internal affairs of the MECG are managed.
20       On balance, I believe that the laws of this forum, the
21  District of Columbia, should apply to this case. Although the
22  parties seemed to presume that that would be the case, I did
23  think it useful or necessary, actually, to go through the
24  analysis, thick as the conflict of laws analyses tend to be, to
25  make sure that the basis for my using the D.C. law was made

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

59

1  clear. And in the event this has to be reviewed by the Court of
2  Appeals, they would certainly know what I did and why I did it.
3       With respect to the likelihood of success on the merits
4  under D.C. law, the first claim in the complaint is the breach of
5  contract claim. And certainly in D.C. for an enforceable
6  agreement to exist, the parties both must agree on all material
7  terms and intend to be bound. And the party asserting the
8  existence of the contract bears the burden of proof, which is
9  particularly onerous where the parties had contemplated
10  ultimately a written contract.
11       The undisputed evidence in this case shows that at no time
12  in the November 2005 e-mails or in the exchange of draft
13  agreements in December 2005 that either party intended to be
14  bound. In e-mail exchanges in November, the plaintiff accepted
15  that IFC's acceptance is subject to documentation and that the
16  agreement will come into force for the sale of the shares only
17  after the written sales agreement is signed. The draft sales
18  agreement explicitly notes on the front of it that neither party
19  intends to be bound by the draft agreement.
20       Now, the plaintiff argues that the November e-mails
21  created an enforceable contract to proceed in good faith to
22  document and execute a formal stock sale agreement. Now, even if
23  the District of Columbia were to follow the modern trend in
24  contracts law, I don't think that plaintiff's claim would succeed
25  because the parties explicitly intended not to be bound by their

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

60

1  negotiations under the evidence before me, and the District of
2  Columbia, by my reading of these cases, did not recognize binding
3  preliminary agreement of this type.
4       Under D.C. law, a binding preliminary agreement is one
5  that binds the parties to prepare and execute a subsequent
6  documentary agreement after all terms have been agreed upon. The
7  so-called contract to make a contract is not a contract at all,
8  according to the D.C. Court of Appeals and the *D.C. Area*
9  *Community Council, Incorporated versus Jackson* case, reported at
10  385 Atlantic.2d 185, with a jump cite at 187. That was reported
11  in 1978. The *Jack Baker* case also supports that proposition.
12  That's reported at 664 Atlantic.2d at 1239.
13       I don't find, then, that the plaintiff has shown a
14  likelihood of success on the merits of his claim for breach of
15  contract.
16       But the plaintiff has also filed a claim in Count 2 of
17  promissory estoppel. The doctrine of promissory estoppel has
18  three elements: First, a promise; second, the promise reasonably
19  induced reliance on it; and third, the promisee relied on the
20  promise to his or her detriment.
21       Now, the promise here has to be definite, as reliance on
22  an indefinite promise is not reasonable.
23       With respect to the promise here, the plaintiff argues
24  that the defendant repeatedly promised the plaintiff that it
25  would sell the MECG stock to the plaintiff under the terms of the

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**