UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
SALAH N. OSSEIRAN,            )
                              )
        Plaintiff,            )
                              )
        v.                    )     Civil Action No. 06-336 (RWR)
                              )
INTERNATIONAL FINANCE         )     UNSEALED
CORPORATION,                  )
                              )
        Defendant.            )
_____)
```

## MEMORANDUM OPINION AND ORDER

Plaintiff Salah Osseiran brings claims for promissory estoppel and breach of a confidentiality agreement against the International Finance Corporation ("IFC"), alleging that IFC failed to sell to Osseiran its shares of the Middle East Capital Group ("MECG") after representing that it would do so, and that IFC divulged Osseiran's potential share purchase to an unauthorized party.[1]  IFC has moved for summary judgment on both claims.  Because Osseiran has not shown that genuine issues of material fact exist regarding the elements essential to his claim for promissory estoppel and because IFC is entitled to judgment,

---

[1] Osseiran's claim for breach of contract was previously dismissed under Federal Rule of Civil Procedure 12(b)(6), see Osseiran v. Int'l Fin. Corp., 498 F. Supp. 2d 139, 146-147 (D.D.C. 2007), and his motion for reconsideration of the dismissal was denied.  IFC's claim that it was immune from suit also was denied.  Id. at 143-145, aff'd, 552 F.3d 836 (D.C. Cir. 2009).

- 2 -

IFC's motion will be granted as to that claim.  However, because
Osseiran has presented evidence that the parties entered into an
enforceable confidentiality agreement, and whether a breach of
that agreement occurred remains in dispute, IFC's motion will be
denied as to the claim for breach of that agreement.

BACKGROUND[2]

Osseiran is a shareholder in the Middle East Capital Group
("MECG").  In the summer of 2005, he sought to gain a controlling
stake in MECG by purchasing the shares held by IFC, an
international organization and private arm of the World Bank, and
by Barclays Capital, among other shareholders.  Osseiran v. Int'l
Fin. Corp., 498 F. Supp. 2d 139, 142 (D.D.C. 2007).  IFC, acting
on behalf of itself and Barclays Capital, and Osseiran negotiated
for IFC to sell Osseiran its MECG shares, but IFC ultimately sold
its shares to a third party.  Id.

The summary judgment filings set forth the following facts
that are material to Osseiran's claims arising from those
negotiations and as to which there is no genuine dispute.  On
September 5, 2005, Osseiran called Jan van Bilsen, an IFC
investment manager, and expressed interest in buying IFC's and
Barclay's shares in MECG.  Osseiran asked van Bilsen to keep
their negotiations confidential, and van Bilsen verbally agreed.

---

[2] The background of this case is discussed more fully in
Osseiran v. Int'l Fin. Corp., 498 F. Supp. 2d 139 (D.D.C. 2007).

- 3 -

(Def.'s Mot., Ex. 1, van Bilsen Decl. ¶¶ 1, 3; Ex. 5, van Bilsen
Dep. 21:12-14, 23:21-24:2.)  Van Bilsen stated that he agreed to
keep the negotiations confidential because "that's what we always
do with our clients."  (Id. 24:4-5.)  After the phone call, van
Bilsen sent an e-mail to a colleague at IFC, relating the
conversation and explaining that "[Osseiran] approaches us first
and said it must be treated very confidentially."  (Pl.'s Opp'n,
Ex. 12.)  Later in the e-mail, he reiterated that "Osseiran
stressed confidentiality and I told him we will treat it
accordingly . . . ," and he concluded the e-mail with a short
section entitled "Next Steps" that stated "[w]e should look into
this seriously and ensure there are no reputation/corp governance
issues with us selling to Osseiran quietly.  Please handle and
discuss. . . .  Keep it confidential."  (Id.)

On October 3, 2005, Osseiran sent an e-mail to van Bilsen
formally presenting to IFC Osseiran's offer to purchase all of
IFC's MECG shares.  (Def.'s Mot. Summ. J. ("Def.'s Mot."), Ex.
19; id., Ex. 8, Osseiran Dep. 124:17-126:2.)  The e-mail had two
parts, the first setting forth the "Conditions" of the offer, and
the second setting forth the "Terms."  "Ultimate confidentiality
of this offer" appeared under the "Conditions" heading.  (Def.'s
Mot., Ex. 19.)  The "Terms" heading included the proposed

- 4 -

purchase price of the shares and the terms of payment.  (<u>Id.</u>)[3]
The parties agreed on the terms of the purchase and Osseiran sent
an e-mail to van Bilsen on November 18, 2005 purporting to
"confirm" the agreement.  (Def.'s Mot., Ex. 12.)  Van Bilsen
responded the same day asking Osseiran to "confirm" that Osseiran
"accept[ed] that [IFC's] acceptance is subject to documentation -
- meaning separate sales agreements," along with additional bank
guarantees.  (<u>Id.</u>; Def.'s Mot., Def.'s Stmt. of Material Facts
Not in Dispute ("Def.'s Stmt.") ¶ 18.)  Van Bilsen's e-mail also
asked for confirmation of Osseiran's understanding that the
"sales agreements come into force and affect" only after
execution of the agreements and receipt of the guarantees.
(Def.'s Mot., Ex. 12.)  IFC's investment managers lack authority
to finalize transactions with third parties to buy or sell
investments without executed documentation.  (Def.'s Stmt. ¶ 8.)
In a November 19, 2005 response to van Bilsen, Osseiran expressly
accepted these conditions.  (<u>Id.</u> ¶ 18; Osseiran Dep. 152:20-
153:6.)

     Van Bilsen forwarded a draft sales agreement to Osseiran on
November 26, 2005 that stated on its face that the parties did
not intend to be bound until the execution of a final contract.
The draft provided:

---

[3] Osseiran conceded that IFC never accepted the offer
embodied in the e-mail.  (Osseiran Dep. 126:3-13.)

- 5 -

> [t]his draft document is not a contract or an offer to
> enter into a contract.  Only the document as executed
> by IFC and Mr. Osseiran will contain the terms that
> bind them.  Until the document is executed by IFC and
> Mr. Osseiran, neither IFC nor Mr. Osseiran intends to
> be bound.

(Def.'s Mot., Ex. 13.)  IFC officials informed Osseiran via a

telephone call on December 19, 2005 that IFC had decided to

suspend its sale of IFC shares to Osseiran.  (Def.'s Stmt. ¶ 22.)

Osseiran stated that during the call, an IFC representative

"informed [him] that because of the complaints of other MECG

shareholders IFC had decided to suspend, place on hold or delay

the closing of the transaction by which IFC was to sell its MECG

shares to [him]."  (Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Pl.'s

Opp'n"), Decl. of Salah N. Osseiran ("Osseiran Decl.") ¶ 1.)

Osseiran stated that, both in that conversation and afterwards,

IFC representatives "repeatedly assured [him] that IFC still

intended to sell its MECG shares to [him] and was not soliciting

other buyers, but that, for political reasons, [IFC] needed to

first confirm that it did not need the approval of the other MECG

shareholders to sell its shares."  (Id. ¶ 2.)  In his deposition,

Osseiran stated that the day after receiving notice that IFC was

suspending the sale, Barclays contacted him in order to "pursue

the deal that IFC broke."  (Osseiran Dep. 43:20-44:6.)  In an e-

mail he sent to van Bilsen on December 22, 2005, Osseiran

"invite[d] [van Bilsen] to sign immediately the 'Share sale

agreement' that has been negotiated, proposed, and drafted by

- 6 -

IFC" and "urge[d] [him] to conclude the agreement[.]" (Def.'s

Mot., Ex. 15.)

Thereafter, Osseiran entered agreements to purchase MECG

shares from other shareholders.  Later in December, he agreed

upon language for a formal stock purchase agreement with Barclays

and concluded the agreement on January 9, 2006.  (Osseiran Dep.

42:12-43:1.)  He entered into an agreement to purchase shares

from Financial Investment Luxembourg on December 31, and made

additional agreements with other shareholders over the following

months.  (Id.; Def.'s Mot., Ex. 17, Pl.'s Supp. Resps. to Def.'s

First Set of Interrogatories at 3 (listing date, seller, share

amount, and price for Osseiran's purchases of MECG shares).)

Osseiran and IFC never finalized or executed a sales agreement

and IFC never sent Osseiran a signed stock transfer form, which

was necessary to complete a sale of IFC's MECG shares.  (Def.'s

Stmt. ¶ 20.)  Osseiran eventually sold the other MECG shares he

purchased at higher prices than those he paid to obtain them.

(Id. ¶ 37.)

Osseiran's amended complaint alleges that IFC committed a

breach of the confidentiality agreement by telling the MECG chair

in December of 2005 that Osseiran was buying MECG shares from IFC

and Barclays (Am. Compl. ¶¶ 27, 48), and IFC's answer denies the

allegation (Ans. ¶¶ 27, 48).  The parties have neither discussed

nor resolved this dispute in their briefs.

- 7 -

DISCUSSION

Summary judgment is warranted upon a showing that "there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury considering the evidence could return a verdict in favor of the nonmoving party.  Holcomb, 433 F.3d at 895.  A fact is "material" where "a dispute over it might affect the outcome of a suit under the governing law."  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  In considering a motion for summary judgment, a court should draw all "justifiable inferences" in favor of the nonmovant, Liberty Lobby, 477 U.S. at 255, and "eschew making credibility determinations or weighing the evidence," Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  However, "[t]he nonmoving party cannot defeat summary judgment by 'simply show[ing] that there is some metaphysical doubt as to the material facts.'"  Moore v. Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  The nonmoving party must demonstrate that there is sufficient evidence requiring the claimed factual dispute to be resolved by a jury or judge at trial.  Moore, 571 F.3d at 66.  Facts identified by the moving party in its statement of material facts are deemed admitted unless

controverted by the nonmovant in its statement of genuine issues
filed in opposition.  Local Civ. R. 7(h)(1).

I.   PROMISSORY ESTOPPEL

In order to prevail on a promissory estoppel claim, a
plaintiff must establish "(1) a promise; (2) that the promise
reasonably induced reliance on it; and (3) that the promisee
relied on the promise to his detriment."  <u>Daisley v. Riggs Bank</u>,
372 F. Supp. 2d 61, 71 (D.D.C. 2005); <u>Novecon, Ltd. v. Bulgarian-
Am. Enter. Fund</u>, 967 F. Supp. 1382, 1388 (D.D.C. 1997) ("Under a
theory of promissory estoppel, [the plaintiff] must be able to
show that it relied *reasonably* on the promises given by [the
defendant].")  Under District of Columbia law, when the plaintiff
advances a promissory estoppel claim, the absence of an express,
enforceable contract is presumed.  <u>Bldg. Srvcs. Co. v. Nat'l R.R.
Passenger Corp.</u>, 305 F. Supp. 2d 85, 95 (D.D.C. 2004)).  However,
because reliance on an indefinite promise is unreasonable, a
promissory estoppel claim must rest on "a promise with definite
terms on which the promisor would expect the promisee to rely."
<u>In re U.S. Office Prods. Co. Sec. Litig.</u>, 251 F. Supp. 2d 58, 73
(D.D.C. 2003); <u>Novecon, Ltd. v. Bulgarian-Am. Enter. Fund</u>, 190
F.3d 556, 565 (D.C. Cir. 1999) ("Although 'for purposes of
estoppel, a promise need not be as specific and definite as a
contract, . . . in the final analysis there must be a promise' --
and it must be more than merely a promise to 'bargain in good

- 9 -

faith.'") (quoting <u>Bender v. Design Store Corp.</u>, 404 A.2d 194,
196-97 (D.C. 1979)).  The promissory estoppel theory is an
"inherently equitable doctrine," <u>Moss v. Stockard</u>, 580 A.2d 1011,
1035 (D.C. 1990), that "may be invoked only when injustice
otherwise would not be avoidable," <u>Kauffman v. Int'l Bhd. of
Teamsters</u>, 950 A.2d 44, 49 n.7 (D.C. 2008) (internal quotation
marks and alterations omitted).

Osseiran has not proffered evidence on which a reasonable
jury could find that he relied reasonably on an IFC promise to
execute the share deal.  "A promise is 'an expression of
intention that the promisor will conduct himself in a specified
way or bring about a specified result in the future, *communicated
in such a manner to a promisee that he may justly expect
performance and may reasonably rely thereon*.'"  <u>Choate v. TRW,
Inc.</u>, 14 F.3d 74, 77-78 (D.C. Cir. 1994) (quoting 1 CORBIN ON
CONTRACTS § 13 (1963)) (emphasis added).  A promise to do
something does not reasonably induce reliance where, as here, the
promissor repeatedly and expressly conditions fulfilling the
promise on the execution of formal documentation.  In <u>Bender</u>, a
promissory estoppel action to enforce an alleged promise to lease
commercial space from the plaintiffs, the D.C. Court of Appeals
found no sufficiently definite promise where a defendant's
"direct statements that there existed no binding lease were
sufficient to negate any inference that [it] had made such a

promise," because "[t]hrough two letters sent in the early stages
of negotiations, [the defendant's] agents made it clear that
*absent execution of a formal lease agreement*, they intended no
binding commitment to lease."  <u>Bender</u>, 404 A.2d at 196; <u>see also</u>
<u>Doll v. Grand Union Co.</u>, 925 F.2d 1363, 1372-73 (11th Cir. 1991)
(affirming summary judgment for defendant on promissory estoppel
claim where defendant had given "repeated caveats that it did not
intend to be bound until a final lease agreement was signed").
Like what occurred in <u>Bender</u>, the defendant here made it clear on
the face of the draft sales agreement that "*[o]nly the document
as executed* by IFC and Mr. Osseiran will contain the terms that
bind them."  (Def.'s Mot., Ex. 13 (emphasis added).)  Osseiran
acknowledges that the draft share purchase agreement states that
the parties did not intend to be bound until the document was
executed, but contests the significance of this fact, arguing
that "th[e] statement was made only by IFC and was made after the
date on which Osseiran contends a binding agreement was reached."
(Pl's Opp'n, Pl.'s Statement of Material Facts ("Pl.'s Stmt.") ¶
2.)  As is noted above, Osseiran's contract claim, that a
"binding agreement" was reached and then breached, was earlier
dismissed for failure to state a claim.  <u>Osseiran</u>, 498 F. Supp.
2d at 146-147.  Further, Osseiran's contention that the statement
of intent not to be bound "was made only by IFC" misunderstands
the promissory estoppel inquiry.  The express statement by IFC

- 11 -

that it would consider itself bound only by an executed document put Osseiran on notice that the agreement was preliminary.  It thus undercuts the reasonableness of his relying on IFC's promises to finalize the sale.

Moreover, even if the draft agreement's language were insufficient to notify Osseiran that the agreement was not binding, IFC's communication on December 19, 2005 that it was suspending the sale clearly alerted Osseiran to the fact that IFC did not consider itself bound.  Notably, Osseiran did not begin to purchase additional MECG shares from other shareholders until December 31, 2005, *after* he learned of IFC's suspension of their potential sale.  As evidence that he reasonably believed the sale was imminent, Osseiran cites repeated reassurances from IFC representatives that the sale was placed on hold merely in order to resolve whether IFC needed approval from other MECG shareholders and in order to secure confirmation from shareholders that IFC was free to sell its shares.  (Osseiran Decl. ¶¶ 1-5; Pl.'s Opp'n at 4 ("IFC's own documents support Osseiran's assertion that, during the suspension period, IFC intentionally and repeatedly led [Osseiran] to believe that IFC would fulfill its promise to sell its MECG shares to him upon the remaining shareholders' confirmation that IFC was free to sell its shares.").)  These assurances, however, communicate IFC's determination that it needed to resolve outstanding issues and

- 12 -

confirm its authority before proceeding.  On this backdrop, no
reasonable jury could find Osseiran relied reasonably on the
draft sales agreement in order to proceed with his bid to gain a
majority stake.  See, e.g., Novecon, 967 F. Supp. at 1388
(finding reliance unreasonable where the plaintiff acted "in
reliance on a 'promise' that was expressly conditioned on
ratification by the . . . Board of Directors").  Osseiran himself
characterizes the situation as one in which IFC "understandably
wanted to keep *the option* of selling to Osseiran open," and notes
that "IFC continued its policy of *keeping its options open* until
at least February 14, 2006, just prior to the February 16, 2006
shareholders' meeting after which IFC agreed to sell its shares
to a third party."  (Pl.'s Opp'n at 5 (emphasis added).)  In sum,
Osseiran has failed to establish a triable issue that IFC made a
definite promise that reasonably induced him to rely to his
detriment.[4]

---

[4] The parties also dispute whether Osseiran suffered any
detriment by relying on IFC's promise.  IFC argues that no
detriment resulted because Osseiran realized a profit when he
sold the MECG shares he had purchased from other shareholders in
his bid to gain a majority stake.  (Def.'s Mem. of P. & A. in
Supp. of Mot. Summ. J. ("Def.'s Mem.") at 9.)  Osseiran counters
that the detriment was not limited to his purchase of additional
shares but also his "refraining from purchasing shares that would
have offset those that IFC refused to sell to him."  (Pl.'s Opp'n
at 6.)  Osseiran also alleges that he "was forced to pay a higher
price for the stock that he purchased from other MECG
shareholders."  (Am. Compl. ¶ 49.)  Because the finding that
Osseiran's reliance was not reasonable defeats his claim for
promissory estoppel, the existence of detriment need not be
addressed.

- 13 -

II.  BREACH OF CONFIDENTIALITY

Osseiran alleged that the parties agreed in September 2005 that their negotiations were to be kept confidential.  (Am. Compl. ¶ 21.)  In order to establish an enforceable agreement under District of Columbia law, the parties both must (1) agree on all material terms and (2) intend to be bound.  Perles v. Kagy, 473 F.3d 1244, 1249 (D.C. Cir. 2007); Kramer Assocs., Inc. v. Ikam, Ltd., 888 A.2d 247, 251 (D.C. 2005).  "The two requirements are closely intertwined because even if the parties intend to be bound by an agreement, the court must be able to determine the terms of the agreement before it can enforce them." Strauss v. NewMarket Global Consulting Group, LLC, 5 A.3d 1027, 1033 (D.C. 2010).  "While a 'meeting of the minds,' or mutual assent, 'is most clearly evidenced by the terms of a signed written agreement . . . such a signed writing is not essential to the formation of a contract.  The parties' acts at the time of the making of the contract are also indicative of a meeting of the minds.'"  Kramer Assocs., 888 A.2d at 252 (quoting Davis v. Winfield, 664 A.2d 836, 838 (D.C. 1995)).  In addition, "an express contract requires an offer and acceptance, and must be supported by consideration."  Ghahremani v. Uptown Partners, LLC, Civil Action No. 05-1270 (CKK), 2005 WL 3211463, at *16 (D.D.C. Nov. 13, 2005).  The party asserting the existence of the

- 14 -

contract bears the burden of proof.  Jack Baker, Inc. v. Office

Space Dev. Corp., 664 A.2d 1236, 1238 (D.C. 1995).

Osseiran contends that the parties entered into a

confidentiality agreement independent of the share purchase deal

on or about September 5, 2005.  (Pl.'s Opp'n at 7.)  IFC argues

that Osseiran conceded in his sworn deposition testimony that

there was no separate agreement regarding confidentiality.

(Def.'s Reply at 13.)  Osseiran's memorandum in opposition to

IFC's motion for summary judgment advances arguments that are in

tension with Osseiran's prior statements.[5]  (Compare Pl.'s Opp'n

_____

[5] Osseiran alternately characterizes the confidentiality
agreement as a condition of Osseiran's offer to negotiate, as a
condition of his offer to purchase IFC's shares, and as an
independent arrangement.  Osseiran, for example, stated in his
declaration that "[w]hen [he] first approached van Bilsen about
the possibility of my purchasing IFC's shares in MECG, [he] made
clear that [his] offer to enter into negotiations toward th[e]
end [of purchasing IFC's shares] were [sic] conditioned upon
IFC's agreeing to keep our discussions confidential[,]" that van
Bilsen "immediately agreed to this condition," and that "both
[parties] agreed to restrict knowledge of the negotiations to
those persons who participated in them."  (Osseiran Decl. ¶ 8.)
Osseiran stated that he "subsequently conditioned [his] formal
offer to purchase the MECG shares of IFC and Barclays on the
continued maintenance of confidentiality" and that "upon [IFC's]
acceptance of [Osseiran's] offer, the confidentiality agreement
was incorporated into the share purchase agreement."  (Id. ¶ 9.)
IFC contends that, if the confidentiality agreement is viewed as
part and parcel of the share purchase agreement, it must be found
unenforceable since the sales agreement was found not to
constitute an enforceable contract.  (Def.'s Mem. of P. & A. in
Supp. of Mot. Summ. J. ("Def.'s Mem.") at 10.)  Osseiran
maintains, however, that even though the share purchase agreement
was found not to constitute an enforceable contract, the
confidentiality agreement may essentially be found severable and
to have "reverted to its separate form."  (Pl.'s Opp'n at 8 &
n.3.)  IFC also argues that Osseiran misapprehends the legal

- 15 -

at 7 (arguing that "the record shows that on or about September 5, 2005 Osseiran and IFC entered into an agreement [to maintain confidentiality]") <u>with</u> Osseiran Dep. 124:12-16 ("Q: So what you're telling us is [t]hat it was not a separate agreement but it was part of what you believe was your agreement with IFC to purchase the shares.  A: Well, the -- yes.").)  Nevertheless, "[t]he determination of whether an oral contract exists as an enforceable agreement is a question of law."  <u>Strauss</u>, 5 A.3d at 1032.  While Osseiran's prior testimony evinces some confusion regarding the legal significance of various exchanges with IFC, it is not dispositive of, nor does it concede, the question of contract formation.

The record is clear that the parties had earlier discussed keeping their negotiations confidential in a telephone

---

operation of a "condition" to his offer to purchase shares. (Def.'s Reply at 12.)  IFC maintains, correctly, that Osseiran's inclusion of "ultimately confidentiality" as a "condition" to his e-mail offer to purchase shares, standing alone, would not give rise to an enforceable contract, because IFC ultimately rejected Osseiran's offer to purchase shares and the draft sales agreement was found unenforceable.  <u>See</u> <u>Psaromatis v. English Holdings I, LLC</u>, 944 A.2d 472, 481-82 (D.C. 2008) (explaining that "[w]hen a condition precedent has not been performed . . ., 'the rights of both parties [are] at an end'") (quoting <u>Brier v. Orenberg</u>, 90 A.2d 832, 833 (D.C. 1952)).  IFC's arguments regarding the independent legal significance of a condition to an offer are not dispositive, however, because additional objective evidence supports the conclusion that the parties entered into a confidentiality agreement independent of the e-mail offer to purchase shares.

- 16 -

conversation on September 5, 2005.  Van Bilsen stated that he

acquiesced in Osseiran's request for confidentiality:

> Q. But before [Osseiran] put an offer in writing, you
> had already discussed confidentiality, had you not?
> A. Well, yes. . . .  Yes, it was mentioned. . . .
> Q. And you informed [Osseiran] that you would treat it
> confidentially, the negotiations confidentially,
> correct?
> A. Yeah.  I said I would, as we normally do, indeed
> keep, we keep our business confidential.

(Van Bilsen Dep. 25:16-26:6.)  Following that conversation, van

Bilsen sent an e-mail to a colleague at IFC, in which he stated

that Osseiran had called and expressed interest in purchasing

IFC's MECG shares.  Van Bilsen explained that "[Osseiran]

approaches us first and said it must be treated very

confidentially."  Later in the e-mail he explained that "Osseiran

stressed confidentiality and *I told him we will treat it*

*accordingly* . . . ."  (Pl.'s Opp'n, Ex. 12 (emphasis added).)

The e-mail concluded with a section entitled "Next Steps" that

stated "[w]e should look into this seriously and ensure there are

no reputation/corp governance issues with us selling to Osseiran

quietly.  Please handle and discuss. . . .  *Keep it*

*confidential."*  (Id.)

The oral communications exchanged between van Bilsen and

Osseiran and the objective evidence that both parties took the

confidentiality requirement seriously reflect that van Bilsen

intended to be bound by his promise of confidentiality.  The

- 17 -

September 5 e-mail demonstrates van Bilsen's clear understanding that Osseiran expected that the negotiations not be disclosed. Van Bilsen's statement that he told Osseiran that IFC would treat the negotiations "accordingly" shows that van Bilsen assented to Osseiran's request for confidentiality.  Moreover, van Bilsen's instruction to his colleague to "[k]eep it confidential" constitutes an independent action reflecting that van Bilsen intended to carry out, and to be bound, by the assurance he gave Osseiran.  See Duffy v. Duffy, 881 A.2d 630, 637 (D.C. 2005) ("The intentions of parties to a contract can be found from written materials, oral expressions and the actions of the parties.").  Notably absent from van Bilsen's e-mail is any hesitation or ambiguity regarding his understanding of or intent to abide by Osseiran's request for confidentiality.

IFC argues that "even if there had been some agreement, Plaintiff's failure to identify the material terms renders the alleged agreement void."  (Pl.'s Reply at 13.)  See Rosenthal v. Nat'l Produce Co., 573 A.2d 365, 369-70 (D.C. 1990) (internal quotation marks omitted) (recognizing that "[v]agueness of expression, indefiniteness and uncertainty as to . . . the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract").  Osseiran contends that the terms were not vague or indefinite because van Bilsen "clearly understood that Osseiran expected that the negotiations

- 18 -

were not to be disclosed to persons who were not involved in
them." (Pl.'s Opp'n at 8 n.2.)

Courts that have found that vagueness of terms precluded the
creation of enforceable oral contracts typically confronted
contract terms considerably more complex than those at issue
here. For example, in Strauss, the court found an alleged oral
contract unenforceable where is concerned "a complex business
transaction," and omitted critical details regarding the parties'
division of fees generated from stock investments. Strauss, 5
A.3d at 1029. In Bond v. U.S. Dep't of Justice, the court
addressed an alleged oral contract between the plaintiff and a
newspaper concerning the time, content, and focus of an article
concerning a plaintiff. The court concluded that the asserted
contract's "alleged terms are indefinite at best and mutually
exclusive at worst," where the plaintiff had argued that the
parties had agreed the article would both exclude material
"encroach[ing] upon the subject matter of the plaintiff's 'life
story'" and "focus on [the plaintiff's] 'legal battle,'" which,
the court concluded, "necessarily entail[ed] the discussion of
parts of his life story." Bond v. U.S. Dep't of Justice, 828 F.
Supp. 2d 60, 79-80 (D.D.C. 2011). Because a contract must
possess a modicum of clarify in order "for the parties to
understand how they are expected to perform the contract itself,"
the Bond court found the plaintiff's allegations regarding

- 19 -

conflicting material terms failed to plausibly establish the

existence of an enforceable contract.  Id. at 80 (internal

quotation marks omitted); see also New Econ. Capital, LLC v. New

Markets Capital Grp., 881 A.2d 1087, 1096 (D.C. 2005) (finding no

enforceable oral contract existed where the parties did not agree

whether the defendant's consulting services should be rendered or

agree on the rate of compensation for those services).

By contrast, the agreement alleged here does not concern

complex terms of payment, complicated business transactions, or

contain contradictory terms.  Given the straightforward aim of

the contract at issue here -- to preclude disclosure of the

negotiations -- the parties' oral agreement is sufficiently clear

as to the material terms.  "Examples of terms that [the District

of Columbia Court of Appeals] ha[s] recognized as material under

certain agreements include 'subject matter, price, payment terms,

quantity, quality, and duration.'"  Strauss, 5 A.3d at 1033 n.4

(quoting Rosenthal, 573 A.2d at 370).  In his deposition,

Osseiran expressed the agreement in the following general terms:

> Q. . . . What do you believe were the terms of the
> confidentiality agreement?
> A. That they shouldn't -- we shouldn't, me and them,
> shouldn't really be talking about this deal to anybody until
> it is done with.
> Q. And that's the entire agreement, what you just told me?
> A. It's from A to Z, no leakage during the discussion,
> negotiation, consummation, closing.

(Osseiran Dep. 122:13-21.)  Van Bilsen's understanding comported

with Osseiran's basic expectation that the negotiations were to

- 20 -

be kept confidential.  (See Van Bilsen Dep. 24:13-14 (stating
that he "assume[d] [Osseiran] want[ed] to keep confidential [sic]
between us."))

In the context of a straightforward agreement not to
disclose business negotiations, duration and the identity of the
parties privy to disclosure are the material terms.  An oral
agreement need not provide for every potentiality -- Osseiran
does not argue, for example, that the alleged agreement
contemplated or provided for the parties' ability to disclose
negotiations post-closing or after negotiations have ceased.  See
Rosenthal, 573 A.2d at 370 (quoting V'Soske v. Barwick, 404 F.2d
495, 500 (2d Cir. 1968)) (recognizing that "'[a]ll the terms
contemplated by the agreement need not be fixed with complete and
perfect certainty for a contract to [be enforceable],'" since
"[a]ll agreements have some degree of indefiniteness and some
degree of uncertainty.").  The agreement here is complete with
regard to its duration because the parties generally understood
that they were not to disclose the negotiations while they were
ongoing.  The bulk of the parties' negotiations occurred from
early September through November 2005, and van Bilsen stated that
he did not disclose the negotiations to individuals outside IFC
during that period.  (Van Bilsen Dep. 22:13-23:16.)  At the end
of November, van Bilsen sent Osseiran the draft of the share
sales agreement, and then represented through the first couple

weeks of December that IFC was awaiting bank guarantees and
execution of the document. (Def.'s Stmt. ¶ 7.)  It was within
this period of still-open negotiations that the alleged breach of
the contract, by means of disclosure to MECG, occurred. (See Am.
Compl. ¶ 27 ("On or about December 15, 2005, IFC's representative
on MECG's Board of Directors informed MECG's chairman, who is
also an MECG shareholder, that IFC had sold its MECG shares to
Osseiran.").)  IFC represents that it notified Osseiran that IFC
had decided to suspend their deal on December 19, 2005, four days
*after* the alleged disclosure of the negotiations. (Def.'s Stmt.
¶ 22.)

     With regard to the parties privy to disclosure, there is no
genuine dispute that keeping the negotiations confidential
required that IFC *not* disclose them to individuals who were not
involved in the negotiations.  In an e-mail responding to Penny
Walker, an official at Barclays Capital who was involved in
Osseiran's proposal to purchase shares from both IFC and
Barclays, van Bilsen discussed the proposed sales agreement and
specifically explained that "[t]he reason why [he] ha[d] not cc-
ed all is because Osseiran has stressed confidentiality to me
*even within our organisations*." (Pl.'s Opp'n, Ex. 13 (emphasis
added).)  Because the parties agreed to refrain from disclosure
to individuals not involved in their negotiations for at least
the period during which the negotiations were ongoing, the oral

agreement meets the requirement "completeness." <u>Jack Baker</u>, 664 A.2d at 1238.

IFC also contends that the confidentiality agreement is not a valid contract because it was not supported by consideration. (Def.'s Mem. at 11-12.)  Osseiran stated that he did not give anything in exchange for the promise of confidentiality (Osseiran Dep. 123:6-12), but argues that the agreement was supported by consideration because "it was the price IFC paid for Osseiran's agreement to enter into negotiations and it was the result of the parties' exchange of promises." (Pl.'s Opp'n at 8.)  District of Columbia courts "'will not inquire into the adequacy of' consideration, even where it is 'arguably slight,' as long as it is 'legally sufficient.'" <u>Washington Inv. Partners of Delaware, LCC v. Sec. House, K.S.C.C.</u>, 28 A.3d 566, 574 (D.C. 2011) (quoting <u>Riggs v. Aetna Ins. Co.</u>, 454 A.2d 818, 821 (D.C. 1983)). "'An exchange of promises' . . . constitutes legally sufficient consideration, '*so long as it is bargained-for.*'" <u>Id.</u> at 574-75 (quoting <u>Pearsall v. Alexander</u>, 572 A.2d 113, 118 (D.C. 1990) (citing Restatement (Second) of Contracts § 75 (1932); <u>see also</u> <u>Joao v. Cenuco, Inc.</u>, 376 F. Supp. 2d 380, 384 n.4 (S.D.N.Y. 2005) (finding that a written confidentiality agreement covering discussions regarding patent acquisition and the parties' potential partnership would not be invalidated for lack of

- 23 -

consideration where it contained mutual promises prohibiting

either party from disclosing information they discussed).

The record does not reflect extensive bargaining between the

parties over the terms of confidentiality.  (See Van Bilsen Dep.

25:10-12 ("It's not that [Osseiran] said I want to discuss

confidentiality and we discussed it for a long period of time.");

Osseiran Decl. ¶ 8 (stating that van Bilsen "immediately agreed"

to keep the parties' discussions confidential when Osseiran first

approached him about purchasing IFC's shares).)  However,

protracted discussions are not necessary to establish

consideration, particularly where, as here, the terms of the

agreement -- not to disclose the negotiations between IFC and

Osseiran to individuals not involved in them -- are not

complicated.  An exchange of promises suffices so long as "[e]ach

party undertook to do something it would otherwise have no legal

obligation to do."  Eastbanc, Inc. v. Georgetown Park Assocs. II,

L.P., 940 A.2d 996, 1004 (D.C. 2008).  Here, there is evidence

that IFC assented to Osseiran's request for confidentiality and

Osseiran in turn agreed to enter negotiations over the purchase

of IFC's shares, actions that neither party had a legal duty to

perform.  Moreover, the record reflects that Osseiran repeatedly

emphasized and requested that the parties' negotiations be kept

confidential.  As is discussed above, the e-mail offer's

inclusion of confidentiality, standing alone, did not create a

- 24 -

contract.  However, it constitutes extrinsic evidence in support
of Osseiran's position that he "made clear that [his] offer to
enter into negotiations toward th[e] end [of purchasing IFC's
shares] were [sic] conditioned upon IFC's agreeing to keep our
discussions confidential."  (Osseiran Decl. ¶ 8.)

In his deposition, van Bilsen stated that he viewed the
agreement to keep the negotiations confidential as merely IFC's
"normal business practice."  (Van Bilsen Dep. 27:13.)  He
testified as follows:

> Q. Did you understand that you had a, an agreement with
> Mr. Osseiran to keep the negotiations confidential?
> A. Yes, but . . . in the context that we as I see
> always keep business confidential.

(Id. at 25:2-6.)  A business practice and a contractual term,
however, are not mutually exclusive.  The parties' own agreement
determines the "subject matter" of an enforceable contract.
Rosenthal, 573 A.2d at 370.  Where, as here, a party seeks
assurances and agreement of compliance with the specific practice
of maintaining confidentiality, a promissor's assent to those
terms may elevate the arrangement beyond a mere professional
courtesy.  Osseiran requested confidentiality from IFC with
regard to specific discussions regarding a proposed commercial
transaction and van Bilsen, in the phone call, agreed.  The fact
that van Bilsen's September 5 e-mail to his colleague repeatedly
mentioned the request for confidentiality and instructed the
colleague to adhere to it suggests that the arrangement was not

- 25 -

simply business as usual.  Because the promise here was adequately bargained for, the evidence of consideration suffices as a matter of law.

In sum, Osseiran has carried his burden to present evidence of an enforceable contract, namely, that the parties agreed on the material terms of the confidentiality agreement, manifested an intent to be bound, and supported the agreement with consideration.  Thus, IFC's motion as to the breach of the confidentiality agreement claim will be denied.

<u>CONCLUSION AND ORDER</u>

Osseiran has not produced evidence tending to show that he reasonably relied on an IFC promise to finalize the stock sales agreement.  He has, however, presented evidence that the parties entered into an enforceable confidentiality agreement, and whether IFC violated that agreement remains in dispute.  IFC's motion for summary judgment therefore will be granted as to Osseiran's claim for promissory estoppel and denied as to the claim for breach of a confidentiality agreement.  Accordingly, it is hereby

ORDERED that the defendant's motion [58] for summary judgment be, and hereby is, GRANTED IN PART AND DENIED IN PART. Judgment is entered for the defendant on the plaintiff's claim for promissory estoppel.  It is further

- 26 -

ORDERED that the parties confer and file by September 4,

2012 a joint proposed redacted version of the Memorandum Opinion

that can be filed on the public record and a joint status report

and proposed order governing further proceedings.

SIGNED this 31st day of July, 2012.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge