# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| SALAH N. OSSEIRAN, )<br><br>*Plaintiff,* )<br><br>v. )<br><br>INTERNATIONAL FINANCE )<br>CORPORATION, )<br><br>*Defendant.* ) | Civil Action No. 1-06-CV-0336 RWR |

## EXPERT REPORT OF KIRAN P. SEQUEIRA, PE, MBA

Kiran P. Sequeira
July 28, 2009

## TABLE OF CONTENTS

I.   Background and Experience ............................................................................... 1

II.  Scope of Engagement ..................................................................................... 1

III. Information Considered and Assumptions ...................................................... 1

IV.  Case Background and Timeline ...................................................................... 2

V.   NCI Estimate of Damages Suffered by Mr. Osseiran.................................... 4

VI.  Evaluation of Mr. Osseiran's Damages Claim .............................................. 9

i

# I. Background and Experience

1.  My name is Kiran P. Sequeira.  I am a director with Navigant Consulting,
    Inc. (NYSE:NCI).  I work within the North American Dispute and
    Investigative Services segment of the firm, which provides services to
    clients facing the challenges of disputes, litigation, forensic investigation,
    discovery, and regulatory compliance.  Information on NCI can be found at
    www.navigantconsulting.com.

2.  I have provided financial, economic, engineering, and related consulting
    services to attorneys and corporate clients for more than 12 years.  Many of
    my assignments have entailed valuation of equity investments in emerging
    markets.  A complete copy of my curriculum vitae is attached as Exhibit 1.

# II. Scope of Engagement

3.  Navigant Consulting, Inc. ("NCI") was retained by White & Case LLP
    ("White & Case" or "Counsel") on behalf of Defendant International
    Finance Corporation ("IFC").  I have been asked to:  (1) Conduct an
    independent assessment of the damages that may have been suffered by
    Mr. Salah N. Osseiran ("Plaintiff" or "Mr. Osseiran") due to IFC's alleged
    breaches in conjunction with the sale of its shareholding in the Middle East
    Capital Group ("MECG"); (2) Evaluate the damages claimed by Mr.
    Osseiran; and (3) Prepare this Expert Report and possibly testify at
    deposition and trial.

4.  I have not been asked to examine liability issues in the Complaint submitted
    by Plaintiff in this matter.  Therefore, I express no opinion on liability
    issues.  I have also not been asked to determine whether, or to what extent,
    Mr. Osseiran could have mitigated his damages in this matter.

5.  NCI is being compensated for my time on an hourly basis, at a rate of $450
    per hour.

# III.    Information Considered and Assumptions

6.  I have reviewed documents and other information produced by the parties
    in these proceedings.  I have also gathered a limited amount of additional
    information through independent research.  A list of information
    considered in developing this report is attached as Exhibit 2.

7.  In forming my opinions and preparing the exhibits contained herein, I have considered and evaluated the information listed in Exhibit 2 in light of my experience in commercial damages estimation, valuation, and related disciplines. As a general matter, I have assumed the documents and information provided by both parties to this dispute to be accurate and complete. Should such data be found to be incomplete or inaccurate, my opinions may change.

8.  I understand that Plaintiff's document productions may not have been completed and no depositions have been taken as of the time of this filing. Should the parties produce additional documentation, reports or testimony relevant to an assessment of damages in this matter, I may supplement or amend this report.

## IV.    Case Background and Timeline

9.  Middle East Capital Group ("MECG") was founded in 1995 with operations in Beirut, Lebanon.[1] It was the first merchant and investment bank established in the region.[2] In 1996 MECG completed a private equity placement that raised total equity capital of US$ 30 million (this capital subsequently increased to US$ 32.25 million).[3] There were three main institutional shareholders; *viz.*, Barclays Capital ("Barclays") with 50,000 shares (17 percent ownership), Bin Mahfouz group (National Commercial Bank of Saudi Arabia) with 50,000 shares (17 percent ownership), and IFC with 30,000 shares (10 percent ownership).[4] The remaining shares were held by regional individuals and institutions.

10.  MECG had limited success in its initial years, but its performance soon deteriorated and it suffered repeated annual losses that eroded its capital base.[5] By yearend 2004 the book value of equity had declined by over US$ 10 million to just US$ 21.7 million.[6] MECG had a net loss of over US$ 1.8 million in 2003 and a loss of over US$ 450,000 in 2004.[7] As of September 2005, the company's management and its Board of Directors were considering liquidation of the company.[8]

---

[1] IFC-M00000412
[2] IFC-M00001884
[3] Ibid.; IFC-M00000408 (see Capital + Share premium under Shareholder's Equity)
[4] Ibid.
[5] Ibid.
[6] IFC-M00000408
[7] IFC-M00000409
[8] IFC-M00001885

11. In November of 2005, Mr. Osseiran, a minority shareholder of MECG, made an offer to purchase IFC's and Barclays's shares in MECG.[9] Mr. Osseiran offered a price of between US$ 50 and US$ 56 per share.[10]

12. In January 2006, Barclays formally accepted Mr. Osseiran's offer. The two parties executed a Share Purchase Agreement for the sale of 50,000 MECG shares from Barclays to Mr. Osseiran for US$ 2.5 million ($50 per share) with a "Contingent Premium" of US$ 300,000 (US$ 6 per share) depending on the outcome of MECG's contingent liability related to social security obligations.[11] IFC did not proceed with the sale of its 30,000 shares to Mr. Osseiran.

13. Between December 2005 and February 2006, Mr. Osseiran allegedly purchased 57,000 additional shares from other MECG shareholders on terms similar to the Barclays offer, purportedly with the intention of obtaining a controlling interest in MECG.[12] Mr. Osseiran claims these purchases were made in reliance on IFC's alleged promise to sell him its shares.[13]

14. At a shareholders' meeting in February 2006, 4 additional offers were made to purchase MECG shares from existing shareholders. One of these offers was from First National Bank SAL ("FNB"). FNB's offer was for US$ 66 per share, on the condition that FNB acquired a minimum of 51 percent of the outstanding shares.[14]

15. IFC, as well as other MECG shareholders, accepted the FNB offer, and FNB acquired a controlling interest in MECG.[15] Mr. Osseiran alleges that by accepting FNB's offer, IFC breached its promise to sell its shares to Mr. Osseiran.[16] Mr. Osseiran also alleges that IFC breached a confidentiality agreement by disclosing his offer to buy IFC's shares to a third party.[17] Mr.

---

[9] IFC-M00001886
[10] The US$ 6 range was due to a contingent liability related to social security contributions of MECG employees. If this contingent liability was discharged or no related claims were made against the company within 3 years, the higher price (i.e., $56) would be paid to IFC. See IFC-M00001886
[11] See OSSEIRAN 032 - 037
[12] Amended Complaint for Injunctive Relief and Damages at ¶16. See Table 1 below for details.
[13] Id.at ¶ 34
[14] The US$ 66 offer price assumed that one of the MECG investments (a real-estate fund) would not be excluded. The price was set at US$ 60 per share if the real-estate fund were excluded.
[15] IFC-M00002310
[16] Amended Complaint for Injunctive Relief and Damages at ¶9
[17] Id. at ¶48. Plaintiff also alleges Breach of Contract (i.e., Breach of the November Agreement) by Defendant; but Counsel has informed me that the Court has dismissed Plaintiff's claim for this breach.

Osseiran seeks total damages of US$ 6.55 million due to the alleged breaches.[18]

16.   In May 2008, Mr. Osseiran sold the 111,500 MECG shares that he owned to FNB for US$ 9,621,289 (US$ 86.29 per share).[19] Mr. Osseiran derived a net profit of approximately US$ 3.9 million from the sale of these shares.[20]

## V.   NCI Estimate of Damages Suffered by Mr. Osseiran

17.   I have been asked by Counsel to determine the damages suffered by Mr. Osseiran under the assumption that IFC is liable for: 1) the alleged breach of promise to sell its shares to Mr. Osseiran; and 2) the alleged breach of the confidentiality agreement (together "IFC's alleged breaches"). In making this assumption, I am not expressing an opinion on liability.

18.   It should be noted at the outset that Mr. Osseiran has not suffered direct losses as a result of IFC's alleged breaches. In fact, Mr. Osseiran realized a profit of approximately US$ 3.9 million from the sale of MECG shares that he acquired immediately following his offer to purchase IFC's shares. To the extent IFC's alleged "promise to sell" caused Mr. Osseiran to purchase additional MECG shares, he has, in actuality, *benefited* from these purchases.

19.   Counsel has asked me to quantify the damages suffered by Mr. Osseiran by assessing the value of MECG shares *at or around the time* of IFC's alleged breaches. For purposes of my assessment, I have been instructed to consider the period from November 2005 through February 2006 to generally represent "the time of IFC's alleged breaches."

20.   From a purely financial and economic standpoint, I concur that the value of MECG shares should be assessed *at or around the time* of IFC's alleged breaches. Mr. Osseiran alleges that he would have obtained a controlling interest in MECG *but for* IFC's alleged breaches.[21] This in turn implies that FNB would not have acquired control of MECG *but for* IFC's alleged breaches. In other words, Mr. Osseiran's claims damages resulting from a lost opportunity to control and manage the firm. This lost opportunity, however, represents the mere *possibility* of a more favorable economic

---

[18] Plaintiff's Objections and Partial Responses to Defendant's First Set of Interrogatories (Interrogatory No. 10)
[19] OSSEIRAN 053 – 060. This includes the 107,000 shares Mr. Osseiran allegedly purchased between November 2005 and February 2006, plus 4,500 shares that Mr. Osseiran previously owned.
[20] Calculated as 107,000 shares multiplied by the US$ 86.29 sales price to FNB, less average cost to acquire shares of US$ 50.09 per share (see Table 1 below). The purchase price of Mr. Osseiran's remaining 4,500 shares could not be confirmed.
[21] Amended Complaint for Injunctive Relief and Damages at ¶7, 16, 34, 47

outcome had he purchased IFC's shares. The future value of MECG shares was subject to the company's future performance, which could have been influenced by a number of factors including management's decisions, corporate governance, economic conditions, and other market forces. It is impossible to know whether the value of MECG shares would have increased or decreased, or whether the company would have been forced into liquidation *but for* IFC's alleged breaches.

21. Furthermore, fundamental financial theory dictates that economic benefits accruing to the investor must be commensurate with the risk borne by the investor.[22] Therefore, awarding Mr. Osseiran the benefit of an increase in the future price of the MECG shares (e.g. the share price in May 2008) when he did not bear the risk associated with owning those shares would over-compensate Mr. Osseiran for IFC's alleged breaches and potentially result in a windfall benefit. Consequently, an objective and reliable measure of damages suffered by Mr. Osseiran can only be obtained by considering the value of MECG shares *around the time* of IFC's alleged breaches.

22. The potential damages suffered by Mr. Osseiran is indicated by the difference between the price at which he could have divested IFC's shares (i.e., the market value of MECG shares) and the costs he would have incurred in acquiring these shares *around the time* of IFC's alleged breaches. In the following sections, I assess the market value of MECG shares around the time of the breach as a precursor to calculating damages.

Valuation of MECG Shares Around the Time of IFC's Alleged Breaches

23. There were a number of share purchase transactions executed *around the time* of the alleged breach that provide evidence as to the contemporaneous value of the MECG shares. These include 6 transactions between Mr. Osseiran and other shareholders allegedly executed between December 2005 and February 2006, as well as the transaction between FNB, IFC, and other MECG shareholders in February 2006.

24. Additionally, I have reviewed all of the unsuccessful offers made at the MECG shareholders meeting in February 2006 and have assessed the

---

[22] Based on the Risk-Return Tradeoff principle: "The principle that potential return rises with an increase in risk. Low levels of uncertainty (low risk) are associated with low potential returns, whereas high levels of uncertainty (high risk) are associated with high potential returns. According to the risk-return tradeoff, invested money can render higher profits only if it is subject to the possibility of being lost." http://www.investopedia.com/terms/r/riskreturntradeoff.asp

relevance of these offers in determining the value of MECG shares around the time of the alleged breach.

25. Table 1 below summarizes numerous share purchase transactions executed between Mr. Osseiran and other MECG shareholders. In total, Mr. Osseiran alleges that he purchased 107,000 MECG shares between December 2005 and February 2006.[23] As can be seen in the table below, the average price paid for these shares was US$ 50.09. I note that supporting documentation for three of these transactions was not available; therefore the details of these transactions could not be confirmed.[24]

Table 1 – Summary of Share Purchase Transactions between Mr. Osseiran and Other MECG Shareholders[25]

| Date | Buyer | Seller | Shares | Price | Price per Share |
|---|---|---|---|---|---|
| 12/31/2005 | Salah Osseiran | Financial Investment Luxembourg S.A. | 22,500 | $ 1,048,000 | $ 46.58 |
| 1/9/2006 | Salah Osseiran | Barclays Bank plc | 50,000 | $ 2,500,000 | $ 50.00 |
| 1/22/2006 | Salah Osseiran | F.I. Al Mogayel Son's Co. Ltd. | 3,000 | $ 162,000 | $ 54.00 |
| 1/23/2006 | Salah Osseiran | Munther Al Naboulsi | 4,500 | $ 225,000 | $ 50.00 |
| 2/1/2006 | Salah Osseiran | Oryx Merchant Bank Ltd. | 12,000 | $ 600,000 | $ 50.00 |
| 2/15/2006 | Salah Osseiran | Eminvest Limited | 15,000 | $ 825,000 | $ 55.00 |
| | | **Total** | **107,000** | **$ 5,360,000** | **$ 50.09** |

26. As Table 1 above indicates, Mr. Osseiran allegedly purchased 107,000 shares for total consideration of US$ 5,360,000, resulting in an average price per share of US$ 50.09.

27. Additionally, I have also analyzed the share purchase offers made at the shareholder meeting in February 2006. These include: the offer from FNB that was ultimately accepted by the majority of shareholders, offers from three other shareholders which were rejected, and an estimate prepared by MECG's management of the value of the shares if the company were liquidated. Table 2 below summarizes these offers.

---

[23] Plaintiff's Objections and Partial Responses to Defendant's First Set of Interrogatories (Interrogatory No. 5)
[24] These are the transactions between Mr. Osseiran and Oryx Merchant Bank Ltd., F.I. Al Mogayel Son's Co. Ltd., and Mr. Munther Al Naboulsi. I note that a draft Share Sale Agreement was provided for an additional transaction between Mr. Osseiran and George Kanaan for 3,000 shares dated 20 January 2006. It is unclear whether this is the same transaction identified by Mr. Osseiran (in his partial responses to Defendant's first set of interrogatories) as having occurred with F.I. Mogayel Son's Co. Ltd. See OSSEIRAN 283 – 287.
[25] See Plaintiff's Objections and Partial Responses to Defendant's First Set of Interrogatories (Interrogatory No. 5) and OSSEIRAN 029 – 044. In cases of discrepancy between Mr. Osseiran's response to Interrogatory No. 5 and the supporting documentation (Share Sale Agreements), I have relied on the information in the supporting documentation.

6

**Table 2 – Summary of Offers Received at February 16, 2006 Shareholders' Meeting**[26]

| Offeror | Price | Comment |
|---|---|---|
| Mohamed Saad Haidar | US$ 76 | Offer not accepted due to 75% minium equity ownership requirement |
| First National Bank | US$ 60.00 - US$ 66.00 | Offer accepted by majority shareholders. First National purchases shares for $66 and acquires a controlling stake |
| Al Itimad Lebanese Bank | US$ 60 | Offer rejected in favor of First National Bank offer |
| Trisax Investment Holdings SAL | US$ 56.00 - US$ 58.00 | Offer rejected in favor of First National Bank offer |
| Liquidation Value Estimate | US$ 78.9 | Estimate does not factor in costs of liquidation / termination. Liquidation option not ultimately pursued. |

28. As indicated in Table 2 above, offers of between US$ 56 per share and US$ 76 per share were made at the February 16, 2006 shareholder meeting. The liquidation value was estimated by MECG management at US$ 78.90 per share, excluding the costs of liquidation.

29. Ultimately, FNB's offer of US$ 66 per share was accepted by the majority of shareholders.[27] This offer resulted from a competitive bidding process, and the ensuing transactions (at US$ 66 per share) represent arm's length transactions that were concluded between several shareholders (i.e., sellers) and FNB (i.e., buyer). The share price of US$ 66 is therefore an objective indicator of the value of MECG shares at that point in time.

30. There were two offers that were higher than the FNB offer price: the offer by Mohamed Saad Haidar for US$ 76 and the Liquidation Value Estimate of US$ 78.90. The offer from Mohammed Saad Haidar, which was conditional on obtaining 75 percent equity ownership of MECG, was not accepted by MECG shareholders and is therefore not indicative of the market value of the MECG shares ("market value" reflects the price at which shares are trading or the price at which shares can be purchased or sold in an arm's length transaction). Additionally, I note that the offer from Saad Haidar was the only offer that did not reportedly include supporting evidence of availability of funds.[28]

31. I have also rejected the liquidation value estimate of US$ 78.90 per share. This estimate is not a valid measure of the market value of the MECG shares

---

[26] See IFC-M00002054 - 2061
[27] See OSSEIRAN 328
[28] IFC-M00002054

7

for at least two reasons. First, it fails to include the costs of liquidation (particularly the cost of running the company during the liquidation process), which could have been substantial.[29] Second, the feasibility of obtaining approval for liquidation from the Lebanese authorities was uncertain, and even if possible, may have taken a number of years.[30] As a result, any value that might have remained after the costs of the liquidation process were absorbed would not have been realized for some time.

32. I therefore conclude that the FNB transaction price of US$ 66 per share represents the market value of the MECG shares in February 2006. I note that this value represents the highest price that was achieved in any transaction that was concluded around the time of the breach. Reliance on any of the other concluded transactions will result in a lower measure of damages.

33. Therefore, *but for* IFC's alleged breaches, had Mr. Osseiran purchased IFC's 30,000 shares at $50 – US$ 56 per share in November 2005, he would have been able to redeem these shares at a price of US$ 66 per share at the February 16 shareholders meeting. Consequently, assuming IFC is liable for the alleged breaches, damages owing to Mr. Osseiran are in the range of US$ 300,000 - US$ 480,000. This represents Mr. Osseiran's maximum potential damages around the time of the breach (i.e., as of February 2006).[31] The damages calculation is summarized in Table 3 below.

Table 3 – Summary of Potential Damages Suffered by Mr. Osseiran

| Calc. | | High Estimate | Low Estimate |
|---|---|---|---|
| [A] | Number of IFC Shares | 30,000 | 30,000 |
| [B] | Value of IFC Shares | $ 66.00 | $ 66.00 |
| [C] | Cost of IFC Shares | $ 50.00 | $ 56.00 |
| [D] = B - C | Lost Value per Share | $ 16.00 | $ 10.00 |
| [E] = A*D | Damages | $480,000 | $300,000 |

---

[29] See IFC-M00002055
[30] OSSEIRAN 298
[31] The low estimate of damages (i.e., US$ 300,000) would apply if there were no claims advanced by Lebanese authorities in conjunction with MECG's contingent liability (related to social security payments) within 3 years of the November 2005 draft sale agreement.

# VI. Evaluation of Mr. Osseiran's Damages Claim

34. Plaintiff has not submitted an expert report regarding the damages suffered as a result of IFC's alleged breaches. However, Mr. Osseiran has himself quantified damages in the amount of US$ 6.55 million.[32] Mr. Osseiran has not specified the underlying methodology, framework, or assumptions that form the basis of his damages calculation. I summarize Mr. Osseiran's damages calculation below followed by a critique of his damages claim.

35. Mr. Osseiran uses the sale of his shares to FNB in 2008 as a basis to compute damages resulting from IFC's alleged breaches in 2005. Mr. Osseiran computes two distinct components of damages. First, Mr. Osseiran contends that *but for* IFC's alleged breaches, he would have purchased 30,000 MECG shares from IFC at a price of US$ 50 per share in November 2005. He could then have sold those shares for the same price that he sold his other MECG shares to FNB in May 2008 (i.e., US$ 86.29 per share). This would have earned Mr. Osseiran a profit of roughly US$ 1.1 million.[33]

*30,000 shares x [US$ 86.29 – US$ 50.00] = **US$ 1,088,700***

36. Second, Mr. Osseiran also contends that *but for* IFC's alleged breaches, he would have acquired the remaining outstanding MECG shares (150,000 additional shares) at the same price as IFC's shares (US$ 50 per share). Mr. Osseiran claims these shares would fetch the same price that was paid by FNB for his MECG shares in May 2008 (US$ 86.29 per share), netting him a profit of roughly $5.45 million.[34]

*150,000 shares x [US$ 86.29 – US$ 50.00] = **US$ 5,443,500***

37. Thus, Mr. Osseiran calculates total damages of US$ 6.53 million.[35]

38. There are numerous flaws in the approach adopted by Mr. Osseiran to calculate both components of damages.

39. A foundational flaw in Mr. Osseiran's damages calculation is his assumption that he would have sold the shares purchased from IFC to FNB at a price of US$ 86.29 per share in May 2008 *but for* IFC's alleged breaches.

---

[32] Plaintiff's Objections and Partial Responses to Defendant's First Set of Interrogatories (Interrogatory No. 10) dated 4 June 2009.
[33] Ibid.
[34] Ibid.
[35] Ibid. Mr. Osseiran appears to have rounded up his damages to US$ 6.55 million.

As I have discussed in Section V above, it is more appropriate to measure damages at the time of the breach; the value of the MECG shares at the time of the breach was no more than US$ 66 per share.

40. There are additional problems with Mr. Osseiran's use of the US$ 86.29 share price to calculate damages. First, I would note that Mr. Osseiran has been a minority shareholder of FNB since at least 2003.[36] According to FNB's 2006 annual report, Mr. Osseiran personally owned 3.6 percent of FNB's stock.[37] Furthermore, Mr. Osseiran could possibly have an additional ownership interest in FNB through other investment vehicles.[38]

41. The fact that the May 2008 transaction (at a share price of US$ 86.29) was executed between a company and an individual with a potentially significant ownership stake in that company could call into question the arm's length nature of the transaction. Consequently, US$ 86.29 may not represent the market value of MECG shares as of May 2008.

42. However, even if one were to assume that FNB's purchase of Mr. Osseiran's shares (at US$ 86.29 per share) was an arm's length transaction, there are additional factors that limit its use in determining damages in this case.

43. In using the May 2008 transaction to compute damages, Mr. Osseiran is implicitly assuming that the MECG shares would have increased in value in the same amount *but for* IFC's alleged breaches. The price of US$ 86.29 per share paid by FNB in May 2008 is approximately 73 percent greater than the price Mr. Osseiran paid for Barclay's shares in January 2006. Had Mr. Osseiran gained control of MECG but for IFC's alleged breaches (which he claims he would have), there is certainly no guarantee that he would have been able to increase the value of MECG to the same degree.

44. In 2006 FNB had over US$ 1.3 billion of assets and earned over US$ 5.8 million in net income.[39] I also note that FNB's core business is focused on

---

[36] See First National Bank, 2003 Annual Report (Beirut: First National Bank), p. 9
[37] See First National Bank, 2006 Annual Report (Beirut: First National Bank), p. 8
[38] Mr. Osseiran's company (Business Projects Company or BPC) is a direct investor in "United Investment for real Estate" (see http://www.bpcholding.com/bpcworldwide.html). Separately, "United Investments Company (Lebanon) s.a.l." held an 8.3 percent stake in FNB in 2006. If these two entities represent the same/related companies, Mr. Osseiran's ownership stake in FNB in 2006 could be anywhere between 3.6 percent and 11 percent. See First National Bank, 2006 Annual Report (Beirut: First National Bank), p. 8
[39] Based on an average exchange rate of 1,542 Lebanese Pounds per USD. See First National Bank, 2006 Annual Report (Beirut: First National Bank), p. 49 – 50. For exchange rate see http://www.oanda.com/convert/fxhistory.

commercial, retail and investment banking activities in Lebanon,[40] which aligns well with MECG's core business activities.

45.   It is far from certain that Mr. Osseiran would have had the same apparent success in increasing the value of the MECG shares as FNB. As discussed in Section IV above, MECG was suffering significant losses in the years leading up to 2005, and the company's directors were contemplating liquidation of the company in late 2005. Certainly, if Mr. Osseiran, rather than FNB, had assumed control of MECG *but for* IFC's alleged breaches, he would have been taking on significant risk, with no guarantee of success in resurrecting the company. It would therefore be speculative to assume that the share price of MECG would have increased to US$ 86.29 *but for* IFC's alleged breaches. Basing one's damages calculation on the May 2008 transaction price of US$ 86.29 therefore results in an unreliable and unsupportable estimate of damages.

46.   Mr. Osseiran's second component of damages suffers from all of the same flaws outlined above. Indeed, these flaws are further amplified for this component of damages.

47.   It is far from certain that Mr. Osseiran would have been able to acquire any of the additional 150,000 shares *but for* IFC's alleged breaches.[41] It is even more unlikely that Mr. Osseiran would have been able to acquire these shares at the same price that he offered IFC and Barclays (i.e., US$ 50 per share).

48.   This is particularly true in light of the fact that MECG shareholders were presented with other offers that were higher than Mr. Osseiran's (see Table 2 above). For instance, Mr. Osseiran has offered no explanation why shareholders would have accepted his offer of US$ 50 per share rather than the Trisax Investment Holdings offer of US$ 58 per share or the Al Itimad Lebanese Bank offer of US$ 60 per share. Certainly, it seems likely that Mr. Osseiran would have had to at least match the Al Itimad Lebanese Bank's offer to have harbored hopes of acquiring the remaining MECG shares.

49.   Furthermore, even if Mr. Osseiran were able to acquire the remaining 150,000 shares and secure a 100 percent ownership in MECG (as this

---

[40] www.fnb.com.lb
[41] I note that Mr. Osseiran's estimate of 150,000 additional shares may be in error. Mr. Osseiran owned 111,500 shares, and IFC's stake was for 30,000 shares. An additional 150,000 shares yields a total of 291,500 shares. However, there were only 279,150 shares of MECG outstanding as of February 2006 (see IFC-M00002055).

component of his damages claim assumes)[42], it would be highly speculative to base damages on the $86.29 share price of May 2008 transaction because this transaction was executed when FNB (and not Mr. Osseiran) was controlling MECG.

50. In conclusion, I believe that Mr. Osseiran's calculation of damages is predicated on a flawed approach, which results in a speculative and unreliable estimate of damages. The only reliable measure of damages suffered by Mr. Osseiran is obtained by assessing Mr. Osseiran's losses around the time of IFC's alleged breaches, which results in maximum potential damages in the range of US$ 300,000 – US$ 480,000 (see Table 3 above).

---

[42] See Plaintiff's Objections and Partial Responses to Defendant's First Set of Interrogatories (Interrogatory No. 10) dated 4 June 2009.



# Kiran P. Sequeira, PE

**Kiran P Sequeira**
Director

**Navigant Consulting**
1801 K Street, NW  Suite 500
Washington, DC 20006
Tel: 202-481-8487
Fax: 202-973-2401

ksequeira@navigantconsulting.com

**Education**
- MBA (Finance), Johns Hopkins University
- MS - Civil Engineering, Syracuse University
- BS - Civil Engineering, University of Bombay

**Professional Credentials & Memberships**
- Professional Engineer (PE), District of Columbia
- Volunteer Arbitrator, DC Bar Attorney Client Arbitration Board (ACAB)
- American Bar Association, Navigant Liaison to the International Litigation Committee
- Guest lecturer – Johns Hopkins U.

**Employment**
- Navigant Consulting
- Andersen
- Municipal and Financial Services Group (MFSG)
- O'Brien & Gere Engineers

Mr. Sequeira is a Director in Navigant's Disputes and Investigations practice and focuses on damages in international disputes. He has served as a consultant and/or expert on the quantum aspects of several international disputes, with emphasis on valuation of investments. Mr. Sequeira has assisted businesses, investors and governments in disputes within the natural resources, utilities, telecommunications, financial services, manufacturing, retail, and professional services sectors. Mr. Sequeira's broader international consulting experience includes lead roles on disputes and investigations in Europe, Latin America, Africa, Central Asia, Middle-east, South Asia, and Far East.

## Valuation, Financial & Economic Analyses

**Valuation of Investment made by Cigarette Manufacturer – Grand River Enterprises v. US Department of State [NAFTA Investor-State arbitration].** Retained as damages expert by Respondent. Assisting in rebutting arbitration claim pertaining to alleged damages sustained by a Canadian manufacturer with respect to certain state measures adopted in connection with a master settlement agreement. Claimants allege that the state measures have effectively expropriated their enterprise. Quantum analysis entailed an assessment of the economic impact of the challenged state measures on Claimants' enterprise, and in particular on the fair market value of the enterprise as of the date of alleged expropriation. Submitted two expert reports in this matter. Oral testimony is scheduled for late 2009.

**Valuation of a Gold Mine – Glamis Gold v. US Department of State [NAFTA Investor-state arbitration].** Served as damages expert for the U.S. Department of State in defending claim brought before a NAFTA arbitration tribunal for the alleged expropriation of a large open pit gold mine in California. Assessed change in fair market value of the mine due to the imposition of mandatory backfill regulations by the State of California. Submitted three expert reports and provided guidance to Respondent on all quantum aspects of the claim during the arbitral hearing and post-hearing submissions. Tribunal recently issued award dismissing all claims made by Claimants (i.e., zero damages).

**Valuation of Non-Metallic Mineral Mines – Italian Investors v. Republic of South Africa [ICSID Investor-State arbitration]** Assisted Italian investors in assessing damages associated with the loss of several mineral rights that were expropriated pursuant to new regulations promulgated by the government. Valuation included considerations of vertical integration of mineral properties with investors' global sales and distribution channels, diminution of fair market value, as well as the real option value of the expropriated mines.

**Valuation of a Power Plant – Swedish Investor v. West European State [ICSID Investor-State arbitration]** Assisting large Swedish power generator in filing a claim under the Energy Charter Treaty. The damage claim relates to the diminution is value of a large coal-fired power plant due to certain environmental permit restrictions and delays resulting from the actions (and inactions) of the local authorities.

**Toll Road Concession Damage Assessment – Walter Bau v. Republic of Thailand [UNCITRAL Investor-State arbitration]** Assisted Respondent in rebutting damage claim relating to alleged violations of a toll road concession agreement. Assessment includes a valuation of Claimant's equity interest in the concession at various points in time, rebuttal of



Claimant's damage claim, and an evaluation of the impact of various loss events on the damage claim and the value of Claimant's equity interest.

**Bondholders Dispute – Italian Investors v. Republic of Argentina [ICSID Investor State Arbitration]** Assisting claimants (over 180,000 Italian investors) with arbitration claim seeking to obtain compensation for their holdings of several Argentinean government bonds purchased in the 1990's. Respondent defaulted on these bonds in December 2001. Currently assisting claimants with analysis of bondholdings in conjunction with jurisdictional submissions.

**Highway Concession Damage Assessment – US & Spanish Investors v. Latin American Republic. [ICC Arbitration]** Assisting Latin American government in responding to a claim filed by highway concessionaire in regard to alleged breaches of the terms of the concession agreement for construction and operation of a major toll road.

**Loss Quantification, Chevron Corporation and Texaco Petroleum Company v. Republic of Ecuador: (UNCITRAL Investor State Arbitration)** Assisted Claimant with a denial of justice claim for damages suffered in the oil production industry in the Republic of Ecuador. Dispute pertains to alleged breaches by Ecuador of its payment obligations to TexPet under certain contractual agreements negotiated between the two parties.

**Internal Investigation (Billing and Invoicing Dispute) - Confidential Client, Kuwait.** Served as team lead on a large engagement for a Fortune 500 Government Contractor in the extractive sector. Client is executing multi-billion dollar contract associated with US operations in the Middle East. Assisted client in resolving issues related to invoice and billing disputes (value at risk in excess of one billion dollars), vendor sourcing, subcontract administration, and vendor payment. Developed and managed a tracking tool to monitor aged invoices, disputed invoices/claims, and vendor payments.

**FCPA Investigation, Angola – Confidential Client.** Assisted Fortune 500 oil and gas exploration company in analyzing transactions associated with gathering of offshore geophysical data in Angola and sales of this data to large global customers in the oil and gas industry. Led team in conducting detail review of numerous contracts and associated addendums governing capture and sale of geophysical data; analyzed sales, revenues, and profits accruing to the client, its joint venture partners, and affiliated agents. Quantified net revenues and profits associated with sales transacted via business agents that were being investigated by the SEC. Findings were compiled into a report submitted by the client to the SEC.

**Valuation of Non-metallic Mining Company – Latin American Investor v. Republic of Bolivia [ICSID Investor-state arbitration]** Assisted Chilean investor in quantifying the loss in enterprise value due to the expropriation of mine concessions by Bolivia. Assessment includes a detailed analysis of Claimant's industry, market segment, business, and operations. Conducted a valuation of Claimant's integrated business with and without the expropriated concessions to assess harm to Claimant and prepared expert report on damages.

**Valuation of Water Utility – CORFO v. Multinational Water Company.** Provided advice to the Chilean governmental water authority (CORFO), on the losses it sustained on its investment in a partially privatized water utility. Analysis included an assessment of the change in valuation of the water company due to inadequate corporate governance and negative publicity resulting from improper business dealings between the utility's majority owner and a large contractor. The analysis indicated a loss of value to CORFO of at least US$ 11.7 million. The arbitration was settled via a payment from Defendant in the amount of US$ 11.1 million.

**Valuation of a Mobile Telecom Company – Turkish Investors v. Central Asian Republic [ICSID Investor-State arbitration].** Assisted respondent in rebutting arbitration claim involving alleged expropriation of nation's second largest mobile phone company. Rebutted claimants' valuation and developed alternate valuation addressing limitations in claimants' valuation methods. Assessment included detailed review of mobile penetration forecasts, competition and market share, subscriber growth and churn rates, average revenue per user (ARPU), and capital and operating expenditures. Prepared expert report and supported counsel in cross-examination of Claimants' damages expert during the arbitral hearing.



**Kiran P. Sequeira, PE**

**Valuation of Sugar Mills – US Investor v. United Mexican States [NAFTA Investor-State Arbitration].** Assisted in development of expert report submitted to a NAFTA arbitral tribunal on the valuation of a minority stake in a company operating five sugar refineries in Mexico after the Mexican government expropriated the refineries.

**Post-divestiture Dispute – Fortune 500 Mobile Telecom Company [AAA arbitration].** Assisted second largest US wireless carrier in developing damage claim for AAA arbitration. Quantified damages associated with costs incurred to support a post divestiture Transition Services Agreement (TSA). TSA was executed in conjunction with divesture of overlapping wireless spectrum across the United States. Developed allocation basis and methodology to assign costs incurred across multiple local, regional, and, national cost centers. Developed allocation schedules to support client's claim. Assisted counsel in conducting depositions, and in preparing exhibits and demonstratives. Case settled favorably just before the arbitral hearing.

**Lost Profits Claim and Arbitration Support – Cell Tower Lessor [AAA arbitration].** Conducted an economic analysis to assess and quantify damages associated with breach of specific contractual terms in conjunction with the lease of land to a major cell tower operator. The analysis entailed an assessment of the cell tower market, review of a representative sampling of cell tower and land lease agreements, and the quantification of rent transfer associated with Master Service Agreements (MSAs) between the cell tower operator and leading wireless service providers (AT&T, Verizon, Nextel, Sprint, and Voicestream). Assisted attorneys with data requests during discovery, quantification of damages, development of expert report, and advisory support during arbitration proceedings.

**Lost Profits Analysis, Breach of Contract – Confidential Client.** Assisted major construction equipment manufacturer in evaluating a lost profits claim associated with termination of a dealer agreement. Evaluated dealer's mitigation of the termination, and conducted detailed product line analysis to assess gross and net margins associated with sales of client's equipment. Developed exhibits, assisted in preparing expert report, and in rebutting plaintiff expert's lost profit claim.

**Insurance/Reinsurance Investigation – Confidential Client.** Assisted defendants in addressing multiple allegations of fraud and improper accounting at a Fortune 100 insurance company. Led consulting team in analyzing several complex finite risk insurance accounting issues. Tasks including extensive review of relevant documents, evaluation of risk transfer issues, GAAP and Statutory accounting requirements, applicability of finite risk insurance contracts and related party transactions, retrocession and reinsurance accounting protocols. Also assisting in preparation for trial.

**Evaluating Business Value of Technology - Microsoft Corporation.** Conducted and managed multiple engagements for Microsoft that involved business value assessments for a wide range of application software. Engagements entailed detailed business case mapping of the direct relationship between technology and business process improvements. The analyses were based on quantifiable and supportable measurements, and a clear understanding of industry value drivers. Developed framework for Return on Investment (ROI) and Net Present Value (NPV) models for these applications and provided default metrics for costs and benefit realization. ROI models were validated with real-time data gathered during customer site-visits to verify and refine model assumptions, metrics, and default values.

**Royalty Analysis and Arbitration Support - Confidential Client.** Conducted analysis for Fortune 500 Client to quantify royalties associated with licensing of software that enabled printing of select print data streams. The analysis entailed an evaluation of the integrity of client's global databases for tracking selected printer system installations, licensing arrangements, and royalty payments in US, Canada, Europe, Australia, and emerging markets. Results from analysis were used to assess historic royalty payments and receipts, quantify royalty over/underpayment, and rebut plaintiff's damage claim. Assisted with arbitration proceedings including data gathering, analysis, and rebuttal of plaintiff's claim.

**Water System Financial Feasibility Study, Stafford County, Virginia** Performed a financial feasibility study including assessment of revenue adequacy and rate structures, and projections of all financial statements and coverage ratios as required by the bond covenants for a large revenue bond issue. Evaluated adequacy of system development fees, debt service reserve funds, and municipal bond insurance. Assessed risks associated with the implementation of major capital-intensive projects and identified opportunities for phased implementation and risk sharing.



**Kiran P. Sequeira, PE**

**Internal Controls Enhancement - Freddie Mac.** Assisted in the development of a workflow application that enhances internal controls at Freddie Mac by standardizing business processes for change initiatives (e.g., new mortgage products, non-standard transactions, operational changes) across the organization, and serves as a centralized repository for all business change initiatives that may have financial, regulatory, or tax reporting impacts. Provided consulting support, guidance and leadership for all aspects of project.

**Business Transformation and Strategic Cost Reduction – Allstate Insurance.** Member of core team implementing critical project to transition Allstate from a personal lines insurer to a financial services company. The project identified a total of $1.2 - $1.8 billion in annual savings and provided a roadmap for the business transformation over a three to four year period. Identified hypotheses for business process improvements and operational efficiencies. Conducted data gathering and fact-finding, followed by rigorous data analysis to validate hypotheses and develop opportunities for cost savings. Developed consensus among key client stakeholders for phasing in implementation of cost reduction strategies.

**Rate Models for Incurred Cost Submissions– International Public Accounting Firm.** Assisted "Big 4" public accounting company with incurred cost submissions for a 4-year period. Directed and managed a team of 6 consultants in the development of indirect rates and associated submission schedules for a period of four-years. The engagement was executed in anticipation of dispute, under a very aggressive timeline, and involved analysis of large volumes of historic data from legacy IT systems. Led team in reconstructing data elements needed to build robust integrated rate models for each of the four years. Participated in client meetings and made presentations to senior client executives. Consulted with client on cost allocability and allowability matters, and assisted in responding to questions and allegations raised by the government audit agency

**Assessment of Extra-contractual Liability – Confidential Client.** Conducted study for a Fortune 100 insurance carrier to determine root causes of extra-contractual liability (ECL) for a large portfolio of litigation cases. Conducted workshops with litigation attorneys to develop a comprehensive questionnaire to capture data via an extensive closed file review. Assisted attorneys in defining and implementing procedures for file review and data capture. Provided oversight to ensure quality control and integrity of data captured during the file review. Conducted rigorous analysis of data gathered to identify trends and assess root causes of ECL. Compiled findings into a comprehensive presentation to be delivered to C-suite client executives.

**Patent and Trademark Infringement – Confidential Client.** Formulated engagement strategy, developed damage theories, and performed exposure calculations (including lost profits and reasonable royalty) for a patent and trademark infringement in the electronics industry. Conducted detailed revenue and cost assessment of defendant's use of patented technology and assisted in writing expert report.

**Insurance Insolvency - Confidential Clients.** Provided financial and analytical consulting services including support for financial modeling, exposure simulations, contract level recalculations, and expert reports for State and Federal insurance guaranty associations in resolving multiple insurance insolvencies.

**Environmental Risk Management – Confidential Clients.** Assisted two Fortune 500 clients (an energy utility and a textile manufacturing company) in the development of environmental risk management strategies and integrated site management plans. Performed historical and future cost modeling analyses of environmental exposures to settle environmental disputes with insurance carriers. The projects involved resolution of complex liability, allocation and damages issues.

**Financial Management Services, Water & Sewer Authority, Washington DC** Provided assistance in capital budgeting and financing of water/sewer projects over a 6 year planning horizon. Assessed impacts of major capital projects and sequencing options on user rates. Reviewed and refined the future cost-of-service and rate requirements. Evaluated water conserving rate design options to reduce sewage generation within the District of Columbia, including assessment of demand elasticity, impact on customer bills and administrative practicality.

**Water System Financial Planning and Rate Design, Frederick County, Maryland** Conducted a comprehensive cost-of-service evaluation of the county's water and sewer utilities. Evaluated the County's cost allocation and recovery



**Kiran P. Sequeira, PE**

procedures, debt service obligations, major capital projects and associated risks, and prevailing rate structures for user fees, capacity fees, and miscellaneous income. Developed historic and future O&M and capital cost estimates; forecasted future revenue requirements. Developed financial model to evaluate appropriateness of several rate design alternatives and recommended a rate structure consistent with the county's vision, mission and objectives. Projected future cash flows under optimistic and pessimistic scenarios of county growth, interest rates and capital expenditures. Evaluated several financing alternatives for planned capital projects including issue of general obligation and revenue bonds, grants from applicable state and federal funds, public/private financing, and bank loans.

**Water System Regionalization Study, Chitaqua County, New York** Developed a comprehensive financial model to evaluate the economics of integrating seven adjoining water systems. Conducted interviews with accounting/finance personnel, plant operators, utility and county executives to obtain relevant data on system operation, costs/revenues, and regionalization options. Developed, costed, prioritized and sequenced capital projects. Simulated alternate scenarios for regionalization and assessed impact on user rates and connection fees. Recommended most suitable regionalization option for adoption.

## Engineering Consulting

**Strategic Planning for Municipal Utilities – Various Clients.** Developed strategic plans and conducted institutional assessments for water utilities. Tasks included diagnosis and planning to redefine organizational objectives, evaluation of utility's operations and support functions, prioritization of capital expenditures, and technical oversight during project implementation. Developed and implemented regionalization/divestiture plans for water/sewer utilities. Conducted strategic financial planning to assist utilities in financing and managing large capital expenditures; developed rate models to evaluate impacts on user rates. Provided technical oversight and made presentations at public hearings for approval of new rates.

**Water System Infrastructure Planning, Water & Sewer Authority, Washington, DC.** Managed and executed several phases of a 4-year $8.5 million program to improve the aging water distribution system serving the District of Columbia. Conducted a variety of water system planning studies, hydraulic analyses, and design upgrades. Developed, calibrated and applied comprehensive hydraulic model to identify system deficiencies under existing and future demand conditions. Investigated system reliability, pressure and fire flow deficiencies, storage and pump station adequacy, water quality and water age under multiple operating scenarios. Developed and designed capital improvements to address system deficiencies. Costed, prioritized, and scheduled capital projects for phased implementation. The capital projects were valued at over $200 million.

**Hydrogeologic Investigation – Confidential Client, India.** Conducted an investigation to identify and evaluate environmental impacts of pesticide manufacturing operations on ground water for an international conglomerate. The investigation involved installation of overburden and bedrock monitoring wells, collection and analysis of water quality data, and modeling of ground water contaminant plume.

**Water Distribution Master Plan - Water-En Energiebedrijft, Aruba.** Developed a water distribution master plan for the island of Aruba. The plan specified actions for maintaining and expanding Aruba's potable water supply to meet projected demand over the next 15 years and beyond. Developed existing and future water demand projections including distribution of these demands across the island. Conducted hydraulic analysis of the system and identified piping, storage and pumping improvements to meet future demands. Costed, phased and prioritized capital improvements. Recommended upgrading of data management system for improved system operations & maintenance

**Wastewater Treatment Plant Conceptual Design, Valencia, Venezuela.** Conducted conceptual planning and design of a new wastewater treatment plant in Valencia, Venezuela. The project was performed on a turnkey basis due to the aggressive schedule necessary to meet regulatory requirements. Teamed with local Venezuelan construction firms to provide civil, electrical, mechanical, and other construction services.

**Raw Water Supply Study, Rivanna Water & Sewer Authority, Charlottesville, VA** Provided engineering services for permitting of additional raw water supply source(s) to meet projected demands through year 2050. Modeled existing



supply and costs associated with additional supply for 22 raw water supply alternatives including ground water, reservoirs, rivers, and purchase of water from neighboring utilities.

**Storm Water Management, Palisades Center Mall (Pyramid Developers), New York**  Planned and designed a storm water conveyance system for the nation's second largest shopping mall. Evaluated storm water characteristics, delineated drainage areas and storage reservoirs, and established stage-discharge relationships for hydraulic structures to enable modeling of flood routes resulting from 5, 10, and 100 year storm events.

**Maintenance Management System - Department of Defense (Army Corps of Engineers), Washington DC.** Planned and implemented a maintenance management system for urban water systems owned and operated by the Army Corps of Engineers. The management system enhanced system operations and maintenance, and improved inventory management and procurement procedures. It also provided compatibility with inter-jurisdictional Supervisory Control and Data Acquisition (SCADA) systems for real-time data gathering and analysis.

## Publications and Presentations

"The Evolving Role of the Valuation Expert"  Presented at international conference in New York City on "International Arbitration: Managing Risk in High Growth - High Risk Markets".  September 2008.

Guest lectures at Georgetown University, Johns Hopkins University, and Howard University schools of business on valuation and damages in international disputes.  2006 – 2008.

Participated and presented as a damage expert at various seminars sponsored by the National Institute of Trial Advocacy and/or law firms.

"Developing Operating Rules for Raw Water Supplies: Challenges and Opportunities" Sequeira, K.; Dumm, T. Presented at American Water Works Association Annual Conference (Chesapeake Section), 1999. Ocean City, Maryland.

"The response of lake water in the Adirondack Region of New York to changes in acidic deposition" Driscoll, C.; Sequeira, K. 1998. Environmental Science: International Journal of Science and Policy, for the proceedings of the conference "The Adirondacks and Beyond".

"Spatio-temporal modeling of the effects of acid deposition" Driscoll, C.; Sequeira, K.; Csillag, F.  Presented at the International Conference on Integrating Geographic Information Systems (GIS) and Environmental Engineering. 1996. Albuquerque, New Mexico, USA.

Exhibit 2

## Salah N. Osseiran v. International Finance Corporation

*Information Considered in Expert Report of Kiran P. Sequeira, PE, MBA*

| Bates # | Document Title | Date |
|---|---|---|
|  | Amended Complaint for Injunctive Relief and Damages |  |
|  | International Finance Corporation's Answer to Plaintiff's Amended Complaint | 20-Aug-2007 |
|  | Plaintiff Salah N. Osseiran's Objections and Partial Responses to Defendant's Fist Set of Interrogatories | 4-Jun-2009 |
|  | International Finance Corporation's Objections and Answers to Plaintiff's First Set of Interrogatories | 9-Apr-2009 |
| IFC-M00000229 - 234 | Internal IFC Rating of MECG | 29-Jun-2005 |
| IFC-M00000235 -241 | Internal IFC Rating of MECG | 22-Sep-2005 |
| IFC-M00000261 - 273 | Internal IFC Rating of MECG | 25-Sep-2005 |
| IFC-M00000242 - 248 | Internal IFC Rating of MECG | 1-Dec-2005 |
| IFC-M00000249 - 254 | Internal IFC Rating of MECG | 28-Dec-2005 |
| IFC-M00000255 - 260 | Internal IFC Rating of MECG | 29-Mar-2006 |
| IFC-M00000620 - 627 | Management Buyout Presentation | Sept 2005 |
| IFC-M00000677 - 680 | E-mail from Walid Musallam to Daoud Khairallah, Subject: Confidential & Urgent - MECG | 8-Sep-2005 |
| IFC-M00000600 - 601 | E-mail from Walid Cherif to Jan Van Bilsen, Subject: Re: Fw: CONFIDENTIAL mecg urgent | 12-Oct-2005 |
| IFC-M00000507 - 508 | E-mail from Walid Cherif to Jan Van Bilsen , Subject: Re: Re MECG offer by Osseiran | 20-Oct-2005 |
| IFC-M00001882 - 1888 | Internal IFC Memo Re: Sale of MECG Shares to Osseiran | 2-Nov-2005 |
| OSSEIRAN 141 - 142 | Fax from Salah Osseiran to Nabil Khairallah, Subject: F.I.L shares in MECG | 30-Nov-2005 |
| OSSEIRAN 234 | Letter from Salah Osseiran to Nabil Khairallah, Offer to Buy Shares | 22-Dec-2005 |
| OSSEIRAN 029 - 031 | Share Sale Agreement between Salah Osseiran and Financial Investment Luxembourg | 31-Dec-2005 |
| OSSEIRAN 032 - 040 | Share Sale Agreement between Salah Osseiran and Barclays Bank PLC | 9-Jan-2006 |
| OSSEIRAN 276 - 280 | E-mail from Penny Walker to Salah Osseiran, Subject: MECGL - payment mechanics | 9-Jan-2006 |
| OSSEIRAN 283 - 287 | Share Sale Agreement between Salah Osseiran and George Kanaan | 20-Jan-2006 |
| OSSEIRAN 298 - 312 | E-mail from Khodor Bdeir to Salah Osseiran, Subject: RE: Msg dtd Feb 09, 2006.  Includes MECG Unaudited Financial Statements dated January 31, 2006 | 10-Feb-2006 |
| IFC-M00002054 - 2060 | Letter from Walid Musallam to MECG Shareholders with Offers and Liquidation Value Estimate | 13-Feb-2006 |
| IFC-M00002061 | Letter from Joseph Tarabi to His Highness Sheikh Khaled Turqui with Al Itimad Lebanese Bank Offer | 13-Feb-2006 |
| IFC-M00002089 - 2093 | E-mail from Carmen Genovese to Mark Alloway, Subject: Re: FW: FW: MECG Offers | 14-Feb-2006 |

Page 1 of 2

Exhibit 2

## Salah N. Osseiran v. International Finance Corporation
*Information Considered in Expert Report of Kiran P. Sequeira, PE, MBA*

| Bates # | Document Title | Date |
|---|---|---|
| OSSEIRAN 041 - 044 | Share Sale Agreement between Salah Osseiran and Eminvest Limited | 15-Feb-2006 |
| OSSEIRAN 328 | Share Sale Agreement between Imad Alaagar and First National Bank | 16-Feb-2006 |
| OSSEIRAN 053 - 060 | Master Agreement between Salah Osseiran and First National Bank | 26-May-2008 |
| OSSEIRAN 001 - 002 | Transfer of Shares Agreement between Salah Osseiran and Fist National Bank | 26-May-2008 |
| OSSEIRAN 061 - 062 | Transfer of Shares Agreement between Middle East Capital Group SAL and Salah Osseiran | 26-May-2008 |
| OSSEIRAN 063 - 064 | Transfer of Shares Agreement between Middle East Capital Group SAL and Salah Osseiran | 26-May-2008 |
| OSSEIRAN 065 - 066 | Amendment to the Transfer of Shares Agreement between Rami El Nimer and Salah Osseiran | July 2008 |
| IFC-M00000401 - 429 | Middle East Capital Group Limited Consolidated Financial Statements Year Ended December 31, 2004 | 31-Dec-2004 |
| IFC-M00002399 - 2411 | Middle East Capital Group Limited Consolidated Financial Statements September 30, 2005 | 30-Sep-2005 |
| IFC-M00002310 | IFC Item for Monthly Operations Report | Unknown |
| | First National Bank, 2003 Annual Report | 31-Dec-2003 |
| | First National Bank, 2004 Annual Report | 31-Dec-2004 |
| | First National Bank, 2006 Annual Report | 31-Dec-2006 |
| | Website: Business Projects Company Investments Worldwide | 24-Jul-2009 |
| | Website: Oanda Historical Exchange Rate | 24-Jul-2009 |