UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
SALAH N. OSSEIRAN,             )
                               )
         Plaintiff,            )
                               )
         v.                    )    Civil Action No. 06-336 (RWR)
                               )
INTERNATIONAL FINANCE          )
CORPORATION,                   )
                               )
         Defendant.            )
_____)
```

MEMORANDUM OPINION

Plaintiff Salah Osseiran brought a claim for breach of a confidentiality agreement against the International Finance Corporation ("IFC"), alleging that IFC disclosed to an unauthorized party that Osseiran was negotiating to buy certain bank shares from IFC.[1]  The parties presented evidence consisting of the live and deposition testimony of five witnesses along with exhibits during a bench trial conducted from May 1, 2013 to May 6, 2013.  Osseiran proved that IFC breached the agreement, but did not show by a preponderance of the evidence that IFC's

---

[1] Osseiran's claim for breach of contract was previously dismissed under Federal Rule of Civil Procedure 12(b)(6), see Osseiran v. Int'l Fin. Corp., 498 F. Supp. 2d 139, 146–47 (D.D.C. 2007), and his motion for reconsideration of the dismissal was denied.  IFC's claim that it was immune from suit also was rejected.  Id. at 143–45, aff'd, 552 F.3d 836 (D.C. Cir. 2009).  Summary judgment was entered for IFC on Osseiran's claim for promissory estoppel.  Osseiran v. Int'l Fin. Corp., 889 F. Supp. 2d 30, 42 (D.D.C. 2012).

- 2 -

disclosure caused him damages.  Therefore, judgment will be
entered for Osseiran but he will be awarded only nominal damages
in the amount of $1.

Having observed and listened to the witnesses and assessed
their credibility, and having considered all the evidence and the
parties' post-trial submissions, I make the following findings of
fact and conclusions of law.

<u>FINDINGS OF FACT</u>

1.  Salah Osseiran is an international entrepreneur based in
    Lebanon.  Since 1988, he has specialized in acquiring
    distressed companies and turning them into profitable ones.
    Osseiran Test., 5/2 a.m. Tr. 47:16-21, 48:3-20; Def.'s
    Ex. 69, Stipulation No. 1.

2.  The Middle East Capital Group ("MECG") is a banking and
    financial institution in Lebanon.  It was founded in 1996.
    Osseiran has been a minority shareholder of MECG since its
    founding and later joined its board of directors.  Osseiran
    Test., 5/2 a.m. Tr. 51:7-52:21.

3.  IFC is an international organization and is the private
    sector arm of the World Bank.  Def.'s Ex. 70, Stipulation
    No. 2.

4.  As of 2005, IFC owned approximately 10.8% of the shares of
    MECG and Barclays Bank owned approximately 16% of the shares
    of MECG.  Def.'s Ex. 71, Stipulation No. 3; <u>see</u> Pl.'s Ex. 22

at 438; Pl.'s Ex. 35 at 1884; <u>see also</u> Osseiran Test., 5/2 a.m. Tr. 56:8-12.  Osseiran owned approximately 1.5% of the shares.  Am. Compl. ¶ 16; <u>see</u> Pl.'s Ex. 22 at 438.

5.  MECG as a business was consistently losing money through 2005.  Many shareholders wanted to divest themselves of MECG shares.  IFC and Barclays told shareholders on the MECG board that they wanted to sell their shares.  Van Bilsen Test., 5/1 a.m. Tr. 92:6-11, 94:9-16, 95:1-6; Pl.'s Ex. 2 at 232-33 ("IFC is still seeking an exit from this investment, as its role is complete, and the financial prospect [sic] look poor."); Pl.'s Ex. 3 at 443 ("[IFC has] not made it a secret that IFC can sell at the right price, . . . as [IFC's] role as a development bank is deemed to be over here."); Pl.'s Ex. 35 at 1885 ("IFC confirmed its intention to exit from its investment[.]"); Def.'s Ex. 64, Osseiran Dep. 8/20/09 at 117:12-18 (5/6 a.m Tr. 4:2)[2]; <u>see</u> Khambata Test., 5/1 a.m. Tr. 36:7-12.

6.  Finding buyers had been difficult.  IFC had received inquiries in the past from prospective buyers, but none had turned out to be serious.  Van Bilsen Test., 5/1 a.m. Tr. 95:12-23; Pl.'s Ex. 35 at 1886; <u>see</u> Pl.'s Ex. 134, van

---

[2] A videotape of the relevant portions of Osseiran's deposition was shown at trial on the morning of May 6, 2013.  <u>See</u> 5/6 a.m. Tr. 4:2.  All cites to Osseiran's deposition refer to the tape shown at that time.

- 4 -

Bilsen Dep. 9/2/09 at 105:18-106:11 (5/3 a.m. Tr. 57:5-17);
Osseiran Test., 5/2 a.m. Tr. 58:1-9.

7.   Osseiran wanted to gain control of MECG, become the sole
     shareholder, stop the losses, turn MECG around, make it
     profitable, and ultimately sell his shares at a nice profit.
     Osseiran Test., 5/2 a.m. Tr. 55:8-57:14; see Pl.'s Ex. 134,
     van Bilsen Dep. 9/2/09 at 21:10-22:12 (5/3 a.m. Tr. 36:3-
     24).

8.   In September 2005, Osseiran called Jan van Bilsen, the IFC
     portfolio manager for the Middle East stationed in Dubai.
     Osseiran said that he wanted to buy the MECG shares that IFC
     and Barclays owned.  Van Bilsen Test., 5/1 a.m. Tr. 95:24-
     96:9; Pl.'s Ex. 134, van Bilsen Dep. 9/2/09 at 21:10-14
     (5/3 a.m. Tr. 36:3-6); Osseiran Test., 5/2 a.m. Tr. 57:15-
     25.

9.   Van Bilsen asked Osseiran questions about Osseiran's
     intentions for buying IFC's and Barclays' MECG shares.  Van
     Bilsen wanted to gauge whether Osseiran's interest in a
     potential sale was serious or was fake as earlier inquiries
     from others had been.  Van Bilsen Test., 5/1 a.m. Tr. 96:10-
     24; Osseiran Test., 5/2 a.m. Tr. 58:1-9; van Bilsen Test.,
     5/3 a.m. Tr. 123:8-23.

10.  Osseiran said he wanted to change the direction of MECG.
     Osseiran insisted that he and the negotiators for IFC and

- 5 -

Barclays keep confidential the negotiations over his
purchase until the sale closed.  Osseiran Test., 5/2 a.m.
Tr. 60:1-11, 68:15-25; Def.'s Ex. 64, Osseiran Dep. 8/20/09
at 122:13-21 (5/6 a.m Tr. 4:2).  He also insisted that the
negotiations not be disclosed to IFC's representative on the
MECG board of directors, Daoud Khairallah.  <u>See</u> van Bilsen
Test., 5/1 a.m. Tr. 104:15-105:3; Osseiran Test., 5/2 a.m.
Tr. 59:22-60:7, 71:7-12; <u>see also</u> van Bilsen Test., 5/1 a.m.
Tr. 101:4-104:10; Pl.'s Ex. 5 ("The reason why I have not
cc-ed all is because Osseiran has stressed confidentiality
to me even within our organisations."); Pl.'s Ex. 11 at 1586
(Osseiran's "written and serious offer" was conditional to
"IFC maintaining confidentiality - even vis-a-vis Daoud" and
"[i]n line with the confidentiality, we had initially not
advised Daoud on our negotiations with Osseiran[.]").

11.  Van Bilsen responded that he agreed to Osseiran's
confidentiality request.  Van Bilsen Test., 5/1 a.m.
Tr. 97:8-98:23, 103:17-104:3 ("So, to answer your question,
it came up, he asked me to keep it confidential, so I said
yes."); Pl.'s Ex. 134, van Bilsen Dep. 9/2/09 at 23:21-26:6
(5/3 a.m. Tr. 38:5-39:19) ("Q. Did you understand that you
had a, an agreement with Mr. Osseiran to keep the
negotiations confidential?  A. Yes, but as I said, in the
context that we . . . always keep business confidential.");

- 6 -

Osseiran Test., 5/2 a.m. Tr. 58:10-59:7; Def.'s Ex. 64,

Osseiran Dep. 8/20/09 at 122:22-123:5 (5/6 a.m Tr. 4:2); see

Pl.'s Ex. 134, van Bilsen Dep. 9/2/09 at 154:10-17 (5/3 a.m.

Tr. 68:13-17); Pl.'s Ex. 5.[3]

---

[3] Van Bilsen and Osseiran gave conflicting testimony about what else Osseiran said about his share acquisition plans. Osseiran testified that he told van Bilsen that he first wanted to achieve 51% ownership quietly by acquiring the shares from IFC and Barclays, the two largest shareholders, and then buying from some other smaller shareholders to achieve 51% ownership; that once he was the majority shareholder he would acquire the remaining outstanding MECG shares at a greatly reduced price since the market for minority shares would be weak; and that his whole plan depended upon keeping their negotiations confidential to keep other shareholders from knowing he would need some of them to reach a majority ownership and thus keep them from making their offering prices unaffordable to him.  Osseiran Test., 5/2 a.m. Tr. 55:8-57:14; Osseiran Test., 5/2 p.m. Tr. 39:6-10, 40:18-23, 42:1-10, 43:6-15, 43:23-45:8, 47:25-48:7; Def.'s Ex. 64, Osseiran Dep. 8/20/09 at 116:17-117:11, 199:1-10 (5/6 a.m. Tr. 4:2).

Van Bilsen testified that Osseiran did not say he wanted to achieve 51% ownership or sole control of MECG or that he wanted to buy anyone else's shares, and that Osseiran said only that he wanted to buy the MECG shares from IFC and Barclays and would convince the other shareholders to go along with a new direction for MECG.  Van Bilsen Test., 5/3 a.m. Tr. 124:8-13; van Bilsen Test., 5/3 p.m. Tr. 18:20-19:13; Pl.'s Ex. 134, van Bilsen Dep. 9/2/09 at 22:5-12 (5/3 a.m. Tr. 36:19-24); see Pl.'s Ex. 3 at 443.

I credit Osseiran as the more reliable historian concerning the September 5, 2005 telephone conversation.  First, in observing and listening to Osseiran during his testimony, I developed the same impression of Osseiran as van Bilsen said he had during the negotiations, namely, that Osseiran was professional, businesslike, and genuine and that he stuck to his word.  Van Bilsen Test., 5/1 p.m. Tr. 36:16-37:13 (citing Pl.'s Ex. 45 at 757).  I did not view him as the incredible fabricator that IFC argued that he is.  Further, it makes far more sense that Osseiran would have sought to gain control in order to change the direction of the company than to merely gain a larger minority interest and try to persuade the remaining majority to go along with his change in direction for the company.  Van

- 7 -

_____

Bilsen's explanation that he would have included Osseiran's
control goal in his internal memo to his superior if Osseiran had
stated such a goal because it would have affected other
shareholders, van Bilsen Test., 5/3 a.m. Tr. 124:14-125:5, is far
less persuasive proof that Osseiran did not mention control than
Osseiran's natural inclination to mention his control goal is
compelling proof that he did mention the goal.  Even IFC's
internal memorandum corroborates Osseiran's claim that he told
that to van Bilsen.  Walid Cherif, van Bilsen's IFC colleague,
drafted a memorandum which stated:

> This memorandum seeks your approval for the sale of
> IFC's entire shareholding (30,000 shares or 9.34% of
> the share capital) in [MECG] . . . .  This proposed
> sale will be to Mr. Salah Osseiran, an existing
> shareholder with 2% shareholding, **who is seeking to
> gain control of [MECG] and change its strategic
> objectives.**

Pl.'s Ex. 22 at 438 (emphasis original).  It is unlikely that
this declaration of Osseiran's intent was invented rather than
having been stated by Osseiran.  This is especially so since van
Bilsen clarified in his testimony that this language in Cherif's
draft memorandum that van Bilsen deleted in a re-draft was
incorrect only in that Osseiran's purchase of MECG shares from
IFC and Barclay's would not have gained him control, not that
Osseiran was not seeking control.  Van Bilsen Test., 5/2 a.m. Tr.
42:17-44:14.  It makes less sense for Osseiran to have sought
less than 50% of the shares of a failing company losing money
every day and have no other aspiration than to hope that the
other shareholders would go along with his plans.  It also does
not make sense for him to have had this plan and hid it or not
mentioned it to van Bilsen.  Moreover, it is far more likely that
an investor intent upon gaining control of a company would have
been more attentive and would recall with great accuracy details
of his own opening bid valued at approximately $1 million than
would a manager of approximately 85 projects in 20 countries with
a total portfolio of "around a billion dollars" with business
ranging from less than a million to "40, 50, 60 million" dollars
in a division holding around 1,300 portfolios who viewed the MECG
investment as comparatively "small".  Van Bilsen Test., 5/3 a.m.
Tr. 113:1-23; Khambata Test., 5/1 a.m. Tr. 69:8-11.

- 8 -

12. After the phone call, van Bilsen sent an e-mail to Walid
    Cherif, an IFC colleague, relating the conversation, stating
    that "Osseiran stressed confidentiality and I told him we
    will treat it accordingly" and reiterating to Cherif to
    "[k]eep it confidential."  Van Bilsen Test., 5/1 a.m.
    Tr. 105:4-106:25; Pl.'s Ex. 3.

13. On October 3, 2005, Osseiran sent an e-mail to van Bilsen
    offering to purchase all of IFC's MECG shares.  Van Bilsen
    Test., 5/1 a.m. Tr. 114:19-21; Osseiran Test., 5/2 a.m.
    Tr. 61:6-18; Def.'s Ex. 64, Osseiran Dep. 8/20/09 at 125:3-
    12 (5/6 a.m Tr. 4:2); Pl.'s Ex. 4.

14. On October 19, 2005, van Bilsen discussed with Khairallah
    IFC's negotiations to sell the MECG shares to Osseiran.  Van
    Bilsen confirmed[4] to Khairallah that IFC had received an
    offer from Osseiran and was negotiating with Osseiran.  Van
    Bilsen Test., 5/1 p.m. Tr. 11:9-12:13; van Bilsen Test.,

---

[4] At trial, van Bilsen initially stated that Khairallah
raised the subject of IFC's negotiations with van Bilsen.  Van
Bilsen Test., 5/1 p.m. Tr. 11:9-16.  But when asked whether he
had said during his deposition testimony that he mentioned the
negotiations to Khairallah, Pl.'s Ex. 134, van Bilsen Dep. 9/2/09
at 27:15-19 (5/3 a.m. Tr. 40:18-21), van Bilsen responded that he
could not remember who raised the issue of negotiations, van
Bilsen Test., 5/1 p.m. Tr. 12:5-13.  Van Bilsen later testified
that in his conversation with Khairallah on October 19, 2005,
Khairallah said he knew about Osseiran's offer to buy IFC's
shares.  Khairallah did not confirm at trial, though, that he had
been aware of an offer before that conversation occurred.  See
Khairallah Test., 5/2 p.m. Tr. 66:22-24, 67:22-68:2.

- 9 -

5/3 p.m. Tr. 25:11-23; Pl.'s Ex. 134, van Bilsen Dep. 9/2/09
at 27:15-28:2 (5/3 a.m. Tr. 40:18-24); <u>see</u> Pl.'s Ex. 24.

15. On November 11, 2005, van Bilsen told Khairallah that IFC
was seriously considering Osseiran's offer, and that
although IFC had been keeping its options open regarding its
MECG shares, it was inclined to accept Osseiran's offer.
Khairallah had not been aware of the extent of the
negotiations or IFC's intention to proceed to sell to
Osseiran.  Van Bilsen Test., 5/1 p.m. Tr. 21:21-22:5; Pl.'s
Exs. 37, 40; <u>see</u> Khairallah Test., 5/2 p.m. Tr. 67:22-68:2;
Khairallah Test., 5/3 p.m. 52:4-15.

16. The parties agreed on the terms of the purchase and Osseiran
sent an e-mail to van Bilsen on November 18, 2005 purporting
to "confirm" the purchase agreement.  Pl.'s Ex. 43 at 118;
Osseiran Test., 5/2 a.m. Tr. 64:21-65:1.  Van Bilsen
responded the same day asking Osseiran to "confirm" that
Osseiran "accept[ed] that [IFC's] acceptance is subject to
documentation -- meaning separate sales agreements," along
with additional bank guarantees.  Van Bilsen's e-mail also
asked for confirmation of Osseiran's understanding that the
"sales agreements come into force and affect [sic]" only
after execution of the agreements and receipt of the
guarantees.  Pl.'s Ex. 43 at 116; <u>see</u> Osseiran Test., 5/2
a.m. Tr. 65:2-10.

17.  In a November 19, 2005 response to van Bilsen, Osseiran
expressly accepted these conditions.  Pl.'s Ex. 43 at 119;
Osseiran Test., 5/2 a.m. Tr. 67:7-15.

18.  Van Bilsen informed Khairallah that IFC was accepting
Osseiran's offer.  Khairallah then resigned from the MECG
board on November 23, 2005 via email to Chairman of the MECG
Board Khalid Al Turki and MECG CEO Walid Musallam.  Pl.'s
Exs. 48, 51; Def.'s Ex. 11; van Bilsen Test., 5/1 p.m.
41:25-43:6; Khairallah Test., 5/2 p.m. Tr. 73:14-74:5, 75:1-
4; Khairallah Test., 5/3 p.m. Tr. 43:14-44:7.

19.  On the same day, Al Turki and Musallam asked Osseiran
whether Osseiran had bought MECG shares from IFC and
Barclays and he responded that "there is no agreement."
Osseiran Test., 5/2 a.m. Tr. 72:3-18.

20.  At a December 5, 2005 MECG board meeting, Al Turki asked
Osseiran again about whether he had bought MECG shares from
IFC and Barclays, and Osseiran confirmed the impending sale.
Osseiran Test., 5/2 a.m. Tr. 82:12-21; <u>see</u> Def.'s Ex. 19 at
1391.

21.  IFC officials informed Osseiran via a telephone call on
December 19, 2005 that IFC had decided to suspend its sale
of IFC shares to Osseiran.  Osseiran Test., 5/2 a.m.
Tr. 88:14-20; van Bilsen Test., 5/1 p.m. Tr. 86:18-87:1;
Pl.'s Ex. 87.

- 11 -

22. Thereafter, Osseiran entered agreements to purchase MECG shares from other shareholders. Osseiran Test. 5/2 a.m. Tr. 94:4-99:20; Def.'s Ex. 72, Stipulation No. 4; see Def.'s Ex. 59 at 4.

23. Osseiran and IFC never finalized or executed a sales agreement and IFC never sent Osseiran a signed stock transfer form, which was necessary to complete a sale of IFC's MECG shares. Van Bilsen Test., 5/1 p.m. Tr. 77:15-25; Pl.'s Exs. 78-79; van Bilsen Test., 5/2 a.m. Tr. 28:12-29:2.

24. The parties never received the bank guarantees necessary to complete the sale. Van Bilsen Test., 5/1 p.m. Tr. 79:4-80:2; Pl.'s Ex. 81; van Bilsen Test., 5/2 a.m. Tr. 29:3-24; Pl.'s Ex. 134, van Bilsen Dep. 9/2/09 at 46:15-49:12, 50:20-51:5 (5/3 a.m. Tr. 49:3-50:23, 51:16-21); van Bilsen Test., 5/3 a.m. Tr. 120:13-121:3.

25. Osseiran eventually sold the other MECG shares he purchased at a higher price than he paid to obtain them. Osseiran Test., 5/2 a.m. Tr. 120:1-9.

<u>CONCLUSIONS OF LAW</u>

26. Osseiran's amended complaint alleges that IFC breached a confidentiality agreement with Osseiran by divulging Osseiran's potential share purchase to an unauthorized party. Am. Compl. ¶¶ 47-48. "To prevail on a claim of breach of contract, a party must establish (1) a valid

- 12 -

contract between the parties; (2) an obligation or duty
arising out of the contract; (3) a breach of that duty; and
(4) damages caused by [that] breach." <u>Tsintolas Realty Co.
v. Mendez</u>, 984 A.2d 181, 187 (D.C. 2009).

27. To establish an enforceable agreement under District of
Columbia law, the parties both must (1) agree on all
material terms and (2) intend to be bound. <u>Steven R.
Perles, P.C. v. Kagy</u>, 473 F.3d 1244, 1249 (D.C. Cir. 2007);
<u>Kramer Assocs., Inc. v. Ikam, Ltd.</u>, 888 A.2d 247, 251 (D.C.
2005). "Unless the statute of frauds requires otherwise in
a particular case, the contract need not be written;
'parties may be bound by their oral agreement if it meets
the dual requirements of intent and completeness.'" <u>Kramer</u>,
888 A.2d at 252 (citing <u>Jack Baker, Inc. v. Office Space
Dev't Corp.</u>, 664 A.2d 1236, 1238 (D.C. 1995)).

28. In addition, "an express contract requires an offer and an
acceptance, and must be supported by consideration."
<u>Ghahremani v. Uptown Partners, LLC</u>, Civil Action No. 05-1270
(CKK), 2005 WL 3211463, at *16 (D.D.C. Nov. 13, 2005). The
party asserting the existence of the contract bears the
burden of proof. <u>Jack Baker</u>, 664 A.2d at 1238.

29. "'[W]here a plaintiff proves a breach of a contractual duty
he is entitled to damages; however, when he offers no proof
of actual damages or the proof is vague and speculative, he

- 13 -

is entitled to no more than nominal damages.'"  <u>Cahn v. Antioch Univ.</u>, 482 A.2d 120, 130 (D.C. 1984) (quoting <u>Roth v. Speck</u>, 126 A.2d 153, 155 (D.C. 1956)); <u>see also</u> <u>Garcia v. Llerena</u>, 599 A.2d 1138, 1142 (D.C. 1991).  An appropriate amount for nominal damages is one dollar.  <u>See</u> <u>FCE Benefit Adm'rs, Inc. v. George Washington Univ.</u>, 209 F. Supp. 2d 232, 243 (D.D.C. 2002) (citing <u>Patel v. Howard Univ.</u>, 896 F. Supp. 199, 205 (D.D.C. 1995); <u>Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop. Ass'n</u>, 441 A.2d 956, 961 (D.C. 1982)).

I.   VALID CONTRACT

30.  Osseiran demonstrated by a preponderance of the evidence that a valid contract existed.  The parties agreed on the material terms and their actions reflected an intent to be bound.  It is not disputed that Osseiran offered to negotiate to purchase IFC's MECG stock as long as van Bilsen agreed to keep the negotiations confidential, and that van Bilsen agreed in a telephone conversation on September 5, 2005.  <u>See</u> <u>supra</u> ¶¶ 10-11.

31.  The parties' statements and actions after that phone call reflected their understanding that the agreement prohibited divulging to individuals who were not included in the negotiations that negotiations over IFC's MECG shares were underway.  In particular, van Bilsen's September 5 email to

- 14 -

Cherif emphasizing confidentiality for the negotiations with Osseiran is strong evidence that van Bilsen understood Osseiran's expectations and intended to be bound by the confidentiality agreement.  See supra ¶ 12.  Van Bilsen acknowledged that "Osseiran stressed confidentiality" and stated that IFC would "treat it accordingly[.]"  Id.  In addition, van Bilsen concluded the September 5 email reiterating to Cherif that he should "[k]eep it confidential."  Id.  Internal IFC communications confirm that IFC employees regarded the negotiations with Osseiran as confidential.  See Pl.'s Ex. 5; Pl.'s Ex. 11 at 1586.  The oral communications between van Bilsen and Osseiran and the internal communications reflecting IFC's intention to maintain confidentiality during negotiations show by a preponderance of the evidence that a valid confidentiality agreement existed between the parties.

32.  Contrary to the defendant's argument, there was consideration exchanged between the parties for this agreement.  District of Columbia courts "'will not inquire into the adequacy of' consideration, even where it is 'arguably slight,' as long as it is 'legally sufficient.'" Wash. Inv. Partners of Del., LLC v. Sec. House, K.S.C.C., 28 A.3d 566, 574 (D.C. 2011) (quoting Riggs v. Aetna Ins. Co., 454 A.2d 818, 821 (D.C. 1983)).  "'An exchange of promises'

- 15 -

. . . constitutes legally sufficient consideration, 'so long as it is bargained-for.'" Id. at 574-75 (quoting Pearsall v. Alexander, 572 A.2d 113, 118 (D.C. 1990)).  An exchange of promises suffices so long as "[e]ach party undertook to do something it would otherwise have no legal obligation to do."  Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P., 940 A.2d 996, 1004 (D.C. 2008).

33. Here, the parties exchanged promises of confidentiality and agreed to engage in potentially mutually beneficial negotiations that neither was legally obligated to undertake.  Although IFC wanted a buyer for its MECG shares, it was not required to negotiate with Osseiran, especially if it had not been satisfied that he was a serious suitor. It did, though, agree to negotiate.  Osseiran wanted IFC's shares but was not required to make any offer to buy them. He did agree, though, to negotiate for a purchase in exchange for the promise of confidentiality.  Because the exchange of promises here was adequately bargained for, the confidentiality agreement was supported by consideration.

34. Thus, the preponderance of the evidence showed that a valid contract existed to maintain confidentiality during negotiations over selling IFC's MECG shares to Osseiran.

The terms were clear, the parties intended to be bound, and
they exchanged consideration.[5]

II.  OBLIGATIONS ARISING FROM CONTRACT

35.  The preponderance of the evidence showed that the parties
     agreed not to disclose to individuals who were not involved
     with the negotiations, including Khairallah, that the
     negotiations were occurring.  Van Bilsen's communications
     with IFC employees during the negotiations reflected that
     Khairallah should not be informed about the negotiations
     with Osseiran.  See supra ¶ 10.

36.  It was also more likely than not that the parties had an
     obligation to not disclose the sale negotiations to third
     parties until the sale closed.  Osseiran's testimony
     reflected his understanding that confidentiality should be
     maintained until the sale was completed.  See supra ¶ 10.
     Van Bilsen's agreement with Osseiran that IFC would treat

---

[5] At trial, IFC argued that IFC never gave van Bilsen the
authority to enter into a confidentiality agreement and that all
IFC confidentiality agreements must be in writing.  Van Bilsen
testified that written confidentiality agreements must be
approved by his supervisors, that IFC rarely entered
confidentiality agreements, and that he had not "experienced"
written confidentiality agreements.  Van Bilsen Test., 5/3 a.m.
Tr. 114:20-116:5.  But there was no evidence that Van Bilsen was
barred from entering into an oral confidentiality agreement or
that an oral confidentiality agreement had to be approved by his
supervisors.  In fact, van Bilsen explained on cross-examination
that he had entered into oral agreements to keep negotiations
confidential on multiple earlier occasions.  Van Bilsen Test.,
5/3 p.m. Tr. 21:5-22:9.  And, Osseiran could reasonably rely upon
van Bilsen's apparent authority to do so here.

- 17 -

the negotiations in a confidential manner and van Bilsen's
statement to his colleagues that IFC should "maintain[]
confidentiality" comports with that understanding.  <u>See</u>
<u>supra</u> ¶ 11.  Thus, the parties had an obligation to not
disclose the negotiations to individuals who were not
involved, including Khairallah, until the sale closed.

III. BREACH

37. Osseiran proved by a preponderance of the evidence that IFC
breached the confidentiality agreement when van Bilsen
confirmed to Khairallah on October 19, 2005 that IFC was
negotiating with Osseiran.  <u>See</u> <u>supra</u> ¶ 14.

38. Whether van Bilsen or Khairallah raised the issue of the
negotiations first, van Bilsen was under an existing
obligation to maintain in confidence that the negotiations
were underway.  Either by raising it first or by confirming
the existence of negotiations to Khairallah, van Bilsen
breached the confidentiality agreement by disclosing to a
third party who was not involved in the negotiations that
IFC was negotiating with Osseiran.  Van Bilsen violated the
agreement again when he disclosed to Khairallah on
November 11, 2005 more information about the ongoing
negotiations, namely, that IFC was seriously considering
Osseiran's offer.  <u>See</u> <u>supra</u> ¶ 15.

- 18 -

39. IFC maintained in its closing argument that Osseiran had to

   prove that IFC was the first to disclose the negotiations.

   Def.'s Closing Arg., 5/6 p.m. 9:2-5. But IFC offered no

   authority for the proposition that the duty to maintain

   confidentiality expires when a party to the agreement hears

   partial contents of the confidence disclosed to him or her

   from a third party.[6] Thus, Osseiran showed that van

---

[6] IFC conceded this deficit in its closing argument.
Defense Closing Arg., 5/6 p.m. Tr. 10:5-13:8. However, in IFC's
post-trial proposed conclusions of law, IFC cites Tsintolas as
supporting the proposition that the public availability of
confidential information discharges a party's obligation in a
confidentiality agreement. In that landlord-tenant case, a
settlement agreement containing a provision sponsored by the
landlord that required the parties to keep the terms of the
agreement confidential was filed in the Superior Court's case
jacket on the public record and read aloud in open court.
Tsintolas, 984 A.2d at 184, 186. Neither the landlord nor any
other party moved then or in the months that followed to seal the
agreement or the case file. Id. at 184-85. When the tenants
later filed on the public docket a motion to enforce the
settlement agreement and attached a copy of the agreement to the
motion, the landlord argued that the tenants materially breached
the confidentiality provision by making the settlement agreement
available to the public. Id. at 185-86. The D.C. Court of
Appeals stated that "the presence of the agreement in the
Superior Court's case file resulted as much from the landlord's
apparent carelessness and passivity as from the tenants' arguably
improvident disclosure of it in connection with their filing of
the motion to enforce." Id. at 186. The Tsintolas court found
that the tenants' filing did not materially breach the agreement
because nothing changed, as the subject of the confidentiality
provision -- the settlement agreement -- was always available to
the public.
    The circumstances leading to the court's disposition in
Tsintolas are far afield from those present in this case. The
evidence here reflects no carelessness or passivity by Osseiran,
the sponsor of the confidentiality requirement, before van Bilsen
disclosed to Khairallah the confidential negotiations. To the
contrary, Osseiran's insistence upon confidentiality up through

- 19 -

Bilsen breached the confidentiality agreement.

40.   Osseiran did not sufficiently prove his other breach of the
      confidentiality agreement theories.  Osseiran claimed that
      Khairallah breached the confidentiality agreement in
      November 2005 by disclosing the negotiations to Al Turki and
      Musallam.[7]  Pl.'s Closing Arg., 5/6 a.m. Tr. 17:18-22, 19:8-
      21.  Khairallah credibly denied doing so.  See Khairallah
      Test., 5/3 p.m. Tr. 44:8-19, 45:2-4; Pl.'s Ex. 136,
      Khairallah Dep. 8/12/09 at 35:3-22 (5/3 a.m. Tr. 86:3-17).
      There was no exhibit or testimonial evidence that impeached
      or undercut his claim that he did not reveal any
      negotiations at that time.

41.   Osseiran also claimed that Khairallah gave a copy of IFC's
      internal sales memo to Al Turki or Musallam.  See Pl.'s

_____

that point had been firm and unwavering.  Further, every detail
of the Tsintolas agreement was available to the public at large
the very day the settlement was revealed in court.  By contrast,
Khairallah disclaimed knowing of any offer by Osseiran when van
Bilsen told Khairallah on October 19, 2005, that IFC was
negotiating with Osseiran over IFC's MECG shares.  Nor did
Khairallah appear to know, before van Bilsen disclosed to him on
November 11, 2005, that IFC was seriously considering Osseiran's
offer, or that IFC's posture was changing from keeping its
options open to being inclined to accept Osseiran's offer.
Tsintolas does not absolve IFC of having had an obligation of
confidentiality up through November of 2005.


   [7] It is a bit odd for Osseiran to assert that the very man
he insisted that no one inform about the negotiations could be
deemed to be bound by the confidentiality obligation over
negotiations from which he was excluded.

- 20 -

Closing Arg., 5/6 a.m. Tr. 19:8-21.  Khairallah testified

that he did not see and was not aware of the IFC internal

sales memorandum at the time.  Khairallah Test., 5/2 p.m.

66:14-67:10; Khairallah Test., 5/3 p.m. 49:11-24.

Khairallah's testimony was credible and unimpeached.  And,

there was no evidence presented that Khairallah had access

to or possession of a copy of the internal sales memo to

disclose to third parties, or that Khairallah did provide a

copy of the internal sales memo to a third party.  Thus,

Osseiran has not shown that Khairallah disclosed

negotiations by informing Al Turki or Musallam or by

disclosing a copy of IFC's internal sales memo.

42.  Osseiran further claimed that someone at IFC gave a copy of

the internal sales memo to Al Turki or Musallam.  Pl.'s

Closing Arg., 5/6 a.m. Tr. 17:23-18:3.  However, Osseiran

did not carry his burden to prove that assertion.  Osseiran

did not provide any direct evidence that Al Turki or

Musallam saw a copy of the internal sales memo and Osseiran

did not call them as witnesses.[8]  Nor did he otherwise show

---

[8] The only record evidence provided by Osseiran to support
the claim that someone at IFC disclosed the internal memo was IFC
officer Carmen Genovese's emails and testimony stating that Al
Turki and Musallam said they saw the internal memo.  Pl.'s Ex. 89
at 1531 ("IFC was also criticized several times with Al Turki and
Walid noted they had both seen an IFC internal document approving
a sale to Osseiran."); Pl.'s Ex. 90 at 2118 (same); Carmen
Genovese Test. 5/3 a.m. Tr. 7:2-7, 22-24; Carmen Genovese Test.
5/3 p.m. Tr. 107:10-13.  This hearsay is accorded little weight.

that IFC disclosed the memo to a third party.  The

allegation amounts to pure speculation.[9]

IV.  DAMAGES

43.  Osseiran asserted multiple theories for damages.  These

theories ranged from Osseiran losing likely discounts for

buying the remaining shares after he had secured a majority

interest, to Osseiran losing the opportunity to gain control

of MECG, revive the failing business, and sell his MECG

shares for a much larger profit.  <u>See</u> Am. Compl. ¶ 49; Pl.'s

Opening Stmt., 5/1 a.m. Tr. 11:8-17; Pl.'s Closing Arg., 5/6

a.m. 38:24-40:12; Osseiran Test., 5/2 a.m. Tr. 111:22-

112:15.  Any measure of damages used would have to follow

proof that the damages were caused by IFC's breach of the

confidentiality agreement.

44.  One hurdle Osseiran did not overcome is that both he[10] and

IFC breached the agreement, and he has not shown that IFC's

breach is any more likely than his own to have caused any

claimed damages.  Specifically, Osseiran has not shown how

any damages, based on either increased share prices or lost

---

[9] Even if the sales memorandum was disclosed to a third
party or parties, Osseiran has not carried his burden to show
that the disclosure was a product of a breach of the
confidentiality agreement by IFC, nor has he disproven any of the
myriad other ways the disclosure could have occurred involving
parties other than IFC.

[10] Osseiran disclosed the impending sale during the
December 5, 2005 board meeting.  <u>See</u> <u>supra</u> ¶ 20.

- 22 -

share sale profits, were caused by van Bilsen disclosing negotiations to Khairallah rather than Osseiran's own disclosure to the MECG board.  Osseiran's own breach in December would seem at least to weaken his claim for damages arising from IFC's breach in October.

45.  Nonetheless, it is undisputed that the sale that was the aim of the negotiations required bank guarantees and the parties never received the bank guarantees required to close the sale.  See supra ¶¶ 16, 17, 24.  Osseiran did not establish by a preponderance of the evidence that any breach by IFC was responsible for the parties not securing the required bank guarantees.  See supra ¶ 24.  Osseiran conceded in closing argument that the record is bare as to why the bank guarantees were not issued.  Pl.'s Closing Arg., 5/6 a.m. Tr. 37:4-9.

46.  Osseiran failed to carry his burden of proof that IFC's breach of the confidentiality agreement caused damages. However, Osseiran's proof that IFC committed a breach entitles him to nominal damages of one dollar.

## CONCLUSION

Osseiran showed by a preponderance of the evidence that IFC breached the confidentiality agreement.  Osseiran failed to carry his burden of proving that IFC's breach of the confidentiality agreement caused any damages.  Thus, judgment in the amount of $1

- 23 -

will be entered for Osseiran.  A final judgment accompanies this

Memorandum Opinion.

SIGNED this 24th day of June, 2013.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge